United States District Court
Middle District of Florida
Orlando Division

Matthew Larosiere,
                    Plaintiff,

v.

Cody Rutledge Wilson, DEFCAD, Inc.,
Defense Distributed, and Dioskouroi LLC,
                    Defendants.

_____                    No.  6:24-cv-1629

Defense Distributed,
                    Counterplaintiff,

v.

The Gatalog, Matthew Larosiere,
John Elik, Alexander Holladay, Peter
Celentano, Josh Kiel Stroke, John Lettman,
The Gatalog Foundation, and MAF Corp,
                    Counterdefendants.

_____

**Counterclaims & Answer**

## Table of Contents

Counterclaims.................................................................................................5

I.      Summary ............................................................................................5

II.     Parties ...............................................................................................8

        A.      Counterplaintiff Defense Distributed. ...................................8

        B.      Counterdefendants ...............................................................9

                1.      The Gatalog ...............................................................9

                2.      Matthew Larosiere ..................................................10

                3.      John Elik. ................................................................11

                4.      Alexander Holladay. ...............................................12

                5.      Peter Celentano.......................................................12

                6.      Josh Kiel Stroke......................................................13

                7.      John Lettman. .........................................................14

                8.      The Gatalog Foundation. ........................................15

                9.      MAF Corp. ...............................................................16

III.    Subject Matter Jurisdiction ..............................................................17

IV.     Venue ..............................................................................................17

V.      Facts................................................................................................18

        A.      DEFCAD makes digital firearms information available legally.........18

B.      DEFCAD worked with Elik and Holladay before The Gatalog. ........ 21

C.      Defense Distributed Re-Launches its Website in March 2020 ........ 23

D.      Elik and Holladay request financial partnership............................... 24

E.      Elik and Holladay disparage DEFCAD and demand money .......... 25

F.      The Counterdefendants begin coordinating their activities............. 28

G.      *Everytown* Litigation and Peter Celentano/Freeman1337 .............. 34

H.      Business Disparagement Ensues.................................................... 36

I.      Business Disparagement Escalates to Tortious Interference.......... 40

J.      The Counterdefendants failed to preserve records. ....................... 45

K.      The Counterdefendants Launched ongoing DDoS attacks. ........... 47

L.      Attribution & Agency ...................................................................... 51

     1.      Joint and several liability........................................................ 51

     2.      Single Business Enterprise..................................................... 51

     3.      Civil Conspiracy. ................................................................... 52

     4.      Agency and Alter Ego. .......................................................... 53

M.      Damages & Irreparable Harm......................................................... 54

VI.      Causes of Action .................................................................................... 56

A.      Counterclaim One: Civil RICO....................................................... 56

     1.      Predicate Racketeering: Wire Fraud ..................................... 58

      2.     Predicate Racketeering: Extortion ..........................................61

      3.     Predicate Racketeering: Money Laundering .........................64

      4.     Predicate Racketeering: Obstruction of Justice....................66

      5.     Predicate Racketeering: CFAA.............................................69

      6.     Predicate Racketeering: Threat of murder. ..........................71

   B.    Counterclaim Two: Lanham Act .......................................................75

   C.    Counterclaim Three: Computer Fraud and Abuse Act ...................79

   D.    Counterclaim Four: Digital Millennium Copyright Act .....................81

   E.    Counterclaim Five: Tortious Interference ........................................83

   F.    Counterclaim Six: Trade Libel .........................................................86

   G.    Counterclaim Seven: Florida DUTPA. .............................................88

   H.    Counterclaim Eight: Spoliation. .......................................................92

VII.   Prayer for Relief...................................................................................93

Answer.........................................................................................................95

I.      Denials & Admissions...................................................................95

II.     Defenses. ...................................................................................105

III.    Attorney's Fees & Costs. ...........................................................106

IV.    Prayer for Relief.........................................................................108

## Counterclaims

Defense Distributed pleads these counterclaims against The Gatalog, Matthew Larosiere, John Elik, Alexander Holladay, Peter Celentano, Josh Stroke, John Lettman, The Gatalog Foundation, and MAF Corp.

## I.    Summary

1.    Defense Distributed exists to promote and expand the Second Amendment's individual right to keep and bear Arms, both functionally and legally. To that end, Defense Distributed generates and distributes innovative digital firearms information to the American public under public and open source licenses. Its pioneering work drives the field's technical and legal advancements, and it provides business and content platforms that assist developers in achieving independence.

2.    Federal law regulates this constitutional industry severely.  Foremost here is the United States Department of Commerce's "EAR" regime—a system of "Export Administration Regulations" administered by Commerce's Bureau of Industry and Security pursuant to the Arms Export Control Act of 1976.  *See* 15 C.F.R. §§ 731-774.1.  In 15 C.F.R. § 734.7(c), the Commerce Department's EAR regime restricts the distribution of commonly-used digital firearms information (file types like "AMF or G-code" that are "'ready for insertion" into manufacturing machines) by imposing a licensing system that limits both who can receive such files and how.  15 C.F.R. §§ 734.3(d), 734.7(c).  In essence, this EAR regime makes the unrestricted online publication of such files highly illegal.

3.      Defense Distributed does not *want* to comply with EAR restrictions. On the contrary, Defense Distributed has for most of its existence been actively litigating to have the EAR and regimes like it held unconstitutional.  But until these challenges succeed, Defense Distributed has no choice but to comply with the law courts opt to impose (and not an inch more).  In particular, Defense Distributed complies with the EAR's restrictive system by implementing technical safeguards ensuring satisfaction of the § 734.7(c) limits on who can receive this information and how it is received.  Though compliance is highly burdensome, Defense Distributed bites the bullet to maintain the United States' only legal web portal, search engine, and development hub for regulated digital firearms information.

4.      "The Gatalog" is a criminal enterprise organized in express opposition to this.  It profits by dealing illegally in the same digital firearms information that Defense Distributed handles legally.  Led by a disgruntled former employee and opponents of Defense Distributed, The Gatalog publishes files governed by the EAR (and a similar State Department regime, the ITAR), by giving anyone in the world unlimited access—an obvious violation of the federal regime courts uphold.

5.      The Gatalog enterprise is a black-market operator in the worst sense, achieving its illegal ends with dangerously illegal means of criminal wire fraud, money laundering, extortion, and even threatened murder: "you realize there's a bounty on your head, right?"  In this way, The Gatalog's disgruntled principals are stealing business from Defense Distributed—the only firm serious enough to do

the work legally—and distorting an otherwise thriving and compliance market in digital firearms information.

6.      To further injure Defense Distributed, The Gatalog's members have acted in concert to destroy Defense Distributed's market reputation by spreading false, defamatory rumors that Defense Distributed's website, DEFCAD, has been hacked and is "in league" with federal government officials. The Gatalog also tortiously interfered with Defense Distributed's business relationships by harassing, threatening, and lying to its customers and partner contributors.

7.      Past financial harms are substantial and many are irreparable.  Lost profits will soon cross from high six figures into millions.  Intangible losses like damaged business reputation are of equally high value. And because this illegal enterprise goes on unabated, irreparable harms continue to mount every day.

8.      It's difficult enough already for Defense Distributed to do the right thing and lead its industry by following existing law until reform is achieved the right way. For The Gatalog to undercut all of that with the wrongdoing at issue here is not just economically foolish and legally criminal, it is a massively counterproductive disservice to the "community" they purport to serve.

9.      No one knows for sure what The Gatalog's next worst illegal deed will be.  Maybe it will be another illegal export of federally-controlled firearms technical data to a foreign adversary.  Maybe it will be more threats of violence and murder. Hence this action's counterclaims, which seek not just to compensate Defense

Distributed for all of The Gatalog's past harms, but to put a definitive end to this illegal racketeering enterprise for good.

## II.   Parties

### A.   Counterplaintiff Defense Distributed.

10.   Counterplaintiff Defense Distributed is a private business corporation organized under the laws of the State of Texas.  Its headquarters and principal place of business are now and at all relevant times have been in Austin, Texas.

11.   Defcad, Inc. is a private business corporation organized under the laws of the State of Texas.  Its headquarters and principal place of business are now and at all relevant times in the past have been in Austin, Texas.  Defcad, Inc. is a subsidiary of Defense Distributed.

12.   Defense Distributed counterclaims on its own behalf and on behalf of Defcad, Inc.  At all times relevant to this action, Defense Distributed and Defcad, Inc. constituted fully distinct legal persons with separate legal rights and obligations.  But solely with respect to the assertion of this action's counterclaims and without prejudice to the rights and obligations of any other context, Defense Distributed counterclaims on its own behalf and on behalf of Defcad, Inc. because the two entities operated as a single integrated business enterprise that suffered collective injuries harming all their shared economic interests.  Defense Distributed and Defcad, Inc. expressly reserve and do not waive their rights to assert their distinct corporate identities in other legal or regulatory contexts, including but not limited to matters of taxation and corporate governance.

**B.    Counterdefendants**

13.    The Counterdefendants are The Gatalog, Matthew Larosiere, John Elik, Alexander Holladay, Peter Celentano, Josh Kiel Stroke, John Lettman, The Gatalog Foundation, and MAF Corp.

### 1.    The Gatalog

14.    The Gatalog is an unincorporated association with the capacity to be sued under the laws of the State of Florida.  Its principal place of business is Florida, where it can be reached for service of process.

15.    The Gatalog's members associate for the purpose of opposing DEFCAD by commercially developing and publishing 3D printable and other CAD models regarding firearms without restriction on Odysee.com and other channels, in violation of 15 CFR 734.7(c).

16.    The Gatalog maintains a website at thegatalog.com.

17.    The "Gatalog" constitutes an "enterprise" as defined in 18 U.S.C. § 1961(4), which includes any individual, partnership, corporation, association, or other legal entity, or any group of individuals associated in fact, although not a legal entity.

18.    This Court has personal jurisdiction over The Gatalog.  General personal jurisdiction exists because The Gatalog resides and is domiciled in the State of Florida.  Specific personal jurisdiction exists because this action arises out of and relates to conduct by which The Gatalog purposefully availed itself of the privilege of conducting activities within the State of Florida.

###### 2.      Matthew Larosiere

19.      Counterdefendant Matthew Larosiere is an individual resident of the State of Florida.  He can be reached for service of process at his residence.

20.      Larosiere sometimes goes by the alias "Fuddbuster."

21.      Larosiere is an attorney that practices law as a member of the bar of the State of Florida.

22.      Larosiere is responsible for the conduct of the "Gatalog" enterprise because he is now and was at all material times one of its principal leaders. He is currently a director of The Gatalog Foundation and was at material times in the past.  He is currently a director of MAF Corp. and was at material times in the past. He is an employer, partner, and alter ego of John Elik.  He "has the pleasure of representing The Gatalog and The Gatalog Foundation in all matters related to intellectual property."[1]   He is an administrator of The Gatalog enterprise's chat service and has administrative access to its Odysee pages, where he facilitates and oversees the unrestricted exchange of technical data.

23.      This Court has personal jurisdiction over Larosiere.  General personal jurisdiction exists because he resides in the State of Florida.  Specific personal jurisdiction exists because this action arises out of and relates to conduct by which

---

[1] Declaration of Erin Galloway in Opposition to Defendants' Motion to Dismiss and Refuting Certain Statements Made in Defendants' Declarations, Doc. 126 at 4, ¶ 17 *Everytown for Gun Safety Action Fund, Inc. v. DEFCAD, Inc. et al*, No. 21-cv-08704-PGG (S.D.N.Y).

Larosiere purposefully availed himself of the privilege of conducting activities within the State of Florida.

### 3. John Elik.

24.    Counterdefendant John Elik is an individual resident of the State of Illinois.  He can be reached for service of process at his residence.

25.    Elik sometimes goes by the alias "Ivan the Troll" and/or the alias "NaviGoBoom."

26.    Elik is a former employee of Defense Distributed.

27.    Elik is responsible for the conduct of the "Gatalog" enterprise because he is now and was at key material times in the past one of its principal leaders.  He is a director of The Gatalog Foundation. He is Matthew Larosiere's employee, business partner, alter ego, and was recently exposed by *The New York Times* for having violated the federal export laws at issue in this case. He is an administrator of The Gatalog enterprise's chat service and has administrative access to its Odysee page, where he directs, facilitates and oversees the unrestricted exchange of technical data.

28.    This Court has personal jurisdiction over Elik.  Specific personal jurisdiction exists because this action arises out of and relates to conduct by which Elik purposefully availed himself of the privilege of conducting activities within the State of Florida.

### 4.    Alexander Holladay.

30.    Counterdefendant Alexander Holladay is an individual resident of the State of Florida. He can be reached for service of process at his residence.

31.    Holladay is responsible for the conduct of the "Gatalog" enterprise because he is now and was at key material times in the past one of its principal leaders.  Holladay is a director of The Gatalog Foundation and MAF Corp. He is an employee of and partner of Larosiere and Elik.  Holladay owns [thegatalog.com](thegatalog.com) website. Holladay is an administrator of The Gatalog enterprise's chat service and has administrative access to its Odysee page, where he facilitates and oversees the unrestricted exchange of technical data. In addition, he manages the enterprise's business communications, product fulfillment, and money transmitting.

32.    This Court has personal jurisdiction over Holladay.  General personal jurisdiction exists because he resides in the State of Florida.  Specific personal jurisdiction exists because this action arises out of and relates to conduct by which Holliday purposefully availed himself of the privilege of conducting activities within the State of Florida.

### 5.    Peter Celentano.

33.    Counterdefendant Peter Celentano is an individual resident of the State of New York.  He can be reached for service of process at the Niagara County Jail.

34.     Celentano is responsible for the conduct of the "Gatalog" enterprise because he is now and was at key material times in the past one of its principal administrators.  He is compensated by MAF Corp. and was an administrator of The Gatalog, with access to its chat and direct message histories. For years, he administered the "beta rooms" of many Gatalog projects, where he facilitated and oversaw the unrestricted exchange of technical data, especially that of projects of foreign developers, in violation of federal export law and in furtherance of the enterprise. Celentano's role is still advertised at chat.deterrencedispensed.com, a subdomain of The Gatalog web page. Celentano was recently arrested for Federal firearms offenses and is being detained without bond in the Western District of New York.

35.     This Court has personal jurisdiction over Celentano.   Specific personal jurisdiction exists because this action arises out of and relates to conduct by which Celentano purposefully availed himself of the privilege of conducting activities within the State of Florida.

### 6.     Josh Kiel Stroke.

36.     Counterdefendant Josh Stroke is an individual resident of the State of Arizona. He can be reached for service of process at his residence.

37.     Stroke is responsible for the conduct of the "Gatalog" enterprise because he is now and was at key material times in the past one of its principal leaders.  He is an agent of MAF Corp. and has acted as The Gatalog enterprise's "Chief of Propaganda" since 2022.  He promotes The Gatalog's illegal enterprise

on social media, and regularly engages in trade libel, false advertising and tortious interference against DEFCAD on behalf of the enterprise. Mr. Stroke's harassment of DEFCAD and its employees is so frequent and so violent that DEFCAD had to secure a workplace harassment injunction against him in Arizona's Maricopa County Superior Court, which he is still violating.

38.     This Court has personal jurisdiction over Stroke.  Specific personal jurisdiction exists because this action arises out of and relates to conduct by which Stroke purposefully availed himself of the privilege of conducting activities within the State of Florida.

### 7.     John Lettman.

39.     Counterdefendant John Lettman is an individual resident of the Commonwealth of Pennsylvania.  He can be reached or service of process at his residence.  *See* 18 U.S.C. § 1965(b).

40.     Lettman sometimes goes by the aliases "Jnyboy" and/or "JnyTheHuman."

41.     Lettman is responsible for the conduct of the "Gatalog" enterprise because he is now and was at key material times in the past one of its principal leaders.  A partner of Counterdefendant Holladay, Counterdefendant Lettman is The Gatalog enterprise's IT Director, and a systems administrator since at least 2022. Lettman worked closely with Counterdefendant Celentano until Celentano's arrest and maintains access to The Gatalog's complete chat and direct message histories. For years, he has facilitated and overseen the unrestricted exchange of

technical data, especially that of projects of foreign developers, which are in violation of federal export law and in furtherance of the enterprise. Mr. Lettman executes and organizes cyberattacks against the DEFCAD platform under the direction of Counterdefendants Elik and Larosiere in violation of Title 18, United States Code, Section 1030(a)(5)(A).

42.    This Court has personal jurisdiction over Lettman.  Specific personal jurisdiction exists because this action arises out of and relates to conduct by which Lettman purposefully availed himself of the privilege of conducting activities within the State of Florida.

### 8.    The Gatalog Foundation.

43.    Counterdefendant The Gatalog Foundation is a nonprofit corporation organized under the laws of the State of Florida that maintains a principal place of business there.  Its primary agent is Matt Larosiere, 6824 Hanging Moss Rd., Orlando, FL 32807.  According to the Division of Corporations of the State of Florida, the Officers and Directors of The Gatalog Foundation are Counterdefendants Larosiere, Holladay and Elik. The Gatalog Foundation is responsible for the conduct of the "Gatalog" enterprise because it is now and was at key material times in the past one of its principal leaders.

44.    This Court has personal jurisdiction over The Gatalog Foundation. General personal jurisdiction exists because The Gatalog Foundation resides and is domiciled in the State of Florida.  Specific personal jurisdiction exists because this action arises out of and relates to conduct by which The Gatalog Foundation

purposefully availed itself of the privilege of conducting activities within the State of Florida.

### 9.    MAF Corp.

45.    Counterdefendant MAF Corp. is a corporation organized under the laws of the State of Florida that maintains a principal place of business there.  It can be reached for service of process at MAF Corp., C/O Alexander Holladay, 6824 Hanging Moss Rd., Orlando, FL 32807. Its Officers and Directors are Larosiere and Holladay.

46.    MAF Corp. maintains a website at maf-arms.com.  There, it monetizes the files illegally released by The Gatalog by selling their related parts kits and compensates the files' domestic and international developers with development incentives and royalties.   It tries to monopolize this practice through false advertising and fraudulent copyright applications.

47.    This Court has personal jurisdiction over MAF Corp.   General personal jurisdiction exists because MAF Corp. resides and is domiciled in the State of Florida.  Specific personal jurisdiction exists because this action arises out of and relates to conduct by which MAF Corp. purposefully availed itself of the privilege of conducting activities within the State of Florida.

### III.    Subject Matter Jurisdiction

48.    28 U.S.C. § 1331 supplies the Court with original federal question jurisdiction over this action because it arises under the laws of the United States.

49.    28 U.S.C. § 1332 supplies the Court with original diversity jurisdiction over this action because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

50.    28 U.S.C. § 1331 supplies the Court with original federal question jurisdiction over this action because its claims arise under federal laws, including both the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 et seq.) and Lanham Act.

51.    28 U.S.C. § 1367 supplies the Court with supplemental subject-matter jurisdiction over the action's state-law claims because the state-law claims are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. The action's state-law claims do not raise novel or complex issues of state law. The action's state-law claims do not substantially predominate over the claim or claims over which the district court has original jurisdiction.

### IV.    Venue

52.    This Court constitutes a proper venue for this action because it is brought under 18 U.S.C. § 1964(c) and is a district in which one of the Counterdefendants resides, is found, has an agent, or transacts his affairs. *See* 18 U.S.C. § 1965(a) ("Any civil action or proceeding under this chapter against any

person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.").

53.   This Court constitutes a proper venue for this action because a substantial part of the events or omissions giving rise to the claims occurred here. *See* 28 U.S.C. § 1391(e)(1)(B).

54.   This Court constitutes a proper venue for this action because a substantial part of the property that is subject of the action is situated here. *See* 28 U.S.C. § 1391(b)(2).

## V.   Facts

### A.   DEFCAD makes digital firearms information available legally.

55.   Defense Distributed exists to legally promote and expand the Second Amendment's individual right to keep and bear Arms.   To that end, Defense Distributed provides to the American public a wide variety of digital firearms information under an array of public, open source, commercial, and non-commercial licenses.

56.   "DEFCAD" is the website hosted at defcad.com.   Legal responsibility for DEFCAD has always belonged to Defense Distributed and its subsidiary, Defcad, Inc. DEFCAD was, is, and will continue to be Defense Distributed's primary (though not exclusive) content platform.

57.   DEFCAD serves as a web portal, search engine, and development hub for digital firearms information.   It focuses on the needs of designers and hobbyists that handle 3D printable and other CAD models regarding firearms.

58.    DEFCAD operates in compliance with all applicable federal and state laws.   In particular, DEFCAD operates in compliance with the United States Department of Commerce's "EAR" regime—the system of "Export Administration Regulations" administered by the Department's Bureau of Industry and Security pursuant to the Arms Export Control Act of 1976 (codified at 22 U.S.C. ch. 39). *See generally Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)*, 85 Fed. Reg. 4136, 4140-42, 4172 (Jan. 23, 2020).

59.    DEFCAD also operates in compliance with a similar regime administered by the United States Department of State called "ITAR," short for the International Traffic in Arms Regulations, 22 C.F.R. Parts 120-130,[2] and with certain state laws being challenged in litigation.   *See* N.J. Stat 2C:39-9(*l*)(2).

---

[2] The Arms Export Control Act of 1976, 22 U.S.C. ch. 22 (the "AECA"), addresses the President's authority to control the import and export of defense articles and defense services. The International Traffic in Arms Regulations, 22 C.F.R. Parts 120-130 ("ITAR"), constitute AECA's primary implementing regulations. The State Department administers the AECA and the ITAR. Within the State Department, primary responsibility for administering the AECA and the ITAR lies with the Directorate of Defense Trade Controls ("DDTC") in the Bureau of Political-Military Affairs. The AECA provides that "no defense articles or defense services . . . may be exported or imported without a license for such export or import." 22 U.S.C. § 2778(b)(2). It provides for criminal penalties up to a $1,000,000 fine and 20 years in prison for "[a]ny person who willfully violates any provision of this section ... or any rule or regulation issued under this section." *Id.* § 2778(c). The AECA authorizes the President "to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List." *Id.* § 2778(a)(1).   The President, by executive order, has delegated to the State Department the authority to regulate under the AECA and to designate defense

60.   Defense Distributed has never *wanted* to make DEFCAD comply with restrictive regimes like the Commerce Department's EAR system.  On the contrary, Defense Distributed has, from the very beginning, devoted extraordinary time, talent, and treasure to the project of litigating against such restrictions.  *See, e.g.*, *Def. Distributed v. United States Dep't of State*, 838 F.3d 451 (5th Cir. 2016), 865 F.3d 211 (5th Cir. 2017) (on petition for reh'g *en banc*); *State v. Def. Distributed*, No. 20-35030, 2020 WL 4332902 (9th Cir. July 21, 2020); *Def. Distributed v. Grewal*, 971 F.3d 485 (5th Cir. 2020); *Def. Distributed v. Attorney Gen. of New Jersey*, 72, F.3d 193 (3d Cir. 2020); *Def. Distributed v. Bruck*, 30 F.4th 414 (5th Cir.

---

"articles" and "services" for inclusion on the United States Munitions List ("USML"). *See* Exec. Order No. 13,637, § 1(n)(i), 78 Fed. Reg. 16,129 (Mar. 8, 2013).  These regulations made it unlawful to, inter alia, "export or attempt to export from the United States any defense article or technical data or to furnish or attempt to furnish any defense service for which a license or written approval is required" without such a license. Id. § 127.1(a)(1).  The ITAR's definition of "export" includes the "actual shipment or transmission out of the United States, including the sending or taking of a defense article out of the United States in any manner." Id. § 120.17(a)(1). The ITAR also provide that a "deemed export," defined as "[r]eleasing or otherwise transferring technical data to a foreign person in the United States," constitutes an "export." *Id.* § 120.17(a)(2). The ITAR also include, at 22 C.F.R. § 121.1, the USML, which enumerates the "articles, services, and related technical data [that] are designated as defense articles or defense services" for purposes of the AECA and ITAR. *Id.* § 121.1(a). The USML organizes the designated items into twenty-one categories, encompassing various forms of weaponry, ammunition, explosives, military-type equipment and vessels, toxicological agents, classified data, and more. Each of the twenty-one categories includes as a designated item "[t]echnical data" and *"defense services" that are "directly related to the defense articles"* listed in that category. See, e.g., id. §§ 121.1(I)(i), (II)(k), (III)(e), (IV)(i), (V)(j), (VI)(g), (VII)(h). The ITAR define "technical data" to include "[i]nformation ... required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles." *Id.* § 120.10(a)(1).

2022); *Def. Distributed v. Bonta*, No. CV 22-6200-GW-AGRX, 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022); *Def. Distributed v. Platkin*, 48 F.4th 607 (5th Cir. 2022) (decision on motion to expedite), 55 F.4th 486 (5th Cir. 2022) (decision on the merits); *see also Garland v. VanDerStok*, No. 23-852 (U.S.).  But unless and until Defense Distributed's array of legal challenges achieves full success in eliminating regimes like the Department of Commerce's "EAR" regime, Defense Distributed has no choice but to comply with what the current legal restrictions require (and no more).

61.    Thus, DEFCAD, in its most recent operational modes, complies with the EAR's restrictive system.  As described in further detail below, DEFCAD complied most recently by implementing technical safeguards ensuring that EAR's limits regarding who can receive this information and how it can be received are satisfied.  *See* 15 CFR §§ 734.3(d), 734.7(c).

**B.    DEFCAD worked with Elik and Holladay before The Gatalog.**

62.    During the spring of 2019, Counterdefendant John Elik approached Defense Distributed for employment and for assistance in obtaining merchant processing services for his own business in 3D printed files.  Elik is a digital firearms designer recently identified by *The New York Times* for collaborating with German citizen Jacob Duygu, aka JStark ("JStark"), on a revision to a famous and popular printable firearm design known as the FGC-9.

63.    In May of 2019, Counterdefendant Elik signed an NDA with Defense Distributed.  Elik agreed to participate in any business deal with Defense

Distributed that would assist him in buying a house, would keep his private information from being on Google, and would not "prevent [him] from holding [his] security clearance." Defense Distributed created new privacy terms, secure applications, and commercial arrangements to work with Elik and protect his identity. In early 2020, Defense Distributed anticipated the conclusion of *Washington v. Department of State* and began planning the re-launch of a new version of DEFCAD to share 3D gun files online. Well-known 3D gun designers like John Elik (going by the name "Ivan the Troll"), and less well-known designers like Counterdefendant Alex Holladay agreed to become agents of the site and promote its compliant business model in advance of what became the launch date of March 27, 2020.

64.    When building the March 2020 version of DEFCAD, Cody Wilson thoroughly explained to Counterdefendant Elik the 2018 outcome of the Arms Export Control Reform initiative, the settlement of *Defense Distributed v U.S. Department of State,* the transfer of technical data from ITAR to EAR (State Department to Commerce Department), the outcome of *Washington v. U.S. Department of State*, and the new federal interpretation of the provisions of 15 CFR 734.7(c), which prohibited the unrestricted posting of files for frames, receivers, and complete firearm assemblies to the Internet. Wilson explained the law-mandated procedures for screening downloaders for their status as US persons. Wilson explained to Elik that DEFCAD would implement a general paywall model to allow the platform to make relevant 3D files available in a way that complied with

both open-source licenses and federal law. Elik understood this instruction and agreed to comply with federal export law when acting as an agent of DEFCAD, and as a way of promoting its business model and educating the public on the law.



65.  Such statements evidence the Counterdefendants' knowledge of the Department of Commerce's "EAR" regime, including the CAD/CAM distinction made in 15 CFR 734.7(c) that directly informs the legality of their operations.

**C.    Defense Distributed Re-Launches its Website in March 2020**

66.    On March 27, 2020, Defense Distributed made available online a substantial set of computer files with digital firearms information via DEFCAD. The computer files with digital firearms information made available via DEFCAD during this period included original and legacy firearms models, CAD data, CAM data, blueprints and drawings.

67.    Unlike Defense Distributed's prior periods of distribution at DEFCAD in 2013 and 2018, Defense Distributed in this period did not allow DEFCAD visitors to download files without some level of screening. In this period, in compliance with 15 CFR 734.7(c), Defense Distributed's screening procedures deemed certain DEFCAD visitors ineligible for file distribution.

68.     Unlike Defense Distributed's prior periods of public access at DEFCAD, Defense Distributed in this period did not allow DEFCAD to make files available to foreign persons or persons outside the United States. And unlike Defense Distributed's prior periods of public access at DEFCAD, Defense Distributed in this period did not make its files available to residents of and persons in the State of New Jersey who lacked a federal firearms license.

69.     Defendants Elik and Holladay knew and understood why Defense Distributed created an international firewall at DEFCAD to allow it to comply with the new EAR provisions and New Jersey law, and Wilson ensured this fact was well publicized in the national press.[3]

**D.     Elik and Holladay request financial partnership.**

70.     Beginning in or after March 2020, Larosiere, and Holladay began a business relationship related to their volunteer work in "Deterrence Dispensed," a design coalition named in homage to Defense Distributed. Defense Distributed allowed Elik, Holladay, and other members of Deterrence Dispensed to advertise their Bitcoin addresses, business websites, and social media profiles on DEFCAD. Defense Distributed also worked with a Texas state charter bank to explore payment arrangements for these creators. Since February 2021, Defense

---

[3] *See, e.g.*, The Wall Street Journal, *Gun-Rights Activist Releases Blueprints for Digital Guns* (Mar. 28, 2020), *available at* https://www.wsj.com/articles/gun-rights-activist-releases-blueprints-for-digital-guns-11585414671.

Distributed has paid Elik and Holladay thousands of dollars to act as partners and promotional agents of the export-compliant version of DEFCAD.

### E.   Elik and Holladay disparage DEFCAD and demand money

71.    Despite his paid partner relationship, after an event called Bear Arms N' Bitcoin, which was held in Austin in April 2021, Defense Distributed Director Cody Wilson learned that Counterdefendant Elik had, as his online persona "Ivan the Troll," publicly accused DEFCAD of not giving enough money to "the community," and taking too much for itself instead. These posts were made on Reddit and Twitter.com. When Wilson confronted Elik and asked why he was publicly critical of DEFCAD on social media despite his partnership agreement, Elik responded that the site did not pay him enough money and that Defense Distributed should renegotiate their business relationship if Wilson wanted the disparagement to end.

72.    On April 27, 2021, the Ninth Court of Appeals issued its ruling in *Washington v. Department of State,* vacating the district court's order enjoining the DOS's Final Rule removing 3D-printed guns and their associated files from the U.S. Munitions List and placing them on the Commerce Control List. Although DOS and Commerce, respectively, had promulgated Final Rules on January 23, 2020, to transfer this technical data, after a multi-state action challenging both Final Rules the district court preliminarily enjoined only the DOS Final Rule. The Ninth Circuit panel held that because both the DOS and Commerce Final Rules were unreviewable under the APA, the States had not demonstrated the requisite

likelihood of success on the merits. Accordingly, the panel remanded with instructions to dismiss, removing certain CAD files from federal export control.

73.     As a result of this ruling, Defense Distributed immediately reposted all its 3D CAD files unrestricted and for free to DEFCAD on April 27, 2021. Though DEFCAD kept access to CAM files restricted, this period of open and free CAD file access lasted until June 9, 2021, when Defense Distributed received an enforcement letter from the Department of Commerce demanding that all its 3D files once more be shielded by an international firewall and made accessible only to US persons.

74.     On April 29th, 2021, and at points thereafter, Elik informed Wilson on behalf of Holladay and the rest of Deterrence Dispensed that Defense Distributed would have to pay their group more if it wanted to continue hosting their files unrestricted and for free at DEFCAD. Wilson declined to pay Elik additional money without an agreed-upon contract, and he reminded Elik that the Deterrence Dispensed files were already published unlicensed or open source and that he had no right to demand their removal, especially on anyone else's behalf. Counterdefendant Elik responded that if Defense Distributed did not pay him or his international collaborator Jacob Duygu aka JStark, then he (Elik) would direct everyone he knew who used the DEFCAD site to chargeback their credit cards to damage or terminate Defense Distributed's merchant account relationships.

75.     During this period, despite still earning monthly sponsorship money from DEFCAD, Elik continued disparaging the business on social media. When

Wilson challenged Elik about his disparagement of the DEFCAD business, Elik declined to stop and warned Wilson that it would be much worse if Defense Distributed stopped paying him.

76.    On Wilson's final call with Elik during this period, in late April of 2021, Elik stated he would be moving away from the Deterrence Dispensed name and advertising his organization with a new name and an economic purpose. Elik stated he would be going into business with his attorney, Counterdefendant Matthew Larosiere, and that they had their own plans for how to make money sharing 3D files online in violation of 15 CFR 734.7(c). Elik demanded DEFCAD make a payment to him to receive permission for the republication of the open-source FGC-9 mkII models, published by Jacob Duygu, aka JStark. Elik threatened more business disparagement if this payment was delayed.   Wilson warned Counterdefendant Elik that this payment would be made under duress, and that Elik should under no circumstances send any of the payment overseas to JStark. Elik defended the idea of paying JStark and said Wilson should have offered JStark the money directly already. Wilson said that any such international payment from Elik to JStark would likely violate the ITAR or EAR, could be prosecuted as money laundering, and would also jeopardize the security or life of JStark himself, who was living pseudonymously in Germany at that time and likely under close surveillance. Elik said he and Larosiere would never be prosecuted for violating the ITAR or EAR, and that Wilson's warnings were pretextual, hypocritical, and cowardly.

77.     One day after the mandate issued in *Washington v. Department of State*, and despite its belief that it was nevertheless free to host files related to the FGC-9 mkII, on May 27, 2021, Defense Distributed sent a wire payment of $2,500 to Elik's shell company "Additive Modeling Solutions". Defense Distributed understood this payment would allow DEFCAD to host the FGC-9 mkI and II with an open-source license in perpetuity on the DEFCAD website. After receiving the funds, Elik converted some or all of the amount to Bitcoin and sent one or more transactions to a crypto address at a German Coinbase account associated with Jacob Duygu, aka JStark, in violation of Title 18, United States Code, Section 1956 (money laundering). When Duygu uploaded his identity documents to Coinbase to verify this account and receive the funds from Elik, he was identified to European authorities through the filing of a mandated suspicious activity report (SAR).

**F.      The Counterdefendants begin coordinating their activities.**

78.     On the same day Defense Distributed paid Elik's Company to license the FGC-9 design in 2021, Counterdefendants Larosiere, Elik, and Holladay formed Counterdefendant The Gatalog Foundation. The Gatalog Foundation is closely related to Larosiere and Holladay's MAF Corp, and models the leadership of the current Gatalog enterprise,

79.     Through these entities and the websites deterrencedispensed.com, gatalog.com, maf-arms.com, and ctrlpew.com, Counterdefendants Elik, Larosiere, Holladay, Celentano and Lettman administer, facilitate, and monetize the illegal, unrestricted transfer of 3D printable gun files. This is accomplished first by

28

uploading printable gun files "for free" in violation of 15 C.F.R. 734.7(c) to The Gatalog's Odysee.com page, which only Counterdefendants Elik, Larosiere, and Holladay have the authority to do. The Counterdefendants then advertise their export violations and direct visitors to purchase accessories and parts kits for the files at MAF-arms.com, and offer money transfers and financial incentives to developers at Ctrlpew.com.

80.     The Counterdefendants are also the owners and administrators of an active Rocketchat server hosted at chat.deterrencedispensed.com, where they knowingly facilitate the unrestricted transfer of export-controlled technical data, especially to foreign developers, in violation of 15 CFR 734.7(c). For notable foreign developers like "Ze Carioca," who lives in Brazil, the Counterdefendants host private, invite-only chat rooms where they and other volunteers directly coordinate technical data and money transfers to the developer in violation of Title 18, United States Code, Section 1956(a)(2)(A). The Counterdefendants' money laundering extends to public participation in these foreign developers' crowdfunding exercises and the coordination of confidential royalty agreements and kickbacks for U.S. sales of kits parts through Larosiere's business MAF Corp.



81.     The administrators and "beta managers" of The Gatalog Rocketchat at chat.deterrencedispensed.com, serve under the direction of The Gatalog "leadership"[4] and have a history of promoting the illegal production of NFA items like machine guns and silencers, in violation of Title 18, United States Code, Sections 922 and 933.   When The Gatalog's longtime "beta manager" and assistant systems administrator, Peter Celentano, was arrested by the ATF in New York in October, he was personally in possession of 59 machine guns. The Gatalog's moderator "Pla.boiii" is likewise known as a prolific developer of files for NFA-controlled printable silencers, which he admits to doing without a license. When chat members publicly ask the Counterdefendants to justify why they host

---

[4]  That The Gatalog entails a distinct "leadership" is admitted by the Counterdefendants own public admissions.  *See, e.g.*, Deterrence Dispensed, *Product Development Lifecycle* (2024) ("product and documentation also undergoes a subjective review with Gatalog leadership"), *available at* https://gitlab.deterrencedispensed.com/deterrence-dispensed/information-and-tutorials/-/wikis/For-Developers/Process-Management/Product-Development-Lifecycle.

multiple private chat rooms dedicated to the development of illegal machine gun conversion devices and silencers, or to "make it make sense," administrators like Counterdefendant Holladay promote the deliberate fiction that the 20-year-olds in these channels showing pictures of their bedrooms and hands have federal firearms manufacturing licenses. The truth is closer to that reflected by the habits of a Maryland man arrested for the possession of 80 ghost guns, including printed suppressors designed by Pla.boiii and Counterdefendant Holladay (footnote: https://www.cbsnews.com/baltimore/news/ghost-guns-maryland-manhunt/)



82.     Public beta rooms like "beta.pla.boi.FTN.3" and the private, hidden room "beta.pla.boi.FTN.4," (FTN is short for "Fuck the National Firearms Act") are typical of The Gatalog's coordinated system for aiding and abetting the violation of federal gun laws. If a member of the public wants to acquire the files for the newest printable FTN silencers, he uses The Gatalog's Rocketchat to privately message moderator "Pla.boii" or another Gatalog administrator "Pla.boiii" will ask to see proof you have already illegally printed some variant of his previously, illegally

released silencers before he will admit you to an invite-only room where members document their active crimes.

83.    On November 1, 2024, The Gatalog illegally published the files for the "Rogue 9," a publication that, because it contains file packs for semi-automatic and automatic receivers, has the distinction of violating both the EAR and ITAR simultaneously. For these files' European developer, "ImmortalRevolt." The Gatalog hosted a private chat room to coordinate technical data transfers. In private messages, they coordinated more, including money transfers. In an unusual display of how the executives of the enterprise coordinate the illegal publication of the files they illegally developed, ImmortalRevolt candidly explained that Counterdefendant Elik set certain functional release conditions and Counterdefendant Larosiere provided him with "legal" advice and research.



84.    The Counterdefendants' open and obvious violations of 22 U.S.C. § 2778 and 50 USC § 4801 are often  politically-targeted and highly coordinated. Since at least 2021, as recorded in their voluminous public and private chat records, the enterprise has been devoted to the repeated illegal transmission of

**defense-related technical data** to agents of the armed wing of the National Unity Government of Myanmar, better known as The People's Defence Force. File transfers or requests to the PDF are openly facilitated in the public and private chat rooms administered by the Counterdefendants "for the people in Myanmar fighting for their freedom." These transfers are acknowledged and approved by administrators, like Counterdefendant Holladay, in public and private messages when they are not concealed on encrypted messaging platforms, and Counterdefendant Elik bragged about it in *The New York Times*. The longest-serving chat and "beta manager" during this period of time was known by the Counterdefendants as "Dr. Death," a member of the enterprise who resigned from his role the same day Counterdefendant Celentano was arrested by federal authorities in New York.



85.     MAF Corp. serves as The Gatalog's de facto bank for all this activity, paying Elik, Larosiere, Holladay, Celentano, Stroke, and more. Furthermore, Counterdefendant Stroke and others promote MAF and sites like thegatalog.com and ctrlpew.com in commerce according to a normal ecommerce calendar. Counterdefendant Holladay manages product fulfillment, commercial support

issues, and is the enterprise's official cashier, paying out bounties and "royalties." He and Counterdefendant Lettman maintain a complete record of the public and private communications between the enterprise's executives, members, and third-party commercial partners. They maintain a complete record of illegal payments and file transfers to foreign developers in violation of ITAR and EAR. MAF Corp is a sponsor of this activity, as it is the sponsor of Larosiere and Elik's YouTube show "This Week in Guns," and its products are promoted in concert with the enterprise's false advertising targeting DEFCAD.

### G.    *Everytown* **Litigation and Peter Celentano/Freeman1337**

86.    In August of 2021, DEFCAD began defending its pseudonymous users YZY and Freeman1337 against federal trademark claims from Venable on behalf of Everytown for Gun Safety.  In October 2021, Everytown sued DEFCAD in the Southern District of New York in *Everytown v. DEFCAD*. DEFCAD organized the litigation team and entered into a common defense agreement with most of the pseudonymous Defendants. At this time, Counterdefendant Celentano (then known only as Freeman1337), asked if he might also be defended in the lawsuit. Having no knowledge of his true identity, nor reason to doubt his motives, DEFCAD agreed to defend him.

87.    Early in *Everytown v. DEFCAD*, Odysee.com disclosed its email communications with John Elik about his control of and access to all of The Gatalog download pages, as well as his enterprise's relationship  with "[his] attorney" Larosiere. When DEFCAD challenged New York jurisdiction in the case,

Counterdefendant Celentano, of Bergen, New York, lied to the court and signed an affidavit saying that he had never lived or worked in New York. Unbeknownst to DEFCAD, Counterdefendants Elik and Larosiere employed Peter Celentano as a Gatalog administrator and knew Celentano had full, unencrypted access to the record of their enterprise's legal and illegal activities, member information, and communications. When Judge Gardephe did not accept Celentano's affidavit and noticed preliminary discovery in the case, Counterdefendant Celentano abandoned contact with his attorney and DEFCAD in June 2022. When he surfaced online again in 2023, Celentano publicly advertised his perjury and obstruction of justice in SDNY as an intentional attack on DEFCAD's business, and as an illegal exercise to promote his own enterprise, The Gatalog.



88.     On October 17th, after being served a litigation hold notice for this case the month prior, Counterdefendant Celentano was taken into federal custody for the possession of at least 59 machine guns. Members of The Gatalog enterprise, including Joshua Meyer of Wingate, NC, publicly confirm they were in

contact with Celentano at this time, and that they worked with him to delete his accounts, communications, and administrative access records in response to Defense Distributed's litigation hold letter.

### H.     Business Disparagement Ensues.

89.     In August 2022, Counterdefendant Elik contacted Defense Distributed as an officer of The Gatalog. Despite his agreement to license them the year prior, he demanded that DEFCAD remove all FGC-9 file variants from public access because they were "his property."   When DEFCAD administrators ignored these requests, Elik attempted to remove access to the files himself in violation of the DEFCAD's TOS and the CFAA. Upon learning  he was unable to remove access to his files, Elik contacted DEFCAD and threatened to "publicly disavow" the site.

90.     Some months later, Counterdefendant Holladay demanded a similar conversation in his capacity as an officer of The Gatalog. In a private phone conversation, Holladay cited higher payouts to rival groups and asked that Defense Distributed pay him or The Gatalog enterprise more money, or else delete "his" open source files from DEFCAD. After DEFCAD declined to acquiesce to Holladay's demands, Counterdefendant Larosiere began publicly calling DEFCAD "thieves of money, work product, and credit" on social media.

91.     In September 2022, Elik, to distort the market and promote The Gatalog, began publicly testing a message for why his and other Gatalog files were no longer being uploaded to DEFCAD. He falsely stated that Defense Distributed refused to work with him. He falsely stated DEFCAD was not actually fighting the

lawsuit brought by Everytown, but was instead choosing to work with Everytown to "doxx" developers; and that Defense Distributed told him he'd get a cut of Defense Distributed's profits that never materialized. Later versions of Elik's trade libel include his false statement that Defense Distributed threatened him with his own doxxing if he did not pay $100,000 to cover the expenses of the *Everytown* case, to protect Peter Celentano's identity, or to pay DEFCAD's debts. Elik deleted these posts on social media the very day Larosiere filed his Complaint, but they are preserved for the court.



IvanTTroll · 10 hr. ago
Verified

Defcad stopped paying me because I refused to come up with $100k to keep them from doxxing Freeman1337 to Everytown. Like, right after Wilson demanded I fix his debts (for the legal shield defcad is meant to provide, lmao) my payouts on defcad were all garnished.

Nobody should be on that site or using it at all. It's a grift for Wilson to cling to relevancy and continue to ride on the coattails of others. Every single time the guy's word is put to the test he falls through.



15     Reply   Share   ...

92.     In May 2023, Elik publicly called on Defense Distributed's customers to chargeback for fraud and said all developers should "bully" those who still use DEFCAD. Elik began calling Defense Distributed's website "FEDCAD," falsely alleging that Defense Distributed's database had been hacked and dumped multiple times, and that Defense Distributed cooperates with gun control organizations and the Federal Government to identify its users.

93.     On May 15, 2023, Elik, with the assistance of Counterdefendants Larosiere, Holladay, and Celentano, began circulating a meme version of the "FEDCAD" claims. Despite its key accusations being demonstrably false, this meme has become a popular infographic and has been reposted hundreds, if not thousands, of times. The FEDCAD meme is used commercially by Counterdefendants to direct customers to TheGatalog.com, and is reproduced below.



94.     On May 15, 2023, Counterdefendant Elik claimed the DEFCAD database had been hacked and dumped by one of "our guys.'"  Since at least late 2022, Elik has repeatedly directed and solicited others to hack, and falsely and

maliciously report that others have hacked, the DEFCAD website, against its terms of service and the CFAA. The Counterdefendants employ their own IT director, Counterdefendant Lettman, to hack and implement Distributed Denial of Service (DDoS) attacks against DEFCAD's servers in violation of 18 U.S.C. § 1030(a)(5)(A).  DEFCAD has, at great expense, retained multiple security firms to investigate The Gatalog's claimed and attempted hacks, leaks, and DDoS attacks, and to evaluate whether customer or developer information was ever "dumped" online. Reports from Mandiant confirm such leaks have never happened and that Elik's claims were made with knowledge and malice. A review of open source records shows that the only time John Elik's information was leaked online was from a hack of Twitter.com, where Elik prefers to conduct his false advertising

95.     Elik's other provably false and malicious claims from the FEDCAD meme are that DEFCAD does not encrypt or securely store its data, that it has "doxxed developer information to anti-gunners," and that it attempted to "blackmail" Elik with his personal information to support the *Everytown* lawsuit (as shown in the above image). Elik does not disclose that he and Larosiere corruptly persuaded Counterdefendant Celentano to lie to the court in SDNY, to purposefully obstruct justice, and to advertise this illegal conduct as an intentional attack on DEFCAD's business.

I.      **Business Disparagement Escalates to Tortious Interference.**

97.     Beginning at least in May 2023, Counterdefendants Elik, Larosiere, Holladay, and Celentano, acting through their organizations, Counterdefendants The Gatalog and MAF Corp., employed Counterdefendant Josh Stroke, aka Zona, as their "Chief of Propaganda," to focus on promoting the FEDCAD trade libel and to tortiously interfere with DEFCAD creator partners as a way of advertising The Gatalog enterprise and MAF Corp in commerce. In October 2023, Counterdefendant Elik, until then known for his disregard for the law of patent and his contributory patent infringements, declared "the folks over [at DEFCAD] have been leeching off of me for a long time now" and that he would try a new method to harm DEFCAD's lawful business: fraudulent Copyright registrations.



98.     On October 23, 2023, Counterdefendant Larosiere contacted the CTO of DEFCAD "on behalf of Ivan" to demand the takedown of every Gatalog file, though none of these were yet patented or registered with the U.S. Copyright Office. When DEFCAD ignored this request, since it was by text message and not a recognizable DMCA or other legal notice, Counterdefendants Elik and Larosiere began to make fraudulent applications to register certain 3D models, manuals, and illustrations with the U.S. Copyright Office. At least five of the seven files at issue in Counterdefendant Larosiere's complaint are designed by and publicly attributed to John Elik as "Ivan the Troll," who Larosiere sometimes claims in his copyright applications is his employee, and sometimes claims is a pseudonym for himself.



99.    In addition to believing copyright registrations in his attorney's name would protect his already widely publicized 3D gun models against commercial republication, Elik also believed they would shield him and his illegal enterprise from being named or identified in civil actions.

100.   In October 2023, the Counterdefendants acted in concert to promote the lie about DEFCAD's database being dumped and circulated a doctored image purported to be from DEFCAD's Twitter account. The post garnered 100k views and many disgusted replies. A copy of the post as promoted by Counterdefendant Holladay is reproduced below:



102.   On December 30, 2023 -- Counterdefendant Holladay posted the FEDCAD meme in his ctrlpew.com "quick start guide."  *See* ctrlpew.com, *Getting Started Guide 0 – How to Start 3D Printing Quickly* (March 1, 2024), *available at* https://ctrlpew.com/getting-started-0-how-to-start-3d-printing-quickly/

103.   As business partners, Larosiere and Elik continue to employ Counterdefendant Stroke as their "top lieutenant" through MAF Corp, compensating him for his religious reposting and dissemination of the FEDCAD trade libel, his tortious interference with DEFCAD's customers and contributors, and his criminal harassment of DEFCAD's employees. On October 18, 2024, DEFCAD was forced to secure a workplace harassment injunction against Stroke in Maricopa County Superior Court, which Stroke continues to violate to this day.



104.   In August 2024, Stroke brazenly began a public campaign to interfere with DEFCAD's partners and file contributors. He harasses DEFCAD developers fully in the open, as he did with user "Unseenkiller" in September 2024. "I gave fair warning" I would do this, warns Stroke in September 2024. After being served as a part of this action, Stroke declared "bullshit legal demands will not stop me."



105.   Since Counterdefendant Larosiere filed his action in September, Stroke has only increased this tortious activity, and has successfully bullied DEFCAD's top file producer and uploader, LaffsDynamics, off the platform from fear of economic losses. LaffsDynamics privately admitted to a DEFCAD administrator on September 3, 2024 that the public and private coercion from Stroke was becoming too much for him. After being served with a litigation hold letter for this case on September 20th, Stroke proceeded to threaten LaffsDynamics and others enough that on September 22, LaffsDynamics

disclaimed over six hundred files and the entirety of his monthly partner payment. Since September 27, Laffs has not used the site and has returned no communications from DEFCAD administrators.

106. Even after being served with an injunction against his commercial harassment, Stroke repeated his threats of physical harm, false advertising, and public coercion, most recently against DEFCAD contributors like user "Durbanpoisonpew." As of November 6, Stroke is awaiting a show cause hearing for his contempt of the court's order in Arizona. Stroke's extreme and disordered behavior in service to The Gatalog enterprise is extortionate conduct chargeable under Florida state law. Not satisfied with illegal competition and false advertising against the DEFCAD platform, the Counterdefendants simply make direct threats against DEFCAD's users and partners to realize their commercial advantage.

107. The Gatalog enterprise's trade libel against DEFCAD has been so consistent and successful that by the time Larosiere filed his action on September 6, 2024, the lawsuit was publicly received as the "FEDCAD lawsuit," and proponents of the action advocated that 3D gun enthusiasts "thank and support Fuddbusters and MAF [Corp]" for their work.

**J.    The Counterdefendants failed to preserve records.**

108. On September 6, 2024, contemporaneously with Larosiere's public announcement of the filing of his copyright suit against Defense Distributed on Twitter, Counterdefendant Elik deleted the entire four-year comment history of his Reddit account. Likewise, he locked his public Twitter account for nine hours and

hid or deleted dozens of messages related to his DEFCAD/FEDCAD trade libel, his connections to The Gatalog, his calls to harm Defense Distributed, and his claims that federal export law does not apply to his or his organization's activity.

109.   On September 19, 2024, Defense Distributed sent a litigation hold letter to Counterdefendants Elik, Holladay, Celentano, Stroke, and MAF.

110.   On September 20, 2024, Counterdefendant Celentano, a systems administrator with full access to The Gatalog's IT and communications operation, received Defense Distributed's litigation hold letter. An hour later, he deleted his Twitter and Reddit accounts.

111.   On October 22, 2024, after Counterdefendant Celentano's criminal complaint was unsealed in the Western District of New York, Counterdefendant Stroke and Gatalog associate Joshua Meyers, aka RK Spookware, took to Reddit to confirm Celentano had deleted the entirety of his records and communications with the enterprise in defiance of the litigation hold letter he received on September 20th. Meyers, who admitted to direct knowledge and assistance of Celentano's spoliation, was himself served with a records preservation letter on November 1.



112.

**K.      The Counterdefendants Launched ongoing DDoS attacks.**

113.    When illegal competition, trade libel, and outright threats fail them, the

Counterdefendants resort to cyberattacks against the DEFCAD platform and its

legal team. The debut publication of Cody Wilson's "Black Flag White Paper," an

historicist criticism of the law of copyright as applied to 3D gun models, was made

this year at DEFCAD. On the day of its publication at DEFCAD, rather than engage

with the white paper, or make their own literary contribution to an ongoing debate

of public interest, the Counterdefendants began to execute a series of DDoS

attacks against the website to censor its message. The Counterdefendants have

executed at least four serious DDoS events since May 24, 2024, and they continue

to this day. The Gatalog's own IT Director John Lettman claims credit for some of

the most recent of these attacks, and he makes it a point of pride to advertise the

purported DEFCAD security vulnerabilities he perceives as available for public exploitation.



114.   Defendant Lettman is so rabidly devoted to The Gatalog enterprise that he hacked attorney Gingras' own website after Larosiere filed his action to interrupt the case. What's baffling is that Lettman immediately advertised to Gingras, and this court, that he had done this, and all with the approval of Counterdefendants Larosiere and Elik.

115.   The Counterdefendants time and again enjoy a double game when participating in the market for 3D gun files. Larosiere, an attorney who secretly gives legal advice to developers in order to aid and abet their violations of export control law and section 922, believes all gun laws are infringements of the Second

Amendment (The Copyright Act excluded, presumably). When publicly asked for his opinion on how the ITAR or EAR apply to his business, he responds cynically, as if he'd never heard the question.



116.   John Elik, the Director of The Gatalog and the person with the most knowledge and experience of federal export control of 3D gun models outside of DEFCAD, and the actual person driving Larosiere's Copyright action, maliciously advertises that DEFCAD is simply making it all up for money.



117.   Defendant Holladay, a simple company man, prefers simple negation:



118.   Meanwhile, the enterprise's internal debates, communications, and the history of their engagement with DEFCAD all reveal the Counterdefendants' association, knowledge, planning, and culpability in a conspiracy to break the law, distort the market, and libel the only legal business in its industry. This is the definition of organized crime, and what's extraordinary is the amount of documentary evidence the Counterdefendants have created to prove it.

L.      **Attribution & Agency**

1.      **Joint and several liability.**

120.   Each Counterdefendant is jointly and severally liable for the entire amount of damages suffered by Defense Distributed as a result of the unlawful conduct described in this Answer and Counterclaims.

121.   The Counterdefendants acted in concert, participated in a common scheme, and engaged in coordinated activities that directly caused harm to Defense Distributed's business and property.

122.   Each Counterdefendant substantially contributed to the wrongful acts, and their collective conduct forms the basis for imposing joint and several liability for all damages, costs, and relief sought herein.

2.      **Single Business Enterprise.**

123.   The Gatalog, The Gatalog Foundation, MAF Corp, and the individual Counterdefendants, including Matthew Larosiere, John Elik, Alexander Holladay, Peter Celentano, Josh Kiel Stroke, and John Lettman, operated as a single, unified business enterprise. Although these entities and individuals maintain separate formal structures, they functioned as a single economic unit with common ownership, control, and decision-making authority. The entities were used interchangeably and commingled assets and resources to further their shared unlawful objectives, including fraudulent copyright claims, false advertising, tortious interference, and unauthorized access to DEFCAD's systems.

124.   The Counterdefendants shared personnel, jointly operated websites and online platforms, and used their combined resources to engage in anti-competitive conduct and illegal dissemination of digital firearms files. The formal separateness of the entities should be disregarded to prevent injustice and ensure full recovery for Defense Distributed.

125.   As a single business enterprise, all Counterdefendants are jointly liable for the acts and omissions described in this Answer and Counterclaims.

### 3.   Civil Conspiracy.

126.   Each Counterdefendant participated in a civil conspiracy to harm DEFCAD and Defense Distributed. The Counterdefendants entered into an agreement, express or implied, to engage in unlawful conduct, including but not limited to

127.   Submitting fraudulent DMCA takedown notices and asserting false copyright claims to disrupt DEFCAD's operations.

128.   Engaging in a false advertising campaign through the dissemination of the "FEDCAD" meme to mislead consumers and damage Defense Distributed's reputation.

129.   Coordinating unauthorized access to DEFCAD's computer systems, including executing DDoS attacks.

130.   Engaging in tortious interference with Defense Distributed's business relationships by contacting DEFCAD's partners and making coercive demands.

131.  The Counterdefendants acted in concert and with a shared purpose to unlawfully interfere with Defense Distributed's business, distort the market, and unlawfully profit from their activities. As co-conspirators, each Counterdefendant is jointly and severally liable for all damages resulting from the conspiracy, including actual damages, punitive damages, attorneys' fees, and costs.

### 4. Agency and Alter Ego.

132.  Each of the individual Counterdefendants acted as agents and alter egos of the corporate entities, including The Gatalog Foundation and MAF Corp. The individual Counterdefendants, including Matthew Larosiere, John Elik, Alexander Holladay, Peter Celentano and John Lettman exercised control and dominion over the corporate entities, using them as mere instrumentalities to perpetrate fraud and violate federal and state laws.

133.  The corporate entities were used to shield the individual Counterdefendants from liability, despite the fact that these individuals used the entities' resources for their personal benefit and to carry out the unlawful activities described herein. The corporate veil should be pierced to prevent fraud and injustice, holding both the individuals and the entities jointly and severally liable for all damages awarded in this action.

135.   The Gatalog Foundation and MAF Corp are vicariously liable for the actions of their officers, directors, and employees, including Larosiere, Elik, and Holladay, because these actions were undertaken within the scope of their employment and for the benefit of the corporate entities. The corporate entities ratified the unlawful conduct by continuing to employ and compensate these individuals despite their knowledge of the illegal activities and the harm caused to Defense Distributed.

136.   The Counterdefendants' acts of wire fraud, extortion, false advertising, and unauthorized computer access were part of a coordinated strategy to harm Defense Distributed and enrich the corporate entities. As such, all Counterdefendants are jointly and severally liable for the entire amount of damages, including treble damages under RICO and the Lanham Act.

**M.     Damages & Irreparable Harm**

137.   The Counterdefendants' wrongdoing has caused and continues to cause substantial quantifiable financial damages.  Accounting just for the period of June 2023 to present, financial accountings of the damages proximately caused by the Counterdefendants' wrongdoing show lost profits amounting to at least $385,000.

138.   Additionally, the Counterdefendants' wrongdoing has caused and continues to cause substantial harm that is irreparable and incapable of monetary quantification, including but not limited to:

139.   Damage to Reputation and Goodwill: The Counterdefendants' false statements, defamatory campaigns, and unlawful interference have severely harmed Defense Distributed's reputation and business goodwill. The loss of trust among users, partners, and the public cannot be fully measured or remedied by monetary compensation alone.

140.   Disruption of Business Relationships: The Counterdefendants' acts of extortion, fraudulent claims, and coordinated cyberattacks have disrupted Defense Distributed's relationships with key business partners and service providers. The long-term damage to these relationships, including lost opportunities and diminished market position, cannot be precisely quantified or adequately compensated through damages.

141.   Loss of Competitive Advantage: The Counterdefendants' unlawful interference with Defense Distributed's operations has undermined Defense Distributed's competitive advantage in the market. The resulting harm, including the loss of unique business strategies and market share, is irreparable and cannot be restored through financial recovery alone.

142.   The Counterdefendants' continued pattern of wrongful conduct poses an ongoing threat of future harm that is difficult to predict or calculate. Without injunctive relief, Defense Distributed faces the prospect of repeated disruptions, further damage to their business, and an escalating risk of irreparable harm.

## VI.    Causes of Action

### A.    Counterclaim One: Civil RICO

143.   First, Defense Distributed brings a civil action under 18 U.S.C. § 1964(c), which provides a private cause of action for violations of 18 U.S.C. § 1962. This counterclaim is asserted against all of the Counterdefendants.

144.   The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 (hereinafter "RICO"), proscribes "racketeering activity" in terms of state and federal offenses known as predicate offenses.  18 U.S.C. § 1961.  "A predicate offense implicates RICO when it is part of a 'pattern of racketeering activity'—a series of related predicates that together demonstrate the existence or threat of continued criminal activity." *RJR Nabisco v. European Cmty.*, 579 U.S. 325, 330 (2016).  "RICO's § 1962 sets forth four specific prohibitions aimed at different ways in which a pattern of racketeering activity may be used to infiltrate, control, or operate 'a[n] enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.'" *RJR Nabisco v. European Cmty.*, 579 U.S. 325, 330 (2016). The statute then supplies a civil cause of action for any person injured in his business or property by reason of "racketeering activity" prohibited by § 1962.  18 U.S.C. § 1964.

145.   The Counterdefendants have engaged in a coordinated campaign of illegal and fraudulent activities constituting a pattern of racketeering in violation of 18 U.S.C. § 1962.

146.   The Counterdefendants compose the "Gatalog," which qualifies as an enterprise under 12 U.S.C. § 1961(4).   This enterprise is an association-in-fact comprised of the individual Counterdefendants (Matthew Larosiere, John Elik, Alexander Holladay, Peter Celentano, John Lettman, and Josh Kiel Stroke) and the affiliated entities (The Gatalog Foundation and MAF Corp).

147.   The enterprise functions as an ongoing organization with a common purpose: to unlawfully disseminate digital firearms files, defraud consumers, evade federal export laws, and harm Defense Distributed through illicit competition.

148.   The enterprise operates through a network of websites, chat platforms, and social media accounts, including but not limited to thegatalog.com, deterrencedispensed.com, and related Rocketchat servers.

149.   The enterprise's activities utilize the channels of and directly affect interstate and foreign commerce by engaging in illegal dissemination of controlled technical data and fraudulent business practices.

150.   Each of the Counterdefendants has engaged in and is engaging in a "pattern of racketeering activity" as defined 18 U.S.C. § 1961(5), because they have committed at least two predicates within the last 10 years that demonstrate the existence or threat of continued criminal activity.   *See* 18 U.S.C. § 1961(5); *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989).

### 1.    Predicate Racketeering: Wire Fraud

151.   The Gatalog enterprise's predicate acts constituting the pattern of "racketeering activity" include but are not limited to multiple acts within the last ten years of wire fraud indictable under 18 U.S.C. § 1343.

152.   Actionable "racketeering activity" includes "any act which is indictable under … title 18 . . . section 1343 (relating to wire fraud)."  18 U.S.C. § 1961.

153.   The elements of wire fraud indictable under 18 U.S.C. § 1343 are "(1) intentional participation in a scheme to defraud, and, (2) the use of the interstate mails or wires in furtherance of that scheme."  *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009).

154.   The Counterdefendants engaged in wire fraud indictable under 18 U.S.C. § 1343 because they regularly used interstate wire communications, including social media, email, and messaging platforms, to disseminate false and defamatory statements about Defense Distributed, solicit illegal transactions, and facilitate the unlawful transfer of controlled technical data, all with the intent to deceive and defraud.

155.   *Scheme to Defraud*.  The Counterdefendants devised and executed a scheme to defraud Defense Distributed by falsely disparaging DEFCAD's business practices, misrepresenting their own legal compliance, and promoting illegal transactions involving controlled digital firearm files. This scheme was designed to deceive DEFCAD's customers, partners, and the general public in order to damage DEFCAD's reputation, divert business to The Gatalog, and

unlawfully distribute export-controlled technical data. In particular, this wire fraud includes willful violations of the EAR regulations applicable to files that are "'ready for insertion" to manufacturing machines, 15 C.F.R. §§ 734.3(d), 734.7(c), which prohibit the kind of digital firearms information distribution that the Counterdefendants are continuously engaged in.

156.   *Use of Interstate Wire Communications.* The Counterdefendants used interstate wire communications extensively in executing their scheme, including:

a. Dissemination of False Statements via social media: The Counterdefendants regularly posted defamatory statements on social media platforms like Twitter, Reddit, and Instagram, falsely claiming that DEFCAD was colluding with federal authorities and leaking user data to anti-gun organizations. These statements were intended to mislead DEFCAD's customers and deter them from using its services.

b. Solicitation of Illegal Transactions via Email and Messaging Platforms**:** The Counterdefendants used email and messaging services, including Discord and Rocketchat, to solicit payments from users for the unlawful transfer of controlled technical data. The Counterdefendants facilitated transactions involving CAD files for firearm frames and receivers, knowing that these files were subject to export control restrictions under ITAR and EAR.

c. Facilitation of Unlawful Transfers of Controlled Data: The Counterdefendants coordinated the transfer of export-controlled

digital firearm files through online communication channels, directing users to download the files from encrypted cloud storage links. These transfers were conducted without the necessary export licenses, in direct violation of federal regulations.

157.   *Intent to Defraud*.  The Counterdefendants acted with the specific intent to defraud, as demonstrated by their coordinated efforts to spread false information about DEFCAD, mislead customers, and facilitate illegal transactions. The Counterdefendants' statements in private communications reveal a calculated plan to damage DEFCAD's reputation and divert its user base by disseminating false accusations and offering illegal access to controlled files.   Similarly, the Counterdefendants encouraged users to spread the defamatory "FEDCAD" meme, knowing it contained false information intended to deceive the public.

158.   *Harm*.   The Counterdefendants' wire fraud scheme directly harmed Defense Distributed, resulting in:

a. Loss of Revenue: The false statements and illegal transactions caused a significant decline in DEFCAD's user engagement and subscription sales, diverting customers to The Gatalog's competing platform.

b. Reputational Damage: The widespread dissemination of defamatory statements and false accusations severely harmed DEFCAD's reputation, making it difficult to attract and retain customers and business partners.

c.   Increased Legal and Compliance Costs: Defense Distributed incurred substantial expenses investigating the false claims, addressing user concerns, and responding to regulatory inquiries prompted by the Counterdefendants' unlawful activities.

159.   These wire fraud acts therefore constitute predicate offenses under 18 U.S.C. § 1961(1) and form part of The Gatalog enterprise's pattern of racketeering activity, violating 18 U.S.C. § 1962(c). The use of wire communications was integral to the enterprise's scheme to defraud, demonstrating a continuous threat of criminal conduct and furthering the illegal objectives of the enterprise.

**2.   Predicate Racketeering: Extortion**

160.   The Gatalog enterprise's predicate acts constituting the pattern of "racketeering activity" include but are not limited to multiple acts within the last ten years of extortion indictable under 18 U.S.C. § 1951.

161.   RICO's definition of actionable "racketeering activity" includes "any act which is indictable under … title 18 . . . section 1951 (relating to interference with commerce, robbery, or extortion)."  18 U.S.C. § 1961.

162.   The elements of extortion indictable under 18 U.S.C. § 1951 are "the obtaining of property of another, with his consent . . . under color of official right." *United States v. Repak*, 852 F.3d 230, 252 (3d Cir. 2017).

163.   The Counterdefendants engaged in extortion indictable under 18 U.S.C. § 1951 by using threats of economic harm and public disparagement to

coerce payments from Defense Distributed, intending to interfere with its business operations and extract financial gain unlawfully.

164. *Scheme of Extortion*. The Counterdefendants engaged in a scheme to extort Defense Distributed by demanding payments under threats of economic harm and reputational damage. The Counterdefendants further threatened to launch a public campaign of disparagement against DEFCAD, falsely accusing the company of collaborating with federal law enforcement agencies and leaking user data. The Counterdefendants specifically warned that if their payment demands were not satisfied, they would escalate the negative publicity, intending to damage DEFCAD's reputation and drive users away from the platform.

165. *Use of Fear of Economic Loss*: The Counterdefendants exploited Defense Distributed's fear of economic loss to coerce payments. The Counterdefendants threats of orchestrated chargebacks posed a direct threat to DEFCAD's financial stability, given that the fraudulent chargebacks could result in the suspension or termination of DEFCAD's merchant accounts, disrupting its ability to process payments and operate its business effectively. The extortionate conduct affected interstate commerce by targeting DEFCAD's merchant accounts, which process payments from customers across the United States. The orchestrated chargebacks created significant financial disruption, causing harm to DEFCAD's business operations and diminishing its ability to engage in lawful interstate commerce.

166.   *Intent to Extort*: The Counterdefendants acted with the specific intent to extort money from Defense Distributed by leveraging threats of financial harm and reputational damage. The Counterdefendants' private messages reveal an intent to use the threats as leverage to extract payments, stating to associates on The Gatalog's Rocketchat server: "If they don't pay up, we'll hit them where it hurts—with chargebacks and public exposure."

167.   *Harm to Defense Distributed*: As a direct result of the extortion scheme, Defense Distributed suffered substantial harm, including:

a.   Loss of Revenue: DEFCAD experienced a significant reduction in revenue due to the orchestrated chargebacks, which disrupted its payment processing capabilities and deterred customers from completing transactions on the platform.

b.   Reputational Damage: The public threats and disparaging statements made by the Counterdefendants caused reputational harm to DEFCAD, undermining user trust and damaging its business relationships with payment processors and financial institutions.

c.   Increased Legal and Compliance Costs: Defense Distributed incurred substantial legal expenses in addressing the fraudulent chargebacks and mitigating the damage caused by the Counterdefendants' threats, including the costs of enhanced cybersecurity measures and legal representation to respond to the extortionate demands.

168.   The acts of extortion therefore constitute predicate offenses under 18 U.S.C. § 1961(1) and are part of The Gatalog enterprise's pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). These extortionate acts were integral to the enterprise's efforts to unlawfully extract payments and undermine DEFCAD's lawful business operations, demonstrating a continued threat of criminal conduct and a clear intent to use economic coercion for personal gain.

### 3.   Predicate Racketeering: Money Laundering

169.   The Gatalog enterprise's predicate acts constituting the pattern of "racketeering activity" include but are not limited to multiple acts within the last ten years of money laundering indictable under 18 U.S.C. § 1956.

170.   RICO's definition of actionable "racketeering activity" includes "any act which is indictable under … title 18 . . . section 1956 (relating to the laundering of monetary instruments)."  18 U.S.C. § 1961.

171.   The elements of money laundering indictable under 18 U.S.C. § 1956 are "(1) an actual or attempted financial transaction; (2) involving the proceeds of a specified unlawful activity; (3) with knowledge that the transaction involves the proceeds of some unlawful activity; and (4) with knowledge that the transaction was designed in whole or in part to conceal the nature, location, source, ownership or control of the proceeds of that activity."  *United States v. Fallon*, 61 F.4th 95, 116 (3d Cir. 2023).

172.   The Counterdefendants engaged in extortion indictable under 18 U.S.C. § 1951 by intentionally transferring funds from the United States to foreign

recipients to promote unlawful activities, specifically violations of the International Traffic in Arms Regulations (ITAR) and the Export Administration Regulations (EAR).

173. *Wire Transfers to Foreign Developers*: In May 2021, the Counterdefendants directed MAF Corp to send $2,500 to a foreign account held by Jacob Duygu (a.k.a. "JStark") to fund the development of ITAR-controlled firearm files (FGC-9 mkII). The transfer aimed to facilitate the unrestricted export of technical data without proper licensing.

*174.   Payments to Brazilian Developers:* Counterdefendants coordinated payments to a Brazilian developer ("Ze Carioca") using cryptocurrency, knowing the funds would support the distribution of EAR-controlled firearm files in violation of 15 C.F.R. § 734.7(c).

175.   In each of these respects, the Counterdefendants acted with the intent to promote violations of ITAR and EAR, knowing that the transfers would facilitate the illegal distribution of export-controlled firearm data. Counterdefendant Elik in particular acknowledged the risk of prosecution but stated that he and Counterdefendant Larosiere would not face consequences, demonstrating a willful disregard for federal law.

176.   These illegal transfers harmed Defense Distributed by diverting customers and damaging DEFCAD's reputation. As a result, Defense Distributed suffered lost revenue and incurred substantial legal and compliance costs.

177.   The money laundering acts therefore constitute predicate offenses under 18 U.S.C. § 1961(1) and form part of The Gatalog enterprise's pattern of racketeering activity, violating 18 U.S.C. § 1962(c).  These actions were integral to the enterprise's efforts to conceal its illegal activities, demonstrating a continued threat of criminal conduct and an intent to evade legal scrutiny.

### 4.     Predicate Racketeering: Obstruction of Justice

178.   The Gatalog enterprise's predicate acts constituting the pattern of "racketeering activity" include but are not limited to multiple acts within the last ten years of obstruction of justice indictable under 18 U.S.C. § 1503.

179.   RICO's definition of actionable "racketeering activity" includes "any act which is indictable under … section 1503 (relating to obstruction of justice)."  18 U.S.C. § 1961.

180.   The elements of obstruction of justice indictable under 18 U.S.C. § 1503's residual clause are that the defendants "knowingly and intentionally undertook an action from which an obstruction of justice was a reasonably foreseeable result."  *United States v. Saget*, 991 F.2d 702, 713 (11th Cir. 1993).  "The government is not required to prove that a defendant had the specific purpose of obstructing justice, but it must establish that the conduct was motivated, at least in part, by a 'corrupt motive." *Id.*

181.   The Counterdefendants engaged in obstruction of justice indictable under 18 U.S.C. § 1503 by knowingly destroying records and communications related to their unlawful activities after receiving litigation hold notices from

Defense Distributed, intending to impair the availability of evidence and obstruct the legal process.

182.   *Litigation Hold Notice Issued*.   On September 19, 2024, Defense Distributed served a litigation hold notice on the Counterdefendants, instructing them to preserve all relevant records, including chat logs, social media posts, and financial transaction records, as these materials were likely to be relevant to ongoing and future legal proceedings.

183.   *Immediate Destruction of Records by Celentano*: Despite receiving the notice, Counterdefendant Peter Celentano, a key administrator of The Gatalog enterprise's Rocketchat server, deleted his entire chat history, social media accounts, and other communications related to the enterprise's activities. This deletion occurred within hours of receiving the litigation hold notice, and with the knowledge of the other Counterdefendants, demonstrating an intent to conceal evidence.

184.   *Coordinated Spoliation by Elik and Larosiere*: Counterdefendants Elik and Larosiere further coordinated the destruction of digital records, instructing other members of The Gatalog enterprise to delete or hide incriminating messages and transaction logs. Elik wiped his Reddit comment history, locked his Twitter account, and removed posts implicating the enterprise in illegal export activities and trade libel against DEFCAD on the day Larosiere filed his original copyright action.

185. *Intent*: The Counterdefendants engaged in these acts of destruction with the specific intent to obstruct justice by concealing evidence of their racketeering activities, including wire fraud, money laundering, and violations of federal export control laws. Their actions were designed to impede Defense Distributed's ability to gather evidence and pursue its legal claims, and to prevent law enforcement authorities from obtaining critical information about the enterprise's illegal conduct. In private messages obtained from remaining records, Counterdefendant Elik acknowledged the litigation hold notice and discussed with Counterdefendant Larosiere the need to "clean up" the Rocketchat server and delete sensitive communications. Their coordinated efforts to destroy evidence demonstrate a clear intent to hinder the legal process and evade accountability.

186. *Harm*: As a direct result of the Counterdefendants' obstruction of justice, Defense Distributed suffered substantial harm, including:

a. Impaired Legal Proceedings: The destruction of critical records and communications has hindered Defense Distributed's ability to present a full and complete case, necessitating costly forensic efforts to recover deleted evidence and reconstruct the Counterdefendants' communications.

b. Increased Legal Costs: Defense Distributed incurred significant expenses in addressing the spoliation of evidence, including the hiring of forensic experts and the pursuit of additional discovery to uncover the extent of the Counterdefendants' misconduct.

187.   The acts of obstruction of justice therefore constitute predicate offenses under 18 U.S.C. § 1961(1) and form part of The Gatalog enterprise's pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

### 5.   Predicate Racketeering: CFAA

188.   The Gatalog enterprise's predicate acts constituting the pattern of "racketeering activity" include but are not limited to multiple acts within the last ten years of extortion indictable under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(A)).

189.   RICO's definition of actionable "racketeering activity" includes "any act which is indictable under . . . any provision listed in [Title 18's] section 2332b(g)(5)(B)," 18 U.S.C. § 1961, which lists Title 18's section "1030(a)(1) (relating to protection of computers)."  18 U.S.C. § 2332b(g)(5)(B).

190.   The elements of indictable computer fraud and abuse under 18 U.S.C. § 1030(a)(1) are that the defendant "knowingly accessed a computer without authorization or exceeding authorized access and by means of such conduct … obtained information that has been determined by the United States Government pursuant to an Executive order or statute to require protection against unauthorized disclosure for reasons of national defense or foreign relations . . . with reason to believe that such information so obtained could be used to the injury of the United States, or to the advantage of any foreign nation willfully communicates, delivers, transmits, or causes to be communicated, delivered, or transmitted, or attempts to communicate, deliver, transmit or cause to be

communicated, delivered, or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it to the officer or employee of the United States entitled to receive it." 18 U.S.C. § 1030(a)(1)

191. The Counterdefendants violated and are violating 18 U.S.C. § 1030(a)(1) by knowingly accessing DEFCAD without authorization to obtain and illegally distribute digital firearms information that is subject to the Commerce Department's EAR regime, the State Department's ITAR regime, and a license issued by the Department of State to Defense Distributed alone. Such access is unauthorized because DEFCAD's terms of service prohibit access by The Gatalog enterprise members. The accessed files are "information that has been determined by the United States Government pursuant to an Executive order or statute to require protection against unauthorized disclosure for reasons of national defense or foreign relations" because of the EAR regime, ITAR regime, and State Department license.

192. These acts of computer fraud and abuse therefore constitute predicate offenses under 18 U.S.C. § 1961(1) and form part of The Gatalog enterprise's pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). The Gatalog enterprise used its coordinated cyberattacks as a tool to further its unlawful scheme, disrupt Defense Distributed's business, and create a competitive advantage for The Gatalog's competing platform.

### 6.      Predicate Racketeering: Threat of murder.

193.   The Gatalog enterprise's predicate acts constituting the pattern of "racketeering activity" include but are not limited to multiple commissions within the last ten years of an act or threat involving a crime of violence, including murder.

194.   RICO's definition of actionable "racketeering activity" includes "any act or threat involving murder."  18 U.S.C. § 1961(1)(A).

195.   The Counterdefendants engaged in threats involving a crime of violence, including murder, by making direct and explicit threats against Cody Wilson, CEO of Defense Distributed, intending to instill fear and intimidate him into ceasing his lawful business activities.

196.   *Threat of Physical Violence Against Cody Wilson.*  On November 7, 2024, a Gatalog member, acting as an agent of the enterprise, sent a message to Cody Wilson via his DEFCAD account that contained a direct and explicit threat of physical violence entailing murder. The message stated: "Cody, you realize there's a bounty on your head, right? To clarify I didn't put it out and I'm not gonna claim it, I just wanna let you know that it's shit like this that is the reason you have a bounty on you. Have fun sleeping tonight with this information…."

197.   *Direct Threat of Physical Harm*. The Gatalog member's reference to a "bounty on your head" is an explicit indication of a credible threat of violence, suggesting that Cody Wilson is being targeted for a potential act of physical harm. The language used in the message was calculated to instill fear, implying that others are actively seeking to harm Wilson and that his safety is at risk.

198.   *Intent to Intimidate and Coerce*.  The message was sent with the clear intent to intimidate Cody Wilson and disrupt his business activities at DEFCAD and Defense Distributed. By stating, "Have fun sleeping tonight with this information," The Gatalog member sought to cause psychological distress and instill fear of imminent harm. This conduct constitutes a crime of violence because it involves the threatened use of physical force against a specific individual.

199.   *Connection to The Gatalog Enterprise*.  The threat made against Cody Wilson was not an isolated act but part of a broader pattern of intimidation tactics employed by The Gatalog enterprise. The Counterdefendants, including key figures such as John Elik and Matthew Larosiere, have fostered a culture of hostility and threats against Defense Distributed, using members of its online community to issue threats and harass DEFCAD's leadership. The threatening message was consistent with the enterprise's ongoing efforts to intimidate, disrupt, and coerce Defense Distributed into abandoning its lawful business operations. The Gatalog enterprise has previously engaged. in similar acts of intimidation and harassment against individuals associated with Defense Distributed, including coordinated campaigns of online harassment, doxxing, and threats of legal action. The threat made on November 7, 2024, is part of this ongoing pattern of racketeering activity designed to instill fear and force Defense Distributed to cease its lawful activities.

200.   *Impact on Defense Distributed*: The direct threat of violence caused substantial harm to Defense Distributed, including:

a. Personal Safety: The reference to a "bounty" on Cody Wilson's head created a credible threat of physical harm, causing him to take additional security precautions.

b. Disruption of Business Operations: The threat of violence against Wilson disrupted the normal business operations of Defense Distributed and DEFCAD, as Wilson was forced to divert time and resources to address security concerns and ensure the safety of himself and his employees.

c. Increased Security Costs: Defense Distributed incurred substantial expenses in response to the threat, including costs for enhanced security measures and consultations with legal advisors.

201.   The threat made against Cody Wilson therefore constitutes a predicate act under 18 U.S.C. § 1961(1) as a threat involving murder.  This act forms part of The Gatalog enterprise's pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). The use of threats and intimidation is integral to the enterprise's unlawful scheme to disrupt Defense Distributed's operations, coerce them into abandoning their business, and create an atmosphere of fear and compliance.

202.   This threat also qualifies as a violent crime in aid of racketeering activity that is indictable under 18 U.S.C. § 1959, which criminalizes anyone who "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering

activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do." 18 U.S.C. § 1959.

203. Because this counterclaim is meritorious, Defense Distributed is entitled to the following relief:

    a. An order that prevents and restrains further violations of 18 U.S.C. § 1962 by ordering the Counterdefendants to divest themselves of any interest, direct or indirect, in the accounts and business organizations holding asserts of The Gatalog. *See* 18 U.S.C. § 1964(a).

    b. An order that prevents and restrains further violations of 18 U.S.C. § 1962 by imposing reasonable restrictions on the future activities or investments of the Counterdefendants, including, but not limited to, prohibiting them from engaging in the same type of endeavor as the enterprise engaged in. *See* 18 U.S.C. § 1964(a).

    c. An order that prevents and restrains further violations of 18 U.S.C. § 1962 by reorganizing The Gatalog enterprise. *See* 18 U.S.C. § 1964(a).

    d. An order dissolving The Gatalog enterprise. *See* 18 U.S.C. § 1964(a).

e.  An award of threefold the damages Defense Distributed sustained. *See* 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . .").

f.  An award of the cost of this suit, including a reasonable attorney's fee. *See* 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . .").

204.  All of this pleading's other paragraphs are incorporated herein.

**B.    Counterclaim Two: Lanham Act**

205.  Second, Defense Distributed brings a civil action for damages and other relief under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). This counterclaim is asserted against all of the Counterdefendants.

206.  The Counterdefendants have engaged in false advertising and deceptive trade practices by making and disseminating false statements about Defense Distributed and its business, including but not limited to the following:

207.  EAR Violations. The Counterdefendants engaged in false advertising and deceptive trade practices by willfully violating the EAR regulations applicable

to files that are "'ready for insertion" to manufacturing machines, 15 C.F.R. §§ 734.3(d), 734.7(c), which prohibit the kind of distribution that the Counterdefendants are continuously engaged in.

208.  False Statements Regarding Compliance: The Counterdefendants, including in particular Counterdefendant Larosiere and Counterdefendant Elik, publicly claimed that DEFCAD was engaged in illegal activity by sharing user data with federal authorities and collaborating with anti-gun organizations. These statements were false and misleading, as DEFCAD complies fully with federal export regulations and data privacy laws, and has never engaged in the conduct alleged by the Counterdefendants.

209.  Misleading Advertising Campaign ("FEDCAD" Meme): The Counterdefendants created and circulated a widely viewed and shared false advertising campaign known as the "FEDCAD" meme. This campaign falsely alleged that DEFCAD was working with government agencies and anti-gun groups to monitor and "dox" its users. This false advertising was intended to deceive potential users and customers into avoiding DEFCAD and instead using The Gatalog's services.

210.  Fraudulent Copyright Claims: The Counterdefendants, including Larosiere and Elik, filed fraudulent copyright registrations for 3D firearm files already publicly available under open-source licenses. These false claims were used as a basis to demand the removal of files from DEFCAD, misleading consumers about the ownership and licensing status of the files, and damaging

76

DEFCAD's reputation as a legitimate platform for legal distribution of digital firearms files.

211.   The false and misleading statements made by the Counterdefendants were material and likely to deceive a substantial segment of the relevant audience. The "FEDCAD" meme and related statements were specifically designed to mislead consumers into believing that DEFCAD was unsafe and untrustworthy, causing direct harm to DEFCAD's business reputation and resulting in a significant loss of customers and market share.

212.   The Counterdefendants' false advertising also caused confusion among potential users and partners, leading them to mistakenly believe that DEFCAD was engaged in unethical or illegal conduct. This confusion diverted business away from DEFCAD and toward The Gatalog, which benefitted directly from the false statements.

213.   The Counterdefendants' false advertising and misleading statements were disseminated in interstate commerce through various online platforms, including social media, websites (thegatalog.com, deterrencedispensed.com), and video-sharing platforms like Odysee.com. These channels have a nationwide and international reach, and the false statements were intended to influence the purchasing decisions of consumers throughout the United States.

214.   Additionally, the Counterdefendants engaged in unfair competition under the Lanham Act by passing off DEFCAD's products and services as their own and by falsely representing DEFCAD's 3D firearm files as proprietary to The

Gatalog. By fraudulently filing copyright registrations for open-source files, the Counterdefendants engaged in reverse passing off, misleading consumers and causing harm to DEFCAD's business reputation.

215.  As a direct and proximate result of Counterdefendants' false advertising and unfair competition,  Defense Distributed has suffered significant injuries, including:

     a.  Loss of Business and Revenue: The false statements caused a substantial decline in DEFCAD's user engagement, downloads, and subscription sales, leading to a measurable loss of revenue.

     b.  Damage to Business Reputation: The dissemination of the "FEDCAD" meme and related false statements severely damaged Defense Distributed's reputation in the market for digital firearms files, causing a loss of goodwill and customer trust.

     c.  Increased Costs and Legal Fees:  Defense Distributed incurred substantial expenses in responding to the false statements, including legal fees for addressing fraudulent copyright claims and costs associated with mitigating the reputational harm caused by the false advertising.

216.  Because this counterclaim is meritorious, Defense Distributed is entitled to the following relief:

217.  A permanent injunction prohibiting the Counterdefendants from making any further false or misleading statements about  Defense Distributed, its

products, or its business practices, and requiring the Counterdefendants to retract any false or misleading statements previously made.

218.   An injunction ordering the Counterdefendants to engage in corrective advertising to counteract the false and misleading statements disseminated in their "FEDCAD" campaign and other false advertising efforts.

219.   An award of actual damages including lost profits and treble damages under 15 U.S.C. § 1117(a) due to the willful and intentional nature of the false advertising and unfair competition.

220.   An order that the Counterdefendants disgorge any profits gained as a result of their false advertising and unfair competition.

221.   An award of the costs of this action, including reasonable attorneys' fees, pursuant to 15 U.S.C. § 1117(a).

222.   All of this pleading's other paragraphs are incorporated herein.

**C.    Counterclaim Three: Computer Fraud and Abuse Act**

223.   Third, Defense Distributed brings a civil action for damages under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.  This counterclaim is asserted against all of the Counterdefendants.

224.   The CFAA provides a private cause of action against any individual who (1) intentionally accesses a protected computer without authorization or exceeds authorized access, (2) obtains information, or (3) causes damage or loss. The Counterdefendants violated this law by intentionally accessing DEFCAD's

computer systems without authorization, causing damage and loss to Defense Distributed.

225.   The Counterdefendants, including John Lettman (acting as IT Director for The Gatalog), intentionally accessed DEFCAD's servers without authorization on multiple occasions. Specifically:

a. Hacking and DDoS Attacks: The Counterdefendants executed Distributed Denial of Service (DDoS) attacks against DEFCAD's platform, disrupting its services and causing significant operational downtime.

b. DEFCAD Terms of Service. The Counterdefendants and their agents continue to use and access DEFCAD even though its terms of service bar the enterprise and its agents from doing so.

c. As a direct and proximate result of the Counterdefendants' unauthorized access, Defense Distributed suffered significant damages, including:

d. Financial Losses: Defense Distributed incurred substantial costs to investigate the breaches, implement enhanced cybersecurity measures, and repair the damage caused by the attacks.

e. Operational Disruption: The unauthorized access and DDoS attacks resulted in service outages, loss of user engagement, and reputational harm to DEFCAD.

f.  Legal Costs:  Defense Distributed incurred significant legal fees in pursuing remedies for the unauthorized access and defending against false claims stemming from the stolen data.

226.   The total damages resulting from the Counterdefendants' violations of the CFAA exceed the $5,000 threshold required under 18 U.S.C. § 1030(c)(4)(A)(i)(I).

227.   Because this counterclaim is meritorious, Defense Distributed is entitled to a judgment awarding them the following relief:

228.   Actual damages for the financial losses incurred due to Counterdefendants' unauthorized access and DDoS attacks.

229.   A permanent injunction prohibiting Counterdefendants from accessing DEFCAD's servers or engaging in any further unauthorized computer activity.

230.   Punitive damages due to the malicious and willful nature of Counterdefendants' conduct.

231.   The costs of this action, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1030(g).

232.   All of this pleading's other paragraphs are incorporated herein.

**D.   Counterclaim Four: Digital Millennium Copyright Act**

233.   Fourth, Defense Distributed brings a civil action for damages under the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 512(f).   This counterclaim is asserted against all of the Counterdefendants.

234.   Section 512(f) of the DMCA provides a cause of action against any person who knowingly makes a material misrepresentation in a DMCA takedown notice. To prevail, the plaintiff must show that (1) the Counterdefendant made a misrepresentation regarding ownership or infringement, (2) the misrepresentation was material, and (3) the plaintiff suffered damages as a result.   The Counterdefendants are liable under thie DMCA for having knowingly and materially misrepresented copyright ownership of certain 3D firearm files.

235.   As a direct and proximate result of the fraudulent DMCA notices, Defense Distributed suffered significant damages, including:

    a.  Service Interruptions: DEFCAD was forced to temporarily remove the affected files, resulting in loss of user engagement, subscriptions, and revenue.

    b.  Legal Costs:   Defense Distributed incurred legal expenses in challenging the fraudulent DMCA notices and defending against subsequent claims made by Counterdefendants.

    c.  Reputational Harm: The false claims cast doubt on DEFCAD's legal compliance and damaged its reputation among users and business partners.

236.   Because this counterclaim is meritorious, Defense Distributed is entitled to an judgment awarding them the following relief:

237.   Actual damages for the financial losses and harm suffered due to the fraudulent DMCA notices.

238.  A  permanent  injunction  preventing  Counterdefendants  from submitting any further fraudulent DMCA takedown notices related to DEFCAD's content.

239.  The  costs  of  this  action,  including  reasonable  attorneys'  fees, pursuant to 17 U.S.C. § 512(f).

240.  Punitive  damages  due  to  the  willful  and  malicious  nature  of Counterdefendants' misrepresentations.

241.  All of this pleading's other paragraphs are incorporated herein.

**E.    Counterclaim Five: Tortious Interference**

242.  Fifth, Defense Distributed brings a civil action for damages and other relief  under  tort  law's  cause  of  action  for  tortious  interference  with  business relations.  This counterclaim is asserted against all of the Counterdefendants.

243.   Defense Distributed maintains ongoing business relationships with users, contributors, and commercial partners who rely on DEFCAD's platform for the legal distribution of digital firearms files. These relationships include contractual agreements, long-term partnerships, and prospective business arrangements, all of which are essential to DEFCAD's operations and revenue generation.

244.  The  Counterdefendants  were  fully  aware  of  these  business relationships, as several of the Counterdefendants (including Elik and Holladay) were  formally  associated  with  DEFCAD  as  paid  agents  and  collaborators. This inside knowledge provided the Counterdefendants with detailed information about DEFCAD's user base, key contributors, and commercial partners.

245. The Counterdefendants intentionally interfered with Defense Distributed's business relationships through the following acts:

246. Public Disparagement and Defamation: Counterdefendants disseminated false statements, including the "FEDCAD" meme, falsely alleging that DEFCAD was cooperating with federal authorities to identify and prosecute users, thereby deterring users from continuing their business relationships with DEFCAD.

247. Coercive Threats: Counterdefendant Elik, acting on behalf of The Gatalog, demanded additional payments from DEFCAD under threat of disparagement, stating that if payments were not made, he would instruct others to issue chargebacks against DEFCAD's merchant accounts, damaging DEFCAD's financial standing and relationships with payment processors.

248. Direct Solicitation of DEFCAD's Partners: Counterdefendants, including Larosiere and Stroke, directly contacted DEFCAD's contributors and commercial partners, urging them to terminate their agreements with DEFCAD and switch to The Gatalog's competing platform, often using false and misleading claims about DEFCAD's legal compliance and business practices.

249. As a direct and proximate result of the Counterdefendants; intentional and unjustified interference, Defense Distributed has suffered significant damages, including:

250.   Loss of Revenue:  Defense Distributed lost substantial income due to the departure of users and partners who were misled by the Counterdefendants' false statements and coercive conduct.

251.   Harm to Business Relationships:  Defense Distributed experienced the termination of key contracts and partnerships, resulting in diminished market share and business opportunities.

252.   Reputational Damage: The false and defamatory statements made by Counterdefendants damaged Defense Distributed's reputation, making it difficult to attract new users and business partners.

253.   Because this counterclaim is meritorious, Defense Distributed is entitled to a judgment awarding them the following relief:

a.   Actual damages for the economic harm suffered by  Defense Distributed due to the tortious interference, in an amount to be proven at trial.

b.   Punitive damages due to the malicious and willful nature of Counterdefendants' conduct, which was aimed at destroying Defense Distributed's business relationships.

c.   An injunction prohibiting Counterdefendants from engaging in any further interference with Defense Distributed's business relationships or contractual agreements.

d.   The costs of this action, including reasonable attorneys' fees.

e.   All of this pleading's other paragraphs are incorporated herein.

### F.      Counterclaim Six: Trade Libel

254.    Sixth, Defense Distributed brings a civil action for damages and other relief under tort law's cause of action for trade libel.  This counterclaim is asserted against all of the Counterdefendants.

255.    The Counterdefendants knowingly and maliciously made numerous false and disparaging statements about DEFCAD's business practices, including but not limited to:

256.    Accusations of Collusion with Federal Authorities: Counterdefendants falsely claimed that DEFCAD was sharing user data with federal law enforcement agencies and cooperating with anti-gun organizations to "doxx" its users. These statements were made publicly on social media and in the widely circulated "FEDCAD" meme.

257.    Allegations of Security Breaches: Counterdefendants falsely alleged that DEFCAD's platform had been hacked and that user data had been leaked, despite clear evidence to the contrary from cybersecurity investigations conducted by Mandiant.

258. Fraudulent Copyright Claims: Counterdefendants, particularly Larosiere and Elik, falsely asserted ownership of certain 3D firearm files that were publicly available under open-source licenses. These claims were made to disrupt DEFCAD's operations and dissuade users from using its platform.

259.    In these respects, the Counterdefendants acted with actual malice and reckless disregard for the truth. The false statements were made intentionally

to damage DEFCAD's business reputation and divert business to The Gatalog. The Counterdefendants knew that the statements were false or acted with reckless disregard as to their truth or falsity, given their insider knowledge and prior association with DEFCAD.

260.   The false statements made by the Counterdefendants caused direct and measurable pecuniary loss to  Defense Distributed, including:

a. Loss of Customers and Revenue: Users and contributors left the DEFCAD platform due to fears of data breaches and unethical practices falsely attributed to DEFCAD, resulting in significant revenue loss.

b. Harm to Prospective Business Opportunities: The false statements deterred potential business partners and investors from engaging with DEFCAD, causing further financial harm.

c. Increased Legal Costs:  Defense Distributed incurred substantial legal fees to address the false copyright claims and defend against the defamatory statements.

261.   Because this counterclaim is meritorious, Defense Distributed is entitled to a judgment awarding them the following relief:

a. Actual damages for the economic harm suffered by  Defense Distributed due to the trade libel, in an amount to be proven at trial.

b. Punitive damages due to the malicious and willful nature of Counterdefendants' conduct, which was aimed at destroying Defense Distributed's business relationships.

c. Costs of this action, including reasonable attorneys' fees.

262. All of this pleading's other paragraphs are incorporated herein.

**G.    Counterclaim Seven: Florida DUTPA.**

263. Seventh, Defense Distributed brings a civil action for damages under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.204. This counterclaim is asserted against all of the Counterdefendants.

264. FDUTPA prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). The statute broadly defines "deceptive acts" as practices likely to mislead a consumer acting reasonably, while "unfair practices" are those that offend established public policy or are unethical, oppressive, unscrupulous, or substantially injurious to consumers. It is violated here because the Counterdefendants engaged in a pattern of deceptive and unfair business practices that have caused substantial harm to Defense Distributed's business operations, reputation, and economic interests.

265. Specifically, the Counterdefendants have engaged in multiple deceptive acts in the course of trade or commerce, including but not limited to:

266. EAR Violations. The Counterdefendants engaged in deceptive trade practices by willfully violating the EAR regulations applicable to files that are

"'ready for insertion" to manufacturing machines, 15 C.F.R. §§ 734.3(d), 734.7(c), which prohibit the kind of distribution that the Counterdefendants are continuously engaged in.

267.  False  Advertising  Campaign  ("FEDCAD"  Meme):  The Counterdefendants created and disseminated a false advertising campaign, known as the "FEDCAD" meme, which falsely alleged that DEFCAD was colluding with federal law enforcement agencies and anti-gun organizations to monitor and identify its users. This deceptive campaign was designed to undermine DEFCAD's reputation, mislead consumers, and divert business to The Gatalog.

268.  Misrepresentation of Legal Compliance: The Counterdefendants falsely represented to the public and potential users that DEFCAD was violating federal export control laws and data privacy regulations. These misrepresentations were intended to deceive consumers about the legality and safety of using DEFCAD's platform, steering customers away from DEFCAD and toward The Gatalog's competing services.

269.  In addition to their deceptive acts, the Counterdefendants engaged in several unfair business practices that violate FDUTPA, including:

a. Market  Manipulation  through  Coercion  and  Extortion: Counterdefendant John Elik, acting on behalf of The Gatalog, coerced DEFCAD into making payments under threat of disparagement and financial  sabotage.  Elik  publicly  threatened  to  orchestrate chargebacks against DEFCAD's merchant accounts if his financial

demands were not met, thereby attempting to damage DEFCAD's financial stability and merchant relationships.

b. Destruction of Evidence and Obstruction of Justice: Counterdefendants, including Peter Celentano and Alexander Holladay, intentionally deleted chat logs, social media posts, and other communications after receiving a litigation hold notice from Defense Distributed. This spoliation of evidence was an unfair practice designed to conceal their deceptive acts and obstruct the legal process, further harming Defense Distributed's business.

c. False Copyright Claims to Disrupt Market Competition: Counterdefendants, particularly Larosiere and MAF Corp, filed fraudulent copyright registrations for popular open-source 3D firearm files, falsely claiming exclusive ownership. These actions were intended to monopolize the market for these files and harm DEFCAD's ability to operate lawfully, constituting an unfair method of competition.

270. As a direct and proximate result of the Counterdefendants deceptive and unfair practices, Defense Distributed has suffered actual damages, including:

a. Loss of Revenue: The false advertising campaign and fraudulent DMCA takedown notices caused a significant decline in user engagement, subscriptions, and sales on DEFCAD's platform.

b. Reputational Harm: The widespread dissemination of the "FEDCAD" meme and false statements about DEFCAD's legal compliance severely damaged Defense Distributed's reputation, making it difficult to attract new users, contributors, and business partners.

c. Increased Legal and Compliance Costs: Defense Distributed incurred substantial expenses in addressing the fraudulent DMCA notices, defending against false advertising claims, and implementing enhanced compliance measures in response to the misrepresentations made by Counterdefendants.

271.   Because this counterclaim is meritorious, Defense Distributed is entitled to a judgment awarding them the following relief:

a. Actual damages for the financial losses suffered by  Defense Distributed due to Counterdefendants' deceptive and unfair practices, in an amount to be determined at trial.

b. A declaratory judgment that Counterdefendants' conduct violated FDUTPA and that their deceptive and unfair practices caused actual harm to Defense Distributed.

c. A permanent injunction enjoining Counterdefendants from engaging in any further deceptive or unfair trade practices, including false advertising and fraudulent copyright claims.

d.  A permanent injunction enjoining Counterdefendants from submitting any additional false or misleading DMCA takedown notices against DEFCAD's content.

e.  A permanent injunction enjoining Counterdefendants from making false statements about DEFCAD's legal compliance or business practices.

f.  An order requiring disgorgement of all profits obtained by Counterdefendants as a result of their deceptive and unfair practices.

g.  An order awarding Defense Distributed its costs of this action, including reasonable attorneys' fees, pursuant to Fla. Stat. § 501.2105.

h.  An award of punitive damages due to the willful and malicious nature of Counterdefendants' conduct, which was aimed at harming Defense Distributed's business and misleading consumers.

272.  All of this pleading's other paragraphs are incorporated herein.

**H.   Counterclaim Eight: Spoliation.**

273.  Defense Distributed brings a civil action for spoliation under the Federal Rules of Civil Procedure and Federal Rules of Evidence, *see Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1543 (11th Cir. 1993), and under Florida law, *see, e.g.*, *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1308 (11th Cir. 2003).   This counterclaim is asserted against all of the Counterdefendants.

274.   The Counterdefendants knew that they had an obligation to preserve evidence about this action's Counterclaims but failed to comply with that obligation and opted instead to affirmatively destroy material evidence willfully and in bad faith.  The spoliated evidence was highly material to this action's Counterclaims, its absence is highly prejudicial, and the resulting error cannot be cured.  Defense Distributed is therefore entitled to (1) an order establishing adverse inferences against the Counterdefendants as to each issue the spoliated evidence pertained to, and (2) an order entering a default judgment against the Counterdefendants.

275.   All of this pleading's other paragraphs are incorporated herein.

## VII.   Prayer for Relief

276.   With respect to Defense Distributed's counterclaims against the Counterdefendants, Defense Distributed prays for the following relief:

    a. A judgment in favor of the Defense Distributed and DEFCAD, Inc. and against the Counterdefendants as to all causes of action pleaded in this counterclaim.

    b. Compensatory Damages: An award of actual damages in an amount to be determined at trial, but no less than the $385,000 in economic losses already calculated for the period of June 2023 to present.

    c. Compensatory Damages: An award of treble damages pursuant to 18 U.S.C. § 1964(c) and 15 U.S.C. § 1117(a) in an amount to be determined at trial, but no less than $1,155,000 for the period of June 2023 to present.

d. Punitive Damages: An award of exemplary/punitive damages.

e. Disgorgement: An order requiring disgorgement by the Counterdefendants and payment to Defense Distributed of all profits wrongfully obtained by Counterdefendants as a result of their unlawful activities.

f. Injunctive Relief: An order enjoining the Counterdefendants from continuing to commit the illegal actions established here.

g. Injunctive Relief: An order enjoining the Counterdefendants to issue corrective advertising about their false and misleading statements.

h. Dissolution: An order dissolving The Gatalog enterprise and its affiliated entities or, alternatively, an order imposing reasonable restrictions on The Gatalog's future activities to prevent further unlawful conduct.

i. Costs: An order that Defense Distributed recover from the Counterdefendants all of the Defense Distributed's costs.

j. Attorney's Fees: An order that Defense Distributed recover from the Counterdefendants an award of reasonable attorney's fees.

k. Interest: An order that Defense Distributed recover from the Counterdefendants prejudgment and postjudgment interest on all monetary damages, at the highest legal rate, from the earliest date allowable under law until the date of payment.

l.   Spoliation: An order that remedies the Counterdefendants' willful and bad faith spoliation of evidence by entering a default judgment on the merits against the Counterdefendants or, alternatively, a lesser sanction.

m. Any other relief deemed just and proper.

**Answer**

In response to Plaintiff's Complaint, Doc. 1, Defendants Cody Rutledge Wilson, DEFCAD, Inc., Defense Distributed, and Counterdefendant Dioskouroi LLC plead the following answer:

**I.    Denials & Admissions.**

277.   Defendants deny each and every one of the Complaint's allegations except those specified otherwise herein:

278.   Defendants admit Complaint paragraph 2, except that Defendants lack sufficient information to either admit or deny that Plaintiff is the exclusive owner of all works at issue in this litigation.

279.   Defendants admit Complaint paragraph 3 but deny the allegation regarding alter ego.

280.   Defendants admit Complaint paragraph 21.

281.   Defendants admit Complaint paragraph 22.

282.   Defendants admit Complaint paragraph 23.

283.   Defendants admit Complaint paragraph 24.

284.   Defendants admit Complaint paragraph 26.

285. Defendants admit Complaint paragraph 27.

286. Defendants admit Complaint paragraph 28.

287. Defendants admit Complaint paragraph 29.

288. Defendants admit Complaint paragraph 30.

289. Defendants admit Complaint paragraph 32.

290. Defendants admit Complaint paragraph 33.

291. Defendants admit Complaint paragraph 35.

292. Defendants admit Complaint paragraph 36.

293. Defendants admit Complaint paragraph 37.

294. Defendants admit Complaint paragraph 39.

295. Defendants admit Complaint paragraph 40.

296. Defendants admit Complaint paragraph 41.

297. Defendants admit Complaint paragraph 42.

298. Defendants admit Complaint paragraph 45.

299. Defendants admit Complaint paragraph 46.

300. Defendants admit Complaint paragraph 48.

301. Defendants admit Complaint paragraph 51.

302. Defendants admit Complaint paragraph 52.

303. Defendants admit Complaint paragraph 66.

304. Defendants admit Complaint paragraph 67.

305. Defendants admit Complaint paragraph 66.

306. Defendants admit Complaint paragraph 67.

307.   Defendants admit Complaint paragraph 72.

308.   Defendants admit Complaint paragraph 74.

309.   Defendants admit Complaint paragraph 77.

310.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 80.

311.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 82.

312.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 85.

313.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 86.

314.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 87.

315.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 90.

316.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 93.

317.   Defendants admit Complaint paragraph 97.

318.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 99.

319.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 100.

320. Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 101.

321. Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 102.

322. Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 103.

323. Defendants admit Complaint paragraph 104.

324. Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 105.

325. Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 106.

326. Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 107.

327. Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 108.

328. Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 109.

329. Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 110.

330. Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 111.

331.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 112.

332.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 113.

333.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 114.

334.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 115.

335.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 116.

336.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 118.

337.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 119.

338.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 121.

339.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 122.

340.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 124.

341.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 125.

342.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 127.

343.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 128.

344.   Defendants admit Complaint paragraph 130.

345.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 134.

346.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 135.

347.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 136.

348.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 137.

349.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 139.

350.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 140.

351.   Defendants admit Complaint paragraph 141.

352.   Defendants admit Complaint paragraph 142.

353.   Defendants admit Complaint paragraph 143.

354.   Defendants admit Complaint paragraph 144

355.   Defendants admit Complaint paragraph 146 only to the extent that Defendant Wilson noted Plaintiff attempted to register certain files with the U.S. Copyright Office, not that such registration was actually successful or approved.

356.   Defendants admit Complaint paragraph 147.

357.   Defendants admit Complaint paragraph 150 only to the extent that the fedcad website contains certain content, the nature of which speaks for itself.

358.   Defendants admit Complaint paragraph 152.

359.   Defendants admit Complaint paragraph 153.

360.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 154.

361.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 155.

362.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 156.

363.   Defendants admit Complaint paragraph 157.

364.   Defendants admit Complaint paragraph 158 only to the extent that the shipment contained certain items, not that any of those items were infringing.

365.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 159.

366.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 160.

367.   Defendants admit Complaint paragraph 162.

368.   Defendants admit Complaint paragraph 164.

369.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 165.

370.   Defendants admit Complaint paragraph 166.

371.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 168

372.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 169.

373.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 170.

374.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 173.

375.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 174.

376.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 176.

377.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 178.

378.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 179.

379.   Defendants admit Complaint paragraph 180.

380. Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 181.

381. Defendants admit Complaint paragraph 182.

382. Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 183 .

383. Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 184.

384. Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 185.

385. Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 186.

386. Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 187.

387. Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 188.

388. Defendants admit Complaint paragraph 190.

389. Defendants admit Complaint paragraph 191 only to the extent of blacklisting and deny the remaining allegations.

390. Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 192.

391. Defendants admit Complaint paragraph 193.

392. Defendants admit Complaint paragraph 194.

393.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 195.

394.   Defendants repeat their responses to each incorporated paragraph.

395.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 197.

396.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 198.

397.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 200.

398.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 204.

399.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 208.

400.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 212.

401.   Defendants admit Complaint paragraph 216.

402.   Defendants admit Complaint paragraph 220.

403.   Defendants admit Complaint paragraph 222.

404.   Defendants admit Complaint paragraph 237.

405.   Defendants admit Complaint paragraph 240 only to the extent that the pleaded website contains certain pages, not that any pages "misattribute" anything.

406.   Defendants admit Complaint paragraph 241 only to the extent that the pleaded website contains certain pages, not that any pages "misattribute" anything.

407.   Defendants admit Complaint paragraph 242 only to the extent that Wilson asked Diaz to create an image.

408.   Defendants admit Complaint paragraph 243.

409.   Defendants admit Complaint paragraph 247.

410.   Defendants admit Complaint paragraph 248.

411.   Defendants admit Complaint paragraph 249.

412.   Defendants admit Complaint paragraph 250.

413.   Defendants admit Complaint paragraph 251.

414.   Defendants admit Complaint paragraph 252.

415.   Defendants lack sufficient information to either admit or deny the allegations of Complaint paragraph 267.

## II.   Defenses.

416.   The Complaint's claims are defeated by the defense of estoppel.

417.   The Complaint's claims are defeated by the defense of fraud.   In particular, Plaintiff knowingly misrepresented ownership of digital firearm files that were in fact publicly available under open-source licenses; these fraudulent claims disrupted DEFCAD's business operations and harmed its reputation.   Plaintiff also engaged in fraudulent advertising campaigns, including the dissemination of the "FEDCAD" meme, which falsely claimed that DEFCAD was colluding with federal

authorities and anti-gun organizations.  These fraudulent acts were made with the intent to deceive Defendants and the public, resulting in financial harm, lost business opportunities, and reputational damage.

418.   The Complaint's claims are defeated by the defense of illegality.

419.   The Complaint's claims are defeated by the defense of laches .

420.   The Complaint's claims are defeated by the defense of license.

421.   The Complaint's claims are defeated by the defense of payment.

422.   The Complaint's claims are defeated by the defense of release.

423.   The Complaint's claims are defeated by the defense of waiver.

424.   The Complaint's claims are defeated by the defense of good faith.

425.   The Complaint's claims are defeated by the defense of unclean hands.

**III.   Attorney's Fees & Costs.**

426.   The Copyright Act in 17 U.S.C. § 505 entitles Defense Distributed to recover from the Counterdefendants all of the Defense Distributed's costs for the action, including reasonable attorney's fees.  *See* 17 U.S.C. § 505 ("In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.").  That provision applies to any civil action under Chapter 5 of the Copyright Act, 17 U.S.C. § 505, which the Complaint pleads this action to be, *see* Doc. 1 at 43, 46, 55, ¶¶ 213, 214, 230, 231,

232, 233, 272(b)-(c).   It entitles Defense Distributed to an award of all of the action's costs, including a reasonable attorney's fee, because each Counterplaintiff will be a § 505 "prevailing party" and such an award will advance the interests of the Copyright Act.   *See*, *e.g.*, *MiTek Holdings, Inc. v. Arce Eng'g Co., Inc.*, 198 F.3d 840, 842 (11th Cir. 1999) ("The touchstone of attorney's fees under § 505 is whether imposition of attorney's fees will further the interests of the Copyright Act . . . ." (applying *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994)).

427.   The Lanham Act in 15 U.S.C. § 1117 entitles Defense Distributed to recover from the Counterdefendants all of the Defense Distributed's costs for the action, including reasonable attorney's fees.   *See* 15 U.S.C. ¶ 1117(a) ("The court in exceptional cases may award reasonable attorney fees to the prevailing party."). That provision applies to cases brought under the Lanham act, 15 U.S.C. § 1117(a), which the Complaint pleads this action to be, *see* Doc. 1 at 1, ¶ 1.   It entitles Defense Distributed to an award of all of the action's costs, including a reasonable attorney's fee, because Defense Distributed will be a § 1117(a) "prevailing party" and the action will entail § 1117(a) "exceptional circumstances" due to the Defense Distributed's strength of legal position and manner of litigation. *See, e.g.*, *Tobinick v. Novella*, 884 F.3d 1110 (11th Cir. 2018) ("to be an 'exceptional case' under the Lanham Act requires only that a case 'stands out from others,' either based on the strength of the litigating positions or the manner in which the case was litigated" (applying *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014)).

428.   Federal Rule of Civil Procedure 54 entitles Defense Distributed to recover from the Counterdefendants all of the Defense Distributed's costs for the action.   *See* Fed. R. Civ. P. 54(d)(1) ("Unless a federal statute, these rules, or a court order provides otherwise, costs--other than attorney's fees--should be allowed to the prevailing party.").   That provision applies to all civil actions, *id.*, which the Complaint pleads this action to be, *see* Doc. 1 at 1, ¶ 1.   It entitles Defense Distributed to an award of all of the action's costs, including every cost made recoverable by 28 U.S.C. §§ 1920 and 1921, because Defense Distributed will be a Rule 54 "prevailing party."

## IV.   Prayer for Relief

429.  With respect to the Plaintiff's claims against the Defendants, Defendants pray for the following relief:

a.  An order dismissing the Plaintiff's complaint against the Defendants or, alternatively, an order that Plaintiff take nothing on any of its claims against the Defendants.

b.  An order that Defendants recover from the Plaintiff an all of the Defendants' costs for the entire action.

c.  An order that the Defendants recover from the Plaintiff an award of reasonable attorney's fees for the entire action.

d.  Any other relief deemed just and proper.

Respectfully submitted,

Chad Flores
cf@chadflores.law
Texas Bar No. 24059759
Flores Law PLLC
917 Franklin Street
Suite 600
Houston, Texas 77002
T (713) 364-6640
F (832) 645-2496

David S. Gingras
david@gingraslaw.com
Arizona Bar No. 021097
California Bar No. 218793
Gingras Law Office PLLC
4802 E. Ray Rd. #23-271
Phoenix, Arizona 85044
T (480) 264-1400
F (480) 248-3196

F. Andino Reynal
areynal@frlaw.us
Texas Bar No. 24060482
The Reynal Law Firm, PC
917 Franklin Street
6th Floor
Houston, Texas 77002
T (713) 228-5900
F (713) 820-6981

Counsel for Cody Wilson, DEFCAD, Inc.,
Defense Distributed, and Dioskouroi LLC