# 8

## Creativity and Utility: 3D Printable Files and the Boundary Between Copyright and Patent Protection

**Chapter Outline:**

A. U.S. Law: DMFs Are Not a Separate Category of Copyrightable
   "Works," and Whether Files Are "Useful Articles" Is Irrelevant     145
B. U.S. Law: Pictorial Works and DMFs of Utilitarian
   Objects – The Boundary Between Copyright and Patent
   Protection                                                         148
C. Outside the United States: DMFs of Utilitarian Objects            166
D. DMFs as Literary Works                                            169
E. Ancillary Comments or Images Embedded in DMFs – Appending
   Copyright Protection?                                             171
F. Conclusion                                                        177

Copyright disputes over DMFs have been taking place for years.[1] Katy Perry's accusation of copyright infringement against a DMF of "left shark" (a Super Bowl meme), the Estate of Marcel Duchamp's assertion of IP rights against a 3D printable chess set modeled after a work by Duchamp, and Augustana College's assertion that an artist needed its permission to create DMFs from a public domain sculpture on its campus all reveal the prevalence of copyright law in 3D printing.[2]

Of all parts of IP, the copyright system is best prepared for 3D printing because it has faced digitization issues before. Indeed, for decades it has adapted to multiple shifts in media, such as music media progressing from sheet music to records to tapes to CDs to MP3s. There are, however, issues endemic to copyright law that will cause frustration in a world where legally unsophisticated individuals can create and share a vast array of works. These include difficulty in understanding what copyright covers, when it expires,

---

[1]  Matthew Rimmer, *The Maker Movement: Copyright Law, Remix Culture and 3D Printing*, 41 W. Austl. L. Rev. 51 (2017) (describing several copyright-based disputes involving 3D printing).

[2]  *See id.*

https://doi.org/10.1017/9781316584507.009 Published online by Cambridge University Press

infringement issues, and what constitutes fair use (fair dealing).[3] Other important and delicate issues include the application of moral rights to DMFs,[4] the line between industrial design (design patent) and copyright law, or any number of issues that, while intractable, are made no more difficult by 3D printing technology. This chapter will not focus on these issues because they are not novel enough – they have clear analogues in other works.

On the other hand, 3D printing technology raises one issue not raised by the digitization of music, images, or books: the boundary between copyright and patent law. DMFs can be displayed as drawings and text, and thus potentially implicate copyright law. But they simultaneously serve as direct manufacturing precursors to tangible objects, and when a DMF will print a utilitarian object, patent policy is implicated. DMFs now embody much of the economic value of the corresponding utilitarian objects they will manufacture, raising important questions about what role, if any, copyright should play for the files.

This chapter analyzes the balance between patent law and copyright law and emphasizes the existing doctrinal landscape that, if properly interpreted, will channel works between patent and copyright law. This chapter begins with some U.S. copyright law basics to explore its application to DMFs. This doctrinal overview is helpful to the nonexpert and is necessary to clear up misconceptions in the U.S. literature. Analysis then proceeds to address the copyright status of DMFs that depict purely utilitarian objects, first from a U.S. perspective and then from other countries' perspectives.

The bulk of the analysis will be on DMFs that will manufacture utilitarian objects not protected by copyright law. I will refer to these objects as "purely utilitarian" or sometimes simply as "utilitarian" objects, but both terms are

---

[3] Helpful explorations of these topics in the 3D printing context can be found. *See, e.g.,* Simon Bradshaw et al., *The Intellectual Property Implications of Low-Cost 3D Printing.* 7 SCRIPTED 5, 24 (2010); Thomas Margoni, *Not for Designers: On the Inadequacies of EU Design Law and How to Fix It,* 4 J. INTELL. PROP., INFO. TECH., & E-COM. L. 225 (2013) (EU law); Matthew Rimmer, *Makers Empire: Australian Copyright Law, 3D Printing, and the 'Ideas Boom', in* 3D PRINTING AND BEYOND: INTELLECTUAL PROPERTY AND REGULATION (Dinusha Mendis, Mark Lemley, & Matthew Rimmer eds., 2019) (Australian law); Michael Weinberg, *What's the Deal with Copyright and 3D Printing?,* PUBLIC KNOWLEDGE (Jan. 2013), www.publicknowledge.org/files/What%27s%20the%20Deal%20with%20Copyright_%2 0Final%20version2.pdf (U.S. law).

[4] Many helpful analyses of the role of moral rights in digital environments exist. For early works, see Jane C. Ginsburg, *Have Moral Rights Come of (Digital) Age in the United States?,* 19 CARDOZO ARTS & ENT. L.J. 1, 17 (2001) and J. Carlos Fernández-Molina & Eduardo Peis, *The Moral Rights of Authors in the Age of Digital Information,* 52 J. AM. SOC'Y. INFO. SCI. & TECH. 109 (2001). For a more recent work, which includes a rich discussion of many works, see Peter K. Yu, *Moral Rights 2.0,* 1 TEX. A&M L. REV. 873 (2014).

https://doi.org/10.1017/9781316584507.009 Published online by Cambridge University Press

inexact. What I am actually referring to are tangible objects that receive no copyright protection because they are, in a sense, too utilitarian. Such objects may contain ingenuity or even aesthetic appeal, but, to police the boundary between copyright law and patent law, copyright law does not protect them. In some countries, this issue is phrased in terms of whether the object has "separable" creativity, while others simply include a heightened standard of creativity for utilitarian articles.[5]

This chapter will not analyze separability tests or other tests that determine whether a tangible object should receive copyright protection. Instead, it will *assume* the physical utilitarian object does not receive protection under a country's copyright law and will proceed to analyze whether the DMF that will print the object receives copyright protection. This will focus attention on the novel copyright law aspect raised by physitization.

## A. U.S. LAW: DMFS ARE NOT A SEPARATE CATEGORY OF COPYRIGHTABLE "WORKS," AND WHETHER FILES ARE "USEFUL ARTICLES" IS IRRELEVANT

The U.S. copyright statute provides a non-exhaustive list of protected works that includes literary works, musical works, motion pictures, sound recordings, and "pictorial, graphic, and sculptural works" (PGS works).[6] The statute in turn defines PGS works in part as "two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans."[7]

To analyze the basic application of the statute, imagine an original, beautiful, and creative sculpture that an artist carved from a block of marble. Copyright law protects the sculpture as a PGS work, but the law uses some nonintuitive vocabulary that must be grasped. The sculptural "work" protected by the statute is an intangible thing.[8] Copyright law labels *any* tangible instantiation of a work, *including the original*, as a "copy."

---

[5]  *See, e.g.,* Star Athletica, L.L.C. v. Varsity Brands, Inc., 137 S. Ct. 1002 (2017) (applying a separability test); Case C-168/09, Flos SpA v. Semeraro Casa e Famiglia SpA, 2011 E.C.R. I-00181 (referencing the Italian scindabilità doctrine); Lucasfilm Ltd v. Ainsworth, [2011] UKSC 39 (analyzing what constitutes a sculpture under UK law).

[6]  17 U.S.C. § 102(a).

[7]  *Id.* at § 101.

[8]  *Id.* at § 102 ("Copyright protection subsists … in original works of authorship fixed in any tangible medium of expression … "); *see also* Mark P. McKenna & Lucas S. Osborn, *Trademarks and Digital Goods*, 92 NOTRE DAME L. REV. 1425, 1459 (2017) ("[C]opyright attaches to the intangible work of authorship, *not* to the tangible copy in which it is fixed.").

Copies are defined as "material objects . . . in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."[9] So the original sculpture as carved by the artist is a copy because that is where the intangible sculptural work was fixed such that it was perceptible.

To understand how copyright law applies to DMFs, imagine that the artist did not sculpt the marble. Instead, imagine the artist had a mental image of the same sculptural work and created a 3D model of it in a CAD program. The artist then converted the design file into a surface-mesh file and converted that into a machine-instruction file, which was then 3D printed. The end result is a physical sculpture, which is clearly protected as a copy under the statute.

But what about the DMFs? As should be clear, DMFs are not "works." Rather, the DMF that will print the tangible sculpture is a "copy" of the sculptural work, just like a MOV file is a copy of a motion picture. Tracking the statutory definition of a copy, a machine-instruction file is a material object (namely the tangible computer memory) in which the sculptural work is fixed (i.e., stored), and from which the work can be perceived (i.e., seen) with the aid of a machine (i.e., a 3D printer).

It is also important to understand that a DMF simultaneously can be a copy of other types of works. For example, because a computer can use a machine-instruction file to depict a two-dimensional image on a computer screen or on a printed sheet of paper, the file is also a copy of a pictorial work. The same is true for the surface-mesh version and the design version. Moreover, because a DMF of a sculpture can be depicted in a text (code) form as described in Chapter 2, it also constitutes a literary work whose text inherently embodies the originality of the sculpture it can print.

Even though DMFs are not copyrightable works, it is common, if inexact, to say that DMFs are protected by copyright. A more precise statement would be that a DMF is a copy of a protected work.[10] People who make unauthorized copies of that DMF commit copyright infringement by violating the copyright holder's reproduction right. But that is a mouthful, so it is common to elide the phrase and simply state that a file is protected by copyright.

The early 3D printing literature, however, evidences problematic confusion about DMFs and copyrightable works. Some commentators have mistakenly

---

[9]  17 U.S.C. § 101.
[10] 17 U.S.C. § 102(a). ("Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.")

https://doi.org/10.1017/9781316584507.009 Published online by Cambridge University Press

sought to analyze whether DMFs constitute works.[11] They do not. They are copies of PGS and literary works. At best, this confused analysis leads to pointless, complicated tests.[12] At worst, it compounds into other errors.

For example, the confusion that DMFs constitute their own category of works has led some authors to erroneously query whether DMFs constitute "useful articles."[13] They do not. A useful article is "an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information."[14] For example, a fuel injector is a useful article. To prevent copyright protection from extending to useful articles, the statute states:

> [PGS] works shall include works of artistic craftsmanship insofar as their form *but not their mechanical or utilitarian aspects* are concerned; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.[15]

In short, if a tangible object has a utilitarian function that is not merely to portray the appearance of the article (which is what a sculpture does) or to convey information (which is what printed words do), the utilitarian aspects of that object cannot be protected by copyright.

---

[11]  *See* Kyle Dolinsky, Note, *CAD's Cradle: Untangling Copyrightability, Derivative Works, and Fair Use in 3D Printing*, 71 Wash. & Lee L. Rev. 591, 628–57 (2014) (performing a search for the appropriate analogy to DMFs among other works that copyright protects and concluding that DMFs are not perfectly analogous to architectural plans or technical drawings); Nathan Reitinger, Comment, *CAD's Parallel to Technical Drawings: Copyright in the Fabricated World*, 97 J. Pat. & Trademark Off. Soc'y 111, 133 (2015) (analyzing how to "assert a copyright on the CAD file itself"); Brian Rideout, *Printing the Impossible Triangle: The Copyright Implications of Three-Dimensional Printing*, 5 J. Bus. Entrepreneurship & L. 161, 168 (2011) (erroneously concluding that DMFs are not "copyrightable software" because they are "more of a blueprint"); Sarah Swanson, Note, *3D Printing: A Lesson in History: How to Mold the World of Copyright*, 43 Southwestern L. Rev. 483, 489 (2014) ("Another option is to create a new category of protection or qualify the object and digital blueprint as a new medium.").

[12]  *Cf.* Dolinsky, *supra* note 11, at 642–51 (proposing a "composite test for copyrightability of CAD files").

[13]  *See* Dolinsky, *supra* note 11, at 633–34 (stating that it is unclear whether DMFs constitute useful articles); Darrell G. Mottley, *Intellectual Property Issues in the Network Cloud: Virtual Models and Digital Three-Dimensional Printers*, 9 J. Bus. & Tech. L. 151, 159–161 (2014) (analyzing DMFs as useful articles); Reitinger, *supra* note 11, at 136 (analyzing DMFs as useful articles).

[14]  17 U.S.C. § 101.

[15]  *Id.* (emphasis added).

https://doi.org/10.1017/9781316584507.009 Published online by Cambridge University Press

Further, when the copyright statute uses the phrase "the design of a useful article," it is referring to things that might otherwise be copyrightable works. It is not referring to substrates that contain copies of works. Pages containing the words in a book, canvases that support the brushstrokes of paintings, and computer memory that holds digital code for a song are all useful articles, but they are not determinative of the question of whether literary works, pictorial works, and sound recordings, respectively, constitute protectable works. Hence, it is a red herring to ask whether DMFs are useful articles.[16]

Rather, the copyright question is whether the object the DMF will manufacture or depict constitutes a useful article.[17] If the 3D printed object is purely a useful article, it is not protected by copyright. On the other hand, if the 3D printed object is an aesthetic sculpture, it is copyrightable subject matter (and any DMF that would print it or display an image of it is protected by copyright).

### B. U.S. LAW: PICTORIAL WORKS AND DMFS OF UTILITARIAN OBJECTS – THE BOUNDARY BETWEEN COPYRIGHT AND PATENT PROTECTION

This section analyzes a more contentious issue, one on which copyright scholars disagree.[18] The issue is whether a DMF depicting a purely utilitarian

---

[16] In the sense used by the Court in Star Athletica, L.L.C. v. Varsity Brands, Inc., 137 S. Ct. 1002 (2017), the computer memory is of course a useful article, but the code on the memory is easily separable. Many believe the *Star Athletica* Court needlessly complicated matters by using a separability analysis to separate the shapes on the cheerleading outfits from the underlying useful article (the blank outfits). Under that framework, just about every case needs a separability analysis because a painting rests on the useful article of a canvas and printed words rest on the useful article of paper. It would be easier to say that the cheerleading case involved a design *on* a useful article, rather than a design *of* a useful article.

[17] *See, e.g.*, 2 WILLIAM F. PATRY, PATRY ON COPYRIGHT § 3:145 (March 2017) (stating that one must ask "if the design for which protection is sought is a PGS work, is the three-dimensional article that it is the design of, according to the statutory definition, a 'useful article.'"). Interestingly, Mr. Patry changed the language of this query in the 2018 update. He now asks, "[I]f the design for which protection is sought is a PGS work, is the article in which it is embodied a 'useful article' as defined in the statute?" This change is probably to be consistent with the *Star Athletica* mode of analysis.

[18] When I say that copyright scholars disagree as to my specific argument, I am referring to numerous personal conversations with copyright commentators who have seen me present my research. My specific arguments regarding the design of a useful article are novel, so no one has had the opportunity to respond to them in writing. I have no formal count but would estimate that about half agree with my analysis and half do not. In the broader sense, copyright scholars often disagree about the appropriateness of copyright protection for works that are largely utilitarian in nature. *See, e.g.*, Peter S. Menell, *Tailoring Legal Protection for Computer*

object can enjoy copyright protection as a copy of a pictorial work.[19] To reify the issue, consider a DMF of a shovel that has no artistic features.

It is clear that the 3D printed shovel does not enjoy copyright protection because it is a useful article.[20] It has the intrinsic utilitarian function of helping to dig holes. Because the shovel does not qualify as a sculptural work, the DMF of the shovel is not a copy of a sculptural work.

But recall that a DMF can constitute a copy of more than one kind of work. It can be a copy of a sculptural work, a pictorial work, and a literary work (and if it would print a building, an architectural work). Hence, the next issue concerns the DMF as a pictorial work: Since the DMF can, with the aid of a computer, generate a drawing of the shovel, is it protectable as a copy of a pictorial work?

I have elsewhere argued that exact engineering drawings consisting only of the shape of a useful article are not protectable.[21] Others offer the opposite view.[22] The issue is debatable as a matter of statutory interpretation, Supreme Court case law, and policy. This subsection sorts through these arguments.

### The "Design" of a Useful Article

Although the fact is rarely appreciated, the Copyright Act does not necessarily exclude only tangible useful articles from copyright protection. Instead, it

*Software*, 39 STAN. L. REV. 1329 (1987) (arguing for sui generis protection for programs); A. Samuel Oddi, *An Uneasy Case for Copyright Than for Patent Protection of Computer Programs*, 72 NEB. L. REV. 351 (1993) (arguing that programs should be protected by patent law, not copyright law); J. H. Reichman, *Computer Programs as Applied Scientific Know-How: Implications of Copyright Protection for Commercialized University Research*, 42 VAND. L. REV. 639 (1989); Pamela Samuelson et al., A *Manifesto Concerning the Legal Protection of Computer Programs*, 94 COLUM. L. REV. 2308 (1994) (critiquing copyright protection of software and arguing for sui generis protection for programs).

[19] To reiterate what was stated in the introduction to this chapter, this section does not analyze DMFs that will manufacture objects that contain a separable mixture of utilitarian and aesthetic features. If the tangible object is protected by copyright law, so is the corresponding DMF.

[20] A useful article is "an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." 17 U.S.C. § 101.

[21] Lucas S. Osborn, *Intellectual Property Channeling for Digital Goods*, 39 CARDOZO L. REV. 1303 (2018) [hereinafter, Osborn, *IP Channeling*]; Lucas S. Osborn, *The Limits of Creativity in Copyright: Digital Manufacturing Files and Lockout Codes*, 4 TEX. A&M J. PROP. L. 25, 41–52 (2017).

[22] Eli Greenbaum, *Three-Dimensional Printing and Open Source Hardware*, 2 N.Y. U. J. INTELL. PROP. & ENT. L. 257, 275 (2013) (concluding without further analysis that digital manufacturing files depicting useful articles "easily qualify for copyright protection" because "[c]opyright law protects 'pictorial, graphic and sculptural works,'" including "technical drawings").

excludes "the *design* of a useful article."[23] I argue that the "design" includes the shape and appearance of the work in any instantiation, whether on the article itself or in a drawing of the article. Specifically, in defining PGS works, the statute includes language referred to as the useful article exclusion:

> [PGS] works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; *the design of a* useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.[24]

The statutory language contains an ambiguity. On one reading, the exclusion from copyright protection is for "the design" – in the abstract – of a useful article, not merely the design as it appears on or in the useful (tangible) article. Stated differently, one view is that the design of the useful article refers to the article's overall shape and appearance whether depicted (1) by the article itself or (2) in a *mere* drawing of the article.[25] Under an alternate reading, the exclusion applies only to the "design of a useful article" (i.e., its appearance or shape) *when that design/shape is portrayed by the tangible useful article itself* (but not when the design is portrayed in a drawing of the useful article). Both views are reasonable under the text.

The remainder of the sentence in the useful article exclusion does nothing to resolve the ambiguity. Supporting the broader interpretation (which I will call the "design anywhere" interpretation), the sentence applies the exclusion not only to "sculptural" works, which are 2D objects, but also to "pictorial" and "graphic" works, which are 2D images. Thus, the statute can be read to exclude anything that would otherwise be a pictorial or graphic work if that picture constitutes merely *the design of* (i.e., an exact representation of) a useful article without separable features. In support of this view, one can look to different, clearer wording in Congress's definition of an architectural work, which is defined as "*the design of a building* as embodied in any tangible medium of expression, including a building, architectural plans, or drawings."[26] Under the architectural works definition, even though a building is useful, the statute defines the *work* as *the design* of the building.

---

[23]   17 U.S.C. § 101.
[24]   *Id.* (emphasis added).
[25]   As will be discussed, drawings of useful articles can be protected by copyright if they do more than merely depict the article; that is, if they contain creative expression.
[26]   17 U.S.C. § 101 (emphasis added).

The statute also makes clear that "the design of the building" can be manifested (1) in the building itself or (2) in a drawing of the building. With the useful article exclusion, in contrast, the design of the useful article is only a protected work if it has separable PGS features. Textually, the useful article exclusion is arguably independent of whether the design is manifested (1) in the useful article itself or (2) in a drawing of the article.

On the other hand, those favoring the narrower reading (which I will call the "tangible article only" interpretation) can point to legislative history suggesting that the reference to "pictorial" and "graphic" works is meant to refer to designs applied on the surface of a useful article (i.e., surface ornamentation).[27] This is undoubtedly correct as far as it goes. The Supreme Court recently confirmed this point by noting that "the 'design of a useful article' can include two-dimensional 'pictorial' and 'graphic' features" such as surface ornamentation.[28] But this does not resolve the ambiguity. Reading the statutory mention of pictorial works to refer to surface ornamentation does not require that it refers *only* to surface ornamentation.[29] In other words, nonprotected pictorial works may also include exact representations of the useful article.

Another textual point is reasonably clear, but also not determinative. Specifically, the design of a useful article includes its shape. In *Star Athletica*, the Supreme Court defined design as referring to "'the combination' of 'details' or 'features' that 'go to make up' the useful article."[30] Shape constitutes a detail or feature that makes up the article. The legislative history

---

[27] STAFF OF H.R COMM. ON THE JUDICIARY, 87TH CONG., REP. OF THE REGISTER OF COPYRIGHTS ON THE GENERAL REVISION OF THE U.S. COPYRIGHT LAW 14 (Comm. Print 1961) ("However, when a [PGS] work is used as a design or decoration of a useful article, it would continue to have all the protection now afforded by the copyright law."); *id.* at 15 ("The copyright statute should make it clear that, for purposes of registration, the 'works of art' category includes pictorial, graphic, and sculptural works even though they may portray or be intended for use in useful articles, but that useful articles, as such, are not acceptable for deposit.").

[28] Star Athletica, L.L.C. v. Varsity Brands, Inc., 137 S. Ct. 1002, 1009 (2017) (discussing surface ornamentation applied to a cheerleading uniform, which the Court identified as a useful object).

[29] As Professor Ned Snow has pointed out to me, virtually all court treatment of the useful article doctrine limits the inquiry to the design as it exists in the useful article. I agree, but do not think it is conclusive because those courts were only analyzing the facts and arguments posed by the particular cases. They simply did not address an argument as to the meaning of the design of a useful article. A notable exception is discussed below regarding the case of Enterprises Int'l, Inc. v. Int'l Knife & Saw, Inc., No. C12-5638 BHS, 2014 WL 1365398 (W.D. Wash. Apr. 7, 2014).

[30] *Star Athletica*, 137 S. Ct. at 1009 (quoting OXFORD ENGLISH DICTIONARY 244 (def. 7, first listing) (3d ed. 1933)).

also demonstrates that shape is part of a design: "Unless the *shape* of an . . . industrial product contains some element that, physically or conceptually, can be identified as separable from the utilitarian aspects of that article, the *design* would not be copyrighted."[31] But the ambiguity remains: the phrase "shape of an article" is no less ambiguous than the phrase "the design of an article."

Sticking with the textual analysis, the useful article exclusion also uses the phrase "utilitarian aspects of the article."[32] An aspect, like a design, can connote either a tangible or an intangible concept. As discussed in the previous subsection, copyright law often operates in abstract concepts, protecting intangible, abstract "works,"[33] suggesting that the terms "aspect" and "design" should similarly have intangible connotations. If so, the shape of a utilitarian article is part of its intangible "utilitarian aspect" because the shape results from the article's function. In fact, the *Star Athletica* Court stated that "our test does not render the shape, cut, and physical dimensions of the [useful article] eligible for copyright protections."[34] Because the shape is constitutive of the utilitarian aspects of a useful article, if a drawing only depicted the shape of a useful article with no additional content or creativity, the drawing would not have any separable PGS feature. That being said, it is also possible that the *Star Athletica* Court was referring only to the shape as embodied in the physical article.

Of course, the *Star Athletica* Court did not have to consider drawings that are exact representations of purely useful articles. The only additional relevant language (besides its observation that the shape, cut, and physical dimensions of useful articles are not eligible for copyright protection), is found in two ambiguous pieces of dicta that relate to drawings of useful articles. First, the Court stated:

---

[31]  H.R. Rep. No. 94–1476, at 55 (1976) (emphasis added).

[32]  Professors Buccafusco and Fromer provide an excellent description of the sorting between utilitarian and aesthetic aspects/features that should accompany a separability analysis. Christopher Buccafusco & Jeanne C. Fromer, *Forgetting Functionality*, 166 U. Pa. L. Rev. Online 119 (2017).

[33]  *See supra* notes 8–9 and accompanying text.

[34]  *Star Athletica*, 137 S. Ct. at 1016. In its analysis of the facts at hand, the Court first stated that a decisionmaker must determine whether the separately identified PGS feature "has the capacity to exist apart from the utilitarian aspects of the article," which tracked the statutory language. *Id.* at 1010. But in the next sentence it dropped the word "aspects" and referred only to imagining the feature "apart from the useful article." *Id.* The change did not affect that case, but it might affect an analysis of the shape of a useful article because a drawing of its shape is easy to imagine separately from the tangible object, but it is not easy to imagine it separately from the utilitarian *aspects* of it. *Cf.* Buccafusco & Fromer, *supra* note 32, at 122 (criticizing the omission of the word "aspects" in the Court's test).

https://doi.org/10.1017/9781316584507.009 Published online by Cambridge University Press

> Nor could someone claim a copyright in a useful article merely by creating a replica of that article in some other medium – for example, a cardboard model of a car. Although the replica could itself be copyrightable, it would not give rise to any rights in the useful article that inspired it.[35]

It also stated that "[a] drawing of a shovel could, of course, be copyrighted."[36] In neither case did the Court provide any details of the model or drawing it was contemplating.[37] Does this suggest that *all* drawings of useful articles are copyrightable? It is not clear.

The Court's dicta relate to other portions of the copyright statute, portions in which supporters of the narrower, "tangible article only" interpretation find more support. First, the statute specifically includes "technical drawings," which are generally drawings of useful articles, as a type of PGS work that may receive copyright protection.[38] The statute also includes a separate provision making it clear that even if a technical drawing of a useful article is protected by copyright, one who manufactures the tangible useful article does not create an infringing copy.[39] Section 113(b), though convoluted in wording, essentially states that "the owner of copyright in a work that portrays a useful article as such" does not have rights against any physical object made from that drawing.[40]

These provisions plainly indicate that some drawings – even technical drawings – of useful articles can receive copyright protection. But they do not foreclose a reading of the phrase "the design of a useful article" as referring to the shape of an article as depicted in a drawing. Stated another way, the possibility that *some* drawings of useful articles can receive copyright protection does not mean that *all* do.

How can this be? I argue that if a drawing of a useful article *does no more* than portray a useful article, it is not protectable. The statute, although ambiguous, does not foreclose this possibility. I believe the resolution to the

---

[35] *Star Athletica*, 137 S. Ct. at 1010.

[36] *Id.* at 1013 n.2.

[37] Whether "could" means "always will be" is debatable. The Court offered no qualifier, but the issue of pure versus embellished technical drawings or models was not before the Court.

[38] 17 U.S.C. § 101 (defining PGS works to include "two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans.").

[39] *Id.* at § 113(b) ("This title does not afford, to the owner of copyright in a work that portrays a useful article as such, any greater or lesser rights with respect to the making, distribution, or display of the useful article so portrayed than those afforded to such works under the law, whether title 17 or the common law or statutes of a State, in effect on December 31, 1977, as held applicable and construed by a court in an action brought under this title.").

[40] *Id.*

statutory ambiguity lies in the constitutional requirement of creativity. As I argue in the next subsection, a drawing doing nothing more than depicting a useful article contains no creativity.

As I discuss immediately below, the creativity requirement is mandated by the U.S. Constitution. A constitutional requirement would even control over a statute that unambiguously attempted to protect uncreative works. As I have argued in this section, however, I believe that the useful articles exclusion is ambiguous. The ambiguity should, therefore, be interpreted to avoid violating the Constitution.[41] This is all the more so because the Supreme Court did not specifically endorse creativity as a constitutional requirement until several years after the 1976 Copyright Act.[42] I turn now to the creativity requirement directly.

### Creativity Required

In *Feist Publications, Inc. v. Rural Telephone Service Co.*,[43] the Supreme Court announced a constitutional requirement that works must contain a modicum of creativity to be eligible for copyright protection.[44] The *Feist* Court held that the selection and arrangement in a traditional phone book, which listed alphabetically by last name all the residents' names, towns, and phone numbers in a geographic region, did not contain enough creativity to merit copyright protection.[45] In making its holding, the Court rejected the idea that mere effort, or "sweat of the brow," can merit copyright protection and instead described originality (which it defined as requiring creativity) as the "*sine qua non*" of copyright."[46]

The *Feist* Court used the creativity requirement to resolve the "tension" between the uncopyrightability of facts and the copyrightability of compilations of facts.[47] In the same manner, the creativity requirement can resolve the tension between what I have argued is the uncopyrightability of the design of

---

[41] *See, e.g.*, Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.").

[42] *See infra* note 43. It could be argued that the Court articulated the creativity requirement in Trademark Cases, 100 U.S. 82 (1879), but courts inconsistently applied the requirement until *Feist*.

[43] 499 U.S. 340 (1991).

[44] *Id.* at 346.

[45] *Id.* at 362.

[46] *Id.* at 348.

[47] *Id.* at 345–46.

https://doi.org/10.1017/9781316584507.009 Published online by Cambridge University Press

useful articles and the copyrightability of technical drawings. Focusing on creativity, a drawing that is merely an exact representation of a useful article (i.e., something that does no more than reflect the design of a useful article) contains no separable creativity because the design is required by and inseparable from the utilitarian aspects of the article.[48] Another way to think of it is that the utilitarian aspects of an article are akin to the facts in *Feist*.

When can a drawing of a purely useful article qualify for copyright protection? The answer lies in adding creativity. If the pictorial work does not *merely* depict the design (shape) of the useful article, but instead includes additional, creative material, the overall work is copyrightable subject matter. It is for this reason that artists' paintings of useful articles qualify for copyright protection. Even when an artist attempts to paint an exact replica of the shovel, courts insist that the artist imbues the painting with his or her "personal reaction" of the object.[49] The artist chooses the view and angle at which to depict the article, the lighting to include, and other creative choices.

But the situation is different when a draftsperson creates a CAD drawing that does no more than portray the shape of the useful article, whether the draftsperson is copying an already-existing shovel or is designing the purely utilitarian shovel for the first time. In either case, the draftsperson exercises no protectable creativity – the drawing depicts only the exact dimensions (shape) of the useful article, which is entirely dictated by the utilitarian aspects of the object.

How then, are "technical drawings," which the statute specifically mentions as a type of protectable PGS work, ever protectable? Again, the answer lies in creativity added to the drawing. The creativity does not come from the drawing of the object, because that drawing does nothing more than depict the precise design (i.e., the facts) of the useful article. Rather, the creativity, if any, comes from the additional material included in the technical drawing.

Traditional technical drawings (blueprints) contain many elements in addition to the shape of the article, and the decision about whether and how to include those elements may hoist the drawing over the modest creativity threshold. For example, a draftsperson can decide to include various views of the object, such as a top view, side view, perspective view, various "zoomed in" views, and exploded views (though some of these basic choices may be

---

[48]  This section's argument need not rely on my previous statutory construction analysis of the design of a useful article. Nevertheless, I relate the two arguments at times because I think they get to the same point; one tied to statutory language, one tied to doctrines about facts and functionality. Some courts and commentators, however, may be more comfortable with a framework of facts and functionality rather than useful articles.

[49]  Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 250 (1903).

https://doi.org/10.1017/9781316584507.009 Published online by Cambridge University Press

governed by industry convention). Further, a draftsperson can decide which parts to label and how to label them, typically with lines leading from a specific part to a balloon that specifies the part name or number.

But surface-mesh and machine-instruction files differ in important ways from traditional blueprints.[50] The depiction of a useful object in those DMFs contains only one view (because it is a rotatable three-dimensional view) and no part labels. Every aspect of the drawing, every line and curve, exists entirely to depict the exact design (shape) of the utilitarian object. There is only one way to depict that particular shovel – if ten other people independently created a CAD drawing of the same shovel, each drawing (if technically accurate) would show an identical shape. Likewise, each surface-mesh and machine-instruction file, if accurate, would be identical.[51]

## Copying from the Physical

The lack of creativity in DMFs of purely utilitarian objects is most apparent when someone creates a DMF by copying an existing utilitarian object. A person can do this by scanning the object and allowing software to create an accurate depiction of the object as a surface-mesh file, as described in Chapter 2. A person can also do this by taking exact measurements of the object and recreating the object in CAD software by hand. In either case, the copier has done nothing authorial or original, but has simply captured reality. In other words, the copier has only copied facts.

One may be tempted to argue that the scan is like a realistic painting or a photograph, which can be copyrightable, but the analogy proves too much.[52] Photographs are only copyrightable to the extent that the photographer

---

[50]  I do not include design files only because they may, but need not, include extraneous material that can be creatively arranged. It is common for design files to include labels, notes, and the like, which can nudge them over the creativity threshold. Software removes these materials when converting design files into surface-mesh files, leaving the surface-mesh file depicting only the design.

[51]  As discussed in Chapter 2, there could be differences in resolution (the size of the triangles used) or in how well the software tessellates features. But these are generated by the software, not the draftsperson.

[52]  As far as realistic paintings are concerned, courts insist that, intentionally or not, the painting includes the "personal reaction of an individual upon nature." *Bleistein*, 188 U.S. at 250 ("The copy is the personal reaction of an individual upon nature. Personality always contains something unique. It expresses its singularity even in handwriting, and a very modest grade of art has in it something irreducible, which is one man's alone."). In contrast, drawing lines in a CAD program is a science, not an art. The draftsperson can specify the length and curvature with precision. Further, shapes in CAD programs are rarely drawn from scratch. Rather, the CAD software has numerous prestored shapes that a draftsperson uses.

https://doi.org/10.1017/9781316584507.009 Published online by Cambridge University Press

includes creative choices like angle, perspective, and lighting.[53] But where these elements are lacking, that is, where the photograph is nothing more than a slavish copy of an unprotected work, it contains no protectable creativity.[54] The same is true for maps that do no more than depict reality.[55]

Detailed 3D scans of useful objects represent nothing more than slavish copying of the object's shape. The person taking the scan is not making choices as to lighting, perspective, or angles. Therefore, there is no creativity in the initial scan.[56]

As discussed in Chapter 2, the surface-mesh file generated by the scanning software may require some manual repair to accurately depict the object. For example, a user may need to edit the file to reflect a sharp corner when the imperfect software rounded the corner. Such edits, however, when made to accurately reflect an existing object do not constitute creative choices. The Tenth Circuit held as much in *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, when it refused to grant copyright protection to a 3D scan of a car even after workers edited the scanned image "to resemble each vehicle as closely as possible."[57] The court concluded that "Meshwerks' models depict nothing more than unadorned Toyota vehicles … [I]ts models reflect none of the decisions that can make depictions of things or facts in the world, whether

---

[53]  Schrock v. Learning Curve Int'l, Inc., 586 F.3d 513, 519 (7th Cir. 2009).

[54]  *See, e.g., id.* (recognizing that there exists a "narrow category of photographs that can be classified as 'slavish copies,' lacking any independently created expression"); Bridgeman Art Library, Ltd. v. Corel Corp., 25 F. Supp. 2d 421, 427 (S.D.N.Y. 1998) (applying UK law and finding no originality in exact reproductions of public domain works). *Cf.* Daniel J. Gervais, *Feist Goes Global: A Comparative Analysis of the Notion of Originality in Copyright Law*, 49 J. Copyright Soc'y U.S.A. 949, 971–72 (2002) ("[A] photographer trying to take a technically perfect picture is not making creative choices."); Justin Hughes, *The Photographer's Copyright – Photograph as Art, Photograph as Database*, 25 Harv. J. L. & Tech. 339, 374–75 (2012).

[55]  Darden v. Peters, 488 F.3d 277, 286–87 (4th Cir. 2007) (affirming Copyright Office's refusal to register pre-existing map with additions "color, shading, and labels using standard fonts and shapes"); Kern River Gas Transmission Co. v. Coastal Corp., 899 F.2d 1458, 1463–64 (5th Cir. 1990) ("[T]he idea of the location of the pipeline and its expression embodied in the 1:250,000 maps are inseparable and not subject to protection."); *see also* Dennis S. Karjala, *Copyright in Electronic Maps*, 35 Jurimetrics J. 395 (1995) (noting that the *Feist* decision leaves many digital maps unprotected by copyright).

[56]  *See generally* Michael Weinberg, *3D Scanning: A World Without Copyright*, Shapeways (2016), www.shapeways.com/wordpress/wp-content/uploads/2016/05/white-paper-3d-scanning-world-without-copyright.pdf.

[57]  *See, e.g.*, Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc., 528 F.3d 1258, 1260 (10th Cir. 2008). The scanning process was more manually intensive than scanning technology described herein; it involved placing special tape on the car and using an articulated arm tethered to a computer to map coordinates based on the tape. But the principle is the same.

Oscar Wilde or a Toyota Camry, new expressions subject to copyright protection."[58]

### Creating a DMF from Scratch

A more contentious issue is whether a DMF of a useful article (e.g., a shovel) contains protectable creativity when a draftsperson creates the DMF from scratch, as opposed to by copying an existing object. This would commonly be the case in the design phase of a new product. In one sense, creating a DMF of a yet-to-be-manufactured object differs from copying an existing object: the lines cannot be copied from an object because it does not yet exist. The draftsperson is no longer copying the existing facts.

But in another sense, the draftsperson is constrained by the to-be-created physical object. The lines are thus analogous to existing facts. With a little flamboyance, one could say that the draftsperson is copying a Platonic form.[59] The drawing does not emerge from the draftsperson's creativity; it emerges from the designer's utilitarian ingenuity. Every line or shape drawn is dictated by the utilitarian shape of the shovel to be manufactured.

Some might argue that when the draftsperson is drawing a never-before manufactured shovel there are choices to be made, such as how long to make the handle or how wide to make the spade. These choices may be made by the draftsperson or by someone dictating the shovel's dimensions to the draftsperson.

But in my view, and the view of at least one court discussed below, choices as to a useful article's dimensions reflect not creativity in the copyright sense, but only choices about the utilitarian design of the article. In other words, mere choice is not enough. Choice must be coupled with creativity. If choice alone contributed creativity, the tangible object itself would be protected. Some argue that tangible useful objects in fact embody creativity but that the useful article doctrine excludes the inherent creativity in the tangible object to channel useful objects away from copyright law. But as already discussed,

---

[58]  *Id.* at 1265. *Cf.* ABS Entertainment, Inc. v. CBS Corp., 900 F.3d 1113, 1126 (9th Cir. 2018) (stating that digitally remastered sound recordings that merely remove clicking or extraneous noise from the original recording do not contain protectable creativity).

[59]  Plato theorized that "forms" were the most accurate reality even though they were nonphysical. For example, the most accurate, real triangle was a form, but no one could see it. Every triangle drawn by humans was an imperfect copy of the form. *See, e.g.*, JOHN M. FRAME, A HISTORY OF WESTERN PHILOSOPHY AND THEOLOGY 64–65 (2015). Similarly, the digital drawing of a yet-to-be-manufactured utilitarian object can be said to be a copy of a form. This admittedly esoteric analogy should be limited to utilitarian objects lest it wipe out all of copyright. The form is thus a conceptualization of the draftsperson's utilitarian constraints.

section 101 does not exclude only a "useful article," but rather "*the design* of a useful article." In this sense, the issue of "what counts as creativity" when creating a drawing from scratch can be linked to the statutory language already analyzed previously.

Stated another way, choices about the dimensions of the useful object cannot contribute to copyrightable creativity because they are dictated entirely by utilitarian concerns. A shovel designer has the choice to make the handle two feet long or three feet long, but that choice will be made not on the basis of creativity, but on the basis of the best functioning shovel from the end user's perspective. Shorter shovels may be good for some applications and longer shovels better for others, but each shovel is made a certain length based on its function.[60]

That technical drawings are not copyrightable when dictated by function was recognized by the court in *Enterprises International, Inc. v. International Knife & Saw, Inc.*[61] That court refused copyright protection to the plaintiffs' technical drawings because the "designs *admittedly* contain[ed] only functional and utilitarian information, the sole purpose of which [was] to manufacture specific types of knives or blades to precisely fit certain machines."[62] The court's language is probably too broad because creatively arranged utilitarian information can be copyrighted, but the court's emphasis on creativity not constrained by utilitarian concerns is correct.

If ex ante choice were enough to impart creativity, mere written recipes could be protected by copyright, but they are not.[63] In creating a recipe, one chooses the basic dish, ingredients, the cooking time, and the manner of cooking, and yet no protection ensues for these facts. Even the listing of simple cooking instructions does not carry the recipe over the copyright threshold, because the instructions are intimately related to the functional system or method of cooking.[64] As one court stated:

---

[60]  Product design can incorporate aesthetic concerns, but when those concerns as reflected in the design are inseparable from the article's utility, they are protected if at all by design patent rights.

[61]  No. C12-5638 BHS, 2014 WL 1365398 (W.D. Wash. Apr. 7, 2014).

[62]  *Id.* at *6 (emphasis in original). The court did not provide a detailed analysis or description of the drawings, so it is difficult to know whether the drawings had labels, parts lists, or other creative additions.

[63]  37 C.F.R. § 202.1(a) (2018) (stating that "mere listing of ingredients or contents" are not copyrightable).

[64]  *See* Publ'ns Int'l. v. Meredith, 88 F.3d 473, 480–81 (7th Cir. 1996); Lambing v. Godiva Chocolatier, 1998 U.S. App. LEXIS 1983 (6th Cir. Feb. 6, 1998); Tomaydo-Tomahhdo, LLC v. Vozary, 629 F. App'x 658, 661 (6th Cir. 2015); Lapine v. Seinfeld, No. 97–5697, 2009 WL 2902584 (S.D.N.Y. Sept. 10, 2009).

https://doi.org/10.1017/9781316584507.009 Published online by Cambridge University Press

> The recipes involved in this case comprise the lists of required ingredients and the directions for combining them to achieve the final products. The recipes contain no expressive elaboration upon either of these functional components, as opposed to recipes that might spice up functional directives by weaving in creative narrative . . . The identification of ingredients necessary for the preparation of each dish is a statement of facts. There is no expressive element in each listing; in other words, the author who wrote down the ingredients for "Curried Turkey and Peanut Salad" was not giving literary expression to his individual creative labors. Instead, he was writing down an idea, namely, the ingredients necessary to the preparation of a particular dish.[65]

It is the same with a DMF, regardless of the format: everything is included in the drawing for functional reasons to describe the shape of a useful article with the end goal of manufacturing it. To borrow from the words of the *Meredith* court, the drawing merely represents the idea of the utilitarian shovel.

In fact, functional constraints are among the most fundamental limitations on copyright protection.[66] Another common example is found in software cases where the software code is designed to accomplish a utilitarian objective. Any element of software that is dictated by utilitarian concerns like efficiency does not constitute protectable expression.[67] Despite this limitation, complex software continues to garner copyright protection because it can be drafted numerous, arguably creative ways to achieve the same utilitarian objective.[68] But the same is not true for digital manufacturing files of useful objects. Once the design of the useful object is determined based on functionality, the entirety of the design is determined.

In sum, when a drawing does no more than depict the design of a useful article, it contains no protectable creativity. It is important to emphasize that many technical drawings of useful objects will enjoy copyright protection because they include creative choices as to views, labels, parts lists, and the like. This is true whether they are drawn with pencil and paper or in a CAD program. But without such choices, I argue there is no protectable expression.

---

[65] Publ'ns Int'l. v. Meredith, 88 F.3d 473, 480–81 (7th Cir. 1996).

[66] At the extreme, see Lexmark Intern., Inc. v. Static Control Components, Inc., 387 F.3d 522, 544 (2004) ("[A] poem in the abstract could be copyrightable. But that does not mean that the poem receives copyright protection when it is used in the context of a lock-out code."). *See also* Christopher Buccafusco & Mark A. Lemley, *Functionality Screens*, 103 Vᴀ. L. Rᴇᴠ. 1293, 1316–40 (2017).

[67] The leading case on this front is Computer Assocs. Int'l v. Altai, Inc., 982 F.2d 693, 707–10 (2d Cir. 1992). Analogies can be made to fact works, like books covering science topics, which receive thin protection only for the expression, not the facts.

[68] *See, e.g., id.* at 702. Many disagree that copyright is appropriate for software. *See supra* note 18.

One can speculate why Congress felt the need to include technical drawings within copyright's ambit. At the time the statute was drafted, DMFs were not on legislators' minds. Even though I have argued in the chapter that exact drawings of useful objects, even if done on paper, are not copyrightable, the principle carries increased urgency when one considers the different kinds of technical drawings on a spectrum of functionality. Traditional hand-drawn or computer-generated blueprints were limited in their inherent functionality. Humans had to read, interpret, and apply them. The actual value embodied in the blueprint was miniscule compared to the costs of translating that drawing into a finished product.

With 3D printing technology, however, digital drawings implicate much more directly the boundary between copyright and patent law. That is, they become much more closely associated with the end goal of manufacturing and they house vastly more economic value. Design files are the farthest removed from the manufacturing process, because they must first be converted into surface-mesh files. And surface-mesh files must be sliced into machine-instruction files to provide precise instructions to the printer. But all three DMF formats exist on a smooth path to digital manufacturing that does not require much, if any, human intervention.

Because DMFs can be used directly in the manufacturing process, they should be distinguished from traditional blueprints. My analysis thus far demonstrates there is no need to distinguish them, but because the issue of creativity in drawings is debatable, policy considerations are important. Copyright protection for DMFs more directly impedes utilitarian manufacturing than protection for simple blueprints. It is true that copyright in drawings does not prohibit others from manufacturing the object,[69] but in an age of digital manufacturing, an imitator would need to create its own DMFs. It can presumably do this by obtaining the physical object and creating DMFs from it.[70]

But what is the point in forcing the imitator to create its own DMF from scratch like the law currently requires for application programs? Unlike traditional software, where copyright protection was probably granted as a policy matter because patent protection was uncertain and the reverse engineering process provided valuable lead time to the initial creator, useful objects are clearly patentable subject matter and the reverse engineering process is much

---

[69]  17 U.S.C. § 113(b).

[70]  *See* Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 249 (1903) ("Others are free to copy the original [if it is not protected by copyright]. They are not free to copy the copy."). Justice Holmes was speaking of object found in nature, but the rationale should extend to anything unprotected by copyright.

quicker. Copyright protection for DMFs would do nothing to advance crea-
tivity and would instead serve only to slow competition and catch many
imitators unaware.[71] Indeed, the whole point of section 113(b) is that copyright
should not unnecessarily impede the manufacture of utilitarian objects. But
recognizing copyright in DMFs of utilitarian objects would do just that.
Furthermore, how much expensive litigation will ensue with parties arguing
over whether a second DMF was independently created versus verbatim
copied?

   DMFs embody the economic value of utilitarian works in a manner that
traditional blueprints never have. To allow the copyright to protect DMFs of
utilitarian objects would, therefore, be a poor policy fit from a copyright or
a patent perspective. It would serve as friction to the desirable imitation that
fuels capitalism and extends utilitarian benefits throughout society.[72]

### A Note on Models and the Constitution

The creativity requirement explains why unadorned representations of useful
objects are not copyrightable but embellished drawings are. One potential
difficulty with this analysis is that the statute also lists "models" as PGS
works.[73] Unlike technical drawings, models do not typically include anything
more than the depiction of the useful object. They certainly do not include
multiple views, because they are three-dimensional. And they would not often
include part labels or other annotations. Thus, the inclusion of models in the
list of PGS works may suggest a congressional intent to protect exact repre-
sentations of useful articles.

   I do not think that conclusion is required. An alternate explanation is that
models are traditionally made by hand or through other processes that do not
render *exact* representations. They also often need to abstract away details and
features to accommodate size and material requirements.[74] In instances where
an artist sets out to paint (or, presumably, model) something to look "real,"
courts have long (stubbornly?) insisted that regardless of intention, the artist
imparts a "personal reaction" in the work.[75] Congress may have intended to

---

[71] *See* Paul Banwatt & Laura Robinson, *Dispatches from the Front Lines of 3D Copyright*, 28
     Intell. Prop. J. 237, 262 (2016).
[72] Though I argue from a utilitarian perspective, the same result can be arrived at from a *droit
     d'auteur*, continental emphasis, which tends to institute a high originality bar that DMFs of
     utilitarian objects would not cross.
[73] 17 U.S.C. § 101.
[74] I thank Michael Weinberg for this point.
[75] *Bleistein*, 188 U.S. at 250.

apply this rationale to models (and for that matter, hand-drawn blueprints), which contain minor variations imparted by their creator. With digital design and manufacturing, however, there is no room for personal reaction in the design of utilitarian articles – the design software renders the drawing devoid of deviation.

In the end, the statutory analysis of protection for models must keep in mind that the *Feist* Court's articulation of the creativity requirement came several years after the 1976 Copyright Act. Because the Constitution must control over a statute, the statute should be interpreted as only referring to models containing expressive choices. Any models (or technical drawings) depicting only the design of a useful article lack creativity and cannot enjoy copyright protection.

## Merger

The issue as to whether ex ante design choices for useful articles can constitute protectable creativity in drawings can also be viewed from the perspective of the merger doctrine.[76] The merger doctrine starts with the recognition that copyright protection does not extend to "any idea, procedure, process, system, method of operation, concept, principle, or discovery … "[77] Under the doctrine, what otherwise might count as creative expression can be so closely linked to the underlying idea, process, etc., that the expression merges into the idea and thereby is not protected by copyright. Among other things, the merger doctrine polices the boundary between utilitarian and creative works.

For instance, the merger doctrine has been used to exclude copyright protection for blank forms and instruction manuals even though they embody ex ante decisions about how they are designed. In *Baker v. Selden*, the plaintiff had a copyright in an accounting book as a whole.[78] The defendant substantially copied not the entire book, but only the blank forms for use in the accounting method.[79] In the face of the plaintiff's allegation of copyright infringement, the Supreme Court held that the blank forms were "necessary incidents" to the accounting method and therefore not copyrightable.[80] The

---

[76]  For a deep exploration of the merger doctrine, see Pamela Samuelson, *Reconceptualizing Copyright's Merger Doctrine*, 63 J. Copyright Soc'y U.S.A. 417 (2016).

[77]  17 U.S.C. § 102(b).

[78]  Baker v. Selden, 101 U.S. 99 (1879).

[79]  *Id.* at 100.

[80]  *Id.* at 103. The Copyright Office has issued a regulation stating that blank forms and similar materials are not copyrightable. 37 C.F.R. § 202.1(c) (2018). This is harmless as long as courts do not read it as limiting *Baker* to its facts. *Baker* wasn't a case about forms. It was a case about the boundary between copyright law and patent law.

https://doi.org/10.1017/9781316584507.009 Published online by Cambridge University Press

164                          *Creativity and Utility: 3D Printable Files*

*Baker* court did not use the term "merger," but it is widely seen as a clear forerunner to the doctrine.

Beyond blank forms, courts have applied the merger doctrine to pictorial and literary works. In *Decorative Aides Corp. v. Staple Sewing Aides Corp.*, the plaintiff claimed copyright protection in its instruction sheet that consisted of an illustrated diagram and brief instructions describing how to make the pleated draperies.[81] The defendant's instructions and diagram were very similar to the plaintiff's, but the court held that they were "dictated by functional considerations" and thus could not be the basis of infringement.[82] In short, any small choices in the words and diagram merged with their function.

The defendant in *Decorative Aides* did not dispute the existence of a copyright in the instructions and diagram; it argued only about infringement. But other courts have applied the doctrine to foreclose copyright protection altogether. The leading case (besides *Baker*) is *Morrissey v. Procter & Gamble Co.*, where the court found that copyright law will not protect the short phrasing of rules for a contest.[83] Despite the numerous alterations that could be made to the wording of the rules, the idea of the contest merged with its expression.

In another image-related case, the Fifth Circuit Court of Appeals used the merger doctrine to deny copyright protection to the plaintiff in *Kern River Gas Transmission v. Coastal-Corp.*[84] The plaintiff drew a proposed gas pipeline route on an existing map and claimed copyright infringement when the defendant copied the map, including the pipeline route. The court held that the idea of the pipeline route and any expression merged, thereby precluding copyright protection because the map was the only effective way to show the pipeline route once it was decided.[85]

The merger cases have important implications for DMFs of utilitarian objects. First, they recognize the insignificance of minor choices and variations in the subject matter. Selden exercised choices when designing his particular accounting forms. He could have arranged his columns slightly differently or titled his headings using different words, but these choices did not imbue the forms with protectable expression. In the same way, draftspersons who generate DMFs of yet-to-be-manufactured useful articles can be said to exercise choices regarding length, width, and curvatures, some of which at small scale would not meaningfully affect function. But these minor

---

[81]  Decorative Aides Corp. v. Staple Sewing Aides Corp., 497 F. Supp. 154, 156 (S.D.N.Y. 1980).
[82]  *Id.* at 157.
[83]  Morrissey v. Procter & Gamble Co., 379 F.2d 675 (1st Cir. 1967).
[84]  Kern River Gas Transmission v. Coastal-Corp, 899 F.2d 1458 (5th Cir. 1990).
[85]  *Id.* at 1464.

variations, even if they arguably cross the "modicum of creativity" threshold, should be held to merge with the function of the object.

Second, merger cases also take account of the functional constraints upon a claimed work, both from the view of the original creator and from the view of follow-on users.[86] The *Baker* Court emphasized that where "the methods or diagrams" used in the book are necessary to the utilitarian purpose, "such methods and diagrams are to be considered as necessary incidents" to the utilitarian purpose.[87] Similarly, the *Decorative Aides* court emphasized that the plaintiff's instructions and diagram were "dictated by functional considerations," limiting their protection.[88]

The recognition that functional considerations can merge small variations with utilitarian goals should eliminate the prospect of copyright protection for DMFs of purely utilitarian objects.[89] *Baker* emphasized the importance of considering the "final end" of a purported work.[90] The purpose of creating a DMF, whether it be a design file, surface-mesh file, or machine-instruction file, is to manufacture an object. Every choice about the design of a purely useful object is made for functional reasons, whether to imbue the object with the required strength, to limit its weight, or otherwise to accomplish a utilitarian purpose. To the extent that there are small variations possible within the design, they merge with the utilitarian objective, just like with Selden's forms. To hold otherwise would inhibit free market competition in utilitarian works.[91]

Previously in this chapter I argued that choices made for utilitarian reasons should not constitute creativity in the copyright sense. To the extent that one disagrees with that proposition, the merger doctrine would have the same effect of limiting copyright protection for choices dictated by function. But the merger doctrine is less preferred as a tool to protect the line between patents and copyrights because courts apply it inconsistently. Some courts use it broadly, foreclosing copyright protection in cases that involve a great deal of

---

[86]  Samuelson, *supra* note 76, at 442–44.
[87]  Baker v. Selden, 101 U.S. 99, 104 (1879).
[88]  *Decorative Aides Corp.*, 497 F. Supp. at 157.
[89]  Again, this assumes the file contains nothing more than the shape of the object.
[90]  *Baker*, 101 U.S. at 104 ("[T]he teachings of science and the rules and methods of useful art have their final end in application and use.").
[91]  *Cf.* Kern River Gas Transmission v. Coastal-Corp., 899 F.2d 1458, 1464 (5th Cir. 1990) ("Such map markings are certainly the only effective way to convey the idea of the proposed location of a pipeline across 1,000 miles of terrain. To extend protection to the lines would be to grant Kern River a monopoly of the idea for locating a proposed pipeline in the chosen corridor, a foreclosure of competition that Congress could not have intended to sanction through copyright law.").

https://doi.org/10.1017/9781316584507.009 Published online by Cambridge University Press

*Creativity and Utility: 3D Printable Files*

creative expression,[92] while others unrealistically limit it to cases where there is only *one way* to express the idea.[93] More problematically, some courts apply it only as an affirmative defense and limit it to non-verbatim copying, which is inconsistent with *Baker v. Selden* and leads to unnecessary litigation costs.[94]

\* \* \*

Whether parsing the statute, analogizing to unprotectable facts or ideas, or applying the merger doctrine, there is enough uncertainty as to whether to protect DMFs of purely utilitarian objects that courts are likely to be influenced by policy concerns. I think it is self-evident that these DMFs do not implicate the core aesthetic and creative expression that is at the heart of copyright. Rather, they implicate overwhelmingly (if not exclusively) utilitarian concerns. Protecting these DMFs with copyrights, which would last as long as the author lives plus seventy more years, risks intruding upon and upsetting the carefully balanced patent system, which provides a patent term of only twenty years. It may be that copyrights could provide extra incentive to these utilitarian works, but as will be discussed in Chapter 10, it is not at all clear that extra incentive is needed.

### C. OUTSIDE THE UNITED STATES: DMFS OF UTILITARIAN OBJECTS

Not all countries interpret originality as requiring creativity.[95] Without a requirement for creativity, as opposed to mere skill or labor, DMFs of utilitarian objects would be protected by copyright, especially where they are created by a draftsperson rather than scanned. Even when an object is scanned, there can be skill and labor in the scanning process and post-scan editing. The advent of 3D printing technology will put pressure on these jurisdictions to create a legal mechanism that prevents copyright protection for DMFs of utilitarian objects.

---

[92]   *See* Herbert Rosenthal Jewelry Corp. v. Kalpakian, 446 F. 2d 738 (9th Cir. 1971) (stating that the idea of a jeweled bee pin was "indistinguishable" from its expression, despite the fact that millions of different jeweled bees could be imagined).

[93]   *See, e.g.*, Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 111 (2d Cir. 2001) ("[I]f there is just one way to express an idea, the idea and expression are said to merge.").

[94]   Osborn, *IP Channeling, supra* note 21, at 1322; *see also* Samuelson, *supra* note 76, at 435–38.

[95]   For example, Canada does not require creativity, but only skill and judgment. Tesh W. Dagne & Chelsea Dubeau, *3D Printing and the Law: Are CAD Files Copyright-Protected?*, 28 INTELL. PROP. J. 101, 122–23 (2015). Australia and New Zealand also traditionally did not either, though Australia's most recent pronouncement requires "independent intellectual effort." IceTV Pty Ltd. v. Nine Network Australia Pty Ltd. [2009] HCA 14 (Austl.). It is not clear whether this raised the level of originality or not.

6:24-cv-01629-WWB-LHP    Document 74-2    Filed 01/22/25    Page 25 of 35 P
1139
*C. Outside the U.S.: DMFs of Utilitarian Objects*    167

In the European Union, the law as to originality is evolving. Previously diverse standards are being harmonized through directives and forceful (some would say activist) CJEU decisions.[96] These changes, among others, have raised intense discussions about the interface between copyright, patent, and design law.[97]

For example, UK law was traditionally very permissive toward copyright protection in some works. It did not require creativity, but only skill, judgment, and labor.[98] Commentators lament that the meaning of skill, labor, and judgment is unstable,[99] but regardless, it clearly encompassed even simple design drawings, and would encompass DMFs.[100]

EU law, however, has begun to harmonize the standard of originality, forcing out the skill, judgment, and labor standard.[101] The directives aimed at software, databases, and photographs require a work to be "the author's own intellectual creation." But the CJEU has interpreted that standard to apply to all works, not only software, databases, and photographs. CJEU case law further refines the requirement, speaking in terms of the need for an author's "creativity"[102] and "free and creative choices" having a "personal touch."[103] Under this language, mere choice is not enough to provide originality; the choice must be "creative." The CJEU has also stressed that choices dictated by functionality cannot contribute the requisite creativity.[104]

---

[96]    *See, e.g.*, Case C-5/08, Infopaq Int'l v. Danske Dagblades Forening, 2009 E.C.R. I-6569; Case C-604/10, Football Dataco Ltd. v. Yahoo! UK Ltd, 2012 2 CMLR 24; Case C-168/09, Flos SpA v. Semeraro Casa e Famiglia SpA, 2011 E.C.R. I-0081.

[97]    *See, e.g.*, THE COPYRIGHT/DESIGN INTERFACE: PAST, PRESENT AND FUTURE (Estelle Derclaye ed. 2018).

[98]    *See, e.g.*, Indep. Television Publ'ns Ltd. v. Time Out Limited & Elliot [1984] Ch 64 (Eng.).

[99]    LIONEL BENTLY & BRAD SHERMAN, INTELLECTUAL PROPERTY LAW 94 (2008).

[100]    *See, e.g.*, Mackie Designs Inc. v. Behringer Specialised Studio Equipment (UK) Ltd. [1999] 20 RPC 717 (UK); British Northrop Ltd v. Texteam Blackburn Ltd [1973] FSR 241.

[101]    *See, e.g.*, Lionel Bently, *The Return of Industrial Copyright?*, 34 E.I.P.R. 654 (2012); Estelle Derclaye, *Assessing the Impact and Reception of the Court of Justice of the European Union Case Law on UK Copyright Law: What Does the Future Hold?*, 240 REVUE INTERNATIONALE DU DROIT D'AUTEUR 5 (2014); Andreas Rahmatian, *Originality in UK Copyright Law: The Old "Skill and Labour" Doctrine Under Pressure*, 44 INT'L REV. INTELL. PROP. & COMPETITION L. 4, 6 (2013). Of course, the United Kingdom's relationship with the European Union is in flux as "Brexit" continues to unfold at the time of this writing.

[102]    Case C-5/08, Infopaq Int'l v. Danske Dagblades Forening, 2009 E.C.R. I-6569.

[103]    Case C-145/10, Eva-Maria Painer v. Standard Verlags GmbH 2011 E.C.D.R. 297.

[104]    Case C-604/10, Football Dataco Ltd. v. Yahoo! UK Ltd, 2012 2 C.M.L.R. 24 (holding that there can be no originality from aspects of a database that are "dictated by technical considerations, rules or constraints which leave no room for creative freedom"); Case C-406/10, SAS Institute Inc. v. World Programming Ltd., 2012 3 C.M.L.R. 4 ("[T]o accept that the functionality of a computer program can be protected by copyright would amount to

https://doi.org/10.1017/9781316584507.009 Published online by Cambridge University Press

Taken together, these cases suggest an analysis of DMFs similar to the U.S. approach discussed previously in the chapter. That is, DMFs that will manufacture purely utilitarian objects do not contain any creativity in the mere representation of the object.[105] European scholars have recognized the beginnings of this argument, though they conservatively limit its application to the most basic design drawings of utilitarian objects.[106] Alternatively, as in the United States, courts could analogize DMFs to uncopyrightable facts or could apply the merger doctrine to DMFs of purely utilitarian objects.[107]

Additional wrinkles exist in countries that offer sui generis protections for creations that may not qualify for copyright protection. For instance, the EU Database Directive protects databases, defined as "a collection of independent works, data or other materials arranged in a systematic or methodical way and individually accessible by electronic or other means."[108] The CJEU interprets this definition broadly,[109] so much so that DMFs might fall within it. Further, many countries offer copyright-like protection to creations using various tort or unfair competition laws that protect against so-called slavish or parasitic copying.[110] Although the details of these laws are beyond the scope of this

---

making it possible to monopolise ideas, to the detriment of technological progress and industrial development."); Joined Cases C-403 & 429/08, Football Association Premier League v. QC Leisure, 2012 F.S.R. 1. For a similar line of thinking in Australia, see Burge v. Swarbrick [2007] HCA 17 (Austl.) ("The determination [of whether a work is of artistic craftsmanship] turns on assessing the extent to which the particular work's artistic expression, in its form, is unconstrained by functional considerations.").

[105] That is not to say a blueprint of such an object as a whole might not be original based on its choices of views, shading, labeling, and the like. Even as to copyrighted drawings, each country's law generally provides that any copyright does not prohibit the manufacture of the utilitarian object displayed therein. *See* Copyright, Designs and Patents Act, 1988, c. 48 §51(1) (UK) [hereinafter, UK CDPA] ("It is not an infringement of any copyright in a design document or model recording or embodying a design for anything other than an artistic work or a typeface to make an article to the design or to copy an article made to the design."). *See also* Mackie Designs Inc. v. Behringer Specialised Studio Equipment (UK) Ltd, [1999] RPC 717.

[106] Bently, *supra* note 101, at 768 (stating that "drawings of nuts, bolts and even exhaust pipes – might well not pass muster" under the new EU standard for originality); Margoni, *supra* note 3, at 239 ("The blueprint can be of a purely technical nature and lack any possible form of copyright protection. This is an unlikely scenario considering how low the required level of originality usually is.").

[107] *See, e.g.*, Case C-393/09, Bezpečnostní Softwarová Asociace - Svaz Softwarové Ochrany v. Ministerstvo Kultury, 2011 F.S.R. 18.

[108] European Parliament & Council Directive 96/9 on the Legal Protection of Databases, 1996 O.J. (L 77) 20 (EC) art. 1(2).

[109] *See, e.g.*, Case C-490/14, Freistaat Bayern v. Verlag Esterbauer GmbH, ECLI:EU:C:2015:735 (providing database protection for topographical maps).

[110] *See, e.g.*, Eleonora Rosati, Originality in EU Copyright: Full Harmonization Through Case Law 173 (2013).

book, scholars in the relevant jurisdictions should carefully consider whether providing these protections to DMFs of purely utilitarian objects is necessary or beneficial.

### D. DMFS AS LITERARY WORKS

The previous two subsections focused on DMFs as drawings, but DMFs also constitute copies of literary works because the file can be displayed in code (textual) form. Copyright law bends over backward to protect computer program code as literary works, searching scrupulously for creativity despite strong arguments that programs should not be copyrightable.[111] Under U.S. law, DMFs constitute "computer programs" under the statute's capacious definition of "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result."[112] Australia's definition is similar.[113] The EU Software Directive does not define software other than to state that preparatory design material is included in the undefined term,[114] but commentators contend that DMFs can qualify as literary works in the European Union.[115]

But as with drawings, literary works are only protected to the extent they contain creative expression.[116] If every line of code is dictated by efficiency or other external factors, there is no protectable expression.[117] Moreover, with DMFs the literal code is rarely written by humans. While it is technically possible to create a DMF entirely by typing code, the process is tedious and rarely done except for the simplest of shapes. Rather, a draftsperson uses a CAD program to draw the image, and the computer translates the shapes into textual code using algorithms directed to utilitarian goals, not creative

---

[111] For a list of works discussing computer software, see Osborn, *IP Channeling, supra* note 21, at 1311 n.30.

[112] 17 U.S.C. §101.

[113] Australian Copyright Act § 10(1).

[114] European Parliament & Council Directive 2009/24 on the Legal Protection of Computer Programs, 2009 O.J. (L 111) 16 (EC) art. 1(1) [hereinafter, Software Directive].

[115] *See, e.g.,* Dinusha Mendis, *'Clone Wars' Episode II – The Next Generation: The Copyright Implications Relating to 3D Printing and Computer-Aided Design (CAD) Files,* 6 L. Innovation Tech. 265, 271 (2014); Bradshaw et al., *supra* note 3, at 24.

[116] *See, e.g.,* H.R. Rep. No. 94–1476, at 54 (1976) (Conf. Rep.), *as reprinted in* 1976 U.S.C.C.A. N. 5659, 5667 (noting that copyright protects computer programs only "to the extent that they incorporate authorship in programmer's expression of original ideas, as distinguished from the ideas themselves").

[117] *See, e.g.,* Computer Assocs. Int'l v. Altai, Inc., 982 F.2d 693, 707 (2d Cir. 1992); Case C-406/10, SAS Institute Inc v. World Programming Ltd., 2012 3 C.M.L.R. 4.

ones. Further, the software that converts the design file into surface-mesh and machine-instruction files generates the code for those files.

Because humans do not write the actual text of the code, but rather only guide its basic structure by drawing shapes in the CAD program, the literal code does not reflect creativity as to its wording.[118] The only creativity attributable to the draftsperson would correspond to the creativity in the CAD drawing itself, which brings us right back to the previous analysis: drawings that exactly depict useful articles lack creativity.[119]

Some have trouble accepting the argument that textual code of images is not always protectable as a literary work, but they should consider a noncopyrightable photograph.[120] If a physical copy of a photograph is not protected by copyright, it must follow that a digital copy of that photograph would not be protected either. Although a JPEG file is a "computer program" (per the U.S. copyright statute's definition) and can be represented in code format, this fact alone cannot transform the text, generated by a digital camera, into a protectable work.

Another analogy can be drawn to digital files that depict typefaces.[121] Typefaces are not protectable in the United States because they are functional.[122] Congress explicitly considered whether the *design* of typefaces (not just the physical blocks that stamp the letters) should be protected, but concluded the design did not constitute a PGS work.[123] The basic design of

---

[118]  Jane Nielsen & John Liddicoat, *The Multiple Dimensions of Intellectual Property Infringement in the 3D Printing Era*, 27 Australian Intell. P. J. 184, 195–97 (2017); Osborn, *IP Channeling, supra* note 21, at 1318–20.

[119]  Humans can edit the code to fix errors, but because these fixes are for utilitarian reasons, they do not contribute to creativity. They are even less creative than the image editing in *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1260 (10th Cir. 2008).

[120]  *E.g.*, Bridgeman Art Library, Ltd. v. Corel Corp., 36 F. Supp. 2d 191 (S.D.N.Y. 1999).

[121]  A typeface is "'a set of letters, numbers, or other symbolic characters, whose forms are related by repeating design elements consistently applied in a notational system and are intended to be embodied in articles whose intrinsic utilitarian function is for use in composing text or other cognizable combinations of characters.'" Jacqueline D. Lipton, *To © or Not to ©? Copyright and Innovation in the Digital Typeface Industry*, 43 U.C. Davis L. Rev. 143, 148 (2009) (quoting Terrence J. Carroll, *Protection for Typeface Designs: A Copyright Proposal*, 10 Santa Clara Computer & High Tech. L.J. 139, 141 n.2 (1994)).

[122]  Monotype Corp. PLC v. Int'l Typeface Corp., 43 F.3d 443, 446 (9th Cir. 1994) (noting that "typefaces are not afforded copyright protection which has permitted popular typefaces originally developed by one to be easily and closely copied by a competitor without compensation"). Many other countries do protect typeface. *See* Lipton, *supra* note 121, at 147 n.10.

[123]  H.R. Rep. No. 94–1476, 55–56 n.88 (1976) ("The Committee does not regard the design of typeface, as thus defined, to be a copyrightable 'pictorial, graphic, or sculptural work' within the meaning of this bill and the application of the dividing line in section 101."). It should be noted that some typefaces are very creative and should be protected by copyright. *See* Lipton, *supra* note 121, at 155–64 (giving examples of creative fonts).

https://doi.org/10.1017/9781316584507.009 Published online by Cambridge University Press

6:24-cv-01629-WWB-LHP    Document 74-2    Filed 01/22/25    Page 29 of 35 P
1143
*E. Ancillary Comments or Images Embedded in DMFs*                    171

any typeface is dictated by function, thereby precluding the needed creativity.[124] Because the typeface is not copyrightable, a computer program that does no more than recreate the typeface is also not protectable.[125]

Others argue that because code can be arranged multiple ways, it embodies creativity in the choice of a particular arrangement. It is true that countless minor permutations of DMF code are possible without changing the final object at all (e.g., move the nozzle in a clockwise versus counterclockwise direction). Even putting aside the fact that people drawing in CAD programs are not typing the code directly, it cannot be that the mere reordering of certain functional steps can bring the file within copyright protection. Were it otherwise, simple recipes would be copyrightable because the ingredients could be listed in multiple orders. But recipes, as mere listings of ingredients, are not copyrightable.[126]

Hence, the copyrightability of the basic code necessary to depict a drawing is tied directly to the copyrightability of the image itself.

## E. ANCILLARY COMMENTS OR IMAGES EMBEDDED IN DMFS – APPENDING COPYRIGHT PROTECTION?

This chapter has already described how, on a technical drawing, any materials in addition to the basic depiction of a useful object may contribute protectable creativity. Besides the labels and views discussed already, some files include metadata and comments. Metadata is typically found in design files. It

---

[124] This could be seen as another example of why mere depictions of useful articles do not contain creativity. But there is a difference between typeface, which has its utilitarian end in its two-dimensional depiction, and useful articles, which have their utilitarian end in their three-dimensional form. One could quibble that the mere outline of a typeface could be equated to a drawing of an object, but even the outline of the typeface retains its utilitarian function.

[125] Policy Decision on Copyrightability of Digitized Typefaces, 53 Fed. Reg. 38,110 (Sept. 29, 1988) (codified at 37 C.F.R. § 202 (2017)) [hereinafter *1988 Policy Decision*] ("[T]he Copyright Office has decided that digitized representations of typeface designs are not registrable under the Copyright Act because they do not constitute original works of authorship."). *See also* Osborn, *IP Channeling, supra* note 21, at 1319–20. Font designers lobbied furiously to obtain protections for digital typefaces and received a victory for *scalable* digital fonts, but the rationale for this protection would not extend to protecting DMFs. *Id.* at 1320.

[126] 37 C.F.R. § 202.1(a) (stating that "mere listing of ingredients or contents" is not copyrightable). Further, even inclusion of simple instructions for mixing the ingredients does not make the recipe copyrightable because it is merely a functional system or process. *See* Publ'ns Int'l. v. Meredith, 88 F.3d 473, 480–81 (7th Cir. 1996); Lambing v. Godiva Chocolatier, No. 97–5697, 1998 U.S. App. LEXIS 1983 (6th Cir. Feb.6, 1998); Tomaydo-Tomahhdo, LLC v. Vozary, 629 F. App'x 658, 661 (6th Cir. 2015); Lapine v. Seinfeld, No. 08 Civ. 128(LTS) (RLE), 2009 WL 2902584 (S.D.N.Y. Sept. 10, 2009).

includes additional information, such as the name of the draftsperson or notes about design choices, input via the CAD program. Comments are words in the actual lines of program code that are directed to a human reader and are not executable by a computer. Users can embed comments in any kind of file. Chapter 2 provided an example of comments in DMF code.

Design files often include metadata directed to others, such as design parameters or other engineering information. These can certainly contribute to copyright protection if the expression is creative enough. Once the design file is translated into a surface-mesh file, however, usually all metadata and other extraneous information is stripped away. All that is left is the tessellated surface geometry of the object, which I have argued is unprotected by copyright if the object is purely utilitarian. Further, when software converts the surface-mesh file into a machine-instruction file, that file only contains the instructions for the printer.

Users, however, can choose to insert textual comments into the code form of surface-mesh and machine-instruction files. Alternatively, they could add a creative image overlaid onto the digital version of the object such that it prints along with the tangible object.[127] This raises the possibility that even if courts apply my arguments to render mere drawings unprotectable, DMF creators wanting to control their files can circumvent this limitation by inserting extraneous comments or images to put the file as a whole over the creativity threshold.

Although some may put comments or surface images into surface-mesh and machine-instruction files out of pure motives, others will include them solely to exercise control over the file, especially where the object to be printed is not patentable because it is obvious or not novel. In other words, they will want to make up for the lack of patent protection with copyright protection. Because people wanting to copy the file to use it as a DMF would also need to copy the comments, they would arguably commit copyright infringement based on copying protected expression. This would allow a type of backdoor patent using copyright.[128]

Sometimes the motives of users will be obvious, as where they put a poem in the comments that has no instructive value.[129] More savvy users will include

---

[127]  Only some printers have the ability to print in color, but even the least expensive printer could print a monochrome creative shape on the surface of the object.

[128]  Calling the protection a backdoor patent is an overstatement because copyright law permits an imitator to create its own DMF even by copying the utilitarian features of the product.

[129]  *See, e.g., Habeas Haiku Splatters Spam*, INTABᴜʟʟᴇᴛɪɴ (July 1, 2003), www.inta.org/INT ABulletin/Pages/HabeasHaikuSplattersSpam.aspx (describing a company's use of a haiku in a hidden email header in an attempt to use copyright to protect the utilitarian email header).

extraneous material that looks as if it was placed there with altruistic motives. In either case, the content acts as a type of lockout code.[130] Virtually no one values DMFs of utilitarian objects for the creative expression in the comments; they only want the functional features. In that case, copyright law is being used not to protect the value of a creative work, but rather the value of a utilitarian work.

Normatively, this is a misapplication of copyright law, whose goal is to incentivize creative works for the betterment of the public, not to prevent access to otherwise unprotected utilitarian objects. Courts disfavoring such uses of copyright law can refuse copyright protection in several ways. If the expression is miniscule, it may fail the creativity threshold, or its expression may merge with its function. The most aggressive application of the merger doctrine would find that any content acting as a lockout code, no matter how creative, merges with its function as a lockout code.[131]

More aggressively, courts could hold that the lockout codes constitute copyright misuse.[132] Copyright misuse is an equitable doctrine that most

---

[130]  *Cf.* Julie E. Cohen, *Reverse Engineering and the Rise of Electronic Vigilantism: Intellectual Property Implications of "Lock-Out" Programs*, 68 S. CAL. L. REV. 1091, 1094–97 (1995) (discussing lockout programs that limit access to video games without a key, wherein the key consists of copyrighted material); Andrea Pacelli, *Who Owns the Key to the Vault? Hold-up, Lock-out, and Other Copyright Strategies*, 18 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 1229, 1242–46 (2008) (discussing the use of copyrighted material as a password for access to a computer program or other proprietary source).

[131]  *Cf.* Lexmark Intern., Inc. v. Static Control Components, Inc., 387 F.3d 522, 541 (2004) ("[T]he fact that [the expression] also functions as a lock-out code undermines the conclusion that Lexmark had a probability of success on its infringement claim."); *id.* at 544 ("[A] poem in the abstract could be copyrightable. But that does not mean the poem receives copyright protection when it is used in the context of a lock-out code."). In this regard, it is worth noting that 3D printing companies use lockout codes to limit the useable feedstock (ink) to 3D printers. *See* Exemption to Prohibition on Circumvention of Copyright Systems for Access Control Technologies, 80 Fed. Reg. 65,958 (Oct. 28, 2015) (codified at 37 C.F.R. § 201).

[132]  *See, e.g.,* Lasercomb Am., Inc. v. Reynolds, 911 F.2d 970, 979 (4th Cir. 1990) (extending copyright misuse to a license that required licensees to agree not to create competing software); Practice Mgmt. Info. Corp. v. Am. Med. Ass'n, 121 F.3d 516 (9th Cir. 1997); Alcatel USA, Inc. v. DGI Techs., Inc., 166 F.3d 772 (5th Cir. 1999) (extending copyright misuse to a license that required licensees to agree not to create competing software); Omega S.A. v. Costco Wholesale Corp., No. 04-CV-05443, 2011 WL 8492716 (C.D. Cal. Nov. 9, 2011) (finding copyright misuse where Omega placed a copyrighted design on the back of its watches to control parallel importation of lawfully sold goods); Brett Frischmann & Dan Moylan, *The Evolving Common Law Doctrine of Copyright Misuse: A Unified Theory and its Application to Software*, 15 BERKELEY TECH. L.J. 865, 912 (2000); Karen E. Georgenson, *Reverse Engineering of Copyrighted Software: Fair Use Or Misuse?*, 5 ALB. L.J. SCI. & TECH. 291, 313 (1996) (supporting copyright misuse defense for necessary intermediate copying and any derivative uses).

often arises with behavior that violates antitrust laws, but it has also been used to ensure copyright law is cabined within its constitutional mandate to incentivize creative works for the public. "The question is not whether the copyright is being used in a manner violative of antitrust law . . ., but whether copyright is being used in a manner violative of the public policy embodied in the grant of a copyright."[133] As an equitable doctrine, it would probably be reserved for obvious uses of lockout codes.

It should be recognized that the use of copyrightable material in a DMF differs somewhat from many lockout codes used to prevent interoperability between competing hardware. Traditionally, lockout codes have been used to stop competing video games from working on a proprietary console or remote garage door transponders from communicating with a proprietary garage door opener. Circumventing a lockout code in the hardware context does not permit cost-free, instantaneous copying of the hardware. The competitor must build its own hardware. With a DMF, unlocking the code allows instant, cost-free copying of the file (assuming no other IP right is implicated), which means that the copier might not independently develop anything. Whether this free riding alters the balance of equities will be a matter of debate, but as Chapter 10 spells out, there are a number of mechanisms outside of copyright by which creators can appropriate the returns on their investment in creating the files. If these incentives are sufficient, and I believe they are likely to be as I discuss in Chapter 10, providing copyright protection to the entire DMF via lockout codes will needlessly slow utilitarian progress and competition.

That being said, in most cases it will be difficult, if not impossible, to discern whether users include copyrightable content through improper motives. Courts could ignore the content, enforce copyright law against copying it, or take a middle ground. Ignoring it altogether goes too far, especially where a creative design is overlaid on an object.[134] Such aesthetic expression is at the core of copyright law, and some might value surface decoration. Always enforcing copyright law against copying the content is also too broad, because it sweeps in instances where inconsequential expression hinders the dissemination and use of otherwise unprotected files.

To take a middle ground, courts could analyze the issue under fair use, which is a robust doctrine in the United States.[135] Fair use requires the

---

[133]  Lasercomb, 911 F.2d at 978.

[134]  This is not to say that any image is worthy of copyright protection. *See Omega S.A.*, 2011 WL 8492716 (finding copyright misuse where Omega placed a copyrighted design on the back of its watches to control parallel importation of lawfully sold goods).

[135]  Israel, Liberia, Malaysia, the Philippines, Singapore, South Korea, Sri Lanka, and Taiwan have flexible fair use provisions similar to the United States, and other countries like Australia

*E.  Ancillary Comments or Images Embedded in DMFs* 175

balancing of several factors to determine whether a defendant can be excused from infringement.[136] With computer programs, courts have used fair use to preserve "public access to the ideas and functional elements embedded in copyrighted computer software programs."[137] Courts have recognized that fair use can excuse the copying of lockout codes.[138]

In applying fair use, courts should be aware that one who copies a DMF with the goal of printing the utilitarian object is usually forced to copy all content in the file. For things like non-executable comments, courts should pay attention to whether the copier was even aware of or benefited from the comments. If not, and especially if users of DMFs generally ignore the comments, then the use should be presumptively fair. This presumption could be couched in terms of transformative use, because users who ignore or remove extraneous material are using the file for a utilitarian purpose rather than a creative one.

The same presumption should apply to inconsequential creative images, such as those not readily visible to users. For ornate and obvious surface ornamentation, on the other hand, courts should probably only apply fair use if the copier removes the surface ornamentation before printing or further disseminating the file. In all cases, any discernible intent on the copyright claimant's part is certainly relevant. Courts should also distinguish between private, individual uses and commercial distribution of files. The latter should be judged by a harsher standard.

Outside of the United States, many countries utilize more limited fair dealing provisions, though there is continual pressure to broaden

are actively considering reforms. Peter K. Yu, *Customizing Fair Use Transplants*, 7 Laws 9 (2018), www.mdpi.com/2075-471X/7/1/9.

[136]  17 U.S.C. § 107 (listing as nonexclusive factors: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work").

[137]  Sony Comput. Entm't, Inc. v. Connectix Corp., 203 F.3d 596, 603 (9th Cir. 2000).

[138]  *See* Lexmark Intern., Inc. v. Static Control Components, Inc., 387 F.3d 522, 544–45 (2004). *Cf.* Sega Enters. Ltd. v. Accolade, Inc., 977 F.2d 1510, 1520–28 (9th Cir. 1992) (finding intermediate copying to understand video game compatibility with game console to be per se fair use); *Connectix*, 203 F.3d at 602–08 (finding that intermediate copying of BIOS that was necessary to access unprotected functional elements of video game console constituted fair use); Chamberlain Grp., Inc. v. Skylink Techs., Inc., 381 F.3d 1178 (2004) (refusing to allow a DMCA claim to eviscerate a fair use defense); Julie E. Cohen, *Reverse Engineering and the Rise of Electronic Vigilantism: Intellectual Property Implications of "Lock-Out" Programs*, 68 S. Cal. L. Rev. 1091, 1104–51 (1995).

them.[139] Other jurisdictions do not include fair dealing provisions but excuse certain forms of copying under other names.[140] These laws are generally similar to each other in having closed lists of possible exceptions, none of which maps on well to DMFs. DMFs with only ancillary creative expression may increase the impetus for broader exceptions in these jurisdictions.

Another route to avoid a clash between copyright and patent law would be to excuse individual copying in cases of DMFs containing ancillary creative expression. Many countries provide limited private copying exceptions, but the exceptions do not apply to computer programs, which is a problem for DMFs.[141] Of course, this solution, like fair use and misuse, would involve difficult line-drawing questions, particularly in determining when creative expression is ancillary. But just because it is difficult to draw lines does not excuse courts from trying. It is better to free at least some utilitarian DMFs from copyright law's shadow than simply to throw in the towel.

It might be argued that the low damages available for ancillary copyrightable material make the issue moot – who would bother to sue for trivial sums? It is true that damages are often limited to the proportion attributable to infringement.[142] In the United States, however, statutory damages are available for registered copyrights.[143] More importantly, although the low recoveries will deter many suits, they will not deter them all. There have been many instances in the United States (where each side presumptively pays its own legal costs) of copyright owners pursuing low-value suits in part for the

---

[139] Canada's Supreme Court significantly broadened the doctrine. *See* Michael Geist, *Fairness Found: How Canada Quietly Shifted from Fair Dealing to Fair Use*, in The Copyright Pentalogy: How the Supreme Court of Canada Shook the Foundations of Canadian Copyright Law (Michael Geist, ed. 2013). In addition to other exceptions, the United Kingdom utilizes more traditional fair dealing provisions. UK CDPA §§ 29–30A.

[140] *See, e.g.,* Copyright Directive art. 5(2) (allowing member countries to include the listed exceptions).

[141] The United Kingdom at one time excused private noncommercial copying but excluded "computer programs" from the excuse. UK CDPA § 28B. Since DMFs are computer programs, this excuse would not apply. In any event, the UK courts have quashed the private copying exception as inconsistent with the Copyright Directive. *See* BASCA v. Sec'y of State for Bus. & Innovation, [2015] EWHC (Admin) 1723. The Copyright Directive provides that member states may excuse private, noncommercial copying, but only "on condition that the rightholders receive fair compensation." Copyright Directive art. 5(2)(b). Providing compensation should be unnecessary for DMFs with only ancillary creativity.

[142] *See, e.g.,* 17 U.S.C. § 504(b); Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390 (1940) (apportioning damages).

[143] 17 U.S.C. § 504(c).

https://doi.org/10.1017/9781316584507.009 Published online by Cambridge University Press

*F.  Conclusion*                                                                   177

prospect of quick settlement payouts.[144] In jurisdictions where the loser pays all legal costs, a copyright owner has even more incentive to bring suit if the law protects the ancillary expression. The costs of such suits are high – potentially crushing when individuals are involved – and they are not serving the ends of copyright policy.

## F.  CONCLUSION

As a tentative conclusion to this chapter, it is argued that DMFs of utilitarian objects should be protected if at all by patent law rather than copyright law. Patent law's exacting requirements of novelty and nonobviousness may leave many such DMFs unprotected, but a rich public domain of utilitarian technology is an important gear in a capitalist, innovation-centric society. Providing copyright protection to DMFs of utilitarian objects would gum up innovation's gears without obvious return benefit in terms of creativity. Some may argue, as they did with traditional software, that copyright protection provides a necessary incentive to the creation of even utilitarian DMFs. But unlike the uncertain legal climate at the time courts granted copyright protection to software, patent law clearly protects utilitarian objects and provides at least some protection for the corresponding DMFs.

But this conclusion must be only tentative at this point. It may be that, however poorly copyright protection fits as a theoretical matter, it provides a needed appropriability mechanism for creators of utilitarian DMFs. A full exploration of this potential is taken up in Chapter 10, where I conclude that copyright protection does not appear to be necessary based on current evidence.

---

[144]  *See, e.g.*, Matthew Sag, *Copyright Trolling, an Empirical Study*, 100 Iowa L. Rev. 1105, 1111–13 (2015) (discussing copyright "trolls," which he defines as companies who make a business model out of suing and collecting settlements).