UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE №: 6:24-cv-01629

MATTHEW LAROSIERE,

*Plaintiff*,

v.

CODY RUTLEDGE WILSON, DEFCAD, Inc.,
DEFENSE DISTRIBUTED, and DIOSKOUROI
LLC,

*Defendants*.

_____/

**FORMER COUNTERDEFENDANTS MATTHEW LAROSIERE, JOHN ELIK, ALEXANDER HOLLADAY, JOSH KIEL STROKE, JOHN LETTMAN, AND MAF CORP'S CONSOLIDATED MOTION FOR AN AWARD OF REASONABLE ATTORNEYS' FEES AND RELATED EXPENSES AGAINST DEFENSE <u>DISTRIBUTED, FEDERICO REYNAL, CHAD FLORES, AND DAVID GINGRAS</u>**

1

## TABLE OF CONTENTS

**INTRODUCTION AND SUMMARY OF ARGUMENTS**................................................ 3

**ARGUMENT** ................................................................................................. 5

**I.    DEFENDANTS' COUNSEL INTENTIONALLY DISREGARDED THE LACK OF
LEGAL OR FACTUAL SUPPORT FOR DEFENSE DISTRIBUTED'S CLAIMS** ........... 5

A, The Counterclaims Were Facially Deficient ............................................. 5

B, Discovery Revealed A Complete Lack of Factual Basis.......................... 6

C, Discovery Responses Were Bad Faith and Designed to Force Motion Practice... 11

D, Voluntary Dismissal Does Not Save Defendants or their Counsel...................... 12

**II.    DEFENDANTS' COUNSEL REPEATEDLY MANIFESTED BAD FAITH**............. 13

A, Vigorous Default Practice Suddenly Abandoned ................................... 13

B, Repeated Filing of Doomed Motions ..................................................... 14

C, Signing Pleadings With Personal Knowledge They Were False ........................... 14

D, Facially Defective Discovery Responses Designed For Motion Practice ............. 15

E, Reynal and Flores Attempt to Force Appointment of Special Master ................... 15

**III.    DEFENDANTS' COUNSEL AND THEIR "SPOLIATION" CONTRIVANCE**...... 17

A, Premature Pleading Allegations .............................................................. 17

B, Failure to Request Information ................................................................ 18

C, Non-Existent "Evidence" of Spoliation.................................................... 18

D, Fabricated "Admin" Theories ................................................................. 20

E. All Relevant Materials Were Preserved................................................... 21

G. The Spoliation Narrative is Unsupported and Unsupportable .............................. 22

**IV.    COUNTERDEFENDANTS ARE DUE FEES FOR OPPOSING THE DISMISSED
LANHAM ACT CLAIM** ............................................................................. 22

**V.    PRAYER FOR RELEIF** ...................................................................... 23

**Local Rule 3.01(g) Certification**.................................................................. 24

## INTRODUCTION AND SUMMARY OF ARGUMENTS

Today, fust as the ink was drying on this motion, just shy of 14 days from the date of this Court granting its requested dismissal, Defense Distributed, with new counsel, filed *yet another* RICO claim in the Southern District of Florida. *Defense Distributed, et. al. v. Elik, et al.*, No. 9:25-cv-81197-XXXX (S.D. Fla). Its failures mirror those in this Court. Nothing could better exemplify the bad faith nature of Defense Distributed and its counsel's behavior before this Court.

"[F]iling a lawsuit is not a gratuitous license to conduct infinite forays in search of evidence. When it becomes apparent that discoverable evidence will not bear out the claim, the litigant and his attorney have a duty to discontinue their quest." *Collins v. Walden*, 834 F.2d 961, 956 (11th Cir. 1987). Reynal, Flores, and Gingras, on behalf of Defendants, willfully filed a frivolous and baseless shotgun-style counterclaim joining numerous Counterdefendants, repeatedly mooted their own motions after forcing movants to reply, ignored the orders and rules of this Court, and deliberately engaged in a pattern of behavior designed and intended to force the appointment of a special master.

Defendants and their counsel rode their baseless RICO claims for a year, engaging in abusive discovery tactics and noticing depositions across the country - none of which they ever intended on conducting. The bad faith conduct of Defendants' counsel forced the innocent Plaintiff and Counterdefendants to engage counsel at great expense to do what Defendants' counsel should have done prior to filing: examine the veracity of Defense Distributed's materials and allegations. Instead of litigating claims that were vetted by a pre-suit investigation, Defendants' counsel inverted federal procedure and forced Counterdefendants to prove a negative: that the counterclaims were utterly

3

baseless. Defendants sought discovery liberally but responded to it with disingenuous stonewalling. Their discovery responses were facially incomplete and rife with identical boilerplate objections. Facing a motion to compel compliant responses to Counterdefendant's discovery requests, Defense Distributed dismissed their claims, only after milking them to harass Counterdefendants for a year.

Defendants and their counsel's bad faith is not limited to the counterclaims. Their fixation with spoliation is manifest, having alleged it since their first counterclaim, before they had any opportunity to engage in discovery. They have filed unsupported motions for "spoliation relief" claiming Plaintiffs and the former Counterdefendants have destroyed evidence, but Defendants *never asked for any of the information they claim was destroyed*. Relying upon the error-ridden, conclusory affidavits of Defendant's own employee, they claim that third parties have destroyed a universe of information. Yet every piece of relevant information was preserved. This would be no surprise to Defendants if they had bothered to ask for it. But they did not. In fact, they showed no interest when repeatedly invited to the information. It's no wonder why. What they sought wasn't evidence. They sought some finding of spoliation—by any means—and to derail proceedings in the hopes of obtaining the appointment of a special master.

This represents the relatively rare case where literally *none* of Defendants' counsel's behavior was designed to pursue or advance legitimate claims or defenses. This is precisely the type of conduct § 1927 was designed to deter. These actions, taken together, reflect an intentional strategy to delay, increase costs, and harass rather than to litigate legitimate claims, thereby warranting sanctions under 28 U.S.C. § 1927 and this Court's inherent authority.

## ARGUMENT

### I. DEFENDANTS' COUNSEL INTENTIONALLY DISREGARDED THE LACK OF LEGAL OR FACTUAL SUPPORT FOR DEFENSE DISTRIBUTED'S CLAIMS

At the outset, it is readily apparent that Defense Distributed's counterclaims were illogical and implausible. Definitionally, the filing of a counterclaim multiplies proceedings. These, though, did so to an unreasonable degree. Defense Distributed's lawyers had a heightened duty to diligently verify the absurd claims of Defense Distributed, as "[i]t is rare for a party even to plead a RICO claim properly, let alone successfully prove one." *Parenteau v. Iberia Bank, N.A.*, No. 2:07-CV-851, 2013 WL 443624, at *6 (S.D. Ohio Feb. 5, 2013). Reynal and Flores have represented Wilson and Defense Distributed for years, never once having brought a successful claim.[1] In this situation - the context of a single-Plaintiff copyright action in Florida - no reasonable attorney would sign, much less file, a set of counterclaims reaching all across the nation to drag 7 unrelated individuals and entities without substantial pre-suit investigation.

### A, The Counterclaims Were Facially Deficient

The claims were facially deficient from the first filing, and only got worse as Defendants' counsel continued filing them. Counterdefendants have identified the facial deficiencies in the counterclaims at length, and will not burden this Honorable Court by re-hashing that which has already been said. (Doc. 71) at 4-21 (Detailing the deficiencies of the second amended counterclaim as a shotgun complaint, and the lack of any factual

---

[1] WAR MODE Podcast, *Christmas Bonus*, December 19, 2024, at 23:14 https://podscripts.co/podcasts/war-mode/christmas-bonus (Wilson: "I've never officially, like, won a case, for example, really, you know.").

allegations to any purported predicate act of RICO, nor any overt act as to any other count).

Even so, it is well settled that "plaintiffs bringing a civil RICO action for damages must show (1) that an injury occurred to business or property and (2) that such injury was 'by reason of' the substantive RICO violation." *Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto. Ins. Co.*, 259 F. Supp. 3d 1344, 1352 (M.D. Fla. 2017), aff'd, 945 F.3d 1150 (11th Cir. 2019) (quoting *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282 (11th Cir. 2006)). Defense Distributed's counsel cannot hide behind nebulous assertions that discovery might bear such a thing out. Where they failed to plausibly allege a single predicate act conducted by a Counterdefendant, they cannot possibly have alleged concrete injury to business or property by direct result of the violation. Defense Distributed's counsel did not bother to try alleging compliant damages, as they knew the counterclaims were merely one of the "amusing array of legal methods" Defense Distributed's owner uses to harass others. (Doc. 43, ¶35).

B, <u>Discovery Revealed A Complete Lack of Factual Basis</u>

In being forced to defend against Defense Distributed's shotgun counterclaim, Counterdefendants systematically paired interrogatories with requests for admission and production. Defense Distributed's counsel returned manifestly inconsistent materials. For example, Elik's request for admission 2 asked that Defense Distributed admit it did not consult with the U.S. Department of State regarding whether anything allegedly published by a Counterdefendant constituted ITAR-controlled technical data. Defense distributed denied this without condition or context. (Ex. B, B23-24). But when Elik requested Defense Distributed provide any such communications, Defense Distributed simply

6

provided 49 pages of inapposite material, primarily copies of the federal register, without a single communication with State. (Ex. A, A180-229).

Likewise, Elik's request for production 3 asked that Defense Distributed produce materials that support their allegation that any Counterdefendant violated the Export Administration Regulations (EAR) (Ex. B, B-45-46). The only pre-filing material Defense Distributed produced was an FAQ page which states that it isn't legal advice in addition to a slew of materials that were created after the filing of this lawsuit (Ex. A, A-231-311). This FAQ represents the totality of their pre-filing evidence, and a complete lack of pre-filing factual basis – a document which, on its face, clarifies that it isn't a substitute for legal advice.

The lack of factual basis does not stop here. Elik's request for production 5 asked Defense Distributed produce materials to support their allegation that any Counterdefendant conducted, attempted to conduct, or solicited others to conduct cyberattacks or denial-of-service attacks (Ex. B, B-46-47). Defendants produced an unsigned "visualization" that fails to allege an attack does not evince that any attack happened, let alone that any Counterdefendants were responsible (Ex. A, A-340). Instead, this "visualization" lines up exactly with Defendant's own updates and advertisement of their websites and blogs (Ex. H ¶20-31). Defendants also produced a series of screenshots showing comments left on public comment sections (Ex. A-341-343, A-345.). None of these screenshots show or provide any evidence of cyberattacks or denial-of-service attacks (Ex. H ¶50-81). Similarly unrelated, Defendants produced screenshots showing an individual sharing a link to a blog (Ex. A, A-344). This screenshot does not show or provide any evidence of cyberattacks or denial-of-service attacks.

7

Defendants produced a screenshot of a tweet that shows publicly available IP addresses for several web servers (Ex. A, A-347-348). The date of this tweet is between the second and third "attack" that Defendants claim occurred. Thus, it does not coincide with any of the dates of the purported attacks. As an additional matter, none of the servers listed are based in the United States (Ex. H at ¶75-76). In their initial counterclaims, Defendants claimed to maintain an international firewall – one that prevents any access to Defcad from any system outside the United States (Doc. 29, ¶69, 73). This means only one of two things can be true: firstly, that Defendants knowingly misrepresented the in question tweet as a solicitation of hacking against them, despite these servers not belonging to Defendants. Secondly, that Defendants do own these servers, and they host all or some of their website on these foreign servers – in blatant opposition to their counterclaim's explanation of how Defcad operates. Of note, another screenshot that defendants produce shows an IP address summary for each of the addresses in the tweet (Ex. A, A-346). This screenshot clearly shows that each of the servers are not located in the US. Regardless, Defendants lack the necessary evidence to have alleged any attack, let alone one perpetrated by any Counterdefendant.

Related to this issue is Defendant's responses to Elik's request for production 23 – which asked Defense Distributed to produce materials to support their claims concerning Counterdefendant's denial-of-service attacks specifically, as well as their claims that Counterdefendants used geolocation masking (Ex. B, B-54). In response, Defendants again produced the same unsigned "visualization" - which, as explained above, fails to actually evince an attack (Ex. G, G-18). They additionally produced a screenshot showing an IP address and a screenshot that appears to show a comments

section from a blog (Ex. G, G-17-22). Thes sreenshots do not show or provide any evidence regarding denial-of-service attacks nor geolocation masking (Ex. B, B-54). Finally, they produced screenshots of a video that Counderdefendant Lettman had previously created (Ex. G, G-21-22). This video shows an individual interacting a webserver which is configured identically to Defcad's, but is hosted in Iran and uses an Iranian domain *Id*.. In their responses, Defendants indicated they had no knowledge of this server (Ex. B at B-52, 58). Nothing in the video evinces a denial-of-service attack. Only one of two things can be true: Either Defendants do *not* own this server, and as such, no access attempt was made against them—and yet they intentionally misrepresented this video as being proof of denial-of-service attacking or geolocation masking against them, when neither are evident; or that Defendants *do* own the Iranian server, and they intentionally mispresented Lettman's video as being either a denial-of-service attack or a geolocation masking attempt, when in reality it was neither. The more concerning issue with the latter is that Defendants would be violating US sanctions against Iran to own and operate such a webserver, and as explained above, would certainly be acting in blatant opposition to the entire theory they rely on for their ITAR/EAR/compliance claims (or, that they are willingly and intentionally choosing to violate what they claim to be valid interpretation of these regulations). In Defendant Wilson's responses to interrogatories 1 and 14, Defendant Wilson indicated he had no awareness of any servers in Iran (Ex. B, B-57). If these are truthful answers, then the first option is true – Defendants do not own the server at 194.147.222.183, and as such, no access attempt was made against them. This would mean, by including these screenshots in response to Elik's request for production 23, Defendants intentionally

9

misrepresented Lettman's investigation of this supposedly unrelated server as an attempt to access Defcad. Because Defendants dismissed their counterclaims in response to counterdefendants seeking clarification on this and other inconsistencies, the court is deprived of certainty – but ample bad faith is present regardless of which explanation is correct.

In response to Elik's request for production 16, which asked Defense Distributed for evidence supporting their claim that Elik had "repeatedly directed and solicted others to Hack" Defcad or any other website (Ex. B, B-52), Defendants produced three screenshots – one of Elik commenting "woah" beneath the image discussed at (*infra* page 7-8), a duplicate of that image, as well as an image showing that Elik had re-tweeted the image (Ex. G, G-12-14). These images simply do not include any sort of direction of or solicitation for hacking. However, as explained above, these servers are not based in the United States– meaning that Defendants are again either misrepresenting these servers as belonging to them, or that their explanation of how Defcad operates offered in their counterclaim is untrue. Once again, bad faith lies behind both options.

Common to these issues regarding hacking and denial-of-service attacks, Defendant's counterclaim stated that they had "retained multiple security firms" to "investigate... hacks, leaks, and DDoS attacks, and to investigate whether customer or developer information was ever "dumped" online (Doc. 52, ¶111h). However, despite overlapping requests for production that sought the materials that must exist if "multiple security firms" had actually been retained, the only such materials ever turned over dealt singularly with the question of database security (Ex. B, RFP to DD 5 at B-46, RFP to DD 16 at B-52, RFP to DD 22 and 23 at B-54, RFP to Wilson 50 at B-101, RPF to Wilson at

B-101-102). Either Defendants lied about their own actions in their counterclaims and didn't actually retain multiple firms (and thus certainly lacked factual basis for such a claim), or they did retain multiple firms and decided to shirk their discovery obligations because these materials were seriously damaging to their claims. Either way, their counsel would have to have been on notice to this misconduct, especially Reynal, who was the sole signatory on discovery materials.

Elik's request for production 22 asked Defense Distributed to produce materials to support their allegation that Counterdefendants used an "Iranian reverse proxy". Defense Distributed's written response admits they had no evidence of this whatsoever, but their production packet included another copy of their unsigned, unexplained denial-of-service visualization, which seems to have been provided as a last-second attempt to hide the utter lack of factual basis they had for this claim (Ex. G, G-16).

In response to Defense Distributed making the claim that Elik was their employee, Elik's request for production 15 asked for materials to support this allegation. Defendants produced an old NDA which explicitly stated "Nothing contained in this Agreement shall be construed as creating any... employment". (Ex. G, G-2-10) No other proof of employment was produced. Defense Distributed has insisted that Elik was an employee in each of their counterclaims. Defense Distributed's counsel were on notice that this was contested from at least December of 2024. (Doc. 47-1). Yet, they continued to represent to the court and opposing counsel that Elik was their employee. This can only be explained by bad faith and complete absence of pre-filing inquiry.

C, <u>Discovery Responses Were Bad Faith and Designed to Force Motion Practice</u>

For example, in response to Elik's 7th interrogatory, which asked that Defense Distributed describe in detail the statements it alleges were false or misleading and made in commercial advertising and promotion, among other inapposite material was a reliance on "Mr. Larosiere's admission that the purpose of his lawsuit is to be an existential threat to DEFCAD's business, found at [URL]". (Ex. B at B-11) But no such "admission" existed there. What the URL pointed to was a news article Mr. Wilson himself caused to be written. [2]

D, <u>Voluntary Dismissal Does Not Save Defendants or their Counsel</u>

Defense distributed and its counsel are likely to argue that, because they avoided a ruling on the merits of their counterclaims, they cannot be sanctioned for them. But that is not the case. *See Carlson v. Town of Mountail Vill., Colorado*, No. 17-CV-02887-PAB-STV, 2020 WL 1304490, at4 (D. Colo. Mar. 19, 2020) (Noting that Mr. Allen admitted that he hoped that discovery would allow him to "discover the factual basis for the RICO claim," the Court observed that "it is improper for an attorney to file a RICO claim without factual support on the hope that discovery will support it." The Court also ruled that Mr. Allen "failed to perform a reasonable investigation of the legal theories and factual allegations" in the complaint and "persisted in positions defendants demonstrated to be unfounded." As a result, the Court awarded defendants their attorney's fees <u>incurred after filing their</u>

---

[2] Alex Tyrer-Jones, 3D Printing Industry, "3D Printed Gunfight: Matthew Larosiere v. Cody Wilson in Copyright Battle," February 19th 2025, https://3dprintingindustry.com/news/3d-printed-gunfight-matthew-larosiere-v-cody-wilson-in-copyright-battle-236544/. Wilson has a habit of soliciting articles about himself, and over the course of this litigation has repeatedly insisted that reporters write stories covering his claims. Several of these reporters have contacted Plaintiff and volunteered that they were inquiring at Mr. Wilson's behest. The results of these endeavors invariably wind up in the filings of this case.

first motion to dismiss.) Like Mr. Allen, Defense Distributed's counsel filed a RICO claim without factual support at their own peril.

## II.  DEFENDANTS' COUNSEL REPEATEDLY MANIFESTED BAD FAITH

The record establishes that Defense Distributed's counsel acted with actual bad faith, not mere negligence, in a manner beyond that which is "so unreasonable as to be tantamount to bad faith." See *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1242 (11th Cir. 2007). Counsel flatly refused to discuss the substance of their motions during required meet-and-confers, forcing Counter-Defendants to incur the extraordinary expense of arranging for a court reporter at every call to preserve a record of their stonewalling. (Ex. D at 26) (Mr. Larosiere "Have you engaged in any informal attempts to resolve this? Have you emailed any of us asking for clarifying information before [resorting to motion practice]? Mr. Flores: "I haven't.")  (Ex. D at 28) (When asked "who prepared" Ex A at A-496, Mr. Flores responded that he was "done conferring on this" and that he has given "enough detail."); (Ex. D at 31) ("Mr. Flores: I have articulated the basis for our motion by showing you the motion we're going to file. If you think that doesn't suffice, you can say you're opposed and then oppose the motion.").

### A, Vigorous Default Practice Suddenly Abandoned

Defense Distributed repeatedly moved for default against counterdefendant Celentano, (Doc. 87, 105, and 109) only to abandon that position entirely by filing a so-called "notice of issue." (Doc. 117) That filing itself misrepresented opposing counsel's positions: after asking whether counsel opposed a motion to extend their deadline to seek default judgment, and receiving opposition, Reynal sidestepped the truth by filing his

"notice" to suggest agreement where none existed. *Compare* (Ex. E, E-9-11) *with* (Doc. 117).

B, <u>Repeated Filing of Doomed Motions</u>

On two separate instances, counsel filed motions to dismiss and then filed answers and sprawling counterclaims, knowing this procedural sequence would render the motions to dismiss meritless, but persisting anyway to multiply work when the Court did not *sua sponte* strike them. *See* (Doc. 28, mooted by Doc. 29, as ruled by Doc. 38); (Doc. 48, identically mooted by Doc. 49, but forcing a response).

On top of that, Defendants filed their initial Rule 37(e) motion *mere hours before dismissing their own claims*. (Doc. 122, Doc. 123). Then, on the last day afforded by the Court to file a Rule 37 motion, Defense Distributed and its counsel file *an entirely different* motion with a re-framed theory.

C, <u>Signing Pleadings With Personal Knowledge They Were False</u>

Counsel Gingras personally signed a pleading alleging his website had been "hacked," (Doc. 52 at 38) where the only "evidence" was that unknown third parties posted comments on its open, public comment section. Because Defendants neglected to include any factual details in their claims concerning this hacking, Counterdefendants had to reverse engineer what was meant by "hacking" from Defense Distributed's convoluted discovery responses. Defense Distributed provided the same materials in response to Request for Production 6, which sought documents and materials evincing money laundering on behalf of a Counterdefendant, to Request for Production 7, which sought documents supporting their myriad CFAA and "hacking" allegations. (Ex. A at A-372). No evidence suggests that any of the comments posted involved any sort of "hacking".

However, in response to a different request, Defense Distributed and its counsel assert as evidence of unauthorized access… a screenshot of a video showing Unicode diacritical marks[3] posted to David Gingras' public blog comments. (Ex. G, G-20).

D, <u>Facially Defective Discovery Responses Designed For Motion Practice</u>

Their discovery responses were cut-and-paste objections devoid of substance and manifestly incomplete, (Ex. B, for example, contains ""Defendant/Counterplaintiff objects to this request as overbroad, oppressive, and violating the attorney work-product doctrine" six different times) and they compounded this abuse by noticing depositions of far-flung, unrelated third parties nationwide—yet never taking a single deposition.[4] (Ex. F)

When counsel for Elik sought more complete responses to Defense Distributed's answers to Elik's interrogatories on August 21, Reynal suggested a "global conference" "to discuss the shortcomings in [Counterdefendants'] discovery response as well as the items you identify below." Reynal declined to identify any shortcomings in any discovery response. (Ex. E, E-2). At the August 29th conference, Reynal still declined to identify any shortcomings, stating he may choose to do so in the future. (Ex. D at 5-6).

E, <u>Reynal and Flores Attempt to Force Appointment of Special Master</u>

Just 30 minutes following the close of the August 29th conference, Reynal cited his "serious concerns regarding [Counterdefendants'] discovery responses" as well as an invocation of bar disciplinary activities, as making the appointment of a special master

---

[3] Far from hacking, this is inherent in Unicode text. *See* https://en.wikipedia.org/wiki/Combining_Diacritical_Marks
[4] The flurry of subpoenas for in-person depositions Mr. Reynal noticed and served upon individuals all over the country appear to have targeted individuals Mr. Wilson has gotten into disagreements with on the internet.

"desirable." (Ex. E, E-4) *see also* (Ex. D at 11-13). Counsel for Counterdefendants understood this Court's threat to appoint a special master to be a "stick" designed to encourage the parties to "faithfully execute their discovery obligations." (Ex. E, E-4) Instead, it seems, Reynal, Flores, and Defendants viewed the appointment of a special master as a carrot, so much so they have *not ceased begging for one*. *Id.*; (Ex. C at 3:3, 5; 4:15; 5:2, 5; 6:12, 18-19; 7:5, 8, 14, 22; 8:11; 11:5; 12:5, 15; 13:2, 21; 14:2, 25; 15:7; 31:17, 23; 32:9; 33:3, 9, 16; 34:2, 15-16,  21; 35:21; 36:25; 37:3, 11, 20, 24); (Doc. 122) ("including a special master if need be."); (Doc. 136).

If their bad faith wasn't clear enough, in the email chain where Reynal first openly invoked his desire for the appointment of a special master, which he understood would "be a terminating financial sanction against" Plaintiff, (Ex. D at 8) Reynal sought to add to the meet-and-confer "Matthew Larosiere and John Elik's failure to produce John Elik's employment agreement or the transfer agreements related to the files at issue in this case." (Ex. E, E-7). Counsel for Counterdefendants immediately offered to informally provide such documents, despite the fact that they were not responsive to any request for production, if Mr. Reynal would simply "[t]o avoid any confusion, please start a separate email chain with counsel for the parties you seek information from and make said request." (*Id.*) Mr. Reynal never made such a request, nor did any counsel for Defendants. Likely because responsive information was not what they sought. What they sought were subjects for motion practice to multiply and complicate proceedings.

This string of actions, taken together, demonstrates a deliberate pattern of litigation abuse designed to harass, mislead, and multiply proceedings, and easily satisfies the Eleventh Circuit's bad-faith threshold for §1927 sanctions.

### III. DEFENDANTS' COUNSEL AND THEIR "SPOLIATION" CONTRIVANCE

Rule 37(e) requires, at minimum, proof that electronically stored information was lost, that it cannot be restored or replaced, that it was lost because a party failed to take reasonable steps to preserve it, and that prejudice resulted. For harsher measures, it further requires a showing of intent to deprive. *See* Fed. R. Civ. P. 37(e)(1)–(2). The Eleventh Circuit has been clear that spoliation sanctions cannot issue absent evidence that the party had control of the materials, a duty to preserve them, and intentionally destroyed them. *See, e.g., Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020); *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir.1997) ("In this circuit, an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith."); Defense Distributed met none of these elements. They never identified relevant information that was unavailable from other sources, never demonstrated that Counterdefendants had a duty to preserve at the time of deletion, never showed prejudice, and never came close to proving intent. Their spoliation motion was not merely weak—it was frivolous, transparently tactical, and pursued in bad faith.

### A, Premature Pleading Allegations

Counsel for Defense Distributed first raised the specter of spoliation not through discovery but by baldly inserting it into their initial pleading—claiming evidence had been destroyed before they had even served a single request or made an informal inquiry. (Doc. 29 at 92). They never asked, formally or informally, for the materials they later accused Counterdefendants of destroying. Indeed, many of the materials they point to were alleged to have been deleted long before any litigation hold notice was even issued.

Meanwhile, for Defense Distributed, Mr. Reynal sprayed litigation hold notices across the country, directing unrelated individuals to preserve information purportedly relevant to Plaintiff Matthew Larosiere's copyright claim—an incoherent and abusive tactic that only underscores the lack of connection to the spoliation theory that paradoxically predated any discovery in this case. *See* (Doc. 136-1); (Ex. A-498) (Identical litigation hold notice served upon an individual mentioned nowhere in the pleadings or any motion and yet somehow claimed to evince destruction of evidence).

B, <u>Failure to Request Information</u>

At no point did Defense Distributed actually ask for the materials they accused Counterdefendants of destroying. Not formally in discovery, not informally in correspondence, and not during any meet-and-confer. (Ex. D at 26). Indeed, the materials they claimed were deleted in their counterclaims long pre-dated any litigation hold notice.

Why Defense Distributed didn't bother to ask for the information is clear: they already had all of it. (Doc. 29 at 68); (Ex. C ¶ 15). The fact that Defense Distributed chose to use bizarre means to acquire the information before ever asking for it cannot possibly support 37(e) relief.

C, <u>Non-Existent "Evidence" of Spoliation</u>

When asked to produce any documents evincing their "Spoliation" theory, Defense Distributed offered two categories of "evidence." The first were a series of screenshots of various communications, including a great many between third parties, and including the contents of the reddit account Defense Distributed claimed to have been spoliated. (Ex. A-497-537). The second, being an unsigned, unsworn affidavit prepared *after* the information was requested, alleging that "26,010 messages have been deleted," without

any information as to how this number was reached, who deleted the messages, and what the messages were relevant to. (Ex. A-496). In the meet-and-confer predating Defense Distributed's Doc. 122 motion, counsel for Counterdefendants expressed confusion as to what was claimed to have been deleted, how it was relevant, who had the ability to preserve it, and why Defense Distributed hadn't asked for any of this information prior.

> Mr. Larosiere: "[The report indicates] that 26,000 messages were deleted. The screen shot of your motion asserts that 71,000 messages were deleted… we don't understand that, can you tell us who prepared [the report]?

> Mr. Flores: Mr. Larosiere, I'm done conferring on this. We've given you enough detail, and I really don't think there's anything more to tell about this motion. If you want to oppose and say we didn't confer sufficiently by telling you who the declarant is, go ahead.

> Mr. Larosiere: I mean, you're asking for full briefing, Mr. Flores…[the report] appears to be the basis of your contention…and it's concerning that we aren't being allowed to even understand where this came from….If we're to brief this, shouldn't we be able to explore it?

> Mr. Flores: Sure. Yeah. You can explore it all you want in 500 words in opposition. That's great.

> Mr. Larosiere: I'm a little surprised, but I understand you don't want to talk about this anymore, but I'm just surprised you won't tell us the source of the—

> Mr. Flores: I have conferral fatigue, guys, I really do.

> …

> Mr. Depury: I think we're trying to ask the same very obvious questions that the Court is going to ask. For instance, who is the author of that document?

> …

> Mr. Larosiere: The litigation hold notice considered only the copyright action. So this is just very hard to understand how, for example, jen.ghostgunner spaceprivateer junkversion2, would be…something one of my clients should have preserved. Do you understand? We're very confused.

> Mr. Flores: I have articulated the basis for our motion by showing you the motion we're going to file. If you think that doesn't suffice, you can say you're opposed and then oppose the motion. That's all we're really here to do.

(Ex. D at 23-35)

D, <u>Fabricated "Admin" Theories</u>

Much of Defense Distributed's spoliation theory rested on the claim that certain Counterdefendants were "admins" or "administrators," allegedly giving them broad powers to control and delete communications. This assertion came from nowhere in the record. When asked why he had not inquired into what administrative capabilities anyone actually had, Chad Flores responded as follows:

> Mr. Zermay: "[T]he second [question] I have about your [motion] is your assertions as to the Plaintiff and counter-defendants' status as…administrators or admins of the Rocket.Chat. [T]here are some sweeping assertions made as to administrative powers…that relate to allegations regarding duties to preserve [ESI]. I'm wondering what the factual basis for these assertions that a person that has the title of admin or administrator of a Rocket.Chet has the ability to preserve, maintain, or has control over [that ESI].
>
> Mr. Flores: Well, the factual basis comes from, I think, publicly available information about the nature of the Rocket.Chat platform and how it operates.
>
> …
>
> Mr. Zermay: Wouldn't in the course of a reasonable inquiry prior to attempting to set extensive briefing on a meta-discovery on discovery issue include propounding a written interrogatory about the administrative privileges that the targets of the motion maintained before putting the issue before the Court?
>
> Mr. Flores: Our position is, no, that's not required and that we propounded sufficient requests already.
>
> …
>
> Mr. Larosiere: I would ask, have you attempted to engage in any informal attempts to resolve this? Have you emailed any of us asking for clarifying information before this?
>
> Mr. Flores: I haven't."

(Ex. D at 23-26).

In fact, neither Larosiere nor Elik had the administrative powers alleged, with Larosiere never being a general administrator *at all* and having been unable to access his Rocket.Chat account since July of 2024. (Ex. C at 12). As is the case with many of

these items, this would have been no surprise to Defense Distributed if they had bothered to ask. The only affidavit offered, from Defense Distributed employee Walliman, described what "we think" about the conduct of third parties, which Walliman could not possibly have personal knowledge of.  (Doc. 136-2; Doc. 136-9). No reasonable attorney acting in good faith

### E. All Relevant Materials Were Preserved

In reality, all materials relevant to the copyright claim were preserved. Defendants swear that the "Hitchhiker" chat room was spoliated, but it still exists. (Doc. 136 at 9) Defendants would have known this if they had bothered to ask, or had bothered to look at the materials that were *actually provided* and offered to them over the course of litigation. (Doc. 136-5 at 14; Doc. 136-6).

### F. Misrepresentations of Discovery Responses

Defendants repeatedly misrepresent responses that they received during discovery. Starting at page 3, they claim that (Larosiere's and Elik's) "discovery responses now disclaim possession or knowledge of the missing ESI." This is utterly unsupported. Defendants point to Doc. 163-8 at 14-15 and Doc. 136-6 at 12-14 as containing requests that would have made this information responsive. None of these requests ask explicitly for any of this ESI. One request in each of Defense Distributed's exhibits (Doc. 136-8's 9 and Doc. 136-6's 9) pertains to ESI tangentially, and both Larosiere's and Elik's (Doc. 136-5 and Doc. 136-3) responses clearly indicated that ESI pertinent to these requests was available, subject to objections and seeking clarification as to what specifically was being requested because these requests were extremely vague (seeking "any materials"). Defendants' counsel never provided this clarity, even after being reminded and prompted

to do so by Counterdefendants, and never pressed further. As explained above at E, the
ESI which could be reasonably foreseen to lead to discoverable evidence was preserved.
*See also* (Doc. 47-1).

The pattern of misrepresenting discovery responses also includes the explanation
offered above at D. Taken together, it becomes clear that, at best, the entire spoliation
motion is a bad faith misrepresentation of the facts.

G. <u>The Spoliation Narrative is Unsupported and Unsupportable</u>

Defense Distributed's spoliation allegations have remained unsupported and
unsupportable from the beginning. They paint a massive number of messages and rooms
as having been deleted but proceed to explain that only three of these rooms could
possibly have contained ESI relevant to this matter. Yet, bewilderingly, they never asked
for this information. Instead, they opted to misrepresent what was deleted, when it was
deleted, and to lean on vague assertions rather than facts. This evolving spoliation yarn
was not an effort to remedy lost evidence but a calculated tactic to smear, harass, and
multiply these proceedings in bad faith.

**IV. COUNTERDEFENDANTS ARE DUE FEES FOR OPPOSING THE
DISMISSED LANHAM ACT CLAIM**

Counterplaintiff has asserted a claim under §1125(a) of the Lanham Act, entitling
Counterdefendants to attorneys' fees for opposing it, if the opposition is successful. 15
U.S.C. § 1117(a). § 1125(a) is predicated on statements made "on or in connection with
any goods or services" which is either deceptive "as to the affiliation, connection or
association" relevant to the goods, or solely "in commercial advertising or promotion"
misrepresents the nature" of "goods, services, or commercial activities." 15 U.S.C. §

1125(a). The counterclaims never identified an § 1125(a) violation. *See* (Doc. 52 p. 44).
When asked for documents that support these allegations, Defense Distributed provided
over 70 pages of irrelevant materials, none of which contained an § 1125(a)
communication, and an evasive and conclusory interrogatory response. (Ex. B, B-10-11);
(Ex A, A373-A446). The action entails a § 1117(a) "exceptional circumstances" due to the
Counterdefendants' strength of legal position and the Counterplaintiff's abusive manner
of litigation. See, e.g., *Tobinick v. Novella*, 884 F.3d 1110 (11th Cir. 2018).

### V. PRAYER FOR RELEIF

WHEREFORE, former Counterdefendants respectfully request that this Court
enter an Order:

1. Finding this matter to be an "exceptional case" under the Lanham Act, 15
   U.S.C. § 1117(a), and awarding attorneys' fees and costs on that
   independent statutory basis;

2. Imposing sanctions under 28 U.S.C. § 1927 and the Court's inherent
   authority upon Defense Distributed's counsel, Federico A. Reynal, Chad C.
   Flores, and David S. Gingras, jointly and severally, for unreasonably and
   vexatiously multiplying these proceedings;

3. Awarding Counterdefendants their reasonable attorneys' fees and related
   expenses incurred in defending against Defense Distributed's
   counterclaims, responding to abusive discovery tactics, and addressing the
   motions and filings generated by counsel's bad-faith conduct;

4. Directing Counterdefendants to submit sworn declarations of fees and expenses within a time certain so the Court may determine the precise award; and

5. Granting such other and further relief as the Court deems just and proper.

## <u>Local Rule 3.01(g) Certification</u>

Pursuant to M.D. Fla. R. 3.01(g), I hereby certify that I met and conferred telephonically with opposing counsel regarding the substance of the foregoing motion. Counsel could not reach an agreement as to resolution, and thus the motion is opposed.

Respectfully submitted,

DATED: September 25, 2025

/s/ Gary C. De Pury
Gary C. De Pury
Florida Bar No: 126588
Law Offices of Gary De Pury, P.A.
21035 Leonard Road
Lutz, Florida 33558
Tel: (813) 607-6404
Email: Gary@DePury.com
*Lead Counsel for Counterdefendant Alex Holladay and MAF Corp.*

/s/Matthew Larosiere
Matthew Larosiere, Esq.
Fla. Bar. No. 1005581
The Law Offices of Matthew Larosiere
6964 Houlton Circle
Lake Worth, FL 33467
Email: Larosieremm@gmail.com
Tel: (561) 452-7575
*Lead Counsel for Counterdefendants Elik, Stroke, and Lettman*

/s/ Zachary Z. Zermay
Zachary Z. Zermay, Esq.
Fla. Bar № 1002905
*Zermay Law, P.A.*
1200 Fourth Street, #1102
Key West, FL 33040
Email: zach@zermaylaw.com
Tel: (305) 767-3529
*Lead Counsel for Plaintiff/Counterdefendant Matthew Larosiere*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on this 25th day of September, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served this day on all counsel of record either via transmission of Notices of Electronic Filing generated by CM/ECF or in another authorized manner for those counsel or parties not authorized to receive electronically Notices of Electronic Filing.

*/s/ Zachary Z. Zermay*

Zachary Z. Zermay, Esq.
Fla. Bar № 1002905