# TABLE OF CONTENTS

Responses to RFP 1: Criminal Enterprise Allegations…………...A-2

Responses to RFP 2: ITAR Violation Allegations…..…………… A-180

Responses to RFP 3: EAR Violation Allegations…….…………..A-230

Responses to RFP 4: Murder Threat Allegations………………A-312

Responses to RFP 5: Cyberattack Allegations……………………A-339

Responses to RFP 6: Money Laundering Allegations……………A-349

Responses to RFP 7: CFAA Allegations…………………………...A-372

Responses to RFP 8: Trade Libel/Lanham Act Allegations……...A-373

Responses to RFP 9 : Business Interference Allegations……….A-447

Responses to RFP 10: False or Disparaging Allegations………..A-479

Responses to RFP 11: Obstruction of Justice Allegations……….A-490

Responses to RFP 12: Destruction of Evidence Allegations…….A-495

Ex. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

DEFENSE DISTRIBUTED'S RESPONSES TO ELIK'S
REQUEST FOR PRODUCTION 1:

SEEKING DOCUMENTS
SUPPORTING THE CONTENTION THAT "THE GATALOG"
CONSTITUTES A CRIMINAL ENTERPRISE

Ex. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION


Generated by Gataleaks.org
File ID: GLS—ky5ezrdtlt9kkwr

 **ctrlpew** 1:22 PM
Now that we are all collected here.
Freeman was indeed arrested. Before his arrest he deactivated his accounts here and elsewhere across the internet. That said, as we have always said, this is a public chat. Mind your opsec and at least pretend to be legal. NFA things being NFA things the assumption we make is that you have an SOT and are doing things appropriately and that your testers do also.

 3


Generated by Gataleaks.org
File ID: GLS—sy1jvk7rkljgpeh

| Top | **Latest** | People | Media | Lists |

**Anti-Gunner Leaks** ☠️❤️🚀 ✅ @AGleaks · Oct 12, 2024

Replying to @AGleaks

9/ Two individuals I won't name revel in personal satisfaction of getting guns going in Myanmar, but they'll never know my bitter shame and defeat of failing to pour gas on the **fire** that was **Hong Kong**. I live with this failure often, and my happiness at Burma is tainted.

💬 2          🔁          ♡ 5          📊 279          🔖 ⬆️

**Anti-Gunner Leaks** ☠️❤️🚀 ✅ @AGleaks · Jan 11, 2024

Replying to @RShcklfrd @SpOokyBoiii and @DeathAthletic

No I tried to help set **Hong Kong** on **fire**. Through someone I know who worked there I established contact with the hard liners and tried to get them to build guns.

Two others did too, one of them Stark. It's not something we often talk about. I consider that effort a really sad

Show more

💬 1          🔁          ♡ 1          📊 37          🔖 ⬆️

# Ex. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION


Generated by Gataleaks.org
File ID: GLS-lhy9l85bmnjc19m



← **Post**                                    **Reply**

**Anti-Gunner Leaks** 🕵️❤️🔫 ✔ @AGleaks · Oct 12, 2024

7/ This isn't quite accurate. Ivan had horrible opsec and if you'd like I could detail numerous times myself and others had to clean up his name potentially being out there.

Just look in the AR-15 TDP, his first name is in the metadata. We knew for years

> **SuckBoyTony** ✔ @SuckBoyTony1 · Oct 12, 2024
> Replying to @AGleaks
> Literally how? One person copyright's something, now everyone has to and it's harming development? I also have no idea how the fuck copyright would open up journalists to do more than they already are. You know who gave the journo Ivan's information? It wasn't the ...
> Show more

💬 1          ⟲          ♡ 3          �III 318          🔖 ⬆

**Anti-Gunner Leaks** 🕵️❤️🔫 ✔ @AGleaks · Oct 12, 2024

8/ I was the information condom between some less than savory types and the group, or others who didn't want to be around the group because they felt it was flying too close to the sun.

Ask any of the old timers, they'll all say it was much better to have me around than not.

💬 1          ⟲          ♡ 3           III 224          🔖 ⬆

**Anti-Gunner Leaks** 🕵️❤️🔫 ✔
@AGleaks

9/ Two individuals I won't name revel in personal satisfaction of getting guns going in Myanmar, but they'll never know my bitter shame and defeat of failing to pour gas on the fire that was Hong Kong. I live with this failure often, and my happiness at Burma is tainted.

A-5


Generated by Gataleaks.org
File ID: GLS-3hob1k52qg5gje6



that account hosts belong to me or have ever belonged to me. None of the files that account hosts or has hosted were created or uploaded by me. None of the files that account hosts or has hosted were upload through my website TheGatalog.com. A person with an Odysee user account cannot upload a file to Odysee through my website TheGatalog.com. I do not now know nor have I ever known who owns or uses the Odysee account THEGATALOG-PRINTABLEMAGAZINES.

9.      My website contains links to other websites I do not own or control, much like this Court's COVID-19 webpage at https://www.nysd.uscourts.gov/covid-19-coronavirus contains a link to a webpage of the United States Centers for Disease Control at https://www.cdc.gov/coronavirus/2019-ncov/index.html. Any website can include a link to any other website regardless of ownership or control.

10.     Seeing Everytown's own name on exactly those items they so aggressively try to destroy sends the perfect political message about their


Generated by Gataleaks.org
File ID: GLS-qpsgz4pq3sfr7fd



 Generated by Gataleaks.org
File ID: GLS—bf41a1dbwasdrsb

# DONATE TO JSTARK

 ctrlpew

You know who he is.

In light of recent news regarding his passing we have redirected these funds to a wallet controlled by Deterrence Dispensed until we can make contact with his next of kin and confirm their access to the wallet.

Update: Out of respect for his family's wishes these funds will be held in trust to enable and offset project costs from future developers.

1

USD



Ex. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION



Generated by Gataleaks.org
File ID: GLS—bf41a1dbwasdrsb

# DONATE TO JSTARK

 ctrlpew

You know who he is.

In light of recent news regarding his passing we have redirected these funds to a wallet controlled by Deterrence Dispensed until we can make contact with his next of kin and confirm their access to the wallet.

Update: Out of respect for his family's wishes these funds will be held in trust to enable and offset project costs from future developers.



1

USD

Donate with BTCPAY




Generated by Gataleaks.org
File ID: GLS-vnl64beyznj7bhj




Generated by Gataleaks.org
File ID: GLS-6ilhqvr1y7b4dfm




Generated by Gataleaks.org
File ID: GLS—alxzzic1tfnxxyg



Deterrence Dispensed › Information and Tutorials › Wiki › ··· › How to set up a beta

Last edited by  **Vinh Nguyen** 2 years ago

Page history

# How to set up a beta

This is a guide and process guidance on how to conduct a beta.

> **Note:** These instructions required that your GitLab account be provisioned as a developer. If you aren't a developer yet, please fill out the "Developer Request Form" at the Help Desk

## ⚠️ Are you ready to run a beta?

You should really open a beta if you are nearing the finality of your product's initial development.

A beta should be for:

- private *(if desired)* testing of a design among a trusted and reliable group of testers
- gathering information on your design, such as its compatibility with variants of a parts kit
- gathering feedback on your design, such as whether the instructions are sound, assembly is easy and accessible, or if users are able to successfully assemble and use your product

A beta is **NOT**:

- early access.
- for designs that haven't been independently tested by the author.
- for designs that are clearly not of sound engineering judgement.

When a beta is announced, that will be the single event of most attention for your product until you release it. If it is public, users will be interested in testing, then quickly trail off as life beckons them or as they become disinterested.

So- it is only when you have a concrete design in place ready for evaluation that you open a beta. A beta is NOT for "what do you guys think" or for early access. For more casual evaluations, find a group of vetted testers or those interested, and create a group chat amongst yourselves to discuss your design. Beginning a beta is more of a formal step towards release.

## Configuring your GitLab for a beta

*(Applicable only if you use GitLab.)*

The steps below will configure your GitLab repository for a beta. Your files will NOT be exposed to anyone who is not a member of your project (either explicitly added by you, or within your group).

1. Go to your repository settings, then "General".
2. Ensure Issues is enabled, for "Everyone with Access"
3. Ensure Repository is enabled, but "Only Project Members"
4. Ensure "Forks" under "Repository" is set to "Only Project Members"
5. Under Repository, disable "Pipelines", "Container Registry", and "Packages".
6. Disable Analytics, Wiki, Snippets, and Operations. (Unless you wish to use these features)
7. Click "Save Changes".

After you configured your repository, follow the steps below for tracking changes to your files:

1. Commit your files. You must have the following files in your package as highlighted in the Release Package Requirements guidance document.
2. Create a "Release" with a "tag" in the following format off of your primary/develop branch: `vX.x` where `X` is major version, and `x` is minor version. (i.e, if this is your products first beta, you could use `v0.1` .)

A-14

Requirements guidance document.

2. Create a "Release" with a "tag" in the following format off of your primary/develop branch: `vX.x` where `x` is major version, and `x` is minor version. (i.e, if this is your products first beta, you could use `v0.1`.)
3. Do not use the release artifacts archive automatically bundled by GitLab- create a zip file with all your files EXCEPT the Natives, STEP, and all Git-related folders.
4. Upload your file to the beta channel.

## Tidy your package, and submit a beta request

Starting a beta is easy from a developer's end. You just need to make sure two things, and a moderator will take care of creating your room for you.

Your ticket will be closed and you will be notified when it is fulfilled.

1. Your beta package aligns to the requirements as outlined in ["Release Package Requirements"] (https://gitlab.deterrencedispensed.com/deterrence-dispensed/information-and-tutorials/-/wikis/For-Developers/Resources/Release-Package-Requirements), but for a beta.
2. You submit a Beta Request at the [Help Desk](https://gitlab.deterrencedispensed.com/deterrence-dispensed/help-desk/-/issues)

## Configuring the beta channel

> **Note:** This step can only be done by a RocketChat administrator after your beta request is approved.

1. Create a channel with the following format: `#beta.username_projectslug`
2. Populate the description and topic.

> Description: `Beta channel for project` Topic: `Beta channel for project`

3. Disable pruning for the beta room. (This will prevent files from getting removed.)

- Under "Edit Room", go to Prune, then enable "automatically prune old messages", "override global retention policy", set the maximum age to 1000 days, enable "Exclude pinned messages", and enable "Prune Files Only".

3. Paste in the beta rules as described below:

```
**BETA RULES**
The Purpose:
To create a singular publicly released and shared package of known good files paired with instructi

The Rules:
1. Don't leak the beta files. A singular, known good, with instructions package is the first thing
2. These rooms and groups are to test what the developer is releasing, not for you to make feature
3. Do not attempt to modify beta files. We are trying to lock down a configuration.
4. Test build and report back with speed (if you're able). We understand you're busy but the faster
4. Beta rooms are for us to collectively verify new files, not for you to get some cool shit early.
5. Have fun. Seriously. And don't be dicks.

Info:
GitLab Link for submitting issues: <insert link>
```

4. Drop in the beta files archive.
5. Set the designer as the Channel Owner.
6. Add channel to #z.beta, with note if beta is public or private.
7. Update private channel link directory with non-expiring permanent beta invite.

A-15

Case 1:24-cv-01023-WWB-LHP    Document 135-1    Filed 09/26/25    Page 16 of 537 PageID 2258



☰ Menu

Information and Tutorials

- Project information
- Issues    10
- Packages & Registries
- Wiki

Deterrence Dispensed  >  Information and Tutorials  >  Wiki  >  •••  >  Product Development Lifecycle

Last edited by 👤 Vinh Nguyen 3 years ago

[ Page history ]

# Product Development Lifecycle

Welcome to the PDL process guidance documentation. The purpose of this guide is to succinctly explain the product development lifecycle, offer a concise release checklist, and provide succinct guidance for a quality release.

## Methodology

This process guidance is written with a decentralized development nature in mind along with a decentralized organization.

Traditional organizations (such as Raytheon, Caterpillar, etc.) working with safety-critical solutions have rigorous controls from design to release that specifically define how a product is made. Under the context of a decentralized and volunteer driven organization, however, this is unsustainable and impossible to enforce. No products will get released.

A completely loose approach and an equally disjointed "organization" (akin to FOSSCAD) however, creates a large quantity of products, but with a low fidelity of quality and documentation. This too is unsustainable. More rubbish than gems are released.

The "Funnel Approach" seeks to meet in the middle of these extremes. Developers are free to engineer and test how they please, but as they get closer to a release, it is expected that they follow guidelines to ensure quality, with a final release requiring that the package satisfy a checklist and subjective review.

At the "top" and broader end of the "funnel", developers are free to design and test however they please. Not only does this maintain creative freedom, but it also retains the unyielding flexibility of experimentation and self-evaluation. No restrictions on how they maintain or version control their designs are imposed even.

At the "middle" of the funnel where it begins to narrow, developers submit their designs for a wider audience to test. Some discipline here is expected- developers are to be active within their beta rooms and respond to user feedback and questions. While infrastructure, such as GitLab for version control or issue tracking is offered, developers are *not* required to use these tools. These tools are offered to help a beta go smoothly.

At the very "end" of the funnel, the most narrow part of it, developers must finalize their beta and their deliverable archive must satisfy the Release Package Requirements checklist. Their product and documentation also undergoes a subjective review with Gatalog leadership to ensure a high fidelity of quality is present, rather than just "checking the boxes." At this point, if all goes well, the deliverable is then published to the Gatalog Odyssey page, and publicized.

## Stages of development

### Internal Development and Design

Every idea starts from somewhere. Generally you have free reign on how to develop your own project- the process gating comes in when you begin to test with the public or with a group, along with preparing documentation.

### Beta Testing

Now you are ready to start a beta. Check out this guide on how to pull it off.

Having a controlled beta test and a place to collect feedback is important. Some developers think that simply releasing to the public as a "beta test" is enough. (It is not.) Doing so makes it difficult to gather feedback, gauge adoption, or maintain communication with a quality set of testers. It will also add to the mound of untested rubbish that archivers will collect and bundle (which can be dangerous in terms of safety).

Case 3:24-cv-01423-WWB-LLL   Document 138-1   Filed 09/25/25   Page 18 of 537 PageID 2360



The "Funnel Approach" seeks to meet in the middle of these extremes. Developers are free to engineer and test how they please, but as they get closer to a release, it is expected that they follow guidelines to ensure quality, with a final release requiring that the package satisfy a checklist and subjective review.

At the "top" and broader end of the "funnel", developers are free to design and test however they please. Not only does this maintain creative freedom, but it also retains the unyielding flexibility of experimentation and self-evaluation. No restrictions on how they maintain or version control their designs are imposed even.

At the "middle" of the funnel where it begins to narrow, developers submit their designs for a wider audience to test. Some discipline here is expected- developers are to be active within their beta rooms and respond to user feedback and questions. While infrastructure, such as GitLab for version control or issue tracking, is offered, developers are *not* required to use these tools. These tools are offered to help a beta go smoothly.

At the very "end" of the funnel, the most narrow part of it, developers must finalize their beta and their deliverable archive must satisfy the Release Package Requirements checklist. Their product and documentation also undergoes a subjective review with Gatalog leadership to ensure a high fidelity of quality is present, rather than just "checking the boxes." At this point, if all goes well, the deliverable is then published to the Gatalog Odyssey page, and publicized.

## Stages of development

### Internal Development and Design

Every idea starts from somewhere. Generally you have free reign on how to develop your own project- the process gating comes in when you begin to test with the public or with a group, along with preparing documentation.

### Beta Testing

Now you are ready to start a beta. Check out this guide on how to pull it off.

Having a controlled beta test and a place to collect feedback is important. Some developers think that simply releasing to the public as a "beta test" is enough. (It is not.) Doing so makes it difficult to gather feedback, gauge adoption, or maintain communication with a quality set of testers. It will also add to the mound of untested rubbish that archivers will collect and bundle (which can be dangerous in terms of safety).

### Final Packaging

Your product's release package (or repository) must satisfy the (Release Package Requirements) [https://gitlab.deterrencedispensed.com/deterrence-dispensed/information-and-tutorials/-/wikis/For-Developers/Resources/Release-Package-Requirements] checklist.

In the checklist, a standard folder structure is defined for your package, along the requirement for an Assembly Guide PDF. This PDF is very important- it contains essential information on assembly and troubleshooting for your design.

The goal of the final release package is simple: conclusively deliver everything needed to build and assemble the product. This includes everything from a parts list, instructions, models, and the sources themselves.

### Release

To submit your project for release under the Gatalog, contact a beta administrator or moderator. Your project's packaging will be reviewed based on the objective checklist above, and subjective quality of your documentation.

After this, it's hands-off for you from here, unless your project gets returned to you with feedback on items to address before release. Your project will be uploaded to the Gatalog's Odysee page and promoted on social media.

Case 6:24-cv-01063-WWB-LHP Document 139-1 Filed 09/25/25 Page 19 of 537 PageID 2361



Case 3:24-cv-01203-WWB-LLF    Document 28-1    Filed 09/25/25    Page 20 of 537
PageID 2362





Generated by Gataleaks.org
File ID: GLS-vnl64beyznj7bhj




Generated by Gataleaks.org
File ID: GLS—19i6bzaojan4mrh



Every idea starts from somewhere. Generally you have free reign on how to develop your own project- the process gating comes in when you begin to test with the public or with a group, along with preparing documentation.

## Beta Testing

Now you are ready to start a beta. Check out this guide on how to pull it off.

Having a controlled beta test and a place to collect feedback is important. Some developers think that simply releasing to the public as a "beta test" is enough. (It is not.) Doing so makes it difficult to gather feedback, gauge adoption, or maintain communication with a quality set of testers. It will also add to the mound of untested rubbish that archivers will collect and bundle (which can be dangerous in terms of safety).

## Final Packaging

Your product's release package (or repository) must satisfy the (Release Package Requirements) [https://gitlab.deterrencedispensed.com/deterrence-dispensed/information-and-tutorials/-/wikis/For-Developers/Resources/Release-Package-Requirements] checklist.

In the checklist, a standard folder structure is defined for your package, along the requirement for an Assembly Guide PDF. This PDF is very important- it contains essential information on assembly and troubleshooting for your design.

The goal of the final release package is simple: conclusively deliver everything needed to build and assemble the product. This includes everything from a parts list, instructions, models, and the sources themselves.

## Release

To submit your project for release under the Gatalog, contact a beta administrator or moderator. Your project's packaging will be reviewed based on the objective checklist above, and subjective quality of your documentation.

After this, it's hands-off for you from here, unless your project gets returned to you with feedback on items to address before release. Your project will be uploaded to the Gatalog's Odysee page and promoted on social media.

**For Developers**

FAQ

FAQ

   Types of Designs

Guides

   Checklist to Deactivate an Admin

   How to create a static webpage with GitLab Pages

   How to set up a beta

   How to use set up SourceTree

Process Management

   **Product Development Lifecycle**

Resources

   Release Package Requirements

   **Release Package Requirements**

     Assembly PDF Sample

     README.md Sample

   Remixes

     README.md Sample

**For Signal Boosters**

   Branding Guide

   Graphic Assets and Guidelines

**For Users**

   Acromania and Glossary


Generated by Gataleaks.org
File ID: GLS-s86ce4ycfdi8cxi



## Product Development Lifecycle

Welcome to the PDL process guidance documentation. The purpose of this guide is to succinctly explain the product development lifecycle, offer a concise release checklist, and provide succinct guidance for a quality release.

## Methodology

This process guidance is written with a decentralized development nature in mind along with a decentralized organization.

Traditional organizations (such as Raytheon, Caterpillar, etc.) working with safety-critical solutions have rigorous controls from design to release that specifically define how a product is made. Under the context of a decentralized and volunteer driven organization, however, this is unsustainable and impossible to enforce. No products will get released.

A completely loose approach and an equally disjointed "organization" (akin to FOSSCAD) however, creates a large quantity of products, but with a low fidelity of quality and documentation. This too is unsustainable. More rubbish than gems are released.

The "Funnel Approach" seeks to meet in the middle of these extremes. Developers are free to engineer and test how they please, but as they get closer to a release, it is expected that they follow guidelines to ensure quality, with a final release requiring that the package satisfy a checklist and subjective review.

At the "top" and broader end of the "funnel", developers are free to design and test however they please. Not only does this maintain creative freedom, but it also retains the unyielding flexibility of experimentation and self-evaluation. No restrictions on how they maintain or version control their designs are imposed even.

At the "middle" of the funnel where it begins to narrow, developers submit their designs for a wider audience to test. Some discipline here is expected- developers are to be active within their beta rooms and respond to user feedback and questions. While infrastructure, such as GitLab for version control or issue tracking is offered, developers are *not* required to use these tools. These tools are offered to help a beta go smoothly.

At the very "end" of the funnel, the most narrow part of it, developers must finalize their beta and their deliverable archive must satisfy the Release Package Requirements checklist. Their product and documentation also undergoes a subjective review with Gatalog leadership to ensure a high fidelity of quality is present, rather than just "checking the boxes." At this point, if all goes well, the deliverable is then published to the Gatalog Odyssey page, and publicized.


Generated by Gataleaks.org
File ID: GLS-32opza33sej30ec



# det_disp

Official Deterrence Dispensed keybase team. We develop digital firearm files. We are not affiliated, associated, or in any way officially connected with Defense Distributed. Code is free speech. Copyright is theft. *16518 total members*

## 6 public admins



**ivanthetroll**
Ivanov of Trollanov



**jstark1809**
FUCK GUN CONTROL

 Generated by Gataleaks.org
File ID: GLS—iucvfdlfo2jfy4c

3:50    📞 2:53    ·············    📶 🔋 ·

As I stated previously The Gatalog is the only group currently with robust testing and documentation standards before a public release.

**FRIENDS DON'T LET FRIENDS USE FEDCAD**

"Friends don't let Friends use defcad.

Defcad's database has been hacked and dumped on multiple occasions. They do not encrypt their data, and keep it stored unsalted - all your information is in a row. That they never disclosed and breaches is reason enough not to use the site.

They pass off unusable, untested, bogus files as if they are working projects in order to milk money out of people. Wow! A 3D printable M82? That's so cool! Turns out it's a low-poly videogame model, but they won't say so until they've got your money. Additionally, for things that are actually tested and documented, they do not update files to latest versions - many out of date files to be found. That you can't (or shouldn't) trust the files you get there might be a signal not to use the site, but it gets better.

Defcad can, and has, doxxed developer information to antigunners. They did this with only the slightest pressure, and made no serious attempt to obfuscate. They then attempted to blackmail myself and others with our personal information in an attempt to force money out of us - to support a lawsuit where defcad was getting sued, and myself and such others were not. Certainly shady for a company that claims that it only collect money from users so that it can fight lawsuits. Of course, they forget to mention that they'll extort you and that they've yet to actually win a lawsuit.

And while I could go on, I'll leave you with the notion that Defcad is wretchedly awful, should be avoided, shouldn't be used, and should be publicly shamed.

We can discuss its founder having paid a 16 year old for sex and other outstanding things that your money will be used for if you give it to them another time!" - *@NaviGoBoom*

Just say no FEDCAD. And their affiliated sites, Legio, Defense Distributed, ghostgunner.net, and ghostguns.com.

**WHERE DO I GET THE PARTS KITS?**



🔒 ctrlpew.com

 Generated by Gataleaks.org
File ID: GLS-p2xwrnrb013nnzd



and threatened on Twitter and other platforms. Threats ranged from communication of my personal views and beliefs to my employer in the hopes of getting me fired to threats to murder me and my family with our own firearms as "payment for lives lost at Sandy Hook."

6.      I do not live or work and have never lived or worked in the State of New York.  I do not conduct business and have never conducted business in or with anyone in the State of New York.  I do not own property in New York.

7.      I do live within the United States District Court for the Western District of Texas, and therefore I am amenable to personal jurisdiction and venue in that district.

8.      I have never sent any files as alleged in the Complaint to anyone in the State of New York.

9.      I have made a special and limited appearance in this case to contest jurisdiction and venue and also to address, as an emergency matter, this court's November 5, 2021 Order to Show cause which authorizes expedited discovery calculated to enable the Plaintiff to learn my true identity.

2

A-26




Generated by Gataleaks.org
File ID: GLS—ahbuxhcjo0ll9e2





Generated by Gataleaks.org
File ID: GLS—6ah7v491hen7jv8

Power full Team

# The Founders



**CTRLPew**



**Fudd Busters**



**Ivan The Troll**




Generated by Gataleaks.org
File ID: GLS—31f6r48uyc15v15




Generated by Gataleaks.org
File ID: GLS-fdiu54cdzw6qqh5

## ─── DONATE TO THE DEVS ───



**DONATE TO CATHODE**



**DONATE TO FREEMAN1337**



**DONATE TO FMDA**



**DONATE TO ATMAC**



**DONATE TO EVAN JONES**


Generated by Gataleaks.org
File ID: GLS-xp4hmoe3f32nmsc



**m70b1jr** 1:06 PM
Because why not?

Some people have their FFL / SOT

**Balyegr** 1:07 PM
make it make sense

**m70b1jr** 1:07 PM
some people are in counties where it's legal

**ctrlpew** Admin 1:07 PM
Hello retards.

2

**crafty_waffle** 1:07 PM

> **Balyegr** 1:06 PM
> then why the fuck are the admins ok with people running nfa betas here

There are legal ways to go about this, and if you're doing anything that's not 100% kosher, you should probably have good OPSEC

**MiloLC** 1:07 PM
It is assumed that if you play with that shit, you are taking your own precautions or doing it legally.

**m70b1jr** 1:07 PM
it's up to the the user

Does this mean Freeman is going to be put in stasis (jail) for 20 years by the G-Man (feds) and then be woken up to defeat the combine?

i assume it's way too early for jokes

**ctrlpew** Admin 1:08 PM
I would really love it if you would all remember that fellow admin fuddbusters is in the middle of suing defcad and this is the flailings of that organization.

2


Generated by Gataleaks.org
File ID: GLS-34a9ixia7u04opg

 **ctrlpew** 1:22 PM

Now that we are all collected here.

Freeman was indeed arrested. Before his arrest he deactivated his accounts here and elsewhere across the internet. That said, as we have always said, this is a public chat. Mind your opsec and at least pretend to be legal. NFA things being NFA things the assumption we make is that you have an SOT and are doing things appropriately and that your testers do also.

 3


Generated by Gataleaks.org
File ID: GLS—53scn1c670g65v3

The instructions themselves compound these problems. Instruction No. 1 demands a level of labeling and categorization of documents that is infeasible for an individual litigant who does not maintain records in a formal or structured manner. Instruction No. 2 calls for production "as kept in the ordinary course of business," which is simply inapplicable to Respondent, who does not operate a business. Instruction No. 3 is especially objectionable in that it mandates native file production of ESI, the creation of a discovery log detailing the type, source, and electronic ID of each file, the generation of load files compatible with commercial document review platforms, and the use of secure file transfer protocols. These technical and labor-intensive requirements are vastly disproportionate to the needs of this case and are not appropriate for discovery directed to an individual, particularly one who has not engaged in any commercial activity relating to the subject matter of the lawsuit.

Instruction No. 4 improperly shifts the burden of identifying non-searched sources of potentially responsive information onto Respondent, in contravention of Rule 26(g), which

 Generated by Gataleaks.org
File ID: GLS—oo7w752dqwt9f63

level of labeling and categorization of documents that is infeasible for an individual litigant who does not maintain records in a formal or structured manner. Instruction No. 2 calls for production "as kept in the ordinary course of business," which is simply inapplicable to Respondent, who does not operate a business. Instruction No. 3 is especially objectionable in that it mandates native file production of ESI, the creation of a discovery log detailing the type, source, and electronic ID of each file, the generation of load files compatible with commercial document review platforms, and the use of secure file transfer protocols. These technical and labor-intensive requirements are vastly disproportionate to the needs of this case and are not appropriate for discovery directed to an individual, particularly one who has not engaged in any commercial activity relating to the subject matter of the lawsuit.

Instruction No. 4 imp non-searched sources of potentially responsive ntion of Rule 26(g), which

Generate image

Simplify

Define

Ex. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION


Generated by Gataleaks.org
File ID: GLS-9skxieeav90bg6o




Generated by Gataleaks.org
File ID: GLS-euzalgh65hij0h2



Ex. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

 Generated by Gataleaks.org
File ID: GLS-srwqowjgwkx4lmf

8:40      .ıll 5G 🔋

Beta Hosted by The Gatalog on their Rocket
Chat. Join the rocket chat to participate. Click
the "Join the Beta" button to message the
developer directly requesting access. Must
have a rocket chat user account to participate.
– *See Joining the Gatalog's Rocket Chat*

## THE GATALOG'S RULES FOR BETA TESTERS

**The Purpose:** To create a singular publicly
released and shared package of known
good files paired with instructions that
would enable someone to build whatever
we have released without having to come
in contact with us. *A stand-alone
downloadable unit that will allow someone
to complete it without having to come to a
forum for assistance*.

**The Rules:**

1. **Don't leak the beta files.** A singular,
   known good, with instructions package
   is the first thing the broader world
   should ever see of this. *A smattering of
   files of dubious dimension and quality
   with incomplete instruction are of no
   benefit to anyone.*

2. These rooms and groups are to test
   what the developer is releasing, not for
   you to make feature requests of them.
   **Test what they are providing.** Give

🔒 ctrlpew.com

Generated by Gataleaks.org
File ID: GLS-3yvmsolqwvgyinl



**ImmortalRevolt** `Owner` 6:57 PM ✏️

`all` all uppers and lowers in the beta file packs are noncompatible with the official release uppers and lowers. This is becouse I had to make a semi upper that cant fit bolts with the oob trip pin installed and I also needed to make the select lower unable to fit on the semi upper.
This was made so I could get both the semi and the select versions released in the same filepack. Otherwise the AFT would label both the semi and the select versions as machineguns.

I changed the lug on the uppers and the lug pocket on the lowers to be able to do this, as well as intentionally missaligning the hole in the lug for the pin bo it doesent line up if using the wrong upper or lower.

All other parts are compatible. You can save the beta uppers and lowers if you want and rename them EU version or something like that.



**nunya.business** 11:48 PM ✏️

>  **ImmortalRevolt** 10/31/2024
>
> `all` all uppers and lowers in the beta file packs are noncompatible with the official release uppers and lowers. This is becouse I had to make a semi upper that cant fit bolts with the oob trip pin installed and I also needed to make the select lower unable to fit on the semi upper.
> This was made so I could get both the semi and the select versions released in the same filepack. Otherwise the AFT would label both the semi and the select versions as machineguns.

Smart, is that based on your own research or did you run it by a lawyer?

───────────────── November 1, 2024 ───────── **unread messages**



**ImmortalRevolt** `Owner` 1:58 AM ✏️
It was a requirement by ivan to be able to release both the semi and the select version in the same filepack. Im pretty sure Matt Larrosiere did the research.


Generated by Gataleaks.org
File ID: GLS-kputtiawg26330m



**Navi of Boomhandia** ✔
@NaviGoBoom

Fedcad has ignored DMCAs already. What would you recommend next? Would you agree that their continued actions in this vein warrants some level of concern, and awareness should be brought to it?

Their bottom line is absolutely hurt by people being aware of their scummy practices. They've admitted this privately to people. It also explains their infantile behavior in response.

9:59 AM · May 8, 2024 · **79** Views

💬 1          ↻          ♡ 4          🔖          ⬆

 Generated by Gataleaks.org
File ID: GLS—2o2al040emvm0cw

 Replying to @NaviGoBoom

im not up to date, how can **fedcad** profit off open source files? sure they can technically resell them but nobody actually buys linux for example.

💬 3          ⟲          ♡ 2          ılıl 493          🔖  ⬆

 **Navi of Boomhandia** ✔ @NaviGoBoom · Aug 6          •••
Replying to @NaviGoBoom

So: I think smacking **fedcad** over the copyright infringement \*that they admit to doing\* is good.

**Fedcad**'s founder will make any attempt to hold them responsible nasty. I'm sure he'll dox me (again) and others just for taking this stance.

But if that's what it takes, fine.

💬 8          ⟲ 8          ♡ 175          ılıl 6.6K          🔖  ⬆

 **Navi of Boomhandia** ✔ @NaviGoBoom · Aug 6          •••
Replying to @NaviGoBoom

Their notion that copyright being used to ensure free access to the files is "gun control" is farcical - **fedcad** itself \*invents\* gun laws to justify their commercialization, their terms of service levy controls over what you can do with the files.

💬 2          ⟲          ♡ 97          ılıl 1.4K          🔖  ⬆

 **Navi of Boomhandia** ✔ @NaviGoBoom · Aug 6          •••
Replying to @NaviGoBoom

If, at the end of the day, **fedcad** must be rewarded for trying to force commercialization onto these files - what better reward exists than the one they've sown for themselves?

💬 3          ⟲          ♡ 105          ılıl 1.1K          🔖  ⬆



Generated by Gataleaks.org
File ID: GLS-rlrlu6mi7oagbs1



### SEASON 2 EPISODE 9 Ivan the Troll
← My Files

But once we had sort of, uh, Stark and I had talked

**Speakers** · **Notes** · **Versions**

+ Create new Speaker

- 🔵 Speaker 1 ✏️
- 🟢 Speaker 2 ✏️
- 🟣 Speaker 3 ✏️
- 🟠 Speaker 4 ✏️
- 🟤 Ivan the Troll ✏️

**Speaker 4** ⏱ 55:52

It's a 30 run burst.

**Ivan the Troll** ⏱ 55:56

So those are things that I've seen. And of course I do encourage people to take the platform for what it is. And if your use case for the thing is like: I just want to have lots of fun and make much noise, then certainly a full auto one will suit you better. But once we had sort of, uh, Stark and I had talked to people in gun control places around the world, at the time Hong Kong was a thing, and talking with them, they will be lucky if they have 30 rounds of ammo in their thing and if they need to ambush somebody, 30 rounds will get you a better gun. But if you're nervous, you haven't ever shot a gun before and you hop out of your hiding spot and you dump 30 rounds and don't hit 'em, now you're fucked. And all your buddies are fucked because 30 rounds didn't get you a new gun.

**Speaker 4** ⏱ 56:41

Yeah. One thing to note for people who haven't fired Open Bolt have that privilege and luxury, what I've been talking about is when that bolt slams forward, you press the trigger, the bolt slams forward, you have basically huge barrel droop and then the recoil, you have huge barrel rise. So it's, imagine

Resume Auto-Scroll

BETA


Generated by Gataleaks.org
File ID: GLS-h5ueu7s1l2m8lk4

### DETERRENCE DISPENSED

- Home
- **About Us**
- Blog
- Contact Us
- FAQ
- Gallery

## MEET THE TEAM

These three are only some of the many members of Deterrence Dispensed who have helped contribute to the glut of information the organization has released since being formed.



### JSTARK1809

*Founder*

JStark's latest work has been development of the legendary Shuty AP-9 into a weapon that can be made at home from parts that are not restricted anywhere in the world: the FGC-9. The FGC-9, when released, will be the gun to break the back of worldwide gun control for good.



### IVANTHETROLL

*Head of Public Relations*

Ivan is the voice of Deterrence Dispensed, responsible for hosting the group's primary filebase. He has also done an effective job at pissing off every major anti-gunner from New Jersey to California with his 3D-printed Glock magazines and electrochemically machined barrels.



### FREEMENDONTASK

*Head of Reverse Engineering*

FreeMenDontAsk is responsible for some of DetDisp's most noted creations, including the "Ghetto Blaster" AB-10 lower receiver and multiple pistol frames, from the Glock 17 to the S&W M&P Shield. FMDA is the effective head of reverse engineering within DetDisp.

### NEXT STEPS...



Generated by Gataleaks.org
File ID: GLS-my1o9vitc6qxcgh



**jny the human** ✔
@jnyboy



**Follow** • • •

The man who requires paid help to overcome his lack of skills emphatically states our chat has no encryption options.

It's weird; it's almost like he's spreading misinformation or clueless about how computer services work.



8:22 PM · Oct 24, 2024 · **4,613** Views

 Generated by Gataleaks.org
File ID: GLS-1r55axsrjw1kffa





# det_disp

Official Deterrence Dispensed keybase team. We
develop digital firearm files. We are not affiliated,
associated, or in any way officially connected
with Defense Distributed. Code is free speech.
Copyright is theft. *16518 total members*

## 6 public admins



**ivanthetroll**
Ivanov of Trollanov



**jstark1809**
FUCK GUN CONTROL



That's a

**Matt Larosiere**   🕑 22:58

Manic. And he is basically, this is a strike suit, which is a lawsuit that is objectively frivolous and it's brought for the purpose of basically scaring you out of the underlying litigation. And that's not going to work for them. So, they've brought in as counterdefendants, basically a bunch of my personal friends. And it's just very interesting the way that they've alleged the nexus here. And you can probably guess how this goes, right? Because Sean, what do you always tell your audience about? What claim is it not?

**Sean P. Martin**   🕑 23:47

Yes. Yes. Guys, you're going to get shocker because it's going to sound like pro se, there's a RICO claim here. And remember, chat RICO is never the answer. RICO is never the answer here. If you're doing RICO, you're already fucked up.

In his interview with *Florida Bulldog*, Larosiere said The Gatalog's website is owned by his friend and co-defendant in the countercomplaint Alex Holladay, and that he has nothing to do with it. "The domain just links to Odysee, and Odysee is like a free speech website [that] just links to the works of people that want to be linked on there. I mean, there's no way for it to make money."

Put a Banana in Your Garden

Plant Bananas in Your Garden, Here's What Happens

LifeHack Guru

Learn More >


Generated by Gataleaks.org
File ID: GLS—nytcm5d3fqojdkq




Generated by Gataleaks.org
File ID: GLS—c5enznjdosovmi7

behavior, as everyone has come to expect from fedcad — no greater offense than to ask them to honor their word, no greater insult than to point out this fact.

Ivan (2024—03—02T22:55:36.099Z): Fedcad fumbled the entire notion of being a platform to monetize development (when it came back, it was pitched to stark and I exclusively as a way to do this, basically a patreon for printed guns), they made it clear right out of the gate that was a lie, and continued to contradict it to the point that we are where we are today — developers seek to maintain their copyrights specifically so fedcad can't sell them, because fedcad has made it abundantly clear that their model (really, their execution of it) is fundamentally incompatible with the way this community actually works (works as in actually makes stuff that isn't just retarded gimmicks).

Ivan (2024—03—05T05:13:51.608Z): Not that I'm accusing you of being silly enough to take anything cody says at face value or as being the whole truth, but hopefully that answers your questions @nikolai.romanov
        (Reaction: thumbsup by iwillnotcomply.fgc, mountainman1776)

sparquah (2024—03—04T14:15:00.969Z): Imagine taking anything Cody has to say seriously
        (Reaction: laughing by ctrlpew, freeman1337, gerald.katz, iwillnotcomply.fgc)

Ivan (2024—03—04T14:19:01.057Z): If understand your position correctly as "wait is gatalog selling stuff to fedcad?", then you can rest assured that does not and will not happen. The MK2 was owned by Stark and to whatever extent I had helped out, by me. This was what Stark and I were promised, denied, then verbally assaulted for bringing back up, then chided for how stupid we were to ask him to honor his word, before he eventually capitulated (which evidently was humiliating enough for him that he's very mad about a little bit of money years later). Stark and I both did NOT want the MK2 to be sold on fedcad, but since cody insisted it must be there in order for him to shit up another legal effort, we demanded he honor his words about using fedcad to pay developers. As far as my memory recalls the conversation, we had brought back up the way the current payment system works, he had proposed a lump sum, in the end he did both, before shitting up the way the payment system works horribly and driving the site completely into the ground. Stark and I both appreciated the gravity of the MK2, and we did not want it to be something only accessible behind a paywall, but it's important to remember that at this point in time, we both still had hope that fedcad could become something worthwhile for the community (become an outlet for developers to get some form of monetization), and idea which cody later pretended that he never proposed, saying that developers have to figure everything out on their own (as he steals their files and sells them).
        (Reaction: point_up by Dr. Death, iwillnotcomply.fgc)

UberClay (2024—03—04T14:19:57.394Z): Fedcad is just throwing shit out there to take the heat off of them. What happened 10 years ago isn't part of the conversation (or really shouldn't be). What's happening now very much is. And what's happening now is a blight on the community at large and shouldn't be tolerated any longer. (IMO)

ctrlpew (2024—03—03T00:37:15.706Z): Indeed

UberClay (2024—03—04T14:22:59.785Z): 100% agree. I think the most pernicious thing Fedcad does is that they rope in less-aware people by dominating Google searches and tricking them into paying for access to free documents. Unfortunately, I don't know if there is a good or practical way to counter this.

nikolai.romanov (2024—03—03T02:21:16.866Z): That answers pretty much all of my questions

nikolai.romanov (2024—03—03T02:29:13.504Z): I am of course not blind to the idea that this is a misdirection, the shit slinging will only continue as we grow closer to the problem

nikolai.romanov (2024—03—03T02:29:24.894Z): As we root out this corruption bit by bit

nikolai.romanov (2024—03—03T02:30:01.457Z): I will still be writing a dissertation including all of the information I can find, and I would appreciate any perspective from anyone willing to share.

PaganGiraffe (2024—03—04T14:23:10.388Z): It's kind of sad to imagine all the money that has gone through that website and not to the developers in this chat.

nikolai.romanov (2024—03—04T14:23:11.853Z): Sad that money is involved period

nikolai.romanov (2024—03—03T02:32:21.424Z): I get people wanting to profit from their designs, and surely I cannot blame people like laffs for seeking such a thing, but it is not the act he did, but the company he keeps by doing so.


Generated by Gataleaks.org
File ID: GLS-zm6v3jticfdzps2

nikolai.romanov (2024-03-02T20:08:04.693Z): In the most recent defcad tabloid info drop, who is Cody saying demanded 2500 bucks to let Cody post the fgc-9

nikolai.romanov (2024-03-02T22:22:09.687Z): Also, what does the gatalog administration have to say about these allegations that they were not being paid  enough by defcad

nikolai.romanov (2024-03-02T22:24:18.168Z): I am developing a full list of questions I will be publishing at some point, that I will require answers on. Until then none of my releases will be published through the gatalog.

Ivan (2024-03-02T22:48:03.830Z): Cody promised stark and I money in exchange for his and I's help in ensuring fedcad worked as a part of alpha testing. This never happened, and made stark mad enough that he didn't want the mk2 on fedcad, especially because fedcad was running behind a paywall. Cody, in one of his typical schizophrenic power fits, decided that he needed to lose another legal endeavor, and that he really really needed the mk2 to be on his site before he lost it. Stark didn't like this, because cody had failed on multiple promises up till then, and it's not like it was some secret that fedcad would be back behind a paywall the moment that they lost their endeavor (which they did). Sure enough, fedcad changes their TOS to entail that they own an exclusive license to every on their site right afterwards. Anyway, cody, in a fit of impotent rage, went around demanding that everyone follow his losing plan, when stark and I reminded him that he had a lot of good faith to earn back before anyone should trust him. He then proposed 2500 bucks, on his own, stark and I demanded that he implement the system that they currently have in place for paying developers.

Ivan (2024-03-02T22:48:50.057Z): All the while, the MK2 was freely available, as it has always been, in places that aren't very obviously so poorly managed that their existence is very easy to confuse to actions of the federal government

Ivan (2024-03-02T22:51:05.792Z): The thought was that if fedcad is going to be selling developer's work, the developers should get a cut. This idea, which cody originally proposed, made him extremely angry when it was brought back up. Mad enough that, years later, he's willing to dox people over it, evidently. Totally reasonable and rational behavior, as everyone has come to expect from fedcad — no greater offense than to ask them to honor their word, no greater insult than to point out this fact.

Ivan (2024-03-02T22:55:36.099Z): Fedcad fumbled the entire notion of being a platform to monetize development (when it came back, it was pitched to stark and I exclusively as a way to do this, basically a patreon for printed guns), they made it clear right out of the gate that was a lie, and continued to contradict it to the point that we are where we are today — developers seek to maintain their copyrights specifically so fedcad can't sell them, because fedcad has made it abundantly clear that their model (really, their execution of it) is fundamentally incompatible with the way this community actually works (works as in actually makes stuff that isn't just retarded gimmicks).

Ivan (2024-03-05T05:13:51.608Z): Not that I'm accusing you of being silly enough to take anything cody says at face value or as being the whole truth, but hopefully that answers your questions @nikolai.romanov
        (Reaction: thumbsup by iwillnotcomply.fgc, mountainman1776)

sparquah (2024-03-04T14:15:00.969Z): Imagine taking anything Cody has to say seriously
        (Reaction: laughing by ctrlpew, freeman1337, gerald.katz, iwillnotcomply.fgc)

Ivan (2024-03-04T14:19:01.057Z): If understand your position correctly as "wait is gatalog selling stuff to fedcad?", then you can rest assured that does not and will not happen. The MK2 was owned by Stark and to whatever extent I had helped out, by me. This was what Stark and I were promised, denied, then verbally assaulted for bringing back up, then chided for how stupid we were to ask him to honor his word, before he eventually capitulated (which evidently was humiliating enough for him that he's very mad about a little bit of money years later). Stark and I both did NOT want the MK2 to be sold on fedcad, but since cody insisted it must be there in order for him to shit up another legal effort, we demanded he honor his words about using fedcad to pay developers. As far as my memory recalls the conversation, we had brought back up the way the current payment system works, he had proposed a lump sum, in the end he did both, before shitting up the way the payment system works horribly and driving the site completely into the ground. Stark and I both appreciated the gravity of the MK2, and we did not want it to be something only accessible behind a paywall, but it's important to remember that at this point in time, we both still had hope that fedcad could become something worthwhile for the community (become an outlet for developers to get some form of monetization), and idea which cody later pretended that he never proposed, saying that developers have to figure everything out on their own (as he steals their files and sells them).
        (Reaction: point up by Dr. Death, iwillnotcomply.fgc)


Generated by Gataleaks.org
File ID: GLS-335aaugiqjtbd60



← **Post**

**Nikolai Romanov** ✔
@romanov13649

**Follow**

BURNORDER - 5-15-25

anyone in gatalog ever is probably cooked. Get your stuff in order. Not advocating for crime. Just make sure your house is clean and your dogs have a cage to be in at night.


Generated by Gataleaks.org
File ID: GLS-ulltbmwhr2qrs05




Generated by Gataleaks.org
File ID: GLS—alxzzic1tfnxxyg




Generated by Gataleaks.org
File ID: GLS—9d498cinq6r9m5c



**crafty_waffle** 2:39 PM
ctrlpew Another thing that may be helpful is automated metadata scrubbing for images, and scrubbing of messages older than a set time period
🔼 1

**ctrlpew** Admin 2:40 PM ✏️
Thanks, this is all being taken into account for the next software update.
🔧 2 ⊙

**m70b1jr** 2:42 PM

> C **crafty_waffle** 10/22/2024
> @ctrlpew Another thing that may be helpful is automated metadata scrubbing for images, and scrubbing of messages older than a set time period

This would be huge

E2E, autoscrubbing, and then the ability to delete chats / rooms, but that might be a rocketchat limitation

**ethan.hall** 2:48 PM

> 🖼️ **ethan.hall** 10/22/2024
>
> > N **nathan.mayer** 10/22/2024
> > You are accused of having access to the chats

This has been acknowledged publicly in the past by jny. If not using OTR they can read everything.

A-56


Generated by Gataleaks.org
File ID: GLS-7k0vtsl8abjurdk

May 21, 2024

 **Dr._Death** `Beta Manager` `Admin` 10:14 AM ✎
Beta information can be found here: https://gitlab.deterrencedispensed.com/deterrence-dispensed/information-and-tutorials/-/wikis/For-Users/Active-Beta-List

Current beta list.
#beta.freeman1337.ThePerpPincher - 3D printed Springfield Armory XD9 frame (full size and subcompact)
#beta.freeman1337_Wooly-Bully - 3D printed Taurus G3 frame

#beta.freeman1337_FannyBlaster-v2-stipples - 3D printed Taurus pt709 slim frame

`beta.generalscotty_trudeau-sks-mag` - Variable capacity SKS magazines optimized for 3D printing

`beta.spookyspectre_waffle.mag` - Spooky Waffle AR-15/AK Printable Magazine

`beta.nguyenkvvn_PS522` - Pond Side 522 (Sig Sauer 522 Printable Receiver)

`beta.nguyenkvvn_MERP` - MPX beta

`beta.chairmanwon_bigpp95` - Ruger P95 frame designed to take Glock 17 magazines

`beta.VanguardArms_Pathfinder.SingleShot22` - Vanguards Single Shot Slam Fire .22 called the PathFinder

#beta.truandjust.Truger.SR22 - Truger sr22 - printable trigger frame for the Ruger sr22 pistol

`beta.UpgrayDD1776_FreedomLPK` - DIY AR springs, detents and pins

`beta.10spanky.FDM-9` - 3D printed Glock 17 frame based off the FMG-9

`beta.Hellreaver.Chelada` - Monolithic printable .22 suppressor

`beta.gerald.katz_Tomkatz.3032` - Beretta 3032 Tomcat frame.

#beta.ImmortalRevolt.FGC22 - A .22lr Fgc 9

#beta.ImmortalRevolt.FGC9_RIP - An improved FGC9 with a special memorial version dedicated to JStark.

`beta.broletariat.Boring_ecm` - A deep hole boring ecm, with a focus on barrels

#beta.ImmortalRevolt.V2_FGC_Triggergroup - An improved and strengthened fire control group

`beta.geraldkatz_Manx.950b` - A printable Beretta 950 Jetfire frame

`beta.ze_carioca_Urutau` - Diy bullpup 9mm

`beta.Thaxian_BattolsOutto.Butterfly` - FIE Titan printable frame

`beta.geraldkatz.Sphynx` - A printable Beretta 92

`beta.advanced.payment.MPC` - DIY compact PDW

`beta.kelli.blue.Groovy_Rocket_Flare` - A printed 37mm rocket assisted flare

`beta.kelli.blue.tripwire` - A printable 12 ga tripwire alarm device

#beta.untangleworks.Accessory_Bundle - A bundle of printable firearm accessories

 Generated by Gataleaks.org
File ID: GLS–c9gswe3nzd9beyl

@Dr._Death up and let's discuss it

Message has been edited by
UberClay at 10/3/2024, 6:09:41
AM

May 21, 2024

**Dr._Death** Beta Manager  Admin  10:14 AM
Beta information can be found here: https://gitlab.deterrencedispensed.com/deterrence-dispensed/information-and-tutorials/-/wikis/For-Users/Active-Beta-List

Current beta list.
#beta.freeman1337.ThePerpPincher - 3D printed Springfield Armory XD9 frame (full size and subcompact)
#beta.freeman1337_Wooly-Bully - 3D printed Taurus G3 frame

#beta.freeman1337_FannyBlaster-v2-stipples - 3D printed Taurus pt709 slim frame

beta.generalscotty_trudeau-sks-mag - Variable capacity SKS magazines optimized for 3D printing

beta.spookyspectre_waffle.mag - Spooky Waffle AR-15/AK Printable Magazine

beta.nguyenkvvn_PS522 - Pond Side 522 (Sig Sauer 522 Printable Receiver)

beta.nguyenkvvn_MERP - MPX beta

beta.chairmanwon_bigpp95 - Ruger P95 frame designed to take Glock 17 magazines

beta.VanguardArms_Pathfinder.SingleShot22 - Vanguards Single Shot Slam Fire .22 called the PathFinder

#beta.truandjust_Truger.SR22 - Truger sr22 - printable trigger frame for the Ruger sr22 pistol

beta.UpgrayDD1776_FreedomLPK - DIY AR springs, detents and pins

beta.10spanky.FDM-9 - 3D printed Glock 17 frame based off the FMG-9

beta.Hellreaver.Chelada - Monolithic printable .22 suppressor

beta.gerald.katz_Tomkatz.3032 - Beretta 3032 Tomcat frame.

#beta.ImmortalRevolt.FGC22 - A .22lr Fgc 9

#beta.ImmortalRevolt.FGC9_RIP - An improved FGC9 with a special memorial version dedicated to JStark.

beta.broletariat.Boring_ecm - A deep hole boring ecm, with a focus on barrels

#beta.ImmortalRevolt.V2_FGC_Triggergroup - An improved and strengthened fire control group

beta.geraldkatz_Manx.950b - A printable Beretta 950 Jetfire frame

beta.ze_carioca_Urutau - Diy bullpup 9mm

beta.Thaxian_BattoIsOutto.Butterfly - FIE Titan printable frame

beta.geraldkatz.Sphynx - A printable Beretta 92

beta.advanced.payment.MPC - DIY compact PDW

beta.kelli.blue.Groovy_Rocket_Flare - A printed 37mm rocket assisted flare

beta.kelli.blue.tripwire - A printable 12 ga tripwire alarm device

Ex. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION


Generated by Gataleaks.org
File ID: GLS-4emw5vl5n44gj7e




Generated by Gataleaks.org
File ID: GLS-19i6bzaojan4mrh





Generated by Gataleaks.org
File ID: GLS—euzalgh65hij0h2




Generated by Gataleaks.org
File ID: GLS—jpmlxdtoz201ejn




Generated by Gataleaks.org
File ID: GLS-1j1p9fl3f7tm2bp

## DONATE TO THE DEVS



DONATE TO CTRLPEW



DONATE TO FMDA



DONATE TO IVANTHETROLL



DONATE TO ATLAS ARMS



DONATE TO NGUYENKVVN (VINH)

DONATE TO JSTARK



DONATE TO CATHODE



DONATE TO JEFFROD


Generated by Gataleaks.org
File ID: GLS-f7cug8dr0spa7go




Generated by Gataleaks.org
File ID: GLS-s86ce4ycfdi8cxi



## Product Development Lifecycle

Welcome to the PDL process guidance documentation. The purpose of this guide is to succinctly explain the product development lifecycle, offer a concise release checklist, and provide succinct guidance for a quality release.

### Methodology

This process guidance is written with a decentralized development nature in mind along with a decentralized organization.

Traditional organizations (such as Raytheon, Caterpillar, etc.) working with safety-critical solutions have rigorous controls from design to release that specifically define how a product is made. Under the context of a decentralized and volunteer driven organization, however, this is unsustainable and impossible to enforce. No products will get released.

A completely loose approach and an equally disjointed "organization" (akin to FOSSCAD) however, creates a large quantity of products, but with a low fidelity of quality and documentation. This too is unsustainable. More rubbish than gems are released.

The "Funnel Approach" seeks to meet in the middle of these extremes. Developers are free to engineer and test how they please, but as they get closer to a release, it is expected that they follow guidelines to ensure quality, with a final release requiring that the package satisfy a checklist and subjective review.

At the "top" and broader end of the "funnel", developers are free to design and test however they please. Not only does this maintain creative freedom, but it also retains the unyielding flexibility of experimentation and self-evaluation. No restrictions on how they maintain or version control their designs are imposed even.

At the "middle" of the funnel where it begins to narrow, developers submit their designs for a wider audience to test. Some discipline here is expected- developers are to be active within their beta rooms and respond to user feedback and questions. While infrastructure, such as GitLab for version control or issue tracking is offered, developers are *not* required to use these tools. These tools are offered to help a beta go smoothly.

At the very "end" of the funnel, the most narrow part of it, developers must finalize their beta and their deliverable archive must satisfy the Release Package Requirements checklist. Their product and documentation also undergoes a subjective review with Gatalog leadership to ensure a high fidelity of quality is present, rather than just "checking the boxes." At this point, if all goes well, the deliverable is then published to the Gatalog Odyssey page, and publicized.

 Generated by Gataleaks.org
File ID: GLS–lh1o47rja9k4oen



**r/fosscad** · 1 mo. ago
Cute_Battle_9209

# N0t-4-Gl0cK

`technical-discussion`

NEVER MIND..... Beta is now dead and gone.. ..It seems that if I would like to clame the bounty on Ctrl-Pew i need to do a beta and release with The Gatalog.. seems very redundent to me, but realy need the funds. This being said the only requirment left to complet the beta with them seems to be i have to have STEP files.. and with my lack of Hardware to run anything that can do this, Im looking for people that already have and can help in this beta. And even posably making this even better then it already is. So contact me here or telegram if theres any way you can help.

⬆ 30 ⬇     💬 46     ↗ Share

Single comment thread ———————————————————————— See full discussion

**ctrlpew** · 1mo ago ·
`FOSS/DEV`

To address this specifically, there are 3 sets of requirements. The first, listed on the bounty page is technical requirements for the design itself. The second, on the rules page is a procedural requirement for validating the files, package and corresponding documentation which directs the submitter to the beta process via the gatalog. The third being the requirements for the beta process which are not clearly documented here. -- That's an oversight on my part from when I helped architect those requirements, i made assumptions about people starting work in CAD software and the submission of step files and documentation. -- Based on the previous exchanges with OP I am going to rectify this missing data (or does that constitute moving goalposts?) Regardless the guidance for submitting a claim has always stated a requirement for stl, step and documentation and that the package would need to be reviewed and proofed (by a group that is not me)

The bounty program was established when we went by Deterrence Dispensed. Is it so strange to think that when we changed the name the bounty review process would get left behind or that rules would not update over time? The admin group that reviewed these packages before is the same admin group that would review them now. Im not sure how one predating the other is relevant here.

⊖  ⬆ 2 ⬇   💬 Reply   ↗ Share   ···



Generated by Gataleaks.org
File ID: GLS-5ar535n9dbs9k5s



Generated by Gataleaks.org
File ID: GLS-cc8x61x4xz2m84z



Ex. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION


Generated by Gataleaks.org
File ID: GLS—ahbuxhcjo0ll9e2




Generated by Gataleaks.org
File ID: GLS—6ah7v491hen7jv8

Power full Team

# The Founders



**CTRLPew**



**Fudd Busters**



**Ivan The Troll**



Generated by Gataleaks.org
File ID: GLS-m91wxg1d9gbioyw

**Who We Are**

# A Pro-Gun, Non-Profit Org Run By People Who Actually Like, Own, And Make Guns

We are stewards of the internet masses beginning their gun printing journey.

We are designers of all manner of 3d printed firearms.

We are tireless advocates for the 2nd amendment.

We are here to protect your right to arm yourself against anything that would seek otherwise.

**Support Us In Our Mission**



 Generated by Gataleaks.org
File ID: GLS-u8g4cl5oopnkf2x





 Generated by Gataleaks.org
File ID: GLS-srwqowjgwkx4lmf

8:40

.ıll 5G ⬛

Beta Hosted by The Gatalog on their Rocket Chat. Join the rocket chat to participate. Click the "Join the Beta" button to message the developer directly requesting access. Must have a rocket chat user account to participate. – *See Joining the Gatalog's Rocket Chat*

## THE GATALOG'S RULES FOR BETA TESTERS

**The Purpose:** To create a singular publicly released and shared package of known good files paired with instructions that would enable someone to build whatever we have released without having to come in contact with us. *A stand-alone downloadable unit that will allow someone to complete it without having to come to a forum for assistance.*

**The Rules:**

1. **Don't leak the beta files.** A singular, known good, with instructions package is the first thing the broader world should ever see of this. *A smattering of files of dubious dimension and quality with incomplete instruction are of no benefit to anyone.*

2. These rooms and groups are to test what the developer is releasing, not for you to make feature requests of them. **Test what they are providing.** Give

🔒 ctrlpew.com

A-74





Generated by Gataleaks.org
File ID: GLS-eeer3vpy4fh3xh2



Ex. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION


Generated by Gataleaks.org
File ID: GLS-looda5qeb305emz




Generated by Gataleaks.org
File ID: GLS—wt67k9f6xtswv3j




Generated by Gataleaks.org
File ID: GLS-66byah2e5htzpnn




Generated by Gataleaks.org
File ID: GLS—hqizjozyxc6ocb1





 Generated by Gataleaks.org
File ID: GLS-jg0l21z5g2ecnj7



Galloway Declaration and Larosiere/Elik

The Erin Galloway Declaration, unsealed during *Everytown v. DEFCAD*, says a lot about how Larosiere and Elik run their operation.

Larosiere makes a distinction between "The Gatalog" and The Gatalog Foundation, a corporation in Florida. He and Elik made Alex Holladay represent "The Gatalog" in Everytown and pretend that he didn't know who ran the Odysee download accounts. Anyone can use the name, we are thousands of members, etc. This is Elik and Larosiere's preferred fantasy, but Everytown saw through it and pointed out the officers of the Gatalog Foundation are in business together in companies like MAF Corp, and clearly also run the Odysee account at issue in that case.

John Elik is the party named "Gatalog Printable Magazines" who never answered in the original suit. Odysee provided his email communication in response to the original takedown request from Everytown/Venable. The Galloway declaration shows that Elik mentions "Matt" and "our attorney." We know who this attorney is. Larosiere is not licensed to practice law in New York or Illinois, where Elik and Freeman1337/Peter Celentano live.

Larosiere directed Freeman1337 to drop out of the Everytown case when discovery was noticed. This is because Freeman/Peter Celentano is an IT administrator of "The Gatalog" and has access to all of their communications, which as of 2021/22 were not encrypted. Freeman then blamed his dropout on DEFCAD being an enemy actor who tried to doxx him to Everytown, and Elik and Larosiere ran with this to promote the FEDCAD meme in commerce. As pointed out in the GNET article and many posts I have saved, Freeman/Celentano (unbelievably) admits to his fraud and obstruction of justice.

Elik went out of his way to say he was not involved in the Everytown suit and that I (Cody Wilson) tried to extort him for $100,000 to continue the case or else I would give up Freeman's information to Everytown. This is a lie.

In the Galloway declaration Larosiere hangs himself re: the Gatalog and The Gatalog Foundation. He says he represents both for all matters of intellectual property.

Works for me.

Ex. A - COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION



**Studies in Conflict & Terrorism**



ISSN: 1057-610X (Print) 1521-0731 (Online) Journal homepage: www.tandfonline.com/journals/uter20

# 3D-Printed Firearms: Global Proliferation Trends and Analyses

Rueben Dass

**To cite this article:** Rueben Dass (20 May 2025): 3D-Printed Firearms: Global Proliferation Trends and Analyses, Studies in Conflict & Terrorism, DOI: 10.1080/1057610X.2025.2477849

**To link to this article:** https://doi.org/10.1080/1057610X.2025.2477849

© 2025 The Author(s). Published with license by Taylor & Francis Group, LLC.

Published online: 20 May 2025.

Submit your article to this journal ↗

Article views: 915

View related articles ↗

View Crossmark data ↗

Full Terms & Conditions of access and use can be found at
https://www.tandfonline.com/action/journalInformation?journalCode=uter20

STUDIES IN CONFLICT & TERRORISM
https://doi.org/10.1080/1057610X.2025.2477849



Routledge
Taylor & Francis Group

🔓 OPEN ACCESS 

# 3D-Printed Firearms: Global Proliferation Trends and Analyses

Rueben Dass

International Centre for Political Violence and Terrorism Research, S. Rajaratnam School of International Studies, Nanyang Technological University, Singapore

**ABSTRACT**

Since 2020, there has been a rapid rise in the use of 3D-printed firearms (3DPFs) by criminal and terrorist networks. This study aims to provide an empirical and data-driven understanding of the proliferation of 3DPFs using a dataset of 225 incidents involving 3DPFs from 2013 to July 2024 that was obtained through open-source data mining of the Clear Web. Various analyses of the data were carried out to understand the temporal and geographical spread of 3DPF incidents, the type and nature of use of 3DPFs, the profiles of individuals involved, their ideological motivations and the types of firearms detected. This study shows that 3DPF incidents have proliferated steadily since 2020 and is currently concentrated in North America, Europe, parts of Asia (Myanmar) and Australia. 3DPFs are predominantly linked to crime and criminal networks and is a lone actor phenomenon. Within the terrorism sphere, it has gained traction particularly with the far-right. There has also been a steady increase in youth involvement with 3DPFs. Firearm components and parts kit completions (PKCs) are more prevalent in North America while hybrid firearms are prevalent in Europe.

**ARTICLE HISTORY**
Received 20 November 2024
Accepted 3 March 2025

## Introduction

3D-printing, also known as additive manufacturing, is a process whereby a digitally designed object in the form of a computer-assisted design (CAD) file is created or "printed" by a 3D-printer using raw materials that are either polymer plastics or in some cases metals. The CAD file with the help of a digital slicer software provides the information to the 3D-printer to create the object,[1] much like 2D-printing whereby a Word document is sent to a printer to be printed out on a piece of paper.

3D-printing was first developed in the late 1980s and was referred to as rapid prototyping due to its ability to create cost-effective prototypes for industrial purposes. Ever since, the technology has evolved and developed rapidly, gaining widespread use in several industries namely construction, engineering, medicine and aerospace. The technology has also found popularity among hobbyists who use it to create miniatures and common decorative objects.[2]

**CONTACT** Rueben Dass ✉ isrdass@ntu.edu.sg International Centre for Political Violence and Terrorism Research, S. Rajaratnam School of International Studies, Nanyang Technological University, Singapore.

© 2025 The Author(s). Published with license by Taylor & Francis Group, LLC.
This is an Open Access article distributed under the terms of the Creative Commons Attribution License (http://creativecommons.org/licenses/by/4.0/), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited. The terms on which this article has been published allow the posting of the Accepted Manuscript in a repository by the author(s) or with their consent.

Case 1:24-cv-01628-WCB-EHP Document 136-1 Filed 09/26/25 Page 85 of 537 PageID 2427

2  R. DASS

The most common process used in consumer and commercial-level 3D-printing is known as fused deposition modelling (FDM) whereby thin filaments of thermoplastic material are deposited through a heated nozzle to construct a three-dimensional object.[3] FDM printers are relatively inexpensive and can produce objects from a wide range of thermoplastic and organic polymer blends including acrylonitrile butadiene styrene (ABS), polylactic acid (PLA) and polycarbonate.[4]

As with other commercial technologies, criminal and extremist networks have taken advantage of 3D-printing to manufacture weapons, in particular, firearms. 3D-printing offers malicious actors a viable alternative to obtain weapons particularly in regions where weapons are hard to obtain. They provide malicious actors with anonymity and untraceability and discount the need to rely on the black market and other criminal networks to obtain firearms and weapons.

Digital files for firearms have been available since the early 2000s.[5] One of the earliest firearm components to have been developed was the AR-15 upper and lower receivers in September 2011.[6] Following that, a .22LR handgun which was built on a 3D-printed AR-15 receiver was successfully developed and test fired in 2012.[7]

3D-printed firearms (3DPFs) received widespread attention in May 2013 when Texas University Law student Cody Wilson developed and successfully test-fired the first fully 3D-printed single shot handgun called The Liberator. The gun was inspired by the FP-45 Liberator, a single-shot pistol originally created by the United States military during World War II.[8] 15 out of the 16 components that made up the gun were 3D-pinted – the only non-3D-printed part being a common nail that functioned as a firing pin.[9] Blueprints for The Liberator were downloaded 100,000 times in the first two days of its release before it was initially taken down.[10] The gun was tested by several police agencies including the Austrian Interior Ministry, the United States Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and the Australian police who concluded that the firearm was potentially lethal albeit dependent on the skill of the maker and could be used in assassinations, and instances where only a single shot needed to be fired.[11]

Wilson, a libertarian who believed everyone had the right to own and bear arms, founded his company called Defense Distributed in the same year. Defense Distributed is a private defense technology development agency that disseminates 3DPF blueprints and technical data.[12]

Ever since the development of The Liberator, 3DPFs have proliferated at a concerning rate. 3DPFs form a sub-category of the popularly known term "ghost guns" owing to the fact that these firearms do not have serial numbers and are technically untraceable. Several police agencies worldwide have expressed grave concern over the rise and increasing use of 3DPFs by criminal and extremist networks. In 2023, US authorities recovered more than 10,000 privately manufactured firearms (PMFs) domestically and 1,000 internationally.[13]

The main aim of this project is to collect and collate data on 3DPF incidents globally and to provide an empirical analysis of the global 3DPF phenomenon. There are currently few databases that have collated and analysed 3DPFs collectively. This study is aimed at addressing that gap in the literature and providing a data-driven understanding of the phenomenon from various perspectives such as the temporal and geographical spread, the types of uses, the profiles of individuals using these weapons,

Case 1:24-cv-01628-WCB-SRF Document 136-1 Filed 06/26/25 Page 86 of 537 PageID 2428



the nature of use (criminal or terrorist), the ideological affiliations and the types and classifications of 3DPFs that are most prevalent. This may be useful for law enforcement agencies and governments to mitigate the threat from 3DPFs and prevent it from spreading.

## Literature Review

While several organisations including both government and public agencies report incidents involving 3DPFs, there has been a lack of research literature providing an empirical analysis of this phenomenon. While police agencies may be engaging in their own research and analysis of the subject in their respective countries and regions, these are often not publicly available and published.

A recent study conducted by Veilleux-Lepage investigated the links between 3DPFs and its use by right-wing extremists. He identified 35 incidents worldwide and used a technique called "crime script analysis" which "identifies specific stages and actions within the commission of a crime, from preparation to aftermath" to better understand the "operational steps, patterns, motivations and tactical decision-making processes behind the adoption and use of 3DPFs in extremist activists".[14]

The study covered incidents from January 2017 to 1 June 2024 which were analysed according to several variables such as the date of the incident, place, motivation, intended use, profile of individual and type of firearm (among others).[15] The study made use of newspaper articles, court records, law enforcement documents, governmental reports, and primary sources such as manifestos, interview transcripts and online activities of the perpetrator.[16] While this study focused primarily on the links with right-wing extremism, it does provide some interesting empirical trends.

Firstly, there was an increase in the number of 3DPF incidents linked to right-wing extremists post-2020.[17] The United Kingdom recorded the highest number of cases followed by Australia, Germany, the US and several other European countries highlighting the existence of transnational networks associated with these right-wing extremists.[18] A large number of the cases involved attempts to manufacture or acquire these weapons "highlighting a significant engagement in the actual creation of such weapons".[19]

Schaufelbühl et.al. looked at the phenomenon from a broader lens examining 186 cases involving 3DPFs spanning North America, Europe and Oceania.[20] Their study was based exclusively on open-source information available on the Clear Web.[21] This included media reports, blogs, law enforcement reports and selected social media platforms utilizing keywords searches on standard search engines such as Google. The period of investigation was from 2014 to August 2023. Data analysis and visualization was conducted using Microsoft Excel and Tableau (Table 1).

The cases in Schaufelbühl et.al. were not exclusively focused on right-wing extremism as Veilleux-Lepage but instead focused on the entire spectrum of activity including crime. Several key trends including the geographical and temporal spread of incidents, type of cases, types of firearms and a deep analysis of the type of equipment used, i.e. the printer and printing material used to manufacture the firearms were highlighted. Like Veilleux-Lepage, the study notes that there was a significant rise in cases post-2020. Most of the cases were centered in North America and Europe and involved seizures of firearms as opposed to cases where the weapons were discharged.[22]

Case 1:24-cv-01628-WMR-LTW   Document 36-1   Filed 09/26/25   Page 87 of 537   PageID 2429

4    R. DASS

A 2024 report by van der Meij looks at the spread of 3DPF incidents in Europe from a law enforcement point of view. The study notes an alarming increase in 3DPF incidents in Europe and notably in Scandinavian countries where these weapons have been "offered on the illicit markets and illegal workshops have been identified showing synergies between illicit trade in firearms and organised crime, cybercrime and terrorism/extremism".[23] Several case studies of 3DPF seizures were also highlighted.

The analysis in this paper mirrors Schaufelbühl et.al. in the sense that it offers an analysis of the 3DPF phenomenon from a broader lens and not exclusively confined to its links to a particular activity. However, the points of analyses and variables differ and is explained in the section below.

## Methodology

This study analyses 225 incidents involving 3DPFs from 2013 to July 2024. Data was gathered through keyword searches on Clear Web search engines such as Google and media databases such as Nexis. This study relied primarily on open-source media reports, articles, academic journals, firearms blogs, and selected social media platforms such as X and Facebook. This study also made use of publicly available reports, press releases and open-source database/statistics from government agencies such as the Department of Justice (DOJ) in the United States (US), the National Crime Agency (NCA) in the United Kingdom (UK) and the Royal Canadian Mounted Police (RCMP). Scholarly literature and data published by arms watch organisations such as Armament Research Services (ARES) were also used.

An "incident" in this study is defined as any reported case of an arrest, raid or discovery of a 3D-printed firearm(s). An arrest of more than one individual relating to the same incident will qualify as one incident/entry in the dataset of this study. Only incidents involving 3DPFs or ones strongly suggesting firearms or firearm parts that were manufactured using 3D-printers were included in the dataset. Other firearms that fall under the broader "ghost gun" umbrella such as Polymer80s were not included.

A codebook was created for data collection based on several variables. The codebook is broadly divided into two components: Incidents and Firearms.

### Incidents

An incident is coded based on the following elements:

**Year:** The year in which the corresponding media report was published regardless of whether the actual arrest, raid or discovery may have taken place sometime earlier.

**Country:** Country where the incident took place.

**Type of Use:** Manufacture,[24] Attempt to buy,[25] Possession of firearm,[26] Possession of blueprint,[27] Trafficking/Selling,[28] Mass Shooting,[29] Unplanned Shooting,[30] Assassination,[31] Battlefield,[32] Threatening,[33] Smuggling,[34] Others.[35]

**Number of perpetrators:** If only one perpetrator was involved, the entry was coded as "lone actor". If more than one perpetrator was involved but there was no evidence of them



being part of an established criminal or terrorist network, the entry was coded as "cell". If more than one perpetrator was involved and there was evidence of them being part of an established criminal or terrorist network, the entry coded was "group".

**Number of Youth:** Followed the United Nations definition of youth which is between the ages of 15–24.

**Ideology:** Ethno-separatist, Far-right, Jihadi, Left-Wing/Anarchist, Unknown.

**Nature of Activity:** Criminal, Terrorist,[36] Suspected Criminal, Suspected Terrorist.

### Firearms

The firearms in this study have been classified into five broad categories namely fully 3D-printed (F3DP), hybrid, parts kit completions (PKC), firearm components and others. The definitions for the first three categories were adopted from the definitions proposed by ARES. ARES defines F3DP as small arms that "require no pressure-bearing non-printed components, but may contain minor non-printed parts, such as a nail to act as a firing pin or an elastic band to power a hammer".[37] In other words, F3DPs are almost entirely 3D-printed except for certain minor parts which make use of improvised commercial materials. Examples of firearms in this category are the Liberator, the Songbird and Washbear-type pistols.

Hybrid firearms are firearms that are primarily 3D-printed but utilize non-restricted metal parts such as steel tubing and springs to strengthen major assemblies or to serve as barrels and chambers.[38] The non-restricted parts may be hardware store materials that are modified to serve a function within the firearm. Examples of hybrid designs are the FGC-9, Urutau and the Shuty AP-9.

PKCs are firearms that have a 3D-printed lower receiver (or frame) supplemented with commercial, factory-made parts.[39] The lower receiver, considered the body of the firearm, holds all the major operational components of the firearm, including the trigger mechanism and magazine, and is where the serial number of the firearm is usually stamped.[40] The lower receiver is often the part of the firearm that is regulated. Most or all of the pressure-bearing components, i.e. the barrel, slide, bolt are often bought commercially and assembled into a workable firearm.[41] Glock handguns and various AR-15 firearm models are examples of PKCs.

Two other classifications have been added for the purposes of data collection. "Firearm components" consist of incidents where only components (e.g. lower receivers, conversion devices, suppressors) have been found and have not been assembled into a firearm. "Others" refer to any 3D-printed weapons aside from firearms (e.g. knuckledusters, daggers, hand grenades) and have been included here for the sake of completeness. The specific makes/models of firearms detected were also recorded where available.

### Limitations

Collecting data on 3DPFs is extremely challenging. This is due to several factors namely underreporting and lack of a systematic reporting framework and classification standard for 3DPFs. This is corroborated by Veilleux-Lepage's study on 3DPFs and its use by

Case 1:24-cv-01628-WJM-STV   Document 135-1   Filed 09/25/25   Page 89 of 537
PageID 2431

6  &#9728;   R. DASS

right-wing extremists.[42] Granular information relating to specific raids are often not made publicly available by police agencies for security and other reasons. As this dataset relies solely on open-source information, in particular media reports and newspaper articles, the data obtained is likely to be vulnerable to underreporting and varied reporting standards.

Some reports may go into great detail with regards to the type of firearms recovered and other desired variables while others may only provide surface-level information. Some cases may not even be reported by the media or systematically categorized by law enforcement due to the unique nature of 3DPFs which can sometimes lead them to be mistaken as toys or replicas.[43] Some cases within the stipulated time period may also have been missed due to human error. As such, it is important to note that the dataset in this study may not represent absolute values. In order to circumvent some of these limitations, at least two sources were recorded for each incident. Nevertheless, despite the limitations, the results of the analysis from the dataset highlight interesting and novel trends and provide useful insights into the global 3DPF phenomenon on a cumulative level.

## Analysis and Discussion

### Incident Profile

3D-printed firearms seemed to have gained traction relatively recently with a steady increase post-2020. This is corroborated by Schaufelbühl et.al., Veilleux-Lepage and van der Meij. The number of cases recorded in the first half of 2024 is more than double the number of cases in 2021 and is expected to increase. Schaufelbühl et.al. notes that the rise in cases post-2020 may be due to the increase in the number of published police reports on 3DPFs since then.[44] Veilleux-Lepage further notes that the growth in cases corresponds with the increase in overall 3DPF seizures worldwide.[45] As mentioned by Schaufelbühl et.al., the reason for a rise in cases post-2020 is largely due an increase in media awareness and reporting on the subject in recent years. It has to be noted however, that the actual numbers are likely to be much higher because many 3DPF cases may not even be reported in the mainstream media and in certain cases, information may be withheld by the security agencies (Figure 1).

The rise in cases post-2020 may also be due to advancements in 3D-printing technology that has made it cheaper, easier and more accessible. The proliferation of firearm designers and firearm design blueprints that are easily available online is likely to have played a part. Furthermore, the effect of the COVID-19 pandemic cannot be discounted. Global lockdowns during this period resulted in an increase in online activity worldwide. Reports noted an increase in global extremism and radical activity during this time.[46] Given that the 3DPF space is heavily driven by online interactions and communities, the lockdown may have sparked the interest in 3D-printed firearms among certain individuals as a result of increased interaction within the online 3D-printing space.

Figure 2 shows that the 3D-printing phenomenon remains concentrated in North America and Europe. Out of the 225 recorded cases, almost half of the cases (49%) took place in North America while Europe came in second with 27% of the cases.

The 3D-printing firearm phenomenon is predominantly linked to criminal activity (70%; 145 of 225 cases) as shown in Figure 3. The number of incidents linked to

Case 0:24-cv-01626-WMW-DLM   Document 136-1   Filed 09/25/25   Page 90 of 537
PageID 2432

terrorism makes up 17% (35 cases) of the total number of incidents. Although this might appear to be a small number, the growing interest in 3DPFs among extremists cannot be taken lightly.

Figure 4 shows that manufacture, possession and trafficking/selling are the three highest types of use relating to 3DPFs. Most of the perpetrators involved with 3DPFs were lone actors (Figure 5). Shanon Lacorte, the Chief of the Crime Strategies and Intelligence Bureau at the Queens District Attorney's Office in New York noted in an interview that there has been an increasing number of hobbyists in the US who have shifted into 3D-printing firearms out of curiosity and other reasons as a result of spending time within those online communities.[47] He further noted that in New York there is no fixed profile of individuals linked to 3DPFs. The individuals arrested come from both ends of the professional and social spectrum and there have been individuals as young as 13, and others who are middle-aged who have been linked to 3DPFs.[48]



**Figure 1.** Number of 3DPF incidents by year.



**Figure 2.** Number of 3DPF incidents by continent.

8    ⊛   R. DASS

Unstructured criminal networks/cells (Figure 5) linked to drug or weapons trafficking rings and/or other criminal gangs form the second highest perpetrator type. While conventional firearms still remain the weapon of choice for both criminal and terrorist cells and groups, 3DPFs are gaining more and more traction. For example, a report by Sky News in April 2024 noted how 3DPFs are slowly penetrating criminal gangs in Sweden.[49]

This is also corroborated across all the types of activity linked to 3DPFs (Figure 6).

3DPFs have also found their way to active conflict zones. They have been used as a supplementary firearm by the People's Defence Forces (PDFs) in Myanmar, the armed wing of the National Unity Government (NUG) (discussed below). The PDFs in Myanmar and the armed forces in Ukraine have also used 3D-printing to manufacture other weapons and weapons parts such as drones and munitions.



**Figure 3.** Number of 3DPF incidents by nature of activity.



**Figure 4.** Number of 3DPF incidents by type of use.



**Figure 5.** Number of 3DPF incidents by perpetrator type.



**Figure 6.** Number of 3DPF incidents by perpetrator type and nature of activity.

Interestingly, a vast majority of the cases were failures; the perpetrators were interdicted before they could discharge the weapons (Figure 7). Similarly, Schaufelbühl et.al. notes that a large proportion of the cases involved "seizures" as opposed to "discharged firearms".[50] This could be credited to effective policing and intelligence capabilities on the part of the respective security agencies.

### *Battlefield Use – Myanmar*

In Asia, a large majority of the cases occurred in Myanmar where there has been evidence of the use of 3DPFs on the battlefield, namely the FGC-9. The FGC-9 is the first 3DPF that has been used on the battlefield in an active conflict zone. These firearms have been used by several component groups of the PDFs namely the Salingyi Special Task Force (SSTF) and the Karenni Nationalities Defence Forces (KNDF) in areas such as Sagaing province.[51]

While their use in Myanmar still remains on the periphery, 3DPFs have helped the PDFs alleviate weapons shortages and have functioned primarily as a supplementary firearm that is used in ambushes against the junta forces where conventional arms are procured.[52] It has also been used in training and to arm fighters manning checkpoints.[53]

10   R. DASS



**Figure 7.** Proportion of success and failure of 3DPF incidents.

The manufacture of these weapons has been driven by the younger, more tech-savvy generation of the PDF fighters, many of whom are students, engineers and IT graduates.[54]

The two biggest raids by junta forces on the PDFs where 3DPFs were recovered occurred in September 2023 and May 2024 respectively where a cache of 60 and 30 FGC-9s were seized respectively.[55] There has also been evidence of the PDFs using 3D-printing to manufacture components of other firearms such as the M-16 rifle and drones.[56]

### Terrorism

35 out of 225 cases (or 17%) were linked to terrorism. There were four cases of suspected terrorist incidents where the perpetrators were found to have adhered to an extreme political ideology, but the exact ideology remained unclear. For example, in March 2024, Wayne Brunner from Herkimer, New York was found to have manufactured three handguns with a 3D-printer.[57] Police also found extremist logos and slogans but have not specified the nature of these.[58]

Figure 8 shows that 3DPFs are predominantly linked to the far-right as compared to other ideologies. The most high-profile far-right incident was the 2019 Halle attack in Germany by far-right extremist Stephan Balliet. In the attack, the then 27-year-old Balliet shot and killed two individuals and injured two others. His main gun had a 3D-printed component namely the trigger cover.[59] German police discovered a 3D-printer in his apartment and suspected that he had manufactured a 9 mm Luty submachine gun with a 3D-printed magazine and grip.[60] He famously quoted that "all you need is a weekend's worth of time and $50 for the materials" to make the firearms.[61]

Ever since the Halle attack, there have been at least 31 far-right linked plots involving 3DPFs (Figures 9–12). Most of the cases have been centered in Europe with the UK recording the highest number of cases (Table 1). Veilleux-Lepage, in his study, corroborates the findings here noting that there was a rise in 3DPF-linked right wing extremist

STUDIES IN CONFLICT & TERRORISM   11



**Figure 8.** Ideological breakdown for terrorist incidents involving 3DPFs.



**Figure 9.** Number of 3DPF incidents linked to the far-right by continent.

**Table 1.** Number of 3DPF incidents linked to the far-right by country.

| Country | Number of Incidents |
|---|---|
| UK | 9 |
| US | 6 |
| Australia | 3 |
| Germany | 3 |
| Belgium | 1 |
| Brazil | 1 |
| Canada | 1 |
| Czech Republic | 1 |
| Finland | 1 |
| Iceland | 1 |
| Netherlands | 1 |
| Slovakia | 1 |
| Spain | 1 |
| Sweden | 1 |

12   R. DASS



**Figure 10.** Nature of activity involving 3DPFs by continent.



**Figure 11.** Timeline of incidents involving 3DPFs linked to the far-right.



**Figure 12.** Type of use of 3DPFs linked to the far-right.

Case 1:24-cv-01628-WMR-ELH   Document 136-1   Filed 09/26/25   Page 96 of 537   PageID 2438


cases post-2020 and the number of right-wing cases linked to 3DPFs was found to be highest in the UK and was generally concentrated in Europe.[62]

In February 2024, three men aged between 24 and 33, one of whom was a former military cadet, were charged with planning a neo-Nazi attack on an Islamic Education Centre in Leeds, England.[63] The men were found to have 3D-printed an FGC-9 firearm which they had planned to use in the attack.[64] They were also part of neo-Nazi chat groups and a Telegram group that was used to "provide advice on military training and weaponry with the aim of preparing terrorist acts".[65]

In July 2023, Finnish police discovered a far-right cell consisting of four men between the ages of 22 and 66 who had planned on carrying out terrorist attacks on high-profile targets and infrastructure using 3DPFs.[66] The men had 3D-printed four FGC-9s and several other firearm components.[67] They were found to have adhered to accelerationist ideology, which is rooted in the idea of facilitating and supporting the collapse of society using various means including violence, similar to the ideology of the neo-Nazi group, Atomwaffen Division.[68] They were also anti-immigration in nature.[69] Apart from cells, there were 5 cases where individuals linked to far-right groups such as Nordic Resistance, Knockout 51, San Fernando Valley Peckerwoods and Boogaloo Bois had either manufactured 3DPFs or possessed 3DPF blueprints.[70]

3DPF expert Rajan Basra notes several possible reasons for why 3DPFs have been more prevalent among the far-right. The far-right places a strong emphasis on stock-piling weapons and the "cultural draw" of firearms among the far-right increases the propensity of individuals associated with such movements to engage in the development of weapons such as 3DPFs.[71] This is exacerbated by the prevalence of material relating to improvised weapons including 3DPFs on far-right forums.[72] The second factor is precedence.[73] Although Stephan Balliet's attack was largely a failure and his weapon jammed during the attack, the fact that he had used a firearm with 3D-printed components managed to draw significant attention to 3DPFs. Balliet's manifesto had been referred to by other far-right extremists namely Jim Holmgren and Dean Morrice.[74]

To further expand, Veilleux-Lepage noted four main motivations for the adoption of 3DPFs by the far-right namely: symbolic and ideological reasons – where "the desire to acquire or manufacture a 3DPF exceeds its material benefits and instead is viewed through an ideological lens"; complementing stocks of conventional firearms rather than as a means of replacing them; using 3DPFs as a means of circumventing regulations and as an alternative when access to conventional firearms is limited; and for financial gain where trafficking and smuggling of 3DPFs is carried out for profit.[75]

Apart from far-right ideologies, other ideologies have also been linked to 3DPFs. In January 2024, two Greek American brothers were arrested in New York for allegedly manufacturing 3DPFs. The authorities recovered a large cache of weapons including several 3D-printed "high capacity" magazines, two 3D-printed 9 mm semi-automatic pistols and several improvised explosive devices.[76] Also recovered were anarchist propaganda and paraphernalia and a "hit list" of high-profile individuals.[77] Two months later, a 23-year-old alleged anarchist was arrested in Pescara, Italy for attempting to manufacture an FGC-9 MKII and ammunition.[78]

Within the ethno-separatist sphere, members of the Óglaigh na hÉireann (ONH), an Irish Republican paramilitary group which is a splinter group of the Real Irish

14    R. DASS

Republican Army (Real IRA), were found to have been in possession of 3DPFs. In 2022, members of the ONH brandished 3D printed weapons during an Easter Commemoration.[79] In 2024, members of the same party had fired shots from an FGC-9 at a commemoration ceremony of a deceased IRA member.[80]

There has been at least one case within the Islamist/jihadi sphere. In January 2025, 31-year-old Somali born Abdiwahid Abdulkadir Mohamed was sentenced to prison in the UK for "possessing documents likely to be useful for committing or preparing an act of terrorism".[81] He was noted to have "indicated support for jihadist terrorist attacks" and was found to have an "extensive library of documents which could be used to make 3D firearms" in particular, the MAC-10 submachine gun.[82] He had also looked up 3D-printers on e-Bay.[83]

3DPFs are slowly beginning to gain traction within Islamist/jihadi circles. Pro-Islamic State (IS) supporters have discussed the potential use of 3DPFs, in particular the FGC-9 and more recently the Urutau in pro-IS chatrooms.[84] Design manuals and information regarding these firearms are being shared on online platforms. Recently, Al-Shabaab was found to have picked up interest in 3D-printing technology. A July 2024 United Nations Security Council report noted that the Al-Qaeda affiliate was "working on utilizing 3D-printers for designing explosives, weapons and unmanned aerial systems components in Somalia".[85] If successful, this would make Al-Shabaab one of the first Islamist extremist groups to have operationalized the technology in a conflict zone.

However, 3DPFs are still relatively new within the jihadi sphere. Traditional tried-and-tested attack methods such as suicide bombings, knife attacks, vehicle ramming and conventional firearms that have featured prominently in jihadi propaganda since IS propagandist Abu Muhammad Al-Adnani's 2014 call for lone actor attacks remain the method of choice as opposed to experimenting with new technologies such as 3DPFs.[86] Having said that, if 3DPFs continue to be featured in jihadi propaganda and a successful high-profile attack is carried out, this may change the equation.

### *Youth Involvement*

25% of the incidents (56 out of 225) involved youth. Figure 13 shows that there has been a spike in youth involvement in 3DPF incidents since 2021. This coincides with the spike in 3DPF activity as shown in Figure 1.

Youth involvement is the highest in the US (25 incidents), followed by the UK (8 incidents) and Canada (6 incidents). On the whole, youth involvement tends to be concentrated in North America and Europe, similar to the general profile of 3DPF activity.

The majority of cases involving youth and 3DPFs were linked to crime (66%; 37 cases) followed by terrorism (28%, 16 cases) (Figure 14).

Similar to the general 3DPF trends, youth involvement with these weapons are primarily as lone actors or cells as opposed to part a structured group as shown in Figure 15.

Out of the 16 terrorism incidents involving youth, 14 incidents were linked to the far-right with the UK recording the highest number of incidents followed by the US (Figure 16). One notable case in the UK was that of 20-year-old Daniel Harris. Harris had disseminated far-right material online including a documentary on the Christchurch shooter, Brenton Tarrant.[87] His material was believed to have influenced Payton Gendron

Case 6:24-cv-01629-WWB-EJK Document 136-1 Filed 09/25/25 Page 98 of 537 PageID 2440





**Figure 13.** Timeline of youth involvement with 3DPFs by year.



**Figure 14.** Youth involvement by nature of activity.



**Figure 15.** Youth involvement by perpetrator type.

16    R. DASS



**Figure 16.** Number of youths linked with the far-right and 3DPFs by country.

who carried out a mass shooting targeting the black community in Buffalo, New York in May 2022 and Anderson Lee Aldrich who had carried out a shooting at a gay bar in Colorado in November 2022.[88] Harris was found to be in possession of a 3D-printer and had attempted to build an unspecified "semi-automatic gun".[89]

In June 2024, 19-year-old Mason Reynolds from Brighton was alleged to have plotted an attack on a local Jewish synagogue.[90] He was found to be in possession of a files pertaining to the manufacture of an FGC-9.

In April 2023, then 23-year-old Noah Edwin Anthony who was a soldier at Fort Bragg was found to be in possession of a 3D-printed FGC-9.[91] He had planned an "operation" to "physically remove as many of (black and brown people) from Hoke, Cumberland, Robeson and Scotland Counties by whatever means need be".[92]

### *Firearms*

Firearm components were the most frequently encountered followed by hybrid and PKCs (Figure 17). F3DPs recorded the lowest number. This may be because F3DPs are the least reliable and durable in terms of use. Most F3DPs are single shot pistols that only last at maximum a few shots before they become either too distorted or structurally unsafe to use.[93] In terms of performance, hybrid firearms are almost



**Figure 17.** Number of incidents by firearm classification.

comparable to some conventional weapons although this highly depends on the skill of the maker whereas PKCs are the most reliable and are almost as good as factory-made weapons.[94] However, the latter may often be the most challenging to assemble especially in countries where firearm components are restricted.



**Figure 18.** Specific type of firearms detected.

18    R. DASS

Figure 18 shows the specific types of firearms that have been detected. The most highly detected component is the conversion device. Conversion devices, also known as auto-sears for rifles and switches (or Glock switches or chips) for handguns, are small 3D-printed devices that are used to convert a semi-automatic firearm into a fully automatic firearm. 90% of the detected conversion devices have been in the US. According to the ATF, 5,454 guns with conversion devices were recovered between 2017 and 2021, a 570% increase compared to the preceding five-year period.[95] Several shootings in the US including one in Sacramento that killed six and injured 12 involved firearms with conversion devices.[96] In Washington, the police have noted that the growing number of Glock switches in the state contributed to the 274 homicides in the city in 2023.[97] The small devices could either be 3D-printed or bought for prices as low as \$50.

The most frequently detected firearm is the FGC-9 (Figure 18). This is a semi-automatic $9 \times 19$ mm hybrid pistol calibre carbine that does not require regulated firearm components and can be assembled completely with a mix of 3D-printed components and hardware store materials like steel tubing.[98] This firearm was designed by Jacob Duygu, a German-Kurdish national who went by the online moniker "JStark1809" and was released in March 2020. Duygu's decision to design his own firearm came out of a mix of frustration at not being able to own guns in Germany and disappointment with existing 3DPF designs that were developed by Cody Wilson.[99] He also believed that it was a basic human right to own firearms. Ultimately, in his own words, he noted:

> I'm of the opinion that to bear firearms is a human right. The government, or the entity that has rule over you has an executive force. The police, the military – they have firearms. To be able to escape that injustice, they (citizens) need to have the same force on an individual level as the executive force of the government entity that is ruling over them. So, this is my ideological reasoning.[100]

On the last page of the detailed 110-page design manual of the FGC-9 that Duygu created, he further noted:

> We together can defeat for good the infringement that is taking place on our natural born right to bear arms, defend ourselves and rise up against tyranny at any time.[101]

In term of the design, both the firing pin and the barrel can be made from steel tubes and bars available at standard hardware stores. The magazine can be 3D-printed and the trigger can be modified from the trigger of airsoft rifles.[102] The manual provides a detailed step-by-step guide to making the firearm for anyone without prior knowledge and even explains how to purchase a suitable 3D-printer. The FGC-9 doesn't require specific metalworking skills and experience as compared to other similar 9 mm firearms and was noted to be "the easiest to construct semi-automatic homemade firearm and at the same time one of the most practical homemade firearm designs there are".[103]

Although Duygu claimed not to have any political or extremist leanings, his online postings and writings suggested otherwise. He was found to have held onto xenophobic, antisemitic and incel beliefs.[104] He had also endorsed and threatened violence on a few occasions.[105] Apart from designing the FGC-9, Duygu was known to have built a

STUDIES IN CONFLICT & TERRORISM ⊛ 19

decentralized online community of 3D-printed firearm designers known as Deterrence Dispensed that functions to create, promote and distribute 3DPF blueprints.[106] Deterrence Dispensed's famous tagline "Come and Take It" reflects the goal of this platform (and similar ones) in making these blueprints available and accessible to the general public. Duygu was found dead from unknown causes in July 2021 in Germany.[107] He has since been revered as a martyr among the online 3DPF community.[108]

Duygu and the Deterrence Dispensed community have garnered interest among certain elements of the far-right community. One member of the Deterrence Dispensed community stated how he had seen far-right people talking about how much they had liked Duygu.[109] In November 2021, Swedish authorities arrested a far-right extremist named Jim Holmgren. Holmgren had plotted a mass murder attack and was in possession of neo-Nazi literature and a tribute to Norwegian neo-Nazi attacker, Anders Breivik.[110] The authorities also found a 3D-printer and numerous 3DPF parts including that of the FGC-9, FGC-22 and ZBC-21, and later convicted Holmgren of weapons offences as opposed to terrorism as he had no fixed plan or target for the purported attack.[111] He was also alleged to have sourced 3DPF designs from Deterrence Dispensed and was active in its online community.[112]

As shown in Figure 19, the FGC-9 has been widely found in Asia (Myanmar) and Europe. In the latter, it has predominantly been associated with criminal networks and the far-right (Figure 20). However, one has to be cautious when coming to the



**Figure 19.** Number of incidents involving FGC-9 by continent.



**Figure 20.** FGC-9 distribution by nature of activity.

conclusion about the role of the FGC-9 in the Myanmar conflict. While it has been used by several component groups of the PDFs, it remains a supplementary firearm that complements the groups' conventional arsenal. The technology does provide an alternate source of weaponry, particularly in situations where access to weapons is a challenge, but whether it is a game changer or not is hard to say. The high numbers in Figure 19 may just be due to the fact that the reporting of 3DPF incidents is high in Myanmar.

Apart from the conflict in Myanmar, the FGC-9 has not been used in any attack or shooting thus far. The firearms were found either fully manufactured or partially manufactured in raids and in possession of the perpetrators. In the 2023 Finnish case, the cell had successfully manufactured four FGC-9s.[113]

Across both the far-right and criminal spectrum, firearm components seem to be the most frequently encountered (Figure 21). Based on Figure 22, hybrid firearms like the FGC-9 are concentrated in Europe whereas firearm components and PKCs are concentrated in North America. This is because Europe has tight firearm regulations and sourcing firearm components is highly challenging with one of the few options being the black market. Hybrid firearms are an attractive option because it requires no regulated firearm components and relies solely on a mix of 3D-printing and commercially available hardware store materials. Strict firearm regulations were believed



**Figure 21.** Firearm classification by nature of activity.



**Figure 22.** Firearm classification by continent.

STUDIES IN CONFLICT & TERRORISM  21

to be one of the main motivations for Jacob Duygu to create the FGC-9. In essence, hybrid firearms provide an option for individuals to circumvent tight firearm regulations in Europe.

In North America, firearm parts such as barrels and slides are legally available. The only part of the firearm that is often regulated is the lower receiver. Thus, lower receivers are often 3D-printed and supplemented with commercially available components. This explains the high number of firearm components and PKCs in that region. The most frequently encountered components are conversion devices and lower receivers, particularly that of the AR-15 and Glock-type pistols.

## The Role of the Online Ecosystem

The rapidly increasing availability of 3D-printing technologies has given rise to a network of designers dedicated to creating and digitizing all types of objects. The online ecosystem plays a key role in the 3DPF phenomenon. Online communities within this ecosystem function as a decentralized, "online peer-to-peer network" for anyone who engages in printing and building these firearms where users share information and technical support to help each other and anyone who is confronted with problems at any stage of the manufacturing process.[114] It is used primarily for sharing and promotion of firearm designs and as a platform for fellow designers and users to interact and network.

The 3DPF community abides by the principles of free and open-source software (FOSS) which consists of four fundamental pillars: freedom to use; freedom to explore; freedom to modify; and freedom to repost.[115] One of the earliest online communities that was formed was that of Cody Wilson, the founder and maker of The Liberator. In August 2012, Wilson founded a non-profit group called Defense Distributed. Defense Distributed established "DEFCAD" who proclaim to be "the world's largest repository for small arms technical data".[116] Firearm designers upload designs in the form of CAD files and blueprints which can then be downloaded by registered users. However, access to files is limited only to individuals within the US for this particular platform.

Other popular online communities are Deterrence Dispensed which as noted was founded by Jacob Duygu, among others. Now known as The Gatalog, Deterrence Dispensed functions as an online 3DPF ecosystem like DEFCAD. It consists of a wide repository of firearm designs, guides, tutorials, data and information on 3DPFs.

The group also provides access to interested individuals to join "beta testing programs" which are closed groups consisting of a select number of individuals who have some prior experience in printing and assembling firearms. The beta testing program functions as a space where a gun designer can collaborate with the community in an effort to verify the integrity of a model and instructions to build it.[117] Members within the program provide feedback on performance and repeatability of the designs to the designers.

Only after the beta-testing phase is complete and all the feedback is synthesized, will the designer release a final release package with all the instructions and designs for users to download.[118] 3DPF online communities make use of open websites, social media and other alternative platforms such as Odysee, Twitter, Instagram, Utreon, Gab, Reddit, Gettr, Tiktok, Facebook, Discord, Signal, Bitchute, Twitch and Rocket.Chat. The beta-testing programs are primarily carried out in Rocket.Chat.

22  R. DASS



**Figure 23.** Role of the online ecosystem and process of release of a 3DPF file from conception.

YouTube has also been used frequently as a platform to disseminate tutorials, information and promotional videos pertaining to 3DPFs. Videos of beta-testing of 3DPF models have been posted on YouTube. Several videos have garnered wide viewership with some going up to 50,000 views. One YouTube channel of a prominent 3DPF designer and tester has more than 80,000 subscribers. These communities and designers are funded by cryptocurrencies such as Bitcoin, Monero, Ethereum and Litecoin.

Figure 23 shows the process and function of the online ecosystem in the process of designing and manufacturing 3DPFs.

The open-source nature of many of these ecosystems and communities means that they can also be exploited by nefarious actors such as criminals and extremists. It is not difficult for these actors to gain information on 3DPFs from these ecosystems and experiment with them. The proliferation of these ecosystems coupled with the potential with which it could be misused poses a significant threat to public safety.[119]

### Outlook

The rapid development of 3DPFs poses several implications for public security. 3D-printing technology has evolved tremendously since the first 3DPF was built and shot in 2013. 3D-printers have become cheaper, more advanced and easier to use, and the plastics and polymers that are being used as raw material have become more durable. ARES notes the following:

> The time, level of skill, and requirements for hand fitting are reduced, and the rapid assembly of viable firearms becomes a possibility for the average person, particularly when operating with access to the data repositories, designs, and shared knowledge available via the Internet. The cost of producing capable 3D-printed small arms is rapidly decreasing, in-line with the reduction in price for 3D printers and other technologies.[120]

Commercial 3D-printers are available for as low as USD 250–300. Fully functioning firearms can easily be made on those printers. For example, the Harlot, a .22 caliber


single-shot pistol is 95% 3D-printed and costs around USD 20 to make.[121] Other standard firearms like the Glock can cost between USD 200–300 to make if the lower receivers are 3D-printed.[122]

Although it takes a substantial amount of time to print and manufacture these firearms, the time is reducing with advancing technologies. PKCs take as little as half an hour to assemble while lower receivers currently take approximately five hours to print when it previously took around 13 h.[123] The polymers used to make these firearms are becoming more durable and able to withstand the pressures associated with firing the weapons.

3DPF designs are evolving and proliferating on a day-to-day basis with firearm designers racing against each other to produce designs that are increasingly easier to make and rely less and less on regulated firearm parts. These designs would enable users to make the firearms completely at home. One example is the Urutau, a 9 mm variation of the FGC-9, which was released in August 2024. It is notably easier to manufacture and use than the FGC-9. Veilleux-Lepage and Füredi, who carried out a detailed analysis of the Urutau note the following:

> Technically, the design represents a leap forward in terms of ease of construction, reduced cost, and scalability, addressing key limitations faced by earlier models like the FGC-9. Its reliance on non-firearm-specific components and the elimination of complex manufacturing steps, such as welding, make the Urutau more accessible to a broader audience, including individuals in regions with strict firearm regulations. Moreover, its customisable features and distinct aesthetics—heavily influenced by digital subcultures—further contribute to its likely adoption as a standout design within the 3DPF community.[124]

The advancement of technology coupled with cheaper and more durable equipment and the proliferation of information and guides online is lowering the entry barrier and capability threshold for individuals to manufacture these firearms. However, one must take note that making a 3DPF is not as easy as it seems. It requires a significant amount of time, effort, experimentation, digital literacy and basic tooling skills. Duygu himself mentioned that making an FGC-9 would take at least 1.5 to 2 weeks.[125] It could possibly take longer for amateurs without any experience. The performance quality and durability of these firearms are largely dependent on the skill of the maker.

As with any DIY machine, 3D-printing also suffers from machining defects and malfunctioning depending on the type of machine and the type of polymer used as raw materials.[126] 3DPFs suffer from durability issues because they are primarily made of plastic. Metal printing can reduce this problem to a certain extent because it makes use of metals instead of plastics. In November 2013, US additive manufacturing company Solid Concepts successfully 3D-printed a M1911 pistol using metal and fired 50 rounds of it.[127] This made it the world's first metal 3D-printed firearm.[128] Firearms made from metal are more durable as compared to plastics due to their ability to withstand the heat from firing. Metal 3D-printers are still expensive and are primarily for industrial use as opposed to polymer 3D-printers. However, Michigan Technological University was able to build a metal 3D-printer for only USD 1,500 in 2013.[129] Advancements in technology has the potential to make 3D metal printing cheaper and more accessible to the wider public.

24    R. DASS

In this regard, computer-numerical-coded (CNC) milling is a technique that is bridging the gap. CNC milling is a process whereby a piece of material is gradually machined in a series of precise movements governed by a computer code. [130] In 2014, Cody Wilson produced the Ghost Gunner, a CNC milling machine that is able to carve out firearm parts from aluminum. The Ghost Gunner functions to complete "80% lowers" – unfinished firearm frames (roughly 80% finished and hence the name) that can be commercially bought in the US for around USD 80, that lack just a few cavities and do not qualify as legal frames of firearms until they are milled out – into fully functioning lower receivers. [131] CNC milling machines like the Ghost Gunner are able to finish lower receivers for firearms such as the AR-15 and Glocks.

The Ghost Gunner is also able to create a lower receiver from a plain block of aluminum (called 0% lower). These milling machines automate the entire process allowing even amateurs with no basic gunsmithing experience to dabble in this process. [132] A journalist from WIRED magazine who managed to successfully build an AR-15 lower receiver in 2015 using the Ghost Gunner noted the following:

> In fact, the Ghost Gunner worked so well that it may signal a new era in the gun control debate, one where the barrier to legally building an untraceable, durable, and deadly semi-automatic rifle has reached an unprecedented low point in cost and skill. [133]

In 2013, 23-year-old John Zawahri was believed to have used an unserialised AR-15 that he had completed on his own in a shooting rampage in Santa Monica, California where he killed five people. [134] In 2017, Kenvin Janson Neal killed six people and injured 10 in a shooting in Tehama County, Los Angeles using an AR-15 ghost gun that he had assembled on his own. [135]

The assassination of UnitedHealthcare CEO Brian Thompson in New York in December 2024 garnered a significant amount of attention. The alleged perpetrator, 26-year-old Luigi Mangione was purported to have used a 3D-printed PKC, in particular a Glock-19 variant known as the FMDA 19.2. [136] He was alleged to have also used a 3D-printed suppressor. [137] CCTV footage suggested that the firearm had jammed during the shooting but was nevertheless able to deliver a lethal shot, killing Thompson. Mangione was noted to have mentioned in his manifesto that the process of making the firearm was "fairly trivial" requiring some elementary engineering, basic CAD and patience. [138]

3D-printing offers an attractive option to actors seeking to obtain firearms particularly in regions where firearms are difficult to obtain. It preserves the anonymity of individuals and eliminates any dependence on criminal networks to obtain firearms. Malicious actors such as violent extremists pose a significant security threat in this regard.

Apart from firearms, 3D-printing has been adopted by state and non-state actors alike in the production of other weapons and weapons parts. In Ukraine, 3D-printing has been used to manufacture munitions. The Ukrainian forces have used 3D-printing technology to manufacture improvised explosive devices known as "candy bombs" which consists of a 3D-printed casing which is filled with explosive material. [139] These bombs are manufactured by decentralized groups of amateur arms manufacturers both inside and outside of Ukraine. Some of these groups manufacture 1,000 bombs a week while others have been found to manufacture approximately 30,000 candy bombs


between March and August 2023.[140] At least 65,000 of these candy bombs have been imported from outside Ukraine since November 2022.[141]

The Ukrainian forces have also used 3D-printing to modify explosive devices such as the RKG-3, a Soviet anti-tank grenade that was developed in the 1940s. Renamed the RKG 1600, these munitions are fitted with 3D-printed stabilizing fins and tail cones to improve accuracy and are dropped from drones in the air.[142] Similarly, the technology has been used in Myanmar to manufacture stabilizers for mortars and other munitions.[143]

Other than munitions, 3D-printing has been used to develop drones. In Myanmar, the PDFs manufactured a drone they called The Liberator (MKI and MKII) that consists of a 3D-printed frame reinforced with fiberglass.[144] Costing around $5,000, this drone was inspired by the Ukrainian-made drone called The Punisher and can carry up to 1.5 kg of explosives.[145] Footage of the testing of the Liberator MKII was released in July 2023 and it was alleged that the drone was used in both reconnaissance and attack roles using improvised components and munitions.[146]

More recently in Syria, Hayat Tahrir Al-Sham (HTS), a group that was previously linked to Al-Qaeda, had used 3D-printing technology to develop its own drones.[147] HTS' use of technological weapons such as drones played a key role in its rapid takeover of the country and the defeat of the Assad regime in December 2024.[148] The Houthis in Yemen are also using 3D-printing technology to "make and customize parts and fittings" for some of their drones.[149]

3D-printing has provided both state and non-state actors an asymmetric advantage against larger adversaries, aided them to overcome weapons shortages and has served as a supplementary addition to their conventional weapons arsenals.[150] States have also made use of 3D-printing to develop drones. Task Force 99, a Qatar-based US Air Force division tested 3D-printed drones that were designed using artificial intelligence.[151] The UK government is also believed to have tested 3D-printed, delta-wing suicide drones.[152]

Another concerning trend is the development of 3D-printed ammunition. Ammunition is currently one of the few barriers that prevent individuals from developing a complete firearm at home. One must still purchase ammunition to be used with a 3DPF. However, homemade and 3D-printed ammunition are being experimented with and are in the beta-testing phase. While currently at a nascent stage, the development of 3D-printed (and homemade ammunition) is likely to be a significant development within the privately manufactured firearms space that would enable someone to build and fire a gun whilst completely being off-the-radar.

The other potential danger with 3D-printing is the development of weapons which look like toys. Because 3DPFs are made with plastic that is often colorful, it can be easily mistaken for toy or nerf guns. Some firearm components like suppressors have been purposely designed to look like household items such as miniature vases to evade detection. Conversion devices often look like plastic blocks or hooks and can easily be mistaken for ornaments and in some cases wall hangers. 3D-printing has also been used to develop parts of explosive devices. Thus, it remains vital to ensure that the latest developments and innovations within this space are monitored closely.

Case 6:24-cv-01629-WWB-LHP Document 133-1 Filed 05/23/25 Page 109 of 537 PageID 2451

26    R. DASS

## Countermeasures

The 3DPF firearm phenomenon is a multi-layered phenomenon that must be addressed holistically. There are several countermeasures that can be adopted by governments and security services globally to mitigate this threat. First is cyber-vigilance. As noted in the preceding sections, 3DPFs are closely linked to the online ecosystem and online communities. Thus, cyber-intelligence and online patrolling of chat rooms and social media platforms such as Telegram and others is crucial in interdicting the use of 3DPFs by both criminal and terrorist networks. The fact that most of the incidents presented in this report were interdicted before the firearms were used or fired indicates a positive trend that highlights the ability of the security services to execute timely interventions.

Secondly, intra- and inter-stakeholder cooperation between various parties namely law enforcement, governments, academia and the private sector is crucial. Police agencies who are faced with the problems of 3DPFs particularly in Europe and North America should develop good working relationships and intelligence cooperation which will be beneficial particularly in cases which span several countries. In this regard, EUROPOL's initiative to conduct an international conference on 3DPFs in The Hague in 2022 that gathered over 120 participants from 20 countries and a follow-up conference in Madrid in 2023 to encourage cooperation and information sharing between members must be commended.[153]

Apart from intra-security agency cooperation, police and intelligence agencies dealing with 3DPFs must also develop close relationships with other stakeholders and the private sector such as postal companies. As trafficking of 3DPF components is one of the major types of activities detected, good working relationships with postal and delivery services will play a crucial role in managing the threat. For example, if an individual is found to be purchasing large amounts of commercially available firearm parts such as barrels and slides without purchasing lower receivers, this may be an indication that the individual may be engaging in manufacturing their own receivers.

Engaging with 3D-printing companies is also beneficial to ensure that these companies are aware of the threat of misuse of their technology and to ensure that the development of their technology and products are within the requirements of public safety. Some 3D-printing companies like Danish firm "Create it REAL" have taken their own safety measures by developing an algorithm that prevents the 3D-printers from printing 3DPF design files.[154]

Thirdly, legislative measures are important in mitigating the illicit use of 3DPFs. Strict laws and a strong legislative framework will prevent the proliferation of these weapons and serve as a deterrent for anyone who intends to use 3DPFs. There have been a range of legal measures taken to control the spread of 3DPFs which include criminalizing the manufacture of 3DPFs, introducing licensing or registration schemes for 3D printers and 3DPFs, and the introduction of new offences for the possession of 3DPF design files.[155]

Singapore, for example, has outlawed the possession of digital blueprints of firearms without authorisation.[156] The NCA in the UK has called for similar measures after having witnessed a significant increase in the number of 3DPF cases in the country in 2023.[157] In Australia, New South Wales has legislated laws that make the possession of digital blueprints of 3DPFs illegal while Tasmania is in the process of legislating



similar laws.[158] Under Canadian law, the manufacture and possession of any firearm, including a 3DPF is illegal.[159]

Finally, increasing the awareness of members of law enforcement at all levels to the issue of 3DPFs is crucial. Officers responding to crime scenes need to be trained to identify 3DPFs immediately and be able to take the necessary action. International collaboration and sharing of information and knowledge are vital in this regard. There is also a need to conduct empirical research on the subject and create international databases of 3DPF cases to better understand the phenomenon. Members of the public should also be sensitized to 3DPFs and be aware to report any 3DPF encounters to the police immediately. As a whole, governments in both regions where 3DPFs are a serious issue and where they are emerging, must take the threat posed by 3DPFs seriously and take necessary preventive measures before it becomes a national and international security threat.

## Conclusion

3DPFs are a growing and ever-evolving phenomenon. This article attempts to provide an empirical and data-driven understanding of the global 3DPF phenomenon in an attempt to aid law enforcement and governments address the threats posed by 3DPFs. There are several key takeaways from the results of the data.

1. 3DPFs are currently concentrated in North America, Europe and Australia. In Asia, they are being used primarily in Myanmar. However, their role in Myanmar still remains on the periphery.
2. There has been a rapid increase in the number of 3DPF cases since 2020.
3. 3DPFs are primarily linked to crime as opposed to terrorism. Within the terrorism sphere, 3DPFs are most popular with the far-right. Geographically, the far-right cases linked to 3DPFs are centered in Europe with the UK recording the highest number of cases.
4. The profile of individuals linked to 3DPFs are mostly lone actors and small cells. Majority of the cases were interdicted before the firearm had been discharged.
5. There has been an increase in youth involvement with 3DPFs. The highest number of cases involving youth were recorded in the US, followed by the UK and Canada. Youth involvement is primarily linked to criminal activities.
6. Firearm components (unfinished firearms) are most frequently encountered in both criminal and terrorism cases.
7. Firearm components and PKCs are most frequently detected in North America while hybrid firearms are concentrated in Europe primarily due to the varying nature of firearms regulations in both regions.
8. The FGC-9 is the most popular type of 3DPF that has been detected and is concentrated in Europe and Asia (Myanmar). It is also the weapon of choice for individuals linked to the far-right. Conversion devices are the most popular type of firearm component detected and is concentrated in North America.

28  R. DASS

3DPFs are only going to become more sophisticated, more lethal, cheaper and easier to make with time. The current trends already show the gravity of the threat posed by 3DPFs. It is only a matter of time before these weapons are used in a mass-casualty incident. Before that happens, law enforcement agencies and governments worldwide must work together proactively and pre-emptively to prevent this technology from being misused by malicious actors.

## Notes

1. Martin van der Meij, *3D-Printed Firearms: State of Play, Challenges and Law Enforcement Approach* (Belgrade, Serbia: SEESAC, 2024), 19–22.
2. Alina Dragu, 'How Today's High-Tech Hobbyists Use 3D Printing', 3D Universe, 8 June 2023, https://shop3duniverse.com/blogs/digital-fabrication-projects/how-todays-hobbyists-use-3d-printing.
3. N.R. Jenzen-Jones, 'Small Arms and Additive Manufacturing: An Assessment of 3D-Printed Firearms, Components, and Accessories', Behind the Curve (Small Arms Survey, 2015), 48, https://www.jstor.org/stable/resrep10742.10. There are several other 3D-printing processes such as stereolithography (SLA), direct metal laser sintering (DMLS), selective laser melting (SLM), and selective laser sintering (SLS).
4. Jenzen-Jones, 48.
5. Michael Guslik, 'Gunsmithing with a 3D Printer – Part 2', *Have Blue* (blog), 1 July 2012, https://haveblue.org/?p=1321; Duke Snider, 'AR-15 CAD Files', 2003, https://www.biggerhammer.net/ar15/cad/.
6. Jenzen-Jones, 'Small Arms and Additive Manufacturing', 46.
7. Jenzen-Jones, 47.
8. Gwilym Roberts Harry, '3D Printed Firearms: A History of Their Creation, Distribution and Efforts at Restriction' (New York: IANSA and NonViolence International, 2021), 2, https://iansa.org/wp-content/uploads/2021/05/3D-PRINTED-FIREARMS-1.pdf.
9. Gerald Walther, 'Printing Insecurity? The Security Implications of 3D-Printing of Weapons', *Science and Engineering Ethics* 21, no. 6 (1 December 2015): 1436, https://doi.org/10.1007/s11948-014-9617-x.
10. Andy Greenberg, '3D-Printed Gun's Blueprints Downloaded 100,000 Times In Two Days (With Some Help From Kim Dotcom)', Forbes, 8 May 2013, https://www.forbes.com/sites/andygreenberg/2013/05/08/3d-printed-guns-blueprints-downloaded-100000-times-in-two-days-with-some-help-from-kim-dotcom/.
11. Walther, 'Printing Insecurity?', 1436; *NSW Police Commissioner Warns of Dangers of 3D Guns* (YouTube, 2013), https://www.youtube.com/watch?v=9taL4svjH_g.
12. 'DEFCAD', DEFCAD, accessed 27 January 2025, https://defcad.com/.
13. 'FACT SHEET: Update on Justice Department's Ongoing Efforts to Tackle Gun Violence', United States Department of Justice, 14 June 2023, https://www.justice.gov/opa/pr/fact-sheet-update-justice-department-s-ongoing-efforts-tackle-gun-violence. PMFs are also known colloquially as ghost guns.
14. Yannick Veilleux-Lepage, 'Printing Terror: An Empirical Overview of the Use of 3D-Printed Firearms by Right-Wing Extremists', *CTC Sentinel* 17, no. 6 (June 2024), https://ctc.westpoint.edu/printing-terror-an-empirical-overview-of-the-use-of-3d-printed-firearms-by-right-wing-extremists/.
15. Veilleux-Lepage.
16. Veilleux-Lepage.
17. Veilleux-Lepage.
18. Veilleux-Lepage.
19. Veilleux-Lepage.
20. Stefan Schaufelbühl et al., 'The Emergence of 3D-Printed Firearms: An Analysis of Media and Law Enforcement Reports', *Forensic Science International: Synergy* 8 (1 January 2024): 100464, https://doi.org/10.1016/j.fsisyn.2024.100464.

21. Schaufelbühl et al., 2.

22. Schaufelbühl et al., 2–4.

23. van der Meij, '3D-Printed Firearms: State of Play, Challenges and Law Enforcement Approach', 11.

24. Engaged (either directing – without purchase/selling – or directly engaged) in manufacture of the weapon. If there is evidence of a 3D-printer, incident is coded as manufacture.

25. Engaged in attempts to purchase a 3DPF or parts of it. Includes attempt to direct someone else to print the weapon for them, for example, purchasing from an online seller that is printing weapons/parts.

26. Possessing a 3DPF or parts of it at the time of arrest.

27. Possessing of a 3DPF digital blueprint at the time of the arrest.

28. Engaged or planned to engage in selling the firearm/parts for profit – regardless of whether the sale was successful.

29. As per the Federal Bureau of Investigation (FBI) definition of mass shooting – planned incident in which at least four people are murdered with a gun. It may or may not be linked to recognized/mainstream extremist ideological movements. For more information, refer: https://www.ojp.gov/ncjrs/virtual-library/abstracts/analysis-recent-mass-shootings.

30. Murder of less than four people that is unplanned. 'Planned' is defined as evidence indicating that the perpetrator had intent to conduct the shooting on the relevant person(s) prior to the attack. Includes self-defense whether legal or otherwise.

31. Murder of less than four people that is planned.

32. Evidence of use on active battlefield, for example, Myanmar.

33. Intent of using the weapon is to intimidate as opposed to discharge.

34. Engaged or planned to engage in the illicit movement of the firearm/parts across national borders.

35. Type of use not defined in other options, including hobbyist/recreation purposes.

36. Coded as terrorist only when clear evidence of terrorist/political affiliation is found. All other cases are coded as criminal.

37. G. Hays, Ivan T., and N.R. Jenzen-Jones, 'Desktop Firearms: Emergent Small Arms Craft Production Technologies' (Australia: Armament Research Services, March 2020), 13, https://armamentresearch.com/wp-content/uploads/2020/03/ARES-Research-Report-8-Desktop-Firearms.pdf.

38. Hays, T., and Jenzen-Jones, 14.

39. Hays, T., and Jenzen-Jones, 15.

40. Angela Daly et al., '3D Printing, Policing and Crime', *Policing and Society* 31, no. 1 (2020): 8, https://doi.org/10.1080/10439463.2020.1730835.

41. Hays, T., and Jenzen-Jones, 'Desktop Firearms: Emergent Small Arms Craft Production Technologies', 15.

42. Veilleux-Lepage, 'Printing Terror'.

43. Veilleux-Lepage.

44. Schaufelbühl et al., 'The Emergence of 3D-Printed Firearms', 3.

45. Veilleux-Lepage, 'Printing Terror'.

46. Richard Morris, 'Researchers Warn of Rise in Extremism Online after Covid', *BBC*, 30 December 2022, https://www.bbc.com/news/uk-politics-61106191.

47. *Untraceable Ghost Guns: How NYC's Queens DA Is Fighting the Threat of 3D Printed Firearms*, 2024, https://www.youtube.com/watch?v=NlXn4rxI9x4.

48. *Untraceable Ghost Guns.*

49. *Sky News Investigates: Sweden's Deadly Gang War* (YouTube, 2024), https://www.youtube.com/watch?v=3PXZxaKMl9Y.

50. Schaufelbühl et al., 'The Emergence of 3D-Printed Firearms', 3.

51. POPULAR FRONT [@PopularFront_], '#Myanmar: JStark's FGC-9 3D-Printed Gun Once Again Seen in Combat with PDF Fighters in Sagaing. This Footage Comes from a Recent Attack against Government Troops in the Province. (via @war_noir on Twitter)', *X*, 14 May 2023, https://twitter.com/PopularFront_/status/1657470275422699523.

52. Manuel Nicola Primitivi, 'Anti-Junta Rebels Resort to 3D-Printed Weapons in Myanmar', *Jamestown Foundation Terrorism Monitor* 22, no. 7 (6 May 2024), https://jamestown.org/program/anti-junta-rebels-resort-to-3d-printed-weapons-in-myanmar/.

30    R. DASS

53. Jake Hanrahan [@Jake_Hanrahan], '#Myanmar: Female Fighters of the "People's Defence Forces" Doing Target Practice with 3D-Printed FGC-9 Firearms in Preparation for Battle against the Junta', *X*, 23 March 2024, https://twitter.com/Jake_Hanrahan/status/1771488744257851442; Nicholas [@nicholas6284], 'In Kawlin, Sagaing, Local PDFs (LDFs) Are Now Able to Set up Checkpoints along the Roads. They Are Armed with Craft Produced Rifles and #FGC9. #MyanmarRevolution', *X*, 13 July 2022, https://twitter.com/nicholas6284/status/1547123630009892864.

54. Daphne Wesdorp, 'The Rebel Drone Maker of Myanmar', *Wired*, 29 September 2023, https://www.wired.com/story/the-rebel-drone-maker-of-myanmar/.

55. Zoltán Füredi, 'These Images Have Been Released by the hashtag#Myanmar Military Junta Following a Raid on KNLA (Karen National Liberation Army) and People's Defense Force Positions at a Camp', *LinkedIn*, September 2023, https://www.linkedin.com/posts/activity-7092488231807528962-cCLd/?utm_source=share&utm_medium=member_desktop; Zoltán Füredi, 'On May 31, pro-Government Forces Reportedly Seized a Large Cache of Weapons, Including 3D-Printed Hashtag#firearms, in Bago Region, Dai Oo Township, Mid Khin Village', *LinkedIn*, May 2024, https://www.linkedin.com/posts/activity-7208729535066816512-HjqX/?utm_source=share&utm_medium=member_desktop.

56. *How Myanmar's Rebel Fighters Are Using 3D-Printed Guns to Challenge Military Rulers* (YouTube, 2024), https://www.youtube.com/watch?v=2K1qXxONls4.

57. Ellen E. Mintzer, 'Police: Ghost Guns Found in Herkimer Man's Residence', Utica Observer Dispatch, 6 March 2024, https://www.uticaod.com/story/news/2024/03/06/herkimer-man-charged-with-possession-of-ghost-guns/72866747007/.

58. Michael Mahar, 'HPD: Man Admits to Making Guns with 3-D Printer', *NEWS10 ABC*, 5 March 2024, https://www.news10.com/news/crime/hpd-man-admits-to-making-guns-with-3-d-printer/.

59. van der Meij, '3D-Printed Firearms: State of Play, Challenges and Law Enforcement Approach', 42.

60. 'Halle: Baute Der Killer Seine Waffen Mit Hilfe Eines 3D-Druckers?', Bild, 11 October 2019, https://www.bild.de/regional/sachsen-anhalt/sachsen-anhalt-news/halle-baute-der-killer-seine-waffen-mit-hilfe-eines-3d-druckers-65282360.bild.html.

61. Hyder Abbasi, 'What's behind Far-Right Trend of Using 3D Tech to Make Guns?', *Al Jazeera*, 31 July 2021, https://www.aljazeera.com/news/2021/7/31/what-behind-far-right-trend-using-3d-tech-make-guns.

62. Veilleux-Lepage, 'Printing Terror'.

63. Daniel De Simone and Jeremy Culley, 'Three Men Charged with Planning Attack on Islamic Education Centre', *BBC*, 27 February 2024, https://www.bbc.com/news/uk-68411163.

64. Duncan Gardham, 'Three Men Accused of Preparing "3D-Printed Firearm Attack" on Islamic Centre', *Sky News*, 27 February 2024, https://news.sky.com/story/three-men-charged-with-preparing-act-of-terrorism-after-suspected-extreme-right-wing-activity-13081942.

65. De Simone and Culley, 'Three Men Charged with Planning Attack on Islamic Education Centre'.

66. Finland Police, 'Kaksi esitutkintaa valmistunut liittyen epäiltyihin terrorismirikoksiin', 20 July 2023, https://poliisi.fi/-/kaksi-esitutkintaa-valmistunut-liittyen-epailtyihin-terrorismirikoksiin.

67. Finland Police.

68. Tuomas Rimpiläinen, 'Poliisi:" Rotusotaan" valmistautuvat uusnatsit 3D-tulostivat konepistooleja ja suunnittelivat terrori-iskua ihmisiä ja rautateitä vastaan', *Yle Uutiset*, 20 July 2023, https://yle.fi/a/74-20041782; 'Far-right terror plot suspects printed 3D guns to ignite Finland "race war"', *Konya Aktuel*, 21 July 2023, https://www.konyaaktuel.com.tr/far-right-terror-plot-suspects-printed-3d-guns-to-ignite-finland-race-war/433138/.

69. Finland Police, 'Kaksi esitutkintaa valmistunut liittyen epäiltyihin terrorismirikoksiin'.

70. Daniel Boffey, 'Icelandic Police Arrest Four People over Alleged Terror Attack Plans', *The Guardian*, 22 September 2022, sec. World news, https://www.theguardian.com/world/2022/sep/22/icelandic-police-arrest-four-people-over-alleged-terror-attack-plans; Hemkentokrax von Johanna, 'Neonazi-Gruppe "Knockout 51" hatte Kontakt in die Bundeswehr', *MDR.DE*, 13 October 2023, https://www.mdr.de/nachrichten/thueringen/knockout-neonazi-bundeswehr-waffenlager-100.html; 'Reseda Man Who Expressed Anti-Semitic Hate Sentenced to Federal Prison for Illegally Possessing Ammunition and



Machine Guns' (U.S. Attorney's Office, Central District of California, 19 April 2024), https://www.justice.gov/usao-cdca/pr/reseda-man-who-expressed-anti-semitic-hate-sentenced-federal-prison-illegally; 'Self-Described Member of "Boogaloo Bois" Pleads Guilty to Illegally Possessing a Machine Gun' (United States of America: U.S. Attorney's Office, District of Minnesota, 15 July 2021), https://www.justice.gov/usao-mn/pr/self-described-member-boogaloo-bois-pleads-guilty-illegally-possessing-machine-gun.

71.  Rajan Basra, 'The Future Is Now: The Use of 3D-Printed Guns by Extremists and Terrorists', GNET, 23 June 2022, https://gnet-research.org/2022/06/23/the-future-is-now-the-use-of-3d-printed-guns-by-extremists-and-terrorists/.

72.  Basra.

73.  Basra.

74.  Basra.

75.  Veilleux-Lepage, 'Printing Terror'.

76.  THE WANNABEWONK, 'NYPD Seizes Stockpile of "Ghost Guns", Ammo, and Explosives from Self-Styled Anarchists in Queens', *Militant Wire* (blog), 6 February 2024, https://www.militantwire.com/p/nypd-seizes-stockpile-of-ghost-guns; Patrick Smith, 'New York Brothers Face 130 Charges over Huge Weapons Stash and Celebrity "Hit List"', *NBC News*, 30 January 2024, https://www.nbcnews.com/news/us-news/new-york-brothers-130-charges-weapons-celebrity-hitlist-anarchist-rcna136316.

77.  Bill Parry, 'Long Island City Brothers Indicted Following Seizure of Explosive Devices and Ghost Guns: DA', *Astoria Post*, 29 January 2024, https://astoriapost.com/astoria-brothers-indicted-explosive-devices-ghost-guns-da.

78.  Patrizia Pennella, 'Terrorismo, armi per gli anarchici con la stampante 3D', *Il Messagero*, 24 March 2024, https://www.ilmessaggero.it/abruzzo/pescara_terrorismo_armi_3d_fabbricazione_perquisizione-8014953.html.

79.  Connla Young, 'Concerns That ÓNH Could Have "home Made" 3D Printed Weapons', *The Irish News*, 27 April 2022, https://www.irishnews.com/news/northernirelandnews/2022/04/27/news/concerns-raised-over-o-nh-easter-weapons-display-2653114/.

80.  Allison Morris, 'Masked Men Fire 3D-Printed Weapons in Tribute to Former IRA Prisoner Who Featured in Troubles Doc', *Belfast Telegraph*, 6 February 2024, sec. Northern Ireland, https://www.belfasttelegraph.co.uk/news/northern-ireland/masked-men-fire-3d-printed-weapons-in-tribute-to-former-ira-prisoner-who-featured-in-troubles-doc/a856223016.html.

81.  'Man Found with 3D Printing Firearms Manuals Sentenced for Terrorism Offences' (Metropolitan Police, 22 January 2025), https://news.met.police.uk/news/man-found-with-3d-printing-firearms-manuals-sentenced-for-terrorism-offences-492925.

82.  Olivia Jones and Alastair Lockhart, 'Suspected Islamist Extremist "Caught with Hundreds of Terrorist Files"', *Mail Online*, 19 January 2023, sec. News, https://www.dailymail.co.uk/news/article-11652999/Suspected-Islamist-terrorist-31-appear-court-charged-six-offences.html.

83.  'Man Found with 3D Printing Firearms Manuals Sentenced for Terrorism Offences'.

84.  BBC Monitoring, 'IS Supporter Shares 3D-Printed Gun Manual', 6 August 2024.

85.  'Letter Dated 19 July 2024 from the Chair of the Security Council Committee Pursuant to Resolutions 1267 (1999), 1989 (2011) and 2253 (2015) Concerning Islamic State in Iraq and the Levant (Da'esh), Al-Qaida and Associated Individuals, Groups, Undertakings and Entities Addressed to the President of the Security Council' (United Nations Security Council, 22 July 2024), 23.

86.  Helen Davidson, 'Isis Instructs Followers to Kill Australians and Other "Disbelievers"', *The Guardian*, 23 September 2014, sec. World news, https://www.theguardian.com/world/2014/sep/23/islamic-state-followers-urged-to-launch-attacks-against-australians.

87.  Josh Halliday, 'UK Teenager Sentenced over Far-Right Videos That Inspired US Killers', *The Guardian*, 27 January 2023, sec. UK news, https://www.theguardian.com/uk-news/2023/jan/27/uk-teenager-daniel-harris-sentenced-far-right-videos-us-killers.

88.  David Mercer and Duncan Gardham, 'Daniel Harris: British Teenager Whose Videos Were Linked to Two Mass Murders in US Is Jailed', *Sky News*, 27 January 2023, https://news.sky.com/story/daniel-harris-british-teenage-extremist-whose-videos-were-linked-to-two-mass-murders-in-us-jailed-12795052.

32  R. DASS

89. Halliday, 'UK Teenager Sentenced over Far-Right Videos That Inspired US Killers'.

90. 'Teenage Neo-Nazi Who Planned Suicide Bomb Attack on Synagogue Jailed for Eight Years', *Sky News*, 14 June 2024, https://news.sky.com/story/teenage-neo-nazi-who-planned-suicide-b omb-attack-on-synagogue-jailed-for-eight-years-13152887.

91. 'Fort Bragg Soldier Who Wanted to Remove Minorities Found Guilty of Illegal Short Barrel Rifle', *ABC11*, 27 April 2023, https://abc11.com/fort-bragg-soldier-pleads-guilty-noah-edwin-anth ony-plea-ghost-gun/13189341/.

92. 'Fort Bragg Soldier with Apparent Plot to Remove Racial Minorities from Eastern North Carolina Pleads Guilty to Possessing an Illegal Short Barrel Rifle', United States Attorney's Office, 26 April 2023, https://www.justice.gov/usao-ednc/pr/fort-bragg-soldier-apparent-plot-remove-racial-minorities-eastern-north-carolina.

93. Hays, T., and Jenzen-Jones, 'Desktop Firearms: Emergent Small Arms Craft Production Technologies', 13.

94. Hays, T., and Jenzen-Jones, 14–15.

95. Bureau of Alcohol, Tobacco, Firearms and Explosives, 'National Firearms Commerce and Trafficking Assessment (NFCTA): Part VII Recommendations and Future Enhancements' (U.S. Department of Justice, 1 November 2023), 4, https://www.atf.gov/firearms/docs/report/ nfcta-volume-ii-part-vii-recommendations/download.

96. Bill Hutchinson and Jennifer Vilcarino, 'Machine-Gun Conversion Device Dubbed "Glock Switches" Taking Violence to the "next Level": Experts', *ABC News*, 12 June 2024, https:// abcnews.go.com/US/machine-gun-conversion-device-taking-violence-level-experts/ story?id=110855649; Saeed Ahmed and Joe Hernandez, 'Police Arrest 2 Brothers in Connection with Sacramento's Deadliest Mass Shooting', *NPR*, 5 April 2022, sec. National, https://www.npr. org/2022/04/05/1091010496/sacramento-mass-shooting-arrests-developments-details.

97. Zusha Elinson and Scott Calvert, 'The $50 Device That Turns Handguns Into Automatic Weapons', *The Wall Street Journal*, 17 February 2024, sec. US, https://www.wsj.com/us-news/ illegal-glock-switch-mississippi-shooting-f5471416.

98. Hays, T., and Jenzen-Jones, 'Desktop Firearms: Emergent Small Arms Craft Production Technologies', 45.

99. Rajan Basra, 'Behind the Mask: Uncovering the Extremist Messages of a 3D-Printed Gun Designer' (London: International Centre for the Study of Radicalisation, 2023), 25–26, https://icsr.info/wp-content/uploads/2023/10/ICSR-Report-Behind-the-Mask-Uncovering-the -Extremist-Messages-of-a-3D%E2%80%91Printed-Gun-Designer.pdf.

100. *Plastic Defence: Secret 3D Printed Guns in Europe* (YouTube, 2020), https://www.youtube. com/watch?v=jlB2QV5wVxg.

101. JStark1809, 'FGC-9: Designed by JStark1809' (Deterrence Dispensed, 27 March 2020), 105.

102. Maik Baumgärtner et al., 'Guns from the 3D Printer: The Shadowy, Homemade Weapons Community Just Keeps on Growing', *Der Spiegel*, 12 October 2021, https://www.spiegel.de/ international/world/guns-from-the-3d-printer-the-shadowy-homemade-weapons-communit y-just-keeps-on-growing-a-649578f3-0522-40b4-931c-97d347b0f320.

103. Hays, T., and Jenzen-Jones, 'Desktop Firearms: Emergent Small Arms Craft Production Technologies', 48.

104. Basra, 'Behind the Mask'.

105. Basra, 45.

106. Basra, 3, 26–28.

107. Henry Vaughan, 'Jacob Duygu: Incel Who Mysteriously Died Unmasked as Creator of World's Most Popular 3D-Printed Gun', *Sky News*, 2 November 2023, https://news.sky.com/ story/jacob-duygu-incel-who-mysteriously-died-unmasked-as-creator-of-worlds-most-popul ar-3d-printed-gun-12997178.

108. Vaughan.

109. Basra, 'Behind the Mask', 45.

110. Mack Lamoureux, 'Swedish Police Say They Thwarted Neo-Nazi Bombing and Mass Murder Plot', VICE, 31 May 2022, https://www.vice.com/en/article/sweden-neo-nazi-mass-murder-plot-arrest/; Basra, 'The Future Is Now'.


111. Basra, 'The Future Is Now'.
112. Basra, 'Behind the Mask', 46.
113. Finland Police, 'Kaksi esitutkintaa valmistunut liittyen epäiltyihin terrorismirikoksiin'; Rueben Dass, '3D-Printed Weapons and the Far-Right: The Finnish Accelerationist Cell', GNET, 6 October 2023, https://gnet-research.org/2023/10/06/3d-printed-weapons-and-the-far-right-the-2023-finnish-accelerationist-cell/.
114. Nicolò Miotto, 'The Role of Online Communities in Supporting 3D-Printed Firearms', GNET, 25 August 2021, https://gnet-research.org/2021/08/25/the-role-of-online-communities-in-supporting-3d-printed-firearms/.
115. 'On Open Source in Guncad', DEFCAD, accessed 26 September 2024, https://defcad.com/.
116. DEFCAD, accessed 26 September 2024, https://defcad.com/.
117. 'The Beta Program', The Gatalog, accessed 26 September 2024, https://thegatalog.com/the-beta-program/.
118. 'The Beta Program'.
119. Miotto, 'The Role of Online Communities in Supporting 3D-Printed Firearms'.
120. Hays, T., and Jenzen-Jones, 'Desktop Firearms: Emergent Small Arms Craft Production Technologies', 49.
121. *Untraceable Ghost Guns*.
122. *Untraceable Ghost Guns*.
123. *Untraceable Ghost Guns*.
124. Yannick Veilleux-Lepage and Zoltán Füredi, 'Beyond the FGC-9: How the Urutau Redefines the Global 3D-Printed Firearm Movement', GNET, 8 January 2025, https://gnet-research.org/2025/01/08/beyond-the-fgc-9-how-the-urutau-redefines-the-global-3d-printed-firearm-movement/.
125. *Plastic Defence*.
126. Andy Greenberg, 'I Made an Untraceable AR-15 "Ghost Gun" in My Office—and It Was Easy', WIRED, 3 June 2015, https://www.wired.com/2015/06/i-made-an-untraceable-ar-15-ghost-gun/.
127. Ross Bryant, 'Worlds First 3D-Printed Metal Gun Successfully Fired by Solid Concepts', Dezeen, 8 November 2013, https://www.dezeen.com/2013/11/08/worlds-first-3d-printed-metal-gun-manufactured-by-solid-concepts/.
128. Bryant.
129. Walther, 'Printing Insecurity?', 1437.
130. Hays, T., and Jenzen-Jones, 'Desktop Firearms: Emergent Small Arms Craft Production Technologies', see footnote on page 8.
131. Andy Greenberg, 'This "Ghost Gun" Machine Now Makes Untraceable Metal Handguns', Wired, 1 October 2017, https://www.wired.com/story/ghost-gun-machine-makes-untraceable-handguns/; Andy Greenberg, 'The $1,200 Machine That Lets Anyone Make a Metal Gun at Home', Wired, 1 October 2014, https://www.wired.com/2014/10/cody-wilson-ghost-gunner/.
132. Greenberg, 'I Made an Untraceable AR-15 "Ghost Gun" in My Office—and It Was Easy'.
133. Greenberg.
134. Carter Evans, 'Santa Monica Shooter Built His Own Weapon', *CBS News*, 14 June 2013, https://www.cbsnews.com/news/santa-monica-shooter-built-his-own-weapon/.
135. Damon Arthur, 'Sheriff: Tehama Shooter Built His Own Illegal Guns', *Record Searchlight*, 15 November 2017, https://www.redding.com/story/news/2017/11/15/tehama-shooter-built-his-own-illegal-guns/868737001/; 'Shooting Rampage in California Highlights "Ghost Guns" and Their Dangers', *CBS News*, 16 November 2017, https://www.cbsnews.com/news/ghost-guns-shooting-rancho-tehama-california/.
136. Corey Kilgannon, 'Pistol Taken From Suspect Was a Fully Homemade Weapon, Officials Say', *The New York Times*, 10 December 2024, https://www.nytimes.com/2024/12/10/nyregion/uhc-killing-ghost-gun-3d-printing.html; Thomas Gibbons-Neff and Aric Toler, 'When a Glock Isn't a Glock: The History of the Pistol Found With Luigi Mangione', *The New York Times*, 12 December 2024, https://www.nytimes.com/2024/12/12/us/unitedhealthcare-luigi-mangione-gun.html.
137. Kilgannon, 'Pistol Taken From Suspect Was a Fully Homemade Weapon, Officials Say'.
138. Julia Reinstein and Bill Hutchinson, 'Suspect in UnitedHealthcare CEO Killing Allegedly Boasted of Making Ghost Gun: Sources', *ABC News*, 12 December 2024, https://abcnews.go.com/US/ghost-guns-after-killing-unitedhealthcare-ceo/story?id=116637337.

Case 0:24-cv-01624-WMW-DTS   Document 135-1   Filed 05/25/25   Page 117 of 537
PageID 2459

34  ⊛  R. DASS

139. 'Ukraine's Latest Weapons in Its War with Russia: 3D-Printed Bombs', *The Economist*, 1 August 2023, https://www.economist.com/science-and-technology/2023/08/01/ukraines-latest-weapons-in-its-war-with-russia-3d-printed-bombs.

140. 'Ukraine's Latest Weapons in Its War with Russia'.

141. 'Ukraine's Latest Weapons in Its War with Russia'.

142. M Fergus, '3D Printed Weapons Go To War', *3D PRINTING UK* (blog), 17 May 2022, https://3dprintinguk.com/3d-printed-weapons-go-to-war/.

143. Wesdorp, 'The Rebel Drone Maker of Myanmar'.

144. Wesdorp.

145. Wesdorp.

146. POPULAR FRONT [@PopularFront_], '#Myanmar: The KNDF Has Released Footage Showing the Successful Testing of a New Fixed-Wing Drone Dubbed the Liberator MK2. Anti-Junta Militias Such as the KNDF Have Made Great Use of Drones in Both Reconnaissance and Attack Roles, Often Using Improvised Components', *X*, 22 July 2023, https://twitter.com/PopularFront_/status/1682541432588980226.

147. Robert Tollast, 'Militias in Syria Show Chilling Future of Guerrilla War with 3D Printed Drones and Night-Vision Units', *The National*, 4 December 2024, https://www.thenationalnews.com/news/mena/2024/12/04/syria-militants-drones-war/.

148. Rueben Dass, 'Hayat Tahrir Al-Sham's Drone Force', Lawfare, 13 December 2024, https://www.lawfaremedia.org/article/hayat-tahrir-al-sham-s-drone-force.

149. Michael Horton, 'Looking West: The Houthis' Expanding Footprint in the Horn of Africa', *CTC Sentinel* 17, no. 11 (December 2024), https://ctc.westpoint.edu/looking-west-the-houthis-expanding-footprint-in-the-horn-of-africa/. Refer footnote f.

150. Rueben Dass, '3D-Printing in Conflict Zones: A Game-Changer?', GNET, 14 October 2024, https://gnet-research.org/2024/10/14/3d-printing-in-conflict-zones-a-game-changer/.

151. Audrey Decker, 'Air Force's Mideast Drone Experiments May Feed Replicator Effort', Defense One, 5 October 2023, https://www.defenseone.com/technology/2023/10/air-forces-mideast-drone-experiments-may-feed-replicator-effort/390980/; Audrey Decker, 'Air Force Tests AI-Designed, 3D-Printed Drones', Defense One, 10 June 2024, https://www.defenseone.com/technology/2024/06/air-forces-mideast-drone-unit-eyes-stateside-element/397257/.

152. Inder Singh Bisht, 'UK Trialed 3D-Printed "Suicide" Drones Under Secret Ukraine Program', *The Defense Post*, 22 February 2023, https://thedefensepost.com/2023/02/22/uk-3d-printed-drones/; Thomas Newdick, 'Clandestine U.K. Program Developed 3D-Printed "Suicide" Drone For Ukraine', The War Zone, 16 February 2023, https://www.twz.com/clandestine-u-k-program-developed-3d-printed-suicide-drone-for-ukraine.

153. 'Printing Insecurity: Tackling the Threat of 3D Printed Guns in Europe', Europol, 2022, https://www.europol.europa.eu/media-press/newsroom/news/printing-insecurity-tackling-threat-of-3d-printed-guns-in-europe.

154. Kecia Lynn, 'Danish Company Creates 3D Printer Gun-Blocking Software', *Big Think* (blog), 27 June 2013, https://bigthink.com/technology-innovation/danish-company-creates-3d-printer-gun-blocking-software/; Grace Wyler, 'New Software Will Prevent You From Accidentally Printing a Gun', VICE, 3 July 2013, https://www.vice.com/en/article/new-software-will-prevent-you-from-accidentally-printing-a-gun/.

155. '3D & 4D Printing' (France: INTERPOL Global Complex for Innovation, September 2018), 6.

156. Navene Elangovan, 'Parliament Enacts New Law to Keep 3D-Printed Guns off the Streets, Better Regulate Weapons', *TODAY*, 5 January 2021, https://www.todayonline.com/singapore/parliament-enacts-new-law-keep-3d-printed-guns-streets-better-regulate-weapons.

157. Rajeev Syal, 'NCA Calls for Possession of 3D-Printed Gun Blueprints to Be Made Illegal', *The Guardian*, 31 October 2023, sec. World news, https://www.theguardian.com/world/2023/oct/31/nca-calls-for-possession-of-3d-printed-gun-blueprints-to-be-made.

158. 'Legislation - 3D Blueprints', South Australia Police (South Australia Police), accessed 27 September 2024, https://www.police.sa.gov.au/services-and-events/firearms-and-weapons/consultation-3d-blueprints.


159.  'Parliamentary Committee Notes: Ghost Guns and Illegal Manufacturing in Canada', Government of Canada, 24 January 2024, https://www.publicsafety.gc.ca/cnt/trnsprnc/brfng-mtrls/prlmntry-bndrs/20240220/13-en.aspx.

## Disclosure Statement

No potential conflict of interest was reported by the author(s).

Ex. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION



# MoneyFlow

# Detailed Investigation Report

**Report generated:** August 19, 2025

Bitquery — Built on Coinpath® Technology

 **MoneyFlow**

# Cody Wilson
# Investigation Report

| Blockchain | Bitcoin |
|---|---|
| **Initial Wallet Address** | • xpub6DJSJxrFxtXCAXc5pNFPo1cuwftMUipaGmGY1jYVtSZediQkZqg ftYzvXNwBp7AnjdGdN9aRu42buGFrueZehhvmAJx8381NL4A1zEMu F6j<br>• zpub6rrzTbLJRQFvmvQpMB91y7fSgA4jfVxVAHitEzgEESQ39Leho4LF QXcvZCyHAfGuee7mQE3HYFh9ej2TwJdFM8eZsMGxorQnwzFXQb7 s4YA |
| **Attachment** | <u>Full Transaction Spreadsheet</u> |

**Case Summary:**

Analysis of the associated Bitcoin addresses and their transactions indicates that these wallets are not operating independently but instead form part of a broader transaction pattern consistent with a **peel chain** - a laundering typology commonly observed in Bitcoin activity.

In this pattern, a large incoming amount is received into a wallet. Within the same block, the funds are redistributed across two outputs:

- A **small "peeled" portion** (often a fraction of a Bitcoin, in this case around $500 worth) directed to an address associated with the provided xpub keys.
- The **majority of the funds** forwarded to a new address, continuing the chain.

This process repeats consistently across multiple transactions, with the same structural behavior: **large input → two outputs → small peel-off + large continuation**. The repetition, speed (transactions within the same block), and automated structure strongly indicate that these wallets are being used as part of a laundering mechanism, breaking down large balances into smaller transfers to obscure origin and flow.

The presence of the client's address within this chain suggests that it is one of the recipient endpoints for peeled-off funds. This provides evidence of interaction with a high-volume laundering flow rather than organic peer-to-peer transactions.

The report on movement of funds that you obtained is provided for informative purposes only and should not be construed as a guarantee of successful funds recovery. Please note that it does not constitute legal, financial or any other advice

We strongly recommend that you consult with a qualified attorney for guidance on your specific matter. Bitquery provides consulting and investigation services. Any recommendations made by Bitquery should not be considered legal advice.

 **MoneyFlow** | Bitquery, Inc.<br><u>investigations@bitquery.io</u> | Cody Wilson - Investigation Report<br>19 August 2025

Case 6:24-cv-01629-WWB-LHP    Document 138-1    Filed 09/23/25    Page 121 of 537
PageID 2463



## Methodology

**Blockchain Tracing:**

This investigation employed **Coinpath** technology and manual verification to analyze blockchain transactions and trace fund flow. **Coinpath** provided automated tracking across wallets, while manual checks confirmed intermediary wallets and final destinations.

## Investigation Findings

**Flow of Funds Analysis:**

The analysis focused on transactions from the beginning of 2025 involving the aforementioned xpub and zpub keys. Key transactions include:

**xpub6DJS...EMuF6j:**

- b489e75862386f4a261a6870fa0c3f08d94ca21d2e21869711628ca25b948402
- 6644af95a5a52c849269865627e491adcc2e4faf3398c14ea333f5fe7ba30ded
- d308d5747c836c1feb002484f3ec3d4c3c62b5851f7055d6220bc4bbed73c5b7
- d3ff49ef280e482f0fd03eb03593049cf2079436a53c739088b480eba6a7d079
- dc5f2bdcbfbdfc905bfea18bf8ce784411002d80522e774c5bb8aa0797cb61a7
- 07f13ba559a151429ef55fcc95bed66c09348196c71123b82634fd37a4f9c21e
- 1277c4ccd7cbdf7bab72f6d63de9805ec54bf082df9ae4c37ad8f8b19ba110d1
- aedf82a6c397125d9970350d0d9b3fdf56dce850f6c995a49e136bc729a5b98f
- 50a372c36dae48bf855dc6ea39153685b463986d70563ab1cc3881d9dcda2d59
- 160a42a3a6ff31d7b6e7d4756e243b3bd33173182b47f0a06d80d93170bda209
- 0458a88748fb0d7f236cf07dfc5a0ac3d7477c6d5b4191fab44e723ebae8d7de
- ff7c7dd04358ae69125fbe6c807a373c6bc07938896390d0cead2e72b0bb378f
- 28bcf30ad0a8010e2d4e527375c6f66cce9e270fb4ad7f4cab299c1ea294ed89
- a7e84f437207696d281e203018e5d6313a14f8a499a6ca6077c6088b27b77ee2
- 3cdda1bc4677309051fe2598a4d751cb00c4249d9b8707485171dc3f5afb961f

**zpub6rr...7s4YA:**

- 65e26979bc5d919b4415c2b62e024aa9e96eeee5ffcea59f6f9b6eb01f1c2441
- ca0b4e2761fcc236fc9d89cddfa969e379d108980d32965a532613830f5cbb5a
- d213a6b5c1f85adcfc4442bd96500b1eb99fd09366c69170024a6a69dd846166
- f99675cdfe194ab3786376e0b5455da4de2768d3be0dede1c0a88b29e8bb9c2d
- 4cc848f154a741a83f6ba79c01f3126f00caa32a134e602f51cdbc178b2caa24
- d6d0bb92c7d34becf6733b7ffb4a034fea55a49475b980203357abe32b34506b
- a749e4f44314944c6164212525d59f13bee3e7846b78608e839643be0790aa36
- fff70b3c161ef5531d75021225e27e549e501428d558f32d054c6a3799ac1ffc
- f66bb4e879ecde9184481bc34c5fec668e795dae7fe996b5a47abd0ee820d37d
- 8df049eb3d79dbe13030da8788ed223e9cce48ccff99a6f112dc656961c1b448
- 6b5f69d1f988a97995f0fc5b0a42e3385d86fd2e83930595ddab7471b37874ca
- E0b8241b4fd97bcebbe4827a0db0ad3161de54a4882ac90a9fb46f2cdbf6920d



 MoneyFlow

Ex. A COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

Most of these transactions exhibit patterns consistent with peel chains: typically 1 input → 2 outputs, where a small portion ("peel") is sent to an address associated with the xpub key and the majority is forwarded to a continuation address. In some cases, multiple outputs are aggregated into 2 outputs with disproportionate values, where the smaller represents the peel portion and the larger the consolidated continuation— functioning as a post-peel consolidation step. This recurring pattern across transactions indicates automated or coordinated distribution, consistent with money-laundering typologies designed to obscure origin and flow of funds.

Further analysis shows that some funds transacted through **xpub6DJS** can be traced to **Kraken** Exchange. These participated in a large consolidation transaction (<u>3806508c41c725e9c9b4fb70520de111a2a445ff4c10f0703aca630638b1f50e</u>) aggregating over 1,000 inputs—consistent with previously peeled outputs—before a 5 BTC transfer was made to Kraken. This sequence—peel → consolidation → exchange deposit—aligns with obfuscation-driven cash-out behavior.

For **zpub6rr**, traced funds show similar behavior. Following small peel-offs, a consolidation transaction was observed one hop later (<u>8df049eb3d79dbe13030da8788ed223e9cce48ccff99a6f112dc656961c1b448</u>), after which the funds were transferred to wallets attributed to the **Paxos** infrastructure provider. This mirrors the laundering flow identified elsewhere: fragmented peel-offs, rapid consolidation, and transfer into custodial infrastructure.

### Incoming Fund FLows:

Analysis of the inbound flow into the identified **xpub6DJS** and **zpub6rr** addresses indicates that the majority of transactions form part of a peel-chain structure, making clear attribution difficult.

However, address **1QDhKAKmqqbakd6xPkcH5XuwqV3b1wqgro** was identified as a recurring participant within the activity. This wallet has been active for over five years, has had direct transactional links with Coinbase, and most recently, on 6 August 2025, received additional inbound funds originating from the observed peel chain.

The repeated interactions between this wallet and addresses tied to the client-provided xpub6DJS and zpub6rr keys suggest that the same operator has likely been responsible for this activity over an extended period, with a consistent operational pattern persisting for more than five years.



## Contacting Exchanges for Additional Information

To request further information from the exchanges involved, please provide the transaction hashes mentioned above and follow their **Law Enforcement Request** for Information guidelines:

| Entity | Contact Details |
|---|---|
| Paxos | subpoenas@paxos.com |
| Kraken | Link |
| Coinbase | Link |

Given the complexity of the funds' flow and the involvement of centralized exchanges, further collaboration with local Law Enforcement and relevant parties is encouraged. The attached spreadsheet provides additional details on the transaction trail for a comprehensive understanding of the case.

Bitquery is committed to provide any further assistance required to process this investigation further. Please do not hesitate to get in touch with us at investigations@bitquery.io

DISCLAIMER: DUE TO THE NATURE OF THE DATA ANALYZED AND INFORMATION PROVIDED, YOU AGREE THAT BITQUERY IS NOT LIABLE FOR ANY USE OF THE REPORT.

Case 6:24-cv-00629-WWB-LHP Document 38-1 Filed 09/23/25 Page 124 of 537 PageID 2466



# MoneyFlow

# Detailed Investigation Report

**Report generated:** June 26, 2025



# Cody Wilson
# Investigation Report

| | |
|---|---|
| **Blockchain** | Bitcoin |
| **Amount** | 2.279 BTC Inflow<br>2.187 BTC Outflow |
| **Initial Wallet Address** | <ul><li>bc1qzr6nvtc56seu47pc5hm7tz4w7562a2nktfh0ww</li><li>zpub6oRgtF8MfMxEbgYgGSsDv1s7MCZWFMrLNMnQeKTs8pqMdBf p3nZD7fdcJC7ZbHdf3m47aVe3tLgHt5eMkYXnJDiZJ86NcrmoaK6g wBVMYVw</li><li>zpub6rrzTbLJRQFvmvQpMB91y7fSgA4jfVxVAHitEzgEESQ39Leho4LF QXcvZCyHAfGuee7mQE3HYFh9ej2TwJdFM8eZsMGxorQnwzFXQb7 s4YA</li><li>xpub68hPP3wRixweokE9sVvsw7WkxWHKwmEPByx93dagUvuW4H EbfLV491e586fKqC6w7mFhf2NryUTXJWZF1JQbnJ7sQkKHWtSySMV K3ebuJ36</li><li>xpub6DJSJxrFxtXCAXc5pNFPo1cuwftMUipaGmGY1jYVtSZediQkZqg ftYzvXNwBp7AnjdGdN9aRu42buGFrueZehhvmAJx8381NL4A1zEMu F6j</li></ul> |
| **Attachment** | Full Transaction Spreadsheet |

**Case Summary:**

This investigation aims to trace cryptocurrency transactions from the specified wallet addresses, focusing on the flow of assets to centralized cryptocurrency exchanges and service providers. Our analysis revealed that approximately **2.187 BTC** was involved, with **1.150 BTC** (about **53%** of the total) successfully traced to various exchanges and service providers.

The report provides evidence linking the origin wallets to exchanges and outlines potential methods through which the proceeds may have been converted into fiat currency.

The report on movement of funds that you obtained is provided for informative purposes only and should not be construed as a guarantee of successful funds recovery. Please note that it does not constitute legal, financial or any other advice

We strongly recommend that you consult with a qualified attorney for guidance on your specific matter. Bitquery provides consulting and investigation services. Any recommendations made by Bitquery should not be considered legal advice.

 MoneyFlow

## Methodology

**Blockchain Tracing:**

This investigation employed **Coinpath** technology and manual verification to analyze blockchain transactions and trace fund flow. **Coinpath** provided automated tracking across wallets, while manual checks confirmed intermediary wallets and final destinations.

The attached spreadsheet details the transaction trail, including transaction hashes, amounts, and address labels.

Using a **First-In, First-Out** (FIFO) approach allowed us to maintain transaction order and trace the path of funds, especially for wallets with multiple transfers. All findings were cross-referenced with public ledger data for accuracy and transparency.

## Investigation Findings

**Fund Tracing and Final Destinations:**

The table below summarizes the exchange entities identified in this investigation, along with the amounts of proceeds they have received from the traced transactions. This information provides an overview of the funds distribution across centralized exchanges and supports further steps in recovering or freezing assets.

| Centralized Exchange | Amount Received | Wallet |
|---|---|---|
| Binance | 0.6858769925 BTC | xpub68h<br>xpub6DJS<br>zpub6o<br>bc1qzr6nvtc5 |
| Paxos | 0.423475313 BTC | zpub6rr |
| Bitfinex | 0.02687101198 BTC | xpub6DJS |
| OKX | 0.01337266862 BTC | xpub6DJS |
| **SUM** | **1.149595986 BTC** | |

MoneyFlow

Bitquery, Inc.
investigations@bitquery.io

Cody Wilson - Investigation Report
26 June 2025

A-126



The full transaction breakdown is available in the attached spreadsheet; however, the most relevant transaction hashes are listed below:

### Paxos
Key deposit transactions with the highest amounts are highlighted below:
- ec6f5d2516d2a5fafa0e3bdf660ba26a35065fb49658bf20c943cf321f4c3a08
- e1224aed46fa7189ac8c5165f1a4ffad14c4fbcebc00a5c7ac44f662110a3656
- 46603b53fae7fdf53d88c42c1797b9cd94f8391b8e1d7ee1b8ab401c16405720

### Binance
Key deposit transactions with the highest amounts are highlighted below:
- 1987ecf0df96680f144dff7fde2ac30d760d81f8be4181c80b27b2fe6c53beba
- f7f8bdabc5e493b6eba539f61aa54154866dae3c8e342ae06f884a893b99fc83
- c45b70a1a4756aea1484a7a3b2d7e9f29772b1c348b7dd004b671823fe43a8d7

### Bitfinex
Key deposit transactions with the highest amounts are highlighted below:
- 073cb6783775335d1b8326364fa60517bc695a4244cc669bae3a3e988b2b9587
- a4ee2a0805a6725cc02adf74e193757109719bbaa2a9af096cd12ac784c3f207
- 94ad3543e556a13cc3d2975922cf8fed07074bfb7f89bfb50728ef32161119fe

### OKX
Key deposit transactions with the highest amounts are highlighted below:
- 559cba4d62280931589a5f05361eb7beb8053db7e58f8f2bce127953dc239f38
- 7531987d4ca95e05540380b6046dd4445f2ef3d0565798e358163ccd94fe84bf
- 322520fe720947c1d2db2e0e0dce95ad055fe31eb88b2b45ad7641afead9a089

In summary, the transaction hashes listed above represent key movements of the funds involved in this incident to various exchanges. By addressing these specific transactions, we can prioritize recovery efforts and gather additional insights into potential connections and counterparties involved.

For further action, the next step is to reach out to the involved exchanges to initiate formal inquiries. Instructions for contacting each exchange, along with recommended communication templates, are provided further below.



# Investigation Findings

## Tracing the Roots: Uncovering the Source of Funds

The table below summarizes the origin entities identified in this investigation, along with the amounts contributed through traced transactions. A significant portion of the funds originates from a cluster of addresses showing transaction patterns consistent with CoinJoin—a privacy technique that mixes funds from multiple users to obscure individual inputs and outputs. Several origin wallets participated in CoinJoin transactions, adding complexity to our tracing efforts. We also tracked over 3,000 inbound hops from these wallets, revealing smaller yet identifiable traces attributed to known entities.

| Centralized Exchange | Amount Sent |
|---|---|
| Prime Trust Custody | 0.00450085 BTC |
| Gemini | 0.00378559 BTC |
| Binance | 0.00666699 BTC |
| Kraken | 0.00005371 BTC |
| **SUM** | **0.01500714 BTC** |

### Prime Trust Custody
Key withdrawal transactions with the highest amounts are highlighted below:
- 8263ff4177a3824c0ec2574826eafd6570dec6604c4c7a74f3e4830d0418ed71
- aef2716b4c74ad10eb44583c397c3296433fa7c559d8166fdb47def1c32f1942
- bda959fb02840b71731fb89a3b01a33c4cb1a440f53c5b0e5a91985f6f770838

### Gemini
Key withdrawal transaction with the highest amount is highlighted below:
- bba40ea20dde0d1817b39829ccd7a5af4eb818ce0d94efa116f33c6db3bc999e

### Binance
Key withdrawal transaction with the highest amount is highlighted below:
- 2aa115ccad7637c7254088b60c2182f1120737c669a8e96017c375faec6f4cff

### Kraken
Key withdrawal transaction with the highest amount is highlighted below:
- 0b1a49f8737830fa6aa483b5def8ed1eb56383fe9451bdb6f609275afc1f5661



# Contacting Exchanges for Additional Information

To request further information from the exchanges involved, please provide the transaction hashes mentioned above and follow their **Law Enforcement Request** for Information guidelines:

| Entity | Contact Details |
| --- | --- |
| Binance | Link |
| Paxos | subpoenas@paxos.com |
| Bitfinex | Link |
| OKX | Link |
| Gemini | Link |
| Kraken | Link |

Given the complexity of the funds' flow and the involvement of centralized exchanges, further collaboration with local Law Enforcement and relevant parties is encouraged. The attached spreadsheet provides additional details on the transaction trail for a comprehensive understanding of the case.

Bitquery is committed to provide any further assistance required to process this investigation further. Please do not hesitate to get in touch with us at investigations@bitquery.io

DISCLAIMER: DUE TO THE NATURE OF THE DATA ANALYZED AND INFORMATION PROVIDED, YOU AGREE THAT BITQUERY IS NOT LIABLE FOR ANY USE OF THE REPORT.

MoneyFlow | Bitquery, Inc.
investigations@bitquery.io | Cody Wilson - Investigation Report
26 June 2025

A-129

Case 2:24-cv-01049-JNW-LHP Document 23-1 Filed 09/28/23 Page 130 of 537
PageID 2472
Case 1:21-cv-08704-PGG-RWL Document 187 Filed 09/29/23 Page 1 of 38

Ex. A - COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
|  | : |  |
| EVERYTOWN FOR GUN SAFETY ACTION FUND, INC., | : |  |
|  | : | Civil Action No. 21-cv-08704-PGG |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
| DEFCAD, INC.; ODYSEE USER XYEEZYSZN; DEFCAD USER XYEEZYSZN; ODYSEE USER THEGATALOG-PRINTABLEMAGAZINES; THE GATALOG; DEFCAD USER FREEMAN1337; TWITTER USER XYEEZYSZN; PHILLIP ROYSTER. | : | **DECLARATION OF ERIN GALLOWAY IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND REFUTING CERTAIN STATEMENTS MADE IN DEFENDANTS' DECLARATIONS** |
| Defendants. | : |  |
|  | : |  |

Case 6:24-cv-01063-WWB-LHP  Document 128-1  Filed 04/23/25  Page 131 of 537
PageID 2473
Case 1:21-cv-08704-PGG-RWL  Document 187  Filed 07/29/22  Page 2 of 38

EX. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

**TABLE OF CONTENTS**

I.     False and Misleading Statements Made by Alexander Holladay ................................ 1

II.    False and Misleading Statements Made by Defendant Defcad User
       Freeman1337 ......................................................................................................... 19

III.   Misleading Statements Made by Phillip Royster (owner of the
       accounts Twitter User xYeezyszn, Odysee User xYeezyszn, and
       Defcad User xYeezyszn) ....................................................................................... 23

IV.    False and Misleading Statements Made by Garret Walliman ................................... 29

V.     False and Misleading Statements Made by Cody Wilson ......................................... 33

I, Erin Galloway, declare as follows:

      1.      I am a paralegal at Venable LLP, counsel for Plaintiff Everytown for Gun Safety

Action Fund, Inc. ("Everytown"), I am a resident of North Carolina, over eighteen years old and

competent to testify to the facts in this declaration based on my personal knowledge.

      2.      I have reviewed the declarations submitted in support of Defendants' Motion to

Dismiss and submit this declaration to rebut certain statements made in the declarations of (i)

Alexander Holladay (related to Defendant The Gatalog); (ii) Defcad User Freeman1337; (iii)

Phillip Royster the owner of Defendants Odysee User xYeezySZN, Defcad User xYeezySZN,

and Twitter User xYeezySZN; (iv) Garrett Walliman, Lead Software Developer for Defense

Distributed, Inc.[1]; and (v) Cody Wilson, President of Defendant Defcad, Inc.

## I.      <u>False and Misleading Statements Made by Alexander Holladay</u>

      3.      Mr. Holladay is an individual who admits that he owns the domain

www.thegatalog.com ("Gatalog Website"), named in this action as Defendant The Gatalog. *See*

Declaration of The Gatalog (hereinafter "Gatalog Decl."), ¶ 3.

      4.      The Gatalog has promoted and offered one of the Infringing Products, namely the

"Everytown 3D Printable AR15 22lr Magazine" via an affiliated account TheGatalog-

PrintableMagazines on Odysee.com, a Defendant in this action[2]. Users can access many of the

---

[1] Defendant Defcad, Inc.'s parent company.

[22] Odysee User The Gatalog-Printablemagazines is a named Defendant in this action and has not appeared through counsel yet and thus is in default, therefore it is particularly misleading for Mr. Holladay to omit the many and varied connections between The Gatalog, Odysee User The Gatalog-Printablemagazines, and "Ivan The Troll" as described in paragraphs 15-30, 36-63 within this declaration.

Case 1:24-cv-01423-RWL-LHP Document 1283-1 Filed 09/28/25 Page 133 of 537
PageID 2475
Case 1:21-cv-08704-PGG-RWL Document 187 Filed 09/29/23 Page 4 of 38

Infringing Products on TheGatalog-PrintableMagazines page through a link provided on the homepage of the Gatalog Website.

5.      The Gatalog Website also promotes and advertises the Infringing Product named "Everytown 3D Printable AR15 22lr Magazine" through links to the website www.ctrlpew.com ("CTRL+Pew"), a website that is also owned and operated by Mr. Holladay, although he makes no mention of CTRL+Pew whatsoever in his declaration.

***In Paragraph 5 Holladay Falsely States the Gatalog Website Is a Mere "Index"; Falsely Implies the Gatalog Website is Passive When it is Interactive; Falsely States that the Gatalog Website Links to Accounts Holladay Doesn't Own or Operate; Misleadingly Omits that the Links on the Gatalog Website Homepage Take Users to Nine Gatalog-owned Odysee Accounts; and Omits that Holladay is an Officer at "The Gatalog Foundation, Inc."***

6.      Mr. Holladay states in paragraph 5 that: [m]y web domain, TheGatalog.com, hosts a website which serves as an index with links to various accounts owned by other people that host 3-D printable firearm parts related computer files." Gatalog Decl. ¶ 5.

7.      This statement is false because on its face the Gatalog Website does not just "serve as an index" to various other accounts.

8.      When a user accesses the Gatalog Website, a user has the option to correspond with the website through a page entitled "Submit Your Files." The "Submit Your Files" page allows users to submit their name, email, and the name of their design project among other information.

9.      The "Submit Your Files" page also states: "Submit your files below and our team will contact you regarding its publishing." Thus, the Gatalog Website is not merely a passive website serving as an "index" to files on other accounts (such as the Infringing Products), but rather is directly involved with the publication and distribution of those files. A true and correct copy of the "Submit Your Files" page on the Gatalog Website is attached as **Exhibit 1**.

2

EX. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

Case 6:24-cv-01648-JSS-LHP    Document 128-1    Filed 04/28/25    Page 134 of 537
PageID 2476
Case 1:21-cv-08704-PGG-RWL    Document 187    Filed 07/29/23    Page 5 of 38

10.     Mr. Holladay's statement that the Gatalog Website "links to various accounts owned by other people" is also false.

11.     The Gatalog Website directly links to another website Mr. Holladay owns and operates called Ctrl+Pew.

12.     Mr. Holladay's publicly available LinkedIn page identifies him as the "Owner at CTRLPew." A true and correct copy of Mr. Holladay's LinkedIn listing is attached as **Exhibit 2**.

13.     Ctrl+Pew advertises and promotes the Infringing Products, provides links to the Infringing Products, and solicits donations to another Defendant, Defcad User Freeman1337 by advertising that Freeman is the "[c]reator of the Everytown Mag," one of the Infringing Products.

14.     Mr. Holladay's statement "[m]y web domain, TheGatalog.com" is also misleading as he fails to admit or acknowledge that Defendant The Gatalog is owned and operated by not just him alone.

15.     Publicly available incorporation documents with the State of Florida demonstrate that Mr. Holladay is an officer/director of the "Gatalog Foundation, Inc." The Articles of Incorporation and 2022 Annual Report for the Gatalog Foundation, Inc. are included in **Exhibit 3**. Two additional individuals, Mr. Matthew Larosiere, and Mr. John Elik, are also listed as officers and/or directors of the Gatalog Foundation, Inc.

16.     Everytown believes that Matthew Larosiere and John Elik are also involved with Defendant The Gatalog and Mr. Holladay's actions in this case due to Defendant The Gatalog's response to Everytown's takedown notice submitted to Odysee.com on August 24, 2021 pertaining to Everytown's request that Odysee take down the Infringing Product from its website.

3

Ex 2 A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION
Case 6:24-cv-01649-WWB-LHP   Document 128-1   Filed 04/29/25   Page 135 of 537
PageID 2477
Case 1:21-cv-08704-PGG-RWL   Document 187   Filed 07/29/22   Page 6 of 38

17.     In response to Everytown's takedown notice, on August 31, 2021, Matthew Larosiere submitted a counternotice stating "**this office has the pleasure of representing The Gatalog, Gatalog Foundation, et al in all matters relating to intellectual property" and that "this office acts on behalf of the Gatalog and its members."** A true and correct copy of the takedown notice and response submitted to Odysee.com is attached as **Exhibit 4**.

18.     Accordingly, Everytown believes that the entity the Gatalog Foundation, Inc., Matthew Larosiere, and an individual known named John Elik are also involved with operating the Gatalog Website in addition to Mr. Holladay as Mr. Larosiere is an officer/director of the Gatalog Foundation, and he submitted a response to Everytown's takedown request concerning the Infringing Products on behalf of "The Gatalog" and "Gatalog Foundation".

19.     Mr. Holladay's statement in paragraph 5 that the Gatalog Website "links to various accounts owned by other people" is misleading because it claims that the odysee.com user accounts linked to from the Gatalog Website homepage are not owned, operated and/or affiliated with Mr. Holladay and Defendant The Gatalog, when the takedown notice response filed by Mr. Larosiere (**Exhibit 4**), and the expedited discovery received from Odysee.com demonstrate otherwise.

20.     The homepage of the Gatalog Website provides direct links to nine accounts on odysee.com. A true and correct copy of the homepage of the Gatalog Website is attached as **Exhibit 5**, and is depicted within the screenshot below. The nine links to Odysee.com are identified within the red box.

4



21.     When a user clicks on one of the nine links listed on the homepage, they are redirected to a corresponding account on odysee.com related to "thegatalog" ("hereinafter "Gatalog Odysee Accounts"). For example, when a user clicks on "3D Printable Magazines" on the Gatalog Website one is redirected to a corresponding account on odysee.com entitled "TheGatalog-PrintableMagazines."

22.     A screenshot of the Odysee.com page for "TheGatalog-PrintableMagazines" linked to by the "3D Printable Magazines" link on the Gatalog Website is depicted below.

5



23.     All nine Gatalog Odysee Accounts contain usernames incorporating the term
"thegatalog" such as "TheGatalog-printableframesReceivers", "TheGatalog-
PrintableMagazines", and "TheGatalog-accessories".

24.     The Gatalog Website does not link to any odysee.com accounts other than the
nine Gatalog Odysee Accounts. True and correct copies of the "content" pages for the nine
Gatalog Odysee Accounts are attached as **Exhibit 6**.

25.     As demonstrated in **Exhibit 6**, all nine Gatalog Odysee Accounts use the same
"Gatalog" logo in their account profiles as is depicted on the Gatalog Website.

26.     Expedited discovery from third party Odysee.com did not identify the actual name
of the owner/operator Defendant Odysee User thegatalog-printablemagazines, but provided the
same email address, ivanthetroll@protonmail.com for all nine Gatalog Odysee Accounts linked
to from the homepage of the Gatalog Website. The email ivanthetroll@protonmail.com is
associated with an individual known as "Ivan" or "Ivan the Troll".

6

Case 0:24-cv-01363-JWB-LHF Document 12-1 Filed 09/29/23 Page 138 of 537
PageID 2480
Case 1:21-cv-08704-PGG-RWL Document 187 Filed 09/29/23 Page 9 of 38

Ex 2A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

27.     In addition, the same email address, ivanthetroll@protonmail.com, which was used to register the nine Gatalog Odysee Accounts, was used to correspond with a representative from Odysee.com (tom@lbry.com) pertaining to Everytown's takedown notice regarding Infringing Products listed by Defendant Odysee User THEGATALOG-PRINTABLEMAGAZINES.

28.     Within the correspondence between Ivan the Troll and Odyssee, the operator of the email address ivanthetroll@protonmail.com states: "I'll forward [the takedown request] to our lawyer. I suspect the plan will be for us to contest the claim then." The use of the term "our lawyer" indicates that the operator of email ivanthetroll@protonmail.com and the Gatalog Odysee Accounts is not acting alone, but in concert with other individuals.

29.     Later in the conversation, the operator of the email address ivanthetroll@protonmail.com appears to be speaking on behalf of "Thegatalog-printablemagazines" when he states: "What was their email about specifically (if you can share that info)? Matt is curious," in response to an email sent by Everytown to Odysee.com pertaining to removing the Infringing Products listed on Odysee in connection with Defendant Odysee User THEGATALOG-PRINTABLEMAGAZINES.

30.     Accordingly, the correspondence with Odysee.com from email address ivanthetroll@protonmail.com, and the takedown notice submitted by Matthew Larosiere in connection with Defendant Odysee User THEGATALOG-PRINTABLEMAGAZINES, along with the publicly filed entity information related to the Gatalog Foundation, Inc. demonstrate that Mr. Holladay's statement in paragraph 5 that the Gatalog Website links "to various accounts owned by other people" is misleading because (1) the Gatalog Odysee Account Defendant Odysee User THEGATALOG-PRINTABLEMAGAZINES is owned/affiliated with Defendant

7

Case 3:24-cv-01424-VWE-LHP   Document 1261   Filed 09/29/25   Page 139 of 537
PageID 2481
Case 1:21-cv-08704-PGG-RWL   Document 187   Filed 09/29/23   Page 10 of 38

The Gatalog and Mr. Holladay; and (2) Mr. Holladay does not solely operate Defendant The

Gatalog, but appears to act in with others in a coordinated fashion.

***Paragraph 6 is Misleading Because Holladay Omits the Meaning of "Gatalog" and Omits that Others in Fact do not Use the Term***

31.     Mr. Holladay states in paragraph 6 that: "[t]he word 'Gatalog' is a term shared by

a community of thousands of on-line persons who share an interest in 3-D printable firearm

related computer files. I do not own any proprietary interest in the word. Anyone can use the

word in their on-line presence, and many people do. I have no ownership or control over the

activities of those people."  Gatalog Decl. ¶ 6.

32.     Mr. Holladay's statement in paragraph 6 is misleading because he does not define

what "gatalog" means. "Gatalog" accounting to www.urbandictionary.com means "a catalog of

firearms." A true and correct copy of the www.urbandictionary.com results for "gatalog" is

attached as **Exhibit 7**.

33.      Mr. Holladay claims to own the Gatalog Website owned by Defendant The

Gatalog, and Mr. Holladay operates and/or is affiliated with the Gatalog Odysee Accounts linked

to by the Gatalog Website as described above.

34.     I conducted a search on Odysee.com for "the gatalog" and it produced dozens of

hits, relating to the nine Gatalog Odysee Accounts linked to by the Gatalog Website.  The search

produced zero hits to accounts other than those nine Gatalog Odysee Accounts. The odysee.com

search results for "the gatalog" are attached hereto as **Exhibit 8**.

8

Case 8:24-cv-01014-WWB-LHP   Document 128-1   Filed 09/23/25   Page 140 of 537
PageID 2482
Case 1:21-cv-08704-PGG-RWL   Document 187   Filed 09/29/23   Page 11 of 38

***Paragraph 7 is False Because Defendant The Gatalog Does Distribute 3D Printing Files; and The Gatalog Website Directly Links to Defendant Odysee Account THEGATALOG-PRINTABLEMAGAZINES, affiliated with The Gatalog, Distributing One of the Infringing Products.***

35.     Mr. Holladay states in paragraph 7: "TheGatalog.com does not host and at all times relevant to this lawsuit has never hosted any 3-D printable firearms related to computer files on the site or on its server."

36.     Holladay's statement is misleading since the Gatalog Website does in fact receive 3-D printing file information through its "Submit Your Files" page. *See* **Exhibit 1**.

37.     The Gatalog Website's "Submit Your Files" page invites users to submit 3-D printing files for printable firearms if they "[w]ish to release [the files] via The Gatalog" and asks the user to identify if their design relates to the "frame/receiver", "accessory/component/mag" or some other part of a firearm.

38.     As the Gatalog Website is involved with distributing and releasing files "via The Gatalog" related to 3-D printable firearms, it must have a means by which to provide them to the public, such as the nine Gatalog Odysee Accounts, including Defendant Odysee User THEGATALOG-PRINTABLEMAGAZINES.

39.     Similarly, Mr. Holladay's statement that "TheGatalog.com does not host and at all times relevant to this lawsuit has never hosted any 3-D printable firearms" files is false.

40.     The Gatalog Website links to a "beta" program for 3-D printable firearm files that is hosted and maintained by another domain, www.deterrencedispensed.com that is also affiliated with Defendant The Gatalog. A true and correct copy of the Gatalog Website's "Beta Program" page is attached as **Exhibit 9**.

41.     When a user clicks the link to "view the current betas" on the Gatalog Website the user is redirected to the url https://chat.deterrencedispensed.com/channel/z.beta. *See* **Exhibit 10**.

9

Ex 2 A. COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION
Case 0:24-cv-01894-WMB-LHP Document 128-1 Filed 09/25/25 Page 141 of 537 PageID 2483
Case 1:21-cv-08704-PGG-RWL Document 187 Filed 09/29/23 Page 12 of 38

42.    The domain name www.deterrencedispensed.com ("Deterrence Dispensed") is again affiliated with and/or owned and operated by Defendant The Gatalog, and Mr. Holladay.

43.    Deterrence Dispensed is a website that is a stand-in for the Gatalog Website.  On the Gatalog Website homepage written in red font is the text: "Please bear with us during our transition. For more visit Deterrence Dispensed." *See* **Exhibit 5**.

44.    A screenshot of the Gatalog Website homepage depicting the text referring to "Deterrence Dispense" is also provided below outlined in a red box.



45.    When a user clicks on that red font referencing Deterrence Dispensed on the Gatalog Website homepage, they are then re-directed to the domain Deterrence Dispensed. A true and correct copy of the homepage for Deterrence Dispensed is attached as **Exhibit 11**.

46.    The Deterrence Dispensed homepage in turn states the following on the top of the homepage: "We're moving to The Gatalog. Please bear with us through this transition." *See*

10

Case 6:24-cv-01043-RWL-LHP  Document 125-1  Filed 09/23/25  Page 142 of 537
PageID 2484
Case 1:21-cv-08704-PGG-RWL  Document 187  Filed 09/29/23  Page 13 of 38

Ex. 2A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

**Exhibit 11**. A screenshot of the Deterrence Dispensed homepage depicting the text referring to "The Gatalog" is also provided below outlined in a red box.



47.    When a user clicks on the font on the Deterrence Dispensed homepage referencing "The Gatalog" one is re-directed back to the homepage of the Gatalog Website.

48.    In addition, searches on www.icann.org demonstrate that the Gatalog Website, and Deterrence Dispensed are also likely owned and operated by the same entity or individual. Both websites are registered with the same domain registrar, Epik Holdings, Inc., and utilize the same privacy protection service through Anonymize, Inc.  True and correct copies of the ICANN search results for the Gatalog Website, and Deterrence Dispensed are attached within **Exhibit 12**.

49.    Mr. Holladay's statement that "TheGatalog.com does not host and at all times relevant to this lawsuit has never hosted any 3-D printable firearms" files is also false based on

11

A-142

the expedited discovery received from Odysee.com which demonstrates that the same email,

ivanthetroll@protonmail.com, listed in connection with operation of the Gatalog Odysee

Accounts, including Defendant Odysee User THEGATALOG-PRINTABLEMAGAZINES, is

also used to operate the Odysee Account Deterrence-Dispensed.

50.     The "about page" on the "Deterrence-Dispensed" Odysee account states:

"Deterrence Dispensed has moved over to **thegatalog.com** - find all the files and information

over there!" A true and correct copy of the "Deterrence-Dispensed" Odysee.com account is

included within **Exhibit 13**.

51.     Thus, it was misleading for Mr. Holladay to state that Defendant The Gatalog and

the Gatalog Website have no involvement with "hosting" 3-D files when Defendant The Gatalog

and Mr. Holladay distributed files on Odysee.com through the affiliated Gatalog Oydsee

Accounts, "Deterrence-Dispensed" Odysee.com account, and through Deterrence Dispensed.

***Paragraph 8 is False Because Holladay Does Know Defendant Odysee User***
***Thegatalogprintablemagazines; Holladay's Website Links Only to That Account and Other***
***Gatalog Odysee Accounts affiliated with Defendant The Gatalog; and Holladay Did an***
***Interview With LaRosiere and Ivan The Troll.***

52.     Mr. Holladay states in paragraph 8 of the declaration that:

"I am aware that the Plaintiff has named as a defendant in this lawsuit a party called
Odysee User Thegatalogprintablemagazines. That account is one of the many accounts
my website, TheGatalog.com, contains a link to. That account is an account with a whole
different website called Odysee. I do not own and have never owned that account. I do
not use and have never used that account. I do not have access, and I have never had
access to log into that account. None of the files that account hosts belong to me or have
ever belonged to me. None of the files that account hosts or has hosted were created or
uploaded by me. None of the files that account hosts or has hosted were uploaded through
my website TheGatalog.com. A person with an Odysee user account cannot upload a file
to Odysee through my website TheGatalog.com. I do not know nor have I ever known
who owns or uses the Odysee account THEGATALOGPRINTABLEMAGAZINES."

53.     Mr. Holladay's statement that "[t]hat account is one of the many accounts my

website, TheGatalog.com, contains a link to" is misleading because the Gatalog Website only

12

Case 2:24-cv-01363-JNW-LPR Document 125-1 Filed 09/28/25 Page 144 of 537
PageID 2486
Case 1:21-cv-08704-PGG-RWL Document 187 Filed 09/29/23 Page 15 of 38

links to three types of webpages: (1) Deterrence Dispensed, which is connected to Defendant

The Gatalog, and a stand-in for the Gatalog Website (*see* **Exhibit 13**); (2) CTRL+Pew, which is

owned by Mr. Holladay (*see* **Exhibits 2 and 5**), and (3) the nine Gatalog Odysee Accounts listed

on the Gatalog Website, using the same email address and using the same "Gatalog" logo. *See*

**Exhibits 5, and 6**.

54.    Mr. Holladay's statement in Paragraph 8 also omits the fact that the Gatalog

Website *only* links to the nine Gatalog Odysee Accounts and no other Odysee.com accounts.

55.    First, the nine Odysee Accounts, including Defendant Odysee User

THEGATALOG-PRINTABLEMAGAZINES are all operated through the same email address,

ivanthetroll@protonmail.com, that also is used to operate the odysee.com account for

"Deterrence-Dispensed", an account that again provides links and information to the Gatalog

Website. *See* **Exhibits 5, 6, 11 and 13**.

56.    Second, Mr. Holladay's statement that he does "not own and [has] never owned",

does not use and [has] never used" and does "not have access, and [has] never had access to log

into" the "THEGATALOGPRINTABLEMAGAZINES" Odysee.com account is misleading

because it omits the fact that Mr. Holladay is not the only individual that is associated with, and

controls Defendant The Gatalog and its related operations.

57.    As detailed above, at least two individuals besides Mr. Holladay are publicly

involved with "The Gatalog" as officers and/or directors through the Gatalog Foundation, Inc.,

an entity that is associated with Defendant The Gatalog through the representation made by Mr.

Larosiere in his response to Everytown's takedown request to Odysee.com. *See* **Exhibits 3, and

4** (Mr. Larosiere stating: "this office has the pleasure of representing The Gatalog, Gatalog

13

Foundation, et al in all matters relating to intellectual property" and that "this office acts on behalf of the Gatalog and its members.").

58.     Third, Mr. Holladay's statement that "[n]one of the files that account hosts or has hosted were created or uploaded by me. None of the files that account hosts or has hosted were uploaded through my website TheGatalog.com" is false because it omits the fact that the Gatalog Website distributes files obtained through its "Submit Your Files" page even if those files may not be explicitly processed or uploaded by Mr. Holladay. *See* **Exhibit 1**.  The "Submit Your Files" page states that the files submitted by users through the "Submit Your Files" page are reviewed "*by our admin team*." *See* **Exhibit 1** (emphasis added).

59.     Lastly, Mr. Holladay's statement that "I do not know nor have I ever known who owns or uses the Odysee account THEGATALOGPRINTABLEMAGAZINES" must be false.

60.     Mr. Holladay repeatedly directs links to the nine Gatalog Odysee Accounts using the same logo that Defendant The Gatalog uses utilizes through both The Gatalog Website and Mr. Holladay's website CTRL+Pew. A true and correct copy of Mr. Holladay's website CTRL+Pew linking to the same THEGATALOGPRINTABLEMAGAZINES Odysee.com account is attached as **Exhibit 14**.

61.     As detailed above, expedited discovery received from Odysee.com demonstrates that "Ivan" using the email ivanthetroll@protonmail.com corresponded with Odysee.com in connection with Everytown's takedown request to the platform, and coordinated submitting the response with Mr. Larosiere.

62.     Given all these connections, it is perhaps unsurprising that Mr. Holladay, Mr. Larosiere, and "Ivan the Troll" have collaborated publicly as "opinion" authors on a submission

14

Case 6:24-cv-00489-WWB-LHP Document 1xx-1 Filed 09/29/23 Page 146 of 537
PageID 2488
Case 1:21-cv-08704-PGG-RWL Document 187 Filed 09/29/23 Page 17 of 38

to the firearms related website www.ammoland.com. A true and correct screenshot of the byline from the www.ammoland.com submission is below.[3]



63.     Accordingly, Mr. Holladay's statement that he does not know "who owns or uses the Odysee account THEGATALOGPRINTABLEMAGAZINES" is false as at a minimum, he is aware of at least an individual known as "Ivan" associated with the Gatalog Odysee Accounts, and Deterence-Dispensed Odysee account that has communicated with Mr. Larosiere and coordinated with Mr. Larosiere to submit a response to Everytown's take down notice on behalf of Defendant "The Gatalog" and "The Gatalog Foundation", businesses which Mr. Holladay owns and/or is an officer.

**Paragraph 9 is False: Holladay's Gatalog Website Links to Websites He Owns and Controls**

64.     Mr. Holladay states in paragraph 9 that: "My website contains links to other websites that I do not own or control, much like this Court's COVID-19 response page . . . ." yet the Gatalog Website contains links to CTRL+Pew, at least one other website that Mr. Holladay owns and/or controls. *See* **Exhibits 2, and 5**.

65.     As discussed above, Mr. Holladay's statement is misleading because the nine Gatalog Odysee Accounts that his Gatalog Website links to, and Deterrence Dispensed are all affiliated with Defendant The Gatalog and Mr. Holladay in some capacity.

_____

[3] *See* https://www.ammoland.com/2021/04/the-threat-of-drm-infused-home-gunbuilding/#axzz7YINXRogG (describing Mr. Holladay as "operating the site CTRL+Pew")

15

Case 2:24-cv-01039-WWB-LHP  Document 1283-1  Filed 09/29/23  Page 147 of 537
PageID 2489
Case 1:21-cv-08704-PGG-RWL  Document 187  Filed 09/29/23  Page 18 of 38

***Paragraph 11 is Highly Misleading Because Holladay Is Not and Has Not Been Operating Anonymously on Ctrl+Pew, Is Publicly Visible as an Officer of the Gatalog Foundation, Inc. and has Appeared in Publicly Available Interviews in Trade Publications All in Connection with His "unfavored and unpopular" Viewpoints.***

66.     Mr. Holladay states in paragraph 11 that: "I believe that anonymity is important because it provides protection from retaliation and vindictive behavior as a result of unfavored and unpopular viewpoints."

67.     Mr. Holladay suggests that his activities involved with The Gatalog, the Gatalog Foundation, Inc. and Ctrl+Pew have been completely anonymous, when in fact they most certainly are not.

68.     Mr. Holladay's publicly available LinkedIn profile connects him to Ctrl+Pew as its owner, and the public filings of the Gatalog Foundation, Inc. list Mr. Holladay as its officer and/or director. *See* **Exhibits 2, and 3**.

69.     Given Mr. Holladay has also used his name publicly in connection with his opinion on [www.ammoland.com](www.ammoland.com), he also appears unafraid to share his views pertaining to firearms with the general public.

***Paragraph 13 is False Because Mr. Holladay has Conducted Business With Individuals In New York Through His Highly Interactive Websites CTRL+Pew and the Gatalog Website In Connection With the Infringing Products.***

70.     Mr. Holladay states in paragraph 13: "I do not conduct business and have never conducted business in or with anyone in the State of New York."

71.     Mr. Holladay's blanket statement is misleading and unlikely to be true given the highly interactive nature of the Gatalog Website and Mr. Holladay's other website CTRL+Pew.

72.     For example, Ctrl+Pew allows users to purchase almost 80 different products, including but not limited to products such as apparel related to "thegatalog", "deterrencedispensed", and "IvanTheTroll". The prices for the products listed are in U.S. dollars.

16

A true and correct copy of product offerings on Mr. Holladay's website Ctrl+Pew is attached as **Exhibit 15**.

73. There are no state-related restrictions or specific qualifications needed to purchase products from Mr. Holladay's website CTRL+Pew.

74. CTRL+Pew also has "referral" links and links to "affiliates" where CTRL+Pew provide discounts codes to consumers, including to New York consumers. A true and correct copy of referrals, affiliate and discount links on CTRL+Pew is attached as **Exhibit 16**. A screenshot of the "referral" and "affiliate" links on Mr. Holladay's website CTRL+Pew is also depicted below.



Case 8:24-cv-01860-WMB-LHP    Document 128-1    Filed 09/29/23    Page 149 of 537
PageID 2491
Case 1:21-cv-08704-PGG-RWL    Document 187    Filed 09/29/23    Page 20 of 38

75.     Mr. Holladay's statement in paragraph 13 is also misleading given Mr. Holladay's website CTRL+Pew processes and facilitates bitcoin cryptocurrency "donations" provided to various groups and/or individuals involved with the 3-D printing of gun files.

76.     The donations accepted via Mr. Holladay's website do not appear to be restricted or prevent individuals residing in New York from donating. True and correct copies of CTRL+Pew facilitating bitcoin donations to Defendant Defcad User Freeman1337 in connection with his creation of the "Everytown mag' are attached within **Exhibit 17**. A screenshot from CTRL+Pew donation page to Defendant Defcad User Freeman1337 is also depicted below.



*Paragraph 18 Misleadingly Omits the Promotion and Marketing to NY Consumers*

77.     Mr. Holladay states in paragraph 18 that: "I have never sent any files as alleged in the Complaint or Amended Complaint to anyone in the State of New York" which conveniently omits that Mr. Holladay has marketed, promoted, and advertised the Infringing Products as described in Everytown's First Amended Complaint via his highly interactive website[s], which are accessible to, and were viewed by New York consumers. Screenshots of one of the Infringing Products being advertised on Mr. Holladay's website CTRL+Pew are attached as **Exhibit 14**.

18

Ex.2A-COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION
Case 1:24-cv-01644-LLP Document 123-1 Filed 09/29/23 Page 130 of 537 PageID 2492
Case 1:21-cv-08704-PGG-RWL Document 186 Filed 09/29/23 Page 21 of 38

78.     The screenshots demonstrate that Mr. Holladay's CTRL+Pew website represented that "The Gatalog" was involved with the presentation of the Infringing Product using the same "Gatalog" logo used and listed on the Gatalog Website connected with Defendant The Gatalog and Mr. Holladay.

79.     The screenshots also demonstrate CTRL+Pew linked to one of the Gatalog Odysee Accounts, Defendant Odysee User TheGatalog-PrintableMagazines affiliated with Defendant The Gatalog and Mr. Holladay, which offered and distributed the Infringing Products to New York consumers. *See* Declaration of Delia Green filed on October 22, 2021 [ECF 16] [hereinafter "Green Decl."], Ex. E, 16-5; Declaration of Delia Green filed on December 10, 2021 [ECF 65-1] [hereinafter "Green Reply Decl."], at ¶ 40.

**II.     False and Misleading Statements Made by Defendant Defcad User Freeman1337**

80.     Defendant Defcad User Freeman1337 ("Freeman") has promoted and offered the Infringing Product "**Everytown 3D Printable AR15 22lr Magazine**" on Defcad.com and via an affiliated account "**Freeman1337 GunCAD Mirror**" on Odysee.com.

81.     Freeman has also promoted and advertised himself in connection with his Infringing "**Everytown Mag**" product on CTRL+Pew, which is owned by Mr. Holladay (*see supra* paragraphs 76-77, 80), in connection with bitcoin donations, and through Twitter.com in connection with his Twitter account "**Freeman13372**".

***Freeman Omits Any Specific Information Relevant to His Request to Remain Anonymous***

82.     Defendant Freeman states in paragraph 4 that: "I have chosen to be anonymous on the internet for my personal safety and that of my family."

83.     Freeman goes on to state in paragraph 5 that: "Prior to making my internet activities anonymous, I was direct messaged and threatened on Twitter and other platforms.

19

Threats ranged from communications of my personal views and beliefs to my employer in the hopes of getting me fired to threats to murder me and my family with our own firearms as "payment for lives lost at Sandy Hook."

84.     Freeman's statements in paragraphs 4 and 5 are misleading because the statements do not provide any specific time, place, or reason for the supposed threats, and do not provide any information as to whether the threats were related to Freeman's distribution of the Infringing Products in connection with his "Freeman" accounts or some other conduct entirely.

85.     Moreover, Freeman's account with Twitter.com, "**Freeman13372**" was created in July 2021, and it is therefore highly unlikely that the threats Freeman received were related to those account activities.

***Paragraph 6 is False Because the Platforms Where Freeman Promotes and Distributes the Infringing Products and Receives Donations Are Accessible to New York Consumers.***

86.     In paragraph 6 Freeman states: "I do not live or work and have never lived or worked in the State of New York. I do not conduct business and have never conducted busines in or with anyone in the State of New York. I do not own property in New York."

87.     That statement is misleading because Freeman is unable to verify his statement given that he receives donations in bitcoin cryptocurrency from various individuals online through Mr. Holladay's CTRL+Pew website and there is no way to verify where those donations are coming from.

88.     Freeman's donation page on CTRL+Pew advertises him as the creator of the "**Everytown mag**", one of the Infringing Products in this case. *See* **Exhibit 17**.

89.     When a user donates to Freeman on CTRL+Pew, a user donates by transferring Bitcoin cryptocurrecy via the application "BTCPAY".

20

90.     BTCPAY does not show Freeman where the donator is physically located. A true

and correct copy of the BTCPAY screen in connection with donations to Freeman on

CTRL+Pew is attached as **Exhibit 18**. A screenshot of the BTCPAY is further depicted below.



91.     Accordingly, Freeman's statement is misleading because he does not know if he

has received donations from anyone in New York in connection with CTRL+Pew advertising

him as the creator of the "Everytown Mag" which is one of the Infringing Products.

21

Case 6:24-cv-01363-WWB-LHP   Document 1261   Filed 09/23/25   Page 159 of 537
PageID 2495
Case 1:21-cv-08704-PGG-RWL   Document 187   Filed 09/29/23   Page 24 of 38

Ex.A-COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

***Paragraph 7 is Misleading - Freeman's Area Code Is Associated With Idaho, Not Texas.***

92.     In paragraph 7 Freeman states: "I do live within the United States District Court for the Western District of Texas, and therefore I am amenable to personal jurisdiction and venue in that district."

93.      Freeman's statement may be false as the area code of a phone number (208 494 1786) obtained from Defendant Defcad, Inc. in connection with Freeman's Defcad.com account is associated with a geographic area in the state of Idaho. *See* DEFCAD000001.

***Paragraph 8 is Misleading Because Freeman Has Already Distributed One of the Infringing Products to New York Consumers through His Odysee.com Account.***

94.     In paragraph 8 Freeman states: "I have never sent any files as alleged in the Complaint to anyone in the State of New York."

95.     Freeman's statement is false, and does not address Everytown's allegations as to the First Amended Complaint, in which Everytown describes how Freeman owns/operates the Odysee.com account "Freeman1337 GunCAD Mirror" in addition to his account on Defcad.com. *See* FAC ¶¶ 191-98. A true and correct copy of the about page on Freeman's odysee.com account "Freeman1337 GunCad Mirror" is attached as **Exhibit 19**.

96.     Everytown knows that the Odysee.com account "Freeman1337 GunCAD Mirror" is owned by Defendant Freeman because the account references the email address 1337freeman1337@protonmail.com, the exact same email that was disclosed by Defcad, Inc. in expedited discovery as relating to the Defendant Freeman. *See* DEFCAD000001.

97.     Through Freeman's account on odysee.com he has distributed the same Infringing Product as he has distributed on his defcad.com account, namely, the "**Everytown cmmg 22lr Mag**".

22

A-153

Case 1:24-cv-01644-WWE-LHF Document 126-1 Filed 09/28/23 Page 154 of 537
PageID 2496
Case 1:21-cv-08704-PGG-RWL Document 187 Filed 09/29/23 Page 25 of 38

98.     Freeman's files for the "**Everytown cmmg 22lr Mag**" have been downloaded by New York consumers from his "Freeman1337 GunCAD Mirror" odysee.com account. *See* FAC ¶¶ 191-98 (depicting download window).

### III.     Misleading Statements Made by Phillip Royster (owner of the accounts Twitter User xYeezyszn, Odysee User xYeezyszn, and Defcad User xYeezyszn)

99.     Defendant Phillip Royster ("Royster") through his online accounts Defendants Defcad User xYeezySZN, Twitter User xYeezySZN, and Odysee User xYeezySZN has promoted and offered the Infringing Products "Moms Demand Action Firebolt 5.56 Bolt Catch Magwell" and "Everytown - Firebolt 5.56 Bolt Catch (R) Magwell Panel" on Defcad.com, and Odysee.com.

100.     Royster further advertised the Infringing Products using his Twitter account Twitter User xYeezySZN, and solicited donations from the public using his Twitter account.

***Paragraph 4 is Misleading Because Royster Can Receive Funds from Defcad in Connection With the Infringing Products; and Royster Has Received Compensation On Odysee.com From the Infringing Products.***

101.     In paragraph 4 Mr. Royster states: "Downloaders of my 3-D printable files do not and have not ever paid me for downloading my files, including what Delia Green refers to as 'tips'. I am aware that there are mechanisms by which a downloader could pay a creator for their files, but this has never happened with me. In fact, I dot no have a bank account connected to my Odysee account, which is what I would need to do if I ever received a tip and wanted to collect the money. I have also never received any money from Defcad."

102.     These statements are false and/or misleading in several respects.

103.     First, Royster's statement that he "never received any money from Defcad" is misleading as his Infringing Product on Defcad.com is being sold for a purchase price of $11.00 USD. Mr. Royster does not allege that he is unable to receive compensation in connection with

23

Case 8:24-cv-01349-WWB-LHP  Document 128-1  Filed 09/29/25  Page 155 of 537 PageID 2497
Ex. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION
Case 1:21-cv-08704-PGG-RWL  Document 187  Filed 09/29/23  Page 26 of 38

those Infringing Product listings. A screenshot of Mr. Royster's Infringing Product listing on Defcad.com in connection with a price of $11.00 USD is below.



104.    A post on website www.reddit.com by Defcad employee Garret Walliman confirms that Royster could receive funds from Defcad relating to the distribution of files, and can receive monetary compensation for posts made on the website. A true and correct screenshot of a post made by Mr. Walliman on reddit.com discussing funds received by creators is attached as **Exhibit 20**.

105.    The reddit.com account "gw_Defcad" appears to be operated by Mr. Walliman as the user account name contains "GW" and "Defcad", and in other posts the account describes himself as a "defcad project lead" and directs users to email support@defcad.com with issues they have on the website.

106.    In Mr. Walliman's declaration he also indicates that Defcad processes various fees in Bitcoin, cryptocurrency. *See* Walliman Decl. ¶ 12.

24

Ex. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

Case 1:24-cv-01363-RWL-LHP   Document 128-1   Filed 09/29/23   Page 156 of 537
PageID 2498
Case 1:21-cv-08704-PGG-RWL   Document 187   Filed 09/29/23   Page 27 of 38

107.     Accordingly, it is unclear if by "money" Royster is explicitly referring to USD, or all currency, including cryptocurrency, which is used by Defcad in various capacities.

108.     Second, Mr. Royster's statement that "Downloaders of my 3-D printable files do not and have not ever paid me for downloading my files, including what Delia Green refers to as 'tips'" is false and contradicted by Royster's Infringing Product listings.

109.     Royster's odysee.com account, Defendant Odysee User xYeezySZN, demonstrates that he received some monetary compensation in connection with the Infringing Products on odysee.com. As an example, Royster's Infringing Product listing for "Everytown Firebolt Magwell" shows that Royster received "11.7" LBRY credits as "Supports and Tips" in connection with the Infringing Product listing. A screenshot of Royster's Infringing Product listing depicting the 11.7 LBRY credits in supports and tips is depicted below.



Ex. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION
Case 6:24-cv-01903-WWB-LHP   Document 123-1   Filed 05/23/25   Page 159 of 537
PageID 2499
Case 1:21-cv-08704-PGG-RWL   Document 187   Filed 09/29/23   Page 28 of 38

110.    LBRY Credits, such as those received by Royster, can be redeemed for cash. A true and correct copy of Odysee.com's "Monetization of Content" page is attached within **Exhibit 21**.

111.    Royster's statement that he has not received monetary compensation in connection with the Infringing Products is false given he has received support and tips in connection with the Infringing Product listings. Whether Mr. Royster has chosen as of yet to "collect" those tips is of no consequence as the funds are available to him should he choose to retrieve them, much like funds available through a gift card.

***Paragraph 7 is False as Royster Solicited Funds Through His Twitter Account.***

112.    In paragraph 7 Mr. Royster states: "My purpose in all of this activity is entirely political. It is not financial."

113.    The statement is misleading as Royster linked his PayPal account to his Twitter account so that his followers could provide him with monetary funds. Screenshots of Royster's Twitter.com Linktree, and PayPal page in which he provides links to "support my projects" and "buy Yeezy a Coffee!" are attached within **Exhibit 22**.

***Paragraph 8 is Misleading Because Royster Was Not Anonymous on Twitter***

114.    In paragraph 8 Mr. Royster states: "I have chosen to be anonymous on the internet for my personal safety and that of my family."

115.    This is misleading as Royster provided the public with his name in connection with his Twitter and PayPal accounts, and was therefore not anonymous in connection with his online activities. *See* **Exhibit 22**.

Ex 2A COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION
Case 1:24-cv-01043-VWE-LHF Document 138-1 Filed 09/29/23 Page 159 of 537
PageID 2500
Case 1:21-cv-08704-PGG-RWL Document 187 Filed 09/29/23 Page 29 of 38

***Paragraph 9 is False Since Royster Omits Prior Online Conduct Which is Likely Related to the Alleged "SWAT-ing" Incidents, and it is Not Related to 3-D Printing of Firearms or Distributing the Infringing Products.***

116.     In paragraph 9 Mr. Royster states:

"Prior to making my internet activities anonymous, my mother and I were "SWAT-ed" more than once. By "SWAT-ing" I am referring to the act of anonymously reporting to the police a false criminal emergency involving extreme danger to life and safety such that the police arrive at the scene at a heightened state of alert and heavily armed with the false expectation of a high probability of armed conflict with an alleged perpetrator at the scene. The result is a substantially increased probability of a person in the house being shot and killed by the police. This is a technique sometimes used to effectively commit murder against a disfavored person. My mother and I were SWAT-ed twice based on internet activity I engaged in prior to becoming anonymous. Fortunately, both times we were unharmed."

117.     That statement is misleading in several respects as Mr. Royster's internet activities were not anonymous. *See* **Exhibit 22**.

118.     Second, Royster's statements about the alleged "swatting" are misleading as the statements do not provide any specific time, place, or reason for said threats, and do not provide any information as to whether the threats were actually related to Mr. Royster's distribution of the Infringing Products.

119.     Given that Royster describes "SWAT-ing" as "the act of anonymously" making a report to police, Mr. Royster does not know who (if anyone) called police in the instances he describes.

120.     Third, Royster's statement that he and his mother "were SWAT-ed twice based on internet activity I engaged in prior to becoming anonymous" is misleading as he omits prior online conduct that he engaged in unrelated to the instant litigation or 3-D firearms which is likely related to the alleged "SWAT-ing" incidents.

121.     Prior to the instant action, Royster, and his mother, appeared to have been involved with a business managing social media accounts for incarcerated individuals. An article

27

in Business Insider about Royster, and his mother's business, stated "[Royster's] specialty is getting the prisoners on dating websites, helping them meet women, and then explaining to those women that their new acquaintance might not be able to grab that drink for a while." A true and correct copy of the Business Insider article is attached as **Exhibit 23**.

122.    Accordingly, there is reason to believe that any previous law enforcement inquiries into Royster, and/or his mom, may have been the result of online activities having nothing to do with the instant claims or lawsuit.

***Paragraph 11 is False Because Royster Explicitly Offered to Write an Affidavit Disclosing His Identity in the Instant Action.***

123.    In paragraph 11 Royster states: "I am aware that Everytown claims that I said in a chat that I'm 'just fine' with disclosing my identity. I am not. I was only 'just fine' revealing my identity to the person I was communicating with, knowing that that person would keep my identity confidential."

124.    Royster's statement is contradicted by the message chat produced by Defendant Defcad in this case.

125.    In response to a conversation with Defcad employee Garret Walliman in which Mr. Royster and Mr. Walliman were discussing Everytown's request to remove the Infringing Products from defcad.com, and Mr. Walliman stating that Defcad would "of course plan to fight" a legal battle with Everytown, Royster stated: "I am also fine with sharing my actual identity as well I do live in a free state so I'm not actually breaking any laws printing guns here. I don't really want to but if need be for legal procedures we can." DEFCAD000009.

126.    Mr. Royster then goes on to state: "I have a hard time thinking a judge would be willing to take this issue through to the end. I do understand that 100%. This is why I am willing

28

to offer whatever help, anything I can do . . . If you need an affidavit or anything that's fine too." DEFCAD000009.

127.    Accordingly, Mr. Royster's statement is false as he offered to complete an affidavit in connection with this matter which he understood would be disclosed to individuals outside of Garret Walliman, with whom he was chatting.

**Paragraph 18 is False and/or Misleading as Royster's Infringing Products Have Been Distributed to Consumers In New York.**

128.    In paragraph 18 Royster states: "I have never sent any files as alleged in the Complaint or Amended Complaint to anyone in the State of New York."

129.    Royster's statement is false given that New York consumers have accessed and downloaded his Infringing Product files on odysee.com. *See* Green Decl. ¶ 5, 8-14, Exs. A-B; Green Reply Decl. ¶¶ 31-39, Ex. E

### IV.    False and Misleading Statements Made by Garret Walliman

130.    Declarant Garret Walliman ("Walliman") is a "Lead Software Developer" for Defense Distributed, Inc., the parent company of Defendant Defcad, Inc. Declaration of Garret Walliman ("Walliman Decl") ¶ 2, 3.

131.    Walliman communicated with Defendants Royster and Freeman on behalf of Defendant Defcad, Inc. and solicited Mr. Royster to distribute his Infringing Products on Defcad.com. *See* DEFCAD000002-DEFCAD000010.

**Paragraph 8 is False Since Defcad's IP Geolocation Services Do Not Accurately Determine Where Users Are Located.**

132.    In paragraph 8 of Mr. Walliman's declaration he states: "Defcad's systems use a method called "IP geolocation" to try to determine the state from which the user is accessing the website. IP geolocation is a third-party service which correlates IP addresses with the last known

29

physical location of the device using this IP address. The IP geolocation service provides this information in a searchable, regularly updated database. An IP geolocation lookup is performed by looking up the IP address of the computer being used in a geolocation database and retrieving the physical location information corresponding to that IP address. A computer's IP address provides information allowing for the routing of data packets over the internet to that computer. A computer's IP address acts like the physical address that one writes on an envelope when sending a letter through the mail."

133.    Mr. Walliman's statement is misleading as it implies that Defcad's IP geolocation services accurately determines the geographic locations from which defcad.com users access the website.

134.    Defcad's use of IP geolocation is flawed because it recognized Ms. Green as residing in Maryland when she resides in NY and provided Defcad with a NY driver's license and credit card address. *See* Green Reply Decl. ¶¶ 15-23, Ex. B.

135.    Further, Mr. Walliman's statement that "The IP geolocation service provides this information in a searchable, regularly updated database" is also inconsistent with the information that Defcad represented was in its possession with regard to Defendant Freeman1337, a "Defcad Partner."

136.    "Defcad Partners" are individuals who have accounts with www.defcad.com that are able to submit files for distribution on Defcad's website. To become a "Defcad Partner", users like Defendant Freeman had to "apply for partnership" to Defcad by accessing www.defcad.com and filing out a form. A true and correct copy of screenshots on www.defcad.com describing "Defcad Partners" is attached as **Exhibit 24**.

30

137.     As Defendant Defcad Freeman submitted the Infringing Products for distribution on www.defcad.com as a Defcad Partner, Freeman had to access www.defcad.com, and fill out the form implicating the IP geolocation process that Mr. Walliman alleges occurs in paragraph 8.

138.     However, in expedited discovery produced by Defcad, Walliman told Freeman that Defcad had "virtually no info about [Freeman] whatsoever" when Walliman was asked what information/data Defcad possessed by Freeman. *See* DEFCAD000003.

139.     Further, expedited discovery received from Defcad demonstrates that even if Defcad did maintain IP geolocation services as Mr. Walliman describes, such IP geolocation services are likely to be ineffective at determining user locations given Freeman himself "used tor/VPN" when signing up for www.defcad.com. *See* DEFCAD000004.

140.     Freeman was so confident that the "tor/VPN" hid his/her actual geographic location that Freeman stated there were "no worries" in having to comply with a court order regarding the disclosure of Freeman's personal identifying information in Defcad's possession. *See* DEFCAD000004.

141.     Accordingly, Defcad's "IP geolocation service" described in paragraph 8 does not, and has not, identified the actual geographic location of Defcad's users.

***Paragraph 15 is Misleading as Defcad has Charged New York Consumers Subscription Fees to Access Defcad's Website, and Has Shipped A Flash Drive to New York***

142.     Walliman states in paragraph 15: "Even had [Ms. Green] completed all the steps necessary to complete the transaction, she would never have received any files. This is because Defcad does not ship files to any user known or believed to be in the state of New York. If Ms. Green had continued in her attempt to complete one of her transactions, which our system showed originated in Maryland, Defcad would still have refused the order once it became aware that Ms. Green was a resident of New York."

31

Ex. A - COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

Case 2:24-cv-01685-WBS-LHF   Document 13-1   Filed 09/29/23   Page 169 of 537
PageID 2505
Case 1:21-cv-08704-PGG-RWL   Document 187   Filed 09/29/23   Page 34 of 38

143.     Walliman's statement is false and/or misleading as Defcad has shipped files to New York. Walliman's own declaration states Defcad ship a flash drive to New York containing data files for a fee as recently as May 2021. *See* Walliman Decl. ¶ 17.

144.     This negates any statements made by Walliman that Defcad has never shipped flash drives to New York, or has done business with New York consumers, or that Defcad would have categorically refused to ship a flash drive to Ms. Green.

**Paragraph 16 is False Since Defcad Has Shipped A Flash Drive to New York; and Defcad Does not Put Customers on Notice That It Does Not Ship Files To New Jersey or New York.**

145.     Walliman states in paragraph 16: "Consistent with Defcad's blocking of downloads in New York, Defcad does not ship files to New York FFL holders, in accordance with a similar policy to refuse to ship files to New Jersey FFL holders. Defcad does this because New York and New Jersey have objected to Defcad providing files to people in those states."

146.     Walliman's statements are misleading because (1) Walliman stated that Defcad has shipped a flash drive to a New York consumer within 2021 (*see* Walliman Decl. ¶ 17) and (2) the publicly available information on Defcad's website does not state it will not ship files to New Jersey or New York.

147.     Defcad's website does not provide any information specific to New York visible to consumers regarding the shipment of files, and Defcad's website states the following with regard to New Jersey: "Defcad files and other hardware are not currently available to persons outside the United States and are not available to residents of and persons in the state of New Jersey who do not possess a federal firearms license." *See* Green Reply Decl. ¶¶ 7-14, Exs. A, D.

148.     Accordingly, Defcad does not have any policy on its website indicating that it has categorically refused to ship flash drives or files to New York or New Jersey.

32

Ex. 2A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

Case 8:24-cv-01349-WWB-LHP   Document 128-1   Filed 09/29/23   Page 164 of 537
PageID 2506
Case 1:21-cv-08704-PGG-RWL   Document 187   Filed 09/29/23   Page 35 of 38

## V.   False and Misleading Statements Made by Cody Wilson

149.   Declarant Cody Wilson ("Wilson") is the President of Defendant Defcad, Inc., the entity that has distributed the Infringing Products, and solicited the posting of Royster's Infringing Products on www.defcad.com.

***Paragraphs 2 and 3 are Misleading -- Defcad Cannot Be Incorporated In Two States.***

150.   Wilson states in paragraph 2: "I am the President of Defendant Defcad, Inc., a Delaware corporation ("Defcad")."

151.   Wilson further states in paragraph 3: "Defcad is a corporation organized under the laws of Arkansas with a principal place of business of 2320 Donley Dr., Suite C, Austin, Texas 78758-4514."

152.   Wilson's statements in paragraphs 2, and 3 pertaining to Defcad being a "Delaware corporation" and Defcad being a "corporation organized under the laws of Arkansas" are inconsistent and false as Defcad cannot be an entity with its place of incorporation in two different states.

***Paragraph 6 is False as Defcad Emails New York Consumers with Promotional Materials.***

153.   Wilson states in Paragraph 6: "Defcad does not engage in advertising targeted to New York."

154.   Wilson's statement is misleading since Defcad sends emails containing promotional materials to New York consumers. *See* Green Reply Decl. ¶¶ 26-30, Ex. D (detailing how Ms. Green received emails from Defcad containing promotional materials after having signed up for a www.defcad.com subscription with her New York credit card).

33

***Paragraph 7 is Misleading as Defcad Has Charged New York Consumers for Subscriptions to Its Website; and Has Shipped New York Consumers Flash Drives.***

155.    Wilson states in paragraph 7: "Defcad does not conduct business and has never conducted business in or with anyone in the State of New York."

156.    Wilson's statement is false as Defcad has charged and obtained subscription fees from New York consumers, and Defcad has sent files to New York consumers in exchange for a shipping fee.

157.    Ms. Green was charged $50.00 by Defcad in connection with a subscription fee to obtain a membership to www.defcad.com as previously detailed by Mr. Green. *See* Green Decl. ¶¶ 30-31; Green Reply Decl. ¶¶ 15-23, Ex. B.

158.    Walliman has also stated that Defcad sent a flash drive containing files to New York in 2021 in connection with a fee of $11.00. *See* Walliman Decl. ¶ 17.

159.    Accordingly, Wilson's statement that Defcad "has never conducted business in or with anyone in the State of New York" is false.

***Paragraph 18 is False as "Ghost Guns", "Assault Weapons" and "Large Capacity Magazines" are Common Terms Used by the Public, and are not Terms Invented by Everytown.***

160.    Wilson refers to "so-called 'ghost guns' . . . 'assault weapons', and so-called 'large capacity magazines" in paragraph 18.

161.    Wilson's statements are misleading to the extent that he attempts to insinuate that the terms "ghost guns", "assault weapons", and "large capacity magazines" were coined by Everytown, and are not common-place terms in the media, and in the firearms industry.

162.    The terms "ghost guns", "assault weapons", and "large capacity magazines" are terms used by news outlines across the country, and in legislation concerning various firearms

34

and accessories. An example of one such definition codified by the state of New York for a "ghost gun" is within **Exhibit 25** attached.

***Paragraph 24 is Misleading as Defcad Has Shipped A Flash Drive to New York; and Defcad Does not Put Customers on Notice That It Does Not Ship Files To New Jersey or New York.***

163.     Wilson states in paragraph 24: "Defcad has determined not to permit its files to be downloaded from persons located in certain geographic areas inside and outside of the United States. Once of those areas is the State of New York."

164.     Wilson's statement is misleading as (1) Walliman stated that Defcad has shipped a flash drive to a New York consumer within 2021 (*see* Walliman Decl. ¶ 17), and (2) the publicly available information on Defcad's website does not state it will not ship files to New York. *See* Green Reply Decl. ¶¶ 7-14, Exs. A, D.

***Paragraphs 25 and 26 are False as Defcad's IP Geolocation Services are Flawed.***

165.     Wilson states in paragraph 25: "When contacted by a user - - and only as a first step - - Defcad uses geolocation services to determine the location from which a computer user is accessing the Defcad website."

166.     Wilson states in paragraph 26: "Ms. Green asserts that this system is unreliable but this is only the first step and, if Defcad cannot, using those geolocation services, confirm with a high level of accuracy, that the user is located outside of the areas identified by Defcad as 'Restricted,' Defcad treats such users as being located in a 'Restricted Area' and being a 'Restricted User'.

167.     Wilson's statements in paragraphs 25 and 26 are misleading as Defcad's reliance on geolocation is flawed considering it recognized Ms. Green as residing in Maryland when she resides in New York, and provided Defcad with a New York driver's license and credit card information. *See* Green Reply Decl. ¶¶ 15-23, Ex. B.

EX. A - COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

168.    Wilson's statements are further misleading given that Defendant Freeman, a
Defcad Partner, stated that he/she used "tor/VPN" services when signing up for defcad.com and
accordingly, Defcad has "virtually no information about [Freeman] whatsoever."
DEFCAD000003-DEFCAD000004.

169.    Accordingly, Wilson's statement is inaccurate/misleading because Defcad does
not possess accurate geolocation information about its users.


I declare under penalty of perjury that the foregoing is true and correct to the best of my
knowledge.

Dated: July 8 , 2022

ERIN GALLOWAY

36

A-167

Ex. A - COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

## 2025  FLORIDA NOT FOR PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# N21000006406

**Entity Name:** GATALOG FOUNDATION INC.

**FILED
Feb 11, 2025
Secretary of State
2050254272CC**

**Current Principal  Place of Business:**

16210 SUNFLOWER TRAIL
ORLANDO, FL  32828

**Current Mailing Address:**

6824 HANGING MOSS RD
ORLANDO, FL  32807  US

**FEI Number:** 87-4618284

**Certificate of Status Desired:**  No

**Name and Address of Current Registered Agent:**

LAROSIERE, MATTHEW   ESQ.
6964 HOULTON CIRCLE
LAKE WORTH, FL  33467 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:

| | |
|---|---|
| Electronic Signature of Registered Agent | Date |

**Officer/Director Detail :**

| Title | P | | Title | T |
|---|---|---|---|---|
| Name | LAROSIERE, MATTHEW | | Name | HOLLADAY, ALEXANDER |
| Address | 6964 HOULTON CIRCLE | | Address | 522 BARON RD |
| City-State-Zip: | LAKE WORTH  FL  33467 | | City-State-Zip: | ORLANDO  FL  32828 |

| Title | D |
|---|---|
| Name | ELIK, JOHN |
| Address | 134 SE 30TH ST |
| City-State-Zip: | CAPE CORAL  FL  33904 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 617, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: MATTHEW LAROSIERE                      PRESIDENT                    02/11/2025

| | |
|---|---|
| Electronic Signature of Signing Officer/Director Detail | Date |

# Electronic Articles of Incorporation
# For

N21000006406
FILED
May 27, 2021
Sec. Of State
tscott

GATALOG FOUNDATION INC.

The undersigned incorporator, for the purpose of forming a Florida not-for-profit corporation, hereby adopts the following Articles of Incorporation:

## Article I

The name of the corporation is:

GATALOG FOUNDATION INC.

## Article II

The principal place of business address:

16210 SUNFLOWER TRAIL
ORLANDO, FL. US  32828

The mailing address of the corporation is:

PO BOX 541772
GREENACRES, FL. US  33454

## Article III

The specific purpose for which this corporation is organized is:

OUTREACH & EDUCATION

## Article IV

The manner in which directors are elected or appointed is:

AS PROVIDED FOR IN THE BYLAWS.

## Article V

The name and Florida street address of the registered agent is:

MATTHEW  LAROSIERE ESQ.
6964 HOULTON CIRCLE
LAKE WORTH, FL.  33467

I certify that I am familiar with and accept the responsibilities of registered agent.

Registered Agent Signature:  MATTHEW LAROSIERE

N21000006406
FILED
May 27, 2021
Sec. Of State
tscott

## Article VI

The name and address of the incorporator is:

MATT LAROSIERE
6964 HOULTON CIRCLE

LAKE WORTH FL 33467

Electronic Signature of Incorporator:   MATTHEW LAROSIERE

I am the incorporator submitting these Articles of Incorporation and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.  I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of this corporation and every year thereafter to maintain "active" status.

## Article VII

The initial officer(s) and/or director(s) of the corporation is/are:

Title:  P
MATTHEW  LAROSIERE
6964 HOULTON CIRCLE
LAKE WORTH, FL.  33467  US

Title:  T
ALEXANDER  HOLLADAY
602 W DIVISION
OGDEN, IA.  50212  US

Title:  D
JOHN  ELIK
134 SE 30TH ST
CAPE CORAL, FL.  33904-349  US

Click here (https://gnet-research.org/wp-content/uploads/2024/08/GNET-45-Young-People-Challenging-Extremism_web.pdf) to read our latest report

"Young People Challenging Violent Extremism Online: Insights from Asia"





# Lawsuits, Rivalries, and Trolls: Examining the Behaviour of the 3D-Printed Gun

GNET (https://gnet-research.org)  >  Insights (https://gnet-research.org/category/insights/)  >  Lawsuits, Rivalries, and Trolls: Examining the

 

By Rajan Basra (https://gnet-research.org/author/rajan-basra/) and Nathan Mayer (https://gnet-research.org/author/nathan-mayer/)

10th September 2024
In Insights (https://gnet-research.org/category/insights/)

The broad 3D-printed gun movement has a strong libertarian ethos. While many participants are simply hobbyists attracted to the technical or aesthetic aspects of the guns, there is a distinctive ideological dimension to the movement (known as Gun Computer-Aided Design, GunCAD, or 3D Second Amendment, 3D2A). One central tenet is that bearing arms is a (universal) human right, whether for individual self-defence or as a collective safeguard against government tyranny. GunCAD is thus deeply sceptical of State interference in citizens' lives and heavily influenced by US Second Amendment culture.

Cody Wilson, the creator of the first ever 3D-printed gun, the Defense Distributed group, and the DEFCAD file-sharing site, was emphatic in his libertarian, pro-gun views (https://www.forbes.com/sites/andygreenberg/2013/05/05/meet-the-liberator-test-firing-the-worlds-first-fully-3d-printed-gun/). Jacob Duygu (better known by the pseudonym "JStark1809" (https://icsr.info/wp-content/uploads/2023/10/ICSR-Report-Behind-the-Mask-Uncovering-the-Extremist-Messages-of-a-3D%E2%80%91Printed-Gun-Designer.pdf)), the founder of an influential network of gun developers called Deterrence Dispensed, was just as explicit in his attempts to end gun control. The name he chose for a gun he designed was self-explanatory: the "Fuck Gun Control 9mm" (FGC-9). Such sentiments are also regularly expressed by their supporters.

This worldview – combined with an irreverent Internet culture – means that the movement is inherently adversarial towards advocates of gun control. At its most confrontational, this can manifest in the flouting of local gun laws. Other times, it can also consist of the trolling (https://www.merriam-webster.com/dictionary/troll) of lawmakers, law enforcement, lobby groups, or tech companies. Yet GunCAD's courting of controversy can lead to legal troubles. One such controversy involves a lawsuit filed by the gun control advocacy nonprofit Everytown For Gun Safety (https://www.everytown.org/) against several GunCAD figures, unveiling much of how the movement operates.

This Insight examines some aspects of GunCAD's adversarial behaviour and the revelations and fallout from the Everytown lawsuit.

**Ban Evasions, Commercial Enterprises, and Trolling**

Many within GunCAD attempt to evade bans and moderation from social media platforms. One notable streamer, for instance, regularly publishes YouTube videos talking about new prototype designs for 3D-printed guns and surreptitiously sharing details on where to locate them. This is likely in contravention of YouTube's firearms policy. However, to avoid being banned, the video footage is entirely unrelated; often, it is taken from video games, with the text "THIS IS A GAMING VIDEO" as its thumbnail. Similarly, YouTube videos providing instructions on manufacturing parts of the FGC-9 remain online. Yet in other instances, 3D-printed gun content from other creators, that ostensibly did not contain instructional guidance, has been removed by YouTube. YouTube's enforcement of its firearms policy (https://support.google.com/youtube/answer/7667605?hl=en) can thus appear inconsistent.



Figure 1: A screenshot of YouTuber discussing 3d gun content.

Commercial enterprises have used similarly evasive tactics to sell gun components. For instance, "lightning links (https://www.youtube.com/watch?v=3ADo_pOKUBY)" are metal devices that turn a semi-automatic AR-15 into a fully automatic one. These were sold online (https://www.atf.gov/tampa-field-division/seized-website-autokeycardscom) as seemingly innocuous "bottle openers (https://ecf.flmd.uscourts.gov/cgi-bin/show_public_doc?2021-00022-310-3-cr)" and "pen holders". Similarly, auto sears (3D-printable parts that convert some guns to fully automatic) have been sold as "portable wall hangers (https://gizmodo.com/west-virginia-man-arrested-for-making-a-wall-hook-that-1845636765#:~:text=A%20West%20Virginia%20man%20named,into%20an%20illegal%20machine%20gun.)". Such

euphemisms have become an in-joke within GunCAD and are also used to describe legal activities: one business, run by prominent figures from the movement, sells parts kits for 3D-printed guns (such as barrels and fire control groups) by labelling them as "windchimes".

Establishment political figures have also been trolled. In 2019, New Jersey Senator Robert Menendez lobbied to ban (https://www.menendez.senate.gov/imo/media/doc/Twitter%20Letter%203D%20guns%203.7.pdf) influential 3D-printed gun designer "Ivan the Troll" from Twitter. Ivan, a leading member of Deterrence Dispensed, was eventually banned but reappeared under a different username. In response, he designed and released the "Menendez Mag", a 3D-printable Glock magazine, in 2019. The "Extendez Mag" – an extended magazine with a 30-round capacity – followed shortly after. Ivan stated his rationale:

*"[Menendez] actively pressured private compaines* (sic) *to shutter accounts of mine to suit is* (sic) *political agenda. So found it fitting to tarnish his name with a 'high capacity' magazine that will exist as long as the internet does. Sorry Bobby. Step on snek, snek steps back."*

**Trolling of Everytown for Gun Safety**

Such trolling extended to the gun control advocacy nonprofit Everytown For Gun Safety (https://www.everytown.org/). Formed by a 2013 merger of "Mayors Against Illegal Guns" and "Moms Demand Action For Gun Sense", the group campaigns to regulate (https://www.everytown.org/issues/downloadable-guns/) 3D-printed firearms (https://www.everytown.org/issues/ghost-guns/) – among other gun control issues – particularly around the sharing of digital blueprints or serialisation (https://www.everytown.org/issues/downloadable-guns/#:~:text=3%2DD%20printed%20guns%20are,they're%20used%20in%20crimes.). Currently, most US states do not have regulations targeting the serialisation of 3D-printed firearms.

One GunCAD designer, "Freeman1337", created the digital blueprints for a .22 LR magazine online. He named it "The Everytown Mag". Another design, created by user "xYeezySZN", featured Everytown's logo. The designs were published on Odysee, by an account run by "The Gatalog" (associated with Deterrence Dispensed), and DEFCAD (a website that hosts digital blueprints, associated with Wilson and Defense Distributed).

In response, Everytown filed a claim for copyright infringement against the two designers, The Gatalog, and DEFCAD. The defendants' lawyer was initially paid for by the Firearms Policy Coalition (FPC) (https://www.firearmspolicy.org/) and then DEFCAD. The lawsuit was eventually settled (https://www.reuters.com/legal/litigation/gun-control-group-everytown-settles-with-ghost-gun-sites-over-logo-2023-03-03/), with the defendants agreeing to remove the infringing files from both platforms. However, the lawsuit revealed several details about the figures involved, collaboration within the movement, and tensions between different camps.

**The Fallout Within GunCAD**

Remarkably, Freeman1337 appeared to insinuate (https://web.archive.org/web/20230305212002/https://www.reddit.com/r/fosscad/comments/11j5eew/comment/jb1qleq/) that he had not given "legit" personally identifiable information to the attorney and had instead given a random person's "bogus address" (https://web.archive.org/web/20240623214649/https://www.reddit.com/r/fosscad/comments/1806zni/comment/ka42e7d/?rdt=38688) as his own (see Figures 2 and 2). In return, he was criticised (https://archive.ph/pk44B) by others within the 3D-printed gun community for potentially implicating a random person. His alleged deception indicates the lengths some individuals within GunCAD may go to remain anonymous, even in the face of legal pressure.



Figures 2 and 3: Freeman1337 comments on Reddit about the Everytown lawsuit

The lawsuit added to tension within GunCAD, especially between Cody Wilson (Defence Distributed, DEFCAD) and the pseudonymous "Fuddbusters", "Ctrl-Pew", and "Ivan the Troll" (Deterrence Dispensed and The Gatalog). While both camps espouse libertarian ideals over gun ownership, they have disagreed over the sharing of digital blueprints. DEFCAD uses a FOSS (Free and Open-Source Software) license on their files to allow anyone to modify and repost on the Internet. However, access is restricted to US citizens/residents who pay a membership fee (currently from $60USD annually).

The Gatalog, meanwhile, does not charge its users and alleges that Wilson unfairly profiteers from their designs. In January 2024, Ivan the Troll publicly criticised (https://archive.ph/EQuHy) him and DEFCAD, accusing them of "[stealing] as much of other people's work" as they could, and wrote they were a "wholly untrustworthy, unlikeable entity" (see Figure 4). Its supporters have also repeatedly mentioned Wilson's registration as a sex offender (https://www.texastribune.org/2019/09/12/3d-printed-gun-designer-cody-wilson-sentenced-sexual-assault-girl/), and accused DEFCAD of excessively gathering user personally identifiable information (PII) and suffering a data breach (see Figure 5).

I remember their reaction to their own failure was to commit not to bettering themselves, but to cutting off the last vestiges of communication, making snarky blog posts reminiscent of a dumped teenage girl (the kind this mentioned figurehead likes to rape, actually), then proceeding to steal as much of other people's work as they could - deliberately betraying one of the promises they made to the community from the very beginning. As if this hadn't proved them a wholly untrustworthy, unlikeable entity, they now blame developers who put license info on projects (that are still free to everyone) as being the problem. Despite these developers only mentioning a license to keep fedcad from stealing their shit. The "open source" ethos tends to be misunderstood, but make no mistake - the way in which fedcad has turned it against the community is entirely untenable. Fuck them, and fuck all their related ventures too.

All these ventures are owned by this same figurehead, who has made it quite clear that he hates this community, wants it to wait on him hat in hand, and wants everyone to credit him for the work that others labor to do. Fuck that.

6:36 PM · Jan 29, 2024 · **21.6K** Views

Figure 4: Tweet from "Ivan the Troll" about Cody Wilson and DEFCAD



Figure 5: Tweet from "Ivan the Troll" accusing DEFCAD of having a data breach

In turn, Wilson denies (https://archive.ph/evFyH) that DEFCAD collects PII or has ever had a security breach, and claims that The Gatalog is interested in monetising its user base. He alleges one of its directors has obtained copyrights on several of their build documents (such as the SF5 design) and that another director demanded payment from him for the FGC-9 files to be shared on DEFCAD. As evidence, Wilson posted a screenshot of a payment of $2,500 to a company owned by a director/officer of Gatalog Foundatoin Inc (see Image 7). In September 2024, Matt Larosiere ("Fuddbusters") filed a lawsuit against Cody Wilson and DEFCAD over alleged copyright infringement.



Figure 6: A blog post by Cody Wilson linking to a copyright filed for the SF5 design



Figure 7: Screenshot posted by Cody Wilson of payment to a company owned by a director/officer of Gatalog Foundation Inc.

**Gatalog Foundation Inc.**

Details about The Gatalog were also disclosed in court files. The platform and its Odysee accounts are associated with "Gatalog Foundation Inc.", registered as a nonprofit corporation with its stated purpose as "outreach and education". The registration may allow for monetisation of the brand or legal cover, potentially in anticipation of challenges by the US government or other organisations. Wilson and DEFCAD, for instance, were involved in a lengthy legal struggle (https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/) with the US State Department (https://casetext.com/case/distributed-v-us-dept-of-state-1) over digital blueprints shared online, which eventually culminated in a settlement (https://www.documentcloud.org/documents/4600187-Defense-Distributed-Settlement-Agreement.html).

The registration of Gatalog Foundation Inc. shows there is greater formal and legal collaboration among the gun developers than previously understood – it also shows their commitment to publishing their 3D-printed gun designs. While many parts of GunCAD appear as a loose network, the leadership of Gatalog Foundation Inc. appears to be closely coordinated; two of its three directors are also listed as directors/officers of other firearms-related businesses, such as MAF Corp.

Its article of incorporation names three directors and/or officers. Two are already known in the 3D-printed gun movement, while the third individual is not (he is not named in this Insight). However, he can be identified – using publicly available open sources – as the aforementioned "Ivan the Troll". Ivan is a pivotal figure in GunCAD who has made groundbreaking contributions to do-it-yourself firearms designs, including the FGC-9 (specifically the process of rifling its barrel to increase the bullet's range and accuracy) and the Plastikov (a 3D-printed receiver for the Kalashnikov), among others.

**The Open-Source Trail of "Ivan the Troll"**

"Ivan" originally went by the username "TheBlaster9001 (https://old.reddit.com/user/Theblaster9001)" on Reddit. After being banned from Reddit, he reemerged using the Ivan alias. The same username (https://www.corvetteforum.com/forums/members/569348-theblaster9001.html) appears on Corvette Forum, a discussion board dedicated to the car manufacturer. Given the identical rare username and Ivan the Troll's known love of Corvettes (https://www.reddit.com/r/Corvette/comments/8n5sqf/comment/dzt2moq/) (see Figure 8), it is highly probable that the same individual is behind the Reddit and Corvette Forum accounts. In a discussion on the Corvette Forum, TheBlaster9001 disclosed his location as living in or around a city in the US state of Illinois. This corresponds with later public reporting of Ivan the Troll's home state (https://slate.com/technology/2021/02/3d-printed-semi-automatic-rifle-fgc-9.html).



Figure 8: Reddit post by u/TheBlaster9001 about owning a Corvette C4.

Using publicly available open sources, it is possible to identify an associated property in Illinois (the specific details of this method are not disclosed in this Insight). That property has an old real estate agent listing, and the photos from that listing correspond to two photos that Ivan the Troll (using the name @NaviGoBoom) shared on X (formerly Twitter). For instance, he once shared an image of a fireplace, in which the mantle brick pattern, style, and fireplace doors are

identical to photos of the fireplace in the real estate agent listing (see Figures 9 and 10). In another photo taken from a sunroom, the exterior hot tub (with cover, stairs, and railing), overhead lighting shade, and wall outlets are visible (Figure 11). These all match with an image of the sunroom from the real estate listing (Figure 12).

Ivan the Troll, therefore, is associated with that property. During the Everytown lawsuit, however, the claimants were not able to make this connection. As a result, he was not specifically named as a defendant in the lawsuit.



Figures 9 and 10: Photo of fireplace uploaded on Twitter(X) by Ivan the Troll in January 2022 (left); the same fireplace in a real estate agent listing for a house found using publicly available sources (right) (annotations added)



Figures 11 and 12: Photo of the sunroom and hot tub uploaded on Twitter by Ivan the Troll in January 2022 (left); the same sunroom and hot tub in a real estate agent listing for a house found using publicly available sources (right) (annotations added)

**Prospects**

GunCAD will likely attract greater attention from its political and ideological opponents as the movement spreads and grows in influence and notoriety. Whether such attention will temper the provocative and controversial aspects of many within the movement remains to be seen. Regardless of the external attention, the internal divisions within GunCAD are likely to continue, as disagreements over monetisation combine with personal animosity. Irrespective of this, a consistent application of YouTube's firearms policy in relation to instructional material for 3D-printed guns is necessary.

Despite its relatively small size, GunCAD has already had an enormous influence on worldwide access to firearms. The 3D-printed guns created and promoted by the movement have already been widely adopted, found among hobbyists worldwide, neo-Nazi accelerationists in Finland (https://gnet-research.org/2023/10/06/3d-printed-weapons-and-the-far-right-the-2023-finnish-accelerationist-cell/), organised criminals (https://www.bbc.co.uk/news/uk-england-leeds-64900210) across Western Europe (https://www.rfi.fr/en/france/20240210-police-in-marseille-bust-network-trafficking-in-3d-printed-weapons), and anti-junta insurgents in Myanmar (https://www.wired.com/story/the-rebel-drone-maker-of-myanmar/). They appear here to stay.

*Dr Rajan Basra is a Senior Research Fellow at the International Centre for the Study of Radicalisation (ICSR) and a postdoctoral researcher in the Department of War Studies at King's College London.*

*Nathan Mayer is a security researcher from the United States.*

---



### Rajan Basra

More by Rajan Basra ➡ (https://gnet-research.org/author/rajan-basra/)



### Nathan Mayer

More by Nathan Mayer ➡ (https://gnet-research.org/author/nathan-mayer/)

**Share**

 (https://www.facebook.com/sharer/sharer.php?u=https%3A%2F%2Fgnet-research.org%2F2024%2F09%2F10%2Flawsuits-rivalries-and-trolls-examining-the-behaviour-of-the-3d-printed-gun-movement%2F)

 (https://twitter.com/share?text=Lawsuits, Rivalries, and Trolls: Examining the Behaviour of the 3D-Printed Gun Movement&url=https%3A%2F%2Fgnet-research.org%2F2024%2F09%2F10%2Flawsuits-rivalries-and-trolls-examining-the-behaviour-of-the-3d-printed-gun-movement%2F)

 (https://pinterest.com/pin/create/button/?url=https%3A%2F%2Fgnet-research.org%2F2024%2F09%2F10%2Flawsuits-rivalries-and-trolls-examining-the-behaviour-of-the-3d-printed-gun-movement%2F&media=&description=Lawsuits, Rivalries, and Trolls: Examining the Behaviour of the 3D-Printed Gun Movement)

---

Tags: 3D-Printed (https://gnet-research.org/tag/3d-printed/), Content Moderation (https://gnet-research.org/tag/content-moderation/), Technology (https://gnet-research.org/tag/technology/)

---

©2024 Atelier · Built with love by Swift Ideas (http://www.swiftideas.com) using WordPress (http://wordpress.com/). Premium WordPress Themes by Swift Ideas (http://www.swiftideas.com)

Ex. A - COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

DEFENSE DISTRIBUTED'S RESPONSES TO ELIK'S
REQUEST FOR PRODUCTION 2:

SEEKING DOCUMENTS
SUPPORTING ITAR VIOLATION CONTENTION

## Download

This file type can't be viewed on Odysee.

[⬇ Download]

## The Choosy Express V2

🕐 November 19, 2022   👥 36K views     ◊ 125     ✂ 0     ⓢ Support     ⇄ 6 Reposts     ⌁ Share     •••

**The Gatalog's Collection of Accessories**
@TheGatalog-Accessories
7,440 followers

[⌇ Join]   [❤ Following]   🔔

The Gatalog presents:

The Choosy Express v2 - a 3D printable knicknack that does things and stuff

Join the community at thegatalog.com

**File size**
1.22 MB

Less                                                          ◈ 49 LBC




## The Gatalog's DIY Suppressors

5,610 followers ⓘ

Home    Content    Playlists    Channels    Membership    Community    About



### The FTN.3 Suppressor Pack

The Gatalog's DIY Suppressors • 33K views • 1 year ago

The Gatalog presents:
The FTN.3 Suppressor Pack
Join the community at thegatalog.com

### New Content

View More >





**The FTN.4 Suppressor Pack**

The Gatalog's DIY Suppressors
19K views • 7 months ago




**Venturi Suppressor Pack**

The Gatalog's DIY Suppressors
20K views • 1 year ago




**The FTN.3 Suppressor Pack**

The Gatalog's DIY Suppressors
33K views • 1 year ago



**The RGB Crescent**

The Gatalog's DIY Suppressors
21K views • 2 years ago




**The Shush Puppy**

The Gatalog's DIY Suppressors
33K views • 4 years ago




**K-CAD 3D Printed Suppressor Pack V1.0**

The Gatalog's DIY Suppressors
72K views • 4 years ago




**Saturn Suppressor System**

The Gatalog's DIY Suppressors
44K views • 4 years ago




**KCAD 3D-Printable Fuel Filter Baffels Gen 1**

The Gatalog's DIY Suppressors
27K views • 5 years ago





# Download

This file type can't be viewed on Odysee.

**⟱ Download**

## The REBEL-9

🕑 March 26, 2025   👥 10K views          🔥 73     ✂ 1     ⓢ Support     ⇄ 6 Reposts     ⤳ Share     •••

**The Gatalog's Hybrid Designs**
@TheGatalog-HybridDesigns
7,565 followers

🐾 Join     ♥ Following     🔔

The Gatalog presents:

The REBEL-9 - a 3D Printable Hybrid PCC With Advanced Features

Join the community at thegatalog.com

**File size**
257.75 MB

Less                                                        🌈 1 LBC

## Download

This file type can't be viewed on Odysee.

⬇ **Download**

## The Rogue 9

🕘 October 31, 2024    👥 21K views    🔥 109    ✂ 0    ⑤ Support    ⇄ 4 Reposts    ⌗ Share    •••

**The Gatalog's Hybrid Designs**
@TheGatalog-HybridDesigns
7,565 followers

🏵 Join    ❤ Following    🔔

The Gatalog presents:

The Rogue 9 - a hybrid 3D Printable 9mm carbine that uses 3D printable jigs to facilitate manufacturing.

Join the community at thegatalog.com

**File size**
297.96 MB

**Less**    🔶 16.06 LBC

A-185

## Download

This file type can't be viewed on Odysee.

⬇ **Download**

## Moms Demand Full Auto 3D-Printable Swift Link

🕐 October 23, 2019   👥 28K views       🔥 34       ✂ 1       ⓢ Support       ⇄ 2 Reposts       ⌁ Share       •••

**The Gatalog's Collection of Accessories**
@TheGatalog-Accessories
7,440 followers

🗡 Join   ♥ Following   🔔

The Gatalog presents:

By FreeMenDontAsk: "Moms Demand Full Auto" 3D-Printable Swift Link

Join the community at thegatalog.com

**License**
Public Domain

**File size**
7.17 MB

Less                                                                    ⚡ 299.88 LBC

## Download

This file type can't be viewed on Odysee.

⬇ Download

## Yankee Boogle 3D Printable AR15 Full-Auto Mod (Swift Link)

🕐 December 25, 2019    👥 100K views    🔥 81    ✳ 1    ⓢ Support    ⇄ 6 Reposts    ⤳ Share    •••

**The Gatalog's Collection of Accessories**
@TheGatalog-Accessories
7,440 followers

🚀 Join    ♥ Following    🔔

The Gatalog presents:

Yankee Boogle 3D Printable AR15 Full-Auto Mod (Swift Link)

Join the community at thegatalog.com

**License**
Public Domain

**File size**
333.96 KB

# ITAR
# Exemptions
# Handbook

**Seventh Edition**
**May 2018**



SOCIETY FOR INTERNATIONAL AFFAIRS

© 2018 Society for International Affairs

**2**

## ACKNOWLEDGEMENT

The Society for International Affairs would like to acknowledge the valued contribution of the ITAR Exemptions Task Force in updating this handbook and the Directorate of Defense Trade Controls (DDTC) and the Defense Technology and Security Administration (DTSA) for its support in review of portions of this handbook.

The efforts of the Task Force volunteers, listed below, are especially deserving of recognition for the many hours of research, writing and editing involved in the update of this *ITAR Exemptions Handbook*.

| | |
|---|---|
| Ron Ani | Lockheed Martin |
| Lisa Bencivenga | Lisa Bencivenga LLC |
| Greg Creeser | ITC Strategies |
| Sandra Cross | Huntington Ingalls Industries |
| Debi Davis | Esterline |
| Patricia Dudley | Airbus Defense & Space, Inc. |
| Josh Fitzhugh | BAE Systems, PLC |
| Candace Goforth | Goforth Trade Advisors LLC |
| John Joyce | Lockheed Martin |
| Mark Kelly | Jacobs Engineering Group Inc. |
| Ken Martin | Pratt & Whitney, a UTC Company |
| Christine McGinn | InterGlobal Trade Consulting |
| Beth Mersch | Northrop Grumman Corporation |
| Ken Oukrop | Defense Technology Security Administration |
| Robert Rothenberg | UTC Aerospace Systems |
| Debbie Shaffer | Southwest Research Institute |
| Liz Shipyan | Northrop Grumman Corporation |
| Peter Sywenkyj | Pratt & Whitney, a UTC Company |
| Marlene Tarbell | General Dynamics |
| Jennifer K. Weinel | Northrop Grumman Corporation |
| Denise Williams | General Electric |

In particular, SIA gratefully acknowledges the efforts of the 2017 "Tiger" Team that saw this update to its completion:

| | |
|---|---|
| Sandra Cross | Huntington Ingalls Industries |
| Debi Davis | Esterline |
| Patricia Dudley | Airbus Defense & Space, Inc. |
| Jahna Hartwig | Booz Allen Hamilton |
| Denise Lester | Northrop Grumman |
| Blount Stewart | Raytheon Company |
| Jennifer K. Weinel | Northrop Grumman Corporation |
| Pam Weich | Raytheon Company |

Jennifer K. Weinel
President
Society for International Affairs
May 2018

---

ITAR Exemptions Handbook

© 2018 Society for International Affairs

# EXPORTING PROCEDURES

See SIA's *U.S. Customs & Border Protection Handbook for Defense Trade* for more detailed instructions and process tips.

**SHIPMENTS OF HARDWARE AND DATA**

In general, the following should occur:

1. **AES Filing\*** - Per ITAR § 123.22(b), before the export of any hardware using an exemption in this subchapter, the DDTC registered applicant/exporter, or an agent acting on the filer's behalf, must electronically provide Electronic Export Information (EEI) to the U.S. Customs and Border Protection electronic system(s) which is currently the Automated Export System (AES) housed in the Automated Commercial Environment (ACE) in accordance with the following timelines:

   a. Air or Truck Shipments. The export information must be electronically filed at least 8 hours prior to departure.

   b. Sea or Rail Shipments. The export information must be electronically filed at least 24 hours prior to departure.

   c. Emergency shipments of hardware that cannot meet the pre-departure filing requirements. U.S. Customs and Border Protection may permit an emergency export of hardware by truck (e.g., departures to Mexico or Canada) or air, by a U.S. registered person, when the exporter is unable to comply with the AES filing timeline in paragraph (b)(1)(i) of this section. (See § 123.22(b)(2) for additional information)

The EEI can be filed by the U.S. Principal Party of Interest (exporter), its authorized agent or the authorized agent of the Foreign Principal Party in Interest (15 CFR 30.2)

> Note: Using an agent to file your EEI does not relieve you from the compliance responsibilities.

**\*Special Note for Technical Data Shipments**

Per ITAR 123.22 (b)(3)(iii), "In any instance when technical data is exported using an exemption in this subchapter (e.g., §§ 125.4(b)(2), 125.4(b)(4), 126.5) from a U.S. port, the exporter must provide the export data electronically to DDTC. A copy of the electronic notification to DDTC must accompany the technical data shipment and be made available to the U.S. Customs and Border Protection upon request."

However, there currently is no electronic means by which to provide the requested data directly to DDTC. Future changes to the electronic reporting procedure will be amended by publication of a rule in the Federal Register. Meanwhile, Exporters

---

© 2018 Society for International Affairs   **ITAR Exemptions Handbook**

**20** | Exporting Procedures

are reminded to continue maintaining records of all export transactions, including exemption shipments, in accordance with this subchapter.

FTR 30.37(u) provides the exemption from filing AES for these transactions.

"(u) Exports of technical data and defense service exemptions as cited in 22 CFR 23.22(b)(3)(iii) of the ITAR."

2. **Prepare/Complete Commercial Invoice** –

   a. In addition to electronically providing the export information to the U.S. Customs and Border Protection before export, all the mandatory documentation must be available to present to the port authorities if requested (e.g., attachments, certifications, proof of AES filing (i.e. the EEI); the Internal Transaction Number (ITN)).

   b. Annotate on the Commercial Invoice with the proper AES/Census exemption legend or proof of filing citation.

      For example AES ITN: X20170015000001

   c. Provide Freight Forwarder (if applicable) with Shipping Instructions, Packing List and AES/ITN or AES/Census exemption

3. **Destination Control Statement** – incorporate the following statement as an integral part of the Commercial/Pro Forma invoice:

   "These items are controlled by the U.S. government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. government or as otherwise authorized by U.S. law and regulations."

**HAND CARRIES OF HARDWARE AND DATA**

Individuals' hand-carrying a defense article which is exempt from licensing should arrange to file the EEI to the Department of Census via AES prior to their planned arrival at the airport. The individual should have the Internal Transaction Number (ITN) generated by AES, which confirms the acceptance of the transaction by Census. In addition, 22 CFR 123.22(b) has established various "wait times" that must be observed between the time the EEI is filed and when the exporter can actually ship/make the export. Hand carrying technical data using an exemption does not currently require an EEI, but the document(s) must be clearly marked with the appropriate exemption citation. This procedure will continue until DDTC completes development of an electronic process for submission of reports on the export of technical data.

---

ITAR Exemptions Handbook                                      © 2018 Society for International Affairs

## INTANGIBLE TRANSFERS OF DATA

Intangible transfers of data could include verbal, visual or electronic transfers. For electronic transfers, though not required, it is encouraged (and general industry practice) that exports via E-mail or over the Internet be encrypted to protect against inadvertent disclosures/access, in addition to the below:

1. **Destination Control Statement** – Though not required, it is encouraged that intangible exports of data incorporate a Destination Control Statement on the document, cover/title page or email to inform the recipient of controls:

   "These items are controlled by the U.S. government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. government or as otherwise authorized by U.S. law and regulations."

2. **Reporting** – There currently is no reporting requirement to DDTC. Meanwhile, Exporters are reminded to continue maintaining records of all export transactions, including exemption shipments, in accordance with this subchapter.

## RECORD KEEPING REMINDERS

Exporters are reminded to continue maintaining and reviewing all import and export documents, to include: AES/EEI records; Airway Bill/Bill of Lading AWB/BOL; delivery confirmation; and for your imports, CBP Forms such as Entry documentation such as CBP Forms 3461; 7501, especially those that will be used for exemption use upon export; 3311; etc.

© 2018 Society for International Affairs

**ITAR Exemptions Handbook**

attorney fees, market value appraisals, and foreclosure costs. Annual fees advanced by the lender to the Agency are ineligible for reimbursement when calculating the loss claim payment.

■ 11. Amend § 3555.353 by revising paragraphs (a) introductory text and (b) to read as follows:

### § 3555.353  Net recovery value.

\* \* \* \* \*

(a) *For a property that has been sold.* When a loss claim is filed on a property that was sold to a third party at the foreclosure sale or through an approved pre-foreclosure sale, net recovery value is calculated as follows:

\* \* \* \* \*

(b) *For a property that has been acquired.* When a loss claim is filed on a property acquired by the lender through a foreclosure sale or a deed-in-lieu of foreclosure, the net recovery value is based on an estimated sales price calculated using a market value appraisal along with holding and disposition costs calculated using the acquisition and management factor (also known as the VA Net Value Factor) published by the VA, and other factors as determined by the Agency. The lender must submit a loss claim package, including a market value appraisal, within 60 days of the foreclosure sale date or the date the lender acquires title. If eviction action is required in order to obtain a market value appraisal, the lender must submit the loss claim package, including the market value appraisal, within 60 days of the date the occupants clear the premises and in accordance with other requirements of this subpart. with any loss claim request in accordance with subpart H.

■ 12. Amend § 3555.354 by revising the introductory text and paragraph (b) to read as follows:

### § 3555.354  Loss claim procedures.

All lenders must use a web-based automated system designated by the Agency to submit all loss claim requests.

\* \* \* \* \*

(b) *REO.* If at liquidation, the title to the property is conveyed to the lender, the lender will submit a loss claim package, including a market value appraisal, within 60 days of the foreclosure sale date or the date the lender acquires title. If eviction action is required in order to obtain a market value appraisal, the lender must submit the loss claim package within 60 days of the date the occupants clear the premises. The lender must order a market value appraisal and include the market value appraisal with the loss claim package. The Agency will use the market value appraisal, along with other Agency required documentation, to determine the property value for the basis of the loss claim. The Agency will apply an acquisition and management resale factor to estimate holding and disposition costs, based on the most current VA Management and Acquisition Factor found at *https://www.benefits.va.gov/HOMELOANS/servicers_valeri.asp.*

\* \* \* \* \*

### § 3555.356  [Removed and Reserved]

■ 13. Remove and reserve § 3555.356.

Dated: November 25, 2019.

**Bruce W. Lammers,**

*Administrator, Rural Housing Service.*

[FR Doc. 2019–27504 Filed 12–23–19; 8:45 am]

**BILLING CODE 3410–XV–P**

---

## FEDERAL RESERVE SYSTEM

**12 CFR Parts 206, 208, 211, 215, 217, 223, 225, 238, and 251**

**[Regulation Q; Docket No. R–1638]**

**RIN 7100–AF 29**

### Regulatory Capital Rule: Capital Simplification for Qualifying Community Banking Organizations

**AGENCY:** Board of Governors of the Federal Reserve System (Board).

**ACTION:** Final rule; correction.

**SUMMARY:** The **Federal Register** document of November 13, 2019, promulgating a final rule that provides for a simple measure of capital adequacy for certain community banking organization had two erroneous amendment instructions. This document corrects these errors.

**DATES:** This correction is effective on January 1, 2020.

**SUPPLEMENTARY INFORMATION:** In FR Doc. 2019–23472 appearing on page 61776 in the **Federal Register** of Wednesday, November 13, 2019, the following corrections are made:

■ 1. On page 61796, in the center column, amendatory instruction 31 is corrected to read as follows:

"31. Section 208.43 is amended by revising paragraphs (a), (b) introductory text, and (b)(1) to read as follows:"

■ 2. On page 61799, in the center column, amendatory instruction 46 is corrected to read as follows:

"46. Section 225.14 is amended by:
a. Redesignating footnote 3 to paragraph (a)(1)(ii) as footnote 1 to paragraph (a)(1)(ii);

b. Revising paragraphs (a)(1)(v), (a)(1)(vii), and (c)(6)(i)(A) and (B); and
c. Adding paragraphs (c)(6)(iii) and (f)."

Board of Governors of the Federal Reserve System, December 18, 2019.

**Ann Misback,**

*Secretary of the Board.*

[FR Doc. 2019–27717 Filed 12–23–19; 8:45 am]

**BILLING CODE 6210–01–P**

---

## DEPARTMENT OF STATE

**22 CFR Part 120**

**[Public Notice: 10946]**

**RIN 1400–AE76**

### International Traffic in Arms Regulations: Creation of Definition of Activities That Are Not Exports, Reexports, Retransfers, or Temporary Imports; Creation of Definition of Access Information; Revisions to Definitions of Export, Reexport, Retransfer, Temporary Import, and Release

**AGENCY:** Department of State.

**ACTION:** Interim final rule; request for comment.

**SUMMARY:** The Department of State amends the International Traffic in Arms Regulations (ITAR) to create a definition of "activities that are not exports, reexports, retransfers, or temporary imports" by combining existing text from the regulations with new text regarding secured unclassified technical data. The activities included in the new definition are: Launching items into space, providing technical data to U.S. persons within the United States or within a single country abroad, and moving a defense article between the states, possessions, and territories of the United States. The definition also clarifies that the electronic transmission and storage of properly secured unclassified technical data via foreign communications infrastructure does not constitute an export. Additionally, the Department amends the ITAR to create a definition of "access information" and revise the definition of "release" to address the provision of access information to an unauthorized foreign person.

**DATES:** *Effective date:* This interim final rule is effective on March 25, 2020.

*Comments due date:* Interested parties may submit comments by January 27, 2020.

**ADDRESSES:** Interested parties may submit comments by one of the following methods:

- *Email: DDTCPublicComments@state.gov* with the subject line, "Revisions to Definitions; Data Transmission and Storage"
- *Internet:* At *www.regulations.gov*, search for this notice using Docket DOS–2019–0040.

**FOR FURTHER INFORMATION CONTACT:** Ms. Sarah Heidema, Director, Office of Defense Trade Controls Policy, Department of State, telephone (202) 663–1282; email *DDTCPublicComments@state.gov*. ATTN: ITAR Amendment—Revisions to Definitions; Data Transmission and Storage.

**SUPPLEMENTARY INFORMATION:** The Directorate of Defense Trade Controls (DDTC), U.S. Department of State, administers the International Traffic in Arms Regulations (ITAR) (22 CFR parts 120 through 130). The items subject to the jurisdiction of the ITAR, *i.e.,* defense articles and defense services, are identified on the ITAR's U.S. Munitions List (USML) (22 CFR 121.1). With few exceptions, items not subject to the export control jurisdiction of the ITAR are subject to the jurisdiction of the Export Administration Regulations (EAR, 15 CFR parts 730 through 774, which includes the Commerce Control List (CCL) in Supplement No. 1 to part 774), administered by the Bureau of Industry and Security (BIS), U.S. Department of Commerce. Both the ITAR and the EAR create license requirements for exports and reexports of controlled items. Items not subject to the ITAR or to the exclusive licensing jurisdiction of any other set of regulations are subject to the EAR.

On June 3, 2015, the Department of State published a proposed rule (80 FR 31525) (2015 proposed rule) and requested comments on an extensive array of proposed amendments to the ITAR, including the revision of key definitions, the creation of several new definitions, and the revision of related provisions. The proposed amendments also attempted to harmonize these definitions with the EAR to the extent appropriate. After reviewing the public comments on the 2015 proposed rule, the Department published an interim final rule on June 3, 2016 (81 FR 35611) (2016 interim final rule), which updated the definitions of "export" and "reexport or retransfer" and, in an effort to clarify and support the interpretation of these definitions, also created definitions of "release" and "retransfer." BIS concurrently published amendments (BIS companion rule) to definitions, including "export," "reexport," "release," and "transfer (in-country)" in the EAR (81 FR 35586).

The Department subsequently reviewed the public comments on the 2016 interim final rule and published a final rule on September 8, 2016 (81 FR 62004) (2016 final rule), which revised the definition of "retransfer" and made other clarifying revisions. Not all of the amendments proposed in the 2015 proposed rule were adopted, and both the 2016 interim final rule and the 2016 final rule reserved the remaining amendments for consideration in separate rulemakings.

This interim final rulemaking addresses certain of the remaining amendments from the 2015 proposed rule, and the Department continues to reserve the remaining amendments for consideration in separate rulemakings. Included in this interim final rule is the creation of a definition for "activities that are not exports, reexports, retransfers, or temporary imports" under a new ITAR § 120.54 (§ 120.52 in the 2015 proposed rule). Among other things, this provision provides that the properly secured (by end-to-end encryption) electronic transmission or storage of unclassified technical data via foreign communications infrastructure does not constitute an export, reexport, retransfer, or temporary import.

The Department recognizes the BIS companion rule addressed these issues with the creation of EAR § 734.18, and the Department has received repeated enquiries regarding when a similar rule would be issued regarding the ITAR. In an effort to align the definition in the ITAR with the definition in the EAR, the interim final rule described below is structured similarly to EAR § 734.18. The Department also recognizes that it has received public comments regarding these amendments to the ITAR. Where appropriate, those comments are addressed in the analysis below. In light of the potential impact the amendments in this rule may have on the regulated community's processes, and the updated security strength standards described below, the Department considered it appropriate to provide another opportunity for the public to submit comments and therefore publishes this rule as an interim final rule with the opportunity for the public to provide comment.

### 1. Definition of Activities That Are Not Exports, Reexports, Retransfers, or Temporary Imports

The Department adds § 120.54 to describe those "activities that are not exports, reexports, retransfers, or temporary imports" and do not require authorization from the Department. For the purpose of this preamble, the Department will use the term

"controlled event" to mean an export, reexport, retransfer, or temporary import, all of which require a DDTC license or other approval.

The first of five provisions in the new § 120.54 states in paragraph (a)(1) that it is not a controlled event to launch items into space. This activity is already excluded from the definition of an export in ITAR § 120.17(a)(6) and by statute, see 51 U.S.C. 50919(f). In an effort to consolidate the different activities that do not qualify as exports under the ITAR, this provision has been moved to § 120.54(a)(1), and the language has been simplified.

The second provision states in paragraph (a)(2) that it is not a controlled event to transmit or otherwise transfer technical data to a U.S. person within the United States from a person in the United States. In response to public comments, the updated version of paragraph (a)(2) provides that a transmission or other transfer between U.S. persons who are in the United States is unequivocally not a controlled event. However, any release to a foreign person remains a controlled event.

The third provision, which was not included in the 2015 proposed rule but is added here in response to public comments to that proposed rule, is found in the new paragraph (a)(3). This provision states that transmissions or other transfers of technical data between and among only U.S. persons in the same foreign country are similarly not reexports or retransfers so long as they do not result in a release to a foreign person or transfer to a person prohibited from receiving the technical data because that person is otherwise precluded from engaging in the regulated activity, for example a debarred person.

The fourth provision states in paragraph (a)(4) that it is not a controlled event to move a defense article between the states, possessions, and territories of the United States. One commenter requested that the Department revise paragraph (a)(4) to list explicitly the Virgin Islands of the United States, Guam, American Samoa, and the various United States Minor Outlying Islands. The Department will not make this change because the ITAR already defines the term "United States" in § 120.13, and that definition is applicable.

The fifth provision states in paragraph (a)(5) that it is not a controlled event to send, take, or store unclassified technical data when it is effectively encrypted using end-to-end encryption. Therefore, a controlled event does not occur when technical data is encrypted

Case 2:24-cv-01260-WBS-LJH Document 1281 Filed 09/28/23 Page 195 of 537 PageID 2537

prior to leaving the sender's facilities and remains encrypted until decrypted by the intended authorized recipient or retrieved by the sender, as in the case of remote storage. The controlled event occurs upon the release of the technical data. If the technical data is decrypted by someone other than the sender, a U.S. person in the United States, or a person otherwise authorized to receive the technical data, then the technical data is not secured using end-to-end encryption for purposes of paragraph (a)(5) and the original transmission was a controlled event.

The encryption must be accomplished in a manner that is certified by the U.S. National Institute for Standards and Technology (NIST) as compliant with the Federal Information Processing Standards Publication 140–2 (FIPS 140–2), or must meet or exceed a 128-bit security strength. At the time of publication of this rule, that criterion is expressed in ''Table 2: Comparable strengths'' of NIST Special Publication 800–57 Part 1, Revision 4. Additionally, the technical data may not be intentionally sent to a person in or stored in a § 126.1 country or the Russian Federation, even in its encrypted state. This will allow for transmissions and storage of encrypted data in most foreign countries, so long as the technical data remains continuously encrypted while outside of the United States or until decrypted by an authorized intended recipient.

In response to public comments regarding the requirement of the 2015 proposed rule that the encryption be via a FIPS 140–2 compliant module, the Department added language that allows encryption through means other than FIPS 140–2 compliant modules, so long as it meets or exceeds a 128-bit security strength. One commenter suggested that the Department retain only FIPS 140–2 to encourage interoperability between systems, but the overwhelming number of commenters requested other encryption modules be allowed. The Department also clarified that intentional storage in the Russian Federation or a § 126.1 country constitutes a controlled event. However, incidental collection by a foreign intelligence service or transient storage that is incidental to sending information via the internet does not.

Further, in response to public comments, the Department revised paragraph (b) to clarify the definition of end-to-end encryption. The cryptographic protection must be applied prior to the data being sent outside of the originator's security boundary and remain undisturbed until it arrives within the security boundary

of the intended recipient. For communications between individuals, this can be accomplished by encrypting the data on the sender's computer prior to emailing or otherwise sending it to the intended recipient. For large entities, the security boundary may be managed by IT staff, who will encrypt the data before it leaves the entity's secure network and decrypt it on the way into the network. However, in all instances, the means of decryption must not be provided to any third party and the data must not have the cryptographic protection removed at any point in transit.

One commenter suggested that the Department define which modules under FIPS 140–2 are compliant and which NIST publications are applicable, in the rule. The Department disagrees with this comment. Compliance with any of the four levels set out in FIPS 140–2 is sufficient for the purposes of this section. Exporters are free to choose the level that best meets their needs. Different NIST publications are relevant to each standard, so the applicable publications will depend on the standard used.

One commenter suggested that the Department provide one year from the issuance of a new NIST standard for implementation. The Department disagrees with this comment. The NIST standards will be final and applicable when NIST makes them the standard.

One commenter requested that the Department allow a transition period so that exporters can implement IT systems compliant with paragraph (5). The Department disagrees with this comment. Paragraph (5) creates a mechanism for companies to send and store technical data outside the United States without engaging in a controlled event. Until companies implement an IT system that is compliant with paragraph (5), they may not take advantage of this paragraph, but nothing in paragraph (5) places any new requirements on exporters, therefore there is no need for a transition period.

One commenter suggested that the Department revise paragraph (b) to say ''the means to access the data in unencrypted form is not 'released' to any third party'' rather than ''the means to access the data in unencrypted form is not given to any third party,'' as ''release'' is a defined term. The Department disagrees with this comment. The Department did revise this concept in paragraph (b) to require that ''the means of decryption are not provided to any third party,'' but the Department chose not to use the word ''released'' because that word has a

technical definition that would not be applicable in this usage.

Several commenters requested that the Department provide a safe harbor, of sorts, by only requiring that cloud customers obtain contractual assurances that the data would not be stored in a § 126.1 country or the Russian Federation. The Department disagrees with this comment. Such a provision would not be in the national security or foreign policy interests of the United States. The Department recognizes it can be difficult to control the actions of third parties, including partners, service providers, and subcontractors, and will review potential violations on a case-by-case basis, subject to the totality of the facts and circumstances comprising the issue at hand.

One commenter requested that the Department clarify that appropriately encrypted transmissions may transit the Russian Federation or a § 126.1 country and still qualify for this provision. The Department clarified this point by adding the word ''intentionally,'' to differentiate those electronic transmissions that were intentionally sent to Russia or a § 126.1 country, and those that simply transited them in route to another country. The commenter also provided an example of such a transmission where an email server is located in the Russian Federation or a § 126.1 country. Transmission through these destinations is allowed, including temporary storage incident to internet transmissions, but long-term storage of the information, such as is commonly done on email servers, is prohibited in these destinations. Prior to using this provision, putative exporters should ensure that the intended recipient or any intended remote storage provider does not store their information in the Russian Federation or a § 126.1 country.

One commenter requested that the Department provide that emails between authorized parties in the same country also be included in the definition of activities that are not exports, reexports, or retransfers if they happen to transit a third country, even if the technical data is not encrypted as described in paragraph (5). The Department notes that transmissions between U.S. persons in the United States are not exports under paragraph (2), but that with respect to transmissions in foreign countries, only those communications that remain in one country between only U.S. persons are excluded under paragraph (3). If a company in a foreign country is concerned that emails that include technical data may transit third countries, it should encrypt those

communications consistent with paragraph (5).

Several commenters requested that the Department revise the local definition of end-to-end encryption to allow for information security mechanisms that render the data into clear text in route to the intended recipient, for processing via applications, such as anti-virus software or spell-check. The commenters also note that multiple layers of encryption may be applied and removed throughout the transit of the data. The Department disagrees with this comment. Use of paragraph (a)(5) requires that the technical data subject to the ITAR be continuously encrypted at all times while outside of an authorized security boundary. The Department is aware that there are many ways that this provision can be implemented; some of which would allow an entity to run anti-virus or other security scans prior to allowing the data onto its servers. As long as that initial encryption layer remains intact, the addition or removal of subsequent layers of encryption, which may or may not meet the FIPS 140–2 standard, is not relevant to the application of this section.

One commenter requested that the Department include the electronic storage in the United States and transfer from the United States of non-U.S. origin technical data by non-U.S. persons within the activities that are not an export, reexport, or retransfer, even when not encrypted. The Department disagrees with this comment. Non-U.S. origin technical data transiting or stored in the United States that is encrypted in the manner described in paragraph (a)(5) (*i.e.,* it remains encrypted at all times between originator and recipient, including at any time while in the United States), does not require authorization from the Department, unless it originates in or is sent to a country listed in § 126.1 or the Russian Federation.

One commenter stated that paragraph (a)(5) in this rule does not authorize the export of technical data in a physical medium and requested that the Department revise paragraph (a)(5) to allow the shipment or carriage of technical data in a physical medium that has been properly encrypted. The Department notes that the comment mischaracterizes the activity. The movement or storage of controlled technical data in a properly encrypted state outside of the United States is not an export as defined in § 120.17(a)(1), the specific concern raised by the commenter, or a controlled event of any type, and does not require

authorization. The Department notes that paragraph (a)(5) is not limited to electronic transmissions and the shipment or carriage of technical data in a physical medium is not a controlled event, so long as all of the conditions are met.

One commenter requested that the Department expand paragraph (a)(5) to cover tokenization, as well as encryption. Tokenization is a process whereby individual elements of a document, be they letters, words, diagrams, or pictures, are replaced by a representative token. As described by the commenter, the tokens are assigned randomly and a key of the document is created. The document may not be returned to the original text from the tokens without use of the specific key for that document. This process is different from encryption, in that encryption uses an algorithm to encode the document, such that representative characters are assigned according to a mathematical formula that can, at least theoretically, be deciphered through analysis of the encrypted text. The Department will not add tokenization. There is no NIST or other comparable standard that the Department can reference to set a minimum threshold for implementation of tokenization.

One commenter suggested that the Department encourage other jurisdictions to adopt a provision similar to paragraph (a)(5) in their export control systems. The Department agrees, and has already engaged in discussions with allies regarding paragraph (a)(5).

One commenter requested that the Department add shipping to and within the territory of an approved end-user as an activity that is not an export, reexport, or retransfer. The Department disagrees with this comment. A shipment to the territory of an approved end-user is an export or reexport that requires authorization. Shipments within the territory of an authorized end-user will likewise require authorization if the shipment is to someone other than the authorized end-user or for activities other than the authorized end-use.

One commenter requested that the Department create a definition of "basic technical data" and include the sharing of such information in this section, analogizing to the sharing of the owner's manual for a car. The Department disagrees with this comment. The export of technical data requires authorization from the Department. If the Department were to define some portion of technical data that does not warrant control, the Department would revise § 120.6 or § 120.10 to exclude it.

One commenter suggested that the Department include shipments to military post offices in this section, noting that the National Industrial Security Program Operating Manual (NISPOM) treats transfers to military post offices as domestic transfers. The Department disagrees with this comment. The export of a defense article shipped to a military post office via the U.S. Postal Service is accomplished by the U.S. military and therefore may be authorized without a license via § 126.4 of the ITAR, so long as the other terms and conditions of that provision are met.

**2. Revised Definitions of Export, Reexport, Retransfer, and Temporary Import**

As stated above, the Department moves the language of § 120.17(a)(6), which articulates that it is not an export to launch items into space, to § 120.52(a)(1), and simplifies the language. In its place, the Department adds a new § 120.17(a)(6) in order to include within the definition of export the release through the use of access information of previously encrypted technical data as described in § 120.50(a)(3) (to a foreign person, no matter where located) and (a)(4) (causing the technical data to be in an unencrypted form out of the United States). The Department added a citation to § 120.54 to §§ 120.17(a), 120.18, 120.19(a), and 120.51(a), which define export, temporary import, reexport, and retransfer, respectively, to exclude from those definitions activities identified in § 120.54. In addition, the Department takes this opportunity to revise § 120.17(a) in order to mirror the construction of the other definitions of controlled activities and lead with the defined term of "export."

**3. Definition of Access Information**

The Department adds new § 120.55 to define "access information." Access information allows access to encrypted technical data in an unencrypted form, such as decryption keys, network access codes, and passwords. An authorization is required to release technical data through access information to the same extent that an authorization is required to export the technical data when it is unsecured by encryption.

Several commenters requested that the Department adopt the knowledge requirement that was included in the BIS companion rule and now appears in EAR § 734.19. The Department disagrees with this comment. As provided in §§ 120.50(b) and 120.54(b), an existing authorization for the release of technical data to the foreign person must be in

place prior to the provision of access information to the foreign person that will allow the transition of the encrypted technical data to an unencrypted state.

### 4. Revised Definition of Release

The Department adds two new subparagraphs to paragraph (a) and a new paragraph (b) to the definition of release in § 120.50 in order to clarify what constitutes a release of technical data, a controlled event requiring authorization from the Department, and the provision of access information that may result in the release of technical data. Paragraph (a)(3) makes it a release of technical data to use access information to cause or enable a foreign person to access, view, or possess technical data in unencrypted form. Paragraph (a)(4) makes it a release of technical data to use access information in a foreign country to cause technical data to be in unencrypted form, including when such actions are taken by U.S. persons abroad. Most U.S. persons will be authorized to release the technical data abroad to themselves or over their employer's virtual private network through the exemption at ITAR § 125.4(b)(9).

The 2015 proposed rule proposed a new paragraph (a)(5) to make it a release to provide access information to a foreign person that can cause or enable access, viewing, or possession of technical data in unencrypted form. It also proposed a Note to paragraph (a) in order to clarify the license requirement regarding technical data secured by the access information when a release occurs under the proposed paragraphs (a)(3), (a)(4), or (a)(5).

In a change from the 2015 proposed rule, the Department now includes at paragraph (b) language derived from the proposed paragraph (a)(5) and Note included in that draft. The new paragraph (b) clarifies that the provision of access information to a foreign person is not itself a controlled event; there is no need for an application by the access information provider, or for the Department to issue an authorization, for the provision of access information. However, in order for the Department to effectively control the release of technical data to a foreign person in certain circumstances, paragraph (b) requires an authorization for a release of technical data to a foreign person before providing the access information to that foreign person, if that access information can cause or enable access, viewing, or possession of the unencrypted technical data. In the absence of an authorization for the release of technical data in such circumstances, the provision of access information to a foreign person is a violation of ITAR § 127.1(b)(1) for failure to abide by a rule or regulation contained in this subchapter.

Furthermore, causing or enabling a foreign person to access, view, or possess unencrypted technical data may constitute a separate violation of ITAR § 127.1(a), if the exporter (or reexporter or retransferrer) in question has not received prior authorization from the Department in the form of a license or other authorization (*e.g.*, exemption). As stated in ITAR § 120.54(b), in order for the sending, taking, or storing technical data to meet the requirements of end-to-end encryption and therefore to constitute an activity that is not a controlled event under ITAR § 120.54(a)(5), the intended recipient must be the originator, a U.S. person in the United States, or otherwise authorized to receive the technical data in an unencrypted form.

The Department recognizes that the 2015 proposed rule contained draft language for a new § 127.1(b)(4) that would have listed the types of controlled events involving the secured unclassified technical data described in this interim final rule's § 120.54(a)(5). The Department did not receive any public comments on this proposed amendment. Nevertheless, once the Department decided to establish a new definition for "access information" in § 120.55 that is distinct from the definition of technical data in § 121.10, it seemed more appropriate to include descriptions of the relevant controlled events under the definition of release in § 120.50 because that provision was added to the ITAR in order to describe more effectively the controlled disclosure of information. Moreover, this construction is analogous to how the EAR defines the term "access information" in EAR § 772.1 and uses that term in § 734.19 to describe controlled events related to "activities that are not exports, reexports, or retransfers" under § 734.18.

Finally, the Department adds and reserves §§ 120.52 and 120.53.

### Regulatory Analysis and Notices

*Administrative Procedure Act*

This rulemaking is exempt from section 553 (Rulemaking) and section 554 (Adjudications) of the Administrative Procedure Act (APA) pursuant to 5 U.S.C. 553(a)(1) as a military or foreign affairs function of the United States Government. Although the Department is of the opinion that this interim final rule is exempt from the rulemaking provisions of the APA, the Department published this rule as a proposed rule (80 FR 31525) with a 60-day provision for public comment, published an interim final rule (81 FR 35611) with a 30-day provision for public comment and three-month delayed effective date for certain provisions thereof, and now as another interim final rule with a 30-day provision for public comment and three-month delayed effective date for the provisions identified herein. Those publications were without prejudice to the Department's determination that controlling the import and export of defense services is a foreign affairs function.

*Regulatory Flexibility Act*

Since the Department is of the opinion that this rulemaking is exempt from the rulemaking provisions of 5 U.S.C. 553, there is no requirement for an analysis under the Regulatory Flexibility Act.

*Unfunded Mandates Reform Act of 1995*

This rulemaking does not involve a mandate that will result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any year and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

*Small Business Regulatory Enforcement Fairness Act of 1996*

For purposes of the Small Business Regulatory Enforcement Fairness Act of 1996 (the "Act"), a major rule is a rule that the Administrator of the OMB Office of Information and Regulatory Affairs finds has resulted or is likely to result in: (1) An annual effect on the economy of $100,000,000 or more; (2) a major increase in costs or prices for consumers, individual industries, federal, state, or local government agencies, or geographic regions; or (3) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and foreign markets.

The Department does not believe this rulemaking is a major rule within the meaning of the Act. The means of solving the issue of data protection are already both familiar to and extensively used by the affected public in protecting sensitive information.

**70892**  **Federal Register** / Vol. 84, No. 247 / Thursday, December 26, 2019 / Rules and Regulations

*Executive Orders 12372 and 13132*

This rulemaking will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 13132, it is determined that this rulemaking does not have sufficient federalism implications to require consultations or warrant the preparation of a federalism summary impact statement. The regulations implementing Executive Order 12372 regarding intergovernmental consultation on Federal programs and activities do not apply to this rulemaking.

*Executive Orders 12866 and 13563*

Executive Orders 12866 and 13563 direct agencies to assess costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributed impacts, and equity). The executive orders stress the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rulemaking has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Accordingly, the rulemaking has been reviewed by the Office of Management and Budget (OMB).

*Executive Order 12988*

The Department has reviewed the rulemaking in light of sections 3(a) and 3(b)(2) of Executive Order 12988 to eliminate ambiguity, minimize litigation, establish clear legal standards, and reduce burden.

*Executive Order 13175*

The Department has determined that this rulemaking will not have tribal implications, will not impose substantial direct compliance costs on Indian tribal governments, and will not preempt tribal law. Accordingly, Executive Order 13175 does not apply to this rulemaking.

*Executive Order 13771*

This final rule is not subject to the requirements of Executive Order 13771 because it is issued with respect to a military or foreign affairs function of the United States.

*Paperwork Reduction Act*

This rulemaking does not impose any new reporting or recordkeeping requirements subject to the Paperwork Reduction Act, 44 U.S.C. Chapter 35; however, the Department seeks public comment on any unforeseen potential for increased burden.

**List of Subjects in 22 CFR 120**

Arms and munitions, Classified information, Exports.

Accordingly, for the reasons set forth above, title 22, chapter I, subchapter M, part 120 of the Code of Federal Regulations is amended as follows:

**PART 120—PURPOSE AND DEFINITIONS**

■ 1. The authority citation for part 120 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2794; 22 U.S.C. 2651a; Pub. L. 105–261, 112 Stat. 1920; Pub. L. 111–266; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 2. Section 120.17 is amended by revising paragraphs (a) introductory text and (a)(6) to read as follows:

**§ 120.17  Export.**

(a) *Export,* except as set forth in § 120.54, § 126.16, or § 126.17, means:
*    *    *    *    *

(6) The release of previously encrypted technical data as described in § 120.50(a)(3) and (4) of this subchapter.
*    *    *    *    *

■ 3. Section 120.18 is revised to read as follows:

**§ 120.18  Temporary import.**

*Temporary import,* except as set forth in § 120.54, means bringing into the United States from a foreign country any defense article that is to be returned to the country from which it was shipped or taken, or any defense article that is in transit to another foreign destination. Temporary import includes withdrawal of a defense article from a customs bonded warehouse or foreign trade zone for the purpose of returning it to the country of origin or country from which it was shipped or for shipment to another foreign destination. Permanent imports are regulated by the Attorney General under the direction of the Department of Justice's Bureau of Alcohol, Tobacco, Firearms, and Explosives (see 27 CFR parts 447, 478, 479, and 555).

■ 4. Section 120.19 is amended by revising paragraph (a) introductory text to read as follows:

**§ 120.19  Reexport.**

(a) *Reexport,* except as set forth in § 120.54, § 126.16, or § 126.17, means:
*    *    *    *    *

■ 5. Section 120.50 is amended as follows:
■ a. By removing the word "or" at the end of paragraph (a)(1);
■ b. By removing the period and adding in its place a semi-colon at the end of paragraph (a)(2); and
■ c. By adding paragraphs (a)(3) and (4) and (b).

The additions read as follows:

**§ 120.50  Release.**

(a) *    *    *

(3) The use of access information to cause or enable a foreign person, including yourself, to access, view, or possess unencrypted technical data; or

(4) The use of access information to cause technical data outside of the United States to be in unencrypted form.

(b) Authorization for a release of technical data to a foreign person is required to provide access information to that foreign person, if that access information can cause or enable access, viewing, or possession of the unencrypted technical data.

■ 6. Section 120.51 is amended by revising paragraph (a) introductory text to read as follows:

**§ 120.51  Retransfer.**

(a) *Retransfer,* except as set forth in § 120.54, § 126.16, or § 126.17, means:
*    *    *    *    *

**§ 120.52  [Reserved]**

■ 7. Add reserved § 120.52.

**§ 120.53  [Reserved]**

■ 8. Add reserved § 120.53.

■ 9. Section 120.54 is added to read as follows:

**§ 120.54  Activities that are not exports, reexports, retransfers, or temporary imports.**

(a) The following activities are not exports, reexports, retransfers, or temporary imports:

(1) Launching a spacecraft, launch vehicle, payload, or other item into space.

(2) Transmitting or otherwise transferring technical data to a U.S. person in the United States from a person in the United States.

(3) Transmitting or otherwise transferring within the same foreign country technical data between or among only U.S. persons, so long as the transmission or transfer does not result in a release to a foreign person or

Case Ex. 4:24-cv-01149-O COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION 190 of 537
Document 123-1    Filed 09/28/23    Page 190 of 537
PageID 2541

transfer to a person prohibited from receiving the technical data.

(4) Shipping, moving, or transferring defense articles between or among the United States as defined in § 120.13 of this subchapter.

(5) Sending, taking, or storing technical data that is:

(i) Unclassified;

(ii) Secured using end-to-end encryption;

(iii) Secured using cryptographic modules (hardware or software) compliant with the Federal Information Processing Standards Publication 140–2 (FIPS 140–2) or its successors, supplemented by software implementation, cryptographic key management, and other procedures and controls that are in accordance with guidance provided in current U.S. National Institute for Standards and Technology (NIST) publications, or by other cryptographic means that provide security strength that is at least comparable to the minimum 128 bits of security strength achieved by the Advanced Encryption Standard (AES–128);

(iv) Not intentionally sent to a person in or stored in a country proscribed in § 126.1 of this subchapter or the Russian Federation; and

**Note to paragraph (a)(5)(iv):** Data in-transit via the internet is not deemed to be stored.

(v) Not sent from a country proscribed in § 126.1 of this subchapter or the Russian Federation.

(b)(1) For purposes of this section, end-to-end encryption is defined as:

(i) The provision of cryptographic protection of data, such that the data is not in an unencrypted form, between an originator (or the originator's in-country security boundary) and an intended recipient (or the recipient's in-country security boundary); and

(ii) The means of decryption are not provided to any third party.

(2) The originator and the intended recipient may be the same person. The intended recipient must be the originator, a U.S. person in the United States, or a person otherwise authorized to receive the technical data, such as by a license or other approval pursuant to this subchapter.

(c) The ability to access technical data in encrypted form that satisfies the criteria set forth in paragraph (a)(5) of this section does not constitute the release or export of such technical data.

■ 9. Section 120.55 is added to read as follows:

**§ 120.55   Access Information.**

Access information is information that allows access to encrypted technical data subject to this subchapter in an unencrypted form. Examples include decryption keys, network access codes, and passwords.

**Christopher A. Ford,**
*Assistant Secretary, International Security and Nonproliferation, U.S. Department of State.*

[FR Doc. 2019–27438 Filed 12–23–19; 8:45 am]

**BILLING CODE 4710–25–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Coast Guard**

**33 CFR Part 165**

**[Docket No. USCG–2019–0942]**

**Safety Zone, Brandon Road Lock and Dam to Lake Michigan Including Des Plaines River, Chicago Sanitary and Ship Canal, Chicago River, and Calumet-Saganashkee Channel, Chicago, IL**

**AGENCY:** Coast Guard, DHS.

**ACTION:** Notice of enforcement of regulation.

**SUMMARY:** The Coast Guard will enforce a segment of the Safety Zone; Brandon Road Lock and Dam to Lake Michigan including Des Plaines River, Chicago Sanitary and Ship Canal, Chicago River, Calumet-Saganashkee Channel on all waters of the Main Branch of the Chicago River 600 feet west of the N Orleans Street Bridge and 1000 feet east of the N Columbus Street Bridge. This action is necessary and intended to protect the safety of life and property on navigable waters prior to, during, and immediately after firework displays. During the enforcement periods listed below, entry into, transiting, or anchoring within the safety zone is prohibited unless authorized by the Captain of the Port Lake Michigan or a designated representative.

**DATES:** The regulation in 33 CFR 165.930 will be enforced from 11:30 p.m. on December 31, 2019 through 12:15 a.m. on January 1, 2020.

**FOR FURTHER INFORMATION CONTACT:** If you have questions about this notice of enforcement, call or email LT Tiziana C. Garner, Waterways Management Division, Marine Safety Unit Chicago, U.S. Coast Guard; telephone (630) 986–2155, email *D09-DG-MSUChicago-Waterways@uscg.mil.*

**SUPPLEMENTARY INFORMATION:** The Coast Guard will enforce a segment of the Safety Zone; Brandon Road Lock and Dam to Lake Michigan including Des Plaines River, Chicago Sanitary and

Ship Canal, Chicago River, Calumet-Saganashkee Channel on all waters of the main branch of the Chicago River 600 feet west of the N Orleans Street Bridge and 1000 feet east of the N Columbus Street bridge. During the enforcement period, no vessel may transit this regulated area without approval from the Captain of the Port Lake Michigan or a designated representative. Vessels and persons granted permission to enter the safety zone shall obey all lawful orders or directions of the Captain of the Port Lake Michigan, or an on-scene representative.

This notice of enforcement is issued under authority of 33 CFR 165.930 and 5 U.S.C. 552(a). In addition to this notice in the **Federal Register**, the Coast Guard will also provide notice through other means, which will include Broadcast Notice to Mariners, Local Notice to Mariners, distribution in leaflet form, and on-scene oral notice. The Captain of the Port Lake Michigan or a designated on-scene representative may be contacted via Channel 16, VHF–FM or at (414) 747–7182.

Dated: December 17, 2019.

**Thomas J. Stuhlreyer,**
*Captain, U.S. Coast Guard, Captain of the Port, Lake Michigan.*

[FR Doc. 2019–27625 Filed 12–23–19; 8:45 am]

**BILLING CODE 9110–04–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Coast Guard**

**33 CFR Part 165**

**[Docket Number USCG–2019–0965]**

**RIN 1625–AA00**

**Safety Zone; Straits of Mackinac, MI**

**AGENCY:** Coast Guard, DHS.

**ACTION:** Temporary final rule.

**SUMMARY:** The Coast Guard is establishing a temporary safety zone in the Captain of the Port, Sault Sainte Marie zone in Mackinac City, MI. This temporary safety zone is necessary to protect the public and private contractors from potential hazards associated with remotely operated underwater vehicle operations in the Straits of Mackinac. During the effective dates of the rule, vessels will not be able to operate in certain U.S. navigable waters in the Straits of Mackinac within 500 yards of the Tug Nancy Anne and Deck Barge MM–142 without authorization from the Captain of the Port.

Subtitle VII, Part A, Subpart III, Section 44701: General requirements. Under that section, Congress charges the FAA with promoting safe flight of civil aircraft in air commerce by prescribing regulations for practices, methods, and procedures the Administrator finds necessary for safety in air commerce. This regulation is within the scope of that authority because it addresses an unsafe condition that is likely to exist or develop on products identified in this rulemaking action.

**Regulatory Findings**

This AD will not have federalism implications under Executive Order 13132. This AD will not have a substantial direct effect on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government.

For the reasons discussed above, I certify that this AD:

(1) Is not a "significant regulatory action" under Executive Order 12866,

(2) Will not affect intrastate aviation in Alaska, and

(3) Will not have a significant economic impact, positive or negative, on a substantial number of small entities under the criteria of the Regulatory Flexibility Act.

**List of Subjects in 14 CFR Part 39**

Air transportation, Aircraft, Aviation safety, Incorporation by reference, Safety.

**The Amendment**

Accordingly, under the authority delegated to me by the Administrator, the FAA amends 14 CFR part 39 as follows:

**PART 39—AIRWORTHINESS DIRECTIVES**

■ 1. The authority citation for part 39 continues to read as follows:

**Authority:** 49 U.S.C. 106(g), 40113, 44701.

**§ 39.13 [Amended]**

■ 2. The FAA amends § 39.13 by adding the following new airworthiness directive:

**2021–10–18 Airbus Helicopters Deutschland GmbH:** Amendment 39–1551; Docket No. FAA–2021–0104; Project Identifier MCAI–2020–00477–R.

**(a) Effective Date**

This airworthiness directive (AD) is effective July 6, 2021.

**(b) Affected ADs**

None.

**(c) Applicability**

This AD applies to Airbus Helicopters Deutschland GmbH Model MBB–BK117 D–2 helicopters, certificated in any category, all serial numbers, having an affected part defined in European Union Aviation Safety Agency (EASA) AD 2020–0084, dated April 3, 2020 (EASA AD 2020–0084).

**(d) Subject**

Joint Aircraft System Component (JASC) Code 2700, Flight Control System.

**(e) Reason**

This AD was prompted by reports that collective lever switch units having certain part numbers did not have retaining rings installed in the cable cut switch guard. The cable cut switch guard has an axis that holds, and allows the guard to turn over, the cable cut switch. This axis is secured with two retaining rings and if both retaining rings are missing, the axis can move out. The FAA is issuing this AD to address this condition, which could cause inadvertent activation of the rescue hoist cable cut function, resulting in personal injury.

**(f) Compliance**

Comply with this AD within the compliance times specified, unless already done.

**(g) Requirements**

Comply with all required actions and compliance times specified in, and in accordance with, EASA AD 2020–0084.

**(h) Exceptions to EASA AD 2020–0084**

(1) Where EASA AD 2020–0084 refers to its effective date, this AD requires using the effective date of this AD.

(2) The "Remarks" section of EASA AD 2020–0084 does not apply to this AD.

**(i) Special Flight Permit**

Special flight permits may be issued in accordance with 14 CFR 21.197 and 21.199 to operate the helicopter to a location where the helicopter can be modified (if the operator elects to do so), provided the helicopter is not used for hoist operations.

**(j) Alternative Methods of Compliance (AMOCs)**

(1) The Manager, International Validation Branch, FAA, has the authority to approve AMOCs for this AD, if requested using the procedures found in 14 CFR 39.19. In accordance with 14 CFR 39.19, send your request to your principal inspector or local Flight Standards District Office, as appropriate. If sending information directly to the manager of the International Validation Branch, send it to the attention of the person identified in paragraph (k) of this AD. Information may be emailed to: *9-AVS-AIR-730-AMOC@faa.gov.*

(2) Before using any approved AMOC, notify your appropriate principal inspector, or lacking a principal inspector, the manager of the local flight standards district office/certificate holding district office.

**(k) Related Information**

For more information about this AD, contact Hal Jensen, Aerospace Engineer, Operational Safety Branch, FAA, 950 L'Enfant Plaza SW, Washington, DC 20024; telephone 202–267–9167; email *hal.jensen@faa.gov.*

**(l) Material Incorporated by Reference**

(1) The Director of the Federal Register approved the incorporation by reference (IBR) of the service information listed in this paragraph under 5 U.S.C. 552(a) and 1 CFR part 51.

(2) You must use this service information as applicable to do the actions required by this AD, unless this AD specifies otherwise.

(i) European Union Aviation Safety Agency (EASA) AD 2020–0084, dated April 3, 2020.

(ii) [Reserved]

(3) For EASA AD 2020–0084, contact the EASA, Konrad-Adenauer-Ufer 3, 50668 Cologne, Germany; telephone +49 221 8999 000; email *ADs@easa.europa.eu;* internet *www.easa.europa.eu.* You may find this EASA AD on the EASA website at *https://ad.easa.europa.eu.*

(4) You may view this service information at the FAA, Office of the Regional Counsel, Southwest Region, 10101 Hillwood Pkwy., Room 6N–321, Fort Worth, TX 76177. For information on the availability of this material at the FAA, call 817–222–5110. This material may be found in the AD docket on the internet at *https://www.regulations.gov* by searching for and locating Docket No. FAA–2021–0104.

(5) You may view this material that is incorporated by reference at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, email *fedreg.legal@nara.gov,* or go to *https://www.archives.gov/federal-register/cfr/ibr-locations.html.*

Issued on May 5, 2021.

**Lance T. Gant,**
*Director, Compliance & Airworthiness Division, Aircraft Certification Service.*
[FR Doc. 2021–11391 Filed 5–28–21; 8:45 am]
**BILLING CODE 4910–13–P**

**DEPARTMENT OF COMMERCE**

**Bureau of Industry and Security**

**15 CFR Parts 732 and 734**

**[Docket No. 210527–0116]**

**RIN 0694–AF47**

**Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML); Notifying the Public of the Transfer of Jurisdiction of Certain Technology and Software as a Result of a Vacated March 6, 2020 Injunction**

**AGENCY:** Bureau of Industry and Security, Department of Commerce.

**ACTION:** Notification of vacated court order.

**29190** **Federal Register** / Vol. 86, No. 103 / Tuesday, June 1, 2021 / Rules and Regulations

**SUMMARY:** The Bureau of Industry and Security (BIS) is publishing this notification to the public concerning the transfer of jurisdiction of certain "software" and "technology" as a result of action by the Court of Appeals for the Ninth Circuit vacating a March 6, 2020 preliminary injunction by the district court in *Washington* v. *U.S. Dep't of State,* No. 20–35391, 2021 WL 1621320, 2021 U.S. App. LEXIS 12448 (9th Cir. Apr. 27, 2021). Pursuant to that decision, issued on April 27, 2021, the mandate of the Ninth Circuit was issued on May 26, 2021 and district court's injunction was vacated. This notice also includes guidance to persons with technology or software that was previously retained on the U.S. Munitions List (USML) and controlled under the International Traffic in Arms Regulations (ITAR) pursuant to the March 6 district court order, but which is now subject to the jurisdiction of the Export Administration Regulations (EAR).

**DATES:** The district court injunction of March 6, 2020 was vacated on May 26, 2021. As of May 26, 2021, the "technology" and "software" that meets the criteria in section 734.7(c) is "subject to the EAR" and is no longer controlled under the ITAR.

**FOR FURTHER INFORMATION CONTACT:** Steven Clagett, Office of Nonproliferation Controls and Treaty Compliance, Nuclear and Missile Technology Controls Division, tel. (202) 482–1641 or email *steven.clagett@bis.doc.gov.*

**SUPPLEMENTARY INFORMATION:**

**Court Order of March 6, 2020**

On March 6, 2020, the U.S. District Court for the Western District of Washington issued an order preliminarily enjoining the U.S. Department of State from implementing or enforcing the final rule entitled International Traffic In Arms Regulations: U.S. Munitions List Categories I, II, and III, 85 FR 3819 (Jan. 23, 2020) "insofar as it alters the status quo restrictions on technical data and software directly related to the production of firearms or firearm parts using a 3D-printer or similar equipment." *Washington* v. *U.S. Dep't of State* (Case No. 2:20–cv–00111–RAJ).

**Court Order of March 6, 2020 Vacated by Ninth Circuit Court Decision Issued on April 27, 2021**

On April 27, 2021, a panel of the United States Court of Appeals for the Ninth Circuit (Case No. 20–35391) issued a decision that vacated the district court's order enjoining the

Department of State's Final Rule removing 3D-printed guns and their associated files from the USML; however, the preliminary injunction remained in effect until the mandate of the Ninth Circuit for this decision was issued on May 26, 2021. Until the entry of the mandate, all persons engaged in manufacturing, exporting, temporarily importing, brokering, or furnishing defense services related to 'technical data and software directly related to the production of firearms or firearm parts using a 3D-printer or similar equipment' were required to treat such technical data and software as listed on the USML and controlled by the ITAR.

On May 26, 2021, the mandate of the Ninth Circuit was issued, and the entirety of the Department of State's final rule published in the **Federal Register** at 85 FR 3819 went into effect.

As a result of the vacatur of the injunction, any request for licenses of "technology" and "software" that fall under the U.S. Department of Commerce regulations, 15 CFR 732.2(b) and 734.7(c) (added by the Commerce January 23, 2020 rule, entitled Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the USML; 85 FR 4136, Jan. 23, 2020), should be directed to the U.S. Department of Commerce because this "technology" and "software" are subject to the Export Administration Regulations (EAR).

BIS strongly encourages any person with "technology" or "software" that may meet the criteria in section 734.7(c) of the EAR to review those provisions in the Commerce January 23, 2020 rule closely, as well as all other applicable EAR provisions. In anticipation of the dismissal of the case, BIS updated Frequently Asked Questions (FAQs) posted on the BIS website to add twelve FAQs to assist public understanding of section 734.7(c), including addressing application questions. These FAQs are available on the BIS website at *https://www.bis.doc.gov/index.php/documents/policy-guidance/2572-faqs-for-the-commerce-category-i-iii-firearms-rule-posted-on-bis-website-7-7-20/file.* For instance, those FAQs make clear that a BIS license is required prior to posting on the internet of "any file, including any CAD file, that can be processed by a software program into an electronic format, such as a CAM file, with no or minimal additional information or manipulation from the operator(s), and that . . . once converted will be in an executable code for the production of a firearm frame or receiver or complete firearm."

BIS also strongly encourages any person with questions regarding section 734.7(c), which they believe are not addressed sufficiently in the FAQs on the BIS website, to contact BIS for additional guidance. See the BIS contact information under the For Further Information Contact section of this notice. In addition, if a person is unsure whether the criteria of section 734.7(c) are met, including whether the "technology" or "software" is ready for insertion into a computer numerically controlled machine tool, additive manufacturing equipment, or any other equipment, persons with such "technology" or "software" can submit an official classification request to BIS using the free online submission system, called SNAP–R, available on the BIS website, to receive an official classification of the "technology" or "software." For additional information on SNAP–R, see *https://www.bis.doc.gov/index.php/licensing/simplified-network-application-process-redesign-snap-r/getting-started-with-snap-r.* The person submitting the official classification should note in the classification request that the classification is being submitted to determine whether the "technology" or "software" meets the criteria in section 734.7(c).

**Matthew S. Borman,**
*Deputy Assistant Secretary for Export Administration.*

[FR Doc. 2021–11585 Filed 5–27–21; 4:15 pm]

**BILLING CODE 3510–33–P**

---

**DEPARTMENT OF COMMERCE**

**Bureau of Industry and Security**

**15 CFR Part 744**

**[Docket No. 210514–0106]**

**RIN 0694–AI49**

**Addition of Entities, Revision of Entries, and Removal of Entity From the Entity List; and Revision of Entry and Removal of Entity From the Military End-User List (MEU)**

**AGENCY:** Bureau of Industry and Security, Commerce.

**ACTION:** Final rule.

**SUMMARY:** In this rule, the Bureau of Industry and Security (BIS) amends the Export Administration Regulations (EAR) by adding eight entities to the Entity List. These eight entities have been determined by the U.S. Government to be acting contrary to the national security or foreign policy interests of the United States. These

Ex. 2-A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

**§ 242.600   [Corrected]**

■ On page 18810, in the first column, Instruction 8.w. is added to read as follows: "w. Amending newly redesignated paragraph (b)(7)(i) by removing the text "paragraph (b)(4) of this section" and adding in its place "paragraph (b)(6) of this section"."

Dated: May 24, 2021.

**Vanessa A. Countryman,**
*Secretary.*

[FR Doc. 2021–11282 Filed 5–28–21; 8:45 am]

**BILLING CODE 8011–01–P**

---

# DEPARTMENT OF STATE

**22 CFR Parts 121, 123, 124, 126, and 129**

**[Public Notice: 11434]**

## International Traffic in Arms Regulations: U.S. Munitions List Categories; Preliminary Injunction Vacated by a Federal Court of Appeals

**AGENCY:** Department of State.

**ACTION:** Notification of vacatur of a prior preliminary injunction.

**SUMMARY:** The U.S. Department of State (the Department) is issuing this document to inform the public of the vacatur of a preliminary injunction previously ordered by a federal district court on March 6, 2020. As a result of the vacatur, the Department's previously issued final rule of January 23, 2020, goes into full effect. Therefore, software and technical data related to 3–D printing of firearms or components transferred to the Export Administration Regulations (EAR), administered by the Department of Commerce now is exclusively controlled by the EAR.

**DATES:** The court order vacating the preliminary injunction took effect May 26, 2021.

**FOR FURTHER INFORMATION CONTACT:** For technical questions only: Sarah Heidema, Office of Defense Trade Controls Policy, Department of State, telephone (202) 663–2809; email *DDTCPublicComments@state.gov.*

**SUPPLEMENTARY INFORMATION:** On January 23, 2020, the Department published a final rule in the **Federal Register** at 85 FR 3819 (RIN 1400–AE30) that amended the International Traffic in Arms Regulations (ITAR) to revise Categories I, II, and III of the U.S. Munitions List (USML) and remove certain items that no longer warrant control. On the same date, the Department of Commerce published a companion final rule in the **Federal Register** at 85 FR 4136 (RIN 0694–AF47)

that made conforming changes to the Export Administration Regulations (EAR) to control the export of certain commodities, software, and technology removed from the USML. These final rules were set to be effective March 9, 2020.

On March 6, 2020, in response to a lawsuit filed by several U.S. States, the U.S. District Court for the Western District of Washington (Civil Action No. 2:20–cv–00111), issued an order preliminarily enjoining part of the Department's final rule. More specifically, the order enjoined the Department "from implementing or enforcing the regulation entitled International Traffic in Arms Regulation: U.S. Munitions List Categories I, II, and III, 85 FR 3819 (Jan. 23, 2020) insofar as it alters the status quo restrictions on technical data and software directly related to the production of firearm and firearm parts using a 3D-printer or similar equipment." As the text of the order explained, and as was similarly described in a document published on April 2, 2020 at 85 FR 18445, the court's order required the Department to maintain certain technical data controls in the USML related to producing 3–D printed firearms or firearm parts; however, other parts of the subject final rule were allowed to go into effect, including the removal of certain tangible firearms from the USML, which the Department of Commerce then began to regulate for export under its EAR.

However, on May 26, 2021, the U.S. Court of Appeals for the Ninth Circuit issued its mandate in *Washington* v. *U.S. Dep't of State,* No. 20–35391, 2021 WL 1621320, 2021 U.S. App. LEXIS 12448 (9th Cir. Apr. 27, 2021), vacating the preliminary injunction previously entered by the U.S. District Court for the Western District of Washington on March 6, 2020.

As a result, the remainder of the Department's subject final rule at 85 FR 3819 has now gone into effect. The Department therefore no longer regulates the export of certain kinds of technical data as described in its previous **Federal Register** document of April 2, 2020 at 85 FR 18445. Now, the EAR, administered by the Department of Commerce, exclusively controls the export of all commodities, software, and technology described in its final rule at 85 FR 4136 on January 23, 2020. For questions about that rule, please contact the Department of Commerce's Bureau

of Industry and Security or visit its website at *https://www.bis.doc.gov/.*

**Michael F. Miller,**
*Deputy Assistant Secretary of State for Defense Trade Controls, Department of State.*

[FR Doc. 2021–11536 Filed 5–27–21; 4:15 pm]

**BILLING CODE 4710–08–P**

---

# FEDERAL MEDIATION AND CONCILIATION SERVICE

**29 CFR Part 1473**

## Recission of Federal Mediation and Conciliation Rule on Administrative Guidance

**AGENCY:** Federal Mediation and Conciliation Service.

**ACTION:** Final rule; rescission of regulations.

**SUMMARY:** On April 20, 2020, the Federal Mediation and Conciliation Service (FMCS) published a final rule on administrative guidance implementing an Executive order entitled "Promoting the Rule of Law Through Improved Agency Guidance Documents," and providing policy and requirements for issuing, modifying, withdrawing, and using guidance; and taking and responding to petitions about guidance. In accordance with the "Executive Order on Revocation of Certain Executive Orders Concerning Federal Regulation," issued by President Biden on January 20, 2021, this final rule rescinds FMCS's rule on guidance.

**DATES:** This final rule is effective June 1, 2021.

**FOR FURTHER INFORMATION CONTACT:** Alisa Silverman, Attorney-Advisor, Office of General Counsel, Federal Mediation and Conciliation Service, 250 E St. SW, Washington, DC 20427; Office/Fax/Mobile 202–606–5488; *asilverman@fmcs.gov.*

**SUPPLEMENTARY INFORMATION:**

### I. Discussion

On April 20, 2020, at 85 FR 21770, the Federal Mediation and Conciliation Service (FMCS) published a final rule on administrative guidance implementing E.O. 13891, "Promoting the Rule of Law Through Improved Agency Guidance Documents," signed by President Trump on October 9, 2019. As required by the E.O., this rule contained policy and requirements for issuing, modifying, withdrawing, and using guidance; making guidance available to the public; a notice and comment process for significant

Ex. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

This document is scheduled to be published in the
Federal Register on 06/01/2021 and available online at
**federalregister.gov/d/2021-11536**, and on **govinfo.gov**

ode 4710-08

**DEPARTMENT OF STATE**

**22 CFR Parts 121, 123, 124, 126, and 129**

**[Public Notice:  11434]**

**International Traffic in Arms Regulations: U.S. Munitions List Categories;**

**Preliminary Injunction Vacated by a Federal Court of Appeals**

**AGENCY:** Department of State.

**ACTION:** Notification of vacatur of a prior preliminary injunction.

**SUMMARY:** The U.S. Department of State (the Department) is issuing this document to inform the public of the vacatur of a preliminary injunction previously ordered by a federal district court on March 6, 2020.  As a result of the vacatur, the Department's previously issued final rule of January 23, 2020, goes into full effect. Therefore, software and technical data related to 3-D printing of firearms or components transferred to the Export Administration Regulations (EAR), administered by the Department of Commerce now is exclusively controlled by the EAR.

**DATES:** The court order vacating the preliminary injunction took effect May 26, 2021.

**FOR FURTHER INFORMATION CONTACT:** For technical questions only: Sarah Heidema, Office of Defense Trade Controls Policy, Department of State, telephone (202) 663-2809; email DDTCPublicComments@state.gov.

**SUPPLEMENTARY INFORMATION:** On January 23, 2020, the Department published a final rule in the *Federal Register* at 85 FR 3819 (RIN 1400-AE30) that amended the International Traffic in Arms Regulations (ITAR) to revise Categories I, II, and III of the U.S. Munitions List (USML) and remove certain items that no longer warrant control. On the same date, the Department of Commerce published a companion final rule in the Federal Register at 85 FR 4136 (RIN 0694-AF47) that made conforming changes to the Export Administration Regulations (EAR) to control the export of certain

commodities, software, and technology removed from the USML. These final rules were set to be effective March 9, 2020.

On March 6, 2020, in response to a lawsuit filed by several U.S. States, the U.S. District Court for the Western District of Washington (Civil Action No. 2:20-cv-00111), issued an order preliminarily enjoining part of the Department's final rule. More specifically, the order enjoined the Department "from implementing or enforcing the regulation entitled International Traffic in Arms Regulation: U.S. Munitions List Categories I, II, and III, 85 FR 3819 (Jan. 23, 2020) insofar as it alters the status quo restrictions on technical data and software directly related to the production of firearm and firearm parts using a 3D-printer or similar equipment." As the text of the order explained, and as was similarly described in a document published on April 2, 2020 at 85 FR 18445, the court's order required the Department to maintain certain technical data controls in the USML related to producing 3-D printed firearms or firearm parts; however, other parts of the subject final rule were allowed to go into effect, including the removal of certain tangible firearms from the USML, which the Department of Commerce then began to regulate for export under its EAR.

However, on May 26, 2021, the U.S. Court of Appeals for the Ninth Circuit issued its mandate in *Washington v. U.S. Dep't of State*, No. 20-35391, 2021 WL 1621320, 2021 U.S. App. LEXIS 12448 (9th Cir. Apr. 27, 2021), vacating the preliminary injunction previously entered by the U.S. District Court for the Western District of Washington on March 6, 2020.

As a result, the remainder of the Department's subject final rule at 85 FR 3819 has now gone into effect. The Department therefore no longer regulates the export of certain kinds of technical data as described in its previous *Federal Register* document of April 2, 2020 at 85 FR 18445. Now, the EAR, administered by the Department of Commerce, exclusively controls the export of all commodities, software, and technology

Ex. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

described in its final rule at 85 FR 4136 on January 23, 2020. For questions about that rule, please contact the Department of Commerce's Bureau of Industry and Security or visit its website at https://www.bis.doc.gov/.

**Michael F. Miller,**

*Deputy Assistant Secretary of State for Defense Trade Controls,*

*Department of State.*

[FR Doc. 2021-11536 Filed: 5/27/2021 4:15 pm; Publication Date:  6/1/2021]

This document is scheduled to be published in the Federal Register on 06/01/2021 and available online at **federalregister.gov/d/2021-11585**, and on **govinfo.gov**

Billing Code: 3510-33-P

**DEPARTMENT OF COMMERCE**

**Bureau of Industry and Security**

**15 CFR Parts 732 and 734**

**[Docket No. 210527-0116]**

**RIN 0694-AF47**

**Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML); Notifying the Public of the Transfer of Jurisdiction of Certain Technology and Software as a Result of a Vacated March 6, 2020 Injunction**

**AGENCY:** Bureau of Industry and Security, Department of Commerce.

**ACTIONS:** Notification of vacated court order.

**SUMMARY:** The Bureau of Industry and Security (BIS) is publishing this notification to the public concerning the transfer of jurisdiction of certain "software" and "technology" as a result of action by the Court of Appeals for the Ninth Circuit vacating a March 6, 2020 preliminary injunction by the district court in *Washington v. U.S. Dep't of State*, No. 20-35391, 2021 WL 1621320, 2021 U.S. App. LEXIS 12448 (9th Cir. Apr. 27, 2021). Pursuant to that decision, issued on April 27, 2021, the mandate of the Ninth Circuit was issued on May 26, 2021 and district court's injunction was vacated. This notice also includes guidance to persons with technology or software that was previously retained on the U.S. Munitions List (USML) and controlled under the International Traffic in Arms Regulations (ITAR) pursuant to the March 6 district court order, but which is now subject to the jurisdiction of the Export Administration Regulations (EAR).

**DATES:** The district court injunction of March 6, 2020 was vacated on May 26, 2021. As of May 26, 2021, the "technology" and "software" that meets the criteria in section 734.7(c) is "subject to the EAR" and is no longer controlled under the ITAR.

**FOR FURTHER INFORMATION CONTACT:** Steven Clagett, Office of Nonproliferation Controls and Treaty Compliance, Nuclear and Missile Technology Controls Division, tel. (202) 482-1641 or e-mail steven.clagett@bis.doc.gov.

**SUPPLEMENTARY INFORMATION:**

*Court Order of March 6, 2020*

On March 6, 2020, the U.S. District Court for the Western District of Washington issued an order preliminarily enjoining the U.S. Department of State from implementing or enforcing the final rule entitled International Traffic In Arms Regulations: U.S. Munitions List Categories I, II, and III, 85 FR 3819 (Jan. 23, 2020) "insofar as it alters the status quo restrictions on technical data and software directly related to the production of firearms or firearm parts using a 3D-printer or similar equipment." *Washington v. U.S. Dep't of State* (Case No. 2:20-cv-00111-RAJ).


*Court Order of March 6, 2020 vacated by Ninth Circuit decision issued on April 27, 2021*

On April 27, 2021, a panel of the United States Court of Appeals for the Ninth Circuit (Case No. 20-35391) issued a decision that vacated the district court's order enjoining the Department of State's Final Rule removing 3D-printed guns and their associated files from the USML; however, the preliminary injunction remained in effect until the mandate of the Ninth Circuit for this decision was issued on May 26, 2021. Until the entry of the mandate, all persons engaged in manufacturing, exporting, temporarily importing, brokering, or furnishing defense services related to 'technical data and software directly related to the production of firearms or firearm parts using a 3D-printer or similar equipment' were required to treat such technical data and software as listed on the USML and controlled by the ITAR.

On May 26, 2021, the mandate of the Ninth Circuit was issued, and the entirety of the Department of State's final rule published in the *Federal Register* at 85 FR 3819 went into effect.

As a result of the vacatur of the injunction, any request for licenses of "technology" and "software" that fall under the U.S. Department of Commerce regulations, 15 CFR 732.2(b) and 734.7(c) (added by the Commerce January 23, 2020 rule, entitled Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the USML; 85 FR 4136, Jan. 23, 2020), should be directed to the U.S. Department of Commerce because this "technology" and "software" are subject to the Export Administration Regulations (EAR).

BIS strongly encourages any person with "technology" or "software" that may meet the criteria in section 734.7(c) of the EAR to review those provisions in the Commerce January 23, 2020 rule closely, as well as all other applicable EAR provisions.  In anticipation of the dismissal of the case, BIS updated Frequently Asked Questions (FAQs) posted on the BIS website to add twelve FAQs to assist public understanding of section 734.7(c), including addressing application questions.  These FAQs are available on the BIS website at https://www.bis.doc.gov/index.php/documents/policy-guidance/2572-faqs-for-the-commerce-category-i-iii-firearms-rule-posted-on-bis-website-7-7-20/file.  For instance, those FAQs make clear that a BIS license is required prior to posting on the Internet of "any file, including any CAD file, that can be processed by a software program into an electronic format, such as a CAM file, with no or minimal additional information or manipulation from the operator(s), and that … once converted will be in an executable code for the production of a firearm frame or receiver or complete firearm."

BIS also strongly encourages any person with questions regarding section 734.7(c), which they believe are not addressed sufficiently in the FAQs on the BIS website, to contact BIS for additional guidance.  See the BIS contact information under the For Further Information Contact section of this notice.  In addition, if a person is unsure whether the criteria of section 734.7(c) are met, including whether the "technology" or "software" is ready for insertion into a computer numerically controlled machine tool, additive manufacturing equipment, or any other equipment, persons with such "technology" or "software" can submit an official classification request to BIS using the free online submission system, called SNAP-R, available on the BIS website, to receive an official classification of the "technology" or "software."  For additional information on SNAP-R, see https://www.bis.doc.gov/index.php/licensing/simplified-network-application-process-redesign-snap-r/getting-started-with-snap-r.  The person submitting the official classification should note in the classification request that the classification is being submitted to determine whether the "technology" or "software" meets the criteria in section 734.7(c).

**Matthew S. Borman**

*Deputy Assistant Secretary for Export Administration.*

[FR Doc. 2021-11585 Filed: 5/27/2021 4:15 pm; Publication Date:  6/1/2021]

Case 2:24-cv-01349-JNW-LHF Document 1291 Filed 09/28/23 Page 210 of 537 PageID 2552

to rebuild the readiness of our Armed Forces and take care of our troops and their families.

With regard to rebuilding our readiness, I remember the recent and significant dip in the readiness of our B–1B bomber fleet at Ellsworth Air Force Base in South Dakota. While the Air Force has reversed that trend, it remains an example of the wear and tear on our forces after 18 years of war. Now is not the time to go backward by failing, for the first time in 58 years, to pass a National Defense Authorization Act.

NDAA is must-pass legislation, as it has been every year for over half a century. That is why Chairman INHOFE introduced his ''skinny'' NDAA. The NDAA is typically bipartisan, and it should stay that way. I am hopeful we will find a final agreement.

This is about more than the NDAA. It is also about Defense appropriations. In that regard, I will not vote for another continuing resolution with its distinctive impact on our national security.

As chairman of the Cybersecurity Subcommittee of the Senate Armed Services Committee, I am particularly concerned about what failure to enact NDAA 2020 would mean for our cybersecurity. Some vital cybersecurity measures in the NDAA passed by the Senate include the following: critical funding for United Stated Cyber Command, CYBERCOM, infrastructure development. In a sense, CYBERCOM is at war every day, operating in our enemies' backyards to negate or at least reduce their ability to attack the United States. It is not a coincidence that there was no successful interference in our 2018 mid-term elections. We can thank the men and women of CYBERCOM for that. Now is not the time to deny them what they need to boost their capabilities. Our adversaries and enemies will surely boost theirs; development of a consistent, comprehensive framework to enhance the cybersecurity of the U.S. defense industrial base after disastrous theft of critical defense information relating to development of an important new weapon system. I am concerned there may be other ongoing such instances of which we are not even aware; a consortium of universities, to include Dakota State University in Madison, SD, to advise and assist the Secretary of Defense on cybersecurity matters; authorization for the armed services to use operation and maintenance funds for the rapid creation testing, fielding, and operation of new cyber capabilities; and completion of the work of the Cyberspace Solarium Commission charged with evaluating divergent approaches to defending the United States in cyberspace and driving consensus toward a comprehensive strategy.

These are just some of the cybersecurity related measures that will have to wait another year, unless Congress passes NDAA 2020. When added to the concerns noted by my fellow chairs, it should be clear to all that now is the time to put aside partisan obstructionism and enact this must-pass legislation.●

━━━━━━━━

ARMS EXPORT CONTROL ACT NOTIFICATION

Mr. RISCH. Mr. President, in keeping with the committee's intention to see that relevant information is available to the full Senate, I ask unanimous consent to have printed in the RECORD at this point the notifications which have been received.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

UNITED STATES DEPARTMENT OF STATE,
*Washington, DC.*

Hon. JAMES E. RISCH, Chairman,
*Committee on Foreign Relations,*
*U.S. Senate, Washington, DC.*

DEAR MR. CHAIRMAN: Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), the Department is transmitting herewith notification of the intention to transfer jurisdictional control of certain classes of item currently on the United States Munitions List (USML) to the Commerce Control List (CCL).

Attached for your reference are the following documents: a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the controls for major defense equipment.

Sincerely,

MARY ELIZABETH TAYLOR,
*Assistant Secretary, Bureau of Legislative*
*Affairs.*

Enclosures.

Billing Code 4710–25
DEPARTMENT OF STATE
22 CFR Parts 121, 123, 124, 126, and 129
[Public Notice 10603]
RIN 1400–AE30
International Traffic in Arms Regulations: U.S. Munitions List
Categories I, II, and III
AGENCY: Department of State.
ACTION: Final rule.
§ 121.1 The United States Munitions List.
* * * * *

Category I—Firearms and Related Articles
*(a) Firearms using caseless ammunition.
*(b) Fully automatic firearms to .50 caliber (12.7 mm) inclusive.
*(c) Firearms specially designed to integrate fire control, automatic tracking, or automatic firing (*e.g.,* Precision Guided Firearms).
*Note to paragraph (c):* Integration does not include only attaching to the firearm or rail.
*(d) Fully automatic shotguns regardless of gauge.
*(e) Silencers, mufflers, and sound suppressors.
(f) [Reserved]
(g) Barrels, receivers (frames), bolts, bolt carriers, slides, or sears specially designed for the articles in paragraphs (a), (b), and (d) of this category.
(h) Parts, components, accessories, and attachments, as follows:
(1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor;
(2) Parts and components specially designed for conversion of a semiautomatic firearm to a fully automatic firearm;
(3) Parts and components specially designed for defense articles described in paragraphs (c) and (e); or
(4) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

(i) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in this category and classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(j)–(v) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

*Note to Category I:* The following interpretations explain and amplify the terms used in this category:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the deflagration of propellant;

(2) A fully automatic firearm or shotgun is any firearm or shotgun that shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger; and

(3) Caseless ammunition is firearm ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

Category II—Guns and Armament

(a) Guns and armament greater than .50 caliber (12.7 mm), as follows:
*(1) Guns, howitzers, artillery, and cannons;
*(2) Mortars;
*(3) Recoilless rifles;
*(4) Grenade launchers; or
(5) Developmental guns and armament greater than .50 caliber (12.7 mm) funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(5):* This paragraph does not control guns and armament greater than .50 caliber (12.7 mm); (a) in production; (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter); or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(5):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(5):* This provision is applicable to those contracts or other funding authorizations that are dated [INSERT DATE ONE YEAR AFTER PUBLICATION IN THE FEDERAL REGISTER], or later.

*Note 1 to paragraph (a):* This paragraph does not include: Non-automatic and non-semiautomatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) that are controlled on the CCL under ECCN 0A501; shotguns controlled on the CCL under ECCN 0A502; black powder guns and armaments manufactured between 1890 and 1919 controlled on the CCL under ECCN 0A602; or black powder guns and armaments manufactured earlier than 1890.

*Note 2 to paragraph (a):* Guns and armament when integrated into their carrier (*e.g.,* surface vessels, ground vehicles, or aircraft) are controlled in the category associated with the carrier. Self-propelled guns and armament are controlled in USML Category VII.

Case 2:24-cv-00482-WBS-EFB   Document 1351   Filed 04/28/25   Page 211 of 537
PageID 2553

# Ex. A—COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

Towed guns and armament and stand-alone guns and armament are controlled under this category.

(b) Flamethrowers with an effective range greater than or equal to 20 meters.

(c) [Reserved]

*(d) Kinetic energy weapon systems specially designed for destruction or rendering mission-abort of a target.

*Note to paragraph (d):* Kinetic energy weapons systems include but are not limited to launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6 km/s, in single or rapid fire modes, using methods such as: Electromagnetic, electrothermal, plasma, light gas, or chemical. This does not include launch systems and subsystems used for research and testing facilities subject to the EAR, which are controlled on the CCL under ECCN 2B232.

(e) Signature reduction devices specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category (*e.g.*, muzzle flash suppression devices).

(f)–(i) [Reserved]

(j) Parts, components, accessories, and attachments, as follows:

(1) Gun barrels, rails, tubes, and receivers specially designed for the weapons controlled in paragraphs (a) and (d) of this category;

(2) Sights specially designed to orient indirect fire weapons;

(3) Breech blocks for the weapons controlled in paragraphs (a) and (d) of this category;

(4) Firing mechanisms for the weapons controlled in paragraphs (a) and (d) of this category and specially designed parts and components therefor;

(5) Systems for firing superposed or stacked ammunition and specially designed parts and components therefor;

(6) Servo-electronic and hydraulic elevation adjustment mechanisms;

(7) Muzzle brakes;

(8) Bore evacuators;

(9) Independent ammunition handling systems for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(10) Components for independently powered ammunition handling systems and platform interface, as follows:

(i) Mounts;

(ii) Carriages;

(iii) Gun pallets;

(iv) Hydro-pneumatic equilibration cylinders; or

(v) Hydro-pneumatic systems capable of scavenging recoil energy to power howitzer functions;

*Note to paragraph j(10):* For weapons mounts specially designed for surface vessels and special naval equipment, *see* Category VI. For weapons mounts specially designed for ground vehicles, *see* Category VII.

(11) Ammunition containers/drums, ammunition chutes, ammunition conveyor elements, ammunition feeder systems, and ammunition container/drum entrance and exit units, specially designed for the guns and armament controlled in paragraphs (a), and (d) of this category;

(12) Systems and equipment for the guns and armament controlled in paragraphs (a) and (d) of this category for use in programming ammunition, and specially designed parts and components therefor;

(13) Aircraft/gun interface units to support gun systems with a designed rate of fire greater than 100 rounds per minute and specially designed parts and components therefor;

(14) Recoil systems specially designed to mitigate the shock associated with the firing process of guns integrated into air platforms

and specially designed parts and components therefor;

(15) Prime power generation, energy storage, thermal management, conditioning, switching, and fuel-handling equipment, and the electrical interfaces between the gun power supply and other turret electric drive components specially designed for kinetic weapons controlled in paragraph (d) of this category;

(16) Kinetic energy weapon target acquisition, tracking fire control, and damage assessment systems and specially designed parts and components therefor; or

*(17) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

''Classified'' means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(k) Technical data (*see* §120.10 of this subchapter) and defense services (*see* §120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), and (j) of this category and classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data. (*See* §125.4 of this subchapter for exemptions.)

(1)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* §120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* §123.1(b) of this subchapter).

## Category III—Ammunition and Ordnance

(a) Ammunition, as follows:

*(1) Ammunition that incorporates a projectile controlled in paragraph (d)(1) or (3) of this category;

*(2) Ammunition preassembled into links or belts;

*(3) Shotgun ammunition that incorporates a projectile controlled in paragraph (d)(2) of this category;

*(4) Caseless ammunition manufactured with smokeless powder;

*Note to paragraph (a)(4):* Caseless ammunition is ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

*(5) Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance;

*(6) Ammunition employing pyrotechnic material in the projectile base or any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm and designed to be observed primarily with night vision optical systems;

*(7) Ammunition for fully automatic firearms that fire superposed or stacked projectiles or for guns that fire superposed or stacked projectiles;

*(8) Electromagnetic armament projectiles or billets for weapons with a design muzzle energy exceeding 5 MJ;

*(9) Ammunition, not specified above, for the guns and armaments controlled in Category II; or

(10) Developmental ammunition funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(10):* This paragraph does not control ammunition: (a) in production; (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* §120.4 of this subchapter); or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(10):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(10):* This provision is applicable to those contracts or other funding authorizations that are dated [INSERT DATE ONE YEAR AFTER PUBLICATION IN THE FEDERAL REGISTER], or later.

(b) Ammunition/ordnance handling equipment specially designed for the articles controlled in this category, as follows:

(1) Belting, linking, and de-linking equipment; or

(2) Fuze setting devices.

(c) [Reserved]

(d) Parts and components for the articles in this category, as follows:

(1) Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm or are incendiary or explosive;

(2) Shotgun projectiles that are flechettes, incendiary, tracer, or explosive;

*Note to paragraph (d)(2):* This paragraph does not include explosive projectiles specially designed to produce noise for scaring birds or other pests (*e.g.*, bird bombs, whistlers, crackers).

(3) Projectiles of any caliber produced from depleted uranium;

(4) Projectiles not specified above, guided or unguided, for the items controlled in USML Category II, and specially designed parts and components therefor (*e.g.*, fuzes, rotating bands, cases, liners, fins, boosters);

(5) Canisters or sub-munitions (*e.g.*, bomblets or minelets), and specially designed parts and components therefor, for the guns or armament controlled in USML Category II;

(6) Projectiles that employ tips (*e.g.*, M855A1 Enhanced Performance Round (EPR)) or cores regardless of caliber, produced from one or a combination of the following: tungsten, steel, or beryllium copper alloy;

(7) Cartridge cases, powder bags, or combustible cases specially designed for the items controlled in USML Category II;

(8) Non-metallic cases, including cases that have only a metallic base, for the ammunition controlled in paragraph (a)(5) of this category;

(9) Cartridge links and belts for fully automatic firearms and guns controlled in USML Categories I or II;

(10) Primers other than Boxer, Berdan, or shotshell types;

*Note to paragraph (d)(10):* This paragraph does not control caps or primers of any type in use prior to 1890.

(11) Safing, arming, and fuzing components (to include target detection and proximity sensing devices) for the ammunition in this category and specially designed parts therefor;

(12) Guidance and control components for the ammunition in this category and specially designed parts therefor;

(13) Terminal seeker assemblies for the ammunition in this category and specially designed parts and components therefor;

(14) Illuminating flares or target practice projectiles for the ammunition controlled in paragraph (a)(9) of this category; or

Case 2:24-cv-00089-DWWE-LPF Document 13-1 Filed 09/28/23 Page 212 of 537 PageID 2554

*(15) Any part, component, accessory, attachment, equipment, or system that:
(i) Is classified;
(ii) Contains classified software; or
(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(e) Technical data (*see* §120.10 of this subchapter) and defense services (*see* §120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a), (b), and (d) of this category and classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data. (*See* §125.4 of this subchapter for exemptions.)

(f)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* §120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* §123.1(b) of this subchapter).

*Note 1 to Category III:* This category does not control ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber.

*Note 2 to Category III:* This category does not control cartridge and shell casings that, prior to export, have been rendered useless beyond the possibility of restoration for use as a cartridge or shell casing by means of heating, flame treatment, mangling, crushing, cutting, or popping.

*Note 3 to Category III:* Grenades containing non-lethal or less lethal projectiles are under the jurisdiction of the Department of Commerce.

**Billing Code 4710–25**
**DEPARTMENT OF STATE**
**22 CFR Parts 121, 123, 124, 126, and 129**
**[Public Notice 10603]**
**RIN 1400–AE30**
**International Traffic in Arms Regulations: U.S. Munitions List**
**Categories I, II, and III**
**AGENCY:** Department of State.
**ACTION:** Final rule.
**§121.1 The United States Munitions List.**
* * * * *
**Category I—Firearms *and Related Articles*[, Close Assault Weapons and Combat Shotguns]**

*(a) *Firearms using caseless ammunition* [Nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm).]

*(b) Fully automatic firearms to .50 caliber *inclusive*[(12.7 mm) *inclusive*.

*(c) Firearms *specially designed to integrate fire control, automatic tracking, or automatic firing (e.g., Precision Guided Firearms)* [or other weapons (e.g. insurgency counterinsurgency, close assault weapons systems) having a special military application regardless of caliber].

*Note to paragraph (c): Integration does not include only attaching to the firearm or rail.*

*(d) Fully automatic shotguns regardless of gauge.*
[Combat shotguns. This includes any shotgun with a barrel length less than 18 inches.]

*(e) Silencers, mufflers, *and* sound [and flash] suppressors [for the articles in (a) through (d) of this category and their specifically designed, modified or adapted components and parts.]

(f) *[Reserved]*
[Riflescopes manufactured to military specifications (See category XII(c) for controls on night sighting devices.)]

*(g) Barrels, [cylinders,] receivers (frames), *bolts, bolt carriers, slides, or sears* [or complete breech mechanisms] *specially designed* for the articles in paragraphs (a), *(b), and* [through] (d) of this category.

(h) [Components, [*Parts, components,* accessories, and attachments*] 1, as follows:*
[for the articles in paragraphs (a) through (g) of this category.]

*(1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor;*

*(2) Parts and components specially designed for conversion of a semiautomatic firearm to a fully automatic firearm;*

*(3) Parts and components specially designed for defense articles described in paragraphs (c) and (e); or*

*(4) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.*

(i) Technical data [as defined in] *see* §120.10 of this subchapter) and defense services [as defined in] (*see* §120.9 of this subchapter) directly related to the defense articles described in [paragraphs (a) through (h) of] this category *and classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data. (See §125.4 of this subchapter for exemptions.)*

[Technical data relating to the manufacture or production of any defense articles described elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.]

(j)—*(w) [Reserved]* [The following interpretations explain and amplify the terms used in this category and throughout this subchapter:

[(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the action of an explosive or which may be readily converted to do so.

[(2) A rifle is a shoulder firearm which can discharge a bullet through a rifled barrel 16 inches or longer.

[(3) A carbine is a lightweight shoulder firearm with a barrel under 16 inches in length.

[(4) A pistol is a hand operated firearm having a chamber integral with or permanently aligned with the bore.

[(5) A revolver is a hand operated firearm with a revolving cylinder containing chambers for individual cartridges.

[(6) A submachine gun, "machine pistol" or "machine gun" is a firearm originally designed to fire, or capable of being fired, fully automatically by a single pull of the trigger.]

*(z) Commodities, software, and technology subject to the EAR (see*
§120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (see §123.1(b) of this subchapter).

*Note to Category I:* The following interpretations explain and amplify the terms used in this category:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the deflagration of propellant;

(2) A fully automatic firearm or shotgun is any firearm or shotgun that shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger; and

(3) Caseless ammunition is firearm ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

[This coverage by the U.S. Munitions List in paragraphs (a) through (i) of this category excludes any non-combat shotgun with a barrel length of 18 inches or longer, BB, pellet, and muzzle loading (black powder) firearms. This category does not cover riflescopes and sighting devices that are not manufactured to military specifications. It also excludes accessories and attachments (e.g., belts, slings, after market rubber grips, cleaning kits) for firearms that do not enhance the usefulness, effectiveness, or capabilities of the firearm, components and parts. The Department of Commerce regulates the export of such items. See the Export Administration Regulations (15 CFR parts 730–799). In addition, license exemptions for the items in this category are available in various parts of this subchapter (e.g., §§123.17, 123.18 and 125.4).]

**Category II—Guns and Armament**

*(a) Guns and armament greater than [over] caliber .50 ([i.e.,] (12.7 mm), as follows:

*(1) Guns, howitzers, artillery, and cannons;

*(2) Mortars;

*(3) Recoilless rifles;

*(4) Grenade launchers; or [whether towed, airborne, self-propelled, or fixed, including but not limited to, howitzers, mortars, cannons, recoilless rifles, and grenade launchers]

(5) Developmental guns and armament greater than .50 caliber (12.7 mm) funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(5):* This paragraph does not control guns and armament greater than .50 caliber (12.7 mm); (a) in production; (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* §120.4 of this subchapter); or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(5):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(5):* This provision is applicable to those contracts or other funding authorizations that are dated [INSERT DATE ONE YEAR AFTER PUBLICATION IN THE FEDERAL REGISTER], or later.

*Note 1 to paragraph (a):* This paragraph does not include: Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) that are controlled on the CCL under ECCN 0A501; shotguns controlled on the CCL under ECCN 0A502; black powder guns and armaments manufactured between 1890 and 1919 controlled on the CCL under ECCN 0A602; or black powder guns and armaments manufactured earlier than 1890.

*Note 2 to paragraph (a):* Guns and armament when integrated into their carrier (*e.g.,* surface vessels, ground vehicles, or aircraft) are controlled in the category associated with the carrier. Self-propelled guns and armament are controlled in USML Category VII. Towed guns and armament and stand-alone guns and armament are controlled under this category.

(b) Flame[*]throwers with an effective range greater than or equal to 20 meters. [specifically designed or modified for military application.]

(c) [Reserved] [Apparatus and devices for launching or delivering ordnance, other than those articles controlled in Category IV.]

*(d) Kinetic energy weapon systems specially [specifically] designed [or modified]

rendering mission-abort of a target.

*Note to paragraph (d):* Kinetic energy weapons systems include but are not limited to launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6 km/s, in single or rapid fire modes, using methods such as: Electromagnetic, electrothermal, plasma, light gas, or chemical. This does not include launch systems and subsystems used for research and testing facilities subject to the EAR, which are controlled on the CCL under ECCN 2B232.

(e) Signature *reduction devices* [control materials (e.g., parasitic, structural, coatings, screening) techniques, and equipment]*specially* [specifically]*designed* [developed, configured, adapted or modified to alter or reduce the signature (e.g., muzzle flash suppression, radar, infrared, visual, laser/electro optical, acoustic) of] *for the guns and armament controlled in paragraphs (a), (b), and (d) of this category (e.g., muzzle flash suppression devices)*[defense articles controlled by this category.]

*(f)—(i)* [Reserved][Engines specifically designed or modified for the self-propelled guns and howitzers in paragraph (a) of this category.]

[(g) Tooling and equipment specifically designed or modified for the production of defense articles controlled by this category.]

[(h) Test and evaluation equipment and test models specifically designed or modified for the articles controlled by this category. This includes but is not limited to diagnostic instrumentation and physical test models.]

[(i) Autoloading systems for electronic programming of projectile function for the defense articles controlled in this Category.]

(j) [All other components, p]Parts, *components,* accessories, and attachments, *as follows:* [and associated equipment specifically designed or modified for the articles in paragraphs (a) through (i) of this category. This includes but is not limited to mounts and carriages for the articles controlled in this category.]

*(1) Gun barrels, rails, tubes, and receivers specially designed for the weapons controlled in paragraphs (a) and (d) of this category;*

*(2) Sights specially designed to orient indirect fire weapons;*

*(3) Breech blocks for the weapons controlled in paragraphs (a) and (d) of this category;*

*(4) Firing mechanisms for the weapons controlled in paragraphs (a) and (d) of this category and specially designed parts and components therefor;*

*(5) Systems for firing superposed or stacked ammunition and specially designed parts and components therefor;*

*(6) Servo-electronic and hydraulic elevation adjustment mechanisms;*

*(7) Muzzle brakes;*

*(8) Bore evacuators;*

*(9) Independent ammunition handling systems for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;*

*(10) Components for independently powered ammunition handling systems and platform interface, as follows:*

*(i) Mounts;*

*(ii) Carriages;*

*(iii) Gun pallets;*

*(iv) Hydro-pneumatic equilibration cylinders; or*

*(v) Hydro-pneumatic systems capable of scavenging recoil energy to power howitzer functions;*

*Note to paragraph (j)(10):* For weapons mounts specially designed for surface vessels and special naval equipment, see Category VI. For weapons mounts specially designed for ground vehicles, see Category VII.

*(11) Ammunition containers/drums, ammunition chutes, ammunition conveyor elements, am-*

munition feeder systems, and ammunition container/drum entrance and exit units, specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

*(12) Systems and equipment for the guns and armament controlled in paragraphs (a) and (d) of this category for use in programming ammunition, and specially designed parts and components therefor;*

*(13) Aircraft/gun interface units to support gun systems with a designed rate of fire greater than 100 rounds per minute and specially designed parts and components therefor;*

*(14) Recoil systems specially designed to mitigate the shock associated with the firing process of guns integrated into air platforms and specially designed parts and components therefor;*

*(15) Prime power generation, energy storage, thermal management, conditioning, switching, and fuel-handling equipment, and the electrical interfaces between the gun power supply and other turret electric drive components specially designed for kinetic weapons controlled in paragraph (d) of this category;*

*(16) Kinetic energy weapon target acquisition, tracking fire control, and damage assessment systems and specially designed parts and components therefor; or*

*(17) Any part, component, accessory, attachment, equipment, or system that:*

*(i) Is classified;*

*(ii) Contains classified software; or*

*(iii) Is being developed using classified information.*

''Classified'' means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(k) Technical data (*see* [as defined in] §120.10 of this subchapter) and defense services (*see* [as defined in] §120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), *(b), (d), (e), and* [through]

(j) of this category *and classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data. (See §123.4 of this subchapter for exemptions.)*[Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.]

(1)–(w) [Reserved] [The following interpretations explain and amplify the terms used in this category and elsewhere in this subchapter:

[(i) The kinetic energy weapons systems in paragraph (d) of this category include but are not limited to:

[(i) Launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6km/s, in single or rapid fire modes, using methods such as: electromagnetic, electrothermal, plasma, light gas, or chemical;

[(ii) Prime power generation, electric armor, energy storage, thermal management; conditioning, switching or fuel handling equipment; and the electrical interfaces between power supply gun and other turret electric drive functions;

[(iii) Target acquisition, tracking fire control or damage assessment systems; and

[(iv) Homing seeker, guidance or divert propulsion (lateral acceleration) systems for projectiles.

[(2) The articles in this category include any end item, component, accessory, attachment part, firmware, software or system that has been designed or manufactured using technical data and defense services controlled by this category.

[(3) The articles specifically designed or modified for military application controlled

in this category include any article specifically developed, configured, or adapted for military applications.]

*(x) Commodities, software, and technology subject to the EAR (see §120.42 of this subchapter) used in or with defense articles.*

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (see §123.1(b) of this subchapter).

**Category III—Ammunition and Ordnance**

*(a) Ammunition, as follows:* [ordnance for the articles in Categories I and II of this section.]

*(1) Ammunition that incorporates a projectile controlled in paragraph (d)(1) or (3) of this category;*

*(2) Ammunition preassembled into links or belts;*

*(3) Shotgun ammunition that incorporates a projectile controlled in paragraph (d)(2) of this category;*

*(4) Caseless ammunition manufactured with smokeless powder;*

*Note to paragraph (a)(4):* Caseless ammunition is ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

*(5) Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance;*

*(6) Ammunition employing pyrotechnic material in the projectile base or any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm and designed to be observed primarily with night vision optical systems;*

*(7) Ammunition for fully automatic firearms that fire superposed or stacked projectiles or for guns that fire superposed or stacked projectiles;*

*(8) Electromagnetic armament projectiles or billets for weapons with a design muzzle energy exceeding 5 MJ;*

*(9) Ammunition, not specified above, for the guns and armaments controlled in Category II; or*

*(10) Developmental ammunition funded by the Department of Defense and specially designed parts and components therefor.*

*Note 1 to paragraph (a)(10):* This paragraph does not control ammunition: (a) in production; (b) determined to be subject to the EAR via a commodity jurisdiction determination (see §120.4 of this subchapter); or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(10):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(10):* This provision is applicable to those contracts or other funding authorizations that are dated [INSERT DATE ONE YEAR AFTER PUBLICATION IN THE FEDERAL REGISTER], or later.

(b) Ammunition/ordnance handling equipment *specially* [specifically] designed [or modified] for the articles controlled in this category, *as follows:*[such as, belting, linking, and de-linking equipment.]

*(1) Belting, linking, and de-linking equipment; or*

*(2) Fuze setting devices.*

(c) *[Reserved]* [Equipment and tooling specifically designed or modified for the production of defense articles controlled by this category.]

(d) [Components, p] *Parts and components,* [accessories, attachments and associated equipment specifically designed or modified] for the articles in this category, *as follows:*

*(1) Projectiles that use pyrotechnic tracer materials that incorporate any material having*

# Ex. A—COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

peak radiance above 710 nm or are incendiary or explosive 【Guidance and control components for the articles in paragraph (a) of this category】;

\*(2) *Shotgun projectiles that are flechettes, incendiary, tracer, or explosive;* 【Safing, arming and fuzing components (including target detection and localization devices) for the articles in paragraph (a) of this category; and】

*Note to paragraph (d)(2): This paragraph does not include explosive projectiles specially designed to produce noise for scaring birds or other pests (e.g., bird bombs, whistlers, crackers).*

(3) *Projectiles of any caliber produced from depleted uranium;* All other components, parts, accessories, attachments and associated equipment for the articles in paragraphs (a) through (c) of this category.

(4) *Projectiles not specified above, guided or unguided, for the items controlled in USML Category II, and specially designed parts and components therefor (e.g., fuzes, rotating bands, cases, liners, fins, boosters);*

(5) *Canisters or sub-munitions (e.g., bomblets or minelets), and specially designed parts and components therefor, for the guns or armament controlled in USML Category II;*

(6) *Projectiles that employ tips (e.g., M855A1 Enhanced Performance Round (EPR)) or cores regardless of caliber, produced from one or a combination of the following: tungsten, steel, or beryllium copper alloy;*

(7) *Cartridge cases, powder bags, or combustible cases specially designed for the items controlled in USML Category II;*

(8) *Non-metallic cases, including cases that have only a metallic base, for the ammunition controlled in paragraph (a)(5) of this category;*

(9) Cartridge links and belts for fully automatic firearms and guns controlled in USML Categories I or II;

(10) Primers other than Boxer, Berdan, or shotshell types;

*Note to paragraph (d)(10):* This paragraph does not control caps or primers of any type in use prior to 1890.

(11) Safing, arming, and fuzing components (to include target detection and proximity sensing devices) for the ammunition in this category and specially designed parts therefor;

(12) Guidance and control components for the ammunition in this category and specially designed parts therefor;

(13) Terminal seeker assemblies for the ammunition in this category and specially designed parts and components therefor;

(14) Illuminating flares or target practice projectiles for the ammunition controlled in paragraph (a)(9) of this category; or

\*(15) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(e) Technical data (*see* 【as defined in】 §120.10 of this subchapter) and defense services (*see* 【as defined in】 §120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a), (b), and 【through】 (d) of this category and classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data. (*See* §125.4 of this subchapter for exemptions.) 【Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that are designated as

Significant Military Equipment (SME) shall itself be designated SME.】

(f)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* §120.42 of this subchapter) used in or with defense articles. 【The following explains and amplifies the terms used in this category and elsewhere in this subchapter.

【(1) The components, parts, accessories and attachments controlled in this category include, but are not limited to cartridge cases, powder bags (or other propellant charges), bullets, jackets, cores, shells (excluding shotgun shells), projectiles (including canister rounds and submunitions therefor), boosters, firing components, therefor, primers, and other detonating devices for the defense articles controlled in this category.】

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* §123.1(b) of this subchapter).

*Note 1 to Category III:* This category does not control ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber.

*Note 2 to Category III:* 【(2)】This category does not control cartridge and shell casings that, prior to export, have been rendered useless beyond the possibility of restoration for use as a cartridge or shell casing by means of heating, flame treatment, mangling, crushing, cutting, or popping. 【(3) Equipment and tooling in paragraph (c) of this category does not include equipment for hand loading ammunition.

【(4) The articles in this category include any end item, component, accessory, attachment, part, firmware, software, or system that has been designed or manufactured using technical data and defense services controlled by this category.

【(5) The articles specifically designed or modified for military application controlled in this category include any article specifically developed, configured, or adapted for military application】

*Note 3 to Category III:* Grenades containing non-lethal or less lethal projectiles are under the jurisdiction of the Department of Commerce.

* * * * *

Billing Code: 3510–33–P
DEPARTMENT OF COMMERCE
Bureau of Industry and Security
15 CFR Parts 732, 734, 736, 740, 742, 743, 744, 746, 748, 758, 762, 772, and 774
[Docket No. 191107–0079]
RIN 0694–AF47
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the United States Munitions List (USML)
AGENCY: Bureau of Industry and Security, Department of Commerce.
ACTION: Final rule.

1. The authority citation for 15 CFR part 732 is revised to read as follows:

Authority: 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

2. Section 732.2 is amended by adding one sentence to the end of the paragraph (b) introductory text to read as follows:

§ 732.2 Steps regarding scope of the EAR.

* * * * *

(b) \* \* \* The following also remains subject to the EAR: "software" or "technology" for the production of a firearm, or firearm frame or receiver, controlled under ECCN 0A501, as referenced in 734.7(c).

* * * * *

## PART 734—SCOPE OF THE EXPORT ADMINISTRATION REGULATIONS

3. The authority citation for 15 CFR part 734 is revised to read as follows:

Authority: 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13020, 61 FR 54079, 3 CFR, 1996 Comp., p. 219; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13637, 78 FR 16129, 3 CFR, 2014 Comp., p. 223; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018); Notice of November 8, 2018, 83 FR 56253 (November 9, 2018).

4. Section 734.7 is amended by:
a. Revising paragraph (a) introductory text; and
b. Adding paragraph (c) to read as follows:

§ 734.7 Published.

(a) Except as set forth in paragraph (b) and (c) of this section, unclassified "technology" or "software" is "published," and is thus not "technology" or "software" subject to the EAR, when it has been made available to the public without restrictions upon its further dissemination such as through any of the following:

* * * * *

(c) The following remains subject to the EAR: "software" or "technology" for the production of a firearm, or firearm frame or receiver, controlled under ECCN 0A501, that is made available by posting on the internet in an electronic format, such as AMF or G-code, and is ready for insertion into a computer numerically controlled machine tool, additive manufacturing equipment, or any other equipment that makes use of the "software" or "technology" to produce the firearm frame or receiver or complete firearm.

* * * * *

## PART 736—GENERAL PROHIBITIONS

5. The authority citation for 15 CFR part 736 is revised to read as follows:

Authority: 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 2151 note; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13020, 61 FR 54079, 3 CFR, 1996 Comp., p. 219; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p. 168; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018); Notice of November 8, 2018, 83 FR 56253 (November 9, 2018); Notice of May 8, 2019, 84 FR 20537 (May 10, 2019).

6. Supplement No. 1 to part 736 is amended by revising paragraph (e)(3) to read as follows:

SUPPLEMENT NO. 1 TO PART 736—GENERAL ORDERS

* * * * *

(e) \* \* \*
(3) *Prior commodity jurisdiction determinations.* If the U.S. State Department has previously determined that an item is not subject to the jurisdiction of the ITAR or the item was not listed in a then existing "018" series ECCN (for purposes of the "600 series" ECCNs, or the 0x5zz ECCNs) or in a then existing ECCN 9A004.b or related software or technology ECCN (for purposes of the 9x515 ECCNs), then the item is per se not within the scope of a "600 series" ECCN, a 0x5zz ECCN, or a 9x515 ECCN. If the item was not listed elsewhere on the CCL at the time of such determination (*i.e.*, the item was designated EAR99), the item shall remain designated as EAR99 unless specifically enumerated by BIS or DDTC in an amendment to the CCL or to the USML, respectively.

* * * * *

## PART 740—LICENSE EXCEPTIONS

7. The authority citation for 15 CFR part 740 is revised to read as follows:

*November 13, 2019*          CONGRESSIONAL RECORD — SENATE          **S6551**

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 7201 *et seq.*; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

8. Section 740.2 is amended by adding paragraphs (a)(21) and (22) to read as follows:

**§ 740.2 Restrictions on all license exceptions.**

(a) * * *

(21) The reexport or transfer (in-country) of firearms classified under ECCNs 0A501 or 0A502 if a part or component that is not "subject to the ITAR," but would otherwise meet the criteria in USML Category I(h)(2) (i.e., parts and components specially designed for conversion of a semiautomatic firearm to a fully automatic firearm) is incorporated into the firearm or is to be reexported or transferred (in-country) with the firearm with "knowledge" the part or component will be subsequently incorporated into the firearm. (See USML Category I(h)(2)). In such instances, no license exceptions are available except for License Exception GOV (740.11(b)(2)(ii)).

(22) The export, reexport, or transfer (in-country) of any item classified under a 0x5zz ECCN when a party to the transaction is designated on the Department of the Treasury, Office of Foreign Assets Control (OFAC), Specially Designated Nationals and Blocked Persons (SDN) list under the designation [SDNT], pursuant to the Narcotics Trafficking Sanctions Regulations, 31 CFR part 536, or under the designation [SDNTK], pursuant to the Foreign Narcotics Kingpin Sanctions Regulations, 31 CFR part 598.

9. Section 740.9 is amended by:

a. Adding five sentences at the end of paragraph (a) introductory text;

b. Adding one sentence at the end of paragraph (b)(1) introductory text;

c. Adding paragraph (b)(5); and

d. Redesignating notes 1 through 3 to paragraph (b) as notes 2 through 4 to paragraph (b);

The additions read as follows:

**§ 740.9 Temporary imports, exports, reexports, and transfers (in-country) (TMP).**

* * * * *

(a) * * * This paragraph (a) does not authorize any export of a commodity controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502 to, or any export of such an item that was imported into the United States from, a country in Country Group D:5 (Supplement No. 1 of this part), or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. The only provisions of this paragraph (a) that are eligible for use to export such items are paragraph (a)(5) of this section ("Exhibition and demonstration") and paragraph (a)(6) of this section ("Inspection, test, calibration, and repair"). In addition, this paragraph (a) may not be used to export more than 75 firearms per shipment. In accordance with the requirements in §758.1(b)(9) and (g)(4) of the EAR, the exporter or its agent must provide documentation that includes the serial number, make, model, and caliber of each firearm being exported by filing these data elements in an EEI filing in AES. In accordance with the exclusions in License Exception TMP under paragraph (b)(5) of this section, the entry clearance requirements in §758.1(b)(9) do not permit the temporary import of: firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country, or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan (ex-

cept for any firearm model designation (if assigned) controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740));; or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under paragraph (b)(5) of this section.

* * * * *

(b) * * *

(1) * * * No provision of paragraph (b) of this section, other than paragraph (b)(3), (4), or (5), may be used to export firearms controlled by ECCN 0A501.a, .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502.

* * * * *

(5) Exports of firearms and certain shotguns temporarily in the United States. This paragraph (b)(5) authorizes the export of no more than 75 item firearms per shipment controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are temporarily in the United States for a period not exceeding one year, provided that:

(i) The firearms were not shipped from or manufactured in a U.S. arms embargoed country, i.e., destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR;

(ii) The firearms were not shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740; and

(iii) The firearms are not ultimately destined to a U.S. arms embargoed country, i.e., destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR, or to Russia;

(iv) When the firearms entered the U.S. as a temporary import, the temporary importer or its agent:

(A) Provided the following statement to U.S. Customs and Border Protection: "This shipment will be exported in accordance with and under the authority of License cException TMP (15 CFR 740.9(b)(5))";

(B) Provided to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial number, quantity, and U.S. dollar value; and

(C) Provided (if temporarily imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States.

(v) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (b)(5)(iv)(B) of this section to U.S. Customs and Border Protection at the time of export.

Note 1 to paragraph (b)(5): In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (b)(5), exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches con-

trolled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.

* * * * *

10. Section 740.10 is amended by:

a. Adding one sentence at the end of paragraph (b)(1); and

b. Adding paragraph (b)(4).

The additions read as follows:

**§ 740.10 Servicing and replacement of parts and equipment (RPL)**

* * * * *

(b) * * *

(1) * * * The export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 temporarily in the United States for servicing and replacement may be exported under paragraphs (b)(2) or (3) of this section only if the additional requirements in paragraph (b)(4) of this section are also met.

* * * * *

(4) Exports of firearms and certain shotguns temporarily in the United States for servicing and replacement. This paragraph (b)(4) authorizes the export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are temporarily in the United States for servicing or replacement for a period not exceeding one year or the time it takes to service or replace the commodity, whichever is shorter, provided that the requirements of paragraphs (b)(2) or (3) of this section are met and:

(i) The firearms were not shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740;

(ii) When the firearms entered the U.S. as a temporary import, the temporary importer or its agent:

(A) Provided the following statement to U.S. Customs and Border Protection: "This shipment will be exported in accordance with and under the authority of License Exception RPL (15 CFR 740.10(b))";

(B) Provided to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial number, quantity, and U.S. dollar value; and

(C) Provided (if temporarily imported for servicing or replacement) to U.S. Customs and Border Protection the name, address and contact information (telephone number and/or email) of the organization or individual in the U.S. that will be receiving the item for servicing or replacement.

(iii) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (b)(4)(iii)(B) of this section to U.S. Customs and Border Protection at the time of export.

Note 1 to paragraph (b)(4): In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (b)(4), exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.

Case 2:24-cv-00489-WBS-LHF Document 138-1 Filed 04/28/25 Page 216 of 537 PageID 2558

* * * * *

11. Section 740.11 is amended by:

a. Adding two sentences at the end of the introductory text;

b. Adding Note 2 to paragraph (b)(2); and

c. Redesignating note 1 to paragraph (c)(1) as note 3 to paragraph (c)(1) and notes 1 and 2 to paragraph (e) as notes 4 and 5 to paragraph (e).

The additions read as follows:

**§740.11 Governments, international organizations, international inspections, under the Chemical Weapons Convention, and the International Space Station (GOV).**

* * * Commodities listed in ECCN 0A501 are eligible only for transactions described in paragraphs (b)(2)(i) and (ii) of this section. Any item listed in a 0x5zz ECCN for export, reexport, or transfer (in-country) to an E:1 country is eligible only for transactions described in paragraphs (b)(2)(i) and (ii) solely for U.S. Government official use of this section.

* * * * *

Note 2 to paragraph (b)(2): Items controlled for NS, MT, CB, NP, FC, or AT reasons may not be exported, reexported, or transferred (in-country) to, or for the use of military, police, intelligence entities, or other sensitive end users (e.g., contractors or other governmental parties performing functions on behalf of military, police, or intelligence entities) of a government in a Country Group E:1 or E:2 country.

* * * * *

12. Section 740.14 is amended by revising paragraph (b)(4) introductory text, revising the heading to paragraph (e), and by adding paragraphs (e)(3) and (4) to read as follows:

**§740.14 Baggage (BAG).**

* * * * *

(b) * * *

(4) Tools of trade. Usual and reasonable kinds and quantities of tools, instruments, or equipment and their containers and also technology for use in the trade, occupation, employment, vocation, or hobby of the traveler or members of the household who are traveling or moving. For special provisions regarding firearms and ammunition, see paragraph (e) of this section. For special provisions regarding encryption commodities and software subject to EI controls, see paragraph (f) of this section. For a special provision that specifies restrictions regarding the export or reexport of technology under this paragraph (b)(4), see paragraph (g) of this section. For special provisions regarding personal protective equipment under ECCN 1A613.c or .d, see paragraph (h) of this section.

* * * * *

(e) Special provisions for firearms and ammunition. * * *

(3) A United States citizen or a permanent resident alien leaving the United States may export under this License Exception firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505.a, subject to the following limitations:

(i) Not more than three firearms and 1,000 rounds of ammunition may be taken on any one trip.

(ii) "Parts," "components," "accessories," and "attachments" exported pursuant to this paragraph must be of a kind and limited to quantities that are reasonable for the activities described in paragraph (e)(3)(iv) of this section or that are necessary for routine maintenance of the firearms being exported.

(iii) The commodities must be with the person's baggage.

(iv) The commodities must be for the person's exclusive use and not for resale or other transfer of ownership or control. Accordingly, except as provided in paragraph (e)(4) of this section, firearms, "parts," "components," "accessories," "attachments," and ammunition may not be exported permanently under this License Exception. All firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and all unused ammunition controlled under ECCN 0A505.a exported under this License Exception must be returned to the United States.

(v) Travelers leaving the United States temporarily are required to declare the firearms, "parts," "components," "accessories," "attachments," and ammunition being exported under this license exception to a Customs and Border Protection (CBP) officer prior to departure from the United States and present such items to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG and that the exporter is compliant with its terms.

(4) A nonimmigrant alien leaving the United States may export or reexport under this License Exception only such firearms controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505 as he or she brought into the United States under the relevant provisions of Department of Justice regulations at 27 CFR part 478.

* * * * *

**§740.16 [AMENDED]**

13. Section 740.16 is amended by:

a. Revising paragraph (a)(2);

b. Revising paragraphs (b)(2)(iv) and (v); and

c. Adding paragraph (b)(2)(vi).

The revisions and addition read as follows:

**§740.16 Additional permissive reexports (APR).**

* * * * *

(a) * * *

(2) The commodities being reexported are not controlled for NP, CB, MT, SI, or CC reasons or described in ECCNs 0A919, 3A001.b.2 or b.3 (except those that are being reexported for use in civil telecommunications applications), 6A002, 6A003; or commodities classified under a 0x5zz ECCN; and

* * * * *

(b) * * *

(2) * * *

(iv) Commodities described in ECCN 0A504 that incorporate an image intensifier tube;

(v) Commodities described in ECCN 6A002; or

(vi) Commodities classified under a 0x5zz ECCN.

* * * * *

14. Section 740.20 is amended by revising paragraph (b)(2)(ii) to read as follows:

**§740.20 License Exception Strategic Trade Authorization (STA).**

* * * * *

(b) * * *

(2) * * *

(ii) License Exception STA may not be used for:

(A) Any item controlled in ECCNs 0A501.a, .b, .c, .d, or .e; 0A981; 0A982; 0A983; 0A503; 0E504; 0E982; or

(B) Shotguns with barrel length less than 18 inches controlled in 0A502.

* * * * *

15. Add Supplement No. 4 to part 740 to read as follows:

**SUPPLEMENT NO. 4 TO PART 740—ANNEX A FIREARM MODELS**

(a) *Pistols/revolvers.*

(1) German Model P08 Pistol = SMCR.

(2) IZH 34M, .22 Target pistol.

(3) IZH 35M, .22 caliber Target pistol.

(4) Mauser Model 1896 pistol = SMCR.

(5) MC–57–1 pistol.

(6) MC–1–5 pistol.

(7) Polish Vis Model 35 pistol = SMCR.

(8) Soviet Nagant revolver = SMCR.

(9) TOZ 35, .22 caliber Target pistol.

(10) MTs 440.

(11) MTs 57–1.

(12) MTs 59–1.

(13) MTs 1–5.

(14) TOZ–35M (starter pistol).

(15) Biathlon–7K.

(b) *Rifles.*

(1) BARS–4 Bolt Action carbine.

(2) Biathlon target rifle, .22.

(3) British Enfield rifle = SMCR.

(4) CM2, .22 target rifle (also known as SM2, .22).

(5) German model 98K = SMCR.

(6) German model G41 = SMCR.

(7) German model G43 = SMCR.

(8) IZH–94.

(9) LOS–7, bolt action.

(10) MC–7–07.

(11) MC–18–3.

(12) MC–19–07.

(13) MC–105–01.

(14) MC–112–02.

(15) MC–113–02.

(16) MC–115–1.

(17) MC–125/127.

(18) MC–126.

(19) MC–128.

(20) Saiga.

(21) Soviet Model 38 carbine = SMCR.

(22) Soviet Model 44 carbine-SMCR.

(23) Soviet Model 91/30 rifle = SMCR.

(24) TOZ 18, .22 bolt action.

(25) TOZ 55.

(26) TOZ 78.

(27) Ural Target, .221r.

(28) VEPR rifle.

(29) Winchester Model 1895, Russian Model rifle = SMCR.

(30) Sever—double barrel.

(31) IZH18MH single barrel break action.

(32) MP–251 over/under rifle.

(33) MP–221 double barrel rifle.

(34) MP–141K.

(35) MP–161K.

(36) MTs 116–1.

(37) MTs 116M.

(38) MTs 112–02.

(39) MTs 115–1.

(40) MTs 113–02.

(41) MTs 105–01.

(42) MTs 105–05.

(43) MTs 7–17 combination gun.

(44) MTs 7–12–07 rifle/shotgun.

(45) MTs 7–07.

(46) MTs 109–12–07 rifle.

(47) MTs 109–07 rifle.

(48) MTs 106–07 combination.

(49) MTs 19–97.

(50) MTs 19–09.

(51) MTs 18–3M.

(52) MTs 125.

(53) MTs 126.

(54) MTs 127.

(55) Berkut–2.

(56) Berkut–2M1.

(57) Berkut–3.

(58) Berkut–2M1.

(59) Berkut–2M2.

(60) Berkut–3–1.

(61) Ots–25.

(62) MTs 20–07.

(63) LOS–7–1.

(64) LOS –7–2.

(65) LOS–9–1.

(66) Sobol (Sable).

(67) Rekord.

(68) Bars–4–1.

(69) Saiga.

(70) Saiga–M.

(71) Saiga 308.

(72) Saiga–308–1.

(73) Saiga 308–2.

(74) Saiga–9.
(75) Korshun.
(76) Ural–5–1.
(77) Ural 6–1.
(78) Ural–6–2.
(79) SM–2.
(80) Biatlon–7–3.
(81) Biatlon–7–4.
(82) Rekord–1.
(83) Rekord–2.
(84) Rekord–CISM.
(85) Rekord–1–308.
(86) Rekord–2–308.
(87) Rekord–1–308–CISM.
(88) VEPR.
(89) VEPR Super.
(90) VEPR Pioneer.
(91) VEPR Safari.
(92) TOZ 109.
(93) KO 44–1.
(94) TOZ 78–01.
(95) KO 44.
(96) TOZ 99.
(97) TOZ 99–01.
(98) TOZ 55–01 Zubr.
(99) TOZ 55–2 Zubr.
(100) TOZ 120 Zubr.
(101) MTs 111.
(102) MTs 109.
(103) TOZ 122.
(104) TOZ 125.
(105) TOZ 28.
(106) TOZ 300.

## PART 742—CONTROL POLICY—CCL BASED CONTROLS

16. The authority citation for part 742 is revised to read as follows:

Authority: 50 U.S.C. 4801–4852; 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; 22 U.S.C. 3201 et seq.; 42 U.S.C. 2139a; 22 U.S.C. 7201 et seq.; 22 U.S.C. 7210; Sec. 1503, Pub. L. 108–11, 117 Stat. 559; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Presidential Determination 2003–23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018); Notice of November 8, 2018, 83 FR 56253 (November 9, 2018).

17. Section 742.6 is amended by revising the first and sixth sentences of paragraph (b)(1)(i) and adding a seventh sentence at the end of paragraph (b)(1)(i) to read as follows:

## 742.6 Regional stability.

* * * * *

(b) * * *

(1) * * *

(i) Applications for exports and reexports of ECCN 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items; 9x515 items and ''600 series'' items and will be reviewed on a case-by-case basis to determine whether the transaction is contrary to the national security or foreign policy interests of the United States, including the foreign policy interest of promoting the observance of human rights throughout the world. * * * When destined to the People's Republic of China or a country listed in Country Group E:1 in Supplement No. 1 to part 740 of the EAR, items classified under ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items when there is reason to believe the transaction involves criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries, will be subject to a policy of denial.

* * * * *

18. Section 742.7 is amended by revising paragraphs (a)(1) through (4) and (c) to read as follows:

## §742.7 Crime control and detection.

(a) * * *

(1) Crime control and detection instruments and equipment and related ''technology'' and ''software'' identified in the appropriate ECCNs on the CCL under CC Column 1 in the Country Chart column of the ''License Requirements'' section. A license is required to countries listed in CC Column 1 (Supplement No. 1 to part 738 of the EAR). Items affected by this requirement are identified on the CCL under the following ECCNs: 0A502, 0A504, 0A505.b, 0A978, 0A979 0E502, 0E505 (''technology'' for ''development'' or for ''production'' of buckshot shotgun shells controlled under ECCN 0A505.b), 1A984, 1A985, 3A980, 3A981, 3D980, 3E980, 4A003 (for fingerprint computers only), 4A980, 4D001 (for fingerprint computers only), 4D980, 4E001 (for fingerprint computers only), 4E580, 6A002 (for police-model infrared viewers only), 6E001 (for police-model infrared viewers only), 6E002 (for police-model infrared viewers only), and 9A980.

(2) Shotguns with a barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 2 in the Country Chart column of the ''License Requirements'' section regardless of end user to countries listed in CC Column 2 (Supplement No. 1 to part 738 of the EAR).

(3) Shotguns with barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 3 in the Country Chart column of the ''License Requirements'' section only if for sale or resale to police or law enforcement entities in countries listed in CC Column 3 (Supplement No. 1 to part 738 of the EAR).

(4) Certain crime control items require a license to all destinations, except Canada. These items are identified under ECCNs 0A982, 0A503, and 0E982. Controls for these items appear in each ECCN; a column specific to these controls does not appear in the Country Chart (Supplement No. 1 to part 738 of the EAR).

* * * * *

(c) Contract sanctity. Contract sanctity date: August 22, 2000. Contract sanctity applies only to items controlled under ECCNs 0A982, 0A503, and 0E982 destined for countries not listed in CC Column 1 of the Country Chart (Supplement No. 1 to part 738 of the EAR).

* * * * *

19. Section 742.17 is amended by:

a. Revising the first sentence of paragraph (a); and

b. Revising paragraph (f) to read as follows:

## §742.17 Exports of firearms to OAS member countries.

(a) License requirements. BIS maintains a licensing system for the export of firearms and related items to all OAS member countries. * * *

* * * * *

(f) Items/Commodities. Items requiring a license under this section are ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f), and 0A505 (except 0A505.d). (See Supplement No. 1 to part 774 of the EAR).

## §742.19 [AMENDED]

20. Section 742.19(a)(1) is amended by:

a. Removing ''0A986'' and adding in its place ''0A505.c''; and

b. Removing ''0B986'' and adding in its place ''0B505.c''.

## PART 743—SPECIAL REPORTING AND NOTIFICATION

21. The authority citation for 15 CFR part 743 is revised to read as follows:

Authority: 50 U.S.C. 4801–4852; 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13637, 78 FR 16129, 3 CFR, 2014 Comp., p. 223; 78 FR 16129; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

22. Section 743.4 is amended by:

a. Adding four sentences to the end of paragraph (a);

b. By redesignating Note to paragraph (a) as Note 1 to paragraph (a);

c. Revising paragraph (b);

d. Adding paragraphs (c)(1)(i) and (c)(2)(i);

e. By redesignating Note to paragraph (e)(1)(ii) as Note 2 to paragraph (e)(1)(ii);

e. Revising paragraph (h); and

f. Adding paragraph (i) to read as follows:

## §743.4 Conventional arms reporting.

(a) * * * This section does not require reports when the exporter uses the alternative submission method described under paragraph (h) of this section. The alternative submission method under paragraph (h) requires the exporter to submit the information required for conventional arms reporting in this section as part of the required EEI submission in AES, pursuant to §758.1(b)(9). Because of the requirements in §758.1(g)(4)(ii) for the firearms that require conventional arms reporting of all conventional arms, the Department of Commerce believes all conventional arms reporting requirements for firearms will be met by using the alternative submission method. The Department of Commerce leaves standard method for submitting reports in place in case any additional items are moved from the USML to the CCL, that may require conventional arms reporting.

Note 1 to paragraph (a): * * *

(b) Requirements. You must submit one electronic copy of each report required under the provisions of this section, or submit this information using the alternative submission method specified in paragraph (h) of this section, and maintain accurate supporting records (see §762.2(b) of the EAR) for all exports of items specified in paragraph (c) of this section for the following:

(c) * * *

(1) * * *

(i) ECCN 0A501.a and .b.

* * * * *

(2) * * *

(i) ECCN 0A501.a and .b.

* * * * *

(h) Alternative submission method. This paragraph (h) describes an alternative submission method for meeting the conventional arms reporting requirements of this section. The alternative submission method requires the exporter, when filing the required EEI submission in AES, pursuant to §758.1(b)(9), to include the six character ECCN classification (i.e., 0A501.a or 0A501.b) as the first text to appear in the Commodity description block. If the exporter properly includes this information in the EEI filing in AES, the Department of Commerce will be able to obtain that export information directly from AES to meet the U.S. Government's commitments to the Wassenaar Arrangement and United Nations for conventional arms reporting. An exporter that complies with the requirements in §758.1(g)(4)(ii) does not have to submit separate annual and semi-annual reports to the Department of Commerce pursuant to this section.

(i) Contacts. General information concerning the Wassenaar Arrangement and reporting obligations thereof is available from the Office of National Security and Technology Transfer Controls, Tel.: (202) 482-0092, Fax: (202) 482-4094. Information concerning the reporting requirements for items identified in paragraphs (c)(1) and (2) of this section is available from the Office of Nonproliferation and Treaty Compliance

# Ex. A. COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

(NPTC), Tel.: (202) 482–4188, Fax: (202) 482–4145.

## PART 744—CONTROL POLICY: END-USER AND END-USE BASED

23. The authority citation for 15 CFR part 744 is revised to read as follows:

Authority: 50 U.S.C. 4801–4582; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 et seq.; 22 U.S.C. 3201 et seq.; 42 U.S.C. 2139a; 22 U.S.C. 7201 et seq.; 22 U.S.C. 7210; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13099, 63 FR 45167, 3 CFR, 1998 Comp., p. 208; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13224, 66 FR 49079, 3 CFR, 2001 Comp., p. 786; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018); Notice of September 19, 2018, 83 FR 47799 (September 20, 2018); Notice of November 8, 2018, 83 FR 56253 (November 9, 2018); Notice of January 16, 2019, 84 FR 127 (January 18, 2019).

### § 744.9 [AMENDED]

24. Section 744.9 is amended by removing ''0A987'' from paragraphs (a)(1) and (b) and adding in its place ''0A504''.

## PART 746—EMBARGOES AND OTHER SPECIAL CONTROLS

25. The authority citation for 15 CFR part 746 is revised to read as follows:

Authority: 50 U.S.C. 4802; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 287c; Sec 1503, Pub. L. 108–11, 117 Stat. 559; 22 U.S.C. 6004; 22 U.S.C. 7201 *et seq.*; 22 U.S.C. 7210; E.O. 12854, 58 FR 36587, 3 CFR, 1993 Comp., p. 614; E.O. 12918, 59 FR 28205, 3 CFR, 1994 Comp., p. 899; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p 168; Presidential Determination 2003–23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Presidential Determination 2007–7, 72 FR 1899, 3 CFR, 2006 Comp., p. 325; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018); Notice of May 8, 2019, 84 FR 20537 (May 10, 2019).

### § 746.3 [AMENDED]

26. Section 746.3 is amended by removing ''0A986'' from paragraph (b)(2) and adding in its place ''0A505.c''.

### § 746.7 [AMENDED]

27. Section 746.7 is amended in paragraph (a)(1) by:
a. Adding ''0A503,'' immediately before ''0A980''; and
b. Removing ''0A985,''.

## PART 748—APPLICATIONS (CLASSIFICATION, ADVISORY, AND LICENSE) AND DOCUMENTATION

28. The authority citation for 15 CFR part 748 is revised to read as follows:

Authority: 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

29. Section 748.12 is amended by:
a. Revising the heading;
b. Adding introductory text;
c. Revising paragraphs (a) introductory text and (a)(1);
d. Redesignating the note to paragraph (c)(8) as note 1 to paragraph (c)(8); and
e. Adding paragraph (e).
The revisions and additions read as follows.

### § 748.12 Firearms import certificate or import permit.

License applications for certain firearms and related commodities require support documents in accordance with this section. For destinations that are members of the Organization of American States (OAS), an FC Import Certificate or equivalent official document is required in accordance with paragraphs (a) through (d) of this section. For other destinations that require a firearms import or permit, the firearms import certificate or permit is required in accordance with paragraph (e) of this section.

(a) *Requirement to obtain document for OAS member states.* Unless an exception in § 748.9(c) applies, an FC Import Certificate is required for license applications for firearms and related commodities, regardless of value, that are destined for member countries of the OAS. This requirement is consistent with the OAS Model Regulations described in § 742.17 of the EAR.

(1) *Items subject to requirement.* Firearms and related commodities are those commodities controlled for ''FC Column 1'' reasons under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f), or 0A505 (except 0A505.d).

* * * * *

(e) *Requirement to obtain an import certificate or permit for other than OAS member states.* If the country to which firearms, parts, components, accessories, and attachments controlled under ECCN 0A501, or ammunition controlled under ECCN 0A505, are being exported or reexported requires that a government-issued certificate or permit be obtained prior to importing the commodity, the exporter or reexporter must obtain and retain on file the original or a copy of that certificate or permit before applying for an export or reexport license unless:

(1) A license is not required for the export or reexport; or

(2) The exporter is required to obtain an import or end-user certificate or other equivalent official document pursuant to paragraphs (a) thorough (d) of this section and has, in fact, complied with that requirement.

(3)(i) The number or other identifying information of the import certificate or permit must be stated on the license application.

(ii) If the country to which the commodities are being exported does not require an import certificate or permit for firearms imports, that fact must be noted on any license application for ECCN 0A501 or 0A505 commodities.

*Note 2 to paragraph (e). Obtaining a BIS Statement by Ultimate Consignee and Purchaser pursuant to § 748.11 of the EAR does not exempt the exporter or reexporter from the requirement to obtain a certificate pursuant to paragraph (a) of this section because that statement is not issued by a government.*

30. Supplement No. 2 to part 748 (Unique Application and Submission Requirements) is amended by adding paragraph (z) to read as follows:

### SUPPLEMENT NO. 2 TO PART 748—UNIQUE APPLICATION AND SUBMISSION REQUIREMENTS

* * * * *

(z) *Exports of firearms and certain shotguns temporarily in the United States.*

(1) *Certification.* If you are submitting a license application for the export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that will be temporarily in the United States, *e.g.*, for servicing and repair or for intransit shipments, you must include the following certification in Block 24:

The firearms in this license application will not be shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740. I and the parties to this transaction will comply with the requirements specified in paragraph (z)(2)(i) and (ii) of Supplement No. 2 to part 748.

(2) *Requirements.* Each approved license for commodities described under paragraph (z) must comply with the requirements specified in paragraphs (z)(2)(i) and (ii) of this supplement.

(i) When the firearms enter the U.S. as a temporary import, the temporary importer or its agent must:

(A) Provide the following statement to U.S. Customs and Border Protection: ''This shipment is being temporarily imported in accordance with the EAR. This shipment will be exported in accordance with and under the authority of BIS license number (provide the license number) (15 CFR 750.7(a) and 758.4);''

(B) Provide to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provide (if temporarily imported for servicing or replacement) to U.S. Customs and Border Protection the name, address, and contact information (telephone number and/or email) of the organization or individual in the U.S. that will be receiving the item for servicing or replacement.

(ii) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (z)(2)(i)(B) of this supplement to U.S. Customs and Border Protection at the time of export.

*Note 1 to paragraph (z): In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (z), exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.*

## PART 758—EXPORT CLEARANCE REQUIREMENTS

31. The authority citation for part 758 is revised to read as follows:

Authority: 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

32. Section 758.1 is amended by:
a. Revising paragraphs (b)(7) (8), and adding paragraph (b)(9);
b. Revising paragraph (c)(1);
c. Adding Note 1 to paragraph (c)(1);
d. Adding paragraph (g)(4); and
d. Redesignating Note to paragraph (h)(1) as Note 3 to paragraph (h)(1); to read as follows:

### § 758.1 The Electronic Export Enforcement (EEI) filing to the Automated Export System (AES).

* * * * *

(b) * * *

(7) For all items exported under authorization Validated End-User (VEU);

(8) For all exports of tangible items subject to the EAR where parties to the transaction, as described in 748.5(d) through (f) of the EAR, are listed on the Unverified List (Supplement No. 6 to part 744 of the EAR), regardless of value or destination; or

(9) For all exports, except for exports authorized under License Exception BAG, as set forth in § 740.14 of the EAR, of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition

controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada.

(c) * * *

(1) License Exception Baggage (BAG), as set forth in §740.14 of the EAR. See 15 CFR 30.37(x) of the FTR;

Note 1 to paragraph (c) (1): See the export clearance requirements for exports of firearms controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505, authorized under License Exception BAG, as set forth in §740.14 of the EAR.

* * * * *

(e) * * *

(4) Exports of Firearms and Related Items. This paragraph (g)(4) includes two separate requirements under paragraph (g)(4)(i) and (ii) of this section that are used to better identify exports of certain end item firearms under the EAR. Paragraph (g)(4)(i) is limited to certain EAR authorizations. Paragraph (g)(4)(ii) applies to all EAR authorizations that require EEI filing in AES.

(i) Identifying end item firearms by manufacturer, model, caliber, and serial number in the EEI filing in AES. For any export authorized under License Exception TMP or a BIS license authorizing a temporary export of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing, you must report the manufacturer, model, caliber, and serial number of the exported items. The requirements of this paragraph also apply to any other export authorized under a BIS license that includes a condition or proviso on the license requiring the submission of this information specified in paragraph (g) of this section when the EEI is filed in AES.

(ii) Identifying end item firearms by ''items'' level classification or other control descriptor in the EEI filing in AES. For any export of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other 39 required data for the associated EEI filing, you must include the six character ECCN classification (i.e., 0A501.a, or 0A501.b), or for shotguns controlled under 0A502 the phrase ''0A501 barrel length less than 18 inches'' as the first text to appear in the Commodity description block in the EEI filing in AES. (See 743.4(h) for the use of this information for conventional arms reporting).

*Note 2 to paragraph (g)(4):* If a commodity described in paragraph (g)(4) is exported under License Exception TMP under §740.9(a)(6) for inspection, test, calibration, or repair is not consumed or destroyed in the normal course of authorized temporary use abroad, the commodity must be disposed of or retained in one of the ways specified in §740.9(a)(14)(i), (ii), or (iii). For example, if a commodity described in paragraph (g)(4) was destroyed while being repaired after being exported under §740.9(a)(6), the commodity described in paragraph (g)(4) would not be required to be returned. If the entity doing the repair returned a replacement of the commodity to the exporter from the United States, the import would not require an EAR authorization. The entity that exported the commodity described in paragraph (g)(4) and the entity that received the commodity would need to document this as part of their recordkeeping related to this export and subsequent import to the United States.

* * * * *

33. Add §758.10 to read as follows:

### §758.10 Entry clearance requirements for temporary imports.

(a) *Scope.* This section specifies the temporary import entry clearance requirements

for firearms ''subject to the EAR'' that are on the United States Munitions Import List (USMIL, 27 CFR 447.21), except for firearms ''subject to the EAR'' that are temporarily brought into the United States by non-immigrant aliens under the provisions of Department of Justice regulations at 27 CFR part 478 (See 740.16(e) of License Exception BAG for information on the export of these firearms ''subject to the EAR''). These firearms are controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502. Items that are temporarily exported under the EAR must have met the export clearance requirements specified in §758.1 of the EAR.

(1) An authorization under the EAR is not required for the temporary import of ''items'' that are ''subject to the EAR,'' including for ''items'' ''subject to the EAR'' that are on the USMIL. Temporary imports of firearms described in this section must meet the entry clearance requirements specified in paragraph (b) of this section.

(2) Permanent imports are regulated by the Attorney General under the direction of the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (see 27 CFR parts 447, 478, 479, and 555).

(b) *EAR procedures for temporary imports and subsequent exports.* To the satisfaction of U.S. Customs and Border Protection, the temporary importer must comply with the following procedures:

(1) At the time of entry into the U.S. of the temporary import:

(i) Provide one of the following statements specified in paragraphs (b)(1)(i)(A), (B), or (C) of this section to U.S. Customs and Border Protection:

(A) ''This shipment is being temporarily imported in accordance with the EAR. This shipment will be exported in accordance with and under the authority of License Exception TMP (15 CFR 740.9(b)(5));''

(B) ''This shipment is being temporarily imported in accordance with the EAR. This shipment will be exported in accordance with and under the authority of License Exception RPL (15 CFR 740.10(b));'' or

(C) ''This shipment is being temporarily imported in accordance with the EAR. This shipment will be exported in accordance with and under the authority of BIS license number (provide the license number) (15 CFR 750.7(a) and 758.4);''

(ii) Provide to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value;

(iii) Provide (if temporarily imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States;

(iv) Provide (if temporarily imported for servicing or replacement) to U.S. Customs and Border Protection the name, address and contact information (telephone number and/ or email) of the organization or individual in the U.S. that will be receiving the item for servicing or replacement.

*Note 1 to paragraph (b)(1):* In accordance with the exclusions in License Exception TMP under §740.9(b)(5) of the EAR, the entry clearance requirements in §758.1(b)(9) do not permit the temporary import of firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country; or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan,

Moldova, Turkmenistan, Ukraine, or Uzbekistan (except for any firearm model controlled by proposed 0A501 that is specified under Annex A in Supplement No. 4 to part 740.); or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under §740.9(b)(5).

*Note 2 to paragraph (b)(1):* In accordance with the exclusions in License Exception RPL under §740.10(b)(4) and Supplement No. 2 to part 748 paragraph (2) of the EAR, the entry clearance requirements in §758.1(b)(9) do not permit the temporary import of: firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan (except for any firearm model controlled by proposed 0A501 that is specified under Annex A in Supplement No. 4 to part 740.); or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception RPL under §740.10(b)(4) and Supplement No. 2 to part 748 paragraph (2) of the EAR.

(2) At the time of export, in accordance with the U.S. Customs and Border Protection procedures, the eligible exporter, or an agent acting on the filer's behalf, must as required under §758.1(b)(9) of the EAR file the export information with CBP by filing EEI in AES, noting the 43 applicable EAR authorization as the authority for the export, and provide, upon request by CBP, the entry document number or a copy of the CBP document under which the ''item'' subject to the EAR'' on the USMIL was temporarily imported. See also the additional requirements in §758.1(g)(4).

34. Add §758.11 to read as follows:

### §758.11 Export clearance requirements for firearms and related items.

(a) *Scope.* The export clearance requirements of this section apply to all exports of commodities controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada, that are authorized under License Exception BAG, as set forth in §740.14.

(b) *Required form.* Prior to making any export described in paragraph (a) of this section, the exporter is required to submit a properly completed Department of Homeland Security, CBP Form 4457, (Certificate of Registration for Personal Effects Taken Abroad) (OMB Control Number 1651–0010), to the U.S. Customs and Border Protection (CBP), pursuant to 19 CFR 148.1, and as required by this section of the EAR.

(1) Where to obtain the form? The CBP Certification of Registration Form 4457 can be found on the following CBP website:

https://www.cbp.gov/document/forms/form-4457-certificate-registration-personal-effects-taken-abroad

(2) Required ''description of articles'' for firearms to be included on the CBP Form 4457. For all exports of firearms controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, the exporter must provide to CBP the serial number, make, model, and caliber for each firearm being exported by entering this information under the ''Description of Articles'' field of the CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad.

Case 2:24-cv-01349-WBS-LFF Document 1281 Filed 09/28/23 Page 220 of 537
PageID 2562

EX A COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

(c) *Where to find additional information on the CBP Form 4457?* See the following CBP website page for additional information: https://help.cbp.gov/app/answers/detail/a_id/323/~/traveling-outside-of-the-u.s.-temporarily-taking-a-firearm%2C-rifle%2C-gun%2C.

(d) *Return of items exported pursuant to this section.* The exporter when returning with a commodity authorized under License Exception BAG and exported pursuant this section, is required to present a copy of the CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad) (OMB Control Number 1651–0010), to CBP, pursuant to 19 CFR 148.1, and as required by this section of the EAR.

**PART 762—RECORDKEEPING**

35. The authority citation for part 762 is revised to read as follows:

Authority: 50 U.S.C. 4801–4852; 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

36. Section 762.2 is amended by removing "and," at the end of paragraph (a)(10), redesignating paragraph (a)(11) as paragraph (a)(12), and adding a new paragraph (a)(11) to read as follows:

**§ 762.2 Records to be retained.**

(a) * * *

(11) The serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502 that have been exported. The "exporter" or any other party to the transaction (see 758.3 of the EAR), that creates or receives such records is a person responsible for retaining this record; and

* * * * *

37. Section 762.3 is amended by revising paragraph (a)(5) to read as follows:

**§ 762.3 Records exempt from recordkeeping requirements.**

(a) * * *

(5) Warranty certificate, except for a warranty certificate issued for an address located outside the United States for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502;

* * * * *

**PART 772—DEFINITIONS OF TERMS**

38. The authority citation for part 772 is revised to read as follows:

Authority: 50 U.S.C. 4801–4852; 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

**§ 772.1—[AMENDED]**

39. In §772.1, in the definition of "specially designed," Note 1 is amended by removing "0B986" and adding in its place "0B505.c"; and the definition of "complete breech mechanisms" is added as set forth below:

**§ 772.1 Definitions of terms as used in the Export Administration Regulations (EAR).**

* * * * *

Complete breech mechanisms. The mechanism for opening and closing the breech of a breech-loading firearm, especially of a heavy-caliber weapon.

* * * * *

**PART 774—THE COMMERCE CONTROL LIST**

40. The authority citation for 15 CFR part 774 is revised to read as follows:

Authority: 50 U.S.C. 4801–4852; 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; 10 U.S.C. 7420; 10 U.S.C. 7430(e); 22 U.S.C. 287c, 22 U.S.C. 3201 et seq.; 22 U.S.C. 6004; 42 U.S.C. 2139a; 15

U.S.C. 1824a; 50 U.S.C. 4305; 22 U.S.C. 7201 et seq.; 22 U.S.C. 7210; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

41. In Supplement No. 1 to part 774, Category 0, revise Export Control Classification Number (ECCN) 0A018 to read as follows:

Supplement No. 1 to Part 774—The Commerce Control List

* * * * *

0A018 Items on the Wassenaar Munitions List (see List of Items Controlled).

No items currently are in this ECCN. See ECCN 0A505 for "parts" and "components" for ammunition that, immediately prior to [INSERT DATE 45 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER], were classified under 0A018.b.

42. In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0A018 and 0A521, entries for ECCNs 0A501, 0A502, 0A503, 0A504, and 0A505 to read as follows:

0A501 Firearms (except 0A502 shotguns) and related commodities as follows (see List of Items controlled).

**License Requirements**

*Reason for Control:* NS, RS, FC, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except 0A501.y. | NS Column 1 |
| RS applies to entire entry except 0A501.y. | RS Column 1 |
| FC applies to entire entry except 0A501.y. | FC Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

*License Requirement Note:* In addition to using the Commerce Country Chart to determine license requirements, a license is required for exports and reexports of ECCN 0A501.y.7 firearms to the People's Republic of China.

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $500 for 0A501.c, .d, and .x.

$500 for 0A501.c, .d, .e, and .x if the ultimate destination is Canada.

*GBS:* N/A

*CIV:* N/A

Special conditions for STA

*STA:* Paragraph (c)(2) of License Exception STA (§740.20(c)(2) of the EAR) may not be used for any item in this entry.

**List of Items Controlled**

*Related Controls:* (1) Firearms that are fully automatic, and magazines with a capacity of greater than 50 rounds, are "subject to the ITAR." (2) See ECCN 0A502 for shotguns and their "parts" and "components" that are subject to the EAR. Also see ECCN 0A502 for shot-pistols. (3) See ECCN 0A504 and USML Category XII for controls on optical sighting devices.

*Related Definitions:* N/A

*Items:*

a. Non-automatic and semi-automatic firearms equal to .50 caliber (12.7 mm) or less.

*Note 1 to paragraph 0A501.a:* 'Combination pistols' are controlled under ECCN 0A501.a. A 'combination pistol' (a.k.a., a combination gun) has at least one rifled barrel and at least one smoothbore barrel (generally a shotgun style barrel).

b. Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but less than or equal to .72 inches (18.0 mm).

c. The following types of "parts" and "components" if "specially designed" for a commodity controlled by paragraph .a or .b of this entry, or USML Category I (unless

listed in USML Category I(g) or (h)): barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control "parts" or "components" (*e.g.,* triggers, hammers, sears, disconnectors) and buttstocks that contain fire control "parts" or "components."

d. Detachable magazines with a capacity of greater than 16 rounds "specially designed" for a commodity controlled by paragraph .a or .b of this entry.

*Note 2 to paragraph 0A501.d:* Magazines with a capacity of 16 rounds or less are controlled under 0A501.x.

e. Receivers (frames) and "complete breech mechanisms," including castings, forgings stampings, or machined items thereof, "specially designed" for a commodity by controlled by paragraph .a or .b of this entry.

f. through w. [Reserved]

x. "Parts" and "components" that are "specially designed" for a commodity classified under paragraphs .a through .c of this entry or the USML and not elsewhere specified on the USML or CCL.

y. Specific "parts," "components," "accessories" and "attachments" "specially designed" for a commodity subject to control in this ECCN or common to a defense article in USML Category I and not elsewhere specified in the USML or CCL as follows, and "parts," "components," "accessories," and "attachments" "specially designed" therefor.

y.1. Stocks or grips, that do not contain any fire control "parts" or "components" (e.g., triggers, hammers, sears, disconnectors);"

y.2. Scope mounts or accessory rails;

y.3. Iron sights;

y.4. Sling swivels;

y.5. Butt plates or recoil pads;

y.6. Bayonets; and

y.7. Firearms manufactured from 1890 to 1898 and reproductions thereof.

*Technical Note 1 to 0A501: The controls on "parts" and "components" in ECCN 0A501 include those "parts" and "components" that are common to firearms described in ECCN 0A501 and to those firearms "subject to the ITAR."*

*Note 2 to 0A501: Antique firearms (i.e., those manufactured before 1890) and reproductions thereof muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles are EAR99 commodities.*

*Note 3 to 0A501: Muzzle loading (black powder) firearms with a caliber less than 20 mm that were manufactured later than 1937 that are used for hunting or sporting purposes that were not "specially designed" for military use and are not "subject to the ITAR" nor controlled as shotguns under ECCN 0A502 are EAR99 commodities.*

0A502 Shotguns; shotguns "parts" and "components," consisting of complete trigger mechanisms; magazines and magazine extension tubes; "complete breech mechanisms;" except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use.

**License Requirements**

*Reason for Control:* RS, CC, FC, UN, AT, NS

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to shotguns with a barrel length less than 18 inches (45.72 cm). | NS Column 1 |
| RS applies to shotguns with a barrel length less than 18 inches (45.72 cm). | RS Column 1 |
| FC applies to entire entry | FC Column 1 |
| CC applies to shotguns with a barrel length less than 24 in. (60.96 cm) and shotgun "components" controlled by this entry regardless of end use. | CC Column 1 |

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm), regardless of end user. | CC Column 2 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm) if for sale or resale to police or law enforcement. | CC Column 3 |
| UN applies to entire entry .............. | See § 746.1(b) of the EAR for UN controls |
| AT applies to shotguns with a barrel length less than 18 inches (45.72 cm). | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $500 for 0A502 shotgun "parts" and "components," consisting of complete trigger mechanisms; magazines and magazine extension tubes.

$500 for 0A502 shotgun "parts" and "components," consisting of complete trigger mechanisms; magazines and magazine extension tubes, "complete breech mechanisms" if the ultimate destination is Canada.

*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls:* Shotguns that are fully automatic are "subject to the ITAR."

*Related Definitions:* N/A

*Items:* The list of items controlled is contained in the ECCN heading.

*Note 1 to 0A502: Shotguns made in or before 1898 are considered antique shotguns and designated as EAR99.*

*Technical Note: Shot pistols or shotguns that have had the shoulder stock removed and a pistol grip attached are controlled by ECCN 0A502. Slug guns are also controlled under ECCN 0A502.*

0A503 Discharge type arms; non-lethal or less-lethal grenades and projectiles, and "specially designed" "parts" and "components" of those projectiles; and devices to administer electric shock, for example, stun guns, shock batons, shock shields, electric cattle prods, immobilization guns and projectiles; except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use; and "specially designed" "parts" and "components," n.e.s.

**License Requirements**

*Reason for Control:* CC, UN

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry .............. | A license is required for ALL destinations, except Canada, regardless of end use. Accordingly, a column specific to this control does not appear on the Commerce Country Chart. (See part 742 of the EAR for additional information.) |
| UN applies to entire entry .............. | See 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* N/A
*GBS:* N/A
*C/V:* N/A

**List of Items Controlled**

*Related Controls:* Law enforcement restraint devices that administer an electric shock are controlled under ECCN 0A982. Electronic devices that monitor and report a person's location to enforce restrictions on movement for law enforcement or penal reasons are controlled under ECCN 3A981.

*Related Definitions:* N/A

*Items:* The list of items controlled is contained in the ECCN heading.

0A504 Optical sighting devices for firearms (including shotguns controlled by 0A502); and "components" as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* FC, RS, CC, UN

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| RS applies to paragraph.i .............. | RS Column 1 |
| FC applies to paragraphs .a, .b, .c, .d, .e, .g, and .i of this entry. | FC Column 1 |
| CC applies to entire entry .............. | CC Column 1 |
| UN applies to entire entry .............. | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $500 for 0A504.g.
*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls:* (1) See USML Category XII(c) for sighting devices using second generation image intensifier tubes having luminous sensitivity greater than 350 μA/lm, or third generation or higher image intensifier tubes, that are "subject to the ITAR." (2) See USML Category XII(b) for laser aiming or laser illumination systems "subject to the ITAR." (3) Section 744.9 of the EAR imposes a license requirement on certain commodities described in 0A504 if being exported, re-exported, or transferred (in-country) for use by a military end-user or for incorporation into an item controlled by ECCN 0A919.

*Related Definitions:* N/A

*Items:*

a. Telescopic sights.

b. Holographic sights.

c. Reflex or "red dot" sights.

d. Reticle sights.

e. Other sighting devices that contain optical elements.

f. Laser aiming devices or laser illuminators "specially designed" for use on firearms, and having an operational wavelength exceeding 400 nm but not exceeding 710 nm.

*Note 1 to 0A504.f: 0A504.f does not control laser boresighting devices that must be placed in the bore or chamber to provide a reference for aligning the firearms sights.*

g. Lenses, other optical elements and adjustment mechanisms for articles in paragraphs .a, .b, .c, .d, .e, or .i.

h. [Reserved]

i. Riflescopes that were not "subject to the EAR" as of [INSERT DATE ONE DAY PRIOR TO THE EFFECTIVE DATE OF THE FINAL RULE] and are "specially designed" for use in firearms that are "subject to the ITAR."

*Note 2 to paragraph i:* For purpose of the application of "specially designed" for the riflescopes controlled under 0A504.i, paragraph (a)(1) of the definition of "specially designed" in § 772.1 of the EAR is what is used to determine whether the riflescope is "specially designed."

0A505 Ammunition as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* NS, RS, CC, FC, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to 0A505.a and .x .......... | NS Column 1 |
| RS applies to 0A505.a and .x .......... | RS Column 1 |
| CC applies to 0A505.b .................... | CC Column 1 |
| FC applies to entire entry except 0A505.d | FC Column 1 |
| UN applies to entire entry .............. | See § 746.1 of the EAR for UN controls |
| AT applies to 0A505.a, .d, and .x .... | AT Column 1 |
| AT applies to 0A505.c .................... | A license is required for items controlled by paragraph .c of this entry to North Korea for antiterrorism reasons. The Commerce Country Chart is not designed to determine AT licensing requirements for this entry. See § 742.19 of the EAR for additional information. |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $500 for items in 0A505.x, except $3,000 for items in 0A505.x.that, immediately prior to [INSERT DATE 45 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER], were classified under 0A018.b, (*i.e.,* "Specially designed" components and parts for ammunition, except cartridge cases, powder bags, bullets, jackets, cores, shells, projectiles, boosters, fuses and components, primers, and other detonating devices and ammunition belting and linking machines (all of which are "subject to the ITAR"). (See 22 CFR parts 120 through 130))

*GBS:* N/A
*CIV:* N/A

**Special conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§740.20(c)(2) of the EAR) may not be used for any item in 0A505.

**List of Items Controlled**

*Related Controls:* (1) Ammunition for modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles as well as inherently military ammunition types such as ammunition preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile are "subject to the ITAR." (2) Percussion caps, and lead balls and bullets, for use with muzzle-loading firearms are EAR99 items.

*Related Definitions:* N/A

*Items:*

a. Ammunition for firearms controlled by ECCN 0A501 or USML Category I and not enumerated in paragraph .b, .c, or .d of this entry or in USML Category III.

b. Buckshot (No. 4 .24'' diameter and larger) shotgun shells.

c. Shotgun shells (including less than lethal rounds) that do not contain buckshot; and "specially designed" "parts" and "components" of shotgun shells.

*Note 1 to 0A505.c: Shotgun shells that contain only chemical irritants are controlled under ECCN 1A984.*

d. Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in USML Category III.

e. through w. [Reserved]

x. "Parts" and "components" that are "specially designed" for a commodity subject to control in this ECCN or a defense article in USML Category III and not elsewhere specified on the USML, the CCL or paragraph .d of this entry.

*Note 2 to 0A505.x: The Controls on "parts" and "components" in this entry include Berdan and boxer primers, metallic catridge cases, and standard metallic projectiles such as full metal jacket, lead core, and copper projectiles.*

Note 3 to 0A505.x: The controls on "parts" and "components" in this entry include those "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.

Note 4 to 0A505: Lead shot smaller than No. 4 Buckshot, empty and unprimed shotgun shells, shotgun wads, smokeless gunpowder, 'Dummy rounds' and blank rounds (unless linked or belted), not incorporating a lethal or non-lethal projectile(s) are designated EAR99. A 'dummy round or drill round' is a round that is completely inert, i.e., contains no primer, propellant, or explosive charge. It is typically used to check weapon function and for crew training.

43. In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0A521 and 0A604, an entry for ECCN 0A602 to read as follows:

0A602 Guns and Armament as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control: NS, RS, UN, AT*

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

List Based License Exceptions (See Part 740 for a description of all license exceptions)
LVS: $500
GBS: N/A
CIV: N/A

Special conditions for STA

STA: Paragraph (c)(2) of License Exception STA (§740.20(c)(2) of the EAR) may not be used for any item in 0A602.

List of Items Controlled

Related Controls: (1) Modern heavy weapons such as howitzers, artillery, cannon, mortars, and recoilless rifles are "subject to the ITAR." (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a de minimis amount of U.S.-origin "600 series" items. (3) See ECCN 0A606 for engines that are "specially designed" for a self-propelled gun or howitzer subject to control under paragraph .a of this ECCN or USML Category VII.

Related Definitions: N/A

Items:

a. Guns and armament manufactured between 1890 and 1919.

b. Military flame throwers with an effective range less than 20 meters.

c. through w. [Reserved]

x. "Parts" and "components" that are "specially designed" for a commodity subject to control in paragraphs .a or .b of this ECCN or a defense article in USML Category II and not elsewhere specified on the USML or the CCL.

Note 1 to 0A602.x: Engines that are "specially designed" for a self-propelled gun or howitzer subject to control under paragraph .a of this ECCN or a defense article in USML Category VII are controlled under ECCN 0A606.x.

Note 2 to 0A602: "Parts," "components," "accessories," and "attachments" specified in USML subcategory II(j) are subject to the controls of that paragraph.

Note 3 to 0A602: Black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants are designated EAR99.

Supplement No. 1 to Part 774—[AMENDED]

44. In Supplement No. 1 to part 774, Category 0, remove ECCNs 0A918, 0A984, 0A985, 0A986, and 0A987.

45. In Supplement No. 1 to part 774, Category 0, revise ECCN 0A988 to read as follows: 0A988 Conventional military steel helmets.

No items currently are in this ECCN. See ECCN 1A613.y.1 for conventional steel helmets that, immediately prior to July 1, 2014, were classified under 0A988.

46. In Supplement No. 1 to part 774, Category 0, add, before the entry for ECCN 0B521, entries for ECCNs 0B501 and 0B505 to read as follows:

0B501 Test, inspection, and production "equipment" and related commodities for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A501 or USML Category I as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control: NS, RS, UN, AT*

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except equipment. | NS Column 1 for ECCN 0A501.y |

---

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| RS applies to entire entry except equipment for ECCN 0A501.y. | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

List Based License Exceptions (See Part 740 for a description of all license exceptions)
LVS: $3000
GBS: N/A
CIV: N/A

Special conditions for STA

STA: Paragraph (c)(2) of License Exception STA (§740.20(c)(2) of the EAR) may not be used to ship any item in this entry.

List of Items Controlled

Related Controls: N/A
Related Definitions: N/A
Items:

a. Small arms chambering machines.

b. Small arms deep hole drilling machines and drills therefor.

c. Small arms rifling machines.

d. Small arms spill boring machines.

e. Production equipment (including dies, fixtures, and other tooling) "specially designed" for the "production" of the items controlled in 0A501.a through .x, or USML Category I.

0B505 Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A505 or USML Category III, except equipment for the hand loading of cartridges and shotgun shells, as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control: NS, RS, UN, AT*

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to paragraphs .a and .x | NS Column 1 |
| RS applies to paragraphs .a and .x | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to paragraphs .a, .d, and .x | AT Column 1 |
| AT applies to paragraph .c | A license is required for export or reexport of these items to North Korea for anti-terrorism reasons. |

List Based License Exceptions (See Part 740 for a description of all license exceptions)
LVS: $3000
GBS: N/A
CIV: N/A

Special conditions for STA

STA: Paragraph (c)(2) of License Exception STA (740.20(c)(2) of the EAR) may not be used for any item in 0B505.

List of Items Controlled

Related Controls: N/A
Related Definitions: N/A
Items:

a. Production equipment (including tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment), not enumerated in USML Category III that are "specially designed" for the "production" of commodities controlled by ECCN 0A505.a or .x or USML Category III.

b. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.b.

c. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.c.

d. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.d.

e. through .w [Reserved]

x. "Parts" and "components" "specially designed" for a commodity subject to control in paragraph .a of this entry.

47. In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0B521 and 0B604, an entry for ECCN 0B602 to read as follows:

0B602 Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A602 or USML Category II as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control: NS, RS, UN, AT*

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

List Based License Exceptions (See Part 740 for a description of all license exceptions)
LVS: $3000
GBS: N/A
CIV: N/A

Special conditions for STA

STA: Paragraph (c)(2) of License Exception STA (§740.20(c)(2) of the EAR) may not be used for any item in 0B602.

List of Items Controlled

Related Controls: N/A
Related Definitions: N/A
Items:

a. The following commodities if "specially designed" for the "development" or"production" of commodities enumerated in ECCN 0A602.a or USML Category II:

a.1. Gun barrel rifling and broaching machines and tools therefor;

a.2. Gun barrel rifling machines;

a.3. Gun barrel trepanning machines;

a.4. Gun boring and turning machines;

a.5. Gun honing machines of 6 feet (183 cm) stroke or more;

a.6. Gun jump screw lathes;

a.7. Gun rifling machines; and

a.8. Barrel straightening presses.

b. Jigs and fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

c. Other tooling and equipment, "specially designed" for the "production" of items in ECCN 0A602 or USML Category II.

d. Test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II,

Supplement No. 1 to Part 774—[AMENDED]

48. In Supplement No. 1 to part 774, Category 0, remove ECCN 0B986.

49. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D001 and 0D521, entries for ECCNs 0D501 and 0D505 to read as follows:

0D501 "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by 0A501 or 0B501.

**License Requirements**

*Reason for Control: NS, RS, UN, AT*

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y. | NS Column 1 |
| RS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y. | RS Column 1 |

Case 2:24-cv-00189-VSWE-LPF Document 1361 Filed 09/28/23 Page 219 of 537 PageID 2565

*(Ex.A-COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION)*

| Control(s) | Country Chart (See Supp. No. 1 part 738) |
|---|---|
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§740.20(c)(2) of the EAR) may not be used for any "software" in 0D501.

**List of Items Controlled**

*Related Controls:* "Software" required for and directly related to articles enumerated in USML Category I is "subject to the ITAR".

*Related Definitions:* N/A

*Items:* The list of items controlled is contained in this ECCN heading.

0D505 "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by 0A505 or 0B505.

**License Requirements**

*Reason for Control: NS, RS, UN, AT*

| Control(s) | Country Chart (See Supp. No. 1 part 738) |
|---|---|
| NS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a and .x. | NS Column 1 |
| RS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a and .x. | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to "software" for commodities in ECCN 0A505.a, .d, or .x and equipment in ECCN 0B505.a, .d, or .x. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§740.20(c)(2) of the EAR) may not be used for any "software" in 0D505.

**List of Items Controlled**

*Related Controls:* "Software" required for and directly related to articles enumerated in USML Category III is "subject to the ITAR".

*Related Definitions:* N/A

*Items:* The list of items controlled is contained in this ECCN heading.

50. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D521 and 0D604, an entry for ECCN 0D602 to read as follows:

0D602 "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A602 or 0B602 as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control: NS, RS, UN, AT*

| Control(s) | Country Chart (See Supp. No. 1 part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§740.20(c)(2) of the EAR) may not be used for any item in 0D602.

## List of Items Controlled

*Related Controls:* (1) "Software" required for and directly related to articles enumerated in USML Category II is "subject to the ITAR". (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

*Related Definitions:* N/A

*Items:* "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by ECCN 0A602 and ECCN 0B602.

51. In Supplement No. 1 to part 774, Category 0, remove ECCN 0E018.

52. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0E001 and 0E521, entries for ECCNs 0E501, 0E502, 0E504, and 0E505 to read as follows:

0E501 "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by 0A501 or 0B501 as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control: NS, RS, UN, AT*

| Control(s) | Country Chart (See Supp. No. 1 part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§740.20(c)(2) of the EAR) may not be used to ship any "technology" in ECCN 0E501.

**List of Items Controlled**

*Related Controls:* Technical data required for and directly related to articles enumerated in USML Category I are "subject to the ITAR".

*Related Definitions:* N/A

*Items:*

a. "Technology" "required" for the "development" or "production" of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

b. "Technology" "required" for the operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

0E502 "Technology" "required" for the "development" or "production" of commodities controlled by 0A502.

**License Requirements**

*Reason for Control: CC, UN*

| Controls | Country Chart (See Supp. No. 1 part 738) |
|---|---|
| CC applies to entire entry | CC Column 1 |
| UN applies to entire entry | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV:* N/A
*TSR:* N/A

**List of Items Controlled**

*Related Controls:* Technical data required for and directly related to articles enumerated in USML Category I are "subject to the ITAR".

*Related Definitions:* N/A

*Items:* The list of items controlled is contained in the ECCN heading.

0E504 "Technology" "required" for the "development" or "production" of commodities controlled by 0A504 that incorporate a focal plane array or image intensifier tube.

**License Requirements**

*Reason for Control: RS, UN, AT*

| Controls | Country Chart (See Supp. No. 1 part 738) |
|---|---|
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1(b) of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV:* N/A
*TSR:* N/A

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A

*Items:* The list of items controlled is contained in the ECCN heading.

0E505 "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing of commodities controlled by 0A505.

**License Requirements**

*Reason for Control: NS, RS, UN, CC, AT*

| Control(s) | Country Chart (See Supp. No. 1 part 738) |
|---|---|
| NS applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing of commodities in 0A505.a and .x for equipment for those commodities in 0B505; and for "software" for that equipment and those commodities in 0D505. | NS Column 1 |
| RS applies to entire entry except "technology" for "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505 and for "software" for those commodities and that equipment in 0D505. | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| CC applies to "technology" for the "development" or "production" of commodities in 0A505.b. | CC Column 1 |
| AT applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing commodities in 0A505.a, .d, and .x. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§740.20(c)(2) of the EAR) may not be used for any "technology" in 0E505.

**List of Items Controlled**

*Related Controls:* Technical data required for and directly related to articles enumerated in USML Category III are "subject to the ITAR".

*Related Definitions:* N/A

*Items:* The list of items controlled is contained in this ECCN heading.

53. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0E521 and 0E604, an entry for ECCN 0E602:

0E602 "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing of commodities controlled by 0A602 or 0B602, or "software" controlled by 0D602 as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control: NS, RS, UN, AT*

| Control(s) | Country Chart (See Supp. No. 1 part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| RS applies to entire entry ............... | RS Column 1 |
| UN applies to entire entry ............... | See 746.1 of the EAR for UN controls |
| AT applies to entire entry ............... | AT Column 1 |

## List Based License Exceptions (See Part 740 for a description of all license exceptions)

*CIV:* N/A
*TSR:* N/A

**Special conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (740.20(c)(2) of the EAR) may not be used for any item in 0E602.

## List of Items Controlled

*Related Controls:* Technical data directly related to articles enumerated in USML Category II are "subject to the ITAR."
*Related Definitions:* N/A
*Items:* "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A602 or 0B602, or "software" controlled by ECCN 0D602.

### Supplement No. 1 to Part 774—[AMENDED]

54. In Supplement No. 1 to part 774, Category 0, remove ECCN 0E918.

55. In Supplement No. 1 to part 774, Category 0, revise ECCN 0E982 to read as follows.

0E982 "Technology" exclusively for the "development" or "production" of equipment controlled by 0A982 or 0A503.

### License Requirements

*Reason for Control:* CC

| Control(s) |
|---|
| CC applies to "technology" for items controlled by 0A982 or 0A503. A license is required for ALL destinations, except Canada, regardless of end use. Accordingly, a column specific to this control does not appear on the Commerce Country Chart. (See part 742 of the EAR for additional information.) |

## List Based License Exceptions (See Part 740 for a description of all license exceptions)

*CIV:* N/A
*TSR:* N/A

## List of Items Controlled

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*
The list of items controlled is contained in the ECCN heading.

### Supplement No. 1 to Part 774—[AMENDED]

56. In Supplement No. 1 to part 774, Category 0, remove ECCNs 0E984 and 0E987.

57. In Supplement No. 1 to part 774, Category 1, revise ECCN 1A984 to read as follows:

1A984 Chemical agents, including tear gas formulation containing 1 percent or less of orthochlorobenzalmalononitrile (CS), or 1 percent or less of chloroacetophenone (CN), except in individual containers with a net weight of 20 grams or less; liquid pepper except when packaged in individual containers with a net weight of 3 ounces (85.05 grams) or less; smoke bombs; non-irritant smoke flares, canisters, grenades and charges; and other pyrotechnic articles (excluding shotgun shells, unless the shotgun shells contain only chemical irritants) having dual military and commercial use, and "parts" and "components" "specially designed" therefor, n.e.s.

### License Requirements

*Reason for Control:* CC

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry ............... | CC Column 1 |

## List Based License Exceptions (See Part 740 for a description of all license exceptions)

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

## List of Items Controlled

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*
The list of items controlled is contained in the ECCN heading.

58. In Supplement No. 1 to part 774, Category 2, revise ECCN 2B004 to read as follows:

2B004 Hot "isostatic presses" having all of the characteristics described in the List of Items Controlled, and "specially designed" "components" and "accessories" therefor.

### License Requirements

*Reason for Control:* NS, MT, NP, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry ............... | NS Column 2 |
| MT applies to entire entry ............... | MT Column 1 |
| NP applies to entire entry, except 2B004.b.3 and presses with maximum working pressures below 69 MPa. | NP Column 1 |
| AT applies to entire entry ............... | AT Column 1 |

## List Based License Exceptions (See Part 740 for a description of all license exceptions)

*LVS:* N/A
*GBS:* N/A
*C/V:* N/A

## List of Items Controlled

*Related Controls:* (1) See ECCN 2D001 for software for items controlled under this entry. (2) See ECCNs 2E001 ("development"), 2E002 ("production"), and 2E101 ("use") for technology for items controlled under this entry. (3) For "specially designed" dies, molds and tooling, see ECCNs 0B501, 0B602, 0D606, 1B003, 9B004, and 9B009. (4) For additional controls on dies, molds and tooling, see ECCNs 1B101.d, 2B104, and 2B204. (5) Also see ECCNs 2B117 and 2B999.a.
*Related Definitions:* N/A
*Items:*
a. A controlled thermal environment within the closed cavity and possessing a chamber cavity with an inside diameter of 406 mm or more; *and*
b. Having any of the following:
b.1. A maximum working pressure exceeding 207 MPa;
b.2. A controlled thermal environment exceeding 1,773 K (1,500 °C); *or*
b.3. A facility for hydrocarbon impregnation and removal of resultant gaseous degradation products.
*Technical Note: The inside chamber dimension is that of the chamber in which both the working temperature and the working pressure are achieved and does not include fixtures. That dimension will be the smaller of either the inside diameter of the pressure chamber or the inside diameter of the insulated furnace chamber, depending on which of the two chambers is located inside the other.*

59. In Supplement No. 1 to part 774, Category 2, revise ECCN 2B018 to read as follows:

2B018 Equipment on the Wassenaar Arrangement Munitions List.

No commodities currently are controlled by this entry. Commodities formerly controlled by paragraphs .a through .d, .m, and .s of this entry are controlled in ECCN 0B606. Commodities formerly controlled by paragraphs .e through .l of this entry are controlled by ECCN 0B602. Commodities formerly controlled by paragraphs .o through .r of this entry are controlled by ECCN 0B501. Commodities formerly controlled by paragraph .n of this entry are controlled in ECCN 0B501 if they are "specially designed" for the "production" of the items controlled in ECCN 0A501.a through .x or USML Category

I and controlled in ECCN 0B602 if they are of the kind exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

60. In Supplement No. 1 to part 774, Category 2, revise ECCN 2D018 to read as follows:

2D018 "Software" for the "development," "production," or "use" of equipment controlled by 2B018.

No software is currently controlled under this entry. See ECCNs 0D501, 0D602, and 0D606 for software formerly controlled under this entry.

61. In Supplement No. 1 to part 774, Category 2, revise ECCN 2E001 to read as follows:

2E001 "Technology" according to the General Technology Note for the "development" of equipment or "software" controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999), or 2D (except 2D983, 2D984, 2D991, 2D992, or 2D994).

### License Requirements

*Reason for Control:* NS, MT, NP, CB, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for items controlled by 2A001, 2B001 to 2B009, 2D00f or 2D002. | NS Column 1 |
| MT applies to "technology" for items controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, 2B119 to 2B122, 2D001, or 2D101 for MT reasons. | MT Column 1 |
| NP applies to "technology" for items controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B 109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B225 to 2B233, 2D001, 2D002, 2D101, 2D201, or 2D202 for NP reasons. | NP Column 1 |
| NP applies to "technology" for items controlled by 2A290, 2A291, or 2D290 for NP reasons. | NP Column 2 |
| CB applies to "technology" for equipment controlled by 2B350 to 2B352, valves controlled by 2A226 having the characteristics of those controlled by 2B350.g, and software controlled by 2D351. | CB Column 1 |
| AT applies to entire entry ............... | AT Column 1 |

### Reporting Requirements

See §743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

## List Based License Exceptions (See Part 740 for a description of all license exceptions)

*CIV:* N/A
*TSR:* Yes, except N/A for MT

### Special Conditions for STA

*STA:* License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "development" of "software" specified in the License Exception STA paragraph in the License Exception section of ECCN 2D001 or for the "development" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

### List of Items Controlled

*Related Controls:* See also 2E101, 2E201, and 2E301
*Related Definitions:* N/A
*Items:*
The list of items controlled is contained in the ECCN heading.
*Note 1 to 2E001: ECCN 2E001 includes "technology" for the integration of probe systems into coordinate measurement machines specified by 2B006.a.*

62. In Supplement No. 1 to part 774, Category 2, revise ECCN 2E002 to read as follows:

2E002 "Technology" according to the General Technology Note for the "production"

Case 8:24-cv-00849-WBE-LHH Document 1281 Filed 04/28/23 Page 225 of 537 PageID 2567

# Ex. A – COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

of equipment controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), or 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999).

**License Requirements**

*Reason for Control:* NS, MT, NP, CB, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for equipment controlled by 2A001, 2B001 to 2B009. | NS Column 1 |
| MT applies to "technology" for equipment controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, or 2B119 to 2B122 for MT reasons. | MT Column 1 |
| NP applies to "technology" for equipment controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233 for NP reasons | NP Column 1 |
| NP applies to "technology" for equipment controlled by 2A290 or 2A291 for NP reasons | NP Column 2 |
| CB applies to "technology" for equipment controlled by 2B350 to 2B352 and for valves controlled by 2A226 having the characteristics of those controlled by 2B350.g | CB Column 2 |
| AT applies to entire entry ................ | AT Column 1 |

**Reporting Requirements**

See §743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV:* N/A

*TSR:* Yes, except N/A for MT

**Special Conditions for STA**

*STA:* License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "production" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*
The list of items controlled is contained in the ECCN heading.

63. In Supplement No. 1 to part 774, Category 7, revise ECCN 7A611 to read as follows:

7A611 Military fire control, laser, imaging, and guidance equipment, as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* NS, MT, RS, AT, UN

| Control | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except 7A611.y. | NS Column 1 |
| MT applies to commodities in 7A611.a that meet or exceed the parameters in 7A103.b or .c. | MT Column 1 |
| RS applies to entire entry except 7A611.y. | RS Column 1 |
| AT applies to entire entry ................ | AT Column 1 |
| UN applies to entire entry except 7A611.y. | See §746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $1500
*GBS:* N/A
*C/V:* N/A

**Special Conditions for STA**

STA: Paragraph (c)(2) of License Exception STA (740.20(c)(2) of the EAR) may not be used for any item in 7A611.

**List of Items Controlled**

*Related Controls:* (1) Military fire control, laser, imaging, and guidance equipment that

are enumerated in USML Category XII, and technical data (including software) directly related thereto, are subject to the ITAR. (2) See Related Controls in ECCNs 0A504, 2A984, 6A002, 6A003, 6A004, 6A005, 6A007, 6A008, 6A107, 7A001, 7A002, 7A003, 7A005, 7A101, 7A102, and 7A103. (3) See ECCN 3A611 and USML Category XI for controls on countermeasure equipment. (4) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a de minimis amount of U.S. origin "600 series" controlled content.

*Related Definitions:* N/A
*Items:*
a. Guidance or navigation systems, not elsewhere specified on the USML, that are "specially designed" for a defense article on the USML or for a 600 series item.
b. to w. [RESERVED]
x. "Parts," "components," "accessories," and "attachments," including accelerometers, gyros, angular rate sensors, gravity meters (gravimeters), and inertial measurement units (IMUs), that are "specially designed" for defense articles controlled by USML Category XII or items controlled by 7A611, and that are NOT:

1. Enumerated or controlled in the USML or elsewhere within ECCN 7A611;
2. Described in ECCNs 6A007, 6A107, 7A001, 7A002, 7A003, 7A101, 7A102, or 7A103; or
3. Elsewhere specified in ECCN 7A611.y or 3A611.y.

y. Specific "parts," "components," "accessories," and "attachments" "specially designed" for a commodity subject to control in this ECCN or a defense article in Category XII and not elsewhere specified on the USML or in the CCL, as follows, and "parts," "components," "accessories," and "attachments" "specially designed" therefor:

y.1 [RESERVED]
Dated:

RICHARD E. ASHOOH,
*Assistant Secretary for Export Administration.*

Summary of Revisions to USML Categories I, II, and III

In 2009, the interagency began a review of the U.S. export control system, with the goal of strengthening national security and the competitiveness of key U.S. manufacturing and technology sectors by focusing on current threats, as well as adapting to the changing economic and technological landscape. This review determined that the then-current export control system was overly complicated, contained too many redundancies, and, in trying to protect too much, diminished our ability to focus our efforts on the most critical national security priorities.

To this end, the Departments of State and Commerce have been reviewing and revising the two primary lists of controlled items, i.e., the United States Munitions List (USML) and the Commerce Control List (CCL). A key strategy in the reform effort has been to construct the lists so they positively identify the items they control. Thus, for example, the USML lists the specific types of parts, components, accessories, and attachments that warrant control under the International Traffic in Arms Regulations (ITAR) rather than all generic "parts," "components," "accessories and attachments" that are in any way "specifically designed, modified, adapted, or configured" for a defense article, regardless of military significance (as is currently the case for unrevised USML categories). All other generic parts, components, accessories, and attachments and the technology for their "production," "development," or "use" that are "specially designed" for an item formerly on the USML but not specifically identified on the USML will become subject to the juris-

diction of the Export Administration Regulations (EAR) and identified on its CCL.

In connection with this effort, the Department of State has published 26 final, or interim final, rules revising 18 of the 21 USML categories. In May 2018, the Department of State published proposed revisions of the remaining three USML Categories, including Category I (firearms and related articles), II (guns and armaments) and III (ammunition and ordnance), which follow this model of utilizing a "positive list" for controls. Articles that are not positively identified on the USML will continue to be controlled, albeit under the jurisdiction of the EAR.

In February 2019, the Department of State formally notified Congress of the transfer of jurisdictional control of certain classes of items in Categories, I, II, and III. The Department of State is submitting a new notification to Congress because the Department of Commerce has amended certain controls in its draft companion rule. In particular, in order to address concerns raised by some members of Congress and the public regarding certain access to 3D printing technology and software for firearms, the Department of Commerce has revised its draft final rule to make certain technology and software capable of producing firearms subject to the EAR when posted on the internet under specified circumstances. The Department of State has not made any changes to the classes of items in Categories I, II, or III that it is proposing to remove from the USML from the time that the Department of State notified Congress in February 2019.

**Category I—Firearms and Related Articles**

Paragraph (a) is revised by limiting the scope of the control to firearms using caseless ammunition. Non-automatic and semi-automatic firearms that do not use caseless ammunition will be controlled in Export Control Classification Number (ECCN) 0A501 on the CCL, except for firearms manufactured prior to 1890.

Paragraph (b) is non-substantively revised.

Paragraph (c) is revised by limiting the scope to firearms specially designed to integrate fire control, automatic tracking, or automatic firing (e.g., Precision Guided Firearms). Other weapons that were controlled here will be controlled in ECCN 0A501.

Paragraph (d) is revised by limiting the scope to fully automatic shotguns. Other shotguns that were controlled here will be controlled in ECCN 0A502.

Paragraph (e) is revised by removing flash suppressors and moving certain parts and components for the remaining items in paragraph (e) to paragraph (h)(3). Flash suppressors will be controlled in ECCN 0A501.

Paragraph (f) is reserved. Riflescopes with night vision or infrared were moved to USML Category XII(c)(2) in 2016 through 81 FR 70340. All other rifle scopes that were controlled here will be controlled in ECCN 0A504.

Paragraph (g) is revised to more clearly delineate the major components of USML firearms that are controlled. The major parts and components of firearms that transition to the CCL will be controlled in ECCN 0A501.

Paragraph (h) is revised by adding four subparagraphs to specifically enumerate the articles controlled. The parts, components, accessories, and attachments of firearms that transition to the CCL will be controlled in ECCN 0A501, as will any parts, components, accessories, and attachments of USML firearms that are not listed in paragraphs (g) or (h).

Paragraph (i) is revised to add control for the classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data.

Case 8:24-cv-00879-VMC-LHP Document 138-1 Filed 04/23/25 Page 226 of 537 PageID 2568

A new paragraph (x) has been added to USML Category I, allowing ITAR licensing on behalf of the Department of Commerce for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category XII and are described in the purchase documentation submitted with the application.

**Category II—Guns and Armament**

Paragraph (a) is revised by adding five subparagraphs to specifically enumerate the articles controlled, including adding a control for DOD-funded development guns and armaments and their specially designed parts and components. Two notes are added to paragraph (a) in order to exclude from the control certain items that do not warrant control on the USML. Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) will be controlled under ECCN 0A501. Black powder guns and armaments manufactured between 1890 and 1919 will be controlled under ECCN 0A602, except for black powder guns and armaments manufactured earlier than 1890.

Paragraph (b) is revised to control flame throwers based on the technical parameter of a range 20 meters or greater.

Paragraph (c) is reserved. The items that were controlled in this paragraph that warrant USML control are now described in paragraph (a)(4) and the rest are controlled in ECCN 0A602.

Paragraph (d) is revised to control specially designed kinetic energy weapons.

Paragraph (e) is revised to more specifically describe the items warranting control under this paragraph. Items that were controlled in this paragraph as being for guns and armaments controlled in paragraph (c) that did not move to paragraph (a)(4) are controlled in ECCN 0A602.

Paragraph (f) is reserved. The items that were controlled here will be controlled in ECCN 0A606.

Paragraph (g) is reserved. The items that were controlled here will be controlled in ECCN 0B602.

Paragraph (h) is reserved. The items that were controlled here will be controlled in ECCN 0B602.

Paragraph (i) is reserved. The items that were controlled that continue to warrant USML control are moved to paragraphs (j)(9) and components therefor to (j)(10) and the rest will be controlled in ECCN 0B602.

Paragraph (j) is revised by adding seventeen subparagraphs to specifically enumerate the articles controlled. The parts, components, accessories, and attachments that are not listed in paragraph (j) will be controlled in ECCN 0A602.

Paragraph (k) is revised to add control for the classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data.

A new paragraph (x) has been added to USML Category II, allowing ITAR licensing on behalf of the Department of Commerce for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category XII and are described in the purchase documentation submitted with the application.

**Category III—Ammunition and Ordnance**

Paragraph (a) is revised by adding ten subparagraphs to specifically enumerate the articles controlled, including adding a control for DOD-funded development ammunition. Ammunition not described will be controlled under ECCN 0A505. Black powder guns and armaments manufactured between 1890 and 1919 will be controlled under ECCN 0A602, except for black powder guns and armaments manufactured earlier than 1890.

Paragraph (b) is revised to more specifically describe the items warranting control under this paragraph by identifying those items in two subparagraphs. Items that were controlled in this paragraph but do not meet the more specific description will be controlled in ECCN 0B505.

Paragraph (c) is reserved. The items that were controlled in this paragraph will be controlled in ECCN 0B505.

Paragraph (d) is revised by adding fifteen subparagraphs to specifically enumerate the articles controlled. Parts and components of USML ammunition that are not described will be controlled in ECCN 0A505.

Paragraph (e) is revised to add control for the classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data.

A new paragraph (x) has been added to USML Category II, allowing ITAR licensing on behalf of the Department of Commerce for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category XII and are described in the purchase documentation submitted with the application.

A new note is added to Category III to provide that ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber are not on the USML. These items will be controlled in ECCN 0A505. An additional new note is added to provide that grenades containing non-lethal or less lethal projectiles are not on the USML. These grenades will be controlled in ECCN 0A505.

For items that have transitioned to the CCL in a 600 series entry, transactions destined for countries subject to a U.S. arms embargo will not be eligible for license exceptions, except for License Exception GOV under EAR §740.11(b)(2)(ii). Multilateral regime-controlled items moved from the USML to the CCL will retain their regime control parameters and reasons for control.

The Department of Commerce has created a License Exception Strategic Trade Authorization (STA, §740.20), which authorizes the export, re-export, and transfer (in-country) of certain items on the CCL to "countries of least concern" without a license (i.e., Argentina, Australia, Austria, Belgium, Bulgaria, Canada, Croatia, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Iceland, Ireland, Italy, Japan, Latvia, Lithuania, Luxembourg, Netherlands, New Zealand, Norway, Poland, Portugal, Romania, Slovakia, Slovenia, South Korea, Spain, Sweden, Switzerland, Turkey, and the United Kingdom). Parts, components, accessories and attachments controlled under subparagraph "x" of the relevant ECCNs will be automatically available for this exception. However, end-items that will be controlled under the new ECCNs will be subject to a "first time" license requirement. Exporters will be able to request a determination on STA eligibility for these items concurrent with a license request. If the Departments of State, Defense, and Commerce all agree, the end-item would be separately posted, by model number, as eligible for STA in the future. If the departments cannot reach consensus, the end-item would continue to require a license to all destinations except Canada.

Existing License Exceptions LVS (§740.3), TMP (§740.9), RPL (§740.10), and GOV (§740.11(b)(2)(ii) or (b)(2)(iii)) will be eligible for use for items controlled by these ECCNs.

Categories I, II and III MDE Transitioning to the CCL

| ITEM DESCRIPTION | CCL CONTROL | |
|---|---|---|
| Cartridge, 5.56mm M855A1 ........... | CCL ................... | ECCN 0A505.a |

Edited text set in black brackets. Revised text set in italic.

---

## NATIVE AMERICAN HERITAGE MONTH

Mr. UDALL. Mr. President, every November, the Senate observes Native American Heritage Month to recognize the contributions of American Indians, Alaska Natives, and Native Hawaiians to the United States.

Today, the promise of Native achievement burns brighter than ever. Just a few months ago, Joy Harjo, a member of the Muscogee Creek Nation, became the Nation's 23rd Poet Laureate. The first Native American appointed to the laureateship in the history of the Library of Congress, Ms. Harjo is an inspiration to the next generation of Native American writers, poets, and artists to share their diverse and powerful voices with the world.

In this spirit, I am proud to have worked with Ms. Harjo, the Library of Congress, the Institute of American Indian Arts, and the Boys and Girls Club of America to host an exhibition of Native student poetry in the rotunda of the Russell Senate Office Building this month. The display showcases Ms. Harjo's poetry alongside original works written by Autumn Abeyta, Ambrosia Morning Gun, Jewel Palmer, Paige Hannan, Lindsey Toya-Tosa, Delaney Keshena, and Rebekkah Autaubo—Native students attending schools in my home state of New Mexico and representing Tribes in New Mexico, Montana, New York, Wisconsin, and Oklahoma.

This year's inaugural exhibit represents the countless ways Native peoples have harnessed their strength, resilience, and unique perspectives to shape nearly every facet of our national identity.

As the vice chairman of the Committee on Indian Affairs, I work every day to achieve Indian Country's priorities and uphold the Federal Government's trust and treaty responsibilities to Indian Country. I hope this month will serve as an opportunity for this entire body to reexamine how we can strengthen our commitment to Native peoples and recommit to our shared responsibilities.

---

## HONORING CHANNING ROBERT WHITAKER

Mr. GRASSLEY. Mr. President, I rise today to pay tribute to a fallen soldier from Iowa, Private Channing Robert Whitaker. After 76 years, this marine is finally coming home. Inspired by the patriotism and service of his four older siblings who also served during World War II, Whitaker enlisted in the U.S. Marine Corps in 1942 at the age of 17. After completing training, his unit deployed on November 20, 1943 during the

EX. A COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

**SIDE-BY-SIDE COMPARISON OF STATE DEPARTMENT RULEMAKING**

[Changes between versions in yellow highlights]

| FINAL INTERIM RULE | PROPOSED RULE |
|---|---|
| **Category I—Firearms and Related Articles** | **Category I—Firearms and Related Articles** |
| *(a) Firearms using caseless ammunition. | *(a) Firearms using caseless ammunition. |
| *(b) Fully automatic firearms to .50 caliber (12.7 mm) inclusive. | *(b) Fully automatic firearms to .50 caliber (12.7 mm) inclusive. |
| *(c) Firearms specially designed to integrate fire control, automatic tracking, or automatic firing (e.g., Precision Guided Firearms). | *(c) Firearms specially designed to integrate fire control, automatic tracking, or automatic firing (e.g., Precision Guided Firearms (PGFs)), and specially designed parts and components therefor. |
| Note to paragraph (c): Integration does not include only attaching to the firearm or rail. | Note to paragraph (c): Integration does not include only attaching to the firearm or rail. |
| *(d) Fully automatic shotguns regardless of gauge. | *(d) Fully automatic shotguns regardless of gauge. |
| *(e) Silencers, mufflers, and sound suppressors. | *(e) Silencers, mufflers, and sound suppressors, and specially designed parts and components therefor. |
| (f) [Reserved] | (f) [Reserved] |
| (g) Barrels, receivers (frames), bolts, bolt carriers, slides, or sears specially designed for the articles in paragraphs (a), (b), and (d) of this category. | (g) Barrels, receivers (frames), bolts, bolt carriers, slides, or sears specially designed for the articles in paragraphs (a), (b), and (d) of this category. |
| (h) Parts, components, accessories, and attachments, as follows: | (h) Parts, components, accessories, and attachments, as follows: |

A-227

# EX. A. COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

| | |
|---|---|
| (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; | (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; |
| (2) Parts and components specially designed for conversion of a semiautomatic firearm to a fully automatic firearm; | (2) Parts and components specially designed for conversion of a semiautomatic firearm to a fully automatic firearm. |
| (3) Parts and components specially designed for defense articles described in paragraphs (c) and (e); or | (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor. |
| (4) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor. | |
| **(i) Technical data (see §120.10 of this subchapter) and defense services (see §120.9 of this subchapter) directly related to the defense articles described in this category and classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data. (See §125.4 of this subchapter for exemptions.)** | **(i) Technical data (see § 120.10 of this subchapter) and defense services (see§ 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), (g), and (h) of this category and classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data. (See § 125.4 of this subchapter for exemptions.)** |
| (j)–(w) [Reserved] | (j)–(w) [Reserved] |
| (x) Commodities, software, and technology subject to the EAR (see §120.42 of this sub- chapter) used in or with defense | (x) Commodities, software, and technology subject to the EAR (see § 120.42 of this subchapter) used in or with defense |

# EX. A. COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

| | |
|---|---|
| articles. | articles. |
| Note to paragraph (x): Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (see §123.1(b) of this subchapter). | Note to paragraph (x): Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (see § 123.1(b) of this subchapter). |
| | Note 1 to Category I: Paragraphs (a), (b), (d), (e), (g), (h), and (i) of this category exclude: Any non-automatic or semi-automatic firearms to .50 caliber (12.7 mm) inclusive; non-automatic shotguns; BB, pellet, and muzzle loading (e.g., black powder) firearms; and parts, components, accessories, and attachments of firearms and shotguns in paragraphs (a), (b), (d), and (g) of this category that are common to non-automatic firearms and shotguns. The Department of Commerce regulates the export of such items. See the Export Administration Regulations (15 CFR parts 730 through 774). |
| Note to Category I: The following interpretations explain and amplify the terms used in this category: | Note 2 to Category I: The following interpretations explain and amplify the terms used in this category: |
| (1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the deflagration of propellant; (2) A fully automatic firearm or shotgun is any firearm or shotgun that shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger; and (3) Caseless ammunition is firearm ammu- nition without a cartridge case that holds the primer, propellant, and projectile together as a unit. | (1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the deflagration of propellant. (2) A fully automatic firearm or shotgun is any firearm or shotgun which shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. (3) Caseless ammunition is firearm ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit. |

DEFENSE DISTRIBUTED'S RESPONSES TO ELIK'S
REQUEST FOR PRODUCTION 3:

SEEKING DOCUMENTS
SUPPORTING EAR VIOLATION CONTENTION



**Commodity Classification**
**Case Number: Z1875906**
**Date of Completion:**
**August 4, 2025**

**UNITED STATES DEPARTMENT OF COMMERCE**
**BUREAU OF INDUSTRY AND SECURITY**
**WASHINGTON, D.C. 20230**

Defense Distributed

C/O RILEY TRADE LAW PLLC

ATTN: DARREN P. RILEY                    G200242

1701 PENNSYLVANIA AVENUE, NW

STE 200, PMB301, ATTN: DARREN RILEY

WASHINGTON, DC 20006


THE FOLLOWING INFORMATION IS IN RESPONSE TO YOUR INQUIRY OF July 24, 2025 REQUESTING COMMODITY CLASSIFICATION(S) FOR:

| COMMODITY | ECCN | SUBPARAGRAPH |
|---|---|---|
| A STEP file for the 3D printable Hitchhiker firearm receiver. | 0E501 | a |
| Hitchhiker Receiver STEP file | | |
| A STEP file for the 3D printable Hitchhiker firearm assembly. | 0E501 | a |
| Hitchhiker Assembly STEP File | | |

COMMENTS FROM LICENSING OFFICER(S):

ITEM #1:

This commodity is classified as 0E501.a and is controlled for National Security (NS1), Regional Stability (RS1), Crime Control (CC2), Anti-Terrorism (AT1) and UN (see 746.1(b) of the EAR) reasons. Please review the Country Chart, Supplement No. 1 to Part 738 for licensing requirements. See Part 740 of the EAR for other exception options.

Further, a BIS export license is required to export or reexport an item subject to the EAR, even when one would not otherwise be necessary, if an exporter or reexporter knows, or has reason to know that the item will be used in activities related to nuclear, chemical or biological weapons or missile delivery systems, or to proscribed destinations.

ITEM #2:

This commodity is classified as 0E501.a and is controlled for National Security (NS1), Regional Stability (RS1), Crime Control (CC2), Anti-Terrorism (AT1) and UN (see 746.1(b) of the EAR) reasons. Please review the Country Chart, Supplement No. 1 to Part 738 for licensing requirements. See Part 740 of the EAR for other exception options.

Further, a BIS export license is required to export or reexport an item subject to the EAR, even when one would not otherwise be necessary, if an exporter or reexporter knows, or has reason to know that the item will be used in activities related to nuclear, chemical or biological weapons or missile delivery systems, or to proscribed destinations.

**Commodity Classification**
**Case Number: Z1875906**
**Date of Completion:**
**August 4, 2025**



**UNITED STATES DEPARTMENT OF COMMERCE**
**BUREAU OF INDUSTRY AND SECURITY**
**WASHINGTON, D.C. 20230**

FOR INFORMATION CONCERNING
THIS CLASSIFICATION CONTACT
Frank Trevino

STEVE CLAGETT
DIVISION DIRECTOR

PHONE #:
BIS/EA/ONP/GA



## The Gatalog's Printable Frames and Receivers

17K followers ⓘ

Home    Content    Playlists    Channels    Membership    Community    About

### New Content

View More ›



**OK Zoomer V2**

The Gatalog's Printable Frames and ...
3.1K views • 24 days ago



**NFA BiPoly**

The Gatalog's Printable Frames and ...
4K views • 1 month ago



**SEMI-BiPoly**

The Gatalog's Printable Frames and ...
4.5K views • 1 month ago



**The KungPow33**

The Gatalog's Printable Frames and ...
4.4K views • 1 month ago





**The UBAR3 / UBARX**

The Gatalog's Printable Frames and ...
7.6K views • 2 months ago



**The Triton 9**

The Gatalog's Printable Frames and ...
8K views • 2 months ago



**MAC Super Safety System**

The Gatalog's Printable Frames and ...
7.1K views • 2 months ago



**The Dissident**

The Gatalog's Printable Frames and ...
5.9K views • 2 months ago



**The Pocket Pleaser**

The Gatalog's Printable Frames and ...
13K views • 4 months ago



**The Regular 1022**

The Gatalog's Printable Frames and ...
9.7K views • 4 months ago



**The 3DSS**

The Gatalog's Printable Frames and ...
12K views • 4 months ago



**The Apple Fritter**

The Gatalog's Printable Frames and ...
7.9K views • 5 months ago





Case 6:24-cv-01363-WWB-LHP   Document 128-1   Filed 09/29/25   Page 236 of 537
PageID 2578

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

*Updated: 5/7/21*

## FAQs for the Commerce Categories I-III (final rule)

*Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)(85 FR 4136)[1]*

## Published: 1/23/20

## Effective Date: 3/9/20

---

[1] The FAQs included in this document are part of the extensive public outreach BIS is conducting on the Commerce final rule issued on January 23, 2020.  These FAQs are intended to assist your understanding of the changes, but are *not* intended to supplant the Commerce final rule or other existing EAR provisions, as applicable, in making a determination regarding your regulatory requirements under the Export Administration Regulations (EAR) (15 CFR 730-774).

1

# EX 2 A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

## Table of Contents

Publication and Effective Date ................................................................................................................. 3

Transition and Grandfathering ................................................................................................................. 5

Registration and Applying for Licenses and Classifications ...................................................... 6

Addition of new ECCNs. ............................................................................................................................. 6

    Export Compliance Aid (ECA) 1: *Overview of 17 New ECCNs* ........................................................ 6

ECCN 0A501 ................................................................................................................................................. 8

ECCN 0A502 ............................................................................................................................................... 12

ECCN 0A504 ............................................................................................................................................... 12

ECCN 0A505 ............................................................................................................................................... 13

ECCN 0A602 ............................................................................................................................................... 14

Removal of Nine ECCNs .......................................................................................................................... 14

    ECA 2: *High Level Cross Walk of Removed ECCNs Mapped to New 0x5zz ECCNs* .............................. 15

    ECA 3: *More Detailed Cross Walk of Removed ECCNs Mapped to New 0x5zz ECCNs* ....................... 15

Revisions to Eight ECCNs ......................................................................................................................... 17

3D Printing of Firearms ............................................................................................................................ 17

Brokering Controls ................................................................................................................................... 23

License Exceptions .................................................................................................................................... 26

    ECA 4: *Text of USML Category I(h)(2)* .......................................................................................... 27

    License Exception LVS .............................................................................................................. 27

    ECA 5: *Cheat Sheet for License Exception LVS Eligibility for 0x5zz, 0A602 and* ................................. 28

    *0B602 ECCNs* ............................................................................................................................. 28

    ECA 6: *Decision Tree Tool for Determining LVS Eligibility* .................................................................. 32

    License Exception BAG .............................................................................................................. 37

    ECA 7: *Cheat Sheet for License Exception BAG* ................................................................................ 38

    License Exception TMP .............................................................................................................. 41

    License Exception RPL .............................................................................................................. 43

    License Exception GOV .............................................................................................................. 44

2

EX. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

License Exception STA .................................................................................................. 45

    ECA 8: *Cheat Sheet for License Exception STA Eligibility for 0x5zz and 0A602, 0B602, 0D602, and 0E602* ................................................................................................................. 46

Licensing Process ........................................................................................................ 49

Conventional Arms Reporting ...................................................................................... 49

Export Clearance Requirements ................................................................................... 50

Entry Clearance Requirements for Temporary Imports ................................................. 59

Changes to EAR Recordkeeping ................................................................................... 62

    ECA 9: *Cheat Sheet for Determining Whether a Warranty Certificate Must be* ............... 64

    *Retained for Recordkeeping Purposes* ....................................................................... 64

For Further Information Contacts ................................................................................. 65

Enforcement ............................................................................................................... 66

Key Terms ................................................................................................................... 67

    Additive manufacturing ........................................................................................... 67

    Antique firearms (for purposes of ECCN 0A501) ...................................................... 67

    Antique firearms (for purposes of ECCN 0A502) ...................................................... 67

    Blue guns or rubber ducks ....................................................................................... 67

    Caseless ammunition .............................................................................................. 67

    CBP Form 4457 ........................................................................................................ 67

    Combination pistol (*a.k.a.*, a combination gun) ...................................................... 68

    Complete breech mechanisms .................................................................................. 68

    Dummy rounds or drill round ................................................................................... 68

    Fully automatic firearm or shotgun .......................................................................... 68

    Temporary imports .................................................................................................. 68

    Sentinel Program ..................................................................................................... 68

    Three-dimensional (3D) printing ............................................................................... 68

    United States Munitions Import List (USMIL) ............................................................ 69

## Publication and Effective Date

**Q.1:  When were the Commerce and State Category I-III (firearms) final rules published?**

3

Ex. A - COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

**A.1:** The final rules were published on January 23, 2020.

[Click here for the Commerce rule (85 FR 4136)](#).

[Click here for the State rule (85 FR 3819)](#).[2]

**Q.2:  When are the Commerce and State Categories I-III (firearms) final rules effective?**

**A.2:** The rules became effective on March 9, 2020.

However, prior to their effective date, on March 6, 2020, the Honorable Richard A. Jones, District Judge of the U.S. District Court for the Western District of Washington issued an order enjoining the State Department from implementing or enforcing the regulation entitled International Traffic In Arms Regulations: U.S. Munitions List Categories I, II, and III, 85 Fed. Reg. 3819 (Jan. 23, 2020) "insofar as it alters the status quo restrictions on technical data and software directly related to the production of firearms or firearm parts using a 3D-printer or similar equipment."  (Case No. 2:20-cv-00111-RAJ).  Requests for export licenses concerning these items should be directed to the State Department Directorate of Defense Trade Controls (DDTC) until further notice.

On April 27, 2021, a panel of the United States Court of Appeals for the Ninth Circuit, vacated the district court's order that enjoined the Department of State's Final Rule removing 3D-printed guns and their associated files from the U.S. Munitions List. (Case No. 20-35391).  The preliminary injunction remains in effect until the mandate of the Ninth Circuit issues. Only once the Ninth Circuit issues its mandate will the preliminary injunction be vacated and the district court reassume jurisdiction such that it may dismiss the case.  At that time, the entirety of the Department of State's final rule published in the Federal Register at 85 Fed. Reg. 3819 will go into effect.  In the interim, all persons engaged in manufacturing, exporting, temporarily importing, brokering, or furnishing defense services related to 'technical data and software directly related to the production of firearms or firearm parts using a 3D-printer or similar equipment' must continue to treat such technical data and software as subject to control on the USML.  For additional information about the court ordered injunction pertaining to revisions to the U.S. Munitions List, see [https://www.pmddtc.state.gov/ddtc_public?id=ddtc_public_portal_news_and_events&timeframe=week](https://www.pmddtc.state.gov/ddtc_public?id=ddtc_public_portal_news_and_events&timeframe=week).

---

[2] This document includes references to the Department of State, Directorate of Defense Trade Controls (DDTC), the International Traffic in Arms Regulations (ITAR) (22 CFR 120-130), the United States Munitions List (USML), and the State Category I-III (final rule), *International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, III, published 1/23/20 (85 FR 3819), effective 3/9/20.*  The Department of State has posted various FAQs on its website regarding the State final rule.  Questions on the ITAR should be directed to the Department of State.

4

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

This answer will be updated as necessary.

## Transition and Grandfathering

**Q.3:  Are there provisions to ease the transition from the United States Munitions List (USML) to the Commerce Control List (CCL)?  For example, are there grandfathering provisions to allow for continued use of State licenses or other approvals during a specified grandfathering period?**

**A.3:**  Yes, the Export Administration Regulations (EAR) include provisions to ease the transition from the USML to the CCL, including grandfathering provisions.  The EAR transition provisions are in General Order No. 5, under paragraph (e) in Supplement No. 1 to part 736.  The Commerce final rule added 0x5zz ECCNs to General Order No. 5, so the transition provisions apply to "600 series," 9x515 items, and 0x5zz items.  Other FAQs on the BIS website, such as those on the "600 series" (for the items that transitioned from USML Category II), Commerce Control List (CCL) Order of Review, and Specially Designed will assist your understanding of the EAR control structure.  Click here for these other Commerce FAQs

The transition related provisions under the International Traffic in Arms Regulations (ITAR) were established in the Department of State final rule published on April 16, 2013 and are supplemented by various transition related FAQs on the DDTC website, including FAQs addressing Grandfathering/Legacy Issues. Click here for these State FAQs  In addition, the Department of State has posted its State Transition Guidance for Revisions to Categories I, II, and III  to provide additional transition guidance for the State final rule.

**Q.4:  My company received a Commodity Jurisdiction (CJ) determination from DDTC that said my product is ITAR controlled under USML Category I (or II or III).  Does that CJ still apply now that firearms and ammunition have transitioned to EAR control, or should we apply for a new commodity classification under BIS?**

**A.4:** Paragraph (e)(3) (Prior commodity jurisdiction determinations) in General Order No. 5 in Supplement No. 1 to part 736 addresses prior commodity jurisdiction determinations, including those for CJs issued prior to March 9, 2020 for items in USML Categories I, II, or III.  For the 0x5zz ECCNs and "600 series" this means that if the U.S. State Department has previously determined that an item is not subject to the jurisdiction of the ITAR and the item was not listed in a then existing 018 series ECCN, then the item is *per se* not within the scope of a "600 series" or a 0x5zz ECCN.  If the item was not listed elsewhere on the CCL at the time of such

5

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

determination (*i.e.*, the item was designated EAR99), the item shall remain designated as EAR99 unless specifically enumerated by BIS or DDTC in an amendment to the CCL or to the USML, respectively.

The Department of State in its State Transition Guidance for Revisions to Categories I, II, and III issued on 1/23/20 also provides guidance on this under the heading **Commodity Jurisdiction Determinations.**

## Registration and Applying for Licenses and Classifications

**Q.5:  Is there a registration requirement under the EAR?**

**A.5:**  There is no registration requirement under the EAR.  In addition, there are no fees for applying for licenses or submitting classification requests to BIS.  To submit license applications or classification requests to BIS, an applicant will need to create a free online account in the SNAP-R system.  If you do not already have a SNAP-R account, BIS highly recommends creating one as one of the steps taken to prepare for transitioning from the USML to the CCL.  Click here for Guidance on creating a SNAP-R account.

## Addition of new ECCNs.

**Q.6: How many new ECCNs were added to the CCL to control items moved from USML Categories I, II, and III?**

**A.6:** Seventeen new ECCNs were added to the CCL to control items moved from USML Categories I, II and III.

### Export Compliance Aid (ECA) 1:  *Overview of 17 New ECCNs*

| New ECCN | Description | Old ECCN |
|---|---|---|
| 0A501 | Firearms (except 0A502 shotguns) and related commodities as follows (see List of Items controlled). | 0A018 |
| 0A502 | Shotguns; shotguns "parts" and "components," consisting of complete trigger mechanisms; magazines and magazine extension tubes; "complete breech mechanisms;" except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use. | 0A984 |
| 0A503 | Discharge type arms; non-lethal or less-lethal grenades and projectiles, and "specially designed" "parts" and "components" of those projectiles; and devices | 0A985 |

6

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

| | | |
|---|---|---|
| | to administer electric shock, for example, stun guns, shock batons, shock shields, electric cattle prods, immobilization guns and projectiles; except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use; and "specially designed" "parts" and "components," n.e.s. | |
| 0A504 | Optical sighting devices for firearms (including shotguns controlled by 0A502); and "components" as follows (see List of Items Controlled). | 0A987 |
| 0A505 | Ammunition as follows (see List of Items Controlled). | 0A984 0A986 |
| 0B501 | Test, inspection, and production "equipment" and related commodities for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A501 or USML Category I as follows (see List of Items Controlled). | 2B018 |
| 0B505 | Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A505 or USML Category III, except equipment for the hand loading of cartridges and shotgun shells, as follows (see List of Items Controlled). | 0B986 |
| 0D501 | "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by 0A501 or 0B501. | NEW |
| 0D505 | "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by 0A505 or 0B505. | NEW |
| 0E501 | "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by 0A501 or 0B501 as follows (see List of Items Controlled). | NEW |
| 0E502 | "Technology" "required" for the "development" or "production" of commodities controlled by 0A502. | NEW |
| 0E504 | ''Technology'' ''required'' for the ''development'' or ''production'' of commodities controlled by 0A504 that incorporate a focal plane array or image intensifier tube. | NEW |
| 0E505 | "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing of commodities controlled by 0A505. | NEW |
| 0A602 | Guns and Armament as follows (see List of Items Controlled). | NEW |
| 0B602 | Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A602 or USML Category II as follows (see List of Items Controlled). | NEW |

7

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

| 0D602 | "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A602 or 0B602 as follows (see List of Items Controlled). | NEW |
|---|---|---|
| 0E602 | "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing of commodities controlled by 0A602 or 0B602, or "software" controlled by 0D602 as follows (see List of Items Controlled). | NEW |

## ECCN 0A501

**Q.7:  What is a 'combination pistol' and where are they controlled under the new 0x5zz ECCNs on the CCL?**

**A.7:**  As specified in *Note 1 to paragraph 0A501.a*, a 'combination pistol' *(a.k.a., a combination gun)* has at least one rifled barrel and at least one smoothbore barrel (generally a shotgun style barrel).  'Combination pistols' are controlled under ECCN 0A501.a.

**Q.8:  ECCN 0A501.c controls *buttstocks that contain fire control "parts" or "components."* 0A501.y.1 controls *stocks … that do not contain any fire control "parts" or "components*."  Where are the following commodities controlled on the CCL:**

   **Q.8.a:  A full length stock for a rifle, typically made of wood, laminate or composite materials, consists of both the butt portion and the forearm portion, and which holds the fire control parts (*i.e.*, trigger group or action).  Would this be controlled under ECCN 0A501.c or .y?**

   **A.8.a:**  Pistol grips and stocks that contain fire control "parts" or "components" will be controlled as 0A501.c commodities.

   **Q.8.b:  A buttstock that does not contain fire control "parts" or "components."  ECCN 0A501.y.1 specifies *stocks* – would that include these types of buttstocks?**

   **A.8.b:**  Pistol grips and stocks that do not contain fire control "parts" or "components" are controlled as 0A501.y.1 items.

8

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

**Q.9:  ECCN 0A501.c controls *pistol grips that contain fire control "parts" or "components*." 0A501.y.1 controls *grips that do not contain any fire control "parts" or "components."***

> **Q.9.a:  Is the term *pistol grips* under 0A501.c meant to control pistol grip frames, *i.e.*, the metal or composite grip frame to which grip panels are attached?**
>
> **A.9.a:**  No.  Pistol grip frames or receivers are controlled as 0A501.e items.

> **Q.9.b:  Is the term *grips* meant to control pistol grip panels, typically made of composite or wood, which are attached to a pistol grip frame?**
>
> **A.9.b:**  Pistol grips panels (wood, composite, bone or other decorative materials) which are attached to the frame are designated EAR99.

**Q.10:  ECCN 0A501.e controls *[r]eceivers (frames)… including castings, forgings or stampings or machined items thereof*.  Does this include partially machined or finished receivers or frames, also known as *80% receivers*?**

**A.10:**  Yes, *80-percenters* are controlled under 0A501.e.

**Q.11:  I understand that detachable magazines with a capacity of greater than 16 rounds "specially designed" for a commodity controlled by 0A501.a or .b are controlled under .d, but where are magazines with a capacity of 16 rounds or less controlled?**

**A.11:**  As specified in *Note 2 to paragraph 0A501.d*, magazines with a capacity of 16 rounds or less are controlled under 0A501.x.

**Q.12:  ECCN 0A501.y.2 controls *scope mounts or accessory rails*.  Prior to the creation of this ECCN, BIS's website advised, "*Mounts, bases, rings and rails are EAR99*."  Paragraph y.2 does not mention bases or rings.  Are scope bases still designated as EAR99, or are they included**

9

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

under *accessory rails*?  Are scope rings still designated as EAR99, or are they included under *scope mounts*?

**A.12:** Mounts, bases, rings and rails will now have an ECCN associated with these items as 0A501.y.2, and are only controlled for UN and AT reasons.

**Q.13:  ECCN 0A501.y.3 controls *iron sights*.  Does that include sights made of other materials like polymer, or that are fiber optic or tritium?  Or does BIS mean this to control any type of open sights, regardless of material?**

**A.13:** ECCN 0A501.y.3 controls open type sights that do not contain any optical elements regardless of the actual material of construction.  This includes flip-up, fiber-optic, tritium, or polymer sights.

**Q.14:  ECCN 0A501.y.4 controls *sling swivels*.  Does this control the stud or attachment point to the stock that becomes a permanent part of the stock?  Or does it control the actual swivel that attaches to the stud?  Or does it control both?**

**A.14:** 0A501.y.4 includes both the swivel and the stud (or attachment point).

**Q.15:  ECCN 0A501.y.5 controls *butt plates or recoil pads*.  Does this include any type of recoil part or component that might be attached to the end of the stock?**

**A.15:** Yes.

**Q.16:  Where are "parts" and "components" that are common to firearms described in ECCN 0A501 and to firearms "subject to the ITAR" controlled?**

**A.16:** As specified in *Technical Note 1 to 0A501*, the controls on "parts" and "components" in ECCN 0A501 include those "parts" and "components" that are common to firearms described in ECCN 0A501 and to those firearms "subject to the ITAR."  *Technical Note 1 to 0A501* does not apply to parts or components enumerated on USML Category I under paragraphs (e)(*i.e.*, silencers, mufflers, and sound suppressors) or to those enumerated under (h)(1)(*i.e.*, drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50

10

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

rounds), regardless of jurisdiction of the firearm. *Note 3 to 0A505.x* functions in the same way as *Note 1 to 0A501*, but is specific to "parts" and "components" that are common to ammunition and ordnance described in 0A505 and to ammunition and ordnance enumerated in USML Category III.

**Q.17: Are antique firearms, muzzle loading black powder firearms, BB guns, pellet rifles, paint ball, and all other air rifles controlled under ECCN 0A501?**

**A.17:** Provided these firearms and related items meet the criteria in *Note 3 to 0A501*, they are not controlled under ECCN 0A501 and are designated as EAR99. As specified in *Note 3 to 0A501*, antique firearms (*i.e.*, those manufactured before 1890) and reproductions thereof; muzzle loading black powder firearms, except those designs based on centerfire weapons of a post-1937 design; BB guns; pellet rifles; paint ball; and all other air rifles are EAR99 commodities.

**Q.18: Based on the answer to A.17, does that mean that all muzzle loading (black powder) firearms that do not meet the scope of *Note 3 to 0A501*, are controlled under ECCN 0A501?**

**A.18:** If you are classifying a muzzle loading (black powder) firearm that does not meet the criteria of *Note 3 to 0A501*, you should review *Note 4 to 0A501* for additional classification guidance. As specified in *Note 4 to 0A501*, muzzle loading (black powder) firearms with a caliber less than 20 mm that were manufactured after 1937, that are used for hunting or sporting purposes, that were not "specially designed" for military use, that are not "subject to the ITAR," and that are not controlled as shotguns under ECCN 0A502 are designated as EAR99.

**Q.19:** *Blue guns* **are complete replicas of firearms that are used as training aids. They are completely non-functioning, and usually made of a composite material, but made to the exact dimensions of the related functioning firearm. Are** *blue guns* **EAR99 since they are replicas?**

**A.19:** *Blue guns* or *rubber ducks* that are non-functioning replicas which cannot be made to fire ammunition are designated as EAR99.

11

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

## ECCN 0A502

**Q.20:  Except for the fully automatic shotguns "subject to the ITAR," are all shotguns that are "subject to the EAR" controlled under ECCN 0A502?**

**A:20:**  Yes.  All shotguns that are "subject to the EAR" are controlled under ECCN 0A502 except antique shotguns that meet the criteria of *Note 1 to 0A502*.  As specified in *Note 1 to 0A502*, shotguns made in or before 1898 are considered antique shotguns and designated as EAR99.  In addition, as stated in the heading of ECCN 0A502, equipment used exclusively to treat or tranquilize animals and arms designed solely for signal, flare, or saluting use are not classified under 0A502 and if "subject to the EAR" are designated EAR99.

**Q.21:  Are shot pistols and shotguns that have had the shoulder stock removed and a pistol grip attached controlled under ECCN 0A501 or 0A502?  Also are slug guns controlled under ECCN 0A501 or 0A502?**

**A.21:**  These firearms are controlled under ECCN 0A502.  As specified in the *Technical Note to ECCN 0A502*, shot pistols or shotguns that have had the shoulder stock removed and a pistol grip attached are controlled by ECCN 0A502.  The *Technical Note to ECCN 0A502* also specifies that slug guns are controlled under ECCN 0A502.

## ECCN 0A504

**Q.22:  Are there any additional EAR license requirements that I should be aware of for ECCN 0A504?**

**A.22:**  The full scope of the EAR license requirement must be taken into account for all exports, reexports, or transfers (in-country) when making a license determination under the EAR, including end-use and end-user controls in part 744 of the EAR.  As specified in *Related Controls* paragraph (3) to ECCN 0A504, § 744.9 of the EAR imposes a license requirement on certain commodities described in 0A504 if being exported, reexported, or transferred (in-country) for use by a military end-user or for incorporation into an item controlled by ECCN 0A919.  Therefore, if you are exporting, reexporting, or transferring (in-country) commodities classified under ECCN 0A504, you should become familiar with the requirements of § 744.9 of the EAR.

**Q.23:  ECCN 0A504.i controls riflescopes that were not "subject to the EAR" as of March 8, 2020 and are "specially designed" for use in firearms that are "subject to the ITAR."  *Note 2 to paragraph (i)* states that paragraph (a)(1) of the definition of "specially designed" in § 772.1**

12

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

**of the EAR is used to determine whether riflescopes controlled under ECCN 0A501.i are "specially designed." Does this note mean that only paragraph (a)(1) is reviewed and paragraph (b) is not reviewed when making the determination whether these rifle scopes are "specially designed?"**

**A.23:** Yes, as specified in the *Note 2 to 0A501.i* only paragraph (a)(1) is used in making the determination whether a rifle scope is "specially designed." The paragraph (b) releases are not considered as part of the "specially designed" analysis for rifle scopes controlled under ECCN 0A504.i.

## ECCN 0A505

**Q.24:** **ECCN 0A505 controls ammunition for firearms controlled under 0A501. The revised USML Category III under the ITAR controls ammunition that is belted or linked. If I am exporting 5.56mm ammunition controlled under 0A505, does it become ITAR-controlled if it is belted or linked? If so, does the technology control for this item also remain on the ITAR?**

**A.24:** Any ammunition that is linked or belted is ITAR controlled. However, the technology associated with the ammunition remains controlled on the Commerce Control List under ECCN 0E505.

**Q.25:** **Are shotguns shells that contain only chemical irritants controlled under ECCN 0A505 or under some other ECCN because of the inclusion of the chemical irritants?**

**A.25:** As specified in *Note 1 to 0A505.c*, shotgun shells that contain only chemical irritants are controlled under ECCN 1A984.

**Q.26:** **Are percussion caps, and lead balls and bullets, for use with muzzle-loading firearms controlled under ECCN 0A505?**

**A.26:** No. As specified in *Related Controls* paragraph (2) in ECCN 0A505, percussion caps, and lead balls and bullets, for use with muzzle-loading firearms are designated as EAR99.

**Q.27:** **Are lead shot smaller than No. 4 Buckshot, empty and unprimed shotguns shells, shotgun wads, smokeless wads, smokeless gunpowder, dummy rounds and blank rounds controlled under ECCN 0A505?**

13

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

**A.27:**  No.  As specified in *Note 4 to 0A505*, lead shot smaller than No. 4 Buckshot, empty and unprimed shotgun shells, shotgun wads, smokeless gunpowder, 'dummy rounds' and blank rounds (unless linked or belted), not incorporating a lethal or non-lethal projectile(s) are designated EAR99.  *Note 4 to 0A505* defines a 'dummy round or drill round' as a round that is completely inert, *i.e.*, contains no primer, propellant, or explosive charge.  It is typically used to check weapon function and for crew training.

## ECCN 0A602

**Q.28:  Where are black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants controlled?**

**A.28:**  As specified in *Note 3 to 0A602*, black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants are designated EAR99.

## Removal of Nine ECCNs

**Q.29: Where are the items previously controlled under the nine ECCNs removed from the CCL now controlled?**

**A.29:** The items controlled under eight of the ECCNs that were removed are controlled under new 0x5zz ECCNs as of March 9, 2020.  The technology controlled under the ninth ECCN that was removed (ECCN 0E918) is designated EAR99 or not "subject to the EAR," if it meets part 734 criteria.

The following two Export Compliance Aids (ECA 2 and ECA 3) show the new CCL classifications of the items controlled by the nine removed ECCNs as of March 9, 2020.  ECA 2 provides a high level cross walk to show where the removed ECCNs have been mapped to new 0x5zz ECCNs and ECA 3 provides a more detailed cross walk of old ECCNs mapped to their new locations in the 0x5zz ECCNs.

14

Case 6:24-cv-01363-WWB-LHP   Document 128-1   Filed 09/23/25   Page 250 of 537 PageID 2592

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

### ECA 2: *High Level Cross Walk of Removed ECCNs Mapped to New 0x5zz ECCNs*



### ECA 3: *More Detailed Cross Walk of Removed ECCNs Mapped to New 0x5zz ECCNs*

| Removed ECCNs | Description of CCL Item in Removed ECCN and New ECCN | New ECCNs |
|---|---|---|
| 0A918 | Bayonets from 0A918 controlled by 0A501.y | 0A501.y |
| 0A984 | All commodities in 0A984 controlled by either 0A502 or 0A505 | 0A502 or 0A505 |
| 0A985 | All commodities in 0A985 controlled by 0A503 | 0A503 |
| 0A986 | All commodities in 0A986 controlled by 0A505.c, *including less than lethal rounds* | 0A505.c |
| 0A987 | All commodities in 0A987 controlled by 0A504 | 0A504 |
| 0B986 | All commodities in 0B986 controlled by 0B505.c | 0B505.c |

15

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

| 0E918 | Because 0E918 "technology" for "development," "production," or "use" of bayonets is widely known, any attempt to limit its dissemination through export license requirements is unlikely to be effective, so it will be designated EAR99 _or_ not "subject to the EAR," if meets part 734 criteria. | EAR99 |
|-------|-------|-------|
| 0E984 | All "technology" in 0E984 for development of shotguns and buckshot shotgun shells controlled under 0E502 (shotguns) _or_ 0E505 (buckshot shotgun shells). | 0E502 or 0E505 |
| 0E987 | All "technology" in 0E987 controlled by 0E504 | 0E504 |

**Q:30:  I have an existing BIS license that is still valid for one of these nine ECCNs, _e.g._, for long barrel shotguns that were controlled under ECCN 0A984 that moved to 0A502 as of March 9, 2020.**

**Q.30.a:  Can I use that existing BIS license or do I need to obtain a replacement license as of March 9, 2020?**

**A.30.a:**  You may continue to use the existing BIS license for the length of time that BIS license is still valid.  You do not need a replacement license.

**Q.30.b:  In the Electronic Export Information (EEI) filing in the Automated Export System (AES) for export clearance am I required to include the ECCN 0A984 listed on the license or the new ECCN 0A502?**

**A.30.b:**  As of March 9, 2020, you will enter the new ECCN 0A502 in the EEI filing in AES. Section 750.7(c)(1)(viii) of the EAR allows a change in ECCN, where necessary only for the purpose of conforming to an official revision in the CCL; or wording of the item description with no notification to BIS.  In this scenario, the change in ECCN is conforming to the official revision in the CCL in the Commerce final rule that became effective on March 9, 2020.  However, note that this authorization does not apply to an actual change in the item to be shipped, or an increase in the total price or quantity stated on the license.

**Q.30.c:  If I use the new ECCN 0A502 instead of the 0A984 stated on the license, will that cause a fatal error or a verify message in AES?**

16

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

**A.30.c:** No, it will not cause a fatal error or verify message in AES. BIS has confirmed this with the U.S. Census Bureau.

**Q.30.d: If I use a removed ECCN stated on the license instead of the new ECCN, will that cause a fatal error message in AES?**

**A.30.d:** Yes, it will cause a fatal error message in AES. *See* the example below under ECA 5 of an exporter that had a license to export shotgun shells that were controlled under ECCN 0A986 that are now controlled under ECCN 0A505 as of March 9, 2020. Because ECCN 0A986 has been removed and is no longer on the approved list of ECCNs in AES, when the filer tried to enter 0A986 it caused a fatal error in AES. The exporter needed to correct their filing to use the new ECCN 0A505 to resolve the fatal error.

## Revisions to Eight ECCNs

**Q.31: Why were eight ECCNs revised in the final rule?**

**A.31:** ECCNs 0A018, 0A988, 0E982, 1A984, 2B004, 2B018, 2D018, and 7A611 were revised to make conforming changes to allow for the addition of the seventeen new ECCNs and the removal of the nine ECCNs described above.

## 3D Printing of Firearms

**Q.32: Where can I find information in the final rule for how comments on the Commerce proposed rule regarding 3D printing of firearms were addressed in the final rule?**

**A.32:** *See* 85 FR 4139-4142 of the Commerce final rule under the heading *3D Printing of Firearms*.

Please also review the status of these controls in A.2 above.

**Q.33: How do the Export Administration Regulations treat posting "technology" or "software" for the production of firearms on the Internet?**

**A.33:** Section 734.7(c) of the Export Administration Regulations (EAR) (15 CFR 730-774) excludes specified "technology" and "software" from the definition of "published" in section 734.7 of the EAR. The excluded "technology" and "software" is "technology" or "software" for

17

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

the production of a firearm frame or receiver or complete firearm, controlled under Export Control Classification Number (ECCN) 0A501, that is made available by posting on the Internet in an electronic format, such as AMF or G-code, and is ready for insertion into a computer numerically controlled machine tool, additive manufacturing equipment, or any other equipment that makes use of the ''software'' or ''technology'' to produce the firearm frame or receiver or complete firearm.  Under section 734.7(c), such "technology" or "software" may not be posted on the Internet without authorization from the Department of Commerce's Bureau of Industry and Security (BIS).

**Q.34:  I am planning to post technology or software that meets the criteria in section 734.7(c).  Do I require a license or other prior approval from BIS before posting the "technology" or "software" on the Internet?**

**A.34:**  Yes, a BIS license is required under the Export Administration Regulations (EAR) prior to posting on the Internet of "technology" or "software" that meets the criteria under section 734.7(c).  No EAR license exceptions are available for such postings.

**Q.35:  I understand that section 734.7(c) applies to Computer Aided Manufacturing (CAM) files, such as in G-code or AMF format, as executable code to produce the items described in paragraph (c).  However, can you confirm whether the criteria in section 734.7(c) would also to apply to Computer Aided Design (CAD) files?**

**A.35:**  Section 734.7(c) covers "technology" and "software" for the production of a firearm frame or receiver or complete firearm, controlled under ECCN 0A501, that is made available by posting on the Internet in an electronic format, such as AMF or G-code, and is ready for insertion into a computer numerically controlled machine tool, additive manufacturing equipment, or any other equipment that makes use of the ''software'' or ''technology'' to produce the firearm frame or receiver or complete firearm.  Any file meeting that criteria is covered regardless of name, including CAD files.  Moreover, this includes any file, including any CAD file, that can be processed by a software program into an electronic format, such as a CAM file, without the file requiring any additional information or manipulation from the operator(s), and that the file once converted will be in an executable code for the production of a firearm frame or receiver or complete firearm.  If a person is unsure whether the criteria of section 734.7(c) are met, including whether the "technology" or "software" is ready for insertion into a computer numerically controlled machine tool, additive manufacturing equipment, or any other equipment, persons with such "technology" or "software" can submit an official classification request to BIS using the free online submission system, called SNAP-R, available on the BIS website to receive an official classification of the "technology" or "software."  The person submitting the official classification should note in the classification request that the

18

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

classification is being submitted to determine whether the "technology" or "software" meets the criteria in section 734.7(c).

**Q.36:  If I do not obtain a BIS license prior to posting "technology" or "software" that meets the criteria in section 734.7(c), will I be subject to penalties under the EAR?**

**A.36:**  Yes.  This would be a violation of the EAR and may result in significant administrative and criminal penalties under the EAR.   Under the Export Control Reform Act of 2018, criminal penalties can reach 20 years imprisonment and $1 million per violation. Administrative monetary penalties can reach $308,901 per violation (subject to adjustment in accordance with U.S. law, *e.g.*, the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (Pub. L. 114 -74, sec. 701)) or twice the value of the transaction, whichever is greater. Violations of the EAR may also lead to the denial of certain export privileges, potentially for a lengthy period of time.

**Q.37:  How will BIS treat "technology" or "software" that meets the criteria under section 734.7(c) that was posted on the Internet prior to the "technology" or "software" coming under the jurisdiction of the EAR?  Is that "technology" or "software" "subject to the EAR," even though it has already been posted online?**

**A.37:**  Upon transfer to the EAR, even previously posted "technology" or "software" becomes "subject to the EAR" and requires a license.  Regardless of when the "technology" or "software" in question was posted for worldwide distribution or how many times it may have been exported, reexported, or downloaded, the EAR continues to apply to the "technology" or "software" that meets the criteria in section 734.7(c).  This same EAR jurisdictional concept also applies if BIS approved a license for an exporter to post "technology" or "software" that meets the criteria in section 734.7(c) on the Internet; the "technology" or "software" would continue to be "subject to the EAR" even after being posted on the Internet (though if authorized it would be a lawful export).  As a result, others would need to obtain a separate license to repost such "technology" or "software" on the Internet, as a license only applies to the party or parties identified on such approved license.

**Q.38:  I understand that BIS will assert its jurisdiction over "technology" or "software" that meets the criteria under section 734.7(c) even if it was previously posted on the Internet when the "technology" or "software" was "subject to the International Traffic in Arms Regulations (ITAR) (22 CFR 120-130)" prior to being transferred to the EAR.  My question deals with the EAR's General Order No. 5 in supplement no. 1 to part 736 under paragraph (e)(1) (*Continued use of DDTC approvals from the Department of State's Directorate of*

19

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

***Defense Trade Controls (DDTC) for items that become subject to the EAR).  If the "technology" or "software" was posted on the Internet in accordance with the ITAR, either by State approving the posting on the Internet or through some court related action that permitted the posting on the Internet, does that mean the "technology" or "software" can continue to be posted on the Internet or is a BIS license required once the "technology" or "software" meets the criteria in section 734.7(c) because the "technology" or "software" is now "subject to the EAR"?***

**A.38:**  BIS, after consultation with DDTC, understands that none of the "technology" or "software" that meet the criteria in section 734.7(c) was authorized by DDTC, so the provisions of General Order No. 5 in Supp. No. 1 to part 736 are not available under the EAR for any "technology" or "software" that meets the criteria of section 734.7(c).  Similarly, no court decisions, including the Ninth Circuit opinion in *Washington v. Dep't of State*, No. 20-35391, authorized the posting of this "technology" or "software."

**Q.39:  I understand a license is required to post on the Internet "technology" or "software" that meets the criteria in section 734.7(c).  However, would it be possible to use an EAR license exception instead of applying for a BIS license to authorize the posting on the Internet?**

**A.39:**  No EAR license exceptions are available for "technology" or "software" that meets the criteria in section 734.7(c).  The online posting of "technology" or "software" that meets the criteria in section 734.7(c) for worldwide release is a release to ALL destinations of the world, including the most restricted embargoed or sanctioned destinations under the EAR, foreign nationals, and "proscribed persons" (*i.e.*, parties on the Denied Persons List, the Entity List, or those Specially Designated Nationals identified in part 744 of the EAR).  As a result, no export license exceptions are available for "technology" or "software" that meets the criteria under section 734.7(c).

In order to overcome the presumption that the posting on the Internet of "technology" or "software" that meets the criteria in section 734.7(c) was not for a worldwide release, the poster must have positive "knowledge" that those downloading the "technology" or "software" are located only in the United States or Canada and that none of the persons downloading the "technology" or "software" are nationals of any country other than the United States or Canada or on any "proscribed persons" lists as noted above.  For purposes of section 734.7(c) of the EAR, it is not adequate to overcome this presumption of a worldwide release to simply require the downloader to assert that they meet certain criteria without the poster taking additional steps to confirm that those nationals are outside the scope of the EAR license requirements.  This is the expectation that BIS has when it states that the poster must have positive

20

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

"knowledge" to overcome the presumption that any such posting on the Internet is considered a worldwide release.

As was stated in the MYTHS AND FACTS document posted on the BIS and DDTC websites on January 23, 2020, "the Departments of Commerce and State regulate exports and the transfer of controlled technologies to foreign persons in the United States; the domestic manufacture or possession of 3-D printed firearms by U.S. persons in the United States is beyond the purviews of the Departments of Commerce and State and will fall within the jurisdiction of existing domestic law."

**Q.40: "Technology" and "software" that meets the criteria in section 734.7(c) is "technology" or "software" that is classified under ECCNs 0E501 or 0D501. These two ECCNs are subject to a worldwide license requirement, except for Canada. If I created a website that was limited to Canadians and citizens of the United States, permanent residents of the United States, or protected individuals as defined by 8 U.S.C. 1234b(a)(3) and I created a way to confirm that only Canadian and U.S. citizens were downloading the "technology" or "software," would that still be restricted under section 734.7(c) and require a prior approval from BIS prior to posting?**

**A.40:** In that case, section 734.7(c) would not be applicable except as to those persons (Canadians, citizens and permanent residents of the United States, protected individuals as defined by 8 U.S.C. 1234(a)(3)) accessing such "technology" or "software" outside of Canada or the United States. But limiting the accessibility of who may download the "technology" or "software" may render the "technology" or "software" outside of the scope of the "published" exception in section 734.7(a)(4), which describes, as an example of "technology" or "software" made available "to the public without restrictions upon its further dissemination," "[P]ublic dissemination (*i.e.,* unlimited distribution) in any form (*e.g.,* not necessarily in published form), including posting on the Internet on sites available to the public;" - meaning the "technology" or "software" would still be "subject to the EAR."

**Q.41: What is the license policy for applications for posting on the Internet "technology" or "software" that meets the criteria in section 734.7(c)?**

**A.41:** License applications for "technology" or "software" that meets the criteria in section 734.7(c) are subject to a policy of denial -- the most restrictive license review policy under the EAR. The rationale for applying this review policy is that, as noted above, the worldwide release of such "technology" and "software" is deemed to be an export to embargoed and sanctioned destinations as well as prohibited end users.

21

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

**Q.42:   Can section 734.7(c) be circumvented by posting only part of the "technology" or "software" on the Internet, so it doesn't meet the section 734.7(c) criteria, but subsequently providing the other part of the "technology" or "software" needed to complete the "technology" or "software"?**

**A.42:** The EAR prohibit various ways to circumvent controls.  BIS is aware that certain persons try to circumvent the requirements of the EAR, which is an issue not unique to the control in section 734.7(c).  BIS's highly trained law enforcement personnel have extensive experience in identifying such attempts to violate the EAR.  Part 764 of the EAR includes provisions that prohibit evasive activities.  Section 764.2 (Violations) enumerates such activities as summarized below.

- Paragraph (a) *(Engaging in prohibited conduct)* specifies that no person may engage in any transaction or take any other action prohibited by or contrary to, or refrain from engaging in any transaction or take any other action required by, ECRA, the EAR, or any order, license or authorization issued thereunder.
- *Paragraph* (b) *(Causing, aiding, or abetting a violation)* specifies that no person may cause or aid, abet, counsel, command, induce, procure, permit, or approve the doing of any act prohibited, or the omission of any act required, by ECRA, the EAR, or any order, license or authorization issued thereunder.
- *Paragraph* (c) *(Solicitation and attempt)* specifies that no person may solicit or attempt a violation of ECRA, the EAR, or any order, license, or authorization issued thereunder.
- *Paragraph* (d) *(Conspiracy)* specifies that no person may conspire or act in concert with one or more persons in any manner or for any purpose to bring about or to do any act that constitutes a violation of ECRA, the EAR, or any order, license, or authorization issued thereunder.
- *Paragraph* (e) *(Acting with knowledge of a violation)* specifies that no person may order, buy, remove, conceal, store, use, sell, loan, dispose of, transfer, transport, finance, forward, or otherwise service, in whole or in part, or conduct negotiations to facilitate such activities with respect to, any item that has been, is being, or is about to be exported, reexported, or transferred (in-country), or that is otherwise subject to the EAR, with knowledge that a violation of ECRA, the EAR, or any order, license, or authorization issued thereunder, has occurred, is about to occur, or is intended to occur in connection with the item.
- *Paragraph (h) (Evasion)* specifies that no person may engage in any transaction or take any other action with intent to evade the provisions of ECRA, the EAR, or any order, license or authorization issued thereunder.

BIS visits companies and individuals and can request export control records to investigate potential circumvention.  The EAR recordkeeping requirements in part 762 are another

22

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

important authority BIS uses to help to prevent, punish and deter violations.  As noted in A.36 above, the potential penalties can be quite costly.

**Q.43:  Can you address exports of ECCNs 0E501 "technology" or 0D501 "software" when the criteria of section 734.7(c) are not applicable.  In my scenario, I am a U.S. firearms manufacturer and I would like to export my CAD firearms design files to a factory in Germany to see if they are feasible for a manufacturer using additive manufacturing techniques.  I assume this would be treated like a regular export of "technology."  I understand the "technology" is "subject to the EAR" and would require a license to Germany.  Can you confirm if my understanding is correct?**

**A.43:**  Yes, CAD, or any other files of firearms designs, are "subject to the EAR" and controlled under ECCN 0E501.  This export to Germany would be treated like any other export of production/design technology, thus requiring a license under the EAR.

**Q.44:  Does the Commerce regulation under section 734.7(c) allow for posting an advertisement online offering 3D firearm files and the delivery of those files by email?**

**A.44:**  Section 734.7(c) only addresses files made available on the Internet.  Other provisions of the EAR already address this scenario.  While there is no prohibition on posting an advertisement, as long as it does not contain the specified "technology" or "software" on the Internet, EAR sections 734.13 and 734.15 make it clear sending an e-mail containing controlled "technology" or "software" to foreign nationals (even if the transmission of the e-mail occurred in the United States) is an export and, as a result, licensing requirements may apply.  For "technology" and "software" controlled under ECCNs 0E501 or 0D501 that are exported using the email mode of transmission, a license requirement would apply for these types of exports to all foreign nationals, except Canadian foreign nationals in the United States or Canada.

## Brokering Controls

***Note:***  *Commerce developed these brokering FAQs jointly with DDTC to assist public understanding of controls under the CCL and the U.S Munitions Import List (USMIL).  DDTC regulates brokering under part 129 of the ITAR, and these FAQs are not intended to supplant the ITAR.*

**Q.45:  My Category I firearm moved to the CCL as of March 9, 2020, but in reading the Commerce and State final rules I read that certain brokering controls are still applicable.  Did the Commerce final rule add any brokering requirements to the EAR?**

23

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

**A.45:** No. However, the Department of State in its proposed rule and final rule retains brokering controls for items which are now listed on the CCL that are also listed on the USMIL. BIS directs the public to review the State final rule for information on the brokering controls under the ITAR. 85 FR 3819-3820 and 3828

**Q.46: My understanding is that the USML and the CCL are mutually exclusive – meaning the item is either on the USML or the CCL. Is that *not* the same for the CCL and the USMIL?**

**A.46:** Correct, the ITAR USML and CCL are mutually exclusive control lists – meaning an item is either on the ITAR USML or on the CCL. The USMIL and the CCL are *not* mutually exclusive because the two lists overlap in certain places. As described in the Background section of the Commerce final rule, pursuant to section 38(a)(1) of the Arms Export Control Act (AECA), *all* defense articles controlled for export or import, or that are subject to brokering controls, are part of the USMIL under the AECA, not just those on the ITAR USML. The list of AECA defense articles on the USMIL are those that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purposes of permanent import under its regulations at 27 CFR part 447. *All defense articles described in the USMIL or the USML are subject to the brokering controls administered by the U.S. Department of State in part 129 of the ITAR.* The transfer of defense articles from the ITAR's USML to the EAR's CCL for purposes of export controls does *not* affect the list of defense articles controlled on the USMIL under section 38 of the AECA, 22 U.S.C. 2778, for purposes of permanent import or brokering controls.

The Department of State final rule also included additional background on brokering (*see* 85 FR 3819-3820). As noted above, questions on the Department of State final rule should be directed to State, including questions on the ITAR brokering requirements, but to assist public understanding, BIS included an excerpt below from the State final rule (*see* 85 FR 3819-3820) that provides additional context for the ITAR brokering requirements.

> "Section 38(b)(1)(A)(ii) of the AECA, requires, with limited exceptions, registration of persons who engage in the business of brokering activities with respect to the manufacture, export, import, or transfer of any defense article or defense service designated by the President as such under section 38(a)(1) and licensing for such activities. Through Executive Order 13637, the President delegated the responsibility for registration and licensing of brokering activities to the Department of State with respect to defense articles or defense services controlled either for purposes of export by the Department of State or for purposes of permanent import by ATF. Section 129.1 of the ITAR states this requirement. As such, all defense articles described in the USMIL or the USML are subject to the brokering controls administered by the U.S. Department of State in part 129 of the ITAR. The transfer of jurisdiction from the ITAR's USML to the

24

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

EAR's CCL for purposes of export controls does not affect the list of defense articles controlled on the USMIL under the AECA for purposes of permanent import or brokering controls for any brokering activity, including facilitation in their manufacture, export, permanent import, transfer, reexport, or retransfer." 85 FR 3819-3820.

**Q.47: All of the firearms my company manufactures moved to the CCL, as of March 9, 2020. I was assuming that one of the benefits of the State and Commerce final rules is that I would no longer have to register under the ITAR or require ITAR licenses or other approvals, but because my firearms will be listed on the USMIL and the CCL, does that mean I will have to register as a broker under the ITAR, as well as obtain a license from State and Commerce to export the same firearms to Germany?**

**A.47:** Questions specific to the brokering requirements under the ITAR should be directed to the Department of State. However, with regard to this specific question and concern over imposing a dual licensing requirement, the Background section of the Commerce final rule addressed this under the heading *Brokering,* where it stated "The Department of State in its companion rule noted it does not intend to impose a double licensing requirement for individuals undertaking activities on behalf of another to facilitate a transaction that will require licensing by the Department of Commerce. In practical terms, this means the vast majority of exporters who only export firearms on the CCL directly from the U.S. or reexport U.S.-origin firearms on the CCL are not "brokers" and will not have to register with DDTC." 85 FR 4143.

The Department of State final rule included a change from the proposed rule to address concerns over dual-licensing for brokering (see 85 FR 3820), when the State rule described that "[The State final rule] adds two new paragraphs, (b)(2)(vii) and (viii), to § 129.2 to update the enumerated list of actions that are not brokering. This change is a conforming change and is needed to address the transfer from the USML to the CCL of USMIL defense articles that remain subject to the brokering controls, and to ensure that the U.S. government does not impose a double licensing requirement on the export, reexport, or retransfer of such items subject to the EAR or continue to require registration with the Department solely based on activities related to the manufacture of these items." 85 FR 3820.

The State final rule also included other references in the Background section that are set out below to assist your understanding:

- "The Department [of State] does not intend to impose a double licensing requirement for individuals undertaking activities on behalf of another to facilitate a transaction that will require licensing by the Department of Commerce. Therefore, the Department is revising the proposed § 129.2(b)(2)(vii) and adding a new (b)(2)(viii) to clarify that

25

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

>    activities to facilitate the domestic manufacture or export of items subject to the EAR are not brokering under the ITAR and do not require authorization or registration." 85 FR 3828.

- "The Department [of State] confirms that new provisions in § 129.2(b)(2)(vii) and (viii) apply to all items subject to the EAR, not just those that transitioned from USML Categories I, II or III, to the extent that other items subject to the EAR are also included on the USMIL. These provisions also clarify the use of the NLR designation and revise the scope of the exclusion from brokering activities to include those activities that are controlled by the Department of Commerce." 85 FR 3828.

Determining whether a particular activity is a brokering activity is determined by DDTC and such determinations are made consistent with the requirements under part 129 of the ITAR. Click here for a link to § 129.9 (*Guidance*) of the ITAR. Paragraph (a) of § 129.9 states that "Any person desiring guidance on whether an activity constitutes a brokering activity within the scope of this part 129 may request in writing guidance from the Directorate of Defense Trade Controls."

## License Exceptions

**Q.48: Did the Commerce final rule add any additional general restrictions on the use of License Exceptions under § 740.2?**

**A.48:** Yes, the Commerce final rule added two new general restrictions under § 740.2, one under paragraph (a)(21) and a second under paragraph (a)(22). These new general restrictions apply to the following 0x5zz items and if applicable you cannot use an EAR license exception:

- **New § 740.2(a)(21)** restricts use of license exceptions, except for License Exception GOV under § 740.11(b)(2)(ii), for reexport or transfer (in-country) of certain firearms classified under 0A501 or 0A502. Restriction applies if a part or component that is not "subject to the ITAR," but would otherwise meet criteria in USML Category I(h)(2) is incorporated into the firearm or is to be reexported or transferred (in-country) with the firearm with "knowledge" the part or component will be subsequently incorporated into the firearm.

26

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

### ECA 4: *Text of USML Category I(h)(2)*

> **USML Category I(h)(2)** *Parts and components specially designed for conversion of a semiautomatic firearm to a fully automatic firearm.*

- **New § 740.2(a)(22)** restricts use of license exceptions for any 0x5zz item when a party to the transaction is designated on the Department of the Treasury, Office of Foreign Assets Control (OFAC), Specially Designated Nationals and Blocked Persons (SDN) list under the designations [SDNT], or [SDNTK]. OFAC makes SDNT designations pursuant to the *Narcotics Trafficking Sanctions Regulations*, 31 CFR part 536, and SDNTK designations are made, pursuant to the *Foreign Narcotics Kingpin Sanctions Regulations,* 31 CFR part 598.

**Q.49: Are ECCN 0x5zz items eligible for reexports under paragraphs (a) and (b) of License Exception APR (§ 740.16)?**

**A.49:** No. All 0x5zz ECCNs are excluded from the use of paragraphs (a) and (b) of License Exception APR.

### License Exception LVS

**Q.50: When will License Exception LVS (§ 740.3) be useful for authorizing exports, reexports, and transfers (in-country)?**

**A.50:** License Exception LVS will be useful for authorizing certain low value shipments of commodities when it is available, but as with all EAR license exceptions there are terms and conditions that need to be met to use the license exception. License Exception LVS requirements include the following:

- limited to a specified LVS dollar value limit;
- limited to exports, reexports, and transfers (in-country) to Country Group B, although certain eligibility is limited to only Canada;
- there are criteria that need to be met for an eligible 'order' under License Exception LVS;
- there is a limit on the net value for LVS shipments where no single shipment may exceed the specified LVS dollar value limit;
- there are restrictions that prohibit the splitting of orders to meet the applicable LVS dollar value limit; and

27

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

- there are restrictions on annual value of LVS orders where the total value of exports per calendar year to the same ultimate or intermediate consignee of commodities classified under a single ECCN may not exceed 12 times the LVS value limit for that ECCN.

### ECA 5: *Cheat Sheet for License Exception LVS Eligibility for 0x5zz, 0A602 and 0B602 ECCNs*

| ECCN | "Items" paragraphs eligible for LVS | LVS eligible dollar value limit | Country Group B LVS eligibility *(including Canada)* | Canada additional LVS eligibility |
|---|---|---|---|---|
| 0A501 | | | | |
| | **0A501.c**<br>The following types of "parts" and "components" if "specially designed" for a commodity controlled by paragraph .a or .b of this entry, or USML Category I (unless listed in USML Category I(g) or (h)):  barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, disconnectors) and buttstocks that contain fire control "parts" or "components."<br><br>**0A501.d**<br>Detachable magazines with a capacity of greater than 16 rounds "specially designed" for a commodity controlled by paragraph .a or .b of this entry.<br><br>**0A501.x**<br>"Parts" and "components" that are "specially designed" for a commodity classified under paragraphs .a through .c of this entry or the | $500 | X | |

28

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

| | | | | |
|---|---|---|---|---|
| | USML and not elsewhere specified on the USML or CCL. | | | |
| | **0A501.e**<br>Receivers (frames) and "complete breech mechanisms," including castings, forgings stampings, or machined items thereof, "specially designed" for a commodity controlled by paragraph .a or .b of this entry<br><br>***Note:*** *LVS eligible <u>only</u> if the ultimate destination is Canada.* | **$500** | | **X** |
| **0A502** | | | | |
| | Shotgun "parts" and "components," consisting of complete trigger mechanisms; magazines and magazine extension tubes | **$500** | **X** | |
| | Complete breech mechanisms<br><br>***Note:*** *LVS eligible <u>only</u> if the ultimate destination is Canada.* | **$500** | | **X** |
| **0A504** | | | | |
| | **0A504.g**<br>Lenses, other optical elements and adjustment mechanisms for articles in paragraphs .a, .b, .c, .d, .e, or .i. | **$500** | | |
| **0A505** | | | | |
| | **0A505.x**<br>"Parts" and "components" that are "specially designed" for a commodity subject to control in this ECCN or a defense article in USML Category III and not elsewhere specified on the USML, the CCL or paragraph .d of this entry. | **$500** | **X** | |
| | **0A505.x (formerly 0A018.b)**<br>Commodities that, immediately prior to March 9, 2020, were classified under 0A018.b. (*i.e.*, "Specially designed" components and parts for ammunition, except cartridge cases, powder bags, bullets, jackets, cores, shells, projectiles, boosters, fuses and components, primers, and other detonating devices and ammunition belting | **$3,000** | **X** | |

29

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

|  |  |  |  |  |
|---|---|---|---|---|
|  | and linking machines (all of which are "subject to the ITAR"). (See 22 CFR parts 120 through 130)) |  |  |  |
| 0A602 | *Note: Entire entry is LVS eligible.* |  |  |  |
|  | **0A602.a**<br>Guns and armament manufactured between 1890 and 1919.<br><br>**0A602.b**<br>Military flame throwers with an effective range less than 20 meters.<br><br>**0A602.x**<br>"Parts" and "components" that are "specially designed" for a commodity subject to control in paragraphs .a or .b of this ECCN or a defense article in USML Category II and not elsewhere specified on the USML or the CCL. | $500 | X |  |
| 0B501 | *Note: Entire entry is LVS eligible.* |  |  |  |
|  | **0B501.a**<br>Small arms chambering machines.<br><br>**0B501.b**<br>Small arms deep hole drilling machines and drills therefor.<br><br>**0B501.c**<br>Small arms rifling machines.<br><br>**0B501d**<br>Small arms spill boring machines.<br><br>**0B501.e**<br>Production equipment (including dies, fixtures, and other tooling) "specially designed" for the "production" of the items controlled in 0A501.a through .x. or USML Category I. | $3,000 | X |  |
| 0B505 | *Note: Entire entry is LVS eligible.* |  |  |  |
|  | **0A505.a**<br>Production equipment (including tooling, templates, jigs, mandrels, molds, dies, fixtures, | $3,000 | X |  |

30

EX 2A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

| | | | | |
|---|---|---|---|---|
| | alignment mechanisms, and test equipment), not enumerated in USML Category III that are "specially designed" for the "production" of commodities controlled by ECCN 0A505.a or .x or USML Category III.<br>**0B505b**<br>Equipment "specially designed" for the "production" of commodities in ECCN 0A505.b.<br><br>**0B505c**<br>Equipment "specially designed" for the "production" of commodities in ECCN 0A505.c.<br><br>**0B505.d**<br>Equipment "specially designed" for the "production" of commodities in ECCN 0A505.d.<br><br>**0B505.x**<br>"Parts" and "components" "specially designed" for a commodity subject to control in paragraph .a of this entry. | | | |
| **0B602** | ***Note:*** *Entire entry is LVS eligible.* | | | |
| | **0B602.a**<br>The following commodities if "specially designed" for the "development" or "production" of commodities enumerated in ECCN 0A602.a or USML Category II:<br><br>    **a.1.**    Gun barrel rifling and broaching machines and tools therefor;<br><br>    **a.2.**    Gun barrel rifling machines;<br><br>    **a.3.**    Gun barrel trepanning machines;<br><br>    **a.4.**    Gun boring and turning machines;<br><br>    **a.5.**    Gun honing machines of 6 feet (183 cm) stroke or more; | $3,000 | X | |

31

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

| | | | | |
|---|---|---|---|---|
| | **a.6.** Gun jump screw lathes; | | | |
| | **a.7.** Gun rifling machines; and | | | |
| | **a.8.** Barrel straightening presses. | | | |
| | **0B602.b** Jigs and fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II. | | | |
| | **0B602.c** Other tooling and equipment, "specially designed" for the "production" of items in ECCN 0A602 or USML Category II. | | | |
| | **0B602.d** Test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II. | | | |
| | | | | |

**ECA 6:** *Decision Tree Tool for Determining LVS Eligibility*

---

**Decision Tree Tool for License Exception LVS (§ 740.3)**

***Note 1:*** *The Decision Tool for License Exception LVS is based on the assumption that you have:*
*(1) determined your commodity is "subject to the EAR;" and*
*(2) determined your export, reexport, or transfer (in-country) requires an EAR authorization.*

***Note 2:*** *The Decision Tool for License Exception LVS is not intended to replace your reviewing the criteria of License Exception LVS and other EAR provisions as applicable and is provided here as a guide to assist understanding of when this license may be available and useful to exporters, reexporters, and transferors.*

**Question A:**

32

Ex 2A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

---

**Is the 0x5zz commodity or "600 series" commodity identified as being eligible for License Exception LVS in the *List Based License Exceptions* section of the ECCN you are planning to export, reexport, or transfer (in-country)?**

- If yes, proceed to question B.
- If no, License Exception LVS is not available because that commodity has no list based eligibility for LVS as stated in the ECCN.

---

**QUESTION B:**
**Have you received an 'order' for this commodity that is no greater than the LVS dollar value limit specified in the ECCN you are planning to export, reexport, or transfer (in-country)? For example, if you are planning to export buttstocks that contain fire control "parts" controlled under 0A501.c the LVS eligibility is $500, so the "order" may not exceed $500.**

- If yes, proceed to question C.  (CAUTION: Splitting 'orders' in order to stay within the LVS dollar value limit is prohibited under License Exception LVS.)
- If no, License Exception LVS is not available because the "order" exceeds the applicable LVS dollar value limit.

---

**QUESTION C:**
**Is the export, reexport, or transfer (in-country) subject to one of the general restrictions in § 740.2?  For example, if you are exporting to someone on the BIS Unverified List in Supplement No. 6 to part 744, you will not be able to use any EAR license exception, including License Exception LVS.**

- If yes, License Exception LVS is not available because one of the general restrictions in § 740.2 restricts the use of LVS.
- If no, proceed to question D.

---

**QUESTION D:**
**CANADA SPECIFIC QUESTION (for additional LVS eligibility only available for Canada)**
**Is the commodity a receiver (frame) or "complete breech mechanism," including castings, forgings stampings, or machined items thereof, "specially designed" for a commodity controlled by paragraph .a or .b of ECCN 0A501 controlled under 0A501, or a complete breech mechanism controlled under 0A502, that you are planning to export, reexport, or transfer (in-country) to Canada?**

- If yes, proceed to Question F.
- If your commodity is described in Question D, but the export, reexport, or transfer (in-country) is not to Canada, then License Exception LVS is not available because the LVS eligibility for these commodities is limited to Canada.

33

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

- If your commodity is not described in Question D, proceed to Question E to determine whether LVS eligibility for your ECCN that applies to all of Country Group B, including Canada, may be available for your commodity.

**QUESTION E:**
***COUNTRY GROUP B (for LVS eligibility for all of Country Group B, including Canada)***
**Is the country you are planning to export, reexport, or transfer (in-country) to identified in Country Group B in Supplement No. 1 to part 740?**
- If no, License Exception LVS is not available because the license exception is only available for Country Group B countries.
- If yes, proceed to Question F.

**QUESTION F:**
**During the current calendar year, have you received any 'orders' from this same entity (including natural persons) where you used License Exception LVS to authorize an export, reexport, or transfer (in-country) commodities classified under this ECCN entry to the same ultimate consignee?**
- If yes, proceed to Question G.
- If no, the export, reexport, or transfer (in-country) may be authorized under License Exception LVS.

**QUESTION G:  During the current calendar year, has the net dollar value of 'orders' exported, reexported, or transferred (in-country) to this same ultimate consignee exceeded 12 times the LVS dollar value limit for your commodity as identified under the *List Based License Exceptions* section of the ECCN?**
- If yes, the export, reexport, or transfer (in-country) may not be authorized under License Exception LVS because the transaction will exceed the maximum annual value of LVS orders.
- If no, the export, reexport, or transfer (in-country) may be authorized under License Exception LVS.

***Note:*** *Use of License Exception LVS also requires complying with all applicable EAR export clearance requirements, reporting requirements, and recordkeeping requirements.*

**Q.51:  What is considered an 'order' under License Exception LVS (§ 740.3)?**

**A.51:**  The term 'order' as used in § 740.3 means a communication from a person in a foreign country, or that person's representative, expressing an intent to import commodities from the exporter.  Although all of the details of the order need not be finally determined at the time of export, terms relating to the kinds and quantities of the commodities to be exported, as well as the selling prices of these commodities, must be finalized before the goods can be exported under License Exception LVS.

34

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

**Q.52:  Is it permissible to split an 'order' to meet the applicable LVS dollar value limits?**

**A.52:**  No, it is not.  An order that exceeds the applicable LVS dollar value limit may not be misrepresented as two or more orders, or split among two or more shipments, to give the appearance of meeting the applicable LVS dollar value limit.  However, an order that meets all the LVS eligibility requirements, including the applicable LVS dollar value limit, may be split among two or more shipments.  For example, if a customer in Japan places an order with a U.S. shotgun parts and components manufacturer for $500 worth of complete trigger mechanisms, but the U.S. exporter only has half of the order currently in stock, it is permissible for the U.S. exporter to fulfill the 'order' with more than one shipment, such as making one shipment for $300 today and next week making a subsequent shipment of $200 to complete fulfilling the 'order.'

**Q.53:  I understand that the annual value restriction is twelve times the LVS dollar value limit specified in the ECCN, but is there a limit on the total number of 'orders' that I can have from the same ultimate consignee over the twelve-month period?**

**A.53:**  There is not a specified limit for the total number of 'orders' you may receive from an ultimate consignee.  However, the net value of the "orders" over each calendar year with that ultimate consignee may not exceed twelve times the LVS dollar value limit.  For example, under ECCN 0A501 for the commodities that are eligible there is a $500 LVS dollar value limit, so an exporter could receive a net total of 'orders' up to $6,000 in a calendar year from an ultimate consignee.  The exporter, reexporter, or transferor is responsible for keeping track of how many exports, reexports, or transfers (in-country) are being made to each ultimate consignee and ensuring that the annual value of LVS 'orders' does not exceed the 12 times the LVS value for that ECCN for each respective ultimate consignee.

**Q.54:  If I have more than one 'order' from the same ultimate consignee, is it permissible to export, reexport, or transfer (in-country) all of those orders in a single shipment exported on the same day?**

**A.54:**  Yes, an eligible shipment may include more than one order, provided the net value for the single shipment does not exceed the applicable LVS dollar value(s) for the commodities being authorized for export, reexport, or transfer (in-country) under License Exception LVS.

**Q.55:  When determining whether License Exception LVS can apply to an export, do you consider the value of the commodities at the ECCN level, *e.g.*, 0A501, or the ECCN "items" level, *e.g.*, 0A501.c?  For example, if an order includes two commodities - one commodity**

35

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

**under the order is controlled under ECCN 0A501.c and one commodity under the order is controlled under 0A501.x.  Do we apply the LVS value of $500 to the 0A501.c commodity, and apply $500 to the 0A501.x commodity?  Or does the $500 apply to the two 0A501 commodities on the order?**

**A.55**:  License Exception LVS under § 740.3 of the EAR authorizes the export, reexport, and transfer (in-country) in a single shipment of eligible commodities as identified by *LVS - $(value limit)* on the CCL.  An order is eligible for shipment under LVS when the "net value" of the commodities controlled *under the same entry* on the CCL does not exceed the amount specified in the LVS paragraph for that entry.  An LVS shipment may include more than one eligible order. The phrase *commodities controlled under the same entry on the CCL* means all items classified under the same ECCN, regardless of the items level classification.  Therefore, the LVS dollar value is based off the ECCN classification – not the items level classification.

Paragraph (d)(2)(Restriction on annual value LVS orders) uses more precise text that helps provide the answer to the meaning of the less precise text used in other parts of License Exception LVS.  Paragraph (d)(2) specifies the annual value restriction applies to commodities *classified under a single ECCN*.  Therefore, in your example of 0A501.c and .x, the eligible 'order' for each shipment authorized under License Exception LVS must not exceed $500 at the ECCN level (0A501).

**Q.56:  Is it permissible under License Exception LVS to mix items level paragraphs in one ECCN under an eligible LVS order?**

**A.56:**  Yes, that is permissible under License Exception LVS provided the net value of the different items level paragraphs do not exceed the applicable LVS dollar value identified in the ECCN.  For example, under ECCN 0A501 LVS eligibility, an exporter may receive an order for $500.  The $500 order consists of $250 of magazines controlled under ECCN 0A501.d and $250 of barrel extrusions controlled under 0A501.c.  The exporter may use License Exception LVS to authorize the export, reexport or transfer (in-country), provided none of the general restrictions in § 740.2 apply and the export, reexport or transfer (in-country) meets the other applicable requirements of License Exception LVS.  Mixing items level paragraphs in one ECCN that exceed the LVS dollar value is *not* permissible under License Exception LVS.

**Q.57:  How can I address License Exception LVS when two or more LVS dollar value limits apply?**

**A.57:**  An 'order' may include commodities that are controlled under more than one ECCN on the CCL (meaning classified under two or more different ECCNs on the CCL that are eligible for LVS). In this case, the net value of the entire 'order' may exceed the LVS dollar value for any single

36

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

ECCN on the CCL. However, the net value of the commodities controlled under each ECCN shall not exceed the LVS dollar value limit specified for that ECCN. For example, an order includes ECCN 0x5zz commodities valued at $500. The order consists of commodities controlled under two 0x5zz ECCNs, each having an LVS value limit of $500. Commodities in the order controlled under ECCN 0A501.x are valued at $500 while those controlled under ECCN 0A502 are valued at $500. Since the net value of the commodities controlled under *each* ECCN falls within the LVS dollar value limits applicable to that ECCN entry (*i.e.*, ECCN 0A501 and 0A502, respectively), the order may be shipped under License Exception LVS.


## License Exception BAG

(§ 740.14)

**Q.58: How many ECCN 0A501 firearms and ECCN 0A505 rounds of ammunition may be exported under License Exception BAG (§ 740.14)?**

**A.58:** A United States citizen or a permanent resident alien leaving the United States may export under License Exception BAG firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505.a, but not more than three firearms and 1,000 rounds of ammunition may be taken on any one trip. The export would also be subject to additional limitations in paragraph (e)(3)(ii)-(v).

Under paragraph (e)(4), a nonimmigrant alien leaving the United States may export or reexport under this License Exception only such firearms controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505 as he or she brought into the United States under the relevant provisions of Department of Justice regulations at 27 CFR part 478.


**Q.59: If a foreign person is in the United States on vacation or for business and purchases a firearm controlled under ECCN 0A501 or ammunition controlled under 0A505, could License Exception BAG be used to authorize the export when the foreign person returns to their country?**

**A.59:** No. License Exception BAG would not be available for that type of an export. In that fact pattern, the foreign person would likely need to obtain a BIS license to authorize the export of the firearm. The purchase and use of a firearm in the United States must comply with any applicable ATF regulations.

37

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

**Q.60:  Are there additional requirements that I need to follow at the time of export under License Exception BAG (§ 740.14)?**

**A.60:**  Yes, there are additional limitations that are specified in paragraphs (e)(3)(i)-(v).  The following table provides a high-level summary of these additional limitations, along with a more detailed summary.

### ECA 7:  *Cheat Sheet for License Exception BAG*

| High level summary | More detailed summary with § 740.14(e)(3)(i)-(v) references |
|---|---|
| **No more than:**<br>• 3 firearms and<br>• 1,000 rounds of ammunition | Not more than 3 firearms and 1,000 rounds of ammunition may be taken on any one trip. (*See* (§ 740.14(e)(3)(i)). |
| PCAAs must be of a kind and in quantities reasonable for:<br>• person's exclusive use, *or*<br>• necessary for routine maintenance of firearms exported under BAG | "Parts," "components," "accessories," and "attachments" (PCAAs) exported must be of a kind and limited to quantities that are reasonable for the person's exclusive use *or* that are necessary for routine maintenance of the firearms being exported.  (*See* § 740.14(e)(3)(ii)). |
| • Must be exported with person's baggage | Commodities must be with the person's baggage (may not be mailed).  (*See* § 740.14(e)(3)(iii)). |
| • For person's exclusive use,<br>• **Not** for resale or transfer,<br>• **Not** permanently exported, *and*<br>• Ultimately returned to U.S., unless ammunition used, or authorized under (e)(4). | Commodities must be for person's exclusive use and not for resale or other transfer of ownership or control and may not be exported permanently, except as provided in paragraph (e)(4).  All firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and all unused ammunition controlled under ECCN 0A505.a must be returned to the United States, except as provided in paragraph (e)(4).  (*See* § 740.14(e)(3)(iv) and (e)(4)). |

38

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

| CBP requirements prior to departure: | Travelers leaving the United States temporarily are required to: |
|---|---|
| • Declare items to CBP, <br> • Present items to CBP for inspection, _and_ <br> • Confirm eligibility/compliance under BAG. | • declare firearms, "parts," "components," "accessories," "attachments," and ammunition being exported to a Customs and Border Protection (CBP) officer prior to departure from the United States, <br> • present such items to the CBP officer for inspection, _and_ <br> • confirm that the authority for the export is License Exception BAG and that the exporter is compliant with its terms. <br><br> (_See_ § 740.14(e)(3)(v)). |

**Q.61: Do these additional requirements in § 740.14(e)(3)(i)-(v) apply regardless of the mode of transportation that I use to export my firearm and ammunition?  For example, if instead of using a common carrier, _e.g._, an airline, train or bus, I use my personal vehicle to export the firearms and ammunition across the Canadian or Mexican border am I still required to meet the same additional requirements?**

**A.61:**  Yes.  The additional requirements apply regardless of the mode of transportation used to export the firearm or ammunition.  The additional requirements would also apply to someone walking across the border to Canada or Mexico or sailing to Bermuda with firearms or ammunition being authorized under License Exception BAG.

**Q.62:  Am I responsible for bringing back to the United States the ECCN 0A501 firearms and 0A505 ammunition that I exported under License Exception BAG?**

**A.62:**  Yes, ECCN 0A501 firearms and 0A505 unused ammunition must be returned to the United States if exported under License Exception BAG.  If the items are to be permanently exported, except for used ammunition, another EAR authorization will be required to authorize the permanent export, _e.g._, a BIS license.

As specified in paragraph (e)(3)(iv) of License Exception BAG, the commodities must be for the person's exclusive use and _not_ for resale or other transfer of ownership or control.  Firearms, "parts," "components," "accessories," "attachments," and ammunition, may not be exported permanently under License Exception BAG, except as provided in paragraph (e)(4) (an authorization for a nonimmigrant alien leaving the United States).  All firearms, "parts,"

39

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

"components," "accessories," or "attachments" controlled under ECCN 0A501 and all unused ammunition controlled under ECCN 0A505.a exported under License Exception BAG must be returned to the United States.  The only exception to that requirement is paragraph (e)(4) of License Exception BAG that authorizes a nonimmigrant alien leaving the United States to export or reexport only such firearms controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505 as he or she brought into the United States under the relevant provisions of Department of Justice regulations at 27 CFR part 478.

**Q.63:  What if I was planning to live overseas for two years and had brought one firearm with me that had been authorized under License Exception BAG, but I no longer have time for competitive shooting after one year of living overseas, so I have decided to sell the firearm to someone in that foreign country.  Is this permissible under the EAR and what would I need to do in order to transfer (in-country) the firearm to another person?**

**A.63:**  You will need another EAR authorization to authorize the transfer (in-country) or reexport in that fact pattern.  In that fact pattern, it would be highly unlikely that another EAR license exception would be available, except possibly License Exception GOV under paragraphs (b)(2)(i) and (ii), so most likely you would need to apply for and obtain a BIS license prior to transferring (in-country) or reexporting that firearm.

**Q.64:  I understand that I am responsible for returning the firearm to the United States that was exported under License Exception BAG.  I intend to return the firearm to the United States, but what happens if the firearm is stolen while I am out of the United States?  What do I need to do in that situation?**

**A.64:**  To avoid this type of situation, you should take reasonable steps to maintain effective control of the firearm while you are outside of the United States.  Before using License Exception BAG you should evaluate whether you will be able to maintain effective control of the firearm while outside the United States and develop your own compliance plan for what safeguards you will take to ensure effective control of the firearm.

BIS realizes that even with the best efforts to safeguard a firearm or other item, that sometimes things can get stolen or lost.  If this occurs, you will be in violation of the terms of License Exception BAG, so it is important that you document as much as possible the theft or how the firearm was lost.  For example, filing a police and/or hotel report that documents that you reported the firearm stolen are ways to start documenting what occurred.  Contacting BIS's Office of Export Enforcement (OEE) to inform them of the loss of the firearm is also advisable to document with BIS that the terms of License Exception BAG were not complied with, and try to establish that you were not the party that was responsible for violating the terms of License

40

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

Exception BAG.  If the firearm was lost, the specifics of how the firearm was lost will be important.

## License Exception TMP

(§ 740.9)

**Q.65:  Is License Exception TMP under § 740.9 paragraph (a) available for firearms controlled under ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502?**

**A.65:**  Yes, for certain destinations, but only paragraphs (a)(5) (*Exhibition and demonstration*) and (a)(6) (*Inspection, test, calibration, and repair*) of paragraph (a) of License Exception TMP are available for firearms controlled under ECCN 0A501.a or .b, or for shotguns with a barrel length less than 18 inches controlled under ECCN 0A502.  Paragraph (a) of License Exception TMP does not authorize any export or reexport of firearms controlled under ECCN 0A501.a or .b, or shotguns with a barrel length less than 18" controlled under ECCN 0A502 *to, or* any *export of such an item that was imported into the U.S. from*, a country in D:5, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan.

**Q.66:  Is there a limit on the quantity of firearms controlled under ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502 that may exported under License Exception TMP under paragraphs (a)(5) and (a)(6)?**

**A.66:**  Yes, there is a limit.  Paragraph (a)(5) and (a)(6) of License Exception TMP may not be used to export more than 75 firearms per shipment.

**Q.67:  Are the other items controlled under 0x5zz ECCNs also limited to paragraphs (a)(5) and (a)(6) as the only paragraph (a) authorizations being available under License Exception TMP?**

**A.67:**  No.  The other items controlled under 0x5zz ECCNs, (*i.e.*, any 0x5zz item other than firearms controlled under ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502) may be eligible for the other authorizations under § 740.9(a), provided none of the general restrictions in § 740.2 apply and all of the applicable terms and conditions of that particular paragraph of License Exception TMP are met.

41

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

**Q.68:** **My company provides maritime cargo transport services, including in certain waters that are known danger spots for pirating activities. In order to defend against possible pirate attacks my company provides the crew on these vessels with ten firearms that are classified under ECCN 0A501.a. The crew will maintain effective control of the ECCN 0A501.a firearms, and the firearms will be returned to the United States within one year. Based on the answers above, is my understanding correct that the tools of trade authorization of License Exception TMP under paragraph (a)(1) (*Tools of trade*) is *not* available to authorize this export?**

**A.68:** Your understanding is correct. Firearms controlled under ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502 are *not* eligible for the tools of trade authorization under License Exception TMP. A license would be required to authorize this type of export. In applying for a license for such an export, including a letter of explanation that explains the need for your people to have these firearms onboard and highlighting that the crew will maintain effective control of the firearms and the firearms will be returned to the United States are helpful things to highlight in the license application. You may also highlight in such an application why you believe such an export is consistent with U.S. national security and foreign policy objectives, *e.g.*, highlighting that you believe that these firearms onboard may help reduce the chance of the ship's crew being taken captive. You may also include whether the same types of transactions had been authorized previously under ITAR.

**Q.69:** **Are there any additional export clearance requirements that need to be complied with for exports of firearms controlled under ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502 when using License Exception TMP?**

**A.69:** Yes, in accordance with the requirements in § 758.1(b)(9) and (g)(4)(i) of the EAR, the exporter or its agent must provide documentation that includes the serial number, make, model, and caliber of each firearm being exported by filing these data elements in an EEI filing in AES for exports authorized under License Exception TMP under paragraphs (a)(5) or (6).

**Q.70:** **Is License Exception TMP under paragraph (b)(5) available to authorize the export of firearms controlled under ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502 that were imported temporarily into the U.S.?**

**A.70:** Yes, License Exception TMP under paragraph (b)(5) (*Exports of firearms and certain shotguns temporarily in the United States*) is available to authorize certain exports of firearms controlled under ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502. Paragraph (b)(5) authorizes the export of *no* more than 75

42

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

firearms per shipment controlled by 0A501.a or .b, or shotguns with a barrel length less than 18" in 0A502 temporarily in U.S. for a period *not* exceeding one year, provided:

- *Not* shipped from or manufactured in D:5; and

- *Not* shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model that is specified under Annex A in Supplement. No. 4 to part 740.

- *Not* ultimately destined to D:5 or Russia; and

- When firearms entered U.S. as a temporary import, temporary importer or its agent must have done the following:

  - Provided the following statement to U.S. Customs and Border Protection (CBP): *"This shipment will be exported in accordance with and under the authority of License Exception TMP (15 CFR 740.9(b)(5));"*

  - Provided to CBP an invoice or other appropriate import-related documentation (or electronic equivalents) that includes complete list and description of firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; *and*

  - Provided (if temporarily imported for trade show, exhibition, demonstration, or testing) to CBP relevant invitation or registration documentation for event *and* an accompanying letter that details arrangements to maintain effective control of firearms while in U.S.

- The exporter or its agent must provide import documentation to CBP at the time of import also to CBP at time of export.

**Q.71:  Are there additional requirements for firearms that enter the United States as a temporary import for subsequent export under License Exception TMP under paragraph (b)?**

**A.71:**  Yes.  Paragraph (b)(5) imposes additional requirements that need to be met for firearms under 0A501.a and .b that are imported for subsequent export under License Exception TMP.

## License Exception RPL

(§ 740.10)

43

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

**Q.72:  If I exported an ECCN 0A501.a firearm to Australia under a BIS license and subsequently I need to send a replacement component for use in the firearm, is there an EAR license exception that may be available?**

**A.72:**  License Exception RPL under § 740.10 is a transaction based license exception that may be available in this fact pattern, provided the export is not restricted under § 740.2 and meets the applicable requirements under paragraph (a) of License Exception RPL.  Paragraph (a) authorizes the export and reexport of one-for-one replacement parts, components, accessories, and attachments for previously exported equipment or other end items.  In order to use License Exception RPL under paragraph (a), the replacement component must not improve or change the basic design characteristics, *e.g.*, as to accuracy, capability, performance or productivity, of the firearm upon which they will be installed.

**Q.73:  As a follow up to Q.72, if the scenario was the same, but this time instead of sending a replacement component to the person that bought the firearm in Australia, the person in Australia will temporarily return the firearm to me in the United States for repair and servicing.  After repairing and servicing, I will export the item back to the person in Australia.  Is License Exception RPL available to authorize that type of a transaction?**

**A.73:**  Yes, License Exception RPL under § 740.10 may be available in that type of fact pattern to authorize the export, provided the export is not restricted under § 740.2 and meets the applicable requirements under paragraph (b) of License Exception RPL.  The export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 temporarily in the United States for servicing and replacement may be exported under paragraph (b)(2) or (3) of this section only if the additional requirements in paragraph (b)(4) of this section are also met.  *See* § 758.10 for the entry clearance requirements that would need to be met for a temporary import for subsequent export under License Exception RPL.

## License Exception GOV

(§ 740.11)

**Q.74:  Are firearms controlled under ECCN 0A501.a, or .b, eligible for License Exception GOV?**

**A.74:**  Yes, but only for paragraphs (b)(2)(i) and (ii) of the United States Government authorization.  No other authorizing paragraphs of License Exception GOV are available for commodities listed in ECCN 0A501.

44

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

**Q.75: Are other 0x5zz items, (*i.e.*, 0x5zz items other than those controlled under ECCN 0A501), eligible for License Exception GOV? For example, are paragraph (c) (Cooperating Governments and the North Atlantic Treaty Organization) and other authorizing sub-paragraphs of (b)(2) of the United States Government authorization under License Exception GOV available?**

**Q.75:** Other 0x5zz items, *e.g.*, ammunition controlled under ECCN 0A505, are eligible for other authorizing paragraphs under License Exception GOV, including paragraph (c) and (b)(2)(iii), provided the export, reexport, or transfer (in-country) is *not* restricted under any of the general restrictions in § 740.2 and meets all of the applicable requirements of that authorization under License Exception GOV under § 740.11.

**Q.76: Can License Exception GOV under paragraph (b)(2)(ii) be used to authorize the export of pistols controlled under ECCN 0A501.a to a contractor providing security at a U.S. Government facility outside the United States?**

**A.76:** No. Private security contractors are not 'contractor support personnel' for purposes of paragraph (b)(2)(ii) of License Exception GOV under § 740.11 because although they may work within a U.S. Government owned or operated facility, such contractors do not provide administrative, managerial, scientific or technical support under contract to the U.S. Government. A BIS license would be required. In the license application it would be helpful to include a letter of explanation that describes how the contractors are providing security for a U.S. Government facility outside the United States, including any documentation, *e.g.*, a contractor with the U.S. Government that establishes there is such a contractual relationship in place with the U.S. Government to provide such security services.

## License Exception STA
(§ 740.20)

*Note 1:* The Commerce final rule revised License Exception STA to make firearms under 0A501 and most "parts," "components," "accessories," and "attachments" under 0A501 not eligible for STA. Only "parts," "components," "accessories," and "attachments" under 0A501.x are eligible for STA.

*Note 2:* The Commerce final rule revised License Exception STA to make shotguns with barrel length less than 18 inches controlled under 0A502 not eligible for STA.

45

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

**Q.77: I understand that License Exception STA is not a list based license exception, but how do I determine whether my ECCN is excluded from or eligible for STA?**

**A.77:** You are correct that License Exception STA is not a list based license exception. In order to determine if the item or your country group is excluded from License Exception STA, you will need to clear three regulatory hurdles before determining your item and country group is eligible for License Exception STA.

- The first hurdle that needs to be cleared is to review the ECCN and determine if your item is excluded under the *Special Conditions for STA* section of the ECCN. The *Special Conditions for STA* section of the ECCN may also exclude country groups, which is typically an exclusion for Country Group A:6 when applicable.

- The second hurdle that needs to be cleared is reviewing § 740.2. License Exception STA may not be used if any of these general restrictions apply to the export, reexport, or transfer (in-country). For the "600 series" ECCNs in the Commerce final rule (0A602, 0B602, 0D602 and 0E602), § 740.2(a)(13) excludes Country Group A:6 from the use of License Exception STA for all "600 series" items.

- The third hurdle that needs to be cleared is reviewing § 740.20(b)(2) *(Limitations on use of License Exception STA)*. Paragraph (b)(2) includes a large number of ECCN specific exclusions when License Exception STA is not available to authorize an export, reexport, or transfer (in-country). Almost all of these exclusions in (b)(2) apply to all of STA – meaning they exclude Country Groups A:5 and A:6. Paragraph (b)(2)(ii)(A) and (B) include exclusions for 0A501.a, .b, .c, .d, or .e, 0A503, 0E503 and shotguns with barrel length less than 18 inches controlled in 0A502, so none of License Exception STA is available for those 0x5zz items.

BIS has included the following table, **Cheat Sheet for License Exception STA Eligibility for 0x5zz and 0A602, 0B602, 0D602, and 0E602,** that reflects the results of the analysis for reviewing the three hurdles referenced above for the 0x5zz and 0A602, 0B602, 0D602 and 0E602 ECCNs. BIS includes this information to assist your understanding of when License Exception STA may be available.

*ECA 8: Cheat Sheet for License Exception STA Eligibility for 0x5zz and 0A602, 0B602, 0D602, and 0E602*

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

*Note:* *In order to use License Exception STA, the item would need to be "subject to the EAR," and the export, reexport, or transfer (in-country) would need to not be restricted under § 740.2 and meet all of the applicable terms and conditions of License Exception STA under § 740.20.*

| Excluded from License Exception STA | |
| --- | --- |
| **0x5zz items excluded from STA based on § 740.20(b)(2)(ii).** | • 0A501.a, .b, .c, .d, .e<br>• 0A503<br>• 0E504<br>• Shotguns with barrel length less than 18 inches controlled in 0A502 |
| **Country Group A:6 excluded from STA based on the *Special Conditions for STA* sections in the 0x5zz and "600 series" (0A602, 0B602, 0D602, 0E602) ECCNs.** | • 0A501<br>• 0A505<br>• 0A602 *(Also excluded because of § 740.2(a)(13))*<br>• 0B501<br>• 0B505<br>• 0B602 *(Also excluded because of § 740.2(a)(13))*<br>• 0D501<br>• 0D505<br>• 0D602 *(Also excluded because of § 740.2(a)(13))*<br>• 0E501<br>• 0E505<br>• 0E602 *(Also excluded because of § 740.2(a)(13))* |
| Eligible for License Exception STA for Country Group A:5 | |
| **0z5zz and "600 series" (0A602, 0B602, 0D602, 0E602) items eligible for STA for Country Group A:5.** | • 0A501.x *(Not eligible for Canada and Argentina because of the FC control)*<br>• Shotguns with barrel length 18 inches or over in 0A502 *(Not eligible for Canada and Argentina because of the FC control)*<br>• 0A504 *(Not eligible for Canada and Argentina because of the FC control for 0A504.a, .b, .c, .d, .e, .g, and .i)*<br>• 0A505 *(Not eligible for Canada and Argentina because of the FC control)*<br>• 0B501<br>• 0B505<br>• 0D501<br>• 0D505<br>• 0E501<br>• 0E502 |

47

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

| | <ul><li>0E505</li><li>0A602</li><li>0B602</li><li>0D602</li><li>0E602</li></ul> |
|---|---|
| **Eligible for License Exception STA for Country Group A:5 and A:6** | |
| **0z5zz items eligible for STA for Country Group A:5 and A:6.** | <ul><li>Shotguns with barrel length 18 inches or over in 0A502 (*Not eligible for Canada and Argentina because of the FC control*)</li><li>0A504</li><li>0E502</li></ul> |

**Q.78: Can License Exception STA be used to authorize the export, reexport, or transfer (in-country) of ECCNs 0A501.x or 0A505 commodities that are controlled for the Firearms Convention (FC)?**

**A.78:** No.

**Q.79: Reviewing the table above for License Exception STA availability, it appears there is very limited License Exception STA eligibility for ECCN 0A501. Am I understanding the table correctly that no end-item firearms under ECCN 0A501.a or .b are eligible for License Exception STA and the only parts and components that are eligible for License Exception STA are those controlled under 0A501.x?**

**A.79:** You are understanding the table correctly. License Exception STA for ECCN 0A501 is only available for the parts and components under 0A501.x. No other commodities controlled under ECCN 0A501 are eligible for License Exception STA.

**Q.80: Does the *Note to paragraph (c)(1)* of License Exception STA also apply for items in 0x5zz ECCNs or is that note limited to "600 series" items?**

**A.80:** The *Note to paragraph (c)(1)* is only required for the "600 series." It is *not* required for the 0x5zz items that are eligible for License Exception STA, or for any other items that may be eligible for License Exception STA that are *not* in the "600 series," *e.g.*, 9x515 spacecraft related items.

48

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

## Licensing Process

**Q.81:  Under the BIS licensing system, do I have to apply for licenses based only on the quantities in the purchase order, or can I apply for higher quantities?  Do I have to include a copy of the purchase order with the license application?**

**A.81:**  You do not need to include a purchase order with your export application.  However, BIS advises you to provide sufficient rationale of the quantity requested to be exported – this can include past purchasing history and anticipated or projected sales.  BIS export licenses are valid for a four-year timeframe, so it is recommended that an application include future sales to cover future customer orders.

**Q.82:  Because of the great variety of firearm models and configurations for a particular model family, what specific information do I need to put on the license application to describe the firearm?**

**A.82:**  Sufficient details are required so that the BIS Licensing Officer can confirm that the ECCN is correct.  However, the exporter should include a number of configurations – caliber, barrel length, metal finish, and other specifics in the commodity description – to allow sufficient flexibility for sales to a commercial market.  Purchase orders and manufacturing serial numbers are *not* required in advance to receive an export license.

## Conventional Arms Reporting

**Q.83:  What 0x5zz items are subject to conventional arms reporting?**

**A.83:**  In § 743.4 (Conventional arms reporting), as specified in paragraphs (c)(1)(i) and (c)(2)(i), ECCN 0A501.a and .b are commodities that require Wassenaar Arrangement reporting and United Nations reporting under this conventional arms reporting section of the EAR.

**Q.84:  Instead of making semi-annual reports to BIS for the conventional arms reporting is there any alternative method for submitting this same information to BIS that may be less burdensome?**

**A.84:**  Yes, an exporter will have two options for submitting the required information needed for the conventional arms reporting.  The first method is referred to as the standard method whereby the exporter is required to submit semi-annual reports to BIS following the requirements of § 743.4.  The second method is referred to as the alternative method and is

49

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

specified in §§ 743.4(h) and 758.1(g)(4)(ii). If the exporter follows the requirements specified in § 743.4 for the alternative submission method described in new paragraph (h) (*Alternative submission method*), that separate reporting does not need to be made to BIS for purposes of § 743.4. Because of the EEI filing requirements in AES in new § 758.1(g)(4)(ii) for the firearms that require conventional arms reporting, all conventional arms reporting requirements for firearms should be able to be met by using the alternative submission method.

**Q.85: If an exporter prefers to use the standard method instead of the alternative method for submitting the semi-annual conventional arms reports is that permissible under the EAR?**

**A.85:** BIS was anticipating based on the comments received on the Commerce proposed rule that all exporters would prefer the alternative submission method under § 743.4(h). If the exporter prefers to use the standard method for submitting the semi-annual reports that is permissible, and then the information in § 758.1(g)(4)(ii) would not be required to be reported in the EEI filing in AES.

**Q.86: I do not see BIS licenses referenced in § 743.4. Do exports of ECCN 0A501.a and .b commodities authorized under BIS licenses also require Wassenaar Arrangement reporting and United Nations reporting under this conventional arms reporting section of the EAR. If it does require reporting, how will BIS obtain the information needed for this reporting and why were BIS licenses not referenced in § 743.4?**

**A.86:** Exports of ECCN 0A501.a and .b commodities authorized under BIS licenses require Wassenaar Arrangement and United Nations conventional arms reporting. BIS will be able to obtain this information using the BIS licensing system data, so no separate reporting is required by exporters for BIS to be able to collect the necessary information BIS needs for compiling the semi-annual reports to the Wassenaar Arrangement and United Nations for conventional arms reporting.

## Export Clearance Requirements

*Note: As specified in § 758.3(a) (Export transactions), "The U.S. principal party in interest is the exporter, except in certain routed transactions. The exporter must determine licensing authority (License, License Exception, or NLR), and obtain the appropriate license or other authorization. The exporter may hire forwarding or other agents to perform various tasks, but doing so does not necessarily relieve the exporter of compliance responsibilities."*

50

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

**Q.87:  Are there any additional export clearance requirements that are applicable to 0x5zz[3] ECCNs?**

**A.87:**  Yes, there are additional export clearance requirements that are applicable to certain 0x5zz ECCNs.  Specifically, for firearms controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, there are additional export clearance requirements that are only applicable to those commodities.

**Q.88:  Do these additional export clearance requirements for 0x5zz items mean an exporter or other party designated to assist the exporter with export clearance responsibilities, *e.g.*, a freight forwarder, will need to know whether the 0x5zz items being exported are controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c?**

**A.88:**  Yes, to make a proper determination regarding your export clearance requirements for 0x5zz items, the exporter or other party designated to assist the exporter with export clearance responsibilities, *e.g.*, an authorized agent, will need to know whether the 0x5zz items being exported are controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c.  Therefore, for exporters that have designated some other party to assist with export clearance responsibilities, *e.g.*, an authorized agent, it is important this classification information is communicated to those other parties in the transaction.  The U.S. Principal Party in Interest (USPPI), consistent with the requirements in § 758.3(a), must determine whether a license exception can be used for the 0x5zz to the subparagraph level classification (*e.g.*, 0A501.x) and therefore should provide the forwarder/filing agent with the ECCN, including the subparagraph level classification and the applicable EAR License Exception or license field.  For example, if an exporter has authorized an agent to file EEI in the AES on their behalf for an export of a commodity controlled under ECCN 0A501, the authorized agent will have a practical need to know whether the export is for an end-item firearm controlled under 0A501.a or .b, or for some other commodity under 0A501 and ideally this should be communicated on the Shippers Letter of Instruction from the USPPI to the authorized agent (*see* Q.100).  In addition to export clearance requirements, there are other EAR requirements tied to whether the commodity is an end-item firearm in ECCN 0A501.a or .b, such as what license exceptions will be available.  For example, License Exceptions LVS (§ 740.3) and STA (§ 740.20) are *not* available for 0A501.a or .b, but are available for a commodity controlled under 0A501.x, provided the

---

[3] The 0x5zz ECCNs do not include the 0Y521 ECCNs (0A521, 0B521, 0C521, 0D521, and 0E521).

51

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

export was not otherwise restricted under § 740.2 and met all the applicable requirements of License Exceptions LVS or STA.

**Q.89: When is filing EEI in AES required for 0x5zz ECCNs that are not controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c?**

**A.89:** The filing EEI in AES requirements for these other 0x5zz items follow the normal rules for filing and are specified in § 758.1(b)(1) and (b)(2), and (b)(4)-(b)(8).

*Note 1: The requirements for filing EEI in AES for the commodities controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c are specified in new § 758.1(b)(9).*

*Note 2: The requirements for filing EEI in AES for "600 series" (including new 0A602, 0B602, 0D602, and 0E602) and 9x515 .a through .x items are specified in § 758.1(b)(3).*

**Q.90: I have a $500 export of "parts" "specially designed" for use in firearms controlled under ECCN 0A501.x to Germany (a Country Group B country under Supplement No. 1 to part 740). The export will be authorized under License Exception LVS under § 740.3. I have reviewed § 758.1(b)(1) and (b)(2), and (b)(4)-(b)(8) and none of those filing EEI in AES requirements apply.**

**Q.90.a: Am I correct that I do not have to file EEI in AES for this export?**

**A.90.a:** That is correct. ECCN 0A501.x commodities are not within the scope of § 758.1(b)(9). Therefore, if none of the other requirements in § 758.1(b)(1) and (b)(2), and (b)(4)-(b)(8) that could be applicable to a 0x5zz ECCN apply, you are *not* required to file EEI in AES.

**Q.90.b: In this export where I am not required to file EEI in AES, is there any other document where I would need to specify the authorization being used to authorize this export to Germany?**

**A.90.b:** As specified in § 758.1(d) (*Notation on export documents for exports exempt from EEI filing requirements),* when an exemption from filing the EEI applies, the export authority (license exception or NLR) of all the items must be entered on the loading document (*e.g.*, Cargo Declaration, manifest, bill of lading, (master) air waybill) by the

52

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

person responsible for preparing the document, see 15 CFR 30.35 of the FTR. This requirement is intended to parallel the Bureau of Census requirement, so that the basis for the EEI exemption and the license authority are entered in the same place and manner (see 15 CFR 30.45(e) and (f) of the FTR for detailed requirements). The loading document must be available for inspection by government officials, along with the items, prior to lading on the carrier.

**Q.90.c:  If instead of exporting $500 of "parts" "specially designed" for use in firearms controlled under ECCN 0A501.a to Germany, I will now be exporting $20,000 of these same "parts" to Germany and am therefore no longer eligible for License Exception LVS.  I will instead be using the authorization of License Exception STA, and I assume that I will be required to file EEI in AES for this export because of STA and the value of the export exceeds $2,500.  Is my understanding correct?**

**A.90.c:**  Yes, in the new scenario, filing EEI in AES is required because the export is being authorized under License Exception STA, so the requirement § 758.1(b)(4) would apply and the value of the commodities classified under a single Schedule B Number (or HTS) is over $2,500, meaning § 758.1(b)(5) would also apply.

**Q.91:  When is filing EEI in AES required for commodities controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c?**

**A.91:**  Filing EEI in AES is required for all exports of these firearms regardless of dollar value or destination, except for those authorized under License Exception BAG.  As specified in new § 758.1(b)(9), filing EEI in AES is required for all exports, except for exports authorized under License Exception BAG, as set forth in § 740.14 of the EAR, of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada.

**Q.92:  If I am going on a trip to Italy with my personally owned rifle controlled under 0A501.a and 200 rounds of ammunition controlled under ECCN 0A505.a for a shooting competition and the export will be authorized under License Exception BAG, based on the answer to A.91 above, I understand filing EEI in AES is not required.  However, are there any other export clearance requirements under the EAR that I need to be aware of for this export, such as other documents that are used for export clearance purposes?**

53

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

**A.92:**  The export clearance requirements of § 758.11 Export clearance requirements for firearms and related items applies to all exports of commodities controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, and ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada, that are authorized under License Exception BAG, as set forth in § 740.14.  Prior to making any export described in paragraph (a) of § 758.11, the exporter is required to submit a properly completed Department of Homeland Security, CBP Form 4457, (Certificate of Registration for Personal Effects Taken Abroad) (OMB Control Number 1651-0010), to the U.S. Customs and Border Protection (CBP), pursuant to 19 CFR 148.1, and as required by this section of the EAR.

Also as specified in *Note 1 to paragraph (c)(1)* of § 758.1, exporters are directed to see the export clearance requirements for exports of firearms controlled under ECCN 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505, authorized under License Exception BAG, as set forth in § 740.14 of the EAR.  These requirements are specified in paragraph (e) (*Special provisions for firearms and ammunition*) under paragraphs (e)(3) and (e)(4).  For example, paragraph (e)(3)(iii) specifies that the commodities must be with the person's baggage.  In addition, paragraph (e)(3)(iv) specifies that travelers leaving the United States temporarily are required to declare the firearms, "parts," "components," "accessories," "attachments," and ammunition being exported under this license exception to a Customs and Border Protection (CBP) officer prior to departure from the United States and present such items to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG and that the exporter is compliant with its terms.

**Q.93:  Where to obtain the CBP Form 4457?**

**A.93:**  The CBP Certification of Registration Form 4457 can be found on the following CBP website:

https://www.cbp.gov/document/forms/form-4457-certificate-registration-personal-effects-taken-abroad

**Q.94:  Where to find additional information on the CBP Form 4457?**

**A.94:**  *See* the following CBP website page for additional information:

https://help.cbp.gov/app/answers/detail/a_id/323/~/traveling-outside-of-the-u.s.---temporarily-taking-a-firearm%2C-rifle%2C-gun%2C.

54

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

**Q.95: Upon returning from a trip in which I used License Exception BAG to take my personal firearm to Italy, am I required to show the CBP Form 4457 when I return to the United States?**

**A.95:** Yes, as specified in § 758.11(d), the exporter when returning with a commodity authorized under License Exception BAG and exported pursuant this section (*i.e.*, commodities controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c), is required to present a copy of the CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad) (OMB Control Number 1651-0010), to CBP, pursuant to 19 CFR 148.1, and as required by § 758.11(d) of the EAR.

**Q.96:  Is the CBP Form 4457 an "export control document" under the EAR?**

**A.96:**  Yes, the CBP Form 4457 is an "export control document" under the EAR for exports authorized under License Exception BAG that require a CBP Form 4457 to be submitted pursuant to § 758.11.  As specified in § 762.2(a)(1), records required to be retained include "export control documents" as defined in part 772.  The definition of "export control documents" in § 772.1 includes "any and all documents prepared and submitted by exporters and agents pursuant to the export clearance requirements of part 758 of the EAR," which would include the new § 758.11.

In addition, under § 762.2, new paragraph (a)(11) documents to be retained include documents that contain the serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502 that have been exported and the CBP Form 4457.  The "exporter" or any other party to the transaction (*see* § 758.3 of the EAR) that creates or receives such records is the person responsible for retaining this record.

**Q.97:  What type of oversight is being provided with the use of the CBP Form 4457 for such exports under License Exception BAG?**

**A.97:**  The U.S. Government maintains oversight through the requirement in the final rule for the CBP Form 4457 to be filed as specified in § 758.11, along with the export requirements to present the firearm to CBP prior to export under License Exception BAG in § 740.14(e)(3)(iv).  In addition, the final rule requires the serial number, make, model, and caliber of the firearm to be included on the CBP Form 4457.  When the U.S. citizen or permanent resident alien returns, the U.S. Government requires that the same firearm be returned as stated on the CBP Form 4457.

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

Failure to comply with these requirements could subject a U.S. citizen or permanent resident alien to administrative and/or criminal penalties depending on the specifics of the potential violation.

**Q.98:  What exports require identifying firearms by manufacturer, model, caliber, and serial number in the EEI filing in AES?**

**A.98:**  As specified in § 758.1(g)(4)(i), for any export authorized under License Exception TMP or a BIS license authorizing a temporary export of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing, you must report the manufacturer, model, caliber, and serial number of the exported items in the EEI filing in AES.  Providing the manufacturer and caliber information, *e.g.*, Smith & Wesson M&P 9mm gun, will give the U.S. Census Bureau enough information to verify the Schedule B number per 15 CFR 30.6(a)(13).  If License Exception TMP is used, the EEI filing must include the Export Information Code TE to specify that the shipment is temporary.  The requirement in paragraph (g)(4)(i) also applies to any other export authorized under a BIS license that includes a condition or proviso on the license requiring the submission of this information specified in paragraph (g) of § 758.1 when the EEI is filed in AES.  Therefore, the number of exports requiring this additional information in the EEI filing in AES will be a small sub-set of the total exports of 0x5zz ECCNs.  As noted above, this is another example of where it will be important for the parties involved in export clearance to know whether they are exporting commodities controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502 because the export clearance requirements will be different compared to other 0x5zz items.

**Q.99:  In reviewing the requirement in § 758.1(g)(4)(ii), it appears there is the wrong ECCN in the phrase *0A501 barrel length less than 18 inches*?  The rest of paragraph (g)(4)(ii) correctly references ECCN 0A502 when referring to the shotguns with barrel length less than 18 inches, so it is clear that what is intended is 0A502, but is this something BIS intends to correct?**

**A.99:**  Yes, there is a typo in that ECCN in § 758.1(g)(4)(ii).  BIS intends to correct this in an upcoming correction rule.

**Q.100:  I do not have a concern with entering 0A501.a or 0A501.b in the Commodity Description block in the EEI filing in AES as required under § 758.1(g)(4)(ii).  However, I am concerned about having to include the phrase *0A502 barrel length less than 18 inches* as required because of the length of that phrase.  The current character limitation of the**

56

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

**Commodity Description block in the EEI filing in AES is 45 characters. Would it be acceptable to BIS to instead use the shorter phrase *0A502sb*? This alternative phrasing would include the ECCN 0A502 and sb (short barrel) to indicate the commodity was a shotgun with a barrel length less than 18 inches? Also given that 0A501 or 0A502 are required to be entered in the ECCN block, does the ECCN need to be restated in the Commodity Description block?**

**A.100:** BIS will permit the alternative shorter formulation of *0A502sb* to be used, as well as the option to use the full phrase *0A502 barrel length less than 18 inches* in the Commodity Description block in the EEI filing in AES when meeting the requirement under § 758.1(g)(4)(ii). BIS had used the phrase *0A502 barrel length less than 18 inches* because ECCN 0A502 does not have an "items" paragraphs, but using 0A502sb would allow BIS to identify those as short barrel shotguns, so allowing this flexibility in meeting the requirement in § 758.1(g)(4)(ii) is acceptable to BIS. As an additional space saving option, it is also permissible to include .a (instead of 0A501.a), .b (instead of 0A502.b), or .sb (instead of the phrase *0A502 barrel length less than 18 inches* or the shorter variant *0A502sb*).

**Q.101: I understand that the requirement in § 758.1(g)(4)(ii) was added as an alternative method for those commenters on the proposed rule that requested BIS use the data in AES instead of requiring the submission of semi-annual reports to BIS for the conventional arms reporting under § 743.4. However, if an exporter decides to submit the conventional arms reporting under § 743.4 instead of using the alternative submission method described under §§ 743.4(h) and 758.1(g)(4)(ii), does the same exporter still have to comply with § 758.1(g)(4)(ii)? I do not believe that would be the case, but please confirm.**

**A.101:** If an exporter decides to not use the alternative submission method described under §§ 743.4(h) and 758.1(g)(4)(ii) and instead submits the reports to BIS pursuant to § 743.4, the exporter would no longer have to comply with the requirements in § 758.1(g)(4)(ii) because they would be fulfilling their EAR conventional arms reporting by the standard submission method as described under § 743.4.

**Q.102: Can BIS provide any guidance on what to consider before an exporter decides on whether to use the standard submission method under § 743.4 or the alternative submission method described under §§ 743.4(h) and 758.1(g)(4)(ii)?**

**A.102:** Before deciding on which of the submission methods to use, the exporter should confirm that whichever option is used, the exporter will be able to follow those requirements consistently. If the exporter will be the one filing the EEI in AES, this will be an easier determination to make. If the exporter is designating another party to file the EEI in AES, *e.g.*, a freight forwarder, and the exporter intends to use the alternative submission method, the

57

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

exporter should communicate with that other party to make them aware of the exporter's intention for the information in § 758.1(g)(4)(ii) to be submitted for those EEI filings in AES and to ensure that the other party is able to insert that information. If the authorized agent filing EEI on your behalf is not able to comply with the requirements of the alternative submission method, then the exporter will need to use the standard method.

**Q.103: I am an exporter that wants to use the alternative submission method. What are some ways that I can help support my freight forwarder in meeting the filing requirement in § 758.1(g)(4)(ii), so I do not have to use the standard submission method under § 743.4? In addition, do you have suggestions how an exporter may help support their freight forwarder to meet the requirements of § 758.1(g)(4)(i)?**

**A.103:** A good compliance practice is for exporters to include the relevant information in the Shipper Letter of Instruction (SLI), when such a document is being used, to assist the freight forwarder in meeting the filing requirement in § 758.1(g)(4)(ii), as well as in (g)(4)(i). Exporters who send their data electronically to their forwarders by making adjustments in the data to accommodate the new requirements in § 758.1(g)(4)(ii), as well as (g)(4)(i), will make it easier for those filing EEI in AES on an exporter's behalf.

For reference, the National Customs & Forwarders Association of America, Inc. (NCBFAA) as a service to the forwarding industry, includes an SLI model that is available to both members and non-members of NCBFAA. Click here for the SLI model.

The NCBFAA has provided permission for BIS to reference their link to the SLI model document in this FAQ. BIS does not endorse any organization or particular SLI form for submitting information between the parties to the transaction, but because this SLI Model is used as a best practice in the freight forwarding industry and by many exporters, BIS includes it as part of this response to provide an example of how such information may be communicated.

In Block 23 of the SLI model, an exporter can assist by including 0A501.a, or 0A501.b, or the shorter .a or .b, or for shotguns the phrase *0A502 barrel length less than 18 inches* or the shorter *0A502sb* in that block of the SLI as the first text to appear. Also in Block 23 of the SLI model, an exporter can assist for any export authorized under License Exception TMP or a BIS license authorizing a temporary export of ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under 0A502, by including the manufacturer, model, caliber, and serial number for each of the firearms. To further assist, the exporter should put a note in *Instructions to the Forwarder* that the description of the item must be shown on the EEI exactly as it is shown on the SLI. If there is an issue with showing the information shown in Block 23, the forwarder should advise the USPPI as soon as possible for developing a solution.

58

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

## Entry Clearance Requirements for Temporary Imports

**Q.104: Is an authorization required under the EAR to temporarily import an item into the United States?**

**A.104:** No. An authorization under the EAR is *not* required for the temporary import of "items" that are "subject to the EAR," including for "items" "subject to the EAR" that are on the USMIL. There are, however, entry clearance requirements for temporary imports of "items" "subject to the EAR" that are on the USMIL as provided below.

**Q.105: Because an EAR authorization is *not* required to temporarily import an item into the United States, why did BIS add § 758.10 Entry Clearance requirements for temporary imports to the EAR? In addition, what is a temporary import for purposes of this new section?**

**A.105:** Temporary imports are transactions that involve both the temporary entry of an item into the U.S. from a foreign country and the subsequent export of that item from the U.S. To preserve the treatment of temporary import transactions for items that transferred on March 9, 2019, from the USML in the ITAR to become subject to the EAR, BIS imposed a temporary imports entry clearance requirement by adding new § 758.10. This new section is limited to items in the 0x5zz ECCNs that are both "subject to the EAR" and on the USMIL in 27 CFR 447.21. To allow such items to temporarily enter the U.S., the final rule created a process to collect identifying information for the sole purpose of tracking items being temporarily imported for subsequent export. BIS does not impose a license requirement for such imports, but this information is necessary to facilitate the export after a temporary import. Temporary imports are limited to firearms temporarily in the United States for a period *not* exceeding one year (*See* License Exception TMP § 740.9(b)(5) and License Exception RPL § 740.10(b)(4). BIS licenses issued to facilitate the export after a temporary import will include this same one-year time limitation.) The entry clearance requirement is an EAR requirement and any false representation made under the new § 758.10 will be a violation of the EAR.

**Q.106: Do the new entry clearance requirements in § 758.10 apply to all ECCN 0x5zz items?**

**A.106:** No, the entry clearance requirements in § 758.10 only apply to certain ECCN 0x5zz commodities. Section 758.10 imposes temporary import entry clearance requirements for firearms "subject to the EAR" that are on the United States Munitions Import List (USMIL, 27

59

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

CFR 447.21), except for firearms "subject to the EAR" (as well as shotguns controlled under ECCN 0A502, shotgun shells controlled under ECCN 0A505.c, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501, and ammunition controlled under ECCN 0A505.a) that are temporarily brought into the United States by nonimmigrant aliens under the provisions of Department of Justice regulations at 27 CFR part 478 (*See* § 740.14(e) of License Exception BAG for information on the export of these firearms "subject to the EAR"). These firearms are controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502.

**Note:** *Items "subject to the EAR" that are also on the USMIL that are conditionally imported for purposes of obtaining ATF classification are subject to the ATF conditional import process pursuant to the applicable ATF provisions at 27 CFR 478.116 or 27 CFR 479.113. The EAR cannot be used to temporarily import items for ATF classification.*

**Q.107: I have some questions regarding if instead of making a temporary import, I am making a permanent import of a firearm controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502.**

**Q.107.a: Is an EAR authorization required for a permanent import?**

**A.107.a:** No. An authorization under the EAR is *not* required for permanent import of "items" that are "subject to the EAR," including for "items" "subject to the EAR" that are on the USMIL.

**Q.107.b: Are permanent imports of a firearm controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 regulated by any other agency?**

**A.107.b:** Yes, as specified in § 758.10(a)(2), permanent imports are regulated by the Attorney General under the direction of the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (see 27 CFR parts 447, 478, 479, and 555).

**Q.108: How will the U.S. Government know when an ECCN 0A501.a or .b or shotgun with a barrel length less than 18 inches controlled in ECCN 0A502 is for temporary import?**

**A.108:** By the temporary importer/subsequent exporter following the entry clearance requirements in § 758.10 under paragraph (b) (*EAR procedures for temporary imports and subsequent exports*), the U.S. Government will be able to confirm whether an ECCN 0A501.a or .b item or shotgun with a barrel length less than 18 inches controlled in ECCN 0A502 is for

60

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

temporary import.  At the time of entry into the United States of the temporary import, the temporary importer must provide one of the following statements specified in paragraphs (b)(1)(i)(A), (B), or (C) of § 758.10, as well as the information in paragraphs (b)(1)(ii)-(iv) as applicable, to U.S. Customs and Border Protection:

> (A) "This shipment is being temporarily imported in accordance with the EAR.  This shipment will be exported in accordance with and under the authority of License Exception TMP (15 CFR 740.9(b)(5));"

> (B) "This shipment is being temporarily imported in accordance with the EAR.  This shipment will be exported in accordance with and under the authority of License Exception RPL (15 CFR 740.10(b));" *or*

> (C) "This shipment is being temporarily imported in accordance with the EAR.  This shipment will be exported in accordance with and under the authority of BIS license number (provide the license number) (15 CFR 750.7(a) and 758.4);"

**Q.109:  If I want to make a temporary import of a firearm controlled under ECCN 0A501.a or .b or shotgun with a barrel length less than 18 inches controlled under ECCN 0A502 where the subsequent export will be authorized under a BIS license, do I need to have obtained the BIS license prior to the temporary import?**

**A.109:**  Yes, in that fact pattern in order for the import to be considered a temporary import under § 758.10, the BIS license needs to have been obtained prior to the firearm under ECCN 0A501.a or .b or shotgun with a barrel length less than 18 inches controlled in ECCN 0A502 being imported.  If a BIS license was not obtained prior to the import, the import would be treated as a permanent import which is subject to other U.S. Government licensing requirements prior to actual importation.  Permanent imports are regulated by the Attorney General under the direction of the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (see 27 CFR parts 447, 478, 479, and 555).

**Q.110:  If I import a firearm under ECCN 0A501.a or .b or shotgun with a barrel length less than 18 inches controlled in ECCN 0A502 as a permanent import as regulated by the Attorney General under the direction of the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (see 27 CFR parts 447, 478, 479, and 555), does that change the EAR license requirements for exports of those firearms under the EAR?**

**A.110:**  No.  The EAR license requirements apply to *all* subsequent exports from the United States regardless of whether a firearm under ECCN 0A501.a or .b or shotgun with a barrel

61

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

length less than 18 inches controlled in ECCN 0A502 was originally imported as a temporary import or permanent import into the United States.

**Q.111: How will the U.S. Government know at the time of subsequent export that a firearm under ECCN 0A501.a or .b or shotgun with a barrel length less than 18 inches controlled in ECCN 0A502 is for subsequent export after temporary import in accordance with the requirements in § 758.10 of the EAR?**

**A.111:** At the time of export, in accordance with the U.S. Customs and Border Protection procedures, the eligible exporter, or an agent acting on the filer's behalf, must as required under § 758.1(b)(9) of the EAR file the export information with CBP by filing EEI in AES, noting the applicable EAR authorization as the authority for the export, and provide, upon request by CBP, the entry document number or a copy of the CBP document under which the "item" "subject to the EAR" on the USMIL was temporarily imported.

For temporary imports made under § 758.10, the only three EAR authorizations that are permissible for authorizing the subsequent export are License Exceptions TMP under § 740.9(b)(5), RPL under § 740.10(b) and BIS licenses. As noted above, firearms "subject to the EAR" (as well as shotguns controlled under ECCN 0A502, shotgun shells controlled under ECCN 0A505.c, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501, and ammunition controlled under ECCN 0A505.a) that are temporarily brought into the United States by nonimmigrant aliens under the provisions of Department of Justice regulations at 27 CFR part 478 (*See* § 740.14(e) of License Exception BAG for information on the export of these firearms "subject to the EAR") are not included in the entry clearance requirements in § 758.10 for temporary imports.

## Changes to EAR Recordkeeping

**Q.112: Which party is responsible for keeping the serial number, make, model, and caliber for exports of any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502 under the new recordkeeping requirement under § 762.2(a)(11)?**

**A.112:** The "exporter" or any other party to the transaction that creates or receives such records is the person responsible for retaining this record.

62

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

**Q.113: Are record holders required to destroy their EAR records after 5 years? I ask this question because the Gun Control Act (GCA) requires all Federal Firearm Licensees (FFLs) to maintain firearm records for 20 years after the date of disposition. I am concerned whether the change requiring records under the EAR as specified in new § 762.2(a)(11) may cause confusion because of the different record retention periods with the EAR requiring 5 years and the GCA requiring 20 years.**

**A.113:** The EAR does not require records to be destroyed after five years, just that the records be kept for at least that long. Nothing in the EAR prohibits maintaining the records for longer periods.

**Q.114: I have a couple of questions regarding the change to § 762.3 (*Records exempt from recordkeeping requirements*), where the Commerce final rule narrowed the scope of an exemption from the EAR recordkeeping requirements for warranty certificates. For warranty certificates for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502, when the certificate issued is for an address located outside the United States, the certificate now required to be retained.**

> **Q.114.a: How can an exporter that is not the manufacturer be in a position to obtain a warranty certificate? Warranties are issued by the manufacturer, not the exporter. For these reasons a potential issue with the recordkeeping requirement of warranty certificates is that an exporter may not have a manufacturer's (or any other) warranty certificate as part of the transaction.**
>
> **A.114.a:** The EAR recordkeeping requirements generally do not impose an affirmative duty to create a record. The recordkeeping requirements typically apply if in the normal course of your business activities related to an export, reexport, or transfer (in-country) a record is created or received that is within the scope of records that must be retained for purposes of the EAR recordkeeping requirements. Therefore, if you as the exporter do not create or receive a warranty certificate, you would not have a recordkeeping requirement to keep the warranty certificate.
>
> **Q.114.b: Can you clarify what types of warranty certificates this requirement applies to? Many manufacturers do not always issue specific warranty certificates to individuals. For example, most manufacturers provide warranty statements in a broad boilerplate statement included in an instruction manual, or on their website. Therefore, there is no way to know when that information is accessed by a foreign person or sent to an address outside the U.S.**

63

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

**A.114.b:** There are three criteria to the warranty certificate requirement in § 762.3 that *all* need to be met for a party to the transaction to be required to keep the warranty certificate. If the answer to any of these three qualifying questions is no, then the warranty certificate does *not* need to be kept for EAR recordkeeping purposes.

**ECA 9:** *Cheat Sheet for Determining Whether a Warranty Certificate Must be Retained for Recordkeeping Purposes*

| Am I required to retain a warranty certificate for EAR recordkeeping purposes? | | |
|---|---|---|
| Q.A | *Was a warranty certificate issued?*<br>• If **no**, you do not have to keep a warranty certificate as an EAR record.<br>• If **yes**, proceed to Question B. | EAR does *not* create an affirmative duty for you to create a warranty certificate. Therefore, if you do *not* create a warranty certificate as part of your normal business activities, you will answer "no" to Question A. |
| Q.B | *Was the warranty certificate issued for a firearm controlled in ECCN 0A501.a or for shotguns with barrel length less than 18 inches controlled in 0A502?*<br>• If **no**, you do *not* have to keep a warranty certificate as an EAR record.<br>• If **yes**, proceed to Question C. | The warranty certificate only applies for those referenced firearms. If the warranty certificate is *not* issued for one of the identified firearms, such as if the warranty certificate was issued for a machine tool, then you would answer "no" to Question B. |
| Q.C | *Was the warranty certificate issued for an address located outside the United States?*<br>• If **no**, you do *not* have to keep a warranty certificate as an EAR record.<br>• If **yes**, the warranty certificate is required to be retained for EAR recordkeeping purposes. | This last criterion in Question C is the key for answering the question in Q.102.b. If the warranty certificate is standard boiler plate text that is included as part of the manual or other documents that accompany the shipment of the firearm that would *not* meet this last criterion, so there would *not* be a recordkeeping requirement for the warranty certificate. If the end user subsequently fills out a postcard or submits an online warranty certificate registration, the party to the export transaction that received that warranty card or online warranty certificate submission will then be required to keep the warranty certificate for that person located outside the United States. |

64

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

**Q.115: I am not the exporter or any other party to the export transaction, but I am a U.S. firearms manufacturer that received a warranty certificate from a person in Japan for a firearm controlled under ECCN 0A501.a. Would I need to keep this warranty certificate as a record under the EAR because of the new requirement in § 762.3?**

**A.115:** If the manufacturer is *not* the exporter, it is *not* required to keep the warranty certificate for purposes of part 762. Section 762.1(b) (*Persons subject to the part*) identifies the persons that are required to keep records for purposes of part 762 of the EAR.

## For Further Information Contacts

**Q.116: For further questions on the Commerce final rule whom should I contact?**

**A.116:** For further questions on the Commerce final rule contact: Steven Clagett, Office of Nonproliferation and Treaty Compliance, Nuclear and Missile Technology Controls Division, tel. (202) 482-1641; e-mail steven.clagett@bis.doc.gov or Jeff Bond, tel. (202) 482-0716; email: Jeff.Bond@bis.doc.gov Office of Nonproliferation and Treaty Compliance, Nuclear and Missile Technology Controls Division for questions regarding the Export Control Classification Numbers (ECCNs) and licensing, as well as Timothy Mooney, Regulatory Policy Division, tel. (202) 482-3371; email timothy.mooney@bis.doc.gov for questions on other changes included in the final rule.

**Q.117: Are there other contacts to assist my understanding of the EAR and the Commerce final rule? I am new to the EAR, so in addition to questions on the Commerce final rule, I also have other questions on understanding the EAR.**

**A.117:** Yes, BIS has several outreach staff available to answer your questions over the phone or by email. These staff have been trained on the Commerce final rule and have expertise in other parts of the EAR to assist your understanding:

- (202) 482-4811 - (located in Washington, DC)

- (949) 660–0144 - (located in Newport Beach, CA)

- (408) 998-8806 - (located in San Jose, CA)

- E-mail: ECDOEXS@bis.doc.gov (General questions about the EAR)

65

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

- E-mail: RPD2@bis.doc.gov (Regulatory interpretation, Advisory Opinions or to submit *De minimis* Reports)

• Anti-boycott Compliance Advice Line - (202) 482-2381, and Encryption – (202) 482-0707

BIS website also includes a significant amount of free information and free online tools to assist your understanding of the EAR under the "Exporter Portal" icon.  Start at www.bis.doc.gov.


# Enforcement

**Q.118:  What can I do if I suspect a violation of the EAR?**

**A.118:**  BIS has a form on its website for reporting suspected violations.  Click here for that page of the BIS website.

Export Enforcement relies heavily on the partnership it has with the business community. Many times it is the information you provide that helps us in our investigations.  By prosecuting those who violate our regulations we are helping the vast majority of exporters who follow the rules and are diligent in their efforts to conduct their affairs in an honest and appropriate manner.  We appreciate your willingness to work with us.  Should you prefer to communicate with BIS enforcement personnel via telephone or to leave a voicemail, please use the Enforcement Hotline 800-424-2980 or contact your local OEE field office directly.  Click here for OEE field office contact information.


**Q.119:  Will U.S. Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI) continue to have the authority and jurisdiction to investigate the illegal export of those items being transferred (firearms, firearms parts, and ammunition) as of March 9, 2020?**

**A.119:**  This transfer does *not* affect ICE HSI's authority or jurisdiction in any way.  ICE HSI will continue to enforce the regulations governing the export of firearms, firearms parts, and ammunition.  The transfer enhances enforcement efforts by creating authority for EE Special Agents to investigate the illegal export of those items being transferred to the CCL, and does not in any way diminish existing ICE HSI authorities.

66

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

## Key Terms

**Additive manufacturing.**  In additive manufacturing, which is often referred to as 3D printing, material such as metal or plastic is laid down in very thin layers one upon the other fusing together until the final net shape is achieved.  In both instances, the adding or removing of the material is controlled by a computer without human intervention.  3D printers utilize electronic digital files to process the materials into a physical object, and these files can be distributed over the internet.  A 3D printer or computer numerically-controlled (CNC) equipment uses Computer Aided Manufacturing (CAM) files in G-code or AMF format as executable code to produce certain items.

**Antique firearms (for purposes of ECCN 0A501).**  Firearms manufactured before 1890 and reproductions thereof.

**Antique firearms (for purposes of ECCN 0A502).**  Shotguns made in or before 1898.

**Blue guns or rubber ducks**.  Blue guns or rubber ducks are complete replicas of firearms which are used as training aids.  They are completely non-functioning, and usually made of a composite material, but made to the exact dimensions of the related functioning firearm.  They are replicas and cannot be made to fire ammunition.

**Caseless ammunition.**  Caseless ammunition is firearm ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit (*see* 22 CFR 121, *Note 1*, paragraph (3) to USML Category I, and *Note 1 to paragraph (a)(4)* to USML Category III). Caseless ammunition is "subject to the ITAR."

**CBP Form 4457** *(Department of Homeland Security, CBP Form 4457 (Certificate of Registration for Personal Effects Taken Abroad)) (OMB Control Number 1651-0010)*. Prior to making any export of commodities controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada, that are authorized under License Exception BAG, as set forth in § 740.14, the exporter is required to submit a properly completed Department of Homeland Security, CBP Form 4457 *(Certificate of Registration for Personal Effects Taken Abroad) (OMB Control Number 1651-0010)* to the U.S. Customs and Border Protection (CBP), pursuant to 19 CFR 148.1, and as required by § 758.11 of the EAR.  The exporter when returning with a commodity authorized under License Exception BAG and exported pursuant this section, is required to present a copy of the CBP Form 4457 (Certificate of Registration for Personal Effects Taken Abroad) (OMB

67

# Ex. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

Control Number 1651-0010), to CBP, pursuant to 19 CFR 148.1, and as required by § 758.11 of the EAR.

## Combination pistol (*a.k.a.*, a combination gun).  A combination pistol has at least one rifled barrel and at least one smoothbore barrel (generally a shotgun style barrel). (*See Note 1 to paragraph 0A501.a*)

## Complete breech mechanisms.  The mechanism for opening and closing the breech of a breech-loading firearm, especially of a heavy-caliber weapon. (*See* definition in § 772.1)

## Dummy rounds or drill round. A dummy round or drill round is a round that is completely inert, *i.e.*, contains no primer, propellant, or explosive charge.  It is typically used to check weapon function and for crew training.

## Fully automatic firearm or shotgun.  A fully automatic firearm or shotgun is any firearm or shotgun that shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger (*see* 22 CFR 121, *Note 1*, paragraph (2), to USML Category I).  Fully automatic firearms or shotguns are "subject to the ITAR."

## Temporary imports.  Temporary imports are transactions that involve both the temporary entry of an item into the U.S. from a foreign country and the subsequent export of that item from the U.S.  (*see* § 758.10 for entry clearance requirements for certain temporary imports).

## Sentinel Program.  The BIS Sentinel Program is one of the Office of Export Enforcement's (OEE) Export Compliance Programs.  Many end-use checks are conducted through BIS' Sentinel Program. Trained OEE Special Agents are deployed from the United States to countries to visit the end-users of sensitive controlled commodities and determine whether these items are being used in accordance with license conditions.  Sentinel teams assess the suitability of foreign end-users to receive U.S.-origin licensed goods and technology, assess prospective end-users on pending license applications for diversion risk, and conduct educational outreach to foreign trade groups. In this way, Sentinel trips help to create the confidence needed to foster trade while strengthening U.S. national security.

## Three-dimensional (3D) printing.  Three-dimensional (3D) printing is a type of additive manufacturing based on the principle of combining numerous, extremely thin layers of a physical material (including plastics, metals, and even living cells) in a controlled build process and joining them to gradually build up a physical, three-dimensional object.

68

This Guidance does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, organization, party, or witness in any administrative, civil, or criminal matter. This information is for general guidance purposes only and should not be regarded as a substitute for legal advice concerning the applicability of this rule to particular facts and circumstances.

United States Munitions Import List (USMIL).  The list of Arms Export Control Act (AECA) defense articles on the United States Munitions Import List (USMIL) are those that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purposes of permanent import under its regulations at 27 CFR part 447.

Note to USMIL definition: *All defense articles described in the USMIL or the USML are subject to the brokering controls administered by the U.S. Department of State in part 129 of the ITAR.  The transfer of defense articles from the ITAR's USML to the EAR's CCL for purposes of export controls does not affect the list of defense articles controlled on the USMIL under section 38 of the AECA, 22 U.S.C. 2778, for purposes of permanent import or brokering controls.*

69

2 of 50

## Classification Conversation

+ Summarize this email

**Cody Wilson** <crw@defcad.com>
to Ronald.Rolfe ▾

Fri, Jun 20, 10:57 AM

Mr. Rolfe,

After a recent conversation with Jeff Bond about the current ECCN process, I wondered if we might be able to get on the phone? If possible, I'd like to ask a couple of questions in advance of a submission.

Thank you,

crw

--

Cody R. Wilson
Managing Director
Defense Distributed

2320 Donley Drive Suite C
Austin, TX 78758
p: 501.743.9680
www.defdist.org

This e-mail transmission contains confidential information that is the property of the sender and the organization (DEFCAD, INC.) for which the sender represents. If you are not the intended recipient and have by accident received this email, please do not retain, disclose, reproduce or distribute the contents of this e-mail transmission, or take any action in relevance thereon or pursuant thereto. Please notify the sender of the error by

 Generated by Gataleaks.org
File ID: GLS-tjzyqw8xsymgj83

 **Navi of Boomhandia** ✅ @NaviGoBoom · Nov 28, 2024  ···
Replying to @FDMArms @unherolike and 3 others

It's pretty simple. "Published" EAR-relevant files aren't subject to EAR. "Public Domain" ITAR-relevant files aren't subject to ITAR. EAR also has an exemption for fundamental research which is published or to be published.

As EAR defines it, published means publicly available (they explicitly say that copyright and other IP protections don't change public availability), unclassified, and with no restriction on further distribution (again, they view copyright an IP as compatible with this clause). The one exception to this exception is software/technology that is "ready" (not readily, ready) for "insertion" into computer controlled manufacturing equipment. Gcode may sometimes be this, but STL never is - STLs are not ready for insertion into any manufacturing equipment, and they simply couldn't be - STL has no way to encode tool instructions, for example. Even if you wrote a compiler/interpreter to try and make STL work this way, the STL itself still isn't "ready" for "insertion".

As ITAR defines it, copyrighted stuff can be public domain. They give a straightforward way to understand what this means - for example, accessible at a library in the US (libraries have computers these days, remember) means public domain for ITAR purposes.

So, where does Cody's theory come from? In truth, it's self-motivated to find a way for him to make money. EAR put out an FAQ that literally says it doesn't have force of law, is not legal guidance, etc, and in this FAQ they say that files which require no or "minimal" modification before "insertion" into manufacturing equipment likely are "ready for insertion". "Minimal" here, though, directly conflicts with what the law actually says - "ready" means "ready", not "with minimal effort can be ready". Perhaps BIS envisions changing a file extension from .txt to .gcode to be this "minimal"


Generated by Gataleaks.org
File ID: GLS—m3d588ntt4jbgn1



**IvanTTroll** · 10 hr. ago
 Verified

They've never actually had a lawsuit conclude that 3D2A code is free speech. That's actually not a thing at all. They had one settlement that applied only to them, and Trump signed over and Obama-era rule change that moved technical data for semiautomatic sub-50 stuff out of ITAR, which created the CAD/CAM distinction which is where things sit.

⬆ 5 ⬇  💬 Reply  Share  ⋯



cv-01629-WWB-LRR Document 138-1 Filed 09/29/25 Page 309 of 537 PageID 2651

Join | Share | Support | Following

# Freeman1337 - GunCAD Releases

2,605 followers

Home  Content  Playlists  Channels  Membership  Community  About

New  Trending  Top  ☰  ⋯

Search

**OK Boomer - 3D Printed 1911 - v1.2**
Freeman1337 - GunCAD Releases
6.6K views • 9 months ago

**Everytown mag - Commemorative Edition**
Freeman1337 - GunCAD Releases
990 views • 1 year ago

**Ar15 gas block pinning jig**
Freeman1337 - GunCAD Releases
482 views • 1 year ago

**The FOSS Cannon - 3D Printable Taurus PG111G2/G2/G2C/G3C...**
Freeman1337 - GunCAD Releases
4.7K views • 2 years ago


**3d printed glock build speed run**
Freeman1337 - GunCAD Releases
1.6K views • 2 years ago



**Ol' Reliable - Glock19 frame**
Freeman1337 - GunCAD Releases
2.8K views • 2 years ago



**Freeman1337 - DD19.2 - JSD invitational 2022 glock frame**
Freeman1337 - GunCAD Releases
6K views • 2 years ago



**XD Series magazine catch**
Freeman1337 - GunCAD Releases
242 views • 3 years ago

**Bidens Bane - 3D Printed AR15 Upper Reciever (223/556 capibl...**
Freeman1337 - GunCAD Releases
4.7K views • 3 years ago

**Freeman1337 Printer Calibration Cube**
Freeman1337 - GunCAD Releases
844 views • 3 years ago

**Angled Foregrips - mk2 - Stipple pack update - BasketCase texture**
Freeman1337 - GunCAD Releases
976 views • 3 years ago

**The Freeloader - AR15 Magazine Loader/Unloader**
Freeman1337 - GunCAD Releases
1.2K views • 3 years ago



## The Gatalog's Hybrid Designs

7,565 followers ⓘ

Home   Content   Playlists   Channels   Membership   Community   About



### FGC-9 MKII

The Gatalog's Hybrid Designs · 175K views · 4 years ago

**The Gatalog presents:**
The FGC-9 MKII - a fully documented, hybrid printable 9x19mm carbine.
Join the community: thegatalog.com

## New Content                                    View More ›



**The REBEL-9**

The Gatalog's Hybrid Designs
10K views · 4 months ago



**FGC-EVO Mod**

The Gatalog's Hybrid Designs
10K views · 7 months ago



**The Rogue 9**

The Gatalog's Hybrid Designs
21K views · 9 months ago



**The Urutau**

The Gatalog's Hybrid Designs
44K views · 11 months ago



**The Nutty 9**

The Gatalog's Hybrid Designs
11K views · 1 year ago



**The Partisan 9**

The Gatalog's Hybrid Designs
31K views · 2 years ago



**FGC-9 MKII - 'Stingray'**

The Gatalog's Hybrid Designs
44K views · 3 years ago



**FGC-9 MKII**

The Gatalog's Hybrid Designs
175K views · 4 years ago



**The Cheetah-9 Hybrid SMG**

The Gatalog's Hybrid Designs


**Professor Parabellum's Hybrid Square Tube SMG**

The Gatalog's Hybrid Designs



**The FGC-9**

The Gatalog's Hybrid Designs



## The Gatalog's Primarily Printed Designs

5,040 followers ⓘ

Home    Content    Playlists    Channels    Membership    Community    About

### The Songbird PM4 CenterFire v1.1



The Gatalog's Primarily Printed Designs • 21K views • 3 years ago

The Gatalog presents:
The Songbird PM4 CenterFire v1.1 - an updated, documented version of JamesPatrick's Songbird, done by K-CAD
Join the community: thegatalog.com

### New Content                                                                    View More ›









COVID-22 3D Printable 22lr Pistol

The Songbird PM4 CenterFire v1.1

PilotGeek's Maverick v2.4

PilotGeek's Aurora

 The Gatalog's Primarily Printed Desi...
31K views • 2 years ago

 The Gatalog's Primarily Printed Desi...
21K views • 3 years ago

 The Gatalog's Primarily Printed Desi...
39K views • 4 years ago

 The Gatalog's Primarily Printed Desi...
30K views • 4 years ago





KadeCAD 3D Printed Liberator Suppressors

PM422 Songbird V3

 The Gatalog's Primarily Printed Desi...
18K views • 5 years ago

The Gatalog's Primarily Printed Desi...
28K views • 5 years ago

A-311

Ex. A - COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

DEFENSE DISTRIBUTED'S RESPONSES TO ELIK'S
REQUEST FOR PRODUCTION 4:

SEEKING DOCUMENTS
SUPPORTING MURDER THREAT CONTENTION



**Dr. Freeman1337, PHD**
@Freeman13372

The more you know ;)



# DID YOU KNOW?

If Bluey from the hit children's show Bluey was Cody Wilson, she would say:
"Hello, my name is Cody Wilson and I am a convicted pedophile. I am the founder of DEFCAD even though I contribute nothing. I live in a $2 million home at 4610 Crestway Drive, Austin TX. I openly seek sugar daddy relationships with minors. My home has many points of entry and a large neighboring wooded parcel that would be hard to spot hooded intruders wearing black at night. I am 15 miles from the nearest Level-1 trauma center."

7:31 PM · Aug 1, 2024 · **8,477** Views

b.b (2024-11-08T15:14:58.459Z): remember files are free on my odysee, fuck
defcad, death to cody wilson

IP Details For: 96.35.6.0

| | |
|---|---|
| Decimal: | 1612908032 |
| Hostname: | syn-096-035-006-000.res.spectrum.com |
| ASN: | 20115 |
| ISP: | Charter Communications LLC |
| Services: | None detected |
| Country: | United States |
| State/Region: | Illinois |
| City: | Roxana |
| Latitude: | 38.8484 (38° 50′ 54.17″ N) |
| Longitude: | -90.0762 (90° 4′ 34.38″ W) |

**CLICK TO CHECK BLACKLIST STATUS**

Latitude and Longitude are often near the center of population. These values are not precise enough to be used to identify a specific address, individual, or for legal purposes. IP data from IP2Location.




Generated by Gataleaks.org
File ID: GLS—t3xm72u8fd5a6f3

⟲ **Fudd Busters** reposted

ZøNA @SillyGirlPsyops · Nov 6  •••

Replying to @RKneegrow and @ArmedJOy

They literally cited my advocacy of untraceable 3D printed firearms and ownership of firearms as a reason why I am dangerous, when Garret perjured himself to obtain a workplace injunction.

> threatening employees of DEFCAD. Based on _____'s online comments and background, _____ is an advocate for untraceable 3D printed guns and owns firearms. For example, in mid-August,

💬 4　　⟲ 15　　♡ 90　　📊 12K　　🔖　　⬆


Generated by Gataleaks.org
File ID: GLS—48lie3g9bqzn23a



 Generated by Gataleaks.org
File ID: GLS-04mqhlrncr7cy4k

 **LizzieHasAGat** 9:59 PM
i hope PLAboi is ok.....

 **wirbelwind** 10:00 PM
Did he leave here too?

 **LizzieHasAGat** 10:01 PM
i dont think so

i seent a dm

 **ethan.hall** 10:02 PM
He said he'd be laying low but left an email.

 **wirbelwind** 10:05 PM
he did nothing wrong

he has nothing to worry about



 **Iwillnotcomply.fgc** 10:06 PM
A lot of people (usually non criminals and non lawyers) are psychlogically very easily scared of the government

✗ Generated by Gataleaks.org
File ID: GLS—8rkm3e6qblg3vzl

 **Navi of Boomhandia** ☑ **Follow** ⋯
@NaviGoBoom

To be clear: when Cody Wilson/Defcad sends the cops after you (which is a thing he seems to do when it's convenient for him), he'll have no problem telling them what a danger you are - because you make guns.

Hope the cops don't decide to raid you based on that.

1:02 PM · Nov 6, 2024 · **1,646** Views

💬 1      🔁 1      ♡ 70      🔖      ⬆️

 **Grandmaster How** @Howzerthec · Nov 6 ⋯
Why is this guy still alive?

💬 1      🔁      ♡ 2      📊 98      🔖 ⬆️

 **Navi of Boomhan** ☑ @NaviGoBo · Nov 6 ⋯
Icepick deficiency in his brain

💬 1      🔁 1      ♡ 12      📊 138      🔖 ⬆️

 **ZøNA** @SillyGirlPsyops · Nov 6 ⋯
This is true, and also going into his spank bank screenshot folder.

 Generated by Gataleaks.org
File ID: GLS—zyq0qhas3cohmkp






Generated by Gataleaks.org
File ID: GLS—xwwizwvn93o96wv



 Generated by Gataleaks.org
File ID: GLS—1xywtcqtb0fhb9r

 **LizzieHasAGat** @LizzieHasAGat · Aug 26 ···
Replying to @LizzieHasAGat
Now I know this doesn't justify anything, but I will admit that I am mentally unstable and I have a extreme loyalty to my friends and the **gatalog**.

That being said, I am overly protective and I have strong feelings about the community I find myself in.

💬 1          🔁 1          ♡ 10          ‖ 115          🔖     ⬆️

 **LizzieHasAGat** @LizzieHasAGat · Aug 26 ···
Replying to @UncleSlapnuts21 @DinkaRoubles and 2 others
I did apologize to him, I apologized to him multiple times. I tried working with him too but he doubled down on everything, I gave him several chances and tried to work through stuff with him.

I got that heated because he betrayed me, people he "cared" about, and the **gatalog**.


Generated by Gataleaks.org
File ID: GLS-g0fmlftslsqovys



**LizzieHasAGat** @LizzieHasAGat · Nov 3  ···
Yall, this riot season do NOT loot random cars and stores, don't fuck up people's lives.

However, many go just for the smoke. So, give it to them. If people are trying to torch a local business then run their pockets, drop kick power abusing riot control. Be a mindful riot.

💬 3       ⟲       ♡ 14       ᶦᥣᵢ 125       🔖       ⬆



**LizzieHasAGat** @LizzieHasAGat · Nov 3  ···
Remember your gloves, balaclava, and bear spray. Leave your wallet and ID at home, don't get caught.

Have fun everyone! Remember to be kind to the innocent and speak to the hateful and needlessly violent in a language they understand.

💬 1       ⟲       ♡ 4       ᶦᥣᵢ 52       🔖       ⬆



**LizzieHasAGat** @LizzieHasAGat · Nov 3  ···
Also, carry medkits and IFAKs, letting someone or yourself bleed out in the street is a dick move.

💬       ⟲       ♡ 3       ᶦᥣᵢ 41       🔖       ⬆


Generated by Gataleaks.org
File ID: GLS-aow1tipe6rl356m



**LizzieHasAGat** @LizzieHasAGat · Nov 7   •••

If you see people who are having suicidal ideation/severe mental distress and encourage they kill themselves or mock them for it because they don't share your political views or religious beliefs, you are objectively evil.

Whatever happened to caring for your fellow American?

         5         69        

 Generated by Gataleaks.org
File ID: GLS-9uzdvx7804l8tqs



**LizzieHasAGat** @LizzieHasAGat · Sep 9

To my combat engineer moot: What if we kissed in a foxhole?



💬 3　　⟲ 2　　♡ 17　　📊 240

 **ZøNA**
@SillyGirlPsyops

**Follow**

I know who that is. 😈

5:04 AM · Sep 9, 2024 · **19** Views


Generated by Gataleaks.org
File ID: GLS—00bpf6pfeqconbt



**LizzieHasAGat** @LizzieHasAGat · Nov 7 ···
Just reminded me of the time
@SillyGirlPsyops printed a UBAR with over a
year old esun without drying it and it actually
came out nice

💬 1          🔁          ♡ 5          �ⅈⅈ 30          🔖          ⬆️



**ZøNA** @SillyGirlPsyops · Nov 7 ···
Hitchy was made with a spool of Sunluu that
had been sitting open in a room adjacent to
a pool for 4 years.



X Generated by Gataleaks.org
File ID: GLS-i2lsp7z097cx9h2



**LizzieHasAGat** @LizzieHasAGat · Nov 7 ···
Zona do you use occult rituals to make your prints perfect?

💬 1   ⟲   ♡ 3   ┃┃ı 24   🔖   ↥

ZøNA @SillyGirlPsyops · Nov 7 ···
No just brute force and dumb luck

💬 1   ⟲   ♡ 4   ┃┃ı 29   🔖   ↥

**LizzieHasAGat** @LizzieHasAGat · Nov 7 ···
Nah it's not that simple

I'm blaming mystical supernatural lesbian powers, probably has something to do with the CoolRocksTM

I should buy some from MAF and attempt to harness their power

💬 1   ⟲   ♡ 3   ┃┃ı 24   🔖   ↥

ZøNA                    Follow  ···
@SillyGirlPsyops

It could be in the rocks. That's a good theory. Better to be safe than sorry, and make sure everyone has a pile of them.

10:48 AM · Nov 7, 2024 · **22** Views

 Generated by Gataleaks.org
File ID: GLS—mxwflf7dna2o39l

 **LizzieHasAGat** @LizzieHasAGat · Nov 7 ···
Snitches get their shit rocked 'round these parts.



 ZøNA @SillyGirlPsyops · Nov 7

Replying to @SKVMLORD and
@ActualPythia

Isn't your brother a federal informant or
something like that? 1776SupplyCo?

Generated by Gataleaks.org
File ID: GLS—94zcwsmushhhkb1




Generated by Gataleaks.org
File ID: GLS-c0y7cskmreeimbd



**Rando Kneanderthal** ✔
@RKneegrow

One source familiar with the situation says, "well that fuckin' sucks."

BREAKING NEWS

Cody Wilson found alive and not raped to death with a claw hammer

community maintains hope

pedophile snitch found in an unfortunate state    5:00    NEWS HD

6:07 AM · Oct 24, 2024 · **6,433** Views

💬 13     🔁 13     ♡ 267     🔖 4     ⬆️

 **Iwillnotcomply.fgc** 7:07 AM
Do any of you know a quicker way of getting karma than commenting or posting metal posts on r/firearms? I have to keep making new reddit accounts since I keep getting banned a few weeks in.

Or months in

**notsuspekt** 7:09 AM
I just stay banned

**notsuspekt** 7:09 AM

*File removed by prune*

Reddit mods didn't like tswift x oscar the grouch porn

 2

 **Iwillnotcomply.fgc** 7:13 AM
Fir me its giving instructoons on making weapons (I told people to go on Deterrence dispensed or the gatalog instead of DEFCAD), Hare speech (telling antigunners ro go back to thwir abusive nursing home before their carwgivers help them find out what elder abiuse really us) inciting violence (saying pedophiles like cpdy wilson sjould face public excutions on TV)

But saying that the Church should be classified as a pedophile cult and therfore hunted down and imprisoned or that religion should be calssified as a mental illness or to exterminate the clergy, hitler or Mao Zedong style is fine



Generated by Gataleaks.org
File ID: GLS—tkse750qaae3dmz






Generated by Gataleaks.org
File ID: GLS—q3h927sinxa31sg



**ZøNA**
@SillyGirlPsyops

"I am explicitly threatening you, but you can avoid that by simply fucking off." – Zona

10:36 AM · Nov 7, 2024 · **352** Views

💬 1        🔁 2        ♡ 39        🔖 1        ⬆️

Post your reply                    Reply

**ZøNA** ✔ @SillyGirlPsyops · 1h

Hi, Cody. I'm gonna own your boat and turn it into an artificial reef when this is all over.

♡ 2       42

 Generated by Gataleaks.org
File ID: GLS—xet3kwkhrctwigx



**DID YOU KNOW?**

If Bluey from the hit children's show Bluey was Cody Wilson, she would say:
"Hello, my name is Cody Wilson and I am a convicted pedophile. I am the founder of DEFCAD even though I contribute nothing. I live in a $2 million home at 4610 Crestway Drive, Austin TX. I openly seek sugar daddy relationships with minors. My home has many points of entry and a large neighboring wooded parcel that would be hard to spot hooded intruders wearing black at night. I am 15 miles from the nearest Level-1 trauma center."

7:31 PM · Aug 1, 2024 · **8,477** Views

DEFENSE DISTRIBUTED'S RESPONSES TO ELIK'S
REQUEST FOR PRODUCTION 5:

SEEKING DOCUMENTS
SUPPORTING CYBERATTACK CONTENTION





DDOS attacks can be seen on the following dates:

- May 24th, 2024
    - 88% CPU usage
    - 5x normal network in bytes
    - Correlates with publication of the Black Flag White Paper. Higher levels of traffic continue all through the remainder of the year.
- July 25th, 2024
    - 10x the normal network in bytes
- August 29th, 2024 – August 31st, 2024
    - 88% CPU usage
    - 5x normal network in bytes

All three of these spikes required significant expenditure of time and money to restore website functionality.


Generated by Gataleaks.org
File ID: GLS-xv4q0ujv3lbhpzq

Thanks again Professor. Same time next year? 👋



3:39 PM · Oct 15, 2024 · **2,430** Views

 9                

  **jny the human** ✔ @jnyboy · 3h                    •••
I need a lawyer
a blogger is about to sue me for doing big
doinks on his comments

        ♡ 1    📊 37    🔖    ⬆️


Generated by Gataleaks.org
File ID: GLS—fxyhw0wvt95oxlf



5:54  5G

0:05

10:52 AM · Oct 17, 2024 · **1,780** Views

💬 2   🔁 4   ♡ 45   🔖 3   ⬆️

**Joe Smowe** @JSmowe · Oct 17   ···
look at this comment I found

> **DD**  **Convicted Child Predator Cody Wilson**
>
> Call me for a good time: (501) 743-9680

💬 1   🔁   ♡ 3   📊 59   🔖   ⬆️

**Yippiekiyay** ✔ @Yippiekiyay6 · Oct 17   ···
I noticed all kinds of goodness on his attorney's blog. Must be all true because anyone with half a brain would turn on comment approval on their professional blog. Especially after representing some other notorious people.

💬   🔁   ♡ 1   📊 35   🔖   ⬆️

**Cuerni Mus** @CuerniM · Oct 17

🔒 x.com

Generated by Gataleaks.org
File ID: GLS—npn75m6vh9truop

1:45     5G

# Gingras Law Office, PLLC

☰ Menu

**Cody Wilson** OCTOBER 16, 2024

Okay friend, let me explain something to you since you seem to be new here. Hebephilia is NOT the same thing as pedophilia. I'm sick and tired of you trolls popping up everywhere and spreading BLATANT misinformation. In many countries hebephilia is considered normal and healthy . Human beings have a natural attraction to girls who are going through puberty. Being attracted to girls who are pre-pubescent is fucking sick and disgusting, but only in the US does there seem to be an unwarranted taboo around a healthy and normal condition. My head hurts. I'm just trying to get my real life back.

**Eitan Katz** OCTOBER 16, 2024

🔒 gingraslaw.com

 Generated by Gataleaks.org
File ID: GLS—3czgbpys9dvaqef




Generated by Gataleaks.org
File ID: GLS—dscigb1aikxsu96



Generated by Gataleaks.org
File ID: GLS—8jd0l8fk0w1x229



← **Post**

**Navi of Boomhandia** ✓ @NaviGoBoom · 1h
woah

💬          ⟲          ♡ 22          �̇ ‖ ̇ 321          🔖  ⬆

**Anon** ✓ @n0wayyy_no · 50m
How kind

💬          ⟲          ♡ 1          ̇ ‖ ̇ 114          🔖  ⬆

**NightTrace** @nighttrace · 51m
Not going to lie, if I were going to be hosting files about Ghost Guns on the
internet I simply don't think I would put that shit in Germany. Pretty sure
they have some real fucked up laws about that.

| # | IP ADDRESS | COUNTRY | LOCATION (CITY,REGION) | ISP | ORG | ASN |
|---|---|---|---|---|---|---|
| 1 | 128.140.46.27 | Germany | Nuremberg, Bavaria | Hetzner Online GmbH | Hetzner Online GmbH | AS24940 |
| 2 | 65.109.205.112 | Finland | Helsinki, South Finland | Hetzner Online GmbH | Hetzner Online GmbH | AS24940 |
| 3 | 141.94.2.52 | France | Gravelines, Hauts-de-France | OVH SAS | OVH SAS | AS16276 |
| 4 | 158.180.57.165 | Germany | Frankfurt, Hesse | Oracle Corporation | Oracle Corporation | AS31898 |
| 5 | 65.109.192.74 | Finland | Helsinki, South Finland | Hetzner Online GmbH | Hetzner Online GmbH | AS24940 |
| 6 | 116.203.234.64 | Germany | Nuremberg, Bavaria | Hetzner Online GmbH | Hetzner Online GmbH | AS24940 |

💬          ⟲          ♡ 11          ̇ ‖ ̇ 139          🔖  ⬆

Generated by Gataleaks.org
File ID: GLS—8hn821d3522pi8i




Generated by Gataleaks.org
File ID: GLS—aondxpuz16ceojz



DEFENSE DISTRIBUTED'S RESPONSES TO ELIK'S
REQUEST FOR PRODUCTION 6:

SEEKING DOCUMENTS
SUPPORTING MONEY LAUNDERING
CONTENTION

# MoneyFlow

# Detailed Investigation Report

**Report generated:** June 26, 2025

Bitquery · Built on Coinpath® Technology



# Cody Wilson
# Investigation Report

| | |
|---|---|
| **Blockchain** | Bitcoin |
| **Amount** | 2.279 BTC Inflow<br>2.187 BTC Outflow |
| **Initial Wallet Address** | • bc1qzr6nvtc56seu47pc5hm7tz4w7562a2nktfh0ww<br>• zpub6oRgtF8MfMxEbgYgGSsDv1s7MCZWFMrLNMnQeKTs8pqMdBf p3nZD7fdcJC7ZbHdf3m47aVe3tLgHt5eMkYXnJDiZJ86NcrmoaK6g wBVMYVw<br>• zpub6rrzTbLJRQFvmvQpMB91y7fSgA4jfVxVAHitEzgEESQ39Leho4LF QXcvZCyHAfGuee7mQE3HYFh9ej2TwJdFM8eZsMGxorQnwzFXQb7 s4YA<br>• xpub68hPP3wRixweokE9sVvsw7WkxWHKwmEPByx93dagUvuW4H EbfLV491e586fKqC6w7mFhf2NryUTXJWZF1JQbnJ7sQkKHWtSySMV K3ebuJ36<br>• xpub6DJSJxrFxtXCAXc5pNFPo1cuwftMUipaGmGY1jYVtSZediQkZqg ftYzvXNwBp7AnjdGdN9aRu42buGFrueZehhvmAJx8381NL4A1zEMu F6j |
| **Attachment** | <u>Full Transaction Spreadsheet</u> |

**Case Summary:**

This investigation aims to trace cryptocurrency transactions from the specified wallet addresses, focusing on the flow of assets to centralized cryptocurrency exchanges and service providers. Our analysis revealed that approximately **2.187 BTC** was involved, with **1.150 BTC** (about **53%** of the total) successfully traced to various exchanges and service providers.

The report provides evidence linking the origin wallets to exchanges and outlines potential methods through which the proceeds may have been converted into fiat currency.

The report on movement of funds that you obtained is provided for informative purposes only and should not be construed as a guarantee of successful funds recovery. Please note that it does not constitute legal, financial or any other advice

We strongly recommend that you consult with a qualified attorney for guidance on your specific matter. Bitquery provides consulting and investigation services. Any recommendations made by Bitquery should not be considered legal advice.

| | | |
|---|---|---|
| **MoneyFlow** | Bitquery, Inc.<br>investigations@bitquery.io | Cody Wilson - Investigation Report<br>26 June 2025 |

 MoneyFlow

## Methodology

**Blockchain Tracing:**

This investigation employed __Coinpath__ technology and manual verification to analyze blockchain transactions and trace fund flow. __Coinpath__ provided automated tracking across wallets, while manual checks confirmed intermediary wallets and final destinations.

The attached spreadsheet details the transaction trail, including transaction hashes, amounts, and address labels.

Using a **First-In, First-Out** (FIFO) approach allowed us to maintain transaction order and trace the path of funds, especially for wallets with multiple transfers. All findings were cross-referenced with public ledger data for accuracy and transparency.

## Investigation Findings

**Fund Tracing and Final Destinations:**

The table below summarizes the exchange entities identified in this investigation, along with the amounts of proceeds they have received from the traced transactions. This information provides an overview of the funds distribution across centralized exchanges and supports further steps in recovering or freezing assets.

| Centralized Exchange | Amount Received | Wallet |
|---|---|---|
| Binance | 0.6858769925 BTC | xpub68h<br>xpub6DJS<br>zpub6o<br>bc1qzr6nvtc5 |
| Paxos | 0.423475313 BTC | zpub6rr |
| Bitfinex | 0.02687101198 BTC | xpub6DJS |
| OKX | 0.01337266862 BTC | xpub6DJS |
| **SUM** | **1.149595986 BTC** | |

MoneyFlow

Bitquery, Inc.
investigations@bitquery.io

Cody Wilson - Investigation Report
26 June 2025

A-352

 **MoneyFlow**

The full transaction breakdown is available in the attached spreadsheet; however, the most relevant transaction hashes are listed below:

### Paxos
Key deposit transactions with the highest amounts are highlighted below:
- ec6f5d2516d2a5fafa0e3bdf660ba26a35065fb49658bf20c943cf321f4c3a08
- e1224aed46fa7189ac8c5165f1a4ffad14c4fbcebc00a5c7ac44f662110a3656
- 46603b53fae7fdf53d88c42c1797b9cd94f8391b8e1d7ee1b8ab401c16405720

### Binance
Key deposit transactions with the highest amounts are highlighted below:
- 1987ecf0df96680f144dff7fde2ac30d760d81f8be4181c80b27b2fe6c53beba
- f7f8bdabc5e493b6eba539f61aa54154866dae3c8e342ae06f884a893b99fc83
- c45b70a1a4756aea1484a7a3b2d7e9f29772b1c348b7dd004b671823fe43a8d7

### Bitfinex
Key deposit transactions with the highest amounts are highlighted below:
- 073cb6783775335d1b8326364fa60517bc695a4244cc669bae3a3e988b2b9587
- a4ee2a0805a6725cc02adf74e193757109719bbaa2a9af096cd12ac784c3f207
- 94ad3543e556a13cc3d2975922cf8fed07074bfb7f89bfb50728ef32161119fe

### OKX
Key deposit transactions with the highest amounts are highlighted below:
- 559cba4d62280931589a5f05361eb7beb8053db7e58f8f2bce127953dc239f38
- 7531987d4ca95e05540380b6046dd4445f2ef3d0565798e358163ccd94fe84bf
- 322520fe720947c1d2db2e0e0dce95ad055fe31eb88b2b45ad7641afead9a089

In summary, the transaction hashes listed above represent key movements of the funds involved in this incident to various exchanges. By addressing these specific transactions, we can prioritize recovery efforts and gather additional insights into potential connections and counterparties involved.

For further action, the next step is to reach out to the involved exchanges to initiate formal inquiries. Instructions for contacting each exchange, along with recommended communication templates, are provided further below.

 **MoneyFlow** | Bitquery, Inc.
investigations@bitquery.io | Cody Wilson - Investigation Report
26 June 2025

A-353



# Investigation Findings

## Tracing the Roots: Uncovering the Source of Funds

The table below summarizes the origin entities identified in this investigation, along with the amounts contributed through traced transactions. A significant portion of the funds originates from a cluster of addresses showing transaction patterns consistent with CoinJoin—a privacy technique that mixes funds from multiple users to obscure individual inputs and outputs. Several origin wallets participated in CoinJoin transactions, adding complexity to our tracing efforts. We also tracked over 3,000 inbound hops from these wallets, revealing smaller yet identifiable traces attributed to known entities.

| Centralized Exchange | Amount Sent |
|---|---|
| Prime Trust Custody | 0.00450085 BTC |
| Gemini | 0.00378559 BTC |
| Binance | 0.00666699 BTC |
| Kraken | 0.00005371 BTC |
| **SUM** | **0.01500714 BTC** |

### Prime Trust Custody
Key withdrawal transactions with the highest amounts are highlighted below:
- 8263ff4177a3824c0ec2574826eafd6570dec6604c4c7a74f3e4830d0418ed71
- aef2716b4c74ad10eb44583c397c3296433fa7c559d8166fdb47def1c32f1942
- bda959fb02840b71731fb89a3b01a33c4cb1a440f53c5b0e5a91985f6f770838

### Gemini
Key withdrawal transaction with the highest amount is highlighted below:
- bba40ea20dde0d1817b39829ccd7a5af4eb818ce0d94efa116f33c6db3bc999e

### Binance
Key withdrawal transaction with the highest amount is highlighted below:
- 2aa115ccad7637c7254088b60c2182f1120737c669a8e96017c375faec6f4cff

### Kraken
Key withdrawal transaction with the highest amount is highlighted below:
- 0b1a49f8737830fa6aa483b5def8ed1eb56383fe9451bdb6f609275afc1f5661

MoneyFlow

Bitquery, Inc.
investigations@bitquery.io

Cody Wilson - Investigation Report
26 June 2025

A-354

Ex. A. COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

 MoneyFlow

# Contacting Exchanges for Additional Information

To request further information from the exchanges involved, please provide the transaction hashes mentioned above and follow their **Law Enforcement Request** for Information guidelines:

| Entity | Contact Details |
|--------|-----------------|
| Binance | Link |
| Paxos | subpoenas@paxos.com |
| Bitfinex | Link |
| OKX | Link |
| Gemini | Link |
| Kraken | Link |

Given the complexity of the funds' flow and the involvement of centralized exchanges, further collaboration with local Law Enforcement and relevant parties is encouraged. The attached spreadsheet provides additional details on the transaction trail for a comprehensive understanding of the case.

Bitquery is committed to provide any further assistance required to process this investigation further. Please do not hesitate to get in touch with us at investigations@bitquery.io

DISCLAIMER: DUE TO THE NATURE OF THE DATA ANALYZED AND INFORMATION PROVIDED, YOU AGREE THAT BITQUERY IS NOT LIABLE FOR ANY USE OF THE REPORT.

 Generated by Gataleaks.org
File ID: GLS—bf41a1dbwasdrsb

# DONATE TO JSTARK

 ctrlpew

You know who he is.

In light of recent news regarding his passing we have redirected these funds to a wallet controlled by Deterrence Dispensed until we can make contact with his next of kin and confirm their access to the wallet.

Update: Out of respect for his family's wishes these funds will be held in trust to enable and offset project costs from future developers.

1

USD





Generated by Gataleaks.org
File ID: GLS-rlrlu6mi7oagbs1



**SEASON 2 EPISODE 9 Ivan the Troll**

← My Files

But once we had sort of, uh, Stark and I had talked

**Speakers** | Notes | Versions

+ **Create new Speaker**

- 🔵 Speaker 1
- 🟢 Speaker 2
- 🟣 Speaker 3
- 🟠 Speaker 4
- 🟤 Ivan the Troll

**Speaker 4** ⏱ 55:52

It's a 30 run burst.

**Ivan the Troll** ⏱ 55:56

So those are things that I've seen. And of course I do encourage people to take the platform for what it is. And if your use case for the thing is like: I just want to have lots of fun and make much noise, then certainly a full auto one will suit you better. But once we had sort of, uh, Stark and I had talked to people in gun control places around the world, at the time Hong Kong was a thing, and talking with them, they will be lucky if they have 30 rounds of ammo in their thing and if they need to ambush somebody, 30 rounds will get you a better gun. But if you're nervous, you haven't ever shot a gun before and you hop out of your hiding spot and you dump 30 rounds and don't hit 'em, now you're fucked. And all your buddies are fucked because 30 rounds didn't get you a new gun.

**Speaker 4** ⏱ 56:41

Yeah. One thing to note for people who haven't fired Open Bolt have that privilege and luxury, what I've been talking about is when that bolt slams forward, you press the trigger, the bolt slams forward, you have basically huge barrel droop and then the recoil, you have huge barrel rise. So it's, imagine

Resume Auto Scroll

BETA

Case 6:24-cv-01629-WWB-LHP Document 138-1 Filed 09/23/25 Page 358 of 537 PageID 2700



# MoneyFlow

# Detailed Investigation Report

**Report generated:** March 11, 2025

Bitquery — Built on Coinpath® Technology

Ex A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

 MoneyFlow

# Jimmy Song
# Investigation Report

| Blockchain | Bitcoin |
|---|---|
| **Amount** | 2.279 BTC Inflow<br>2.187 BTC Outflow |
| **Initial Wallet Address** | <ul><li>bc1qzr6nvtc56seu47pc5hm7tz4w7562a2nktfh0ww</li><li>zpub6oRgtF8MfMxEbgYgGSsDv1s7MCZWFMrLNMnQeKTs8pqMdBf p3nZD7fdcJC7ZbHdf3m47aVe3tLgHt5eMkYXnJDiZJ86NcrmoaK6g wBVMYVw</li><li>zpub6rrzTbLJRQFvmvQpMB91y7fSgA4jfVxVAHitEzgEESQ39Leho4LF QXcvZCyHAfGuee7mQE3HYFh9ej2TwJdFM8eZsMGxorQnwzFXQb7 s4YA</li><li>xpub68hPP3wRixweokE9sVvsw7WkxWHKwmEPByx93dagUvuW4H EbfLV491e586fKqC6w7mFhf2NryUTXJWZF1JQbnJ7sQkKHWtSySMV K3ebuJ36</li><li>xpub6DJSJxrFxtXCAXc5pNFPo1cuwftMUipaGmGY1jYVtSZediQkZqg ftYzvXNwBp7AnjdGdN9aRu42buGFrueZehhvmAJx8381NL4A1zEMu F6j</li></ul> |
| **Attachment** | <u>Full Transaction Spreadsheet</u> |

## Case Summary:

This investigation aims to trace cryptocurrency transactions from the specified wallet addresses, focusing on the flow of assets to centralized cryptocurrency exchanges and service providers. Our analysis revealed that approximately **2.187 BTC** was involved, with **1.360 BTC** (about **62%** of the total) successfully traced to various exchanges and service providers.

The report provides evidence linking the origin wallets to exchanges and outlines potential methods through which the proceeds may have been converted into fiat currency.

The report on movement of funds that you obtained is provided for informative purposes only and should not be construed as a guarantee of successful funds recovery. Please note that it does not constitute legal, financial or any other advice

We strongly recommend that you consult with a qualified attorney for guidance on your specific matter. Bitquery provides consulting and investigation services. Any recommendations made by Bitquery should not be considered legal advice.



## Methodology

**Blockchain Tracing:**

This investigation employed **Coinpath** technology and manual verification to analyze blockchain transactions and trace fund flow. **Coinpath** provided automated tracking across wallets, while manual checks confirmed intermediary wallets and final destinations.

The attached spreadsheet details the transaction trail, including transaction hashes, amounts, and address labels.

Using a **First-In, First-Out** (FIFO) approach allowed us to maintain transaction order and trace the path of funds, especially for wallets with multiple transfers. All findings were cross-referenced with public ledger data for accuracy and transparency.

## Investigation Findings

**Fund Tracing and Final Destinations:**

The table below summarizes the exchange entities identified in this investigation, along with the amounts of proceeds they have received from the traced transactions. This information provides an overview of the funds distribution across centralized exchanges and supports further steps in recovering or freezing assets.

| Centralized Exchange | Amount Received |
| --- | --- |
| PayPal | 0.38932646 BTC |
| Binance | 0.82185685 BTC |
| Bitfinex | 0.05096594 BTC |
| BlockFi | 0.03284463 BTC |
| Bybit | 0.06515625 BTC |
| **SUM** | **1.36015013 BTC** |

**MoneyFlow**

Bitquery, Inc.
investigations@bitquery.io

Jimmy Song - Investigation Report
11 March 2025

A-360



The full transaction breakdown is available in the attached spreadsheet; however, the most relevant transaction hashes are listed below:

**PayPal**
Key deposit transactions with the highest amounts are highlighted below:
- ec6f5d2516d2a5fafa0e3bdf660ba26a35065fb49658bf20c943cf321f4c3a08
- e1224aed46fa7189ac8c5165f1a4ffad14c4fbcebc00a5c7ac44f662110a3656
- af4327fb1f4c0b5791ee4570465a3bec670298705b032cde0f1579269626da72

**Binance**
Key deposit transactions with the highest amounts are highlighted below:
- 270806dda8836f0adf71fd5b6c87cd0aaf63761f08f78e77360a28852f53e1e1
- 8cd3cbb38de4a279678d3f7787ba2832d70a3d964d04bc25770edfb01cd42b38
- 289466030d19ae83f66fe74189b89737b5c5e8ba45f2bf71e370c2f3ca591115

**Bitfinex**
Key deposit transactions with the highest amounts are highlighted below:
- 073cb6783775335d1b8326364fa60517bc695a4244cc669bae3a3e988b2b9587
- a4ee2a0805a6725cc02adf74e193757109719bbaa2a9af096cd12ac784c3f207
- 94ad3543e556a13cc3d2975922cf8fed07074bfb7f89bfb50728ef32161119fe

**BlockFi**
Key deposit transactions with the highest amounts are highlighted below:
- 4d08156f3d2f47f93aa41bb1b95b93a578899fd529695408af3a60e8d06e8dfc
- 2a75be3c93482fa11ed70ae79481a4112657664a337a4dba2a3269bdcb2543be
- de7558766d594c4e6ffc34eb961c7ee5e5c9c11da6e192c77e8ca337bfdb24d9

**Bybit**
Key deposit transactions with the highest amounts are highlighted below:
- 5866a100ad1f8fcece562a26177ac38ca610ddfbaaa92848b4fcdb6756fa47ea
- a6fa8bf9defc464dc6923b4631cbe6be57161596e7a2c4b80838290615161fb6
- a3a7c316d9c4be32bcee31d54a427481f91439eaf468f53deda24c2238709182

In summary, the transaction hashes listed above represent key movements of the funds involved in this incident to various exchanges. By addressing these specific transactions, we can prioritize recovery efforts and gather additional insights into potential connections and counterparties involved.

For further action, the next step is to reach out to the involved exchanges to initiate formal inquiries. Instructions for contacting each exchange, along with recommended communication templates, are provided further below.

 MoneyFlow

# Investigation Findings

## Tracing the Roots: Uncovering the Source of Funds

The table below summarizes the origin entities identified in this investigation, along with the amounts contributed through traced transactions. A significant portion of the funds originates from a cluster of addresses showing transaction patterns consistent with CoinJoin—a privacy technique that mixes funds from multiple users to obscure individual inputs and outputs. Several origin wallets participated in CoinJoin transactions, adding complexity to our tracing efforts. We also tracked over 3,000 inbound hops from these wallets, revealing smaller yet identifiable traces attributed to known entities.

| Centralized Exchange | Amount Sent |
|---|---|
| Prime Trust Custody | 0.00450085 BTC |
| Gemini | 0.00378559 BTC |
| Binance | 0.00666699 BTC |
| Kraken | 0.00005371 BTC |
| **SUM** | **0.01500714 BTC** |

### Prime Trust Custody
Key withdrawal transactions with the highest amounts are highlighted below:
- 8263ff4177a3824c0ec2574826eafd6570dec6604c4c7a74f3e4830d0418ed71
- aef2716b4c74ad10eb44583c397c3296433fa7c559d8166fdb47def1c32f1942
- bda959fb02840b71731fb89a3b01a33c4cb1a440f53c5b0e5a91985f6f770838

### Gemini
Key withdrawal transaction with the highest amount is highlighted below:
- bba40ea20dde0d1817b39829ccd7a5af4eb818ce0d94efa116f33c6db3bc999e

### Binance
Key withdrawal transaction with the highest amount is highlighted below:
- 2aa115ccad7637c7254088b60c2182f1120737c669a8e96017c375faec6f4cff

### Kraken
Key withdrawal transaction with the highest amount is highlighted below:
- 0b1a49f8737830fa6aa483b5def8ed1eb56383fe9451bdb6f609275afc1f5661



# Contacting Exchanges for Additional Information

To request further information from the exchanges involved, please provide the transaction hashes mentioned above and follow their **Law Enforcement Request** for Information guidelines:

| Entity | Contact Details |
|--------|-----------------|
| Binance | Link |
| PayPal | Link |
| Bitfinex | Link |
| Bybit | Link |
| Gemini | Link |
| Kraken | Link |

Given the complexity of the funds' flow and the involvement of centralized exchanges, further collaboration with local Law Enforcement and relevant parties is encouraged. The attached spreadsheet provides additional details on the transaction trail for a comprehensive understanding of the case.

Bitquery is committed to provide any further assistance required to process this investigation further. Please do not hesitate to get in touch with us at investigations@bitquery.io

DISCLAIMER: DUE TO THE NATURE OF THE DATA ANALYZED AND INFORMATION PROVIDED, YOU AGREE THAT BITQUERY IS NOT LIABLE FOR ANY USE OF THE REPORT.

MoneyFlow | Bitquery, Inc.
investigations@bitquery.io | Jimmy Song - Investigation Report
11 March 2025



Generated by Gataleaks.org
File ID: GLS—pwjhrvjkoulmbco




Generated by Gataleaks.org
File ID: GLS—31f6r48uyc15v15



# specified unlawful activity

(7) the term "specified unlawful activity" means— (A) any act or activity constituting an offense listed in section 1961(1) of this title except an act which is indictable under subchapter II of chapter 53 of title 31; (B) with respect to a financial transaction occurring in whole or in part in the United States, an offense against a foreign nation involving— (i) the manufacture, importation, sale, or distribution of a controlled substance (as such term is defined for the purposes of the Controlled Substances Act); (ii) murder, kidnapping, robbery, extortion, destruction of property by means of explosive or fire, or a crime of violence (as defined in section 16 ); (iii) fraud, or any scheme or attempt to defraud, by or against a foreign bank (as defined in paragraph 7 of section 1(b) of the International Banking Act of 1978)); (iv) bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official; (v) smuggling or export control violations involving— (I) an item controlled on the United States Munitions List established under section 38 of the Arms Export Control Act ( 22 U.S.C. 2778 ); or (II) an item controlled under regulations under the Export Administration Regulations ( 15 C.F.R. Parts 730 – 774 ); (vi) an offense with respect to which the United States would be obligated by a multilateral treaty, either to extradite the alleged offender or to submit the case for prosecution, if the offender were found within the territory of the United States; or (vii) trafficking in persons, selling or buying of children, sexual exploitation of children, or transporting, recruiting or harboring a person, including a child, for commercial sex acts; (C) any act or acts constituting a continuing criminal enterprise, as that term is defined in section 408 of the Controlled Substances Act ( 21 U.S.C. 848 ); (D) an offense under section 32 (relating to the destruction of aircraft), section 37 (relating to violence at international airports), section 115 (relating to influencing, impeding, or retaliating against a Federal official by threatening or injuring a family member), section 152 (relating to concealment of assets; false oaths and claims; bribery), section 175c (relating to the variola virus), section 215 (relating to commissions or gifts for procuring loans), section 351 (relating to congressional or Cabinet officer assassination), any of sections 500 through 503 (relating to certain counterfeiting offenses), section 513 (relating to securities of States and private entities), section 541 (relating to goods falsely classified), section 542 (relating to entry of goods by means of false statements), section 545 (relating to smuggling goods into the United States), section 549 (relating to removing goods from Customs custody), section 554 (relating to smuggling goods from the United States), section 555 (relating to

## Source
18 USC § 1956(c)(7)

## Scoping language
As used in this section



Is this correct? okay or not okay

# MoneyFlow

# Detailed Investigation Report

**Report generated:** August 19, 2025

Bitquery — Built on Coinpath® Technology

 MoneyFlow

# Cody Wilson
# Investigation Report

| Blockchain | Bitcoin |
| --- | --- |
| **Initial Wallet Address** | • xpub6DJSJxrFxtXCAXc5pNFPo1cuwftMUipaGmGY1jYVtSZediQkZqg ftYzvXNwBp7AnjdGdN9aRu42buGFrueZehhvmAJx8381NL4A1zEMu F6j<br>• zpub6rrzTbLJRQFvmvQpMB91y7fSgA4jfVxVAHitEzgEESQ39Leho4LF QXcvZCyHAfGuee7mQE3HYFh9ej2TwJdFM8eZsMGxorQnwzFXQb7 s4YA |
| **Attachment** | <u>Full Transaction Spreadsheet</u> |

**Case Summary:**

Analysis of the associated Bitcoin addresses and their transactions indicates that these wallets are not operating independently but instead form part of a broader transaction pattern consistent with a **peel chain** - a laundering typology commonly observed in Bitcoin activity.

In this pattern, a large incoming amount is received into a wallet. Within the same block, the funds are redistributed across two outputs:
- A **small "peeled" portion** (often a fraction of a Bitcoin, in this case around $500 worth) directed to an address associated with the provided xpub keys.
- The **majority of the funds** forwarded to a new address, continuing the chain.

This process repeats consistently across multiple transactions, with the same structural behavior: **large input → two outputs → small peel-off + large continuation**. The repetition, speed (transactions within the same block), and automated structure strongly indicate that these wallets are being used as part of a laundering mechanism, breaking down large balances into smaller transfers to obscure origin and flow.

The presence of the client's address within this chain suggests that it is one of the recipient endpoints for peeled-off funds. This provides evidence of interaction with a high-volume laundering flow rather than organic peer-to-peer transactions.

The report on movement of funds that you obtained is provided for informative purposes only and should not be construed as a guarantee of successful funds recovery. Please note that it does not constitute legal, financial or any other advice

We strongly recommend that you consult with a qualified attorney for guidance on your specific matter. Bitquery provides consulting and investigation services. Any recommendations made by Bitquery should not be considered legal advice.

 MoneyFlow | Bitquery, Inc.<br><u>investigations@bitquery.io</u> | Cody Wilson - Investigation Report<br>19 August 2025

A-368



## Methodology

**Blockchain Tracing:**

This investigation employed **Coinpath** technology and manual verification to analyze blockchain transactions and trace fund flow. **Coinpath** provided automated tracking across wallets, while manual checks confirmed intermediary wallets and final destinations.

## Investigation Findings

**Flow of Funds Analysis:**

The analysis focused on transactions from the beginning of 2025 involving the aforementioned xpub and zpub keys. Key transactions include:

**xpub6DJS...EMuF6j:**

- b489e75862386f4a261a6870fa0c3f08d94ca21d2e21869711628ca25b948402
- 6644af95a5a52c849269865627e491adcc2e4faf3398c14ea333f5fe7ba30ded
- d308d5747c836c1feb002484f3ec3d4c3c62b5851f7055d6220bc4bbed73c5b7
- d3ff49ef280e482f0fd03eb03593049cf2079436a53c739088b480eba6a7d079
- dc5f2bdcbfbdfc905bfea18bf8ce784411002d80522e774c5bb8aa0797cb61a7
- 07f13ba559a151429ef55fcc95bed66c09348196c71123b82634fd37a4f9c21e
- 1277c4ccd7cbdf7bab72f6d63de9805ec54bf082df9ae4c37ad8f8b19ba110d1
- aedf82a6c397125d9970350d0d9b3fdf56dce850f6c995a49e136bc729a5b98f
- 50a372c36dae48bf855dc6ea39153685b463986d70563ab1cc3881d9dcda2d59
- 160a42a3a6ff31d7b6e7d4756e243b3bd33173182b47f0a06d80d93170bda209
- 0458a88748fb0d7f236cf07dfc5a0ac3d7477c6d5b4191fab44e723ebae8d7de
- ff7c7dd04358ae69125fbe6c807a373c6bc07938896390d0cead2e72b0bb378f
- 28bcf30ad0a8010e2d4e527375c6f66cce9e270fb4ad7f4cab299c1ea294ed89
- a7e84f437207696d281e203018e5d6313a14f8a499a6ca6077c6088b27b77ee2
- 3cdda1bc4677309051fe2598a4d751cb00c4249d9b8707485171dc3f5afb961f

**zpub6rr...7s4YA:**

- 65e26979bc5d919b4415c2b62e024aa9e96eeee5ffcea59f6f9b6eb01f1c2441
- ca0b4e2761fcc236fc9d89cddfa969e379d108980d32965a532613830f5cbb5a
- d213a6b5c1f85adcfc4442bd96500b1eb99fd09366c69170024a6a69dd846166
- f99675cdfe194ab3786376e0b5455da4de2768d3be0dede1c0a88b29e8bb9c2d
- 4cc848f154a741a83f6ba79c01f3126f00caa32a134e602f51cdbc178b2caa24
- d6d0bb92c7d34becf6733b7ffb4a034fea55a49475b980203357abe32b34506b
- a749e4f44314944c6164212525d59f13bee3e7846b78608e839643be0790aa36
- fff70b3c161ef5531d75021225e27e549e501428d558f32d054c6a3799ac1ffc
- f66bb4e879ecde9184481bc34c5fec668e795dae7fe996b5a47abd0ee820d37d
- 8df049eb3d79dbe13030da8788ed223e9cce48ccff99a6f112dc656961c1b448
- 6b5f69d1f988a97995f0fc5b0a42e3385d86fd2e83930595ddab7471b37874ca
- E0b8241b4fd97bcebbe4827a0db0ad3161de54a4882ac90a9fb46f2cdbf6920d





Most of these transactions exhibit patterns consistent with peel chains: typically 1 input → 2 outputs, where a small portion ("peel") is sent to an address associated with the xpub key and the majority is forwarded to a continuation address. In some cases, multiple outputs are aggregated into 2 outputs with disproportionate values, where the smaller represents the peel portion and the larger the consolidated continuation— functioning as a post-peel consolidation step. This recurring pattern across transactions indicates automated or coordinated distribution, consistent with money-laundering typologies designed to obscure origin and flow of funds.

Further analysis shows that some funds transacted through **xpub6DJS** can be traced to **Kraken** Exchange. These participated in a large consolidation transaction (3806508c41c725e9c9b4fb70520de111a2a445ff4c10f0703aca630638b1f50e) aggregating over 1,000 inputs—consistent with previously peeled outputs—before a 5 BTC transfer was made to Kraken. This sequence—peel → consolidation → exchange deposit—aligns with obfuscation-driven cash-out behavior.

For **zpub6rr**, traced funds show similar behavior. Following small peel-offs, a consolidation transaction was observed one hop later (8df049eb3d79dbe13030da8788ed223e9cce48ccff99a6f112dc656961c1b448), after which the funds were transferred to wallets attributed to the **Paxos** infrastructure provider. This mirrors the laundering flow identified elsewhere: fragmented peel-offs, rapid consolidation, and transfer into custodial infrastructure.

**Incoming Fund FLows:**

Analysis of the inbound flow into the identified **xpub6DJS** and **zpub6rr** addresses indicates that the majority of transactions form part of a peel-chain structure, making clear attribution difficult.

However, address **1QDhKAKmqqbakd6xPkcH5XuwqV3b1wqgro** was identified as a recurring participant within the activity. This wallet has been active for over five years, has had direct transactional links with Coinbase, and most recently, on 6 August 2025, received additional inbound funds originating from the observed peel chain.

The repeated interactions between this wallet and addresses tied to the client-provided xpub6DJS and zpub6rr keys suggest that the same operator has likely been responsible for this activity over an extended period, with a consistent operational pattern persisting for more than five years.

 MoneyFlow

# Contacting Exchanges for Additional Information

To request further information from the exchanges involved, please provide the transaction hashes mentioned above and follow their **Law Enforcement Request** for Information guidelines:

| Entity | Contact Details |
|---|---|
| Paxos | subpoenas@paxos.com |
| Kraken | Link |
| Coinbase | Link |

Given the complexity of the funds' flow and the involvement of centralized exchanges, further collaboration with local Law Enforcement and relevant parties is encouraged. The attached spreadsheet provides additional details on the transaction trail for a comprehensive understanding of the case.

Bitquery is committed to provide any further assistance required to process this investigation further. Please do not hesitate to get in touch with us at investigations@bitquery.io

DISCLAIMER: DUE TO THE NATURE OF THE DATA ANALYZED AND INFORMATION PROVIDED, YOU AGREE THAT BITQUERY IS NOT LIABLE FOR ANY USE OF THE REPORT.

MoneyFlow | Bitquery, Inc. | Cody Wilson – Investigation Report
investigations@bitquery.io | 19 August 2025

DEFENSE DISTRIBUTED'S RESPONSES TO ELIK'S
REQUEST FOR PRODUCTION 7:

SEEKING DOCUMENTS
SUPPORTING CFAA CONTENTION

RESONSE WAS IDENTICAL TO
RESPONSE TO RFP 6

Ex. 2A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

DEFENSE DISTRIBUTED'S RESPONSES TO ELIK'S
REQUEST FOR PRODUCTION 8:

SEEKING DOCUMENTS
SUPPORTING TRADE LIBEL/ LAN-

HAM ACT CONTENTION

**Mandiant**

TLP:AMBER+STRICT
**DEFCAD**
**Case#: 55979132**
**Digital Risk Profile**
**Date of Report: March 4, 2025**
**Domains: defcad.com, ddlegio.com, ghostguns.com**

**Summary of Results:**

*No compromised corporate credentials were identified in the sources monitored by Mandiant.*
*Over 2400 compromised customer credentials were identifed in the sources monitored by Mandiant.*

*Contents:*

| Tabs | Description |
|------|-------------|
| Summary | Summary of results and clarifying notes regarding data. |
| Corporate Domains | Compromised credentials pertaining to the provided domain list. |

**Notes about data:**

*Mandiant is unable to verify the authenticity of the data identified in leaks and forums. Blank cells, unusual or unexpected data/characters, and errors may exist in the data set. The data is provided as collected from the source.*

*Personally Identifiable Information (PII) and/or passwords (if available) have been redacted to best comply with policy, privacy, and legal regulations.*

*Password MD5 hashes have been provided when available.*

*Timestamps indicate approximate time of infection/compromise when available.*

GOOGLE PROPRIETARY & CONFIDENTIAL
*Dissemination Restrictions: This report can be shared within the customer organization.*
*Further dissemination of the product must be explicitly approved by Mandiant.*
**Google** Cloud

Ex. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION





# Digital Risk Profile: DEFCAD, Inc

Last Update: April 3, 2025

//////////////////////////////////////////////////////////
MANDIANT PROPRIETARY AND CONFIDENTIAL
*Dissemination Restrictions: This report can be shared within the customer organization and Mission Support Partners (MSPs).
Mandiant must explicitly approve further dissemination of the product.*

MANDIANT INTELLIGENCE EXPERTISE                                          TLP:RED

# Table of Contents

**Requirement**......................................................................................................3

**Scope**...............................................................................................................3

**Risk Descriptions**..............................................................................................4

**Executive Summary**...........................................................................................6

**Compromised Credentials**................................................................................ 10

    Overall Assessment.........................................................................................10

    Background.....................................................................................................10

        Corporate Accounts....................................................................................10

        Customer Accounts.....................................................................................10

        Compromised Accounts...............................................................................11

        Combolist Accounts.....................................................................................11

    Customer Credentials.......................................................................................12

**Suspicious Domains**........................................................................................ 14

    Domain Risk Descriptions.................................................................................14

    Domain Risk Matrix For DEFCAD........................................................................15

    High Risk Domains Targeting DEFCAD.................................................................17

        defcad[.]net and def-cad[.]com......................................................................17

        Visually Similar Sites....................................................................................18

    Moderate Risk Domains Targeting DEFCAD.......................................................... 20

        defcad[.]co.................................................................................................20

**Underground Activity**...................................................................................... 23

    Telegram.......................................................................................................23

**Appendices**................................................................................................... 25

    Appendix A: Supplemental Documents.................................................................25

    Appendix B: Credential Stealers.........................................................................25

MANDIANT INTELLIGENCE EXPERTISE



# Requirement

This Digital Risk Profile (DRP) provides a point-in-time analysis of potential DEFCAD-specific digital risks and exposures across monitored online sources. This analysis aims to identify potential cybersecurity threats, data breaches, brand reputation risks, and other vulnerabilities related to the client's digital assets and online presence.

# Scope

Our assessment of DEFCAD's digital risks is based on Mandiant's internal threat intelligence data, which includes proprietary raw data and finished threat intelligence reports primarily from January 1, 2024 to the present. We collect data from open and dark web sources, including known cybercriminal forums, marketplaces, and data leak sites. We also utilize data feeds from our botnet and malicious infrastructure monitoring systems, providing real-time insights into threat activity.

While comprehensive, it is important to acknowledge that highly sophisticated threat actors may operate covertly, and their activities may not always be observable in publicly accessible forums. This assessment provides a point-in-time analysis based on available data.

MANDIANT INTELLIGENCE EXPERTISE                                                         

# Risk Descriptions

This report uses the following risk ratings:

| Digital Threat Risk Ratings |
| --- |
| **High** |
| Indicates a direct and immediate threat to the client's brand, infrastructure, or employees. Examples include: <ul><li>Recent leaks of actively used corporate credentials that grant access to sensitive corporate infrastructure.</li><li>Malware uniquely designed to target the client, its brand, and/or its clients.</li><li>A recent data leak originating directly from client infrastructure.</li></ul> |
| **Moderate** |
| Represents a potential threat that could be exploited indirectly to compromise the client's brand, infrastructure, or employees. Examples include: <ul><li>Recent leaks of actively used corporate credentials that grant access to third-party infrastructure.</li><li>Malware that broadly targets hundreds of disparate organizations, including the client.</li><li>A recent third-party data leak that exposes some client information.</li></ul> |
| **Low** |
| Signifies minimal or no immediate threat and is unlikely to be exploited to cause significant harm to the client's brand, infrastructure, or employees. Examples include: <ul><li>Older leaks of corporate credentials for terminated employees that do not grant access to corporate infrastructure.</li><li>Malware that targets a broad range of similar organizations as the client.</li><li>A recent post that re-shares years-old data related to the client.</li></ul> |

*Table 1: Mandiant's digital risk ratings guide*

Ex. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

MANDIANT INTELLIGENCE EXPERTISE



# Executive Summary



A-379

EX 2A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

MANDIANT INTELLIGENCE EXPERTISE                                                

# Executive Summary

In December 2024, DEFCAD, Inc. requested that Mandiant evaluate whether its data was present on the Dark or Open web. Mandiant did not identify any corporate employee credentials related to the defcad.com domain or sensitive corporate documents in the research period dating back to January 1, 2024.

However, during Mandiant's investigation we identified several notable digital risks:

- We identified customer credentials in monitored sources for the same research period, but we assess these to be likely collected by stealer malware installed on victim computers rather than leaked from the defcad.com website.
- Mandiant identified several high risk domains that present impersonation risks and could be leveraged by threat actors in support of cyber activities.

Additional key findings are summarized below and discussed in subsequent sections.

| Key Findings |
| --- |
| **Compromised Credentials** |



- Since January 1, 2024, we did not identify any corporate employee credentials related to the defcad.com domain.
- Since January 1, 2024, we found over 2,400 sets of compromised customer credentials related to defcad.com. We did not identify any notable patterns suggestive of a new and/or unknown breach of DEFCAD infrastructure.
- We did not observe any hardcoded credentials or leaked secrets in GitHub code repositories that featured keywords related to DEFCAD.
- We recommend DEFCAD review the identified credentials for accuracy and determine if any additional internal action is needed.

| **Suspicious Domains** |
| --- |

A-380

MANDIANT INTELLIGENCE EXPERTISE





- We investigated domains for malicious activity impersonating or targeting DEFCAD. Common themes in observed typosquatted domains included use of "defcad" and terms such as "liberator."
- We identified two high risk domains associated with hosting a coming soon page using a FEDCAD reference.
- We identified several domains recently hosting a mirrored or scraped version of defcad.com. Some, but not all, of the domains employed the *.ir* TLD; although it is unclear what the purpose of this activity was.
- We noted 21 low or moderate risk domains, some of which may be benign.
- Most of the low to moderate risk domains are currently expired, but could plausibly be registered again and used to impersonate DEFCAD.
- We recommend DEFCAD review the domain information for accuracy and awareness. Typically, we recommend that affected organizations initiate takedowns of the moderate to high-risk domains that specifically target employees and customers.

## Underground Activity



- Mandiant identified threat discussions of credentials collected via stealer malware. None of the observed discussions were specific to DEFCAD or customers, but rather relate to opportunistic capture of content from infected devices.

## Malicious Files



- Mandiant did not identify any malicious documents targeting or impersonating DEFCAD.

## Non-Malicious/Sensitive Files



- Mandiant did not identify any malicious documents targeting or impersonating DEFCAD.

## Credential Stuffing



- Our review of available sources did not identify credential stuffing configuration files referencing DEFCAD at this time.

MANDIANT INTELLIGENCE EXPERTISE                                    

## Mobile Applications

**N/A**  • We did not identify any notable malicious or non-malicious mobile applications of concern to DEFCAD.

## Employee Doxxing

**N/A**  • We did not identify any doxxing of DEFCAD employees.

*Table 2: Mandiant's key digital risk findings for DEFCAD*

Ex. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

MANDIANT INTELLIGENCE EXPERTISE





# Compromised Credentials

MANDIANT INTELLIGENCE EXPERTISE                                                                    TLP:RED  ▾

# Compromised Credentials

## Overall Assessment

Since January 1, 2024, Mandiant has not identified any compromised corporate credentials associated with DEFCAD's primary domain, defcad.com, or companion domains defdist.org, ghostgunner.net, ghostguns.com, or ddlegio.com in the sources monitored by Mandiant.

However, Mandiant observed over 2,400 compromised account credential sets accessing defcad.com and related domains ddlegio.com, defdist.org, ghostgunner.net, and ghostguns.com that have been leaked on monitored underground forums. Analysis of these leaked credentials, particularly within the last year, does not indicate a widespread data breach.

## Background

For this report, Mandiant researched various publicly accessible and monitored underground forums to identify "corporate" and "customer" compromised credentials. These platforms include those that require validated accounts (e.g., BreachForums), high levels of "reputation" (e.g., XSS), and those that are open to the public, but require temporary or permanent accounts (e.g., Telegram).

### Corporate Accounts

Credential sets are labeled as "corporate" when either of the following two conditions are met:
1. The username uses an email address on the client's primary domain (e.g., defcad.com).
2. The username uses an "employee ID" or a shortened Lightweight Directory Access Protocol (LDAP) name AND is associated with a URL likely only accessible to corporate employees (e.g., vpn.defcad.com).

### Customer Accounts

Credential sets are labeled as "customer" when either of the following two conditions are met:
1. The username uses an email address not on the client's primary domain (e.g., hotmail[.]com, gmail[.]com).
2. The username does not use an email address (e.g., janedoe1980) and is associated with a customer-centric URL (e.g., defcad.com/login).

The table below provides one example that illustrates the difference between corporate and customer credentials.

MANDIANT INTELLIGENCE EXPERTISE



| Username | URL | Type |
|---|---|---|
| john.doe@acmecorp[.]com | acmecorp[.]com/oauth/2/login | Corporate |
| jane.doe@gmail[.]com | acmecorp[.]com/customeraccount/ | Customer |

*Table 3: Examples of a "corporate" and "customer" credential set*

### Compromised Accounts

Compromised accounts pose the most significant risk as they often represent recent compromises of a victim's entire browser password store. This "store" often contains other sensitive information such as employee IDs, personal email addresses, and phone numbers - all useful for social engineering attacks on the password reset process. Compromised accounts typically also have more metadata that usually helps pinpoint the "date of compromise" within a 2-3 month timeframe.

### Combolist Accounts

These are collections of previously leaked credentials used in brute force attacks; attacks which rely on password reuse. Combolist accounts are typically less impactful as they often lack metadata beyond the username and password and sometimes even an associated URL. The compromise date is also less accurate, often months to years before the combolist is released. Finally, there is typically no associated "credential store," making it difficult to determine how and when the account was compromised, and whether other PII exists that could make socially engineering the password reset process less difficult.

**Key Differences:**

Compromised accounts provide attackers with a richer source of information and a clearer timeline of the breach, making them a more serious threat than combolist accounts.

| Characteristic | Compromised Account | Combolist Account |
|---|---|---|
| Impact | **High:** Attackers may access the entire password repository and potentially sensitive personal information. | **Lower:** Limited to username and password, often missing other details. |
| Compromise Date | **More accurate:** Usually determined within 2-3 months using log files. | **Less accurate:** Can be years before the combolist release date. |
| Metadata | **More extensive:** Includes personal information and website URLs. | **Limited:** Often only includes username and password. |
| Credential Store | **Associated** with a specific user's credential store, providing more context about the compromise. | **Not associated** with a credential store, making it difficult to investigate the compromise. |

*Table 4: Key differences between compromised and combolist accounts*

Proprietary & Confidential   ▾   |   11

MANDIANT INTELLIGENCE EXPERTISE



## Customer Credentials

Mandiant identified over 2,400 customer credential sets for defcad.com and related domains ddlegio.com, defdist.org, ghostgunner.net, and ghostguns.com compromised, published, or first seen since January 1, 2024. Based on our observations and experience, this is not unusual for a company like DEFCAD. In addition, we did not identify any patterns that suggest a unified source of these credentials.

As was the case here, companies with a client base, like DEFCAD, often see more customer (external user) credentials leaked in underground forums and markets. The vast majority of the time, these credential leaks are the result of compromises of personal devices of an organization's clients. While not recommended, we find that more often than not, identified victims save credentials on personal devices that are later compromised by credential stealing malware.

Based on the above analysis and other contextual information, we do not believe these credentials pose a risk to DEFCAD's corporate infrastructure. However, we strongly urge DEFCAD to review these credentials and prioritize rotations of customer accounts as needed. Mandiant strongly advises all clients to rotate compromised passwords, disable inactive accounts, and enforce multi-factor authentication (MFA) for secure logins.

Further details on our credential analysis are available in the "**DEFCAD_Credentials.xlsx**" file included with this report.



*Figure 1: Top Stealer Malware responsible for credential theft*

Ex. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

MANDIANT INTELLIGENCE EXPERTISE



# Suspicious Domains



A-387

MANDIANT INTELLIGENCE EXPERTISE



# Suspicious Domains

The following domains were identified as potential risks to DEFCAD and are listed in order of severity. See the supplemental materials (**DEFCAD_Domains.xlsx**) for more details on each domain.

## Domain Risk Descriptions

Mandiant uses the following ratings when assessing a domain's risk to an organization.

| Domain Risk Ratings |
| --- |
| **High** |
| Indicates a domain that is a direct and immediate threat to the client's brand, infrastructure, or employees. Examples include:<br>• Domains that misuse a client's intellectual property (logos, website assets, etc.).<br>• Domains that target a client and are involved in malware and/or phishing campaigns.<br>• Active domains that mimic client's employee login page. |
| **Recommendations** |
| To prevent future abuse and misuse of all high risk domains, consider these options:<br>• **Filing a takedown:** File a takedown with the domain's registrar and ISP.<br>• **Purchasing the domain:** This gives direct control and prevents unauthorized use.<br>• **Monitoring the domain:** If purchasing isn't feasible, regular checks for changes in registration, reachability, and address resolution can help detect potential threats early.<br>• **Blocking IP/Domain traffic:** Blocking traffic at the edge of the organization's network infrastructure, could help to prevent unauthorized scraping and use of website assets on the organization's domains and may decrease the risk of employee phishing and remote connections.<br>• **Create Awareness:** Awareness and education programs can help reduce the likelihood that an employee, student, or teacher will fall victim to phishing emails abusing these domains. |
| **Moderate** |
| Represents a domain that is a potential threat that could be exploited to compromise the client's brand, infrastructure, or employees. Examples include:<br>• Recently registered typosquatted domains with a history of malicious use.<br>• Typosquatted domains with little available information and unclear intentions.<br>• Domains that mimic a client's domain and are associated with other malicious domains. |
| **Recommendations** |

MANDIANT INTELLIGENCE EXPERTISE



To prevent future abuse and misuse of moderate risk domains, consider these options:
- **Filing a takedown:** File a takedown with the domain's registrar or ISP. However, often this can be difficult if insufficient evidence exists to support a takedown claim.
- **Purchasing the domain:** This gives direct control and prevents unauthorized use.
- **Monitoring the domain:** If purchasing isn't feasible, regular checks for changes in registration, reachability, and address resolution can help detect potential threats early.
- **Blocking IP/Domain traffic:** Blocking traffic at the edge of the organization's network infrastructure, could help to prevent unauthorized scraping and use of website assets on the organization's domains and may decrease the risk of employee phishing and remote connections.

### Low

Signifies a domain that is a minimal or no immediate threat to a client's brand, infrastructure, or employees. Examples include:
- Domains that could potentially be misused but are currently generic in nature.
- Legitimate domains originally owned by a client that have lapsed and expired.
- Client-related domains being squatted for resale.

### Recommendations

To prevent future abuse and misuse of low risk domains, consider these options:
- **Purchasing the domain:** This gives direct control and prevents unauthorized use.
- **Monitoring the domain:** If purchasing isn't feasible, regular checks for changes in registration, reachability, and address resolution can help detect potential threats early.

*Table 5: Mandiant's domain risk ratings and recommendations guide*

## Domain Risk Matrix For DEFCAD

The following notable domains were identified as potential risks to DEFCAD and are listed in order of severity.

| Domain | Risk |
|---|---|
| defcad.net | High |
| def-cad.com | High |
| abadi.sbs | High |
| sir.ffakhar.ir | High |
| nice.woodclub.pw | High |
| consol.braincontrol.ir | High |

# Ex 2A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

MANDIANT INTELLIGENCE EXPERTISE

 TLP:RED

| | |
|---|---|
| fa1.electricity-control.ir | High |
| fa2.electricity-control.ir | High |
| fa3.electricity-control.ir | High |
| sso.ffakhar.ir | High |
| 141.94.2.52.sslip.io | High |
| paneldownloadforwindowsxp.negspace.store | High |
| 157.90.18.138.sslip.io | High |
| 185.201.252.32.sslip.io | High |
| 65.21.58.230.sslip.io | High |
| defcad.co | Moderate |
| defcad.ca | Low |
| defcad.se | Low |
| defcad.us | Low |
| defcadliberator.com | Low |
| defcadliberator.org | Low |
| defcadtactical.com | Low |
| defcad.asia | Low |
| defcad.cn | Low |
| defcad.co.nz | Low |
| defcad.co.za | Low |
| defcad.com.cn | Low |
| defcad.is | Low |
| defcad.net.nz | Low |
| defcad.nl | Low |
| defcad.ph | Low |
| defcad.ru | Low |

MANDIANT INTELLIGENCE EXPERTISE                                     TLP:RED ▾

| | |
|---|---|
| defcad.tk | **Low** |
| defcade.com | **Low** |
| defcadi.tk | **Low** |

*Table 6: Mandiant's risk assessment for observed suspicious domains related to DEFCAD*

## High Risk Domains Targeting DEFCAD

| High Risk | *defcad[.]net and def-cad[.]com* |
|---|---|

This domain and def-cad[.]com were both created on the same day (2024-02-24) via GoDaddy and hosted at Amazon. While def-cad[.]com has since recently expired on 2025-02-24, defcad[.]net remains active and hosting content that indirectly asperses DEFCAD through the use of a logo labelled FEDCAD (Figure 2).

**Analysis**
- This domain is currently resolvable.
- The domain was created in February 2024.
- The page was built using a page builder from GoDadady and employed a distinct "FEDCAD" logo at the top.
- No malicious content was observed at the time of analysis.
- def-cad[.]com recently expired on 2025-02-24 and currently redirects to a parked page. It previously redirected visitor traffic to defcad[.]net
- In addition, the site has the language "Copyright © 69420 Fedcad- All Wrongs Reserved."

### Why these sites are of concern
**Domain Impersonation:** The domain names closely resemble defcad[.]com, which could be exploited to target employees, customers, and partners.
**Recent activity:** Both domains were reactivated on 2024-02-24, though they have both been around since at least 2014 (def-cad[.]com) and 2017 (defcad[.]net).
**Redirect Connection:** def-cad[.]com is connected to defcad[.]net by a number of factors, most notably by a redirect.

MANDIANT INTELLIGENCE EXPERTISE





*Figure 2: Content hosted on defcad[.]net*

There was brief mention of defcad[.]net in a Reddit thread last year (Figure 3).



*Figure 3: Mention of defcad[.]net (https://www.reddit.com/r/fosscad/comments/1c5p10f/reminder/)*

| High Risk | **Visually Similar Sites** |
|---|---|

Proprietary & Confidential  ▾   |  18

MANDIANT INTELLIGENCE EXPERTISE



Mandiant identified several FQDNs recently hosting a mirrored or scraped version of defcad.com (Figures 4 and 5).

- abadi[.]sbs
- sir.ffakhar[.]ir
- nice.woodclub[.]pw
- consol.braincontrol[.]ir
- fa1.electricity-control[.]ir
- fa2.electricity-control[.]ir
- fa3.electricity-control[.]ir
- sso.ffakhar[.]ir
- 141.94.2.52.sslip[.]io
- paneldownloadforwindowsxp.negspace[.]store
- 157.90.18.138.sslip[.]io
- 185.201.252.32.sslip[.]io
- 65.21.58.230.sslip[.]io




*Figure 4: 65.21.58.230.sslip[.]io on July 2, 2024*    *Figure 5: sir.ffakhar[.]ir on October 4, 2024*

It is unclear what the intent was with these sites. We were unable to identify usage of these FQDNs in past malicious campaigns. At the time of analysis, only sir.ffakhar[.]ir was actively serving content, which was confirmed to match the content from defcad.com. While it's plausible the sites were intended to phish credentials, the login page on sir.ffakhar[.]ir retained the reCAPTCHA challenge which generated an error (Figure 6). Likewise, after a simulated login attempt during analysis, there was an error displayed after the login attempt (Figure 7).

MANDIANT INTELLIGENCE EXPERTISE





*Figure 6: reCAPTCHA error on login page*



*Figure 7: Error after login attempt*

The earliest observations of DEFCAD content hosting date back about nine months. While there were a range of hosts previously serving DEFCAD content, five of the sites were hosted behind Cloudflare services. Notably, electricity-control[.]ir has also hosted sites mimicking the Organization for Security and Co-operation in Europe (OSCE) and European Bisexual Conference (EuroBiCon). OSCE content was also observed being hosted at sslip.io FQDNs. sslip[.]io is a DNS service that returns the IP address structured in the FQDN and appears to be a service commonly abused.

Both abadi[.]sbs and 185.201.252.32.sslip[.]io resolved to 185.201.252.32 at the time of capture on June 10th 2024. 185.201.252.32 has previously been associated with a campaign beginning in September 2024 involving download of fake software installers leading to distribution of infostealer malware; however, this campaign occurred after the initial observation of DEFCAD hosted content and does not appear to be linked.

Within the DEFCAD_Domains.xlsx spreadsheet delivered with this report is a worksheet titled 'Mirror Sites'. This worksheet contains the IP addresses where these FQDNs previously resolved. Reviewing web server logs for these IP addresses may help determine if these servers are/were used to actively scrape DEFCAD content.

## Moderate Risk Domains Targeting DEFCAD



| Moderate Risk | *defcad[.]co* |
|---|---|

This domain is assessed with moderate risk because it remains an actively registered domain reactivated in November 2024 after previously expiring. While it is currently parked, it could be easily repurposed by



a threat actor given the use of the .co TLD and its common use for typosquatting and visual similarity to DEFCAD's .com domain. Purchasing this domain, if possible, would eliminate the risk associated with adversarial use.

### Why this domain is a moderate risk

- **Domain Impersonation:** The domain name closely resembles defcad[.]com, which could be exploited to target employees, customers, and partners.
- **Recent Activity:** Recent reactivation was observed in November 2024.
- **Search Engine Confusion:** Web search summaries for this domain may display information incorrectly attributing it to DEFCAD (Figure 8).
- **Infrastructure Connections:** It shares two SSL certificates for numerous other domains including several keepcaling[.]com which appears to be a typosquat domain of the legitimate KeepCalling[.]com.

### Moderating Factors

- **Parked Domain:** The domain is currently parked after previously expiring in July 2024.
- **Limited Subdomain Activity:** Subdomain creation is unremarkable.

---

**About DEFCAD** ⋮

Defcad.co is an American startup that created a search engine and web portal for designers and hobbyists to find and develop 3D printable and other CAD models online. The site has over 2,500 community users and offers access to over 100,000 models. While it is well-designed and user-friendly, it has been criticized for requiring users to provide personal information and pay fees to download files. Less ︿

---

*Figure 8: Auto-generated Google Search summary of defcad[.]co*

MANDIANT INTELLIGENCE EXPERTISE



# Underground Activity



EX 2A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

MANDIANT INTELLIGENCE EXPERTISE



# Underground Activity

Since January 1, 2024, Mandiant identified a small number mentions of DEFCAD in forums and platforms we monitor. Based on our research at the time of the writing of this report, we identified threat discussions of credentials collected via stealer malware. None of the observed discussions were specific to DEFCAD or customers, but rather relate to opportunistic capture of content from infected devices. We assess that this poses a medium risk to DEFCAD customers affected by the installation of stealer malware.

We also identified a post on Telegram in early March 2024 suggesting a possible data breach, but it appears to refer to an earlier post on leakbase[.]cc wherein "Step files and rendering" were reportedly shared via a Mega download link.

## Telegram

Overall, Mandiant observed minimal cyber threat actor discussion of DEFCAD on monitored Telegram channels outside of advertisements for stolen customer credentials discussed in an earlier section.

| FORUM POST TITLE | |
| --- | --- |
| **Risk** | Low ▾ |
| **Type** | Advertisement |
| **Date of Post** | 2024-03-13 06:21:48 |
| **Platform** | breachdetector |
| **Analysis** | The Telegram channel breachdetector posted about a potential data leak originating from defcad.com. While we were unable to evaluate the claims, this may correspond to a post on leakbase[.]cc on Jan. 31, 2024 in which "Step files and rendering" were reportedly shared via a Mega download link.<br><br>This channel appears to be a privately maintained Telegram channel for tracking and publicizing data leaks. |
| **Forum Post Text** | |

```
{
"Source": "https://leakbase.cc/",
"Content": "Defcad.com - Guns And Armor 3D Printing Models",
"author": " (markitto35)",
"Detection Date": "13 Mar 2024",
"Type": "Data leak"
}
```
  ◆  t.me/breachdetector  ◆

A-397

Ex. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

MANDIANT INTELLIGENCE EXPERTISE

 TLP:RED ▾

# Appendices



MANDIANT INTELLIGENCE EXPERTISE                                                  

# Appendices

## Appendix A: Supplemental Documents

The following are supplemental materials provided with this report.

| Name | Type | Description |
|------|------|-------------|
| DEFCAD_Credentials.xlsx | Excel | Credential information referenced in this report. |
| DEFCAD_Domains.xlsx | Excel | Domain information referenced in this report. |

*Table 7: Names and types of supplemental documents*

## Appendix B: Credential Stealers

The following are descriptions of the credential stealing malware referenced in the Compromised Credential section.

| Malware | Description |
|---------|-------------|
| LUMMAC.V2 | LUMMAC.V2 is known to target a wide range of industries, and is associated with threat actors such as UNC3774, UNC5885 and others. It is capable of stealing data from browsers and cryptocurrency wallets and uses a binary morpher. |
| REDLINESTEALER | REDLINESTEALER is a credential stealer malware family that targets numerous industries, including Aerospace & Defense, Education, Energy & Utilities, Financial Services, Government, Healthcare, and Technology. It steals credentials from web browsers, files, FTP applications, and cryptocurrency wallets, and collects system information like hardware specifications, screenshots, usernames, OS details, and IP addresses. |
| STEALC | STEALC is a malware family also known as Netsupport and Stealc. It is a data miner written in C that targets data from web browsers, chat software, and other applications, and uploads collected data to a remote server using HTTP. |
| METASTEALER | METASTEALER is a malware family that functions as a dataminer, targeting system information, usernames, passwords, and cookie values; it can also log keystrokes and establish a Hidden Virtual Network Connection. |
| ERBIUM | ERBIUM is a credential-stealing malware family written in C++ that targets crypto wallets, web browsers, Telegram, FileZilla, Steam, and Discord, and it also captures desktop files, screenshots, and clipboard data, sending the captured information to its command and control server as a ZIP file over HTTPS. |

Ex. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

MANDIANT INTELLIGENCE EXPERTISE 

| RADTHIEF | RADTHIEF is a C++–based infostealer malware family that is also known as Handala, Rhadamanthys, or HeartCrypt. It collects computer name, username, system and network information, installed programs, screenshots, browser data, and crypto wallet data. |
|---|---|
| RACCOON | RACCOON is a malware family that functions as a data miner, targeting credentials, autofill data, credit card information, cookies, email server configurations, cryptocurrency wallets, and system information; it can also download/execute additional payloads and capture screenshots. |
| RISEPRO | It is a credential stealer that communicates via HTTPS and collects web browser and cryptocurrency wallet data. |
| VIDAR | VIDAR targets a wide range of industries, including Aerospace & Defense, Financial Services, Government, Healthcare, and Technology. It collects data from web browsers, cryptocurrency wallets, chat software, and other applications, compressing and uploading it to a remote server via HTTP. |
| PENNYWISE | PENNYWISESTEALER is a credential stealer malware family that targets Windows operating systems and is capable of stealing credentials from web browsers, files, and cryptocurrency wallets. |
| CRYPTBOT | CRYPTBOT is a malware family that steals browser credentials, cookies, and cryptocurrency wallets, and collects system information, packaging the data in a zip file and uploading it to a command and control server via HTTP POST. |
| ATOMIC | The ATOMIC malware family, also known as Banshee or Amos, is a data miner that targets macOS environments. It is written in Go and can exfiltrate browser data, cryptocurrency wallets, system information, and files from the Desktop & Documents folders, sending the collected data to a command and control server (C2) over HTTP. |
| DARKCRYSTALRAT | It communicates over HTTP and its capabilities include remote desktop, file transfer, file execution, shell command execution, credential theft, and arbitrary code execution. It can also capture audio, screenshots, keystrokes, and camera images, and target credentials stored by browsers and FTP clients. |
| AZORULT | AZORULT is a malware family, also known as Azorult and Trickgate, that functions as a data miner written in Delphi. It targets credentials from web browsers, email and FTP clients, and instant messaging software, and can collect cryptocurrency wallets, browser cookies, auto-complete data, screenshots, and basic system information. |

A-400

MANDIANT INTELLIGENCE EXPERTISE



| | |
|---|---|
| WORLDWIND | WORLDWIND is a credential stealer that targets Windows operating systems. It can also enumerate users and hardware, execute files and commands, find processes and files, get environmental variable values and file attributes, perform screen captures, self-delete, self-uninstall, self-update, sleep, suspend threads, terminate processes, and timestomp files. |
| NEXUS | Also known as Nexus Stealer, it is a publicly available infostealer that targets Chromium-based browser data, Windows credentials, cryptocurrency wallets, instant messaging sessions, and system information; it is also capable of taking screenshots. |
| WHITESNAKE | WHITESNAKE is a malware family and an infostealer that uses the .NET Framework. It is capable of exfiltrating keystrokes, taking screenshots, stealing and modifying crypto wallets from the clipboard, stealing browser data and wifi credentials, exfiltrating files and registry values, collecting system information and application credentials, stealing hardware crypto wallets and acting as a backdoor over SSH or TOR via a Telegram bot. |

*Table 8: Descriptions of credential theft malware found in the Compromised Credentials Section*


Generated by Gataleaks.org
File ID: GLS—ws9hm8dz07glyi8

← **ZøNA**
5,566 posts

**Follow**

↻ **ZøNA** reposted

 **ZøNA** @SillyGirlPsyops · Aug 6
Replying to @ArmedJOy

It is my opinion that Child Predator Cody Wilson got his sweet plea deal by giving the feds backdoor access to all the highly sensitive personally identifiable information mined via FedCad. Even if he isn't an informant, the website has still leaked this data. Also, he doxxed me.

# FRIENDS DON'T LET FRIENDS USE
# FEDCAD

"Friends don't let Friends use defcad.

Defcad's database has been hacked and dumped on multiple occasions. They do not encrypt their data, and keep it stored unsalted - all your information is in a row. That they never disclosed and breaches is reason enough not to use the site.

They pass off unusable, untested, bogus files as if they are working projects in order to milk money out of people. Wow! A 3D printable M82? That's so cool! Turns out it's a low-poly videogame model, but they won't say so until they've got your money. Additionally, for things that are actually tested and documented, they do not update files to latest versions - many out of date files to be found. That you can't (or shouldn't) trust the files you get there might be a signal not to use the site, but it gets better.

Defcad can, and has, doxxed developer information to antigunners. They did this with only the slightest pressure, and made no serious attempt to obfuscate. They then attempted to blackmail myself and others with our personal information in an attempt to force money out of us - to support a lawsuit where defcad was getting sued, and myself and such others were not. Certainly shady for a company that claims that it only collect money from users so that it can fight lawsuits. Of course, they forget to mention that they'll extort you and that they've yet to actually win a lawsuit.

And while I could go on, I'll leave you with the notion that Defcad is wretchedly awful, should be avoided, shouldn't be used, and should be publicly shamed.

We can discuss its founder having paid a 16 year old for sex and other outstanding things that your money will be used for if you give it to them another time!" - *@NaviGoBoom*

"Also, Convicted Child Predator Cody Wilson doxxed both me and Ivan out of spite. Do not trust him with your data." - *Zona*

💬　　　↻ 12　　　♡ 41　　　⎮⎮⎮ 671　　　🔖　↥


Generated by Gataleaks.org
File ID: GLS-iucvfdlfo2jfy4c

3:50   📞 2:53   ............   📶 🔋 •

As I stated previously The Gatalog is the only group currently with robust testing and documentation standards before a public release.

## FRIENDS DON'T LET FRIENDS USE
# FEDCAD

"Friends don't let Friends use defcad.

Defcad's database has been hacked and dumped on multiple occasions. They do not encrypt their data, and keep it stored unsalted - all your information is in a row. That they never disclosed and breaches is reason enough not to use the site.

They pass off unusable, untested, bogus files as if they are working projects in order to milk money out of people. Wow! A 3D printable M82? That's so cool! Turns out it's a low-poly videogame model, but they won't say so until they've got your money. Additionally, for things that are actually tested and documented, they do not update files to latest versions - many out of date files to be found. That you can't (or shouldn't) trust the files you get there might be a signal not to use the site, but it gets better.

Defcad can, and has, doxxed developer information to antigunners. They did this with only the slightest pressure, and made no serious attempt to obfuscate. They then attempted to blackmail myself and others with our personal information in an attempt to force money out of us - to support a lawsuit where defcad was getting sued, and myself and such others were not. Certainly shady for a company that claims that it only collect money from users so that it can fight lawsuits. Of course, they forget to mention that they'll extort you and that they've yet to actually win a lawsuit.

And while I could go on, I'll leave you with the notion that Defcad is wretchedly awful, should be avoided, shouldn't be used, and should be publicly shamed.

We can discuss its founder having paid a 16 year old for sex and other outstanding things that your money will be used for if you give it to them another time! " - @NaviGoBoom

Just say no FEDCAD. And their affiliated sites, Legio, Defense Distributed, ghostgunner.net, and ghostguns.com.

## WHERE DO I GET THE PARTS KITS?



🔒 ctrlpew.com


Generated by Gataleaks.org
File ID: GLS-65ij86nvza8bbxp



 Generated by Gataleaks.org
File ID: GLS-81nniw69ddeejs3

# FRIENDS DON'T LET FRIENDS USE
# FEDCAD

"Friends don't let Friends use defcad.

Defcad's database has been hacked and dumped on multiple occasions. They do not encrypt their data, and keep it stored unsalted - all your information is in a row. That they never disclosed and breaches is reason enough not to use the site.

They pass off unusable, untested, bogus files as if they are working projects in order to milk money out of people. Wow! A 3D printable M82? That's so cool! Turns out it's a low-poly videogame model, but they won't say so until they've got your money. Additionally, for things that are actually tested and documented, they do not update files to latest versions - many out of date files to be found. That you can't (or shouldn't) trust the files you get there might be a signal not to use the site, but it gets better.

Defcad can, and has, doxxed developer information to antigunners. They did this with only the slightest pressure, and made no serious attempt to obfuscate. They then attempted to blackmail myself and others with our personal information in an attempt to force money out of us - to support a lawsuit where defcad was getting sued, and myself and such others were not. Certainly shady for a company that claims that it only collect money from users so that it can fight lawsuits. Of course, they forget to mention that they'll extort you and that they've yet to actually win a lawsuit.

And while I could go on, I'll leave you with the notion that Defcad is wretchedly awful, should be avoided, shouldn't be used, and should be publicly shamed.

We can discuss its founder having paid a 16 year old for sex and other outstanding things that your money will be used for if you give it to them another time!" - *@NaviGoBoom*


Generated by Gataleaks.org
File ID: GLS—x80ppjr5nhw0duv



 Generated by Gataleaks.org
File ID: GLS-2c8twvaa4hgx23e



 Generated by Gataleaks.org
File ID: GLS—ancdwy2woc9u0pk




Generated by Gataleaks.org
File ID: GLS-b0s9ydiwvvcoazo




Generated by Gataleaks.org
File ID: GLS—gqt1qm5fithla8j



**r/fosscad** · 7 mo. ago
luty-go-boom-phd

### ...is FEDCAD running out of money?? Why else would they be stealing peoples work and selling it without consent?? Discus

**GATALOG**

Gatalog

The Black Lotus Coalition is not the only organization in DIY Defense that DEFCAD highlights. We're also the home of the Gatalog!

The Gatalog is an international syndicate that fights capitalism by selling commercial parts kits for the AK-47, MP5, MAC 10, AR-15, 1911. I know what you're thinking, but yes, you really can buy communism! Though their license standards are regrettably corporate and closed source, we'll dutifully preserve their work until the Revolution.

⬆ 177 ⬇    💬 42    ↗ Share

**r/fosscad**    Joined

**FOSSCAD**
A community dedicated to the discussion of 3D printed guns and related topics. FOSSCAD = Free Open Source Softwar...

Show more

**107K**    **21**    **Top 2%**
Members    🟢 Online    Rank by size ↗

**RULES**

1  Keep posts on topic and of high quality.    ⌄

2  Be civil and don't troll.    ⌄

3  Don't encourage or incite violence/criminal behavior.    ⌄

4  Accounts must be at least 7 days old to post and comment.    ⌄

5  Research your laws before printing or downloading.    ⌄

6  Do not share firearm receiver or NFA 3D models    ⌄


Generated by Gataleaks.org
File ID: GLS-kmarm1sa6gixtbt



**ZØNA** ✓ @SillyGirlPsyops · Nov 27

How do I make this any clearer?

Cody is stating to a federal court that everyone in guncad except him is committing felonies. He is trying to commercially monopolize our entire space.

Working with him in any capacity is aiding someone trying to harm us.

**ZØNA** ✓ @SillyGirlPsyops · Nov 24

I think it's very telling that Cody Wilson has been more committed to collecting data, snooping on, doxxing, and pursuing legal action against people in the 3D2A community than the actual ...

Show more



Generated by Gataleaks.org
File ID: GLS—apois10mhiuw15n





**Mandiant Inc.**
11951 Freedom Dr FL 6
Reston, VA 20190-5640
US

# INVOICE

| | | | | |
|---|---|---|---|---|
| Voice: | 408-321-6300 | | Invoice Number: | 10219791 |
| Fax: | 408-321-9818 | | Invoice Date : | 15-JUN-23 |
| Email: | accounts-receivable@mandiant.com | | Sales Order/Reference : | 11105118 |
| FEDID: | 20-1548921 | | Customer Tax Registration: | |

| Bill To: | Ship To: |
|---|---|
| Attn: Accounts Payable<br>DEFCAD, Inc<br>2320 Donley Drive STE C<br>Austin TX 78758 | DEFCAD, Inc<br>2320 Donley Drive STE C<br>Austin TX 78758 |

| Customer ID | End Customer | Customer PO | Payment Terms | |
|---|---|---|---|---|
| 601746 | DEFCAD, Inc | P1701 | 30 NET | |
| **Sales Rep Name** | **Shipping Method** | **Shipping Waybill Number** | **Ship Date** | **Due Date** |
| EVANSON, CHRISTOPHER | | | | 15-JUL-23 |
| NOVAL | | | | |

| Line | Qty | UOM | Tax | Purchase Type | Item | Item Description | Start Date | End Date | Unit Price | Amount In USD |
|---|---|---|---|---|---|---|---|---|---|---|
| 1.1...1 | 500 | Yr | Yes | First Time | DIGITAL-THREAT-MONITORING-1999-1Y | Mandiant Threat Intelligence Digital Threat Monitoring | 15-JUN-23 | 14-JUN-24 | $21.22 | $10,610.00 |

| | | |
|---|---|---|
| **Please make payment to:** | Subtotal | **$10,610.00** |
| **Lockbox - Checks**<br>Mandiant Inc.<br>Dept 3063<br>PO Box 123063<br>Dallas, TX 75312-3063, US | Sales Tax | $700.26 |
| | | |
| **ACH/EFT/Wire Details**<br>Mandiant, Inc.<br>Silicon Valley Bank<br>SWIFT SVBKUS6S<br>Routing 121140399<br>Account 3300443459<br>3003 Tasman Drive<br>Santa Clara, CA 95054 US<br>Remit To:<br>ARcollections@mandiant.com | Freight | $0.00 |
| | Total Invoice Amount | **$11,310.26** |
| | **TOTAL In USD** | **$11,310.26** |
| **For Inquiries Regarding Charges On This Bill, Please Contact Your Mandiant Sales Representative.** | | |

 Generated by Gataleaks.org
File ID: GLS—739y8vkgyv7jere



**Navi of Boomhandia** ✓ @NaviGoBoom · May 15

Do not use Defcad. Friends do not let friends use Fedcad. Bully developers who use fedcad. It's for their own good. twitter.com/ModeratorGage/...

This post is unavailable.

💬 24    🔁 40    ♡ 377    📊 22.1K    ↥

**❌Cosmic❌** @CosmicKid98 · May 15

Whuh happened

💬 1    🔁    ♡ 14    📊 1,775    ↥

**Navi of Boomhandia** ✓ @NaviGoBoom · May 15

I could go on, but this sums up some of the more egregious issues.

Friends don't Let Friends use defcad.

Defcad's database has been hacked and dumped on multiple occasions. They do not encrypt their data, and keep it stored unsalted - all your information is in a row. That they never disclosed and breaches is reason enough not to use the site.

They pass off unusable, untested, bogus files as if they are working projects in order to milk money out of people. Wow! A 3D printable M82? That's so cool! Turns out it's a low-poly videogame model, but they won't say so until they've got your money. Additionally, for things that are actually tested and documented, they do not update files to latest versions - many out of date files to be found. That you can't (or shouldn't) trust the files you get there might be a signal not to use the site, but it gets better.

Defcad can, and has, doxxed developer information

Defcad can, and has, doxxed developer information to antigunners. They did this with only the slightest pressure, and made no serious attempt to obfuscate. They then attempted to blackmail myself and others with our personal information in an attempt to force money out of us - to support a lawsuit where defcad was getting sued, and myself and such others were not. Certainly shady for a company that claims that it only collect money from users so that it can fight lawsuits. Of course, they forget to mention that they'll extort you and that they've yet to actually win a lawsuit.

And while I could go on, I'll leave you with the notion that Defcad is wretchedly awful, should be avoided, shouldn't be used, and should be publicly shamed.

We can discuss its founder having paid a 16 year old for sex and other outstanding things that your money will be used for if you give it to them another time!

💬 5    🔁 30    ♡ 205    📊 26.4K    ↥

**The Chthonic One** @OFirmament · May 15

So, they're a scam and a honeypot basically?? Any alternatives??

💬 2    🔁    ♡ 9    📊 1,200    ↥

**Navi of Boomhandia** ✓
@NaviGoBoom

Scam certainly, honeypot possibly. Use the collections on Odysee - The Gatalog and AWCY, for example.

8:08 AM · May 15, 2023 · **1,091** Views

💬 2    🔁    ♡ 53    🔖 7    ↥

 Generated by Gataleaks.org
File ID: GLS—fu29gc33xadr8ac



**Navi of Boomhandia** ✔ @NaviGoBoom · May 15

Do not use Defcad. Friends do not let friends use Fedcad. Bully developers who use fedcad. It's for their own good. twitter.com/ModeratorGage/…

This post is unavailable.

💬 24    🔁 40    ♡ 377    �archive 22.1K    ⬆️

**⚔Cosmic⚔** @CosmicKid98 · May 15

Whuh happened

💬 1    🔁    ♡ 14    �archive 1,776    ⬆️

**Navi of Boomhandia** ✔ @NaviGoBoom · May 15

I could go on, but this sums up some of the more egregious issues.

Friends don't let Friends use defcad.

Defcad's database has been hacked and dumped on multiple occasions. They do not encrypt their data, and keep it stored unsalted - all your information is in a row. That they never disclosed and breaches is reason enough not to use the site.

They pass off unusable, untested, bogus files as if they are working projects in order to milk money out of people. Wow! A 3D printable M82? That's so cool! Turns out it's a low-poly videogame model, but they won't say so until they've got your money. Additionally, for things that are actually tested and documented, they do not update files to latest versions - many out of date files to be found. That you can't (or shouldn't) trust the files you get there might be a signal not to use the site, but it gets better.

Defcad can, and has, doxxed developer information

Defcad can, and has, doxxed developer information to antigunners. They did this with only the slightest pressure, and made no serious attempt to obfuscate. They then attempted to blackmail myself and others with our personal information in an attempt to force money out of us - to support a lawsuit where defcad was getting sued, and myself and such others were not. Certainly shady for a company that claims that it only collect money from users so that it can fight lawsuits. Of course, they forget to mention that they'll extort you and that they've yet to actually win a lawsuit.

And while I could go on, I'll leave you with the notion that Defcad is wretchedly awful, should be avoided, shouldn't be used, and should be publicly shamed.

We can discuss its founder having paid a 16 year old for sex and other outstanding things that your money will be used for if you give it to them another time!

💬 5    🔁 30    ♡ 205    �archive 26.4K    ⬆️

**f🎃😡b** @Foobadoo1 · May 15

holy shit i had no idea they didnt encrypt shit. thats horrendous. literal cybersecurity 101 shit.

💬 1    🔁    ♡ 33    �archive 1,854    ⬆️

**Navi of Boomhandia** ✔
@NaviGoBoom

Hopefully it's been fixed, but the fact they never acknowledged it makes me think maybe not. Being sent my full name by one of our guys who found the DB dump wasn't very encouraging.

8:01 AM · May 15, 2023 · **1,631** Views

💬 1    🔁    ♡ 52    🔖    ⬆️

 Generated by Gataleaks.org
File ID: GLS—v493bljvlu2st25



**Navi of Boomhandia** ✔ @NaviGoBoom · May 15 · · ·
4) They will give your personal information to antigunners and attempt to blackmail developers using it to keep them in line

What's not to love?

💬 6          ↻ 3          ♡ 110          �archive 2,909          ⬆

**Yeet_Pooch** @DolphinSushi2 · May 15 · · ·
I wanted some designs that were on there until I found out I have to give them my credit card info :(

💬 1          ↻          ♡ 2          �archive 217          ⬆

**Navi of Boomhandia** ✔ · · ·
@NaviGoBoom

Any design on there worth anything is free on Odysee. The designs on fedcad are frequently out of date, un or undertested, and otherwise useless because they have no release standard. They try to pass off video game models as printable guns to milk people for money.

6:16 AM · May 15, 2023 · **456** Views

💬 2          ↻ 2          ♡ 24          🔖 3          ⬆


Generated by Gataleaks.org
File ID: GLS-kputtiawg26330m



**Navi of Boomhandia** ✔
@NaviGoBoom

Fedcad has ignored DMCAs already. What would you recommend next? Would you agree that their continued actions in this vein warrants some level of concern, and awareness should be brought to it?

Their bottom line is absolutely hurt by people being aware of their scummy practices. They've admitted this privately to people. It also explains their infantile behavior in response.

9:59 AM · May 8, 2024 · **79** Views


Generated by Gataleaks.org
File ID: GLS-x1xiaf52er8yy59



**[deleted]** · 2mo ago

Yall need to stop drinking the kool-aid put out. Your design posted on defcad? Click the "contact" link on their page send them proof and wala it will be taken down or you will be given credit and all the rewards. Def dist has poisoned your brains because they can't do anything good themselves.

-29 · Reply · Share ···

**IvanTTroll** · 2mo ago

I tried that, and directly contacting no less than five people over there. I got no response at all, but did confirm at least one of the folks did get my request, but ignored it at the direction of fedcad's owner. What's up with that, do you think?

They do attempt to bribe people into letting their stuff remain on the site, but if you reject that bribe, they'll also just ignore you.

It's well established that they do not need to charge money for files due to some legal requirement, and it's abundantly clear that they aren't using that money to look out for the community - the one time their defense was put to the test they failed miserably, their offensive moves are hardly existent, and are losing even still.

Perhaps in spite of the fact that this community flourished without it, fedcad now stands in the way of the community, and tries to push developers around because they reckon they can get away with it - all because it's run by an egomaniac with a tendency to lie and break promises.

25 · Reply · Share ···

2 more replies

**r/fosscad**    Join

**FOSSCAD**

A community dedicated to the discussion of 3D printed guns and related topics.

**100K**         **77**              **Top 2%**
Members    ● Online        Rank by size

r/fosscad
**Odysee Bought Themselves**
617 upvotes · 67 comments

r/fosscad
**PLAR Taking Shape**
581 upvotes · 73 comments

r/fosscad
**Made $1,200 trading in some $18 Chinese made AR-15 airsoft iron sights and 5 3d...**

 Generated by Gataleaks.org
File ID: GLS-u0hmpvqnaaw7uwg



**[deleted]** · 2mo ago

Their defense failed? Sure seemed to me that your buddy freeman fucked everyone around him lied and backstabbed and burned through 10s of thousands of dollars of their defense money.

⊖   ⬆ 0 ⬇   💬 Reply   ⬆ Share   ⋯

**IvanTTroll** · 2mo ago

Yes, their defense failed - they settled and gave Everytown what they wanted. They did not succeed in protecting people's anonymity, nor did their plan to act as a host of content instead of a publisher pan out.

Freeman did fuck fedcad over, yes - after fedcad tried to do the same to him. It really boils down to the absolute lack of communication and coordination skills found in the owner of fedcad - there's a reason FPC also bailed on him. It did become massively expensive for fedcad because they insist on using extremely expensive lawyers that consistently do them no favors - yet another reason FPC bailed.

Fedcad and it's owner take zero responsibility for the legal defense it demanded to be in charge of, then summarily ran straight into the ground. That alone should be a pretty clear indication of where their heads are at, without the other stuff. The manner in which fedcad attempted to scapegoat freeman for their own failures (not that freeman is absolved of all wrongdoing) is a sign. Freeman jumping ship absolutely did not compel anyone to settle, fedcad could have fought, but chose not to - because their strategy failed. Instead of swallowing his pride, the owner of fedcad pinned the failure on anyone but himself, and began a self-destructive meltdown that continues to serve no interest other than sating his need for attention.

It's very easy for him to blame freeman for all of his problems - it's easy to blame anyone else for any of the things he does wrong. But the way he's behaved and what he's turned fedcad into can't possibly be mistaken for an act taken with the community in mind.

⬆ 5 ⬇   💬 Reply   ⬆ Share   ⋯

---

**r/fosscad**   [Join]

**FOSSCAD**

A community dedicated to the discussion of 3D printed guns and related topics.

**100K**          **77**          **Top 2%**
Members      ● Online      Rank by size ⬈

🏆 r/fosscad

**Odysee Bought Themselves**

617 upvotes · 67 comments

🏆 r/fosscad

**PLAR Taking Shape**

581 upvotes · 73 comments

🏆 r/fosscad

**Made $1,200 trading in some $18 Chinese made AR-15 airsoft iron sights and 5 3d...**

566 upvotes · 70 comments

🏆 r/fosscad

**Carbon Fiber Reinforced Brace**

▶ 0:17

Generated by Gataleaks.org
File ID: GLS-7ir0b7k2atm8kyf



**kai542** · 2mo ago

It's ironic seeing this after someone made the comment Fosscad is about spreading the knowledge and skills as far as possible, let's take it down from alternative sites that could provide for other countries, if charging money, that's one thing, if free oh well

-29    Reply    Share    ...

**IvanTTroll** · 2mo ago

It's really unfortunate that this is what it's come to, but I really can't fault anyone who objects to fedcad pilfering from the community that they mock, insult, and look down on - all under some hilarious pretense that they're a "legal shield" (a story that comes apart with the slightest critical glance).

Things sure seem to have reached the point that less money in their pockets and more money in the pockets of the people building guns, designing guns, etc will help the signal far more than it'd be hurt by having fedcad stop stealing.

It's ends up being a paradox of tolerance question, and I reckon cutting out the rot of charing people money for free files (against the designer's wishes) is a preferable option to watching paid downloads become the standard, the way the community is perceived, and the grounds from which any sort of legal question surrounding banning file sharing need be addressed.

25    Reply    Share    ...

r/fosscad

**FOSSCAD**
A community dedicated to the discussion of 3D printed guns and related topics.

**100K**
Members

**77**
● Online

**Top 2%**
Rank by size

r/fosscad

**Odysee Bought Themselves**

617 upvotes · 67 comments

r/fosscad

**PLAR Taking Shape**

581 upvotes · 73 comments

r/fosscad


Generated by Gataleaks.org
File ID: GLS—10ue79bd2wh3u6k

August 4, 2022

**Ivan**  Admin  10:17 AM
You can go ahead and completely delete everything, including any archived versions and my account itself. This should include any/all official FGC-9 models and packages too.

I'll be following up with a list of uploads which contain things I own which will need those items removed from the upload or the upload itself taken down entirely.

August 18, 2022

**Ivan**  Admin  8:56 AM
I noticed that while my account is deactivated for login and has it's email changed to one of your own, the files are still listed and viewable. I would appreciate if this was corrected soon. No listing of my files and work is to remain, and no reuploads of such is to be permitted. I would prefer this not have to get any more unpleasant than Cody has already managed.

August 29, 2022

**Ivan**  Admin  9:16 PM
Is this going to be resolved amicably?

**Ivan**  Admin  9:37 PM
I'm not ok with Cody using defcad as a tool to threaten and manipulate developers to get what he wants. I'm going to need all my files, including the FGC-9, completely removed from the site. Not "archived", but entirely removed. I do not want to be forced to publicly disavow defcad, but if you make it impossible to remove whatever mark of approval my account and files being visible on the site gives, I'll have no other course of action.

Generated by Gataleaks.org
File ID: GLS—kputtiawg26330m



**Navi of Boomhandia** ✔
@NaviGoBoom

Fedcad has ignored DMCAs already. What would you recommend next? Would you agree that their continued actions in this vein warrants some level of concern, and awareness should be brought to it?

Their bottom line is absolutely hurt by people being aware of their scummy practices. They've admitted this privately to people. It also explains their infantile behavior in response.

9:59 AM · May 8, 2024 · **79** Views

💬 1          ⟲          ♡ 4          🔖          ⬆


Generated by Gataleaks.org
File ID: GLS—2o2al040emvm0cw



Replying to @NaviGoBoom

im not up to date, how can **fedcad** profit off open source files? sure they can technically resell them but nobody actually buys linux for example.

💬 3          🔁          ♡ 2          📊 493          🔖  ⬆️



**Navi of Boomhandia** ✅ @NaviGoBoom · Aug 6                    ···
Replying to @NaviGoBoom

So: I think smacking **fedcad** over the copyright infringement *that they admit to doing* is good.

**Fedcad**'s founder will make any attempt to hold them responsible nasty. I'm sure he'll dox me (again) and others just for taking this stance.

But if that's what it takes, fine.

💬 8          🔁 8          ♡ 175          📊 6.6K          🔖  ⬆️



**Navi of Boomhandia** ✅ @NaviGoBoom · Aug 6                    ···
Replying to @NaviGoBoom

Their notion that copyright being used to ensure free access to the files is "gun control" is farcical - **fedcad** itself *invents* gun laws to justify their commercialization, their terms of service levy controls over what you can do with the files.

💬 2          🔁          ♡ 97          📊 1.4K          🔖  ⬆️



**Navi of Boomhandia** ✅ @NaviGoBoom · Aug 6                    ···
Replying to @NaviGoBoom

If, at the end of the day, **fedcad** must be rewarded for trying to force commercialization onto these files - what better reward exists than the one they've sown for themselves?

💬 3          🔁          ♡ 105          📊 1.1K          🔖  ⬆️

X Generated by Gataleaks.org
File ID: GLS—2ccuxdrcu4aecge



**Navi of Boomhandia** ✔ @NaviGoBoom · May 15

Do not use Defcad. Friends do not let friends use Fedcad. Bully developers who use fedcad. It's for their own good. twitter.com/ModeratorGage/…

This post is unavailable.

💬 24      ⟲ 40      ♡ 377      �lil 22.1K      ⬆

**Odin** @ForOdin4823

So, for those of us who already signed up (I joined over a year ago), how do we cancel our membership?

8:41 AM · May 15, 2023 · **227** Views

💬 1      ⟲      ♡      🔖      ⬆

Post your reply                              Reply

**Navi of Boomhandia** ✔ @NaviGoBoom · May 15

If you're big, hit them with a chargeback. If your bank/company asks why, it's because they claimed to have printable gun files but it's majority just shitty videogame gun models that you have to enter your social security number to download.

Otherwise, just don't pay for it.

💬      ⟲      ♡ 9      ⊪ 236      ⬆

 Generated by Gataleaks.org
File ID: GLS-e5l7tl19uhr92gc



**Navi of Boomhandia** ✔ @NaviGoBoom · Aug 6

There's a large difference between commercializing through adding value via parts kits (and the like) and commercializing by literally just copying something that someone else made and putting it behind a paywall.

💬 1          ↻          ♡ 6          �econ 168          🔖 ↥

**dogenado.exe** @dogenado_exe · Aug 6

I don't expect everyone to agree with me. I just feel that lawsuits and copyrights are not the best direction

💬 2          ↻          ♡ 1          ᵢₗᵢ 102          🔖 ↥

**Navi of Boomhandia** ✔
@NaviGoBoom

People being honest, upright, and sincere with each other is certainly the best direction.

Unfortunately, they've rejected all attempts for this, and have outright stated that lawsuits and copyright is the only way they'll be held accountable. They've chosen the battlefield, and yet they complain about how unfair it is.

7:09 PM · Aug 6, 2024 · **81** Views


Generated by Gataleaks.org
File ID: GLS—vufxeq96ejn7p8m



**kai542** · 2mo ago

It's ironic seeing this after someone made the comment Fosscad is about spreading the knowledge and skills as far as possible, let's take it down from alternative sites that could provide for other countries, if charging money, that's one thing, if free oh well

⊖  ⤒ -29 ⤓  💬 Reply  ⬆ Share  ···

**IvanTTroll** · 2mo ago

It's really unfortunate that this is what it's come to, but I really can't fault anyone who objects to fedcad pilfering from the community that they mock, insult, and look down on - all under some hilarious pretense that they're a "legal shield" (a story that comes apart with the slightest critical glance).

Things sure seem to have reached the point that less money in their pockets and more money in the pockets of the people building guns, designing guns, etc will help the signal far more than it'd be hurt by having fedcad stop stealing.

It's ends up being a paradox of tolerance question, and I reckon cutting out the rot of charing people money for free files (against the designer's wishes) is a preferable option to watching paid downloads become the standard, the way the community is perceived, and the grounds from which any sort of legal question surrounding banning file sharing need be addressed.

⤒ 25 ⤓  💬 Reply  ⬆ Share  ···

**lordofmmo** · 2mo ago

yeah defcad charges 60 a year, and what's more they ask for your SSN supposedly for ITAR or other inane bullshit so it's definitely not going to other countries through that trash fire of a site

⊖  ⤒ 19 ⤓  💬 Reply  ⬆ Share  ···


Generated by Gataleaks.org
File ID: GLS—1o72ehkhyjxmj8o



**Rando Kneandertl** ✔ @RKneegr· · Nov 6 ···

SWITCHING SIDES

0          1

⏸ **GIF**

💬     🔁     ♡ 11     📊 306     🔖     ⬆

**jny the human** ✔ @jnyboy · Nov 6     ···

FEDCAD is a branch of the ATF.

💬     🔁 3     ♡ 27     📊 412     🔖     ⬆


Generated by Gataleaks.org
File ID: GLS—1r55axsrjw1kffa




Generated by Gataleaks.org
File ID: GLS—96lk27zq1pn3eyg



25 Sep 2024 07:53

Tags ⓘ

+ Add tags

**Why did you cancel your LEGIO membership?**

I don't want to support fedcad

**Please provide more detail**

I don't like people who have sold out to the fed before

**Response ID**

qmzs2h67o31m97qm9tk0sihnjj8l9tk0

Ex. A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION



17 Aug 2025 18:22

Tags ⓘ

+ Add tags

Why did you cancel your LEGIO membership?

Concerned about personal security / privacy

Please provide more detail

Did knowing it was possible honeypot, wish to end my association with these services

Ending

A. Your response has been recorded.

Response ID

ixwdho8cozis7nkkixwq163kmqwaeeby

Number of New LEGIO Subscriptions / Month

Case 6:24-cv-01027-WWB-LHP   Document 53-1   Filed 09/25/25   Page 4
PageID 2775



Number of New LEGIO Subscriptions / Month


Generated by Gataleaks.org
File ID: GLS-2j19m1i7upziwg5



**nikolai.romanov** 3:39 AM

LMAO yes, unironically there would be a panel interview stage

One of the requirements would also be that the beta is conducted with one of the major groups. And if people don't feel comfortable doing it with the catalog or the Black lotus coalition then I am happy to host it on okb69

We could also use that money to sponsor bounties like pew has been doing for quite a while on his site, just using crowdsource

Another thought I had is to unironically start a competitor to fedcad with the charge is like 1 cent a month or something, just to rape them

Obviously I would like it to be free if possible, but if what fedkette says is true and their method is the only way to publish the files online, then we should start by making the charge absolutely meaningless hosting the service as an actual service to the community rather than as a profit incentive business

Sorry if my messages are a little mutilated right now I'm using TTS on the way to work

💬 6   🔁 2   ❤ 24   📊 511   ⬆

---

ZøNA @SillyGirlPsyops   · · ·

Uhhh... It's a no from me, dawg.
x.com/romanov13649/s...

You're unable to view this Post because this account owner limits who can view their Posts. Learn more

1:32 AM · Aug 3, 2024 · **511** Views

💬 6   🔁 2   ❤ 24   🔖 1   ⬆

⬤ Post your reply                    Reply

ZøNA @SillyGirlPsyops · Aug 3   · · ·

He has me blocked now, but bro literally said he wanted to make her "cool" to "wignats" when he wrote a foreword apologizing for her "controversial" transness, and I literally only quoted him verbatim. Why the hell would I give this person permission to make money off her name?

 Generated by Gataleaks.org
File ID: GLS—gwyxed33vnkfmyv



# gen.general ☆

**October 5, 2024**

**PoppyimoTopG** 12:57 PM
Hello, it says on DEFCAD that I need to regesiter and pay for downloading the files for the FGC 9? It also says my location is blocked? Can any of you help me with this?

**ethan.hall** 12:58 PM
https://odysee.com/@TheGatalog-HybridDesigns:0/FGC-9_MkII_Rev1:f
🔼 1   👍 1

**Markhober** 12:58 PM
yeah dont downoload from fedcad
🔼 1   🔻 1

**ethan.hall** 12:58 PM
Check out the other designs on that page.

**PoppyimoTopG** 12:58 PM
Fedcad? Is like DEFCAD some sort of government site?

> **ethan.hall** October 5, 2024
> Check out the other designs on that page.

Thanks mate.

**ethan.hall** 12:58 PM
Might as well be.

Generated by Gataleaks.org
File ID: GLS—0anshbbu0y02dki



 Generated by Gataleaks.org
File ID: GLS-yev2psefvmd7msk




Generated by Gataleaks.org
File ID: GLS—dvpfin8g9z5gp9h





Generated by Gataleaks.org
File ID: GLS—2l84nsva0kqzth7



 Generated by Gataleaks.org
File ID: GLS-5k4jjgf1cwsi82g

**yzy** ✔
@yzy_is_who



This is your reminder that the Primordial Father and Notable Convicted Pedophile **Cody Rutledge Wilson** (@Radomysisky of @defcad) can see all of your memes and it makes him very very mad.

The supposed "crypto-Anarchist" free speech absolutist and child assaulter himself hates that you can share legitimately accurate information about his business and general M.O., and is currently crying in court about it.

> 93. On May 15, 2▮▮▮▮ ▮ h the assistance of Counterdefendants ▮▮▮▮▮ and ▮▮▮▮, began circulating a meme version of the "FEDCAD" claims. Despite its key accusations being demonstrably false, this meme has become a popular infographic and has been reposted hundreds, if not thousands, of times. The FEDCAD meme is used commercially by Counterdefendants to direct customers to TheGatalog.com, and is reproduced below.

**FRIENDS DON'T LET FRIENDS USE**

# FEDCAD

"Friends don't let Friends use defcad.

Defcad's database has been hacked and dumped on multiple occasions. They do not encrypt their data, and keep it stored unsalted - all your information is in a row. That they never disclosed and breaches is reason enough not to use the site.

They pass off unusable, untested, bogus files as if they are working projects in order to milk money out of people. Wow! A 3D printable M82? That's so cool! Turns out it's a low-poly videogame model, but they won't say so until they've got your money. Additionally, for things that are actually tested and documented, they do not update files to latest versions - many out of date files to be found. That you can't (or shouldn't) trust the files you there might be a signal not to use the site, but it gets better.

Defcad can, and has, doxxed developer information to antigunners. They did this with only the slightest pressure, and made no serious attempt to obfuscate. They then attempted to blackmail myself and others with our personal information in an attempt to force money out of us - to support a lawsuit where defcad was getting sued, and myself and such others were not. Certainly shady for a company that claims that it only collect money from users so that it can fight lawsuits. Of course, they forget to mention that they'll extort you and that they've yet to actually win a lawsuit.

And while I could go on, I'll leave you with the notion that Defcad is wretchedly awful, should be avoided, shouldn't be used, and should be publicly shared.

We can discuss its founder having paid a 16 year old for sex and other outstanding things that your money will be used for if you give it to them another time!" - @NaviGoBoom


Generated by Gataleaks.org
File ID: GLS—swyepvblz2mk1nw




Generated by Gataleaks.org
File ID: GLS—2tj6r7xyf5gg84d





Generated by Gataleaks.org
File ID: GLS-q4mf1v1rcpax2p6

← **Post**                                    **Reply**

**ZøNA** ✓ @SillyGirlPsyops · 10h
Friends Don't Let Friends Use FedCad

💬 1          ⇄          ♡ 6          ılı 48

**Criminals4GunSafety** ☢ ✓ @Crimnls4Safety · 11h
That last point is very important.

Don't get your recipes from chomos, kids.

💬          ⇄          ♡ 4          ılı 49

**Jimbo** ✓ @bigjimbocuz · 7h
Been here since nobody could find files. I have always hated FedCad. I used to use it to find the names of files, though. They have better search function than odysee.

@theshittinator is the man, not only for helping me not have to use a convicted pedophiles honeypot website, but also for refunding a $500(?) donation from said pedophile. I don't know the pedophiles intentions there, but you can imagine.
F
O
S
S
motherfuckers.

💬          ⇄          ♡ 2          ılı 21

**NiceCrew Technologies** ✓ @nicecrewtech · 10h
Yeah I remember trying to get my account to work correctly and they wouldn't let me unless I gave them my name and address. It was fucking weird.

💬          ⇄          ♡ 1          ılı 33


Generated by Gataleaks.org
File ID: GLS-tkr5b0vbrbtm0q5




Generated by Gataleaks.org
File ID: GLS—7r862xt4edikdyn



 Generated by Gataleaks.org
File ID: GLS—hqizjozyxc6ocb1



ZøNA @SillyGirlPsyops · May 8
I think it's fair that people know which devs are collaborating with FedCad & have a financial interest in promoting a business that misrepresents itself as devs, sells their designs without permission, collects and leaks customer/developer information.

What do you think, Gang?

**FRIENDS DON'T LET FRIENDS USE FEDCAD**

Friends don't let Friends use defcad.

Defcads database has been hacked and dumped on multiple occasions. They do not encrypt their data, and keep it stored unsalted - all your information is in a row. That they never disclosed and breaches is reason enough not to use the site.

They pass off unusable, untested, bogus files as if they are working projects in order to milk money out of people. Wow! A 3D printable M82? That's so cool! Turns out it's a low poly videogame model, but they won't say so until they've got your money. Additionally, for things that are actually tested and documented, they do not update files to latest versions - many out of date files to be found. That you can't (or shouldn't) trust the files you get there might be a signal not to use the site, but it gets better.

Defcad can, and has, doxxed developer information to antigunners. They did this with only the slightest pressure, and made no serious attempt to obfuscate. They then attempted to blackmail myself and others with our personal information in an attempt to force money out of us - to support a lawsuit where defcad was getting sued, and myself and such others were not. Certainly shady for a company that claims that it only collect money from users so that it can fight lawsuits. Of course, they forget to mention that they'll extort you and that they've yet to actually win a lawsuit.

And while I could go on, I'll leave you with the notion that Defcad is wretchedly awful, should be avoided, shouldn't be used, and should be publicly shamed.

We can discuss its founder having paid a 16 year old for sex and other outstanding things that your money will be used for if you give it to them another time!" -@NaviGoBoom

○ 8    ⇄ 14    ♡ 70    �III 1.4K    🔖 ⬆

Kem Regik (jackalope underground)
@kemregik

Zona, where can we find the receipts for these accusations? I'm working

---

Zona, where can we find the receipts for these accusations? I'm working on a critical piece regarding DEFCAD and it's role in the current drama, and I'd love to be able to go through all the details myself.

4:15 PM · May 8, 2024 · **88** Views

○ 1    ⇄    ♡ 3    🔖    ⬆

⇌ Most relevant    ⌄

Post your reply    Reply

ZøNA @SillyGirlPsyops · May 8
Some of them are very open about it. Pretty good indicator is devs who intentionally upload to FedCad, in this day and age, with full knowledge of it's behavior.

○ 1    ⇄    ♡ 5    III 72    🔖 ⬆

Kem Regik (jackalope underground) @kemregik · May 8
I'm not really caught up on the minutiae, you'll have to forgive me.

Where can we find more information about the leaking/dumping of servers and the leaking of these documents to anti-gun orgs? I really want to be able to have primary sources for my critique.

○ 1    ⇄    ♡ 3    III 66    🔖 ⬆

ZøNA @SillyGirlPsyops · May 8
The graphic is direct quotes from @NaviGoBoom

I have spoken to several people with first hand knowledge of FedCad's fuckery. @Freeman13372 @CtrlPew2 @FuddBusters @Dianexis @plaboiiii @RKneegrow on Twitter and YZYprints on insta would be better to ask than me.

---



ZøNA @SillyGirlPsyops · May 3
This is a step way too far over the line, even for you FedCad.

DEFENSE DISTRIBUTED'S RESPONSES TO ELIK'S
REQUEST FOR PRODUCTION 9:

SEEKING INFORMATION RE: BUSINESS INTER-
FERENCE ALLEGATIONS


Generated by Gataleaks.org
File ID: GLS—47m19y0cu18jjui


**Loran Kelley** @Polymer80 · Apr 24  ···

Hi this is Loran, I was made aware of this shit show and was completely perplexed. I can say that we do own the design 100% and that we have no working agreements what so ever with DD or Cody at all.

💬 4   ⟲   ♡ 3   �archived 641   🔖  ⬆


**Fudd Busters** ✓   **Follow**   ···
@FuddBusters

I think I know why you're saying that. But it's pretty unbelievable given:

1) You advertise it as being completable on a ghost gunner, aka, a $3,500 drone motor calibrated for breaking expensive endmills. Where this exact platform was first announced after nobody asked for it.

2) The idea was stupid to begin with and nobody wanted it.

3) Given 1 and 2, there's no way you independently came up with it.



Admit it pls.

 Generated by Gataleaks.org
File ID: GLS-cyyc1dxfya3uaeb

 **Loran Kelley** @Polymer80 · Apr 24 · · ·
1. I admit P80 did not design this directly.
That was never a claim. We did reach out to
multiple companies to get this moving ASAP.
P80 has also never been 100% vertically
integrated. We do have manufacturing done
for us

💬 1     ⟲     ♡     ᶧᶦ 347     🔖     ⬆

 **Fudd Busters** ✔ @FuddBusters · Apr 24 · · ·
Yes I can totally see why someone so
familiar with the industry would work with a
radioactive company whose "machine shop"
(read: a single Haas VF2) is famed for its lack
of a single sharp end mill.



💬     ⟲     ♡ 8     ᶧᶦ 477     🔖     ⬆

Number of New LEGIO Subscriptions / Month

Case 6:24-cv-01026-WWB-LHP Document 53-1 Filed 09/25/25 Page 4
PageID 2793



Number of New LEGIO Subscriptions / Month

 Generated by Gataleaks.org
File ID: GLS—d3mo1nxqb9q2mmm



 Generated by Gataleaks.org
File ID: GLS-0kbu1lh5ftwt6kc

 **ZøNA** @SillyGirlPsyops · 51m        •••

Laffs has been a talkative boy, and it looks like well after our private and cordial discussion on August 1st, in which I extended him benefit of the doubt. He lied to me about his then current status as "DEFCAD'S top file producer and uploader", which only ceased September 22nd.

> 105. Since Counterdefendant Larosiere filed his action in September,
> ▨ has only increased this tortious activity, and has successfully bullied
> DEFCAD's top file producer and uploader, LaffsDynamics, off the platform from
> fear of economic losses. LaffsDynamics privately admitted to a DEFCAD
> administrator on September 3, 2024 that the public and private coercion from
> ▨ was becoming too much for him. After being served with a litigation hold
> letter for this case on September 20th, ▨ proceeded to threaten
> LaffsDynamics and others enough that on September 22, LaffsDynamics
>
> 44

Case 6:24-cv-01629-WWB-LHP  Document 29  Filed 11/19/24  Page 45 of 109 PageID 245

> disclaimed over six hundred files and the entirety of his monthly partner payment.
> Since September 27, Laffs has not used the site and has returned no
> communications from DEFCAD administrators.

 **ZøNA** @SillyGirlPsyops · Nov 20

Replying to @Laffs_Dynamics

Laffs, I know. 🗣️💨👂

I am a little disappointed. 👎🚫

Generated by Gataleaks.org
File ID: GLS—hi1irkuaoo09kpb

 ZøNA @SillyGirlPsyops · 4h

I'm not a big money haver & don't normally make this sort of post. But, if you like the work I do & want to help offset any potential expenses I may incur continuing it. My Ko-fi link is in my bio & I genuinely appreciate the assists. The cyberbullying won't stop either way. 😈💋



ZøNA @SillyGirlPsyops · 9h

Garret Walliman of DEFCAD has served me with an Injunction Against Workplace Harrassment, falsely claiming to the court that I threatened ...


Generated by Gataleaks.org
File ID: GLS—1p6u11xtqcmfzox



**ZØNA** @SillyGirlPsyops · Sep 23

Replying to @unseenkiller1

How cool would it be if you stopped collaborating with FedCad and Convicted Child Predator Cody Wilson?

## FRIENDS DON'T LET FRIENDS USE

# FEDCAD

"Friends don't let Friends use defcad.

Defcad's database has been hacked and dumped on multiple occasions. They do not encrypt their data, and keep it stored unsalted - all your information is in a row. That they never disclosed and breaches is reason enough not to use the site.

They pass off unusable, untested, bogus files as if they are working projects in order to milk money out of people. Wow! A 3D printable M82? That's so cool! Turns out it's a low-poly videogame model, but they won't say so until they've got your money. Additionally, for things that are actually tested and documented, they do not update files to latest versions - many out of date files to be found. That you can't (or shouldn't) trust the files you get there might be a signal not to use the site, but it gets better.

Defcad can, and has, doxxed developer information to antigunners. They did this with only the slightest pressure, and made no serious attempt to obfuscate. They then attempted to blackmail myself and others with our personal information in an attempt to force money out of us - to support a lawsuit where defcad was getting sued, and myself and such others were not. Certainly shady for a company that claims that it only collect money from users so that it can fight lawsuits. Of course, they forget to mention that they'll extort you and that they've yet to actually win a lawsuit.

And while I could go on, I'll leave you with the notion that Defcad is wretchedly awful, should be avoided, shouldn't be used, and should be publicly shamed.

We can discuss its founder having paid a 16 year old for sex and other outstanding things that your money will be used for if you give it to them another time!" - @NaviGoBoom

"Also, Convicted Child Predator Cody Wilson doxxed both me and Ivan out of spite. Do not trust him with your data." - Zona

 3        5       ♡ 40       ᴵˡᶦ 493              


Generated by Gataleaks.org
File ID: GLS—d2gcrofkeqrj48f




Generated by Gataleaks.org
File ID: GLS—m8qn9obint508nr

5:29  •••ıl 5G⁴C ▭›



**unseenkiller** @unseenkiller1 · Sep 22   •••

Man, how fucking cool would it be if we could do low infill like the rest of the 3D printing hobbies?

They don't know how good they have it.

💬 13   ⟲ 3   ♡ 131   ‖ıl 3.2K   🔖   ⬆

**Show more replies**



**unseenkiller** @unseenkiller1 · Sep 24   •••

I do not collaborate with defcad.

I'm unsure why you think that I do, but I'd be more than willing to have a rational discussion with you about this if that's something you're comfortable with doing?

💬 2   ⟲   ♡ 17   ‖ıl 274   🔖   ⬆



**ZøNA** @SillyGirlPsyops · Sep 24   •••

My impression was that you still have been willingly uploading to DefCad. If that is not the case, then we have no issue.


Generated by Gataleaks.org
File ID: GLS-b4iyzskf27ijysz



**ZøNA** @SillyGirlPsyops · 3h

Reminder, I gave fair warning. Doxxing me and serving me with bullshit legal demands will not stop me.

This also goes for anyone who is still uploading/working with/making money on FedCad.

How many more of us after Ivan does Cody have to doxx before everyone gets the message?

**FRIENDS DON'T LET FRIENDS USE FEDCAD**

"Friends don't let Friends use defcad.

Defcad's database has been hacked and dumped on multiple occasions. They do not encrypt their data, and keep it stored unsalted - all your information is in a row. That they never disclosed and breaches is reason enough not to use the site.

They pass off unusable, untested, bogus files as if they are working projects in order to milk money out of people. Wow! A 3D printable M82? That's so cool! Turns out it's a low-poly videogame model, but they won't say so until they've got your money. Additionally, for things that are actually tested and documented, they do not update files to latest versions - many out of date files to be found. That you can't (or shouldn't) trust the files you get there might be a signal not to use the site, but it gets better.

Defcad can, and has, doxxed developer information to antigunners. They did this with only the slightest pressure, and made no serious attempt to obfuscate. They then attempted to blackmail myself and others with our personal information in an attempt to force money out of us - to support a lawsuit where defcad was getting sued, and myself and such others were not. Certainly shady for a company that claims that it only collect money from users so that it can fight lawsuits. Of course, they forget to mention that they'll extort you and that they've yet to actually win a lawsuit.

And while I could go on, I'll leave you with the notion that Defcad is wretchedly awful, should be avoided, shouldn't be used, and should be publicly shamed.

We can discuss its founder having paid a 16 year old for sex and other outstanding things that your money will be used for if you give it to them another time!" - @NaviGoBoom

"Also, Convicted Child Predator Cody Wilson doxxed both me and Ivan out of spite. Do not trust him with your data." - *Zona*

**ZøNA** @SillyGirlPsyops · 5/3/24

This is a step way too far over the line, even for you FedCad.

You've made this so very pe...

A-458

 Generated by Gataleaks.org
File ID: GLS—dit6eic0wamdf2h

 **ZØNA** @SillyGirlPsyops · May 10

Replying to @Laffs_Dynamics @MiddletonMade and 4 others

Hey, Laffs a bit of a side note: I really like your designs, and I think you are very talented with CAD. But, can I make the request that you stop uploading your work to **FedCad**?

# FRIENDS DON'T LET FRIENDS USE

# FEDCAD

"Friends don't let Friends use defcad.

Defcad's database has been hacked and dumped on multiple occasions. They do not encrypt their data, and keep it stored unsalted - all your information is in a row. That they never disclosed and breaches is reason enough not to use the site.

They pass off unusable, untested, bogus files as if they are working projects in order to milk money out of people. Wow! A 3D printable M82? That's so cool! Turns out it's a low-poly videogame model, but they won't say so until they've got your money. Additionally, for things that are actually tested and documented, they do not update files to latest versions - many out of date files to be found. That you can't (or shouldn't) trust the files you get there might be a signal not to use the site, but it gets better.

Defcad can, and has, doxxed developer information to antigunners. They did this with only the slightest pressure, and made no serious attempt to obfuscate. They then attempted to blackmail myself and others with our personal information in an attempt to force money out of us - to support a lawsuit where defcad was getting sued, and myself and such others were not. Certainly shady for a company that claims that it only collect money from users so that it can fight lawsuits. Of course, they forget to mention that they'll extort you and that they've yet to actually win a lawsuit.

And while I could go on, I'll leave you with the notion that Defcad is wretchedly awful, should be avoided, shouldn't be used, and should be publicly shamed.

We can discuss its founder having paid a 16 year old for sex and other outstanding things that your money will be used for if you give it to them another time!" - *@NaviGoBoom*

  ♡ 7 ılıl 127 



**@Clockwork0nions** 12 hours ago

So glad I saw you shitting on the GG3 before I bought it 

👍 👎 **Reply**



**Yep, it's possible. With the world's best desktop CN...**
91 likes · 15 comments · Jul 25

Boost unavailable   ···

**ibuild.2022** Got to site to see how much. It says $300. Sounds great. Click to purchase a d find that is your deposit. The price to take one home is 3,000.00. This is the type of shit that pisses me off. I will build that for $3000. Most the people you're marketing to are organically DIY'rs. If they have $3000 in their pocket, their first thought is what can I make, bot what can I buy. If I had a spare $3000 laying around, I'd just build this, as I would save more than likely around $1500. Good luck. Maybe some startups might buy this.

2w   Reply   Message   ···

**74ll357_b0i** Oh shit

1w   Reply   Message   ···

**kingkrull84** How much?

1w   Reply   Message   ···

View replies (1)

**trdoggo** Must be a giant piece of shit if the company is incorrectly referring to a cnc as a 3d printer

1w   Reply   Message   ···

Hide replies

**coastrunnercnc** @trdoggo Are you referring to where we said it's the "size of a printer?" Perhaps you misheard.

1w   Reply

**tospurr** I love this idea but the specs turned me away during the kickstarter. Is there really 0.001" spindle runout as advertised or did yall get better bearings? A 0.020" endmill isn't gonna love 1 thou TIR...

1w   Reply   Message   ···

**ryan.c.reed**

4d   Reply   Send message   ···

**iamphxaz** Cody Rutledge Wilson is a convicted child predator, and you shouldn't buy his dumb machine. Also Garret, you can do better, bud.

23h   Reply   Send message   ···

**forodin4823** The owner of the company is a pedo

15h   Reply   Send message   ···

**bigdaddyrivera** Do you provide software like your competitor( kinda rhymes with your name) to make what your competitor can do out of billets?

8h   Reply   Send message   ···



FIXTURING!

0:20

**91 likes**   Jul 25, 2024

**coastrunnercnc** Yep, it's possible. With the world's best desktop CNC mill. Unlike hobbyist machines, this is capable of machining at an industrial level: i.e. you can make car parts with it (!).
Reserve here and get 50% off your initial deposit 🔽
coastrunner.net



Generated by Gataleaks.org
File ID: GLS—yi8iqb30s2r9iok



11:04

Post

This Post was deleted by the Post author.
Learn more

**InRange TV** @InRangeTV · Sep 5  ···
I have nothing to do with DefCad. Why are
you tagging me in this?

96    1.7K

This Post was deleted by the Post author.
Learn more

**InRange TV**                    Follow  ···
@InRangeTV

No, I interviewed him once by accident, and
I've deleted those videos, including from
rumble.

A lot of other people have interviewed him,
including TfbTV you're not tagging them?

10:29 PM · Sep 5, 2024 · **594** Views

54

x.com



X Generated by Gataleaks.org
File ID: GLS—4hq74uyv1r7soae



**gw_guncad**

12:52

Howdy man - I saw your writeup on why you left the DEFCAD platform. Reading between the lines, I know there's some other major reasons you need to step away as well.

Everything else aside, I'd like to know if you'd be open to us helping you pay for your meds, totally off the record. I was pretty upset when I saw in your writeup that you'd been struggling with that and I don't want you to suffer.

If you're open to that, let's have a call on the matter?

 Generated by Gataleaks.org
File ID: GLS—twp3jr496m77wnr

 **unseenkiller** @unseenkiller1 · Sep 22  ···

Man, how fucking cool would it be if we could do low infill like the rest of the 3D printing hobbies?

They don't know how good they have it.

💬 13    🔁 3    ♡ 131    �ili 3.2K    🔖    ⬆️

Show more replies

 **unseenkiller** @unseenkiller1 · Sep 24  ···

I do not collaborate with defcad.

I'm unsure why you think that I do, but I'd be more than willing to have a rational discussion with you about this if that's something you're comfortable with doing?

💬 2    🔁    ♡ 17    ili 274    🔖    ⬆️

 **ZØNA** @SillyGirlPsyops · Sep 24  ···

My impression was that you still have been willingly uploading to DefCad. If that is not the case, then we have no issue.

This isn't personal towards you or anyone else that I am going to badger, I warned I was going to start doing this after Cody doxxed me, and now Ivan.

💬    🔁    ♡ 2    ili 66    🔖    

 Generated by Gataleaks.org
File ID: GLS—whgb3hc1xytj2lx

 ZøNA @SillyGirlPsyops · Sep 23 · · ·

Replying to @unseenkiller1

How cool would it be if you stopped collaborating with FedCad and Convicted Child Predator Cody Wilson?

## FRIENDS DON'T LET FRIENDS USE

# FEDCAD

"Friends don't let Friends use defcad.

Defcad's database has been hacked and dumped on multiple occasions. They do not encrypt their data, and keep it stored unsalted - all your information is in a row. That they never disclosed and breaches is reason enough not to use the site.

They pass off unusable, untested, bogus files as if they are working projects in order to milk money out of people. Wow! A 3D printable M82? That's so cool! Turns out it's a low-poly videogame model, but they won't say so until they've got your money. Additionally, for things that are actually tested and documented, they do not update files to latest versions - many out of date files to be found. That you can't (or shouldn't) trust the files you get there might be a signal not to use the site, but it gets better.

Defcad can, and has, doxxed developer information to antigunners. They did this with only the slightest pressure, and made no serious attempt to obfuscate. They then attempted to blackmail myself and others with our personal information in an attempt to force money out of us - to support a lawsuit where defcad was getting sued, and myself and such others were not. Certainly shady for a company that claims that it only collect money from users so that it can fight lawsuits. Of course, they forget to mention that they'll extort you and that they've yet to actually win a lawsuit.

And while I could go on, I'll leave you with the notion that Defcad is wretchedly awful, should be avoided, shouldn't be used, and should be publicly shamed.

We can discuss its founder having paid a 16 year old for sex and other outstanding things that your money will be used for if you give it to them another time!" - @NaviGoBoom

"Also, Convicted Child Predator Cody Wilson doxxed both me and Ivan out of spite. Do not trust him with your data." - Zona

 3   5  ♡ 40   493    


Generated by Gataleaks.org
File ID: GLS—jq1sy3uzwgpn4fw


**unseenkiller** @unseenkiller1 · Sep 19 · · ·

IDK man, this is a lot of work... would you guy even use a pre-oriented, pre support painted, pre-configured 3MF? or y'all just want me to shit out a bunch of STL's? lol



💬 31    🔁 4    ♡ 150    ᴵᴵᴵ 4.7K    🔖    ⬆️


**ZøNA** @SillyGirlPsyops · Sep 19 · · ·

Hey, quick question. Have you considered no longer collaborating with DefCad and the Child Predator Cody Rutledge Wilson?


FRIENDS DON'T LET FRIENDS USE FEDCAD


Generated by Gataleaks.org
File ID: GLS—6kn6388a8a3f3zg


**ZøNA**
@SillyGirlPsyops

**Follow**  ...

Wow, that's so interesting.

Would you care to comment on the recent happenings with DEFCAD asserting itself as the sole legal avenue for GunCad filesharing, reporting devs to the feds for EAR, ITAR, and even RICO violations for uploading to Odysee?

Why continue enabling them?



**unseenkiller**
@unseenkiller1

**Follow**  ⋮

Replying to @UberPoor

It's not. I'm $80 away from DefCAD dispersal paying for this giveaway 😌

5:53 PM · 31 Aug 24 · **146** Views



Generated by Gataleaks.org
File ID: GLS—kmarm1sa6gixtbt



**ZØNA** ✔ @SillyGirlPsyops · Nov 27

How do I make this any clearer?

Cody is stating to a federal court that everyone in guncad except him is committing felonies. He is trying to commercially monopolize our entire space.

Working with him in any capacity is aiding someone trying to harm us.

**ZØNA** ✔ @SillyGirlPsyops · Nov 24

I think it's very telling that Cody Wilson has been more committed to collecting data, snooping on, doxxing, and pursuing legal action against people in the 3D2A community than the actual ...

Show more



Generated by Gataleaks.org
File ID: GLS—1m6588otighdbsq



 Generated by Gataleaks.org
File ID: GLS—yi8iqb30s2r9iok



 Generated by Gataleaks.org
File ID: GLS-rfcfdc96g1hgb2r

 **DissidentRexy** 🦖 ✓ @DissidentRexy · 7h · · ·
Wow. Defcad wants to lock files they had
nothing to do with behind their paywall.
Totally pro2A.

> 4. "The Gatalog" is a criminal enterprise organized in express opposition
> to this. It profits by dealing illegally in the same digital firearms information that
> Defense Distributed handles legally. Led by a disgruntled former employee and
> opponents of Defense Distributed, The Gatalog publishes files governed by the
> EAR (and a similar State Department regime, the ITAR), by giving anyone in the
> world unlimited access—an obvious violation of the federal regime courts uphold.

 4    7   ♡ 46    1K   

 **jny the human** ✓ @jnyboy · 7h   · · ·
Notice the subtext here: in Cody's mind,
anyone who freely shares STLs of their work
is violating U.S. law.

This is absurd and only occurs in the wettest
fantasies of the most extreme tyrants. It's
everything the ATF would want, making me
wonder why he has that stance. 🤔

💬 4   🔁 1   ♡ 18   ıllı 128   🔖 


Generated by Gataleaks.org
File ID: GLS-g622zu93z4xbgs5




Generated by Gataleaks.org
File ID: GLS-1khjlja5vu19sr5




Generated by Gataleaks.org
File ID: GLS-jj7a8xyc0yrrgxv



**Navi of Boomhar** ✔ @NaviGoBc · Apr 24 ···
You aren't doing business with him, but your website specifically says your 80% frame can be finished with their jig, and despite identical toolpaths on the complete and 80% articles (technical data changed hands!), you're totally *not* in business with him. Got it.

💬 6      ⟲ 2      ♡ 127      ᴵᴵᵎ 6.7K      🔖      ⬆

**Loran Kelley**                              Follow   ···
@Polymer80

We have contact with engineers helping us bring this to market. Polymer80 owns the 80% design.

2:23 PM · Apr 24, 2024 · **467** Views

💬 2          ⟲          ♡          🔖          ⬆

**Cultivated Laser** ✔ @CultLaser · Apr 24 ···
Tell Cody we said hi!

💬          ⟲          ♡ 2      ᴵᴵᵎ 68      🔖      ⬆

**Navi of Boomhar** ✔ @NaviGoBc · Apr 24 ··
I understand the need to make it seem disjoint from a standpoint of the ATF says you have to, all I'm saying is that you could do a much better job of hiding the rather overt connection.


Generated by Gataleaks.org
File ID: GLS-j5060uzqreq7nh5



**Polymer80** @Polymer80inc · Apr 24 · · ·
SO... a recent post was taken out of context. Just to confirm with everyone, we own the new design for the 80% Spectre. We just clarified with Loran, we aren't doing business with Cody... And yes, I the marketing guy, didn't understand the situation and mis-spoke (aka fucked up)

💬 35    🔁 8    ♡ 226    📊 26K    🔖    ↑

**Fudd Busters** ✔ @FuddBusters · Apr 24 · · ·
Why are you lying?

💬 4    🔁    ♡ 102    📊 5.2K    🔖    ↑

**Loran Kelley** @Polymer80 · Apr 24 · · ·
That being said, in order to expediently and to work within what are P80s currently meager means we did get help from outside engineers to get this going for you guys ASAP. Nothing was done with by or for Cody Wilson at all.

💬 2    🔁    ♡ 1    📊 558    🔖    ↑

**Fudd Busters** ✔ @FuddBusters · Apr 24 · · ·
Oh cool. Obviously Cody himself didn't do anything because he's a talentless hack. Let me ask a different question:

Was the "engineering" done by Cody Wilson,

 Generated by Gataleaks.org
File ID: GLS—urfln23uj2xdexu

 **Loran Kelley** @Polymer80 · Apr 24   •••
That being said, in order to expediently and to work within what are P80s currently meager means we did get help from outside engineers to get this going for you guys ASAP. Nothing was done with by or for Cody Wilson at all.

💬 2       🔁       ♡ 1       ᴵᶥ 558       🔖 ⬆

 **Fudd Busters** ✔ @FuddBusters · Apr 24   •••
Oh cool. Obviously Cody himself didn't do anything because he's a talentless hack. Let me ask a different question:

Was the "engineering" done by Cody Wilson, his pet engineer John Sullivan, or some other person in their employ?

💬 2       🔁       ♡ 14       ᴵᶥ 594       🔖 ⬆

 **Loran Kelley** @Polymer80 · Apr 24   •••
I can say they person who did the engineering owns a completely different company on his own. (Not DD or GG etc.)

💬 1       🔁       ♡       ᴵᶥ 315       🔖 ⬆


Generated by Gataleaks.org
File ID: GLS—yq8qs2c25s5xc4n



**Loran Kelley**
@Polymer80

Follow 

Honestly I dont know who John Sullivan is. Im not avoiding your question but I can say for certain Neither Cody nor anyone named John did any design work on this particular product.

I have NO IDEA who did their jig. That's literally all them.

2:33 PM · Apr 24, 2024 · **248** Views

 1          ♡ 1     🔖     

 **Fudd Busters** ✔ @FuddBusters · Apr 24  ⋯
My brother in Christ this looks so bad.

I don't want to drag you, but if you send me a DM I'd like to talk to you.

          ♡ 8     ᵢₗᵢ 199     🔖     ⬆

DEFENSE DISTRIBUTED'S RESPONSES TO ELIK'S
REQUEST FOR PRODUCTION 10:

SEEKING INFORMATION RE: FALSE OR
DISPARAGING STATEMENT ABOUT DEFENSE
DISTRIBUTED OR ITS PRODUCTS



**Fudd Busters** ✓
@FuddBusters

· · ·

The ghost gunner is $2500 and features:

–a sensitive, cheap Chinese power supply
–a screaming drone motor masquerading as a spindle
–weightless tiny aluminum chips flying everywhere

The combination of the above features makes cool electrical sparks and funny noises.



▶ GIF

10:21 PM · Jul 18, 2024 · **54.5K** Views



**SMALL PART NEEDS**

Click to expand

0:24 / 0:25

COASTRUNNER.NET
**50% OFF Deposit**
Direct from Manufacturer

Shop now

👍 251                                                    87 💬   10 ↗

👍 Like            💬 Comment            ↗ Share

Newest ▾



**Cyrus Downing**
Check out Fudd Busters on YT for review of this piece of crap chatterbox, also Cody Wilson is a pedo

5d   Like   **Reply**   **Send message**   Hide


Generated by Gataleaks.org
File ID: GLS—iucvfdlfo2jfy4c

3:50   📞 2:53   ⚫⚫⚫⚫⚫⚫⚫⚫⚫⚫⚫   📶 🔋 •

As I stated previously The Gatalog is the only group currently with robust testing and documentation standards before a public release.



## FRIENDS DON'T LET FRIENDS USE FEDCAD

"Friends don't let Friends use defcad.

Defcad's database has been hacked and dumped on multiple occasions. They do not encrypt their data, and keep it stored unsalted - all your information is in a row. That they never disclosed and breaches is reason enough not to use the site.

They pass off unusable, untested, bogus files as if they are working projects in order to milk money out of people. Wow! A 3D printable M82? That's so cool! Turns out it's a low-poly videogame model, but they won't say so until they've got your money. Additionally, for things that are actually tested and documented, they do not update files to latest versions - many out of date files to be found. That you can't (or shouldn't) trust the files you get there might be a signal not to use the site, but it gets better.

Defcad can, and has, doxxed developer information to antigunners. They did this with only the slightest pressure, and made no serious attempt to obfuscate. They then attempted to blackmail myself and others with our personal information in an attempt to force money out of us - to support a lawsuit where defcad was getting sued, and myself and such others were not. Certainly shady for a company that claims that it only collect money from users so that it can fight lawsuits. Of course, they forget to mention that they'll extort you and that they've yet to actually win a lawsuit.

And while I could go on, I'll leave you with the notion that Defcad is wretchedly awful, should be avoided, shouldn't be used, and should be publicly shamed.

We can discuss its founder having paid a 16 year old for sex and other outstanding things that your money will be used for if you give it to them another time!" - @NaviGoBoom

Just say no FEDCAD. And their affiliated sites, Legio, Defense Distributed, ghostgunner.net, and ghostguns.com.

## WHERE DO I GET THE PARTS KITS?

MANUFACTURE D'ARMES

🔒 ctrlpew.com


Generated by Gataleaks.org
File ID: GLS—mh76182gt2hm7cj



Generated by Gataleaks.org
File ID: GLS—mogcm32c1ctajjp




Generated by Gataleaks.org
File ID: GLS—jhbiovoeb3t5akz



**Early-Stay2117** · 1y ago

If someone would already have an account with them, would that person be able to cancel it

⊖ ⇧ 1 ⇩   💬 Reply   ⬆ Share   ⋯

**luty-go-boom-phd** OP · 1y ago

Given their data retention policies, probably not, but it doesn't hurt to reach out to them and demand they delete it

⇧ 1 ⇩   💬 Reply   ⬆ Share   ⋯

**NotorioussJorge** · 1y ago

wow, thank you for this post! i sure dodged a bullet there, i was just about to start making an account but never mind.. thank you! also, if not defcad, where do you recommend i get my 2A files from? So far ive been using odysee but is there any other options? (so far ive printed mags, and thats about it, im about to start my 1st lower, im thinking the hoofman double ribbed but im not sure)

⊖ ⇧ 1 ⇩   💬 Reply   ⬆ Share   ⋯

**luty-go-boom-phd** OP · 1y ago

odysee/the gatalog

⇧ 2 ⇩   💬 Reply   ⬆ Share   ⋯


Generated by Gataleaks.org
File ID: GLS-gqt1qm5fithla8j



 Generated by Gataleaks.org
File ID: GLS—u0hmpvqnaaw7uwg



**[deleted]** · 2mo ago

Their defense failed? Sure seemed to me that your buddy freeman fucked everyone around him lied and backstabbed and burned through 10s of thousands of dollars of their defense money.

⊖ ⬆ 0 ⬇    💬 Reply    ⬆ Share    ⋯

**IvanTTroll** · 2mo ago

Yes, their defense failed - they settled and gave Everytown what they wanted. They did not succeed in protecting people's anonymity, nor did their plan to act as a host of content instead of a publisher pan out.

Freeman did fuck fedcad over, yes - after fedcad tried to do the same to him. It really boils down to the absolute lack of communication and coordination skills found in the owner of fedcad - there's a reason FPC also bailed on him. It did become massively expensive for fedcad because they insist on using extremely expensive lawyers that consistently do them no favors - yet another reason FPC bailed.

Fedcad and it's owner take zero responsibility for the legal defense it demanded to be in charge of, then summarily ran straight into the ground. That alone should be a pretty clear indication of where their heads are at, without the other stuff. The manner in which fedcad attempted to scapegoat freeman for their own failures (not that freeman is absolved of all wrongdoing) is a sign. Freeman jumping ship absolutely did not compel anyone to settle, fedcad could have fought, but chose not to - because their strategy failed. Instead of swallowing his pride, the owner of fedcad pinned the failure on anyone but himself, and began a self-destructive meltdown that continues to serve no interest other than sating his need for attention.

It's very easy for him to blame freeman for all of his problems - it's easy to blame anyone else for any of the things he does wrong. But the way he's behaved and what he's turned fedcad into can't possibly be mistaken for an act taken with the community in mind.

⬆ 5 ⬇    💬 Reply    ⬆ Share    ⋯

**r/fosscad**    Join

**FOSSCAD**
A community dedicated to the discussion of 3D printed guns and related topics.

**100K** Members    **77** ● Online    **Top 2%** Rank by size ⬈

📁 r/fosscad
**Odysee Bought Themselves**
617 upvotes · 67 comments

📁 r/fosscad
**PLAR Taking Shape**
581 upvotes · 73 comments

📁 r/fosscad
**Made $1,200 trading in some $18 Chinese made AR-15 airsoft iron sights and 5 3d...**
566 upvotes · 70 comments

📁 r/fosscad
**Carbon Fiber Reinforced Brace**
▶ 0:17

 Generated by Gataleaks.org
File ID: GLS-kmarm1sa6gixtbt



**Freeman arrested, Gatalog reportedly comprom...**

78 upvotes · 60 comments

···    ↩    ⬆ **40** ⬇

 **RKspookware** · 28m

There is no compromise because that's not how the Gatalog works. The unencrypted chatroom of the Gatalog rocketchat is just as open as posting on Reddit. Cody is intentionally sewing seeds of doubt to interrupt community development.



jny the human ✓
@jnyboy

The person Cody says does IT for the Gatalog absolutely does not.

Source: I do the IT with entirely different people, chiefly Pew.

Now, I wonder if Cody Wilson will attempt to dox me to the ATF as he did with that person. Come at me, pedophile.

3:47 PM · Oct 22, 2024 · **1,105** Views

···    ↩ **Reply**    ⬆ **28** ⬇

 **ctrlpew** · 26m
FOSS/DEV

I wish more people would grasp that.

···    ↩    ⬆ **20** ⬇

 **OG_Fe_Jefe** · 1h

I wonder who the lawyer will be who will provide him representation ?

The article states "the best in the business"

I'd like to know the lawyers name,  and see if he had started an account for his legal defense.



DEFENSE DISTRIBUTED'S RESPONSES TO ELIK'S
REQUEST FOR PRODUCTION 11:

SEEKING INFORMATION RE: OBSTRUCTION OF
JUSTICE

Repeated in this production were:

Declaration of Erin Galloway in unrelated litigation:

Rajan Basra Article:

Galloway Declaration and Larosiere/Elik

The Erin Galloway Declaration, unsealed during *Everytown v. DEFCAD*, says a lot about how Larosiere and Elik run their operation.

Larosiere makes a distinction between "The Gatalog" and The Gatalog Foundation, a corporation in Florida. He and Elik made Alex Holladay represent "The Gatalog" in Everytown and pretend that he didn't know who ran the Odysee download accounts. Anyone can use the name, we are thousands of members, etc. This is Elik and Larosiere's preferred fantasy, but Everytown saw through it and pointed out the officers of the Gatalog Foundation are in business together in companies like MAF Corp, and clearly also run the Odysee account at issue in that case.

John Elik is the party named "Gatalog Printable Magazines" who never answered in the original suit. Odysee provided his email communication in response to the original takedown request from Everytown/Venable. The Galloway declaration shows that Elik mentions "Matt" and "our attorney." We know who this attorney is. Larosiere is not licensed to practice law in New York or Illinois, where Elik and Freeman1337/Peter Celentano live.

Larosiere directed Freeman1337 to drop out of the Everytown case when discovery was noticed. This is because Freeman/Peter Celentano is an IT administrator of "The Gatalog" and has access to all of their communications, which as of 2021/22 were not encrypted. Freeman then blamed his dropout on DEFCAD being an enemy actor who tried to doxx him to Everytown, and Elik and Larosiere ran with this to promote the FEDCAD meme in commerce. As pointed out in the GNET article and many posts I have saved, Freeman/Celentano (unbelievably) admits to his fraud and obstruction of justice.

Elik went out of his way to say he was not involved in the Everytown suit and that I (Cody Wilson) tried to extort him for $100,000 to continue the case or else I would give up Freeman's information to Everytown. This is a lie.

In the Galloway declaration Larosiere hangs himself re: the Gatalog and The Gatalog Foundation. He says he represents both for all matters of intellectual property.

Works for me.



c. Increased Legal and Compliance Costs: Defense Distributed incurred substantial expenses investigating the false claims, addressing user concerns, and responding to regulatory inquiries prompted by the Counterdefendants' unlawful activities.

159. These wire fraud acts therefore constitute predicate offenses under 18 U.S.C. § 1961(1) and form part of The Gatalog enterprise's pattern of racketeering activity, violating 18 U.S.C. § 1962(c). The use of wire communications was integral to the enterprise's scheme to defraud, demonstrating

Generated by Gataleaks.org
File ID: GLS—3hob1k52qg5gje6

that account hosts belong to me or have ever belonged to me. None of the files that account hosts or has hosted were created or uploaded by me. None of the files that account hosts or has hosted were upload through my website TheGatalog.com. A person with an Odysee user account cannot upload a file to Odysee through my website TheGatalog.com. I do not now know nor have I ever known who owns or uses the Odysee account THEGATALOG-PRINTABLEMAGAZINES.

9.    My website contains links to other websites that I do not own or control, much like this Court's COVID-19 webpage at https://www.nysd.uscourts.gov/covid-19-coronavirus contains a link to a webpage of the United States Centers for Disease Control at https://www.cdc.gov/coronavirus/2019-ncov/index.html. Any website can include a link to any other website regardless of ownership or control.

10.    Seeing Everytown's own name on exactly those items they so aggressively try to destroy sends the perfect political message about their



Generated by Gataleaks.org
File ID: GLS—p2xwrnrb013nnzd



and threatened on Twitter and other platforms. Threats ranged from communication of my personal views and beliefs to my employer in the hopes of getting me fired to threats to murder me and my family with our own firearms as "payment for lives lost at Sandy Hook."

6.  I do not live or work and have never lived or worked in the State of New York. I do not conduct business and have never conducted business in or with anyone in the State of New York. I do not own property in New York.

7.  I do live within the United States District Court for the Western District of Texas, and therefore I am amenable to personal jurisdiction and venue in that district.

8.  I have never sent any files as alleged in the Complaint to anyone in the State of New York.

9.  I have made a special and limited appearance in this case to contest jurisdiction and venue and also to address, as an emergency matter, this court's November 5, 2021 Order to Show cause which authorizes expedited discovery calculated to enable the Plaintiff to learn my true identity.

2

Ex.2A: COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

DEFENSE DISTRIBUTED'S RESPONSES TO ELIK'S
REQUEST FOR PRODUCTION 12:

SEEKING INFORMATION RE: DESTRUCTION OF
EVIDENCE

EX 2-A COMPOSITE OF DEFENSE DISTRIBUTED'S PRODUCTION

REPORT ON THE GATALOG'S CHAT.DETERRENCEDISPENSED.COM
Prepared August 17th, 2025

==================================

SECTION 1: Deleted Rooms

Since January 12th, 2025, at least 21 rooms have been deleted. These 21 are:

```
beta.ctrlpew.TacDaddy
beta.Ivan.CM-1
beta.ImmortalRevolt.ROGUE-9
beta.ImmortalRevolt.REBEL-9
beta.szeth.SBAD22
beta.Baconman121.COVID-22
beta.tjb556_Merlin
beta.generalscotty_trudeau-sks-mag
beta.timbrewslice_bidenbuybackblaster
beta.American762_PartyPopper
beta.space_privateer_SPACEJUNKV2
beta.hotsauce.FGC9_Stingray_Edition
beta.chairmanwon_bigpp95
beta.sevenperforce.ChuckleButton
beta.VanguardArms_Pathfinder.SingleShot22
beta.bad_face.epsilon-08
beta.digitalnimbus.InvaderPDW
beta.CJwelcome_SaberToothMac-9
beta.foobadoo_GGGR
beta.vogels.Vuurwapen_HMC9
beta.NTTH_AssaultDolphin9
gen.ghostgunner
```
 In addition, other rooms, such as beta.Ze_Carioca.Urutau, have been
configured to automatically delete ("prune") all posted messages older than a
certain age. This pruning functionality was introduced following receipt of
the litigation hold letter.

All files listed in the plaintiff's complaint had dedicated rooms at one
point in time. All of these rooms have been deleted. At least one of these
rooms (beta.Fuddbusters.Hitchhiker) was deleted following receipt of the
litigation hold letter.

==================================

SECTION 2: DELETED MESSAGES

Since August 17th, 2024, 26,010 messages have been deleted.

14,586 of these messages were in the 21 rooms noted above.

11,424 of these messages were deleted from rooms / channels which remain
open.

9,842 of the 11,424 messages mentioned above were deleted after January 12th,
2025

A-496

 Generated by Gataleaks.org
File ID: GLS-zm6v3jticfdzps2

nikolai.romanov (2024-03-02T20:08:04.693Z): In the most recent defcad tabloid info drop, who is Cody saying demanded 2500 bucks to let Cody post the fgc-9

nikolai.romanov (2024-03-02T22:22:09.687Z): Also, what does the gatalog administration have to say about these allegations that they were not being paid  enough by defcad

nikolai.romanov (2024-03-02T22:24:18.168Z): I am developing a full list of questions I will be publishing at some point, that I will require answers on. Until then none of my releases will be published through the gatalog.

Ivan (2024-03-02T22:48:03.830Z): Cody promised stark and I money in exchange for his and I's help in ensuring fedcad worked as a part of alpha testing. This never happened, and made stark mad enough that he didn't want the mk2 on fedcad, especially because fedcad was running behind a paywall. Cody, in one of his typical schizophrenic power fits, decided that he needed to lose another legal endeavor, and that he really really needed the mk2 to be on his site before he lost it. Stark didn't like this, because cody had failed on multiple promises up till then, and it's not like it was some secret that fedcad would be back behind a paywall the moment that they lost their endeavor (which they did). Sure enough, fedcad changes their TOS to entail that they own an exclusive license to every on their site right afterwards. Anyway, cody, in a fit of impotent rage, went around demanding that everyone follow his losing plan, when stark and I reminded him that he had a lot of good faith to earn back before anyone should trust him. He then proposed 2500 bucks, on his own, stark and I demanded that he implement the system that they currently have in place for paying developers.

Ivan (2024-03-02T22:48:50.057Z): All the while, the MK2 was freely available, as it has always been, in places that aren't very obviously so poorly managed that their existence is very easy to confuse to actions of the federal government

Ivan (2024-03-02T22:51:05.792Z): The thought was that if fedcad is going to be selling developer's work, the developers should get a cut. This idea, which cody originally proposed, made him extremely angry when it was brought back up. Mad enough that, years later, he's willing to dox people over it, evidently. Totally reasonable and rational behavior, as everyone has come to expect from fedcad — no greater offense than to ask them to honor their word, no greater insult than to point out this fact.

Ivan (2024-03-02T22:55:36.099Z): Fedcad fumbled the entire notion of being a platform to monetize development (when it came back, it was pitched to stark and I exclusively as a way to do this, basically a patreon for printed guns), they made it clear right out of the gate that was a lie, and continued to contradict it to the point that we are where we are today — developers seek to maintain their copyrights specifically so fedcad can't sell them, because fedcad has made it abundantly clear that their model (really, their execution of it) is fundamentally incompatible with the way this community actually works (works as in actually makes stuff that isn't just retarded gimmicks).

Ivan (2024-03-05T05:13:51.608Z): Not that I'm accusing you of being silly enough to take anything cody says at face value or as being the whole truth, but hopefully that answers your questions @nikolai.romanov
        (Reaction: thumbsup by iwillnotcomply.fgc, mountainman1776)

sparquah (2024-03-04T14:15:00.969Z): Imagine taking anything Cody has to say seriously
        (Reaction: laughing by ctrlpew, freeman1337, gerald.katz, iwillnotcomply.fgc)

Ivan (2024-03-04T14:19:01.057Z): If understand your position correctly as "wait is gatalog selling stuff to fedcad?", then you can rest assured that does not and will not happen. The MK2 was owned by Stark and to whatever extent I had helped out, by me. This was what Stark and I were promised, denied, then verbally assaulted for bringing back up, then chided for how stupid we were to ask him to honor his word, before he eventually capitulated (which evidently was humiliating enough for him that he's very mad about a little bit of money years later). Stark and I both did NOT want the MK2 to be sold on fedcad, but since cody insisted it must be there in order for him to shit up another legal effort, we demanded he honor his words about using fedcad to pay developers. As far as my memory recalls the conversation, we had brought back up the way the current payment system works, he had proposed a lump sum, in the end he did both, before shitting up the way the payment system works horribly and driving the site completely into the ground. Stark and I both appreciated the gravity of the MK2, and we did not want it to be something only accessible behind a paywall, but it's important to remember that at this point in time, we both still had hope that fedcad could become something worthwhile for the community (become an outlet for developers to get some form of monetization), and idea which cody later pretended that he never proposed, saying that developers have to figure everything out on their own (as he steals their files and sells them).
        (Reaction: point up by Dr. Death, iwillnotcomply.fgc)


Generated by Gataleaks.org
File ID: GLS-fnex0qjqjj9h9ra



**Rando Kneanderthal** ✔
@RKneegrow

The Cody Wilson death spiral continues. 🌀

> The undersigned law firm represents Defense Distributed and the firm's Director Cody Wilson. This letter triggers important legal obligations imposed upon you by the Federal Rules of Civil Procedure. You are advised to immediately seek any outside legal advice that is necessary to ensure timely compliance. Now that you are on notice, failure to comply will result in the most severe consequences authorized by law.
>
> ***Litigation Hold***
>
> The Federal Rules of Civil Procedure mandate that, once a person reasonably anticipates litigation, they must suspend its routine document retention/destruction practices and implement a "litigation hold" to ensure the preservation of relevant documents. Specifically, Federal Rule of Civil Procedure 37(e) can impose serious sanctions for failure to preserve electronically stored information, including but not limited to evidentiary preclusion, adverse inference instructions, default judgments, and contempt of court.
>
> Federal legal action against you is contemplated and either has already begun or will begin soon. You are therefore directed to immediately comply with all of the obligations regarding discovery imposed by the Federal Rules of Civil Procedure, including but not limited to the requirement of a full litigation hold. In particular, you are
>
> 917 Franklin Street, Suite 600, Houston, Texas 77002   713.228.5900   www.frlaw.us

11:54 AM · Nov 1, 2024 · **2,929** Views

💬 12    🔁 10    ♡ 92    🔖 5    ⬆

**Ktron (Queso-tron)** ✔ @uwu_hyna · 59m ···
What a fucking bitch made mfer. He really just grasping at straws at this point. Smdh.

💬 1    🔁    ♡ 24    📊 227    🔖 ⬆

**Rando Kneanderth** ✔ @RKneegro · 58m ···
Yup

💬    🔁    ♡ 7    📊 161

 Generated by Gataleaks.org
File ID: GLS—zf4z1ffnnghnz81

# Freeman

38 upvotes · 21 comments

 TM18271998 · 1h

all my chat logs with freeman are gone (i dont see his username anywhere), id have to assume he had a dead man switch to automatically delete all his logs on the chat, not that there was much in my logs anyways

 ··· ↩ Reply ⬆ 23 ⬇

 RKspookware · 1m

He burned everything after getting a threatening letter from Cody Wilson in the mail (before the raid).

··· ↩ ⬆ -1 ⬇

 Generated by Gataleaks.org
File ID: GLS—k1ynfs5r5wgzt6m




Generated by Gataleaks.org
File ID: GLS—4xc17vonsxw4btv



CHECKED PINNED MESSAGES

all 3 of my kits are the "S2" mainspring pattern. out of curiosity, let me know if you confirm you have an "S1" style.

**UberClay** Server Moderator · Admin · Moderator · Owner 10:27 PM
IMG_7440.jpg (4.47 MB)

October 15, 2024

**CodeNameMisfitz** 1:42 PM
I bought the kit freeman recommended from sarco so I'm not entirely sure what spring pattern that one included I'd have to go look

**gerald.katz** Admin 2:00 PM
Is s2 the one that's farther out? If so it's sarco

**UberClay** Server Moderator · Admin · Moderator · Owner 6:42 PM
Yes

That's the S2. 2 RIA and 1 Tisas all S2

Closer to the edge of the housing

Message #beta.UberClay.okboomer


Generated by Gataleaks.org
File ID: GLS—zaddapa44moyc4x




Generated by Gataleaks.org
File ID: GLS—84gpooxev462c6c




Generated by Gataleaks.org
File ID: GLS-l01tehmxelphdvn



Generated by Gataleaks.org
File ID: GLS—9d498cinq6r9m5c



**crafty_waffle** 2:39 PM
`ctrlpew` Another thing that may be helpful is automated metadata scrubbing for images, and scrubbing of messages older than a set time period
🔼 1

**ctrlpew** **Admin** 2:40 PM ✏️
Thanks, this is all being taken into account for the next software update.
👍 2

**m70b1jr** 2:42 PM

> **crafty_waffle** 10/22/2024
> @ctrlpew Another thing that may be helpful is automated metadata scrubbing for images, and scrubbing of messages older than a set time period

This would be huge

E2E, autoscrubbing, and then the ability to delete chats / rooms, but that might be a rocketchat limitation

**ethan.hall** 2:48 PM

> **ethan.hall** 10/22/2024
> > **nathan.mayer** 10/22/2024
> > You are accused of having access to the chats

This has been acknowledged publicly in the past by jny. If not using OTR they can read everything.


Generated by Gataleaks.org
File ID: GLS—zaddapa44moyc4x




Generated by Gataleaks.org
File ID: GLS—wn7eieqvaiq47x2

 **r/fosscad** · "Owner" of a Print

**GuardDenver** replied to **BumpStalk** 26 days ago

Chody is the only one pretending it's unsettled. The copyright act gives authors certain rights concerning their works. Regardless of if you consider designs code or if you consider them visual designs, copyright protects it regardless.

Chody desperately misunderstands the "useful article" distinction as though it applies to the original works themselves. In reality, a design depicting a useful article is protected by copyright - the same way a picture of a car's engine is protected, despite the engine itself being a useful article. The photograph wouldn't prevent someone else from making an engine identical to the one you pictured, however - because that crosses into the realm of patents. Clearly, your original work of authorship doesn't cover someone else making an engine.

This example should make how straightforward this all is for designs apparent: taking the actual, original work and copying it is prohibited. Chody will try and argue that it isn't, but the fact that he's already started putting copyright disclaimers back into models he previously removed them from is certainly a sign he knows that he's fucked up. His case trying to hinge on "3D models that depict something that could be used as a useful article can't be protected by copyright" is laughable, and his sudden reversal on removing copyright notices sure makes it seem like he might know deep down how ridiculous that idea actually is.

The fact that chody hasn't stolen the amigo verde and has suddenly stopped running his mouth about his "genius" whitepaper (the one where he admits to willful infringement) are yet more signs that he knows he's wrong.

 ⬆ 3 ⬇    ⬤ Reply    ⬀ Share    ⋯

 Generated by Gataleaks.org
File ID: GLS-zm6v3jticfdzps2

nikolai.romanov (2024-03-02T20:08:04.693Z): In the most recent defcad tabloid info drop, who is Cody saying demanded 2500 bucks to let Cody post the fgc-9

nikolai.romanov (2024-03-02T22:22:09.687Z): Also, what does the gatalog administration have to say about these allegations that they were not being paid  enough by defcad

nikolai.romanov (2024-03-02T22:24:18.168Z): I am developing a full list of questions I will be publishing at some point, that I will require answers on. Until then none of my releases will be published through the gatalog.

Ivan (2024-03-02T22:48:03.830Z): Cody promised stark and I money in exchange for his and I's help in ensuring fedcad worked as a part of alpha testing. This never happened, and made stark mad enough that he didn't want the mk2 on fedcad, especially because fedcad was running behind a paywall. Cody, in one of his typical schizophrenic power fits, decided that he needed to lose another legal endeavor, and that he really really needed the mk2 to be on his site before he lost it. Stark didn't like this, because cody had failed on multiple promises up till then, and it's not like it was some secret that fedcad would be back behind a paywall the moment that they lost their endeavor (which they did). Sure enough, fedcad changes their TOS to entail that they own an exclusive license to every on their site right afterwards. Anyway, cody, in a fit of impotent rage, went around demanding that everyone follow his losing plan, when stark and I reminded him that he had a lot of good faith to earn back before anyone should trust him. He then proposed 2500 bucks, on his own, stark and I demanded that he implement the system that they currently have in place for paying developers.

Ivan (2024-03-02T22:48:50.057Z): All the while, the MK2 was freely available, as it has always been, in places that aren't very obviously so poorly managed that their existence is very easy to confuse to actions of the federal government

Ivan (2024-03-02T22:51:05.792Z): The thought was that if fedcad is going to be selling developer's work, the developers should get a cut. This idea, which cody originally proposed, made him extremely angry when it was brought back up. Mad enough that, years later, he's willing to dox people over it, evidently. Totally reasonable and rational behavior, as everyone has come to expect from fedcad — no greater offense than to ask them to honor their word, no greater insult than to point out this fact.

Ivan (2024-03-02T22:55:36.099Z): Fedcad fumbled the entire notion of being a platform to monetize development (when it came back, it was pitched to stark and I exclusively as a way to do this, basically a patreon for printed guns), they made it clear right out of the gate that was a lie, and continued to contradict it to the point that we are where we are today — developers seek to maintain their copyrights specifically so fedcad can't sell them, because fedcad has made it abundantly clear that their model (really, their execution of it) is fundamentally incompatible with the way this community actually works (works as in actually makes stuff that isn't just retarded gimmicks).

Ivan (2024-03-05T05:13:51.608Z): Not that I'm accusing you of being silly enough to take anything cody says at face value or as being the whole truth, but hopefully that answers your questions @nikolai.romanov
    (Reaction: thumbsup by iwillnotcomply.fgc, mountainman1776)

sparquah (2024-03-04T14:15:00.969Z): Imagine taking anything Cody has to say seriously
    (Reaction: laughing by ctrlpew, freeman1337, gerald.katz, iwillnotcomply.fgc)

Ivan (2024-03-04T14:19:01.057Z): If understand your position correctly as "wait is gatalog selling stuff to fedcad?", then you can rest assured that does not and will not happen. The MK2 was owned by Stark and to whatever extent I had helped out, by me. This was what Stark and I were promised, denied, then verbally assaulted for bringing back up, then chided for how stupid we were to ask him to honor his word, before he eventually capitulated (which evidently was humiliating enough for him that he's very mad about a little bit of money years later). Stark and I both did NOT want the MK2 to be sold on fedcad, but since cody insisted it must be there in order for him to shit up another legal effort, we demanded he honor his words about using fedcad to pay developers. As far as my memory recalls the conversation, we had brought back up the way the current payment system works, he had proposed a lump sum, in the end he did both, before shitting up the way the payment system works horribly and driving the site completely into the ground. Stark and I both appreciated the gravity of the MK2, and we did not want it to be something only accessible behind a paywall, but it's important to remember that at this point in time, we both still have hope that fedcad could become something worthwhile for the community (become an outlet for developers to get some form of monetization), and idea which cody later pretended that he never proposed, saying that developers have to figure everything out on their own (as he steals their files and sells them).
    (Reaction: point up by Dr. Death, iwillnotcomply.fgc)


Generated by Gataleaks.org
File ID: GLS-c5enznjdosovmi7

behavior, as everyone has come to expect from fedcad — no greater offense than to ask them to honor their word, no greater insult than to point out this fact.

Ivan (2024-03-02T22:55:36.099Z): Fedcad fumbled the entire notion of being a platform to monetize development (when it came back, it was pitched to stark and I exclusively as a way to do this, basically a patreon for printed guns), they made it clear right out of the gate that was a lie, and continued to contradict it to the point that we are where we are today — developers seek to maintain their copyrights specifically so fedcad can't sell them, because fedcad has made it abundantly clear that their model (really, their execution of it) is fundamentally incompatible with the way this community actually works (works as in actually makes stuff that isn't just retarded gimmicks).

Ivan (2024-03-05T05:13:51.608Z): Not that I'm accusing you of being silly enough to take anything cody says at face value or as being the whole truth, but hopefully that answers your questions @nikolai.romanov
        (Reaction: thumbsup by iwillnotcomply.fgc, mountainman1776)

sparquah (2024-03-04T14:15:00.969Z): Imagine taking anything Cody has to say seriously
        (Reaction: laughing by ctrlnew, freeman1337, gerald.katz, iwillnotcomply.fgc)

Ivan (2024-03-04T14:19:01.057Z): If understand your position correctly as "wait is gatalog selling stuff to fedcad?", then you can rest assured that does not and will not happen. The MK2 was owned by Stark and to whatever extent I had helped out, by me. This was what Stark and I were promised, denied, then verbally assaulted for bringing back up, then chided for how stupid we were to ask him to honor his word, before he eventually capitulated (which evidently was humiliating enough for him that he's very mad about a little bit of money years later). Stark and I both did NOT want the MK2 to be sold on fedcad, but since cody insisted it must be there in order for him to shit up another legal effort, we demanded he honor his words about using fedcad to pay developers. As far as my memory recalls the conversation, we had brought back up the way the current payment system works, he had proposed a lump sum, in the end he did both, before shitting up the way the payment system works horribly and driving the site completely into the ground. Stark and I both appreciated the gravity of the MK2, and we did not want it to be something only accessible behind a paywall, but it's important to remember that at this point in time, we both still had hope that fedcad could become something worthwhile for the community (become an outlet for developers to get some form of monetization), and idea which cody later pretended that he never proposed, saying that developers have to figure everything out on their own (as he steals their files and sells them).
        (Reaction: point_up by Dr. Death, iwillnotcomply.fgc)

UberClay (2024-03-04T14:19:57.394Z): Fedcad is just throwing shit out there to take the heat off of them. What happened 10 years ago isn't part of the conversation (or really shouldn't be). What's happening now very much is. And what's happening now is a blight on the community at large and shouldn't be tolerated any longer. (IMO)

ctrlnew (2024-03-03T00:37:15.706Z): Indeed

UberClay (2024-03-04T14:22:59.785Z): 100% agree. I think the most pernicious thing Fedcad does is that they rope in less-aware people by dominating Google searches and tricking them into paying for access to free documents. Unfortunately, I don't know if there is a good or practical way to counter this.

nikolai.romanov (2024-03-03T02:21:16.866Z): That answers pretty much all of my questions

nikolai.romanov (2024-03-03T02:29:13.504Z): I am of course not blind to the idea that this is a misdirection, the shit slinging will only continue as we grow closer to the problem

nikolai.romanov (2024-03-03T02:29:24.894Z): As we root out this corruption bit by bit

nikolai.romanov (2024-03-03T02:30:01.457Z): I will still be writing a dissertation including all of the information I can find, and I would appreciate any perspective from anyone willing to share.

PaganGiraffe (2024-03-04T14:23:10.388Z): It's kind of sad to imagine all the money that has gone through that website and not to the developers in this chat.

nikolai.romanov (2024-03-04T14:23:11.853Z): Sad that money is involved period

nikolai.romanov (2024-03-03T02:32:21.424Z): I get people wanting to profit from their designs, and surely I cannot blame people like laffs for seeking such a thing, but it is not the act he did, but the company he keeps by doing so.



Generated by Gataleaks.org
File ID: GLS-gpbfxa8yffq19yb





Generated by Gataleaks.org
File ID: GLS—0btnzn3kmspl6ic



**IvanTTroll** · 10 hr. ago
Verified

Defcad stopped paying me because I refused to come up with $100k to keep them from doxxing Freeman1337 to Everytown. Like, right after Wilson demanded I fix his debts (for the legal shield defcad is meant to provide, lmao) my payouts on defcad were all garnished.

Nobody should be on that site or using it at all. It's a grift for Wilson to cling to relevancy and continue to ride on the coattails of others. Every single time the guy's word is put to the test he falls through.



15   Reply   Share   ...



Generated by Gataleaks.org
File ID: GLS—ai5b6cv745a41sn



**IvanTTroll** · 10 hr. ago

Verified

This isn't really the place for it, but as a heads up - defcad is not a legal shield for developers and they will blackmail you, refuse to pay out, and go around threatening your friends with the release of your info while also refusing to pay out to them if they are put under just the slightest legal pressure. If your files on their site gets them in trouble, they will be threatening you to extort money from you. Just in the Everytown lawsuit alone, Defcad cost this community more than they've ever paid out to developers.



⬆ 7 ⬇   💬 Reply   Share   ···



Generated by Gataleaks.org
File ID: GLS—m3d588ntt4jbgn1

 IvanTTroll · 10 hr. ago
Verified

They've never actually had a lawsuit conclude that 3D2A code is free speech. That's actually not a thing at all. They had one settlement that applied only to them, and Trump signed over and Obama-era rule change that moved technical data for semiautomatic sub-50 stuff out of ITAR, which created the CAD/CAM distinction which is where things sit.

 5 ⬇ 💬 Reply  Share  •••



Generated by Gataleaks.org
File ID: GLS—vufxeq96ejn7p8m



**kai542** · 2mo ago

It's ironic seeing this after someone made the comment Fosscad is about spreading the knowledge and skills as far as possible, let's take it down from alternative sites that could provide for other countries, if charging money, that's one thing, if free oh well

⊖  ⬆ -29 ⬇   💬 Reply   ⬆ Share   ...

**IvanTTroll** · 2mo ago

It's really unfortunate that this is what it's come to, but I really can't fault anyone who objects to fedcad pilfering from the community that they mock, insult, and look down on - all under some hilarious pretense that they're a "legal shield" (a story that comes apart with the slightest critical glance).

Things sure seem to have reached the point that less money in their pockets and more money in the pockets of the people building guns, designing guns, etc will help the signal far more than it'd be hurt by having fedcad stop stealing.

It's ends up being a paradox of tolerance question, and I reckon cutting out the rot of charing people money for free files (against the designer's wishes) is a preferable option to watching paid downloads become the standard, the way the community is perceived, and the grounds from which any sort of legal question surrounding banning file sharing need be addressed.

⬆ 25 ⬇   💬 Reply   ⬆ Share   ...

**lordofmmo** · 2mo ago

yeah defcad charges 60 a year, and what's more they ask for your SSN supposedly for ITAR or other inane bullshit so it's definitely not going to other countries through that trash fire of a site

⊖  ⬆ 19 ⬇   💬 Reply   ⬆ Share   ...

 Generated by Gataleaks.org
File ID: GLS—7k0vtsl8abjurdk

May 21, 2024

 **Dr._Death** Beta Manager Admin 10:14 AM 🖉
Beta information can be found here: https://gitlab.deterrencedispensed.com/deterrence-dispensed/information-and-tutorials/-/wikis/For-Users/Active-Beta-List

Current beta list.
#beta.freeman1337.ThePerpPincher - 3D printed Springfield Armory XD9 frame (full size and subcompact)
#beta.freeman1337_Wooly-Bully - 3D printed Taurus G3 frame

#beta.freeman1337_FannyBlaster-v2-stipples - 3D printed Taurus pt709 slim frame

beta.generalscotty_trudeau-sks-mag - Variable capacity SKS magazines optimized for 3D printing

beta.spookyspectre_waffle.mag - Spooky Waffle AR-15/AK Printable Magazine

beta.nguyenkvvn_PS522 - Pond Side 522 (Sig Sauer 522 Printable Receiver)

beta.nguyenkvvn_MERP - MPX beta

beta.chairmanwon_bigpp95 - Ruger P95 frame designed to take Glock 17 magazines

beta.VanguardArms_Pathfinder.SingleShot22 - Vanguards Single Shot Slam Fire .22 called the PathFinder

#beta.truandjust_Truger.SR22 - Truger sr22 - printable trigger frame for the Ruger sr22 pistol

beta.UpgrayDD1776_FreedomLPK - DIY AR springs, detents and pins

beta.10spanky.FDM-9 - 3D printed Glock 17 frame based off the FMG-9

beta.Hellreaver.Chelada - Monolithic printable .22 suppressor

beta.gerald.katz_Tomkatz.3032 - Beretta 3032 Tomcat frame.

#beta.ImmortalRevolt.FGC22 - A .22lr Fgc 9

#beta.ImmortalRevolt.FGC9_RIP - An improved FGC9 with a special memorial version dedicated to JStark.

beta.broletariat.Boring_ecm - A deep hole boring ecm, with a focus on barrels

#beta.ImmortalRevolt.V2_FGC_Triggergroup - An improved and strengthened fire control group

beta.geraldkatz_Manx.950b - A printable Beretta 950 Jetfire frame

beta.ze_carioca_Urutau - Diy bullpup 9mm

beta.Thaxian_BattoIsOutto.Butterfly - FIE Titan printable frame

beta.geraldkatz.Sphynx - A printable Beretta 92

beta.advanced.payment.MPC - DIY compact PDW

beta.kelli.blue.Groovy_Rocket_Flare - A printed 37mm rocket assisted flare

beta.kelli.blue.tripwire - A printable 12 ga tripwire alarm device

#beta.untangleworks.Accessory_Bundle - A bundle of printable firearm accessories



**Generated by Gataleaks.org**
**File ID: GLS—c9gswe3nzd9beyl**



@Dr._Death up and

> Message has been edited by
> UberClay at 10/3/2024, 6:09:41
> AM

**May 21, 2024**

**Dr._Death** Beta Manager Admin 10:14 AM ✎
Beta information can be found here: https://gitlab.deterrencedispensed.com/deterrence-dispensed/information-and-tutorials/-/wikis/For-Users/Active-Beta-List

Current beta list.
#beta.freeman1337.ThePerpPincher - 3D printed Springfield Armory XD9 frame (full size and subcompact)
#beta.freeman1337_Wooly-Bully - 3D printed Taurus G3 frame

#beta.freeman1337_FannyBlaster-v2-stipples - 3D printed Taurus pt709 slim frame

beta.generalscotty_trudeau-sks-mag - Variable capacity SKS magazines optimized for 3D printing

beta.spookyspectre_waffle.mag - Spooky Waffle AR-15/AK Printable Magazine

beta.nguyenkvvn_PS522 - Pond Side 522 (Sig Sauer 522 Printable Receiver)

beta.nguyenkvvn_MERP - MPX beta

beta.chairmanwon_bigpp95 - Ruger P95 frame designed to take Glock 17 magazines

beta.VanguardArms_Pathfinder.SingleShot22 - Vanguards Single Shot Slam Fire .22 called the PathFinder

#beta.truandjust_Truger.SR22 - Truger sr22 - printable trigger frame for the Ruger sr22 pistol

beta.UpgrayDD1776_FreedomLPK - DIY AR springs, detents and pins

beta.10spanky.FDM-9 - 3D printed Glock 17 frame based off the FMG-9

beta.Hellreaver.Chelada - Monolithic printable .22 suppressor

beta.gerald.katz_Tomkatz.3032 - Beretta 3032 Tomcat frame.

#beta.ImmortalRevolt.FGC9 - A .22lr Fgc 9

#beta.ImmortalRevolt.FGC9_RIP - An improved FGC9 with a special memorial version dedicated to JStark.

beta.broletariat.Boring_ecm - A deep hole boring ecm, with a focus on barrels

#beta.ImmortalRevolt.V2_FGC_Triggergroup - An improved and strengthened fire control group

beta.geraldkatz_Manx.950b - A printable Beretta 950 Jetfire frame

beta.ze_carioca_Urutau - Diy bullpup 9mm

beta.Thaxian_BattolsOutto.Butterfly - FIE Titan printable frame

beta.geraldkatz.Sphynx - A printable Beretta 92

beta.advanced.payment.MPC - DIY compact PDW

beta.kelli.blue.Groovy_Rocket_Flare - A printed 37mm rocket assisted flare

beta.kelli.blue.tripwire - A printable 12 ga tripwire alarm device


Generated by Gataleaks.org
File ID: GLS-7sl86ah1ntot5kp




Generated by Gataleaks.org
File ID: GLS—osqiufhfm9nqnq7

 r/fosscad
[deleted] · 1y

# Just a friendly PSA for those who don't know about FEDCAD (Defcad)

**i saw a thing online**

**FRIENDS DON'T LET FRIENDS USE**

# FEDCAD

"Friends don't let Friends use defcad.

Defcad's database has been hacked and dumped on multiple occasions. They do not encrypt their data, and keep it stored unsalted - all your information is in a row. That they never disclosed and breaches is reason enough not to use the site.

They pass off unusable, untested, bogus files as if they are working projects in order to milk money out of people. Wow! A 3D printable M82? That's so cool! Turns out it's a low-poly videogame model, but they won't say so until they've got your money. Additionally, for things that are actually tested and documented, they do not update files to latest versions - many out of date files to be found. That you can't (or shouldn't) trust the files you get there might be a signal not to use the site, but it gets better.

Defcad can, and has, doxxed developer information to antigunners. They did this with only the slightest pressure, and made no serious attempt to obfuscate. They then attempted to blackmail myself and others with our personal information in an attempt to force money out of us - to support a lawsuit where defcad was getting sued, and myself and such others were not. Certainly shady for a company that claims that it only collect money from users so that it can fight lawsuits. Of course, they forget to mention that they'll extort you and that they've yet to actually win a lawsuit.

And while I could go on, I'll leave you with the notion that Defcad is wretchedly awful, should be avoided, shouldn't be used, and should be publicly shamed.

We can discuss its founder having paid a 16 year old for sex and other outstanding things that your money will be used for if you give it to them another time!" - @NaviGoBoom

⇧ 1,495    ⇩        💬 135                    ↗ 265

 Generated by Gataleaks.org
File ID: GLS—gaatrheuokh9jp4

## Well this might mean the end for FOSS freedom.

23 upvotes • 26 comments

 Iwillnotcomply1791 • 14m

The FTN channel on the Deterrence Dispensed chatroom is deleted, by the creator of the FTN suppressors due to them freaking out because of this shooting.

 ••• ↩ ⬆ 2 ⬇

 Grouchy-Designer5804 • 8m

If that's true, it's a shame...but someone will carry it forward, like a quiet airborne disease. They think it eradicated but surprise it never was.

••• ↩ ⬆ 1 ⬇

 Iwillnotcomply1791 • 3m

100%, this will push more people towards the gatalog

 ••• ↩ ⬆ Vote ⬇


Generated by Gataleaks.org
File ID: GLS—34a9ixia7u04opg

 **ctrlpew** 1:22 PM
Now that we are all collected here.
Freeman was indeed arrested. Before his arrest he deactivated his accounts here and elsewhere across the internet. That said, as we have always said, this is a public chat. Mind your opsec and at least pretend to be legal. NFA things being NFA things the assumption we make is that you have an SOT and are doing things appropriately and that your testers do also.

 3



Generated by Gataleaks.org
File ID: GLS—akfzuws0dk9ofhs

⊖ ⭡ 43 ⭣ 🗨 Reply ⬆ Share ···

IvanTTroll
6mo ago

There was a point when designs were crapped out into file packs, often before even the designer had built or tested them. Most designs couldn't be assembled without extensive hand fitting, had no instructions to speak of, were often unsafe (if they could even actually get a round to fire), and generally made for a miserable experience for the builder. AR lowers with pin holes in the wrong spots, confusing instructions on using bushings, only to have the thing break in 30 rounds. Zero bureaucracy means zero ownership, and as far as the community was concerned, zero quality.

If a release doesn't have sufficient instructions such that most people will at least be able to build the thing the intended way, it's just not good for helping people make guns.

These sort of rushed, undertested projects do have a substantial downside, however. One which most in the community are now spoiled to the point of taking for granted - shoddy projects that end up being the base for future projects often end up infecting the future projects with their shoddy DNA. There are *hundreds* of printable AR lower projects that have the takedown pin holes and fire control group pin holes in the wrong spots. Not like a "nominal deviation from spec to help it print better", but like "an upper will not fit on that". This is all because Defense Distributed had released a lower ages ago that had these jacked up pin holes - the shoddy DNA it injected lead to a community conscious that AR lowers required too much precision to print (which is untrue), simply because that lower (which, ironically, got its incorrect pin hole locations from another lower model which was posted online from a guy who had taken measurements with calibers and made clear it wasn't perfect).

In a conversation about "the signal", it's important to contrast that with "the noise". It's my conviction that undertested, crapped out projects are "the noise", as *at best* they drive people away because they conclude that printing guns is either too hard or difficult, at worst someone hurts themselves.

Thus why bureaucracy (not really the right word, but it's your term so we'll stick with it) is important - imposing barriers on the circulation of projects until the limits are understood and the kinks worked out ensures that shoddy work doesn't propagate. Most file resharers don't go back to check for revisions, shoddy information becomes impossible to take down the same way we applaud the signal for being impossible to take down.

This should make it clear why certain betas would warrant being closed - if a project is particularly liable to having shoddy DNA, it warrants particular attention to make sure that it gets the work it needs. There's a stange tendency for those with little patience and a general unwillingness to help trying to take things that are in work and spread them, shoddy aspects and all, because they don't really understand the mechanisms of what makes 3D printed guns (as a concept) work.

This impatience and unwillingness is a far greater barrier and detriment to development and the furtherance of this movement than the "bureaucracy" you point to (which, frankly, is what brought printed guns out of their dark ages).

I hope this explainer helps clarify some of why things are done the way they are.

 Generated by Gataleaks.org
File ID: GLS—3suwijxeul7zdng

@Plaboiii

# This account doesn't exist

Try searching for another.

 Generated by Gataleaks.org
File ID: GLS—9mpmv4lqtlluq3q

and a sob ~~December 8, 2024~~ hard upbringing

 **m70b1jr** 7:16 PM

suppressor confirmed 3d printed now

wait

did the FTN4 room go byebye?

 **notsuspekt** 7:23 PM

Yep, looks gone lol

Best not to talk about it, homie broadcasted this intent when the event happened.

Let him lay low. 

 **m70b1jr** 7:24 PM

>  **notsuspekt** 7:23 PM
>
> Best not to talk about it, homie broadcasted this intent when the event happened.

I missed that memo, my bad

 Generated by Gataleaks.org
File ID: GLS—my7b2wjcwx51ak6

 r/fosscad
u/Appropriate-Ad2349 · 9m

## Is u/plaboiii safe?

Tell me if I should delete.

His reddit and Twitter/X accounts have been deleted.

 2 |   2  Share

 Iwillnotcomply1791 · 3m

He said that he would be laying low for now after this shooting of Brian Thompson, so that's why he deleted his social media accounts

···  Reply  Vote 

 Appropriate-Ad2349 OP · 1m

I figured this might be the case. Did he, or any keyboard lawyers, think he would have reason to be in hot water?

···   Vote


Generated by Gataleaks.org
File ID: GLS—yes1hhxgb9ygz9z



**CantoniaCustomsII** · 4mo ago

At this point being associated with a "design group" is a surefire sentence to have your design stuck in design/bureaucracy hell

⌄ ⬆ 45 ⬇ 💬 Reply ↱ Share ⋯

[deleted] · 4mo ago

Comment deleted by user

⊖ ⬆ ⬇ 💬 Reply ↱ Share

**Scout339v2** · 4mo ago

Lmfao this comment got two reports.

Stop having such weak skin, Ivan's got many points here.

⬆ 15 ⬇ 💬 Reply ↱ Share ⋯

**Somebodysomeone_926** · 4mo ago

The original fmda Glock project would be a good example of a major issue. The common visible line on the back of a lot of Glock models isn't a seam but a gaping hole in the model itself that you can only do so much to patch without reworking it entirely. In fact it's hard to find a fmda Glock that doesn't have that particular issue

⬆ 7 ⬇ 💬 Reply ↱ Share ⋯

⊕ 1 more reply

**__Remnants__** · 4mo ago

I'd argue that random people releasing somewhat untested designs on their odysee are even more likely to be stuck and forgotten. I've seen a million people doing this on here. There's a reason most people can't name any of those designs vs. those released through DD or AWCY.

⊖ ⬆ 10 ⬇ 💬 Reply ↱ Share ⋯

---

**r/fosscad**  [ Joined ]

**FOSSCAD**

A community dedicated to the discussion of 3D printed guns and related topics. FOSSCAD = Free Open Source Softwar...

Show more

**107K**  **39**  **Top 2%**
Members  ● Online  Rank by size ↗

**RULES**

1 Keep posts on topic and of high quality. ⌄

2 Be civil and don't troll. ⌄

3 Don't encourage or incite violence/criminal behavior. ⌄

4 Accounts must be at least 7 days old to post and comment. ⌄

5 Research your laws before printing or downloading. ⌄

6 Do not share firearm receiver or NFA 3D models files. ⌄



Generated by Gataleaks.org
File ID: GLS—537taib2fnhuhes




Generated by Gataleaks.org
File ID: GLS—x1xiaf52er8yy59




Generated by Gataleaks.org
File ID: GLS-u0hmpvqnaaw7uwg



**[deleted]** · 2mo ago

Their defense failed? Sure seemed to me that your buddy freeman fucked everyone around him lied and backstabbed and burned through 10s of thousands of dollars of their defense money.

⊖  ⇧ 0 ⇩   💬 Reply   ⬆ Share   ⋯

**IvanTTroll** · 2mo ago

Yes, their defense failed - they settled and gave Everytown what they wanted. They did not succeed in protecting people's anonymity, nor did their plan to act as a host of content instead of a publisher pan out.

Freeman did fuck fedcad over, yes - after fedcad tried to do the same to him. It really boils down to the absolute lack of communication and coordination skills found in the owner of fedcad - there's a reason FPC also bailed on him. It did become massively expensive for fedcad because they insist on using extremely expensive lawyers that consistently do them no favors - yet another reason FPC bailed.

Fedcad and it's owner take zero responsibility for the legal defense it demanded to be in charge of, then summarily ran straight into the ground. That alone should be a pretty clear indication of where their heads are at, without the other stuff. The manner in which fedcad attempted to scapegoat freeman for their own failures (not that freeman is absolved of all wrongdoing) is a sign. Freeman jumping ship absolutely did not compel anyone to settle, fedcad could have fought, but chose not to - because their strategy failed. Instead of swallowing his pride, the owner of fedcad pinned the failure on anyone but himself, and began a self-destructive meltdown that continues to serve no interest other than sating his need for attention.

It's very easy for him to blame freeman for all of his problems - it's easy to blame anyone else for any of the things he does wrong. But the way he's behaved and what he's turned fedcad into can't possibly be mistaken for an act taken with the community in mind.

⇧ 5 ⇩   💬 Reply   ⬆ Share   ⋯

**r/fosscad**   [Join]

**FOSSCAD**
A community dedicated to the discussion of 3D printed guns and related topics.

**100K** Members   **77** ● Online   **Top 2%** Rank by size ⬏

r/fosscad
**Odysee Bought Themselves**
617 upvotes · 67 comments

r/fosscad
**PLAR Taking Shape**
581 upvotes · 73 comments

r/fosscad
**Made $1,200 trading in some $18 Chinese made AR-15 airsoft iron sights and 5 3d...**
566 upvotes · 70 comments

r/fosscad
**Carbon Fiber Reinforced Brace**
▶ 0:17


Generated by Gataleaks.org
File ID: GLS-7ir0b7k2atm8kyf



kai542 · 2mo ago

It's ironic seeing this after someone made the comment Fosscad is about spreading the knowledge and skills as far as possible, let's take it down from alternative sites that could provide for other countries, if charging money, that's one thing, if free oh well

⊖   ⬆ -29 ⬇   💬 Reply   ⬆ Share   …

**IvanTTroll** · 2mo ago

It's really unfortunate that this is what it's come to, but I really can't fault anyone who objects to fedcad pilfering from the community that they mock, insult, and look down on - all under some hilarious pretense that they're a "legal shield" (a story that comes apart with the slightest critical glance).

Things sure seem to have reached the point that less money in their pockets and more money in the pockets of the people building guns, designing guns, etc will help the signal far more than it'd be hurt by having fedcad stop stealing.

It's ends up being a paradox of tolerance question, and I reckon cutting out the rot of charing people money for free files (against the designer's wishes) is a preferable option to watching paid downloads become the standard, the way the community is perceived, and the grounds from which any sort of legal question surrounding banning file sharing need be addressed.

⬆ 25 ⬇   💬 Reply   ⬆ Share   …

r/fosscad

**FOSSCAD**

A community dedicated to the discussion of 3D printed guns and related topics.

**100K**
Members

**77**
🟢 Online

**Top 2%**
Rank by size ⬈

🔖 r/fosscad

**Odysee Bought Themselves**

617 upvotes · 67 comments

🔖 r/fosscad

**PLAR Taking Shape**

581 upvotes · 73 comments

r/fosscad


Generated by Gataleaks.org
File ID: GLS—10ue79bd2wh3u6k

August 4, 2022

**Ivan** Admin · 10:17 AM
You can go ahead and completely delete everything, including any archived versions and my account itself. This should include any/all official FGC-9 models and packages too.

I'll be following up with a list of uploads which contain things I own which will need those items removed from the upload or the upload itself taken down entirely.

August 18, 2022

**Ivan** Admin · 8:56 AM
I noticed that while my account is deactivated for login and has it's email changed to one of your own, the files are still listed and viewable. I would appreciate if this was corrected soon. No listing of my files and work is to remain, and no reuploads of such is to be permitted. I would prefer this not have to get any more unpleasant than Cody has already managed.

August 29, 2022

**Ivan** Admin · 9:16 PM
Is this going to be resolved amicably?

**Ivan** Admin · 9:37 PM
I'm not ok with Cody using defcad as a tool to threaten and manipulate developers to get what he wants. I'm going to need all my files, including the FGC-9, completely removed from the site. Not "archived", but entirely removed. I do not want to be forced to publicly disavow defcad, but if you make it impossible to remove whatever mark of approval my account and files being visible on the site gives, I'll have no other course of action.

 Generated by Gataleaks.org
File ID: GLS-8jd0l8fk0w1x229



← **Post**

**Navi of Boomhandia** ✔ @NaviGoBoom · 1h
woah

💬    ⟲    ♡ 22    ᐧ|ᵢ 321    🔖 ↥

**Anon** ✔ @n0wayyy_no · 50m
How kind

💬    ⟲    ♡ 1    ᐧ|ᵢ 114    🔖 ↥

**NightTrace** @nighttrace · 51m
Not going to lie, if I were going to be hosting files about Ghost Guns on the internet I simply don't think I would put that shit in Germany. Pretty sure they have some real fucked up laws about that.

| # | IP ADDRESS | COUNTRY | LOCATION (CITY,REGION) | ISP | ORG | ASN |
|---|---|---|---|---|---|---|
| 1 | 128.140.46.27 | Germany | Nuremberg, Bavaria | Hetzner Online GmbH | Hetzner Online GmbH | AS24940 |
| 2 | 65.109.205.112 | Finland | Helsinki, South Finland | Hetzner Online GmbH | Hetzner Online GmbH | AS24940 |
| 3 | 141.94.2.52 | France | Gravelines, Hauts-de-France | OVH SAS | OVH SAS | AS16276 |
| 4 | 158.180.57.165 | Germany | Frankfurt, Hesse | Oracle Corporation | Oracle Corporation | AS31898 |
| 5 | 65.109.192.74 | Finland | Helsinki, South Finland | Hetzner Online GmbH | Hetzner Online GmbH | AS24940 |
| 6 | 116.203.234.64 | Germany | Nuremberg, Bavaria | Hetzner Online GmbH | Hetzner Online GmbH | AS24940 |

💬    ⟲    ♡ 11    ᐧ|ᵢ 139    🔖 ↥

 Generated by Gataleaks.org
File ID: GLS—f0k2xy5fnicivgq



**IvanTTroll** · 117d
Verified

You don't understand how IP works. Just because something is distributed for free (or at no direct cost to you) does not entitle you to make copies of it. Taylor Swift's music is free on spotify and youtube, that doesn't mean you can download it and sell it. Patents aren't even the relevant form of protection here.

···　↩　⬆ 14 ⬇


Generated by Gataleaks.org
File ID: GLS-yi8iqb30s2r9iok



 Generated by Gataleaks.org
File ID: GLS—9lu3mveqsxoo9r1

## Freeman arrested, Gatalog reportedly comprom...

78 upvotes · 59 comments

 **thejnyboy** · 2h
FOSS/DEV

> Gatalog reportedly compromised

This is a fabrication from Cody's side.

Freeman **has not** had access to the IT infrastructure of the Gatalog, Deterrence Dispensed, or any other related systems. CTRL+Pew, myself and two other individuals manage this infrastructure.

Unfortunately, Cody is posting with glee on the eve of a man losing his liberties to further his angst against the Gatalog due to FuddBuster's lawsuit. I find his knowledge of the case so close to the arrest and the fact that he ascertained Freeman's PII before the investigation extremely troubling, facts documented far better than his giddy celebration over the community's loss.

··· ← Reply ⬆ 19 ⬇

 Generated by Gataleaks.org
File ID: GLS—naq48kj88anxbzu

 **jny the human**  @jnyboy · 3h ···

Consider destroying or relocating anything spicy you possess if you've ever made fun of a certain pedophile. He has already informed on a person in our community as retribution.

 15    27    280    16K   

 **Eastern Import** @east_imp · 3h ···

@Radomysisky you a bitch ass kidfucker

 1   27 1    5    660

 **Eastern Import**   **Follow** ···
@east_imp

@Radomysisky you aint gonna do shit

3:13 PM · Oct 22, 2024 · **122** Views

   27 1    5   


Generated by Gataleaks.org
File ID: GLS—1r55axsrjw1kffa



 Generated by Gataleaks.org
File ID: GLS-c5enznjdosovmi7

behavior, as everyone has come to expect from fedcad — no greater offense than to ask them to honor their word, no greater insult than to point out this fact.

Ivan (2024-03-02T22:55:36.099Z): Fedcad fumbled the entire notion of being a platform to monetize development (when it came back, it was pitched to stark and I exclusively as a way to do this, basically a patreon for printed guns), they made it clear right out of the gate that was a lie, and continued to contradict it to the point that we are where we are today — developers seek to maintain their copyrights specifically so fedcad can't sell them, because fedcad has made it abundantly clear that their model (really, their execution of it) is fundamentally incompatible with the way this community actually works (works as in actually makes stuff that isn't just retarded gimmicks).

Ivan (2024-03-05T05:13:51.608Z): Not that I'm accusing you of being silly enough to take anything cody says at face value or as being the whole truth, but hopefully that answers your questions @nikolai.romanov
        (Reaction: thumbsup by iwillnotcomply.fgc, mountainman1776)

sparquah (2024-03-04T14:15:00.969Z): Imagine taking anything Cody has to say seriously
        (Reaction: laughing by ctrlpew, freeman1337, gerald.katz, iwillnotcomply.fgc)

Ivan (2024-03-04T14:19:01.057Z): If understand your position correctly as "wait is gatalog selling stuff to fedcad?", then you can rest assured that does not and will not happen. The MK2 was owned by Stark and to whatever extent I had helped out, by me. This was what Stark and I were promised, denied, then verbally assaulted for bringing back up, then chided for how stupid we were to ask him to honor his word, before he eventually capitulated (which evidently was humiliating enough for him that he's very mad about a little bit of money years later). Stark and I both did NOT want the MK2 to be sold on fedcad, but since cody insisted it must be there in order for him to shit up another legal effort, we demanded he honor his words about using fedcad to pay developers. As far as my memory recalls the conversation, we had brought back up the way the current payment system works, he had proposed a lump sum, in the end he did both, before shitting up the way the payment system works horribly and driving the site completely into the ground. Stark and I both appreciated the gravity of the MK2, and we did not want it to be something only accessible behind a paywall, but it's important to remember that at this point in time, we both still had hope that fedcad could become something worthwhile for the community (become an outlet for developers to get some form of monetization), and idea which cody later pretended that he never proposed, saying that developers have to figure everything out on their own (as he steals their files and sells them).
        (Reaction: point_up by Dr. Death, iwillnotcomply.fgc)

UberClay (2024-03-04T14:19:57.394Z): Fedcad is just throwing shit out there to take the heat off of them. What happened 10 years ago isn't part of the conversation (or really shouldn't be). What's happening now very much is. And what's happening now is a blight on the community at large and shouldn't be tolerated any longer. (IMO)

ctrlpew (2024-03-03T00:37:15.706Z): Indeed

UberClay (2024-03-04T14:22:59.785Z): 100% agree. I think the most pernicious thing Fedcad does is that they rope in less-aware people by dominating Google searches and tricking them into paying for access to free documents. Unfortunately, I don't know if there is a good or practical way to counter this.

nikolai.romanov (2024-03-03T02:21:16.866Z): That answers pretty much all of my questions

nikolai.romanov (2024-03-03T02:29:13.504Z): I am of course not blind to the idea that this is a misdirection, the shit slinging will only continue as we grow closer to the problem

nikolai.romanov (2024-03-03T02:29:24.894Z): As we root out this corruption bit by bit

nikolai.romanov (2024-03-03T02:30:01.457Z): I will still be writing a dissertation including all of the information I can find, and I would appreciate any perspective from anyone willing to share.

PaganGiraffe (2024-03-04T14:23:10.388Z): It's kind of sad to imagine all the money that has gone through that website and not to the developers in this chat.

nikolai.romanov (2024-03-04T14:23:11.853Z): Sad that money is involved period

nikolai.romanov (2024-03-03T02:32:21.424Z): I get people wanting to profit from their designs, and surely I cannot blame people like laffs for seeking such a thing, but it is not the act he did, but the company he keeps by doing so.